# EXHIBIT B

Case 3:23-cv-04804-WHA   Document 115-4   Filed 09/17/24   Page 2 of 9

ATTORNEYS' EYES ONLY
Transcript of Justin Armstrong, Corporate Designee & Individually      1 (1 to 4)
Conducted on August 22, 2024

```
                                    1                                                       3
 1           UNITED STATES DISTRICT COURT               1              A P P E A R A N C E S
 2          NORTHERN DISTRICT OF CALIFORNIA             2
 3    - - - - - - - - - - - - - -x                      3   ON BEHALF OF THE PLAINTIFF:
 4    ROADRUNNER RECYCLING, INC.,  :                    4        JOSEPH J. MELLEMA, ESQUIRE
 5              Plaintiff,    :  No 3:23-cv-04804-WHA   5        JEFFER MANGELS BUTLER & MITCHELL LLP
 6    vs.                     :                         6        3 Park Plaza, Suite 1100
 7                            :                         7        Irvine, California 92614
 8    RECYCLE TRACK SYSTEMS, INC.,  :                   8        Phone: (949)623-7200
 9    AND RECYCLESMART SOLUTIONS,                       9        E-mail: Jmellema@jmbm.com
10    INC.,                                            10
11              Defendants.                            11
12    - - - - - - - - - - - - - -x                     12   ON BEHALF OF THE DEFENDANTS:
13                                                     13        MATTHEW S. GALICA, ESQUIRE
14              ATTORNEYS' EYES ONLY                   14        MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
15                                                     15        AND POPEO, P.C.
16    VIDEOTAPED DEPOSITION OF ROADRUNNER RECYCLING, INC.,
         By and through its Designated Representative, 16        One Financial Center
17              JUSTIN ARMSTRONG,                      17        Boston, Massachusetts 02111
              and in his Individual Capacity
18              Pittsburgh, PA                         18        Phone: (617)542-6000
              Thursday, August 22, 2024
19                 9:34 a.m.                           19        E-mail: MSGalica@mintz.com
20                                                     20
21    Job No.: 548736                                  21
22    Pages: 1 - 214                                   22
23    Reported By: Brooklyn E. Schweitzer              23
24              RPR, CRR, CA CSR                       24
25                                                     25

                                    2                                                       4
 1         Videotaped Deposition of JUSTIN ARMSTRONG,   1             C O N T E N T S
 2    conducted at the offices of:                      2   EXAMINATION                             PAGE
 3                                                      3      By Mr. Galica                         8
 4                                                      4
 5         Hilton Garden Inn                            5
 6         Pittsburgh University Place                  6             E X H I B I T S
 7         3454 Forbes Avenue                           7   EXHIBIT                                 PAGE
 8         Pittsburgh, PA 15213                         8   Exhibit 345   Defendants' Amended 30(b)(1)
 9                                                      9                Notice of Deposition of Justin
10                                                     10                Armstrong                   42
11         Pursuant to Notice, before Brooklyn E.      11   Exhibit 346   Defendants' 30(b)(6) Notice
12    Schweitzer, Registered Professional Reporter,    12                of Deposition of Justin
13    Certified Realtime Reporter, Notary Public in and 13                Armstrong                   42
14    for the Commonwealth of Pennsylvania, and California 14 Exhibit 347  6/11/18 Emails
15    CSR No. 14612.                                   15                ROADRUNNER000016625 -
16                                                     16                ROADRUNNER000016631          43
17                                                     17   Exhibit 348   Context Viewpoint - RTN Use of
18                                                     18                Compology Saas
19                                                     19                ROADRUNNER000064439
20                                                     20   Exhibit 349   Architecture Diagram Key
21                                                     21                ROADRUNNER000072550          64
22                                                     22   Exhibit 350   Plaintiff's Identification of
23                                                     23                Trade Secrets
24                                                     24                ROADRUNNER000000097 -
25                                                     25                ROADRUNNER000000118          65
```

Page 5

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 351 | Locking a Container to as Service Location | |
| | RTS_00335593 - RTS_00335596 | 85 |
| Exhibit 352 | In-App Data Download | |
| | RTS_00335565 - RTS_00335568 | |
| Exhibit 353 | Fullness Notifications | 157 |
| | RTS_00335524 - RTS_00335528 | |
| Exhibit 354 | Contamination Notifications | |
| | RTS_00335704 - RTS_00335708 | 163 |
| Exhibit 355 | Rightsizing | |
| | RTS_00335903 - RTS_00335909 | 165 |
| Exhibit 356 | Web Data Collection Report Page Title: Rightsizing | |
| | RTS_00335894 - RTS_00335902 | 166 |
| Exhibit 357 | Web Data Collection Report Page Title: Contamination Notifications | |
| | RTS_00335697 - RTS_00335703 | 171 |
| Exhibit 358 | Web Data Collection Report Page Title: Fullness Notifications | |
| | RTS_00335517 - RTS_00335523 | 171 |

Page 6

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 359 | Web Data Collection Report Page Title: In-App Data Download | |
| | RTS_00335559 - RTS_003355564 | 171 |
| Exhibit 360 | Web Data Collection Report Page Title: Locking a Container to a Service Location | |
| | RTS_00335587 - RTS_00335592 | 172 |
| Exhibit 361 | Second Amended Complaint for (1) Trade Secret Misappropriation Under California Uniform Trade Secrets Act; (2) Trade Secret Misappropriation Under Defend Trade Secrets Act; and (3) Breach of Contract | 176 |
| Exhibit 362 | Compology API api.compology.com ROADRUNNER000024629 - ROADRUNNER000024633 | |
| Exhibit 363 | Compology API ROADRUNNER000024769 - ROADRUNNER000024775 | 191 |

Page 7

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 364 | U.S. Patent Application No. US 2020/0193620 A1 | |
| | RTS_00333112 - RTS_00333135 | 192 |
| Exhibit 365 | U.S. Patent Application No. US 10,943,356 B2 | |
| | RTS_00332217 - RTS_00332241 | 195 |
| Exhibit 366 | U.S. Patent Application No. US 2021/0158308 A1 | |
| | RTS_00333188 - RTS_00333209 | 199 |
| Exhibit 367 | Compology Waste Metering for Contamination Reduction | 204 |
| Exhibit 368 | Web Data Collection Report Page Title: Waste Metering Overview Presentation | |
| | RTS_00337209 - RTS_00337222 | 211 |

Page 8

P R O C E E D I N G S

VIDEOGRAPHER: Here begins Media No. 1 in the videotaped deposition of Justin Armstrong in the matter of RoadRunner Recycle, Incorporated, versus Recycle Track Solutions, Incorporated, et al., in the United States District Court, Northern District of California, Case No. 3:23-CV-04804-WHA.

Today's date is August 22nd of 2024, and the time on the video monitor is 9:34 a.m. The videographer today is Jacob Balistreri representing Planet Depos. This video deposition is taking place at 3454 Forbes Avenue, Pittsburgh, PA 15213.

Would counsel please voice identify themselves and state whom they represent.

MR. GALICA: Matthew Galica from Mintz Levin on behalf of Defendants.

MR. MELLEMA: Joseph Mellema from Jeffer Mangels Butler and Mitchell on behalf of Plaintiff.

VIDEOGRAPHER: The court reporter today is Brooklyn Schweitzer representing Planet Depos. The witness will now be sworn.

JUSTIN ARMSTRONG,
was called, and having been duly sworn,
testified as follows:
EXAMINATION

**73**

1  defined as -- like, the parameters that define that
2  model will be stored in a file.
3     Q.  Okay.  What kind of file?
4     A.  For the TensorFlow ones, they're called H5
5  files.  I don't really remember what kind of file it
6  is for the random forest.  It might be a pickle
7  file.
8     Q.  And the TensorFlow files, those are the
9  deep learning models?
10    A.  Yes.
11    Q.  And that's a -- an open source library?
12    A.  TensorFlow is an open source library.
13    Q.  Okay.  So you didn't design any of the
14 open source TensorFlow library, correct?
15    A.  Right.  I did not.
16    Q.  Okay.  Did you design the -- strike that.
17       Did you identify the parameters you wanted
18 to use in conjunction with the TensorFlow models?
19    A.  Do you mean hyperparameters, or --
20    Q.  Is there a difference between parameters
21 and hyperparameters?
22    A.  Yeah.
23    Q.  What's the difference?
24    A.  So parameters are what define the behavior
25 of the model, and they're learned through training.

**74**

1  Hyperparameters are parameters that are determined
2  by the person creating the model and are -- part of
3  the training process are trying different
4  combinations of hyperparameters and seeing what kind
5  of results you get.
6     Q.  So did you design any hyperparameters
7  using conjunction with TensorFlow models?
8     A.  I would say I selected, not designed, but
9  yes.
10    Q.  Okay.  So you didn't design them, then?
11    A.  Well, I don't really know what you mean by
12 designing hyperparameters.
13    Q.  Well, you said hyperparameters are
14 parameters that are determined by the person
15 creating the model.
16    A.  Mm-hmm.
17    Q.  What do you mean by that?
18    A.  So a typical hyperparameter in machine
19 learning training might be the batch size or the
20 learning rate.  Those are hyperparameters.  And so
21 you --
22 [redacted]
23 [redacted]
24 [redacted]
25 [redacted]

**75**

1  [redacted]
2  [redacted]
3        So I don't really know what the meaning of
4  the word "design" would be in relation to those.
5  You -- I think it -- it's more accurate to say that
6  you choose or select a combination of
7  hyperparameters and then train a model based on
8  those hyperparameters.
9     Q.  Okay.  And then what did you do with
10 respect to parameters in the context of designing
11 your models?
12    A.  So the -- the nature of machine learning
13 is that the parameters get set based on the training
14 data.
15    Q.  So you didn't do anything to set them,
16 correct?
17       MR. MELLEMA:  Objection; form.
18    A.  I trained the model.
19    Q.  Okay.  And that -- the parameters being
20 set is just a by-product of training the model?
21       MR. MELLEMA:  Objection; form.
22    A.  I would say it's the purpose of training
23 the model.
24    Q.  Okay.  So how were the parameters set
25 after you trained the model?

**76**

1     A.  I don't understand.
2     Q.  How does training a model set the
3  parameters of a model?
4     A.  It depends on what kind of model you're
5  talking about.  In the case of a deep learning model
6  or an artificial neural network, they get set
7  through an algorithm called backpropagation based on
8  the training data.
9     Q.  Okay.  And do you choose what parameters
10 you want to set, or is that something that is baked
11 into the open source model in the first instance?
12    A.  The open source framework implements an
13 algorithm that finds good values for the parameters.
14 There are oftentimes millions of parameters, so it's
15 not something you would be able to manually choose
16 values for.
17       The point of doing machine learning is
18 that you can find values for those parameters based
19 on the training data and not have to intervene
20 manually.
21    Q.  Okay.
22       MR. GALICA:  It's been just about another
23 hour.  It's probably a logical place for a break,
24 too.
25       THE WITNESS:  Okay.

Case 3:23-cv-04804-WHA   Document 115-4   Filed 09/17/24   Page 5 of 9

ATTORNEYS' EYES ONLY
Transcript of Justin Armstrong, Corporate Designee & Individually
Conducted on August 22, 2024
20 (77 to 80)

**Page 77**

1  VIDEOGRAPHER: All right. We are going
2  off of the record at 11:38 a.m.
3  (A recess was taken.)
4  VIDEOGRAPHER: We are going back on the
5  record at 11:49 a.m.
6  BY MR. GALICA:
7  Q. Does RoadRunner have a process for
8  tracking what it believes to be trade secrets?
9  A. No, I don't think so.
10  Q. Do you know who might know that?
11  A. No.
12  Q. Did Compology have a process for tracking
13  what it believed to be its trade secrets?
14  A. Not to my knowledge.
15  Q. Is there a policy for submitting ideas
16  that a RoadRunner employee believes to be trade
17  secrets?
18  A. No.
19  Q. Was there a policy or process for
20  submitting ideas that a Compology employee believed
21  to be trade secrets?
22  A. Not to my knowledge.
23  Q. Have you ever thought that any of your
24  design work amounted to a trade secret?
25  A. Yeah.

**Page 78**

1  Q. Which ones?
2  A. I think pretty much everything I've worked
3  on at Compology that hasn't been made public could
4  be considered trade secrets.
5  Q. So just because it's not public, you think
6  it's trade secret?
7  A. I think --
8  MR. MELLEMA: Objection; form.
9  A. I'm not a lawyer, but I -- my
10  understanding of what trade secrets are is that
11  they're valuable information that's not public.
12  Q. It seems like a rehearsed answer. Did you
13  discuss that with anybody before?
14  MR. MELLEMA: Objection to form.
15  A. I've done a lot of research about trade
16  secrets in response to this lawsuit coming up.
17  Q. What kind of research did you do?
18  A. I read some of the opinions that the judge
19  in the case wrote.
20  Q. Which ones?
21  A. I read an article about him, and I think I
22  read -- you think it was the Samsung-Google
23  decision, parts of it. I think there was another
24  case where -- that involved a -- like, an online
25  chat help company that I read.

**Page 79**

1  Q. Any other research?
2  A. I -- I've had conversations with friends
3  of mine that are lawyers about how trade secrets
4  work, how depositions work.
5  Q. Which friends?
6  A. Matt Witlicki and Eric Edison.
7  Q. And what did you discuss with them?
8  A. Just general stuff about how the law
9  treats -- treats things.
10  Q. What'd they tell you?
11  A. They weren't really experts in the field.
12  So they mostly gave me some ideas about what to
13  expect in terms of, you know, how long the case
14  would take, whether I would have to travel, whether
15  I would be in a deposition, stuff like that.
16  Q. What did they tell you about trade
17  secrets?
18  MR. MELLEMA: Objection; privileged. To
19  the extent you can answer without revealing
20  attorney-client communications, you can do so.
21  A. Yeah. In terms of stuff that I discussed
22  with my friends that aren't the attorneys in the
23  case about trade secrets, they didn't really have
24  much to say about it. Like I said, they are not IP
25  lawyers.

**Page 80**

1  Q. Okay. So based on all the research you
2  did, what's your understanding of trade secrets?
3  A. My understanding is that it's valuable
4  information that's not public.
5  Q. Okay. And with that understanding, what
6  of your design work do you consider to be a trade
7  secret?
8  A. I would say most of the work that I did at
9  Compology could fall under that umbrella.
10  Q. Can you give an example?
11  A. The work that I did to develop the right
12  sizing algorithm, for example, I think could be
13  considered a trade secret.
14  Q. Are you saying the idea or the feature of
15  right sizing is a trade secret?
16  MR. MELLEMA: Object to form.
17  A. I think that the method of right sizing.
18  So you asked if the idea of right sizing is a trade
19  secret. I don't know, actually. Could be.
20  Maybe it wouldn't be -- I mean, it wasn't
21  obvious to Compology that right sizing was the right
22  thing to build in the beginning. Part of being a
23  startup is trying things and learning what the
24  market actually needs.
25  So it could be, I guess. The idea of it.

Case 3:23-cv-04804-WHA   Document 115-4   Filed 09/17/24   Page 6 of 9

ATTORNEYS' EYES ONLY
Transcript of Justin Armstrong, Corporate Designee & Individually   21 (81 to 84)
Conducted on August 22, 2024

**81**

1  Q. So you're alleging that Compology's right
2  sizing feature is not public?
3      MR. MELLEMA: Objection; form.
4  A. I would say that the existence of the
5  right sizing feature is public.
6  Q. Okay. So, then, what about the right
7  sizing would you say is non-public?
8      MR. MELLEMA: Objection to form.
9  A. I would say that the -- the method of
10 right sizing is not public. I would say that the
11 specific inputs that go into right sizing are not
12 public.
13 Q. So it would be the deep learning model and
14 the specific inputs that you allege are nonpublic --
15     MR. MELLEMA: Objection to form.
16 Q. -- is that fair to say?
17     MR. MELLEMA: Objection to form.
18 A. No. So in the case of right sizing,
19 there's --
20 
21 but -- yeah. I would have to answer no to your
22 question.
23 Q. Okay. But then it would be at least the
24 
25 that constitute the method for right sizing that you

**82**

1  allege is not public --
2      MR. MELLEMA: Objection; form.
3  Q. -- correct?
4  A. I think that the -- there are lots of
5  things that constitute the right sizing process that
6  we haven't mentioned yet.
7  Q. Okay. What are they?
8  A. So you want me to describe the right
9  sizing process now?
10 Q. Yeah, that you believe is a trade secret.
11 A. Okay.
12     MR. MELLEMA: Objection; form.
13 A. 
14 
15 
16 
17 
18 
19 
20 
21 
22 
23 
24 
25 

**83**

1  And so with
2  that's -- sorry.
3  
4  
5  
6  
7  Q. And that's the specific method you used to
8  perform right sizing --
9  A. Yes.
10 Q. -- correct?
11     And where does the software code that
12 executes that method reside?
13 A. 
14 Q. What do you mean by in          ?
15 A. So          is the main Compology
16 application we were talking about earlier, and it's
17 also --
18 
19 Q. So the repository's called
20 literally?
21 A. Yeah.
22 Q. Okay. Who has access to that?
23 A. I do. I think -- so historically, other
24 software engineers at Compology, and now that we're
25 part of RoadRunner, there are a few people on the

**84**

1  RoadRunner tech team that have access. Certainly
2  Lucas Neffa, Aaron Harley, but I don't know the full
3  list of people.
4  Q. Do you know the software engineers at
5  Compology who had or have access to it?
6  A. I do.
7  Q. Can you name them?
8  A. I can name as many as I can remember right
9  now.
10 Q. Okay.
11 A. They don't have access -- sorry. I should
12 clarify.
13     None of them have access now.
14 Q. Okay.
15 A. But these are the people who have ever had
16 access --
17 Q. Mm-hmm.
18 A. -- to           Excuse me. So Jordan
19 Hamel, Tyler Benjamin, Matthew Dunkin, Mark
20 Stefanski, Clayton -- can't remember his last name.
21 Shandy Brown, Kyle Shepherd, Alicia Sedlock, Clarice
22 Robenalt, I believe, had access. She wasn't really
23 an engineer, but she was a data scientist. That's
24 all I can remember right now.
25 Q. Anybody outside of Compology or RoadRunner

Case 3:23-cv-04804-WHA   Document 115-4   Filed 09/17/24   Page 7 of 9

ATTORNEYS' EYES ONLY
Transcript of Justin Armstrong, Corporate Designee & Individually
Conducted on August 22, 2024
22 (85 to 88)

**85**

1  that has access to it?
2  A. I believe the lawyers in this case have
3  access to it now.
4  Q. Anybody else?
5  A. I don't think so.
6  Q. All right. I'm going to hand you a
7  document marked Exhibit 350. Let me know when you
8  get a chance to look at the first page.
9       (Exhibit 350 was marked for identification
10 and is attached to the transcript.)
11 A. Yeah. Okay.
12 Q. Do you recognize this document?
13 A. I do.
14 Q. What do you recognize it to be?
15 A. I think this is the identification of
16 trade secrets at issue in the lawsuit.
17 Q. Okay. If you turn to Page 4 of the
18 document, you'll see there's a heading "trade
19 secrets at issue in this suit."
20 A. Mm-hmm.
21 Q. Can you read Lines 13 and 19 to yourself?
22 Let me know once you've had a chance to do that.
23 A. Okay.
24    Okay.
25 Q. You see there's a list of trade secret

**86**

1  information numbered 1 through 6, correct?
2  A. I see that.
3  Q. Of that list, which trade secrets are you
4  knowledgeable about?
5  A. Mostly 6 and 5.
6  Q. Okay. Do you have any knowledge relating
7  to No. 4, image preprocessing camera apparatus by
8  machine learning training in operation?
9  A. I don't think so. I -- depending on what
10 that's actually referring to, I think it refers to
11 the processing of the image that happens on board
12 the device, which is not part of my wheelhouse.
13 Q. Do you know how that preprocessing is
14 performed?
15 A. I know a little about it.
16 Q. What do you know about it?
17 A. I think it's using a technique called
18 [REDACTED]
19 [REDACTED]
20 [REDACTED]
21 Q. And is that executed using firmware code?
22 A. Yes, I believe so.
23 Q. Okay. Did you design or develop any of
24 the firmware code?
25 A. No.

**87**

1  Q. Do you know who did?
2  A. Yeah.
3  Q. Who?
4  A. I think it would be Jay and Jacob.
5  Q. Is that Jay Longson?
6  A. That's right.
7  Q. And what is Jacob's last name?
8  A. Junker, I think. There have also been
9  other firmware engineers.
10 Q. And then do you have any knowledge with
11 respect to Nos. 1, the overall waste and recycling
12 meter system; 2, the smart camera apparatus; or, 3,
13 optical assembly and design?
14 A. So No. 1, I take it to mean the entire
15 system including the parts that I'm an expert on,
16 like 5 and 6. So I would have to say yes to one.
17    I don't really claim to know much about 2
18 or 3 or 4.
19 Q. Okay. And with the caveat that you're
20 only knowledgeable about No. 1, to the extent it
21 incorporates Nos. 5 and 6; is that fair to say?
22    MR. MELLEMA: Objection; form.
23 A. So I understand how the Compology system
24 works overall.
25    So does that answer your question?

**88**

1  Q. Do you understand the hardware components
2  in the Compology system?
3  A. Not in very much detail.
4  Q. And at what level detail do you understand
5  them?
6  A. I understand at probably a greater level
7  of detail than a non-technical employee of
8  Compology, but at a much lower level than the people
9  who actually worked on it.
10 Q. Do you know what hardware components are
11 implemented in different Compology devices?
12 A. I know a few. I certainly couldn't name
13 them with any kind of accuracy or specificity.
14 Q. If you saw a bill of materials, could you
15 say what device it relates to?
16 A. No, I don't think so.
17 Q. And you see Lines 20 and 21 on Page 4,
18 that the particular trade secrets at issue are
19 documenting a series of electronically stored files?
20 A. Mm-hmm.
21 Q. Do you know the electronically stored
22 files in which the trade secret information is
23 documented for Nos. 5 and 6?
24    MR. MELLEMA: Objection to form.
25 A. As far as I understand, that could mean

**109**

1  so working hours of Compology employees were spent
2  developing this.
3         MR. MELLEMA:  Objection to form.
4     A.  With this particular model, it was long
5  enough ago that I don't really remember how long I
6  spent on it, but it was typically several months of
7  work to get these up and running.
8     Q.  And was that full-time work?
9     A.  Yeah.
10    Q.  So you weren't working on any other models
11 during that time?
12    A.  During the time that I was working on this
13 model for several months, yeah, I wasn't working on
14 other models.
15    Q.  Okay.
16        MR. MELLEMA:  Is now a good time for a
17 break?  It's been about an hour.  Maybe for lunch?
18        THE WITNESS:  Sounds good to me.
19        MR. GALICA:  Yeah, we can do that, then.
20        VIDEOGRAPHER:  Okay.  We are going off of
21 the record at 12:44 p.m.
22        (A recess was taken.)
23        VIDEOGRAPHER:  We are going back on the
24 record at 1:34 p.m.
25 BY MR. GALICA:

**110**

1     Q.  You recall before lunch we were talking
2  about the subpar image detection model?
3     A.  Yeah.
4     Q.  It's on Page 15 of the document.
5     A.  Mm-hmm.
6     Q.  Can you identify the specific software
7  files that comprise this feature?
8     A.  Can you be more specific?
9     Q.  What is the model?  Can you point to a
10 file that defines the model for this?
11    A.  Yeah.  The model is stored in ▆▆▆▆.
12    Q.  That's the type of file?
13    A.  Yeah.
14    Q.  Do you know the name of the file?
15    A.  It probably has a name like Breaking Dawn
16 or Superman 4 or something like that.
17    Q.  Okay.  And where does the training data
18 used to train this model exist?
19    A.  In Compology, it exists in the Postgres
20 database, and the image values -- key value store,
21 S3.
22    Q.  Okay.  And Lines 21 through 28 describe
23 the method used to perform subpar image detection?
24        MR. MELLEMA:  Objection; form.
25    A.  Let me take a moment to --

**111**

1     Q.  Sure.
2     A.  You said 21 through 28?
3     Q.  Yep.
4     A.  I would say that that passage defines the
5  function of the SPID.  But your question was
6  different, I think.
7     Q.  Well, are you saying that the function of
8  SPID is the trade secret or something else is?
9     A.  I think we're saying that the function --
10 the existence and the function of SPID are trade
11 secret.
12    Q.  Okay.  So you don't believe that a feature
13 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ has ever been
14 disclosed to the public by you?
15        MR. MELLEMA:  Objection to form.
16    A.  Excuse me.
17        I don't know if it has.
18    Q.  You don't know one way or another?
19    A.  I -- I don't know if that -- ▆▆▆▆▆▆▆▆
20 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ has been
21 disclosed.  I also think that the way that you used
22 so or therefore or whatever it was in the phrasing
23 of your question connected it to the thing that you
24 said before, which is that the entire function of
25 the SPID, exactly what it does and exactly how it

**112**

1  works, is more than just the fact that something
2  exists that does that.  I think one piece of
3  information is a subset of the other.
4     Q.  So what is the trade secret, then?
5     A.  I'm so sorry.
6     Q.  Take your time.
7     A.  Go ahead.
8     Q.  Yeah.  So what is the trade secret, then?
9         MR. MELLEMA:  Objection to form.
10    A.  So I understand that the trade secret is
11 everything that's described in this section.
12    Q.  Okay.  And you would describe this -- how
13 would you describe the section?
14        MR. MELLEMA:  Objection to form.
15    A.  I mean, do you want me to read it, or --
16    Q.  Is it just the text, that's the trade
17 secret, nothing beyond that?
18    A.  I don't really know.  I mean, these are
19 kind of questions that seem like a lawyer should
20 answer.  I could explain my understanding of how
21 trade secrets work again, but...
22    Q.  So you don't know one way or another?
23    A.  I -- you're asking do I know if the text
24 is the entirety of the trade secret?
25    Q.  Yeah.

113

1   A.  I don't know if that's true or not.
2   Q.  Okay. You don't know one way or another?
3   A.  I think the text describes the trade
4   secret. I think that's how you can say it.
5   Q.  And just what the text says here,
6   nothing -- nothing beyond that?
7        MR. MELLEMA:  Objection to form.
8   A.  I'm sorry. I really don't understand what
9   you're asking.
10  Q.  Well --
11  A.  It seems like kind of an existential
12  question about what a trade secret is.
13  Q.  And you don't know what the trade secret
14  is, then --
15       MR. MELLEMA:  Objection --
16  Q.  -- is that correct?
17       MR. MELLEMA:  -- to form.
18  A.  I said that I don't know conceptually what
19  a trade secret is. I know what this trade secret
20  is.
21  Q.  Okay. What is this trade secret?
22  A.  This trade secret is the fact that we have
23  a system that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and the fact

114

1   that that is deployed the way it is within the
2   system, I think -- I think that's the trade secret.
3   Q.  Okay. So if there was another feature
4   that did something different than that, that
5   wouldn't be your trade secret, correct?
6        MR. MELLEMA:  Objection; form.
7   A.  So there are other trade secrets that are
8   at issue in the lawsuit, I think.
9   Q.  I'm just focusing on Lines 21 through 28.
10  A.  Okay.
11       MR. MELLEMA:  Same objection.
12  Q.  So you said the trade secret is the fact
13  that we have a system that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and
16  the fact that that is deployed the way it is within
17  the system, that's the trade secret.
18       Do you recall saying that?
19  A.  Yeah.
20  Q.  Okay. What's the specific way that the
21  images are classified in that previous answer you
22  gave?
23  A.  So there's four or five different ▮▮▮▮
24  ▮▮▮▮▮ that are really common in the waste industry
25  that we identified. And so ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

115

1   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
2        So that's what I meant when I said
3   specific way.
4   Q.  Okay. And if there were a feature that
5   didn't have those specific ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6   that wouldn't be your trade secret, right?
7        MR. MELLEMA:  Objection to form.
8   A.  If there were a feature?
9   Q.  Yeah.
10  A.  Like if there were a feature where --
11  Q.  I'm trying to understand if you're saying
12  that subpar image detection as a feature or concept
13  is the trade secret or the specific way in which you
14  perform subpar image detection is the trade secret?
15       MR. MELLEMA:  Objection to form.
16  A.  Yeah. The way that you worded that is a
17  little confusing to me.
18       The way in which we do it could mean the
19  method of implementation, or it could also mean,
20  like, what I was just saying about exactly what --
21  what is the ▮▮▮▮▮▮▮▮▮▮ that's being performed
22  there.
23  Q.  Okay. Are you saying the method of
24  implementation is the trade secret?
25  A.  No, I don't think so.

116

1   Q.  Okay. Are you saying that the specific
2   way in which ▮▮▮▮▮▮▮▮▮ is performed is the
3   trade secret?
4   A.  What do you mean by that?
5   Q.  I'm just going off of your previous
6   answer.
7        MR. MELLEMA:  Objection; form.
8   Q.  So you testified that there's a specific
9   way that ▮▮▮▮▮▮▮▮▮ s performed.
10       Do you recall saying that?
11  A.  Right. I was referring to the ▮▮▮▮▮▮
12  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
13  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
14  Q.  Okay. And is that the trade secret?
15  A.  It's part of the trade secret.
16  Q.  What else is part of the trade secret?
17  A.  The way --
18       MR. MELLEMA:  Objection; form.
19  A.  I -- so among the other things that are
20  parts of the trade secret are how -- the existence
21  or the idea of -- as I understand it, ▮▮▮▮▮▮▮▮
22  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
25  ▮▮▮▮▮▮▮▮▮▮ I would say are also elements