# EXHIBIT 3

Page 1

```
1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3   ----------------------------------------------X
4   ROADRUNNER RECYCLING, INC.,
5                  Plaintiff,
6                  CASE.: 3:23-cv-04804-WHA
7        -against-
8
9   RECYCLE TRACK SYSTEMS, INC., and
10  RECYCLESMART SOLUTIONS, INC.,
11                 Defendants.
11  ----------------------------------------------X
12      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
13          VIDEOTAPED DEPOSITION OF
14            FORREST A. VICKERY
15            NEW YORK, NEW YORK
16              October 2, 2024
17
18  REPORTED BY:  KIARA MILLER
19  FILE NO.:  554078
20
21
22
23
24
25
```

Page 2

```
1          UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3   ----------------------------------------------X
4   ROADRUNNER RECYCLING, INC.,
5                  Plaintiff,
6                  CASE.: 3:23-cv-04804-WHA
7        -against-
8
9   RECYCLE TRACK SYSTEMS, INC., and
10  RECYCLESMART SOLUTIONS, INC.,
11                 Defendants.
12  ----------------------------------------------X
13
14      Deposition of FORREST A. VICKERY, taken on
15      behalf of DEFENDANT, at REMOTE LOCATION, New
16      York, New York, commencing at 11:07 a.m.,
17      October 2, 2024, before Kiara Miller.
18
19
20
21
22
23
24
25
```

Page 3

```
1   A P P E A R A N C E S:
2
3   ON BEHALF OF PLAINTIFF:
4        JEFFER, MANGELS, BUTLER & MITCHELL, LLP
5        2 Embarcadero Center, 5th Floor
         San Francisco, CA 94111
6        EMAIL: SGIBSON@JMBM.COM
7        BY:   STANLEY M. GIBSON, ESQ.
8
9   ON BEHALF OF DEFENDANTS:
10       MINTZ, LEVIN, COHN, FERRIS, GLOVSKY &
         POPEO, P.C.
11       One Financial Center
         Boston, MA 02111
12
13       EMAIL: JJTHOMSON@MINTZ.COM
14       BY:   JAMES J. THOMSON, ESQ.
15
16
17
18
19  ALSO PRESENT:
20  VIDEOGRAPHER, JACK DUNN
21  ZOOM TECH, MIKE MARTINEZ
22
23
24
25
```

Page 4

```
1    TECH MARTINEZ:  We will record the
2    meeting for backup purposes.
3    Thank you to everyone for attending
4    this proceeding remotely, which we
5    anticipate will run smoothly.  Please
6    remember to speak slowly and do your
7    best not to talk over one another.
8    Please be aware that we are recording
9    this proceeding for backup purposes.
10   Any off-the-record discussions should
11   be had away from the computer.  Please
12   remember to mute your mic for those
13   conversations.  Please have your video
14   enabled to help the reporter identify
15   who is speaking.  If you're unable to
16   connect with video and are connecting
17   via phone, please identify yourself
18   and state who is speaking.  I
19   apologize in advance for any technical
20   related issues.  Thank you.
21   VIDEOGRAPHER:  Here begins Media No. 1
22   in the videotaped deposition of
23   Forrest Vickery, in the matter of
24   Roadrunner Recycling, Incorporated v.
25   Recycle Track Systems, Incorporated
```

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

2 (5 to 8)

---

**5**

1  and RecycleSmart Solutions,
2  Incorporated. In the United States
3  District Court, Northern District of
4  California. Case
5  No. 3:23-CV-04804-WHA.
6  Today's date is October 2nd, 2024.
7  The time on the video monitor is 11:07
8  Eastern time. The remote videographer
9  today is Jack Dunn representing Planet
10 Depos. All parties of this video
11 deposition are attending remotely.
12 Would counsel please voice identify
13 themselves and state whom they
14 represent.
15 MR. THOMSON: This is James Thomson of
16 the law firm Mintz, representing
17 Defendants.
18 MR. GIBSON: Stan Gibson on behalf of
19 Roadrunner.
20 VIDEOGRAPHER: The court reporter
21 today is Kiara Miller. The witness
22 will now be sworn.
23 F O R R E S T  V I C K E R Y, after having first
24 been duly sworn by a Notary Public of the State of
25 New York, was examined and testified as follows:

**6**

1  COURT REPORTER: Please state your
2  name and address for the record.
3  THE WITNESS: Forrest Vickery.
4  Business address is 100 Howe Avenue,
5  Suite 220N, Sacramento, California,
6  95825.
7  EXAMINATION BY
8  MR. THOMSON:
9  Q   Good morning, Mr. Vickery. We just went
10 over -- could you please state and spell your
11 name for the record?
12 A   Yeah, Forrest, F-O-R-R-E-S-T, Vickery,
13 V-I-C-K-E-R-Y.
14 Q   And what is your current address?
15 A   My work address is 100 Howe Avenue,
16 Suite 220N, Sacramento, California 95825.
17 Q   Okay. So I take it you've been deposed
18 before; is that accurate?
19 A   Yes.
20 Q   Approximately how many times?
21 A   I think about 60 or more than 60.
22 Q   Do you have a copy of your -- the
23 reports that you issued in this matter in
24 front of you?
25 A   Yes, I do. I have copies of them here.

**7**

1  Q   Okay. And on Page 7 of your opening
2  report, it lists a number of cases under the
3  header entitled "Deposition."
4      Is that list accurate and up-to-date?
5  A   Yes.
6  Q   Okay. Is that list in chronological
7  order?
8  A   I believe it is. I'd have to
9  double-check, but I can verify if you want.
10 Q   Okay. Were you last deposed on July 25,
11 2024?
12 A   That sounds about right, yeah.
13 Q   Okay. Based on your experience, I won't
14 go over all of the deposition ground rules
15 today, but you understand that you are under
16 oath today?
17 A   Yes.
18 Q   Okay. And you understand that your
19 testimony is being transcribed and
20 videotaped?
21 A   I do.
22 Q   Is there any reason you cannot testify
23 fully and truthfully this morning?
24 A   No.
25 Q   And where are you testifying from today?

**8**

1  A   I am at my personal residence.
2  Q   Are you using your personal computer?
3  A   No. It's my work computer.
4  Q   Okay. Other than the deposition
5  software that's running right now, is there
6  anything else running on your computer?
7  A   Honestly, I don't know.
8  Q   Do you have anything up that you can
9  receive communications on, email, chat,
10 otherwise?
11 A   Oh. I mean, I can -- I don't know if
12 it's open, but I will close it.
13     Okay. So, no, I don't.
14 Q   You already mentioned you have printed
15 copies of both of your reports?
16 A   I do.
17 Q   Okay. Do they have annotations of any
18 kind on them?
19 A   Do they have what?
20 Q   Annotations of any kind on them.
21 A   No. They're blank. They're blank
22 copies.
23 Q   Did you bring anything else with you
24 today?
25 A   No. The only other things I have is a

9

1  copy of Holzen's two reports.
2  Q   Mr. Vickery, can you provide an overview
3  of your educational background?
4  A   Yeah.  I have a Bachelor's of Arts in
5  Honors Economics with a minor in mathematics
6  from UC Irvine, University of California,
7  Irvine.
8     And subsequent to that I went to work,
9  and then I got a credential as an accredited
10 senior appraiser, business valuation
11 discipline with the American Society of
12 Appraisers.
13    And then just general continuing
14 education.
15 Q   What is the genuine -- or general
16 continuing education that you've received?
17 A   Yeah.  I mean, it's -- I have
18 requirements for CE credits, just like
19 lawyers do, to maintain my credential, which
20 I've renewed several times.  There's hourly
21 requirements over certain time periods and
22 then webinars and other, you know,
23 specialized sort of trainings.
24 Q   Do you currently work at -- is it Sanli
25 Pastore & Hill?

10

1  A   Close.  It's Sanli Pastore & Hill.
2  Q   The wrong emphasis.
3     What is the nature of your work at --
4  can we use "SPH", "SP&H"?
5  A   Yeah.
6  Q   Okay.  What is the nature of your work
7  at SP&H?
8  A   Yeah, so for me it's -- you know, I
9  would say about half of it's related to
10 valuation work, so business valuation,
11 business appraisal.  The other half would be
12 related to economic damages, lost profits,
13 you know, some financial opinions and
14 disputes, providing expert testimony on a
15 variety of different topics.
16 Q   The 50 percent that is involved in
17 valuation and appraisal work, what types of
18 businesses are you usually doing that type of
19 work for?
20 A   Oh, it's all over the place.  We don't
21 specialize in any particular industry, so it
22 can be anywhere from tech to medical to
23 manufacturing, wholesale.  Here in northern
24 California, you get a lot of ad companies.
25 So it's really -- it's a very varied -- very

11

1  varied, yeah.
2  Q   In your litigation work, how often are
3  you representing plaintiffs versus
4  defendants?
5  A   I don't really think about it that way.
6  I've never counted.  You know, it's just
7  whoever reaches out for an opinion one way or
8  the other.  So that's not really what I'm
9  looking for, to be plaintiff side or
10 defendant's side.  I actually don't know the
11 answer to that question.
12 Q   How many times have you testified in a
13 court or a tribunal?
14 A   I think it's about -- so with
15 arbitration and trial, probably about 20
16 times.  Those cases are listed in my CV or
17 report.
18 Q   The list under Mediation, Arbitration
19 and trial are up-to-date and accurate?
20 A   I believe so.  We try to keep that
21 current.
22 Q   Okay.  How many of those cases have
23 involved trade secrets?
24 A   In the trial?
25 Q   Well, let's start on how many cases have

12

1  you been involved in that involve trade
2  secrets?
3  A   Let me check here.  I need to review
4  that.  Bear with me.
5     I don't believe any of these -- well,
6  Patriot may have.  I don't recall -- there
7  was a variety of different issues involved in
8  that case.  I don't recall whether trade
9  secrets was a component of that.
10 Q   Is that under "Depositions"?  You
11 mentioned "Patriot."
12 A   Oh, it's No. 6 in "Trial."  It's been
13 ten years.  I don't recall all of the issues
14 there.
15    I just remember there were a number of
16 claims in the causes of action.  I can't
17 recall if company had trade secrets were
18 involved with it or not.
19 Q   So aside from the Patriot Rail Corp.
20 matter, any of the other cases you've been
21 involved in involve trade secrets?
22 A   Not in my testimony.
23 Q   Okay.  Are there any cases not listed on
24 your CV that you were involved in that
25 involved trade secrets?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONEY

Transcript of Forrest A. Vickery

Conducted on October 2, 2024

4 (13 to 16)

---

13

1  A   Not from the litigation.  Well, let's
2  see because cases often settle, um.
3      I can't recall the exact names of any,
4  but I know deal with trade secrets in the
5  past, cases may not have gone to trial or
6  deposition.
7  Q   Okay.  Is this case the first time that
8  you've rendered an opinion on economic
9  damages for misappropriation of trade
10 secrets?
11    MR. GIBSON:  Object to form.
12 A   Unless I did that in the Patriot Rail,
13 slash -- the Patriot Rail matter, I just
14 don't recall the full scope of that.
15 Q   Have you done any work on behalf of
16 Roadrunner before?
17 A   No.
18 Q   Okay.  Have you done any work on behalf
19 of Compology before?
20 A   No.
21 Q   Okay.  Have you ever done any work with
22 Jeffer, Mangels, Butler & Mitchell before?
23 A   Yes.
24 Q   Okay.  And what was the nature of that
25 work?

---

14

1  A   One project involved damages associated
2  with a winery inventory loss and sort of
3  economic losses associated with that.
4  Another project involved -- I think it was
5  copyright trademark infringement damages.
6  Q   Okay.  Do you recall the name of the
7  case that involved the winery loss?
8  A   Yes.  It's called Wise Villa.
9  Q   Okay.  And do you recall the name of the
10 case that you rendered an opinion on
11 copyright and trademark damages?
12 A   One second.
13    Not off the top of my head, yes.
14 Q   Do you recall approximately how long ago
15 that was?
16 A   That was probably a year or two ago.
17 Yeah, just the name is escaping my mind right
18 now.
19 Q   You're being compensated for all of your
20 work on this case; is that accurate?
21 A   Yes.
22 Q   And if I understand your report right,
23 you were compensated at a rate of $550 per
24 hour for all work prior to issuing your
25 initial report, and then subsequent, your

---

15

1  rate goes up to 650 an hour?
2  A   For my time, yes.
3  Q   Okay.  As of the date of your initial
4  report, is it accurate that you have invoiced
5  approximately $61,000 to Roadrunner?
6  A   That was the total fees incurred, yeah.
7  Q   Okay.  Approximately how many hours have
8  you spent working on this case so far?
9  A   Oh, I don't know.  That's really hard to
10 estimate.  It would be reflected in invoices,
11 and some of the time is by my staff who are
12 supporting me in the work.
13 Q   At a high level, what were you asked to
14 do in this case?  What work were you asked to
15 perform?
16 A   To determine -- you know, assuming
17 liability, determine lost profits suffered by
18 Roadrunner/Compology and then any forms of
19 unjust enrichment experienced by
20 RecycleSmart.
21 Q   Okay.  And how did you go about
22 determining lost profits?
23 A   The lost profits were connected to
24 assuming that the contracted, you know, would
25 have continued at the prior rates.  So that

---

16

1  basically it's had misappropriation not
2  occurred, Compology/Roadrunner could have
3  continued to receive, you know, their fees
4  throughout continuation of the contract.
5  Q   Okay.  Assuming that the breach of
6  contract claims stem from the
7  misappropriation of trade secrets?
8     MR. GIBSON:  Objection to form.
9  A   You know, I suspect that's probably a
10 legal characterization, and I'm not going to
11 step my toes in the legal world.  I'll just
12 say that I understand that, you know, there's
13 alleged misappropriation, and there's an
14 alleged breach of contract, and that's a
15 reflection of the lost profits associated
16 with the claims made in the case.
17 Q   Okay.  What types of documents did you
18 review in your analysis?
19 A   Well, we received -- I mean, they're
20 broadly described, but we received various
21 financial records pertaining to
22 Roadrunner/Compology.  We also reviewed
23 additional business plans or projections
24 provided by Roadrunner.
25 We received various company documents

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

5 (17 to 20)

17

1 pertaining to the Pello and RecycleSmart, and
2 there were other sort of varied documents,
3 emails, budgets, other things that came
4 through as well. So general company
5 information around both of the companies and
6 whatever financial records were available.
7 Q   Okay. Did you review Defendant's
8 development costs related to their Pello
9 device?
10 A   We did -- I did see they had some
11 estimates of going-forward cost savings. And
12 I believe there may have been a document that
13 pertained to some estimates or budgets on
14 cost.
15 Q   You say you haven't seen all of the
16 documents related to the development of the
17 Pello device?
18 A   Well, I mean, I can only say that I've
19 seen what I was provided, and whether that's
20 all of them, I don't know, right. I can only
21 say that I've seen the ones that have been
22 provided to me. So it's not clear to me
23 whether that is comprehensive or not.
24 Q   Do you think it would have been relevant
25 to your opinion to review all of the

18

1 financials related to the development of the
2 Pello device?
3       MR. GIBSON:  Objection to form.
4 A   Well, you know, as to the financials, it
5 may provide a reflection of, you know, costs
6 that were incurred for certain purposes. I
7 mean, what -- the way I'm looking at the
8 development costs here is looking at that
9 sort of Plaintiff's costs incurred, you know,
10 for what -- for the trade secrets that were
11 allegedly misappropriated.
12 Q   Were the costs that Defendant's incurred
13 in development of the Pello device less
14 relevant to your analysis?
15       MR. GIBSON:  Objection to form.
16 A   Well, I think as it relates to how I'm
17 estimating the cost associated with the
18 alleged misappropriation, I'm using the
19 plaintiff's cost as a, you know, proxy for
20 what those total development costs are and
21 have been.
22 Q   In that analysis Defendant's actual
23 costs aren't relevant as long as you have
24 Plaintiff's cost to use as a proxy?
25 A   Well, it's -- you know, I don't have --

19

1 you know, if it's just financial records, you
2 know, that's a reflection of certain costs,
3 but what I do know is what Compology
4 developed. I know what those actual costs
5 were to develop that, those trade secret
6 assets.
7 Q   At the time of your opening report, you
8 had only reviewed the deposition transcript
9 of -- it looks like Jason Gates, Steve Krebs
10 and Carl Anderson; is that accurate?
11 A   I'd have to look. That sounds familiar,
12 right. And I know we subsequently received
13 several other deposition transcripts.
14 Q   Okay. Did you ask for those transcripts
15 specifically?
16       MR. GIBSON:  Objection to form.
17 A   Are you asking about the ones that are
18 listed in the report or the additional --
19 Q   Yeah, in your opening report, yeah, did
20 you ask specifically for the deposition
21 transcripts of Messrs, Gates, Krebs and
22 Anderson?
23 A   Well, I would say yes to Gates
24 certainly, Krebs certainly. Anderson, I
25 think, was provided to us just in the course.

20

1 Q   And why did you request the deposition
2 transcript of Mr. Gates and Mr. Krebs?
3 A   Because I wanted to read the testimony
4 that related to Roadrunner and Roadrunner's
5 acquisition of the trade secrets and the use
6 of the trade secrets.
7 Q   Is it your understanding that those are
8 the only two transcripts that related to
9 Roadrunner's acquisition of the trade
10 secrets?
11 A   From a leadership perspective at the
12 time, I think you have, I believe, Graham
13 Rihn was later deposed and Jay Longson.
14 Q   Okay. So subsequent to issuing your
15 opening report, you reviewed the depositions
16 of -- it looks like Leo Hoarty, Graham Rihn,
17 Benjamin Chehebar and Jay Longson; is that
18 accurate?
19 A   I believe that's correct.
20 Q   Okay. If you have your reply report in
21 front of you, I think it's on Page 4 --
22 sorry, it's Page 3. It's Page 4 of the PDF.
23 A   I have it.
24 Q   Okay. Why did you review these
25 transcripts for your reply report only?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Forrest A. Vickery

Conducted on October 2, 2024

6 (21 to 24)

**21**

1   A   Oh, they just weren't provided to us.
2   Yeah, I mean, and I think the initial
3   report -- so if you look at the dates, too,
4   the initial report was submitted on
5   August 30.  Hoarty was on September 12;
6   Graham Rihn's on September 5; and Chehebar is
7   August 28.  I don't even know if that
8   transcript is available.  And Longson, that,
9   you know, just came through.  So I don't even
10  think the transcripts were available at the
11  time that we had the report.
12  Q   Okay.  It's your understanding that
13  neither Mr. Chehebar or Mr. Longson's
14  transcripts were available at the time of
15  your opening report?
16  A   Well, actually, I don't know the answer
17  about availability.  I do know that we were
18  provided them as of August 30.  So whether
19  there was an express transcript or something
20  that could have been provided or available, I
21  just don't know.
22  Q   Did you request those transcripts
23  subsequent to issuing your opening report?
24  A   I know that we asked for the Chehebar
25  transcript and that came after.  Graham Rihn,

**22**

1   that was provided to us through my staff.
2   Hoarty we did request that and Jay Longson, I
3   think one of my staff members requested that
4   as well.
5   Q   Okay.  Why did you request
6   Mr. Chehebar's transcripts?
7   A   Just to get an understanding of the
8   Compology history, development, and the
9   overall understanding the business basically,
10  and sort of the growth in transition of the
11  business over the years.
12  Q   Did you not feel that information was
13  relevant to your opening opinion?
14      MR. GIBSON:  Objection.  Form.
15  A   Well, I think the information is
16  relevant, I just didn't have it?  It wasn't
17  available.  It wasn't made available to me.
18  Q   Since receiving and reviewing
19  Mr. Chehebar's transcripts has your opinion
20  changed?
21  A   No.
22  Q   Did you conduct any interviews with
23  Roadrunner employees?
24  A   Yes.
25  Q   Who did you interview?

**23**

1   A   Steve Krebs.  I believe Graham Rihn was
2   on a call, and one other gentleman, I don't
3   recall his name at the moment.
4   Q   Do you know what that other person's
5   role was at Roadrunner?
6   A   Leadership.  And shoot -- Khan.  Overall
7   leadership at the organization, and then you
8   know, Krebs on the financial side.
9   Q   I missed the second?  Khan?
10  A   Well, Khan is a name of the third
11  person.
12  Q   How you do spell that K-h-a-n?
13  A   You know, I would be guessing, I don't
14  recall.
15  Q   Did you disclose these conversations
16  with these Roadrunner employees in your
17  report?
18  A   I believe so.  I believe we said we
19  spoke to management.
20  Q   When you say management you mean Steve
21  Krebs, Graham Rihn, and Mr. Khan?
22  A   Um-hmm.
23  Q   When did these conversations take place?
24  A   I believe it was probably in July.
25  Q   July of this year?

**24**

1   A   Yes.
2   Q   And approximately how many times did you
3   speak with Mr. Krebs, Mr. Rihn, and Mr. Khan?
4   A   I believe once with all three of them.
5   Then I believe I had three conversations with
6   Mr. Krebs.
7   Q   And all of these conversations took
8   place in July of this year?
9   A   I believe so, yes.
10  Q   Did all of these conversations take
11  place over the phone?
12  A   No.  Zoom.
13      I believe they were Zoom.
14  Q   That's the true for all four
15  conversations?
16  A   I think it would be a total of three
17  because Steve Krebs was a co-participant with
18  the other two.
19  Q   Did you take notes during these
20  conversations?
21  A   Yes.
22  Q   Did you provide those notes to counsel?
23  A   No.  Counsel informed us that we did not
24  need to produce our file.
25  Q   Did you correspond with any Roadrunner

25

1 employees?
2 **A   Like email?**
3 Q   Or any other form of written
4 communication.
5 **A   Yeah, I don't think so actually.  Not**
6 **that I can recall.  Calls were set up or**
7 **Zoom's were set up and those communications**
8 **were held.**
9 Q   If you go to Page 19 of your opening
10 report.
11     In the paragraph that starts with step
12 one colon if you go to the second sentence
13 about mid-way through, it says, "I performed
14 independent research correspondent with
15 Roadrunner management and reviewed deposition
16 testimony in connection with this matter."
17     Did you correspond with Roadrunner
18 employees?
19 **A   I guess I'll clarify that word.**
20 **Correspondence was in the form of verbal**
21 **communication over Zoom.**
22 Q   Okay.
23 **A   It wasn't emails going back and forth,**
24 **we literally had conversations.**
25 Q   Did Roadrunner management send you any

26

1 documents during those conversations?
2 **A   I don't think I received anything**
3 **directly from Roadrunner management.**
4 **Everything came through legal counsel.**
5 Q   Okay.  Outside of Mr. Krebs, Mr. Rihn,
6 and Mr. Khan, did you speak with anybody else
7 about this case and outside of counsel for
8 plaintiff as well, did you speak to anybody
9 else about this case?
10 **A   Sorry.  Are you talking about at**
11 **Roadrunner or just generally speaking?**
12 Q   Generally speaking.
13 **A   Oh, my staff.**
14 Q   Did you have any discussion with a
15 technical expert about this case?
16 **A   I have not had verbal communication or**
17 **any kind of correspondence with Mr. Hoarty.**
18 Q   Have you had any communications with any
19 other technical expert about the trade
20 secrets at issue in this case?
21 **A   No.**
22 Q   In performing your analysis, did you
23 think it was necessary to gain a technical
24 understanding of the trade secrets?
25 **A   Well, what I got was, you know, what the**

27

1 **trade secrets were described as and I had**
2 **communications with legal counsel about the**
3 **trade secrets, in this case, with fairly**
4 **lengthy conversations about the technical**
5 **details of them.  But not to the technical**
6 **level as derived by Mr. Hoarty in his report.**
7 Q   Okay.  If you go to Page 15 of your
8 opening report.
9     It's the second paragraph under alleged
10 misappropriation of trade secrets of
11 Roadrunner.
12     Do you see the six listed trade secrets
13 at issue in this matter?
14 **A   I see the six there, yes.**
15 Q   Where did that list of trade secrets
16 come from?
17 **A   I believe it was from the complaint or**
18 **the amended complaint.**
19 Q   Looking at that first trade secret, the
20 overall waste and recycling metering system.
21 What is your understanding of what the
22 overall waste and recycling metering system
23 is?
24 **A   Well, the overall system is the ability**
25 **to monitor the software/hardware to monitor**

28

1 **the fullness -- basically it creates**
2 **knowledge and information as it relates to**
3 **what contamination -- potential**
4 **contamination, the fullness, and you know, if**
5 **there's any spillage, or other issues in the**
6 **way so that it can make the customers waste**
7 **operations more efficient.**
8 Q   By your description Trade Secret No. 1,
9 includes hardware?
10 **A   No.  I'm going to go by whatever Hoarty**
11 **says, right.  So the technical definition of**
12 **the trade secrets are defined by Leo Hoarty.**
13 **So I'm going to defer to his technical**
14 **definitions as to what is precisely in each**
15 **of those trade secrets.  All of those trade**
16 **secrets have a -- as I understand it from**
17 **talking to Roadrunner management is, there is**
18 **an integrated system of different parts and**
19 **pieces and the trade secrets have different**
20 **aspects that are defined by Mr. Hoarty**
21 **specifically, right, such as the subpar**
22 **information detection is a specific thing.**
23 **But he gives the technical definition of each**
24 **of those trade secrets.**
25 Q   Do you have an understanding of whether

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

8 (29 to 32)

---

**29**

1  or not Trade Secret No. 1 includes hardware?
2  **A   I'd have to refer back to his report.  I**
3  **believe it's -- he's looking at as a camera**
4  **system.  So I just don't recall as I'm**
5  **sitting here now, I can look back at his**
6  **report, it's the overall sort of camera**
7  **system and knowledge and the assembly and**
8  **other things if I recall correctly.**
9  Q   Does the overall camera system include
10 hardware?
11 **A   As defined by him.  I don't recall.  But**
12 **I know that the camera is a component of the**
13 **overall portfolio of these integrated trade**
14 **secrets.**
15 Q   Do you have an understanding of whether
16 or not Trade Secret No. 1, includes software?
17 **A   Yeah, defer to Hoarty's definition**
18 **specifically.  Because I think it's more, I**
19 **know he's looking at the sort of the know-how**
20 **and the metering system and the other**
21 **attributes that go into it as an overall**
22 **system.**
23 Q   Okay.  Is it your understanding that
24 Trade Secret No. 1, is the entire camera
25 system, all of the hardware, software and

---

**30**

1  everything else that goes into that?
2  **A   I just don't recall the details, you**
3  **know, because he gives really explicit**
4  **details about it.  And I think -- I'd just**
5  **have to go back to the details, I just don't**
6  **recall.**
7  Q   Moving on to Trade Secret No. 2.  What
8  is your understanding of the smart camera
9  apparatus?
10 **A   That's like the physical apparatus I**
11 **believe as it relates to the physical camera**
12 **itself.**
13 Q   Does the physical camera apparatus
14 include hardware?
15 **A   Again, I would have to go back and read**
16 **Hoarty's report in detail.  But I know**
17 **there's lens, battery, there are different**
18 **sort of water prevention features that go**
19 **into the overall sort of apparatus over time**
20 **that had been developed.**
21 Q   Is the smart camera apparatus part of
22 the overall waste recycling and metering
23 system?
24 **A   I think all of these things together**
25 **form this integrated system as I understand**

---

**31**

1  **it, again, I defer to Mr. Hoarty on the**
2  **technical aspects of his trade secrets**
3  **opinions.**
4  **But I think the overall technology and**
5  **system includes all of these defined trade**
6  **secrets that he has characterized.**
7  Q   Okay.  Moving on to Trade Secret No. 3.
8  What is your understanding of the optical
9  assembly and design?
10 **A   Again, I'll defer to him for the**
11 **technical details, I know that they spent**
12 **time trying to figure out the lenses and the**
13 **positioning and over time refining and**
14 **changing how the camera lenses and other**
15 **things were situated within the overall**
16 **apparatus system.**
17 Q   Is optical assembly part of the smart
18 camera?
19 **A   That, I don't know the answer to that.**
20 **I it would have look at back at Mr. Hoarty's**
21 **report.  In terms of how those items are**
22 **classified or characterized as it relates to**
23 **his characterization.**
24 Q   What is your understanding of image
25 preprocessing and camera apparatus for use by

---

**32**

1  a machine-learning, training and operation,
2  that's Trade Secret No. 4?
3  **A   My understanding is that the camera**
4  **takes the picture, the images are collected,**
5  **the images are then filtered, you know, for**
6  **the purpose of taking out the subpar images**
7  **and then they are tagged and labeled for data**
8  **basically, fullness, contamination, what have**
9  **you.  And then over time they generate a**
10 **database of images that can be utilized for**
11 **implementation in their waste metering**
12 **technology system.**
13 Q   Did your understanding that Trade Secret
14 No. 4 relates to the camera that takes the
15 images?
16 **A   I don't.  I'd have to go back and look**
17 **at Mr. Hoarty's report.**
18 Q   Is it your understanding that Trade
19 Secret No. 4, involves software?
20 **A   I would have to go back and look at his**
21 **report as to whether he's including software**
22 **as a proponent of that trade secret.  I guess**
23 **he's saying involves software, so I guess**
24 **it's a question is there other software**
25 **perhaps, that's being used.  I don't recall**

---

Case 3:23-cv-04804-WHA   Document 136-5   Filed 10/17/24   Page 10 of 63
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

9 (33 to 36)

---

33

1  the distinction.
2  Q   Is it your understanding that image
3  preprocessing of the camera apparatus is part
4  of the overall waste meter and recycling
5  system?
6  A   Again, I would have to defer to
7  Mr. Hoarty as the technical expert in terms
8  of defining these things and characterizing
9  them.  I would say from my knowledge
10 perspective, the overall waste metering
11 system is the integration and combination of
12 these various trade secrets and you know,
13 other items.
14 Q   Moving on to Trade Secret No. 6.
15     What is your understanding of the
16 algorithms and processes to generate data
17 analysis and recommendation to customers
18 including fullness, emptiness, contamination,
19 schedules, data ingestion efficiencies,
20 location analysis of waste containers?
21 A   Yeah, this goes back to the purpose of
22 this system and its implementation, my
23 understanding is, again, I'll refer to Hoarty
24 in terms of the definition and
25 technicalities.  But this is sort of the

34

1  analysis and analytics associated with the
2  implementation.  As I understand it.
3  Q   What is your understanding of an
4  algorithm?
5  A   Well, the technical understanding in
6  this case, I don't have a definition as he
7  relates to the algorithm.  Generally, it's
8  some type of formula or process that's
9  intended to take data and produce output.
10 Q   What is your understanding of the
11 processes that Compology used to generate
12 data?
13    MR. GIBSON:  Objection to form.
14 A   Yeah, I'm not 100 percent sure what
15 you're asking there.
16 Q   Well, in Trade Secret No. 6, it
17 describes processes to generate data.  What
18 is your understanding of processes to
19 generate data?
20 A   I think I first defer to Mr. Hoarty's
21 report because he's defining that as part of
22 that trade secret.  So whatever he's going to
23 include in there, he's the technical expert
24 so he's characterizing that.
25 Q   Do you understand that to include taking

35

1  images, in the first instance?
2  A   So if it's processing, I don't know if
3  the processing would include taking images or
4  the processing is the secondary part where
5  it's, you know, the analysis of the images,
6  but I would have to read his report and get
7  to that level of granular detail.
8  Q   When you use the term analysis of the
9  images, what do you mean by that?
10 A   Well, my understanding is over years and
11 this is sort of detailed in Hoarty's report
12 and sort of discussed in the deposition.
13 Compology accumulated a lot of images in
14 order to create, basically a data warehouse
15 of information, images and have them, I think
16 tabbed and labeled, so that it basically
17 became a valuable dataset that could be
18 employed in the remainder of the system.
19 Q   Okay.  Is it your understanding that
20 Trade Secret No. 6 involves tagging or
21 labeling the images?
22 A   I'd have to go look at the details of
23 Hoarty's report.  I don't recall if he
24 included that there.
25 Q   In Trade Secret No. 5.  What is your

36

1  understanding of training data?
2  A   So I'll -- again I'll refer you to
3  Hoarty for the technical definition of
4  training data, but my understanding is the
5  images and the information of the images are
6  there for the machine-learning training.  It
7  was somehow incorporated into the learning to
8  make the system more effective.
9  Q   Do you have an understanding of how the
10 labeled images involved in Trade Secret
11 No. 6, differed from the labeled images in
12 Trade Secret No. 5?
13    MR. GIBSON: Objection.  Form.
14 A   Well, I guess I don't recall the
15 inclusion or exclusion of labeled images in
16 either one of those.  I'd have to go back and
17 read Hoarty's descriptions there and the
18 level of detail associated with the
19 differences, I don't recall that being
20 described in Hoarty's report.
21 Q   Okay.  Would you agree that there's some
22 overlap in the trade secrets?
23    MR. GIBSON:  Objection.  Form.
24 A   I think that goes to Hoarty's opinion as
25 to a technical expert, in terms of what the

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

10 (37 to 40)

37

1  trade secrets are and what they include. I
2  know that all of these trade secrets are
3  connected and interrelated, in terms of
4  accommodation to create this overall system.
5  I'm saying they're interconnected. Whether
6  they're technically overlapped that's in
7  Hoarty's opinions.
8  Q   For your analysis it wasn't important to
9  decipher the overlap in the trade secrets?
10 A   Well, I think I'm relying on Mr. Hoarty
11 to address the definitions and scope of the
12 trade secrets. That's his technical
13 expertise. And the way I understand each of
14 these trade secrets in the combination of how
15 they work together in the overall system,
16 right. That they are sort of interdependent
17 and connect and they produce sort of business
18 results and economic value by their
19 combinations and they work together.
20 Q   Is it your understanding that all of the
21 trade secrets are interconnected to one
22 another?
23 A   Well, I guess the word "interconnected"
24 may not be the final word on that issue, I
25 guess. It's really that each of these trade

38

1  secrets plays a role in the overall waste
2  metering system. So the interconnectedness
3  is really that I need a camera to get an
4  image, I need an image to be tagged. I need
5  a tagged image to go into machine learning.
6  It's a process where each of these things
7  work together in the overall system.
8  Q   Is it your understanding that there's no
9  substitute for any of the trade secrets
10 within the overall waste metering system?
11     MR. GIBSON: Objection to form.
12 A   Can you clarify what you mean by
13 "substantive"?
14 Q   Yeah. Is it your understanding that
15 each of the trade secrets is necessary to the
16 function of the overall waste metering
17 system?
18 A   It's my understanding that as it exists
19 and as it was developed, that these trade
20 secrets work together in the waste metering
21 system.
22 Q   Now, if you go to Page 6 of your reply
23 report.
24 A   Just give me the number, Page 6?
25 Q   Yes. It's Page 6. The header should be

39

1  "Alleged trade secrets and the integrated
2  nature of camera and tagged images."
3  A   Yep.
4  Q   On Page 6 of your reply report, you list
5  seven categories of trade secrets, correct?
6  A   Yes, sir.
7  Q   And where did that list come from?
8  A   Mr. Hoarty's report.
9  Q   Why did that list change from your
10 opening report to your reply report?
11 A   Because I didn't have it prior to
12 August 30th.
13 Q   How is the list of the trade secrets in
14 your reply report different than the list of
15 trade secrets in your opening report?
16 A   Well, I mean, it just goes down to the
17 specifics identified by Mr. Hoarty.
18 Q   Which of the lists in your expert report
19 provide a more accurate description of the
20 trade secrets at issue in this case?
21     MR. GIBSON: Objection, form.
22 A   Well, I'm relying upon Mr. Hoarty's
23 opinions as it relates to characterizing what
24 are trade secrets.
25     So, for the purposes of calculating the

40

1  damages, it's Mr. Hoarty's list of the seven
2  that I will be relying upon.
3  Q   Do you know if Mr. Hoarty added or
4  dropped trade secrets from your initial list?
5  A   I believe there were some changes.
6  Obviously, there's one additional thing, and
7  I think there may be one that he did not
8  include from the original list. I'd have to
9  go and cross check it. I recall some
10 discussion in his deposition this morning.
11 Q   So it's your understanding that
12 Mr. Hoarty removed one of the trade secrets
13 from the list you initially relied upon?
14     MR. GIBSON: Objection to form.
15 A   Yes, sir. Actually, I would have to
16 clarify that, right. I mean, because he has
17 his own definitions compared to what was
18 characterized before. So from a technical
19 perspective, did he remove one, I don't
20 recall. I'd have to go back and look at his
21 testimony as to if anything was removed.
22     So I'm not going to say whether he did
23 remove a trade secret that was alleged. He
24 may have named it differently or it may have
25 characterized differently in his list of

41

1  seven.  And then he would really be the one
2  to accurately answer that question.
3  Q   Is it your understanding that Mr. Hoarty
4  added a trade secret to the revised list on
5  Page 6 of your reply report?
6      MR. GIBSON:  Objection, form.
7  A   Again, I think it could be a situation
8  where he's characterizing things slightly
9  differently, right.  And so I would have to
10  have a conversation with him or maybe it is
11  detailed in his deposition testimony about
12  the tweaks in terms of this list seven versus
13  six.  And I just don't know, as I'm sitting
14  here right now, the technical differences
15  between those.
16  Q   Looking at your revised list on Page 6
17  of your reply report:  "Trade Secret No. 5 is
18  now subpar image detection or SPID."
19      Do you see that?
20  A   I do.
21  Q   Was that part of the original list of
22  trade secrets that you provided in your
23  opening report on Page 15?
24      MR. GIBSON:  Objection, form.
25  A   I would have to look at that, and then

42

1  determine whether it may potentially have
2  been included in some of the other ones.
3  Whether he chose to recharacterize something
4  specifically that would otherwise be included
5  in the original list of six, I don't know.
6  And if it was addressed at his depo, I don't
7  recall.
8  Q   Can you look at Page 15 of your opening
9  report and point me to the trade secret that
10  you think may encompass SPID?
11  A   Well, I don't think -- I mean, from a
12  technical perspective, right, that would be a
13  determination, I think, by a technical expert
14  like Mr. Hoarty, right, for him to make that
15  determination.
16      Again, I don't know what his -- I don't
17  recall his testimony about the SPID as being
18  something new or a carve-out on the other
19  six, he may have testified to that effect.
20  And he would be the one qualified to asses
21  that categorization.
22  Q   Did you analyze subpar image detection
23  at all in your opening report?
24      MR. GIBSON:  Objection, form.
25  A   I was aware that they had this image

43

1  detection analysis to remove data or images
2  that were not considered to be reliable as
3  part of the overall system.
4      And so I was aware of that.  So, yes, I
5  mean, in terms of costs associated with
6  developing the overall portfolio of the trade
7  secrets in the system, yes, that's included
8  in the historical cost of Compology.
9  Q   Okay.  Looking at your original list
10  now, No. 4 was:
11      "Image preprocessing and camera
12  apparatus for use by machine learning,
13  training and operation."
14      Do you see that?
15  A   One second.  That's No. 4, right, image
16  processing?
17  Q   Yes.  Do you see that?
18  A   I do.
19  Q   Now, shifting to your reply report.  Can
20  you point me to that trade secret in the
21  revised list?
22  A   Again, Mr. Hoarty may have characterized
23  things differently than what's characterized
24  here, but I can certainly see those exact
25  words are shown there, which -- I'd have to

44

1  go through the details of each of these seven
2  to see if he describes that in any of his
3  trade secrets.
4  Q   As you sit here today, you don't have an
5  opinion about whether or not original Trade
6  Secret No. 4 is included in the revised list
7  of trade secrets on Page 6 of your reply
8  report?
9  A   I don't recall the specification.  I can
10  go back and look at the details and make that
11  comparison, but I don't recall, as I'm
12  sitting here right now.
13  Q   What would you need to do to answer that
14  question?
15  A   I would ask to have a conversation with
16  Mr. Hoarty, and I could review his report to
17  see if there's any indication that he
18  describes that very issue in the list of
19  seven.
20  Q   Do you need to have a conversation with
21  Mr. Hoarty to get a better understanding of
22  the trade secrets at issue in this case?
23      MR. GIBSON:  Objection, form.
24  A   I would say for the purpose of making a
25  comparison like that, that would be very

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

12 (45 to 48)

45

1  helpful.  As it relates to the overall cost
2  associated with developing all the trade
3  secrets, he may add information that would
4  be, you know, additional information to
5  refine understanding of the actual trade
6  secrets beyond his report.
7  Q   Okay.  Why is it, then, that you haven't
8  had a conversation with Mr. Hoarty about the
9  trade secrets at issue in this case?
10 A   Well, prior to -- prior to my original
11 report, there was discussion about having a
12 conversation, and then there was discussion
13 about his report, and then receiving his
14 report, and then we just never got a copy of
15 his report prior to the submission of our
16 report.
17 Q   Okay.  That doesn't really answer my
18 question.
19     Why haven't you had a conversation with
20 Mr. Hoarty about the trade secrets at issue
21 in this case?
22 A   Well, he was -- a call was scheduled
23 with him prior to the issue of the original
24 report, and subsequent with these -- with
25 having the opportunity to review his report

46

1  and see the details in his report and review
2  his deposition, getting an understanding of
3  the characterization of the trade secrets and
4  overall integrated nature of them was
5  consistent with what I understood from legal
6  counsel.
7  Q   Is it fair to say that, as you sit here
8  today, you don't have an understanding of how
9  the trade secrets from your opening report
10 changed to those described in your reply
11 report?
12     MR. GIBSON:  Objection, form.
13 A   I would say my understanding is that the
14 trade secrets that were listed in the opening
15 report were reflective of, this is just my
16 understanding of what they were reflective
17 of, all of the trade secrets that went into
18 the overall camera waste metering system,
19 right.
20     And that's my understanding also with
21 Mr. Hoarty's.  Although, I feel like there
22 may have been one area where Mr. Hoarty
23 didn't have information in terms of
24 calculating a trade secret.  That's just off
25 of my memory.

47

1  Q   Can you expand on that.  Mr. Hoarty
2  didn't have information in terms of
3  documenting -- what do you mean by that?
4  A   I just said, in my memory, I thought I
5  recall him saying that he needed additional
6  information for one aspect of something in
7  his deposition recently.  I don't recall the
8  exact details.  I'd have to go find those
9  pages.
10 Q   So your understanding that he didn't
11 have enough information is based on his
12 deposition testimony?
13     MR. GIBSON:  Objection, form.
14 A   No.  On my memory, I recall him talking
15 about a circumstance, and it may not have
16 anything to do with these trade secrets.  I'm
17 just sort of remembering some of his
18 testimony.  I don't recall the exact details.
19 Q   That's what I'm trying to -- you used
20 the terms talking and then -- is it the only
21 understanding you have based on Mr. Hoarty's
22 testimony?
23 A   Understanding of?
24     MR. GIBSON:  Form.
25 Q   Yeah.  Withdrawn.  That's a general

48

1  question.
2     Is the understanding that you gained
3  that Mr. Hoarty lacked certain information
4  based solely on his deposition transcript?
5  A   So I'm going to go back to what I said
6  earlier.  Which is, I remembered some
7  circumstance.  I don't recall exactly what it
8  was, and I don't even recall, as I'm sitting
9  here, I don't even recall if it was
10 pertaining to a specific trade secret.
11     It was, I just recall at his deposition,
12 and, again, his deposition is on the record
13 so this issue can be cleared up quickly.  I
14 just don't recall exactly what it related to.
15 And when I see the differences here, I don't
16 recall whether that was related at all.
17 Q   As you sit here today, do you have an
18 understanding of why Mr. Hoarty changed the
19 description of the trade secrets for his
20 expert report?
21 A   Well, I don't know that he -- I don't
22 know if he was specifically involved in
23 defining six trade secrets originally.  So I
24 don't know if that change is coming from him
25 or somebody else.  And I think his job is to

49

1 identify the trade secrets pursuant to his
2 own expert opinion. And that's what he has
3 done.
4 Q   Do you have an understanding of whether
5 or not Mr. Hoarty determined that any of the
6 original six trade secrets were no longer
7 trade secrets?
8 A   I don't recall that specifically from
9 his testimony. I just don't recall. I was
10 more focused on what he had done. I don't
11 recall a specific distinction from his
12 testimony saying, this isn't any longer as
13 you characterized it. I just don't remember.
14 Q   Do you know if Mr. Hoarty changed the
15 description of the trade secrets because the
16 original list lacked detail or clarity?
17     MR. GIBSON: Objection, form.
18 A   I don't recall his testimony in that
19 regard. All I know is that there was the
20 original list and then he formulated his own
21 opinions later.
22 Q   If Mr. Hoarty removed one of the trade
23 secrets from the initial list, would that
24 impact your analysis?
25     MR. GIBSON: Objection, form.

50

1 A   No. Because what I'm looking at is the
2 plaintiff's cost to develop the trade
3 secrets. And all of the costs that are
4 necessary to have the trade secrets within
5 the overall waste metering system. So I'm
6 looking at all of it within the system in
7 order to make it work. So there's still
8 going to be other costs borne in order to
9 create it.
10 Q   So even removing a trade secret doesn't
11 reduce the cost in developing the trade
12 secrets as a whole?
13 A   Well, I think the overall cost of
14 getting the trade secrets into the use in the
15 overall camera system, and the waste metering
16 technology system requires a certain amount
17 of expenditure. And that's reflected by what
18 Compology did over the years.
19 Q   If Mr. Hoarty removed five of the
20 initial trade secrets, would that change your
21 analysis?
22     MR. GIBSON: Objection, form.
23 A   Well, I think in order for that trade
24 secret to be implemented, it still needs all
25 of the other parts and all the cost to

51

1 develop and make it, you know, sort of viable
2 in terms of the production and use.
3 Q   The costs you calculated are just for
4 the entire waste metering system?
5     MR. GIBSON: Objection, form.
6 A   I guess the way I would describe it is,
7 all of these trade secrets work at an
8 integrated fashion within the overall waste
9 metering system. Compology developed this
10 waste metering system, and these trade
11 secrets, you know, they sort of, I guess
12 they're interconnected or linked in the sense
13 that they work together to formulate an
14 integrated system.
15     And that's the way I understand
16 Mr. Hoarty to talk about these as well, is
17 that they work hand-in-hand in forming the
18 overall system.
19 Q   Okay. You didn't calculate costs
20 associated with development of any particular
21 trade secret; is that correct?
22 A   Sorry. I did not segregate the costs,
23 like as it relates to a specific trade secret
24 and then try to allocate it to a particular
25 trade secret.

52

1     These trade secrets, as I understand it,
2 were all sort of developed together and, you
3 know, they have this interconnecting nature
4 as part of their overall -- as part of the
5 overall system, is the way I understand from
6 Mr. Hoarty. So the set system -- systematic
7 relationship and so there's total costs
8 associated with all of that.
9 Q   So, in other words, you didn't apportion
10 the costs that you calculated on a trade
11 secret by trade secret basis?
12 A   I did not.
13 Q   Okay. Do you know the date that
14 secret -- let's -- for the rest of the day
15 let's use the revised list of the seven trade
16 secrets, just to make sure we're on the same
17 page.
18     Does that sound okay?
19 A   Yeah.
20 Q   Do you know the date that Trade Secret 1
21 first existed?
22 A   So my understanding from Mr. Hoarty, and
23 my understanding talking to management of
24 Roadrunner and then reading the depos, is
25 that this was an evolving process of

53

1  refinement and improvement.
2      And so that these trade secrets have
3  come into existence, and they're being
4  refined and continuously developed. And I
5  don't recall whether Mr. Hoarty actually gave
6  a date, per se, as to when it was first
7  coming into existence. I think it's
8  basically, they're all being developed over
9  time and then improved over time.
10 Q   Do you know when development of Trade
11 Secret 1 began?
12 A   The exact date, let's see. I would have
13 to see -- I would have to look at
14 Mr. Hoarty's report and deposition to see if
15 there's -- he pins a date on it.
16     My understanding of the business is that
17 effectively the objective of the company as a
18 start up was to create this waste metering
19 system technology system. So that objective
20 is taking off at the inception of the
21 business.
22 Q   Okay. So you're making the assumption
23 that development of Trade Secret 1 began at
24 the inception of Compology's business?
25 A   Not specifically. I'd have to look and

54

1  see if Mr. Hoarty identifies any particular
2  dates. What I was saying is that the overall
3  development of the trade secrets comes with
4  the beginning of the company and that the
5  company's intention is to start up. And
6  there, I think, you know, Jason Gates said
7  his ambition was to create this technology
8  for environmental reasons and, you know,
9  wanting to reduce carbon footprint, et
10 cetera, and creating more efficient
11 environment for it, the waste environment,
12 right. And so this whole idea of the system
13 is from the inception of the company as a
14 goal.
15 Q   Outside of Mr. Hoarty's opinion, you
16 don't know when development of Trade Secret 1
17 began?
18 A   Well, with precision I don't know if
19 Mr. Hoarty gives a precise date. My
20 understanding, like I said, is the notion of
21 the overall waste metering system is from the
22 inception of the company, right.
23 Q   Okay. So excising out what Mr. Hoarty
24 knows, do you know when development of Trade
25 Secret 1 began?

55

1  A   I mean, I think going back, you know,
2  they're working on the notion of this concept
3  from the beginning of the inception of the
4  company. But is there a precise exact date
5  when this overall waste metering technology
6  system, it's from the day one they're trying
7  to develop this concept.
8  Q   Okay. Do you know the precise date when
9  development of Trade Secret 1 ended?
10 A   My understanding is that this is a
11 continuous process of them refining and
12 developing these trade secrets since the
13 beginning. And that's why they -- you know,
14 they've gone through their revisions, you
15 know, R0 to R7, R10, R11 and making revisions
16 on the various trade secrets as time passes.
17     And I don't know that Mr. Hoarty has
18 identified that these are done. I think he's
19 identified that these are in a constant state
20 of refinement and betterness.
21 Q   Is it your understanding that Roadrunner
22 is still refining and developing the trade
23 secrets at issue in this case?
24     MR. GIBSON: Objection to form.
25 A   You know, I don't recall the testimony,

56

1  but my understanding is that there's sort of
2  continuous change. I think they're maybe
3  even onto R14 now.
4      And specifically relating to these trade
5  secrets, I don't recall, you know, the
6  specific details. Because, again, I
7  removed -- you know, cut things off at
8  12-31-2021 for my purposes. So I didn't
9  investigate that specific issue. My
10 understanding is that there's some sort of
11 concept learning objective and improvement.
12 But to be honest, I don't know. I don't
13 recall. What Krebs or Rihn or the other guys
14 said.
15 Q   Okay. Why did you use 12-31-2021 as the
16 cutoff date?
17 A   I stopped there because the financial
18 performance of, as I understood, Compology
19 had gone down, and I think there was some
20 testimony that they had cut back on some of
21 their spending, you know, to save cash. And
22 so it seemed logical to me that, you know,
23 that's a break, you know, in terms of the
24 investment, you know, for the purpose of the
25 misappropriation.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

15 (57 to 60)

57

1  Q   Is it fair to say that you don't know
2  the precise date that development of any
3  particular trade secret began?
4      MR. GIBSON: Objection to form.
5  A   Again, I would go back to -- I don't
6  think Hoarty -- or is Hoarty or Hoarty?  I
7  don't think Hoarty -- if I can recall, I
8  don't recall him giving any exact dates in
9  his analysis.  And that -- you know, he's the
10 technical expert that would identify those
11 exact dates.  I just -- I don't recall if he
12 gave exact dates for one or more or any of
13 them.  I'd have to go back and look at his
14 report.
15 Q   As you sit here today, do you know the
16 precise development -- start of development
17 of any particular trade secret?
18 A   Not outside of Mr. Hoarty's expert
19 opinion in terms of that.  What I can say is
20 my understanding of the overall enterprise is
21 that the goal of Compology was to create this
22 waste metering system so that the efforts and
23 the concepts and the goals start when the
24 business starts from day one.  You know,
25 they're -- basically, they've got this

58

1  mission and ambition, and they're going to
2  start moving towards that and, you know,
3  marshal their funds forward towards achieving
4  that goal.
5  Q   As you sit here today, do you know the
6  precise end date to the development of any
7  particular trade secret?
8  A   Well, like I said, I don't recall Hoarty
9  had any opinion as to the end date.  And my
10 understanding is that -- and I believe he
11 testified to this as well, is that there were
12 constant refinement and betterment of their
13 trade secrets.  Like, it's a process of
14 constant growth.
15 Q   Okay.  In either of your reports, do you
16 disclose the precise start date of
17 development of any particular trade secret?
18 A   Not outside of, you know, just
19 discussing the business.
20 Q   Okay.  In either of your reports, do you
21 opine on the date development ended for any
22 particular trade secret?
23 A   Well, I -- like I said before, my
24 understanding is that they continuously
25 improve and evolve the trade secrets.  So I

59

1  don't recall how we stated that in either of
2  the reports, but with that being said, there
3  may not be an exact end date.  And I don't
4  recall what Mr. Hoarty's opinions were in
5  that regard.
6  Q   Okay.
7  A   When you get to a good breaking point,
8  can we just take five.
9      MR. THOMSON:  Let's take a break.
10     We'll go off the record.
11 THE WITNESS:  Okay.  Thank you.
12 VIDEOGRAPHER:  We're going off the
13 record at 12:19.
14     (Whereupon, a recess was taken
15     from 12:19 p.m. until 12:27
16     p.m.)
17 VIDEOGRAPHER:  We are back on the
18 record.  It is 12:27 Eastern time.
19 Q   Mr. Vickery, you don't provide an
20 opinion on the exact number of years it took
21 to develop the trade secrets, correct?
22 A   Can you say that again.
23 Q   You don't provide an opinion on the
24 exact number of years that it took to provide
25 the trade secrets, correct?

60

1  A   Well, I would rely on Mr. Hoarty for,
2  you know, the timing in terms of the
3  development and the -- you know, sort of the
4  exact nature in terms of the development of
5  the trade secrets.  I don't recall that he --
6  I know -- what I do recall from his
7  deposition testimony, I think his report, is
8  that he commented that there was six or
9  seven years of, I think, machine learning and
10 ten years of an overall process associated
11 with the trade secrets.  And I think he may
12 have said that that's a credible time period.
13     So he has provided some indications in
14 terms of a time period associated with the
15 creation of -- you know, the overall nature
16 of the trade secrets.  I don't recall if he
17 specified it one way or the other with one or
18 another.
19 Q   Okay.  If you go to Page 4 of your reply
20 report, it's the paragraph at the bottom I
21 want you to focus on.
22 A   Okay.
23 Q   And it's going to be the third sentence
24 up from the bottom after -- it's Footnote 3
25 kind of breaks it.  The sentence reads:

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

16 (61 to 64)

---

61

1       "The evidence indicates that it
2    took multiple years of time and
3    research as well as trial and error to
4    develop the alleged trade secrets."
5       Do you see that sentence?
6    A   Yeah.
7    Q   You don't provide an exact number of
8    years, correct?
9    A   That -- all I said here is "multiple
10   years."  And I know from Mr. Hoarty he
11   described six to seven and then ten, and then
12   I think Gates and Krebs and Chehebar talk
13   about a number -- you know, that this has
14   been going on for years, you know, sort of on
15   and on with refinement.
16      So that's why, you know, I said
17   "multiple years."  It doesn't have a specific
18   number associated with it but, yeah, multiple
19   years.
20   Q   Okay.  As you sit here today, do you
21   have a precise number of years that it took
22   to -- of research and development of the
23   alleged trade secrets?
24   A   Well, I guess I would say my
25   understanding is that -- from Mr. Hoarty's

---

62

1    report and testimony is that he describes
2    that ten years and the six to seven years in
3    his testimony and described that time period
4    as being credible relative to the trade
5    secrets.  That's just my understanding from
6    his opinions.
7    Q   Did you attempt to calculate that, the
8    total number of years at any point involved
9    in development of the trade secrets?
10   A   Well, my understanding was that the
11   trade secrets are being, you know, constantly
12   refined and evolved over time as improvements
13   and betterments are made.  And I think
14   Mr. Hoarty described it as "Hey, look, it's
15   the trial and error.  We're making one
16   choice.  Then we're making a new choice.
17   We're make a revision, and this process is
18   ongoing."  That's my understanding from
19   Mr. Hoarty.
20   Q   Okay.  You similarly don't have an --
21   provide an opinion on the exact number of
22   person-hours that went into development of
23   the alleged trade secrets; is that accurate?
24   A   Well, there's not a calculation of the
25   person-hours.  What the approach that I took

---

63

1    on it is relating to the actual costs that
2    were experienced by Compology as a business
3    and then allocating those costs toward, you
4    know, the overall development and associated
5    with the trade secrets, you know, based upon
6    deposition testimony or making a
7    proportionate allocation.
8       But not doing it like here's the number
9    of hours, here's a particular wage.  I have
10   the actual costs.  I know this is a start-up
11   business which is geared towards developing
12   this business and develop the trade secrets
13   as part of that.  And that's integral to
14   their ability to generate revenues and become
15   profitable and eventually sold to Roadrunner.
16   And so I'm using those actual costs as a
17   reflection of the cost to develop.
18   Q   Would it have been helpful to your
19   analysis to know the precise number of man --
20   person-hours that went into developing the
21   alleged trade secrets?
22   A   Well, I think it would provide an
23   alternative way of calculating that
24   component, right, of the alleged trade
25   secrets.  But, you know, there's another way

---

64

1    the look at it which is what were the costs
2    actually occurred and utilize those actual
3    costs as a reflection of the cost of
4    development, right.
5    Q   Can you walk me through how were avoided
6    cost damages tied to misappropriation of
7    trade secrets?
8       MR. GIBSON:  Objection.  Form.
9    A   Yeah, well, I think partly that's, you
10   know, a legal issue in determination.  My
11   understanding -- you know, and not as a --
12   making a legal opinion is that the avoided
13   costs are the -- I don't know, I've seen
14   terms like "ill-gotten gains" or this is an
15   "unjust enrichment" that is realized by the
16   misappropriator by virtue of getting the
17   trade secrets at no cost, right, and getting
18   the immediate benefit of the trade secrets.
19   Q   Is it your understanding that "avoided
20   cost" and "ill-gotten gains" or "unjust
21   enrichment" are the same?
22      MR. GIBSON:  Objection to form.
23   A   So, again, I won't give any legal
24   opinions, but my understanding generally in
25   dealing with unjust enrichment is that it's

---

**65**

1  meant to reflect the benefits that the
2  misappropriator realizes by virtue of the
3  misappropriation, right. So those costs
4  would have otherwise been incurred, you know,
5  historically, and they weren't, right. So
6  that's a cost that was avoided and,
7  therefore, you know, there's some form of
8  enrichment by not having to spend that money.
9  Q   So is it that the misappropriation of
10 the trade secrets allows the defendant to
11 avoid spending money on development of the
12 same technology? How would you change that
13 description?
14    MR. GIBSON: Objection. Form.
15 A   Well, I guess that, you know, in this
16 particular case I think maybe it's easier to
17 describe it this way is that we know that
18 Compology has developed this unique -- these
19 unique trade secrets, just based on the
20 opinions of Mr. Hoarty, right. And he's
21 identified them as -- you know, I think he
22 said there's not anything like that out
23 there, their image set and some of the other
24 things.
25    And that these are unique and not

**66**

1  publicly known, and they incurred significant
2  costs in developing all of those, you know,
3  over time and continue to develop them. And
4  that those costs are not borne by
5  RecycleSmart by virtue of the
6  misappropriation.
7    And so had those cost been borne, those
8  costs would have been realized and paid. And
9  so therefore, there's this notion of unjust
10 enrichment.
11 Q   In that analysis you assume that
12 Defendants had access to Compology's trade
13 secrets; is that correct?
14 A   Well, my understanding is that, you
15 know, there's an allegation, and I think
16 Mr. Hoarty goes through it in his report, I
17 think. You know, is that the, you know,
18 camera was opened and images were downloaded
19 and utilized in some way. So the assumption
20 is that -- my understanding is that the
21 assumption is that they misappropriated the
22 technology and got access to it.
23 Q   Do you know precisely what technology
24 defendants had access to?
25 A   I don't recall whether Mr. Hoarty

**67**

1  specifically identifies it on a line-by-line
2  basis, right, 1 through 7. And I don't -- I
3  just don't recall as I'm sitting here right
4  now.
5    I just know that it has been alleged
6  that there was -- I think a camera was
7  disassembled and images were downloaded
8  and -- you know, so then the different
9  components of those trade secrets become a
10 part of that.
11 Q   Is it not relevant to your analysis to
12 know what precisely Defendants had access to?
13 A   Well, you know, I think the issue is
14 that these trade secrets become, you know,
15 now no longer unascertainable to the public
16 domain, right, and that their access to those
17 trade secrets now make them no longer secret
18 as part of that overall camera system. And
19 utilizing some of those trade secrets, you
20 know, they worked together in tandem, and,
21 you know, they have a valuable part in the
22 overall camera system as the individual trade
23 secrets formulating that camera system.
24 Q   It seems like you're saying that once
25 the trade secrets become public, they're no

**68**

1  longer trade secrets, and they no longer have
2  value; is that accurate?
3    MR. GIBSON:  Object to form.
4  A   Well, I think that's a legal
5  determination that -- you know, I don't
6  think -- you know, I think that's a legal
7  determination, that's more appropriate there.
8    But certainly it was once held within
9  Compology, and it is misappropriated now. I
10 know there's, you know, potential remedies
11 through injunctions or other things that are
12 outside of my scope that, you know, could
13 render protection around the trade secrets.
14 I think that gets into the legal arguments
15 around, you know, the trade secrets and, you
16 know, what happens subsequent to this
17 litigation.
18 Q   In your analysis do you need to know
19 when exactly Defendants gained access to the
20 trade secrets?
21 A   Well, my understanding is that they
22 gained access, I believe, in -- I think it
23 was early 2019 when there was a camera
24 disassembly. I believe that's the date. I'd
25 have to check my files. I believe that it

69

1  was approximately that time.
2  Q   Okay.  Do you know if you disclosed that
3  date in your -- in either of your expert
4  reports?
5  A   I don't recall.
6  Q   Is it your opinion that Defendant's
7  first access to the trade secrets occurred in
8  2019?
9  A   I'm not formulating that opinion.
10 That's -- my understanding is that may be the
11 first date.  I'd have to go back and look,
12 but I think that, to my recollection, you
13 know, they entered into their original
14 contracts in '17.  And I believe there was a
15 testimony about the potential disassembly of
16 a camera at that time.  That's my
17 recollection as I'm sitting here right now.
18 Q   Do you calculate damages based on that
19 alleged date of misappropriation?
20 A   Well, the misappropriation continues.
21 So, you know, my understanding is that
22 there's -- that this misappropriation is
23 continuing through current with the use of
24 the -- because my understanding one of the
25 allegations is that the image dataset was

70

1  utilized as part of the learning for their
2  system.  And that information was utilized in
3  developing the Pello, and because it's part
4  of the Pello system, the misappropriation
5  continues.  So it's not like it stopped at
6  one particular point in time.
7  Q   Using that 2019 date, do you have an
8  understanding of what form Trade Secret 1 was
9  in at that time?
10 A   I would have to go back and look at
11 Hoarty's testimony.  I don't recall.
12 Q   Is it important for you to know what
13 form the trade secrets took on the date of
14 the alleged misappropriation?
15     MR. GIBSON:  Objection.  Form.
16 A   I think the misappropriation continues,
17 right, so it's not like it's cut off in 2019.
18 My recollection again, is that there may have
19 been that first date, but that
20 misappropriation continues.  So really it's
21 continuing into current.  So I would say it's
22 in its current form, right.  And we
23 calculated those damages through, I believe
24 2021, even though the misappropriation
25 directly continues.

71

1  Q   Is it fair to say that you don't know
2  what iteration of any of the trade secrets
3  defendants gained access to in 2019?
4  A   Well, I mean, I think in the testimony
5  and Hoarty's report and some of the other
6  documents, there's certainly descriptions of
7  the status of the different, so I would say
8  overall system, right.  And so there may be
9  specific descriptions about particular trade
10 secrets status during that time.  I just
11 don't recall as I'm sitting here right now.
12 Mr. Hoarty may describe it differently over a
13 time period.  I just don't remember whether
14 he went into that detail in his report as a
15 certain time period.
16 Q   If Compology continued to develop the
17 trade secrets after that date, defendants
18 wouldn't have the benefit of those
19 development, would they have?
20     MR. GIBSON:  Objection.  Form.
21 A   I think -- I guess the way I would
22 describe it is, you know, the different trade
23 secrets, like the machine-learning, and the
24 downloading of the image and the use of the
25 images is not limited to that date.  That's

72

1  why I was trying to explain my recollection
2  is that maybe there was an instance, I think
3  in March of 2019, or sometime early 2019,
4  when there may have been a camera opening.
5  I'll have to verify that date, but that's
6  what I recall.
7      And then there was another instance of
8  downloading, I think some of the images I
9  think that's described in Mr. Hoarty's
10 report.  And you know, I don't recall the
11 exact year off the top of my head when that
12 happened.  So it's not like it stops at 2019,
13 it certainly the use of the images, you know,
14 going forward in Pello is a reflection of the
15 ongoing.
16 Q   Focusing on the hardware, if Defendant's
17 misappropriated the hardware trade secrets as
18 of 2019, they would have only had access to
19 the hardware as it existed at that time; is
20 that accurate?
21     MR. GIBSON:  Objection.  Form.
22 A   You know, I would say I'd have to look
23 at Mr. Hoarty's descriptions and definitions
24 and what's included in there to answer that
25 more precisely.  And I think another thought

73

1  would be that the integrated nature of these,
2  well integrated, I'd say the fact that all of
3  these trade secrets kind of worked together
4  as a system, as like a systematic integrated
5  whole, I'd have to think about that.
6  Q   My question's a little more general.  My
7  question is the basic premise, defendants
8  couldn't have access to anything that didn't
9  exist yet; is that correct?
10 A   Well, as a particular date, but you
11 know, for example, the machine -- the images
12 downloads come subsequent to that.  And then,
13 you know, the other things that are described
14 in Mr. Hoarty's description and trade
15 secrets, I'd have to look at how those are
16 described as it relates to each trade secret
17 in the system.
18 Q   Is it your understanding that the
19 defendants gained access to every iteration
20 of Compology's hardware?
21     MR. GIBSON:  Objection, form.
22 A   I don't know that they've had every
23 iteration.  Certainly R0 through R7, which is
24 some of the earlier versions that are
25 basically kind of like building blocks to

74

1  getting to the next level.  My recollection
2  from Mr. Hoarty's report is that he alleges
3  that it's related art wealth, if I recall
4  correctly.
5  Q   So it's based on Mr. Hoarty's opinion,
6  is it your understanding that defendants only
7  had access to Compology's R12 hardware?
8  A   Well, I don't know that it's limiting in
9  that sense.  I think they may have had early
10 versions, I don't recall.  Well, certainly I
11 can say, my understanding is that Mr. Hoarty
12 has said that he's of the opinion that R12
13 was used as the basis for what's
14 misappropriated to Pello.
15 Q   Based on Mr. Hoarty's opinion, do you
16 understand that defendants didn't have access
17 to the R13, or R14 device developed by
18 Compology?
19     MR. GIBSON:  Objection to form.
20 A   I don't know that his statement of that
21 implies the R13, I mean, I think R14 is more
22 current.  R13, I don't recall the exact date
23 and I don't recall whether those were ever
24 installed vis-a-vis RecycleSmart.  But
25 certainly my understanding is that he's

75

1  claiming it's tied to R12.
2  Q   Was it not relevant to your opinion to
3  ascertain what specific Compology devices
4  defendants allegedly had access to?
5  A   Well, it's relevant in the sense that I
6  know that they had access to the R12 and it's
7  also whereabout the image downloads and the
8  overall system, you know, in terms of the
9  overall package of trade secrets and how they
10 work together in the overall system.
11 Q   What is the start date you use for the
12 calculation of damages in this case?
13 A   Well, there's three -- there's three
14 different categories.  So for the loss
15 profits I think it starts, what is it
16 November 1, I think of '22.  And then also, I
17 believe July 1 of '23 for the disgorgement.
18 And then for the avoidant cost it's basically
19 from inception of the business, and whenever
20 that inception point in the investment
21 starts.  So one of the challenges is relating
22 towards the historical information and as you
23 know from the report, we have an estimate of
24 the sort of reproduction costs or replacement
25 costs associated with the initial technology

76

1  that was included in one of 409A reports,
2  they don't identify in that report the exact
3  beginning date, but it is identified that
4  management provided an estimate to reproduce
5  the technology assets as of I believe it was
6  2014 or '15.
7  Q   Okay.  So I understand that the start
8  date you used to calculate damages for
9  avoided cost is the date of conception of
10 Compology?
11 A   Well, I would say from day one.  They
12 had this mission and goal as a start-up and
13 the ambition to create this.  But there's a
14 nuance of that, which is that the 409A report
15 includes an estimate of the cost associated
16 with developing the technology assets as of
17 that date.  Now, that does not say, look,
18 that's day one the date they incorporated or
19 20 days after they opened.  It just says,
20 look, as of that date, that's what management
21 estimated their technology investment to be.
22 Q   Okay.  In your report on Page 23 and
23 Schedule 3A, you just list pre 8-15-2015,
24 that is the date of the 409A valuation you
25 were just referencing?

77

1   A   I think that's the effective date of
2   value of the 409A valuation.
3   Q   When it says pre August 1, 2015, you
4   mean, back to the inception of Compology?
5   A   Well, I think Compology was established
6   as a start-up to basically have this mission
7   of creating this waste metering technology,
8   right.  And the founders worked with, well,
9   provided information to 409A firm about the
10  cost associated with the development of the
11  technologies.  Now, I don't know how far back
12  that goes, right.  But it certainly doesn't
13  go any further than the date of inception,
14  right.  They didn't have the details to
15  specify the exactitude as it relates to the
16  beginning date for those costs.
17  Q   You don't have a precise date when the
18  development of the trade secrets began within
19  that time frame, correct?
20      MR. GIBSON:  Objection, form.
21  A   I guess the goal of the company was to
22  build this waste metering system.  So
23  arguably you could say that the mindset and
24  development of the notion of the technology
25  and the eventual spends, you know, starts

78

1   with the inception of the company.  When
2   those costs kicked in, I don't have the
3   details.
4   Q   So based on the inception date and the
5   goal, the stated goal of Compology, you
6   assume that development of the trade secrets
7   began when the company was formed?
8   A   Well, I think the idea of the camera
9   system, you know, comes a little bit after
10  it's formed, right.  But the notion of it is
11  certainly at the formation.  I don't have the
12  exact date when the spend associated with the
13  system commenced.  All I know is that the
14  409A report describe management's estimates
15  of their investment to that date.
16  Q   So you don't have a precise date of when
17  research and development began on the alleged
18  trade secrets?
19  A   I don't have an exact precise date.  I
20  just know that it commenced prior to 2015.  I
21  believe that 2014 has some R&D costs
22  reflected in the income statement.  So then
23  now we know, okay, it's going from 15 to 14.
24  But there's nothing that was provided to me
25  or that was available that would give an

79

1   exact date of when the first dollar was
2   dedicated towards that in the context of the
3   research and development.  I don't know based
4   upon the records that are available.
5   Q   You understand that Compology solicited
6   funding when it first began, correct?
7   A   I understand that Compology, I believe
8   they had a convertible note at the outset, I
9   think it was about 400 grand or so.
10  Q   Did you endeavor to determine when
11  Compology received funding and how and when
12  it spent that funding?
13  A   Well, throughout the life of the
14  company?
15  Q   Yes.
16  A   Yes.
17  Q   Pre August 1, 2015, do you have an
18  understanding of when Compology received
19  funding and how it spent that funding?
20  A   Well, it's a two part answer.  So if we
21  look at the -- I think there's some fine,
22  some balance sheets, so we'd have to look at
23  the date when the funding hits the balance
24  sheets.  I don't know based on my
25  recollection, I don't know the exact date

80

1   when they may have received that initial
2   funding, but certainly you can see the
3   spending from the income statements on the
4   use of the funds, right.  There may be -- I'm
5   trying to remember if there's some detail in
6   one of the two 409A reports about the date of
7   the funds, but I don't recall off the top of
8   my head now.  I know there's reflection of
9   notes payable and potential convertible notes
10  in the 409A report, but I don't know they
11  detailed the exact date of the monies hitting
12  the bank.
13  Q   Do you know if any of those detail how
14  exactly the funding was spent by Compology in
15  those early years?
16  A   I know that in the -- in one of the
17  early 409A reports there is an income
18  statement or some kind of summary of revenue
19  of expenses.  I believe that includes part of
20  2014.  I have to look at the 409A report,
21  they have different dates of valuation that
22  are not on a calender year basis, but
23  certainly those reflect the use of funds.
24  Q   Do you have an opinion on how defendants
25  used Trade Secret No. 1?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

21 (81 to 84)

---

81

1      MR. GIBSON:  Objection.  Form.
2  A   How the defendants used Trade Secret
3  No. 1.
4      Do I have a specific opinion about that.
5  I mean, I have an understanding that it is
6  alleged by the misappropriation they were
7  able to develop their Pello camera.  I think
8  even, I think Hoarty says that they basically
9  got a head start, for lack of a better term,
10 in terms of advancing their Pello system by
11 virtue of the misappropriation.
12 Q   Do you have an understanding as to how
13 Trade Secret No. 1 gave defendants a head
14 start in developing or advancing their Pello
15 system?
16 A   I don't know if Hoarty specifically
17 identifies that connection.  Like on a -- for
18 that particular trade secret.  And again,
19 these trade secrets are sort of
20 interconnected in terms of their knowledge
21 and their implementation within the overall
22 camera system.  And so the technical
23 definition of the trade secret relative to
24 the Pello, I don't recall if Hoarty actually
25 illustrates that or identifies that in his

---

82

1  deposition or his two reports.  He may, I
2  just don't recall.
3  Q   Do you have an understanding as to the
4  differences between the Pello and the
5  Compology devices?
6  A   Yeah, so my understanding, and again,
7  this is just I'm relying on Mr. Hoarty, is
8  that he describes some of the differences as
9  and I think he says some of them were not
10 material, I know that there's a second
11 measurement in the Pello cameras, which is
12 used.  Which is different than the
13 RecycleSmart.  I think it's -- the name's
14 slipping my mind.  The second measuring, I
15 don't recall.  I know it's described.  It's
16 like a secondary testing, I forget the name.
17 Q   Do you have an opinion as to whether or
18 not the Pello system uses Trade Secret No. 1,
19 as described by Mr. Hoarty?
20     MR. GIBSON:  Objection.  Form.
21 A   I don't recall Mr. Hoarty's testimony on
22 that.  My understanding is that the overall
23 trade secrets are impacted by the
24 misappropriation.  And so the whole notion of
25 the camera system is impacted by the

---

83

1  misappropriation.
2  Q   And when you say that the notion of the
3  camera system is impacted by the
4  misappropriation, are you referring to the
5  Pello system?
6  A   Well, my understanding is that the Pello
7  system was developed expressly, according to
8  Mr. Hoarty, by virtue of the
9  misappropriation, right.  And that he has
10 allegations about different aspects of it.
11 And that the Pello system was advanced by
12 virtue of misappropriation through the images
13 or the opening of the camera and learning the
14 different secrets, right and how those
15 specifically interrelate with Trade Secret
16 No. 1, I don't recall his testimony in that
17 regard.
18 Q   As you sit here today, do you have an
19 opinion as to how the Pello system was
20 advanced in connection with misappropriation
21 of the trade secrets?
22     MR. GIBSON:  Objection.  Form.
23 A   I would say that's connected to
24 Mr. Hoarty's testimony that I think he used
25 the -- you know, he said they got a head

---

84

1  start.  They avoided a lot of costs to
2  develop all of the trade secrets information
3  that Compology had spent 10 years developing
4  and that basically gave them a head start,
5  they didn't have to wait, they didn't have to
6  take the time to develop them, and they
7  didn't have to spend cost to develop them.
8  And I think he used the images as an example
9  to have that robust data set and
10 understanding as an example.
11 Q   As you sit here today, do you have an
12 understanding of when that head start
13 allegedly began?
14 A   Well, I think it would be when the Pello
15 is hitting the market.  And I believe that
16 was in, if I recall, sometime during, was it
17 '22, I mean, I'd have to look at my file for
18 the exact date when they released the Pello
19 with the use of the misappropriated assets.
20 Q   Okay.  And you testify that Mr. Hoarty
21 alleges that defendants avoided a lot of
22 cost.  Did Mr. Hoarty provide a calculation
23 of the costs that defendants allegedly
24 avoided?
25 A   No.  I think my recollection from his

---

85

1 testimony was he remarked that Compology
2 raised $40 million and that $40 million
3 capital raises was a reflection of funding
4 all of the -- funding all the efforts, right,
5 and then he related that to the images and
6 the machine-learning and the training that
7 would then go into the overall system and
8 that they avoided the one -- the cost and I
9 think he used the images as a particular
10 example because of the sheer years and cost
11 that it takes to get that -- to get the
12 dataset basically. And that's what I recall
13 from his depo is that he used that as an
14 illustrative example.
15 Q   As you sit here today, do you know when
16 development of the Pello system began?
17 A   Well --
18     MR. GIBSON:  Objection. Form.
19 A   Yeah, I guess as it currently exists
20 with the alleged misappropriated trade
21 secrets, I mean, that may be different from
22 when it might have otherwise been. My
23 recollection is that RecycleSmart, I think in
24 the some of the documents, might have
25 indicated there was some initial work being

86

1 done in 2014 or 2015 around this concept of
2 using a camera, I think. And then you had
3 the relationship with Compology and then the
4 misappropriation thereafter. Alleged
5 misappropriation.
6 Q   Is it not relevant to your analysis to
7 look at the development timeline of the Pello
8 system?
9 A   Well, I mean, it is relevant because I
10 did consider the overall development
11 timeline, in the sense that they obviously
12 were interested in a camera, and then they --
13 my understanding is then they entered into a
14 relationship with Compology. And then
15 there's the alleged misappropriation.
16     So there's -- it does give a time
17 history associated with that, in terms of
18 their desire to have a camera, and then the
19 use of the Compology camera and then the
20 eventual alleged misappropriation.
21 Q   What relevance does the interest in
22 having a camera have on your analysis -- have
23 to your analysis?
24 A   Well, it just -- they entered into a
25 contractual relationship with Compology, you

87

1 know, which had the overall camera system,
2 waste metering system.
3 Q   Does Pello's independent development of
4 its camera factor into your analysis?
5     MR. GIBSON:  Objection, form.
6 A   Well -- sorry. Yeah. So what I'm
7 looking at, again, is using the plaintiff's
8 cost as a proxy for the total development
9 cost associated with the trade secrets
10 developed by Compology.
11     And so what was taken was the cost that,
12 the experience by Compology to estimate the
13 cost associated with developing those trade
14 secrets. All those costs need to be borne to
15 develop those trade secrets. So by virtue of
16 taking those trade secrets, they have
17 foregone all of the costs associated with
18 them specifically.
19 Q   You would agree that defendants have
20 their own costs associated with development
21 of the Pello system, correct?
22 A   That's my understanding, yes.
23 Q   Have you quantified defendants costs in
24 developing their Pello system?
25 A   Not specifically. I'm aware, I think

88

1 there are some documents that reflect some of
2 the historical costs, and I think there were
3 some budgets as well.
4 Q   So even though defendants have their own
5 costs, you assume they would have spent the
6 same money that Compology did in developing
7 its trade secrets?
8 A   Well, the way that I'm looking at it is
9 that, you know, the Compology's costs are
10 known to get to their overall camera system
11 in developing the trade secrets that they
12 have, right. And so it's being alleged that
13 RecycleSmart has misappropriated those trade
14 secrets and everything associated with them
15 in developing them.
16     And so I'm using the actual cost to
17 reflect that because that's what was
18 experienced in developing the trade secrets
19 of Compology.
20 Q   So in that analysis, defendants own
21 expenditures are irrelevant?
22     MR. GIBSON:  Objection, form.
23 A   Well -- sorry.
24     I think the way that -- the way to think
25 about it is, while I'm trying to determine

89

1  the cost that is associated what was
2  developed at Compology, to develop its trade
3  secrets, which were then misappropriated.
4  And using that as a proxy for what those
5  total costs would have been.  And it's not --
6  there's no identification that there's some
7  kind of offset or specific exact offset on
8  any of those costs at RecycleSmart.
9      So the approach that I'm taking is,
10  look, these are the actual costs, this is
11  what it took, this is what was experienced,
12  this is what we know to be the costs
13  associated with developing these trade
14  secrets.
15      So you look at the other systems of
16  processing, these are the costs that were
17  incurred as a proxy and match a reasonable
18  measure for what those total costs would be.
19  Q   If you have cost expenditures from
20  defendants, wouldn't that be a good sanity
21  check on the cost Compology allegedly spent
22  to develop their trade secrets?
23  A   Well, I think -- they don't have, for
24  example, all the machine learning and the
25  images that Compology incurred over time.

90

1  There are certain things that went into
2  details, whatever the costs were that were
3  experienced by Compology is what it cost them
4  and time it took them to do it.
5      So, I mean, to me, it's just the best
6  reflection of the overall cost to create it.
7  Q   Would costs associated with development
8  of the Pello's camera apparatus be relevant
9  to your analysis of avoided costs?
10  A   Well, again, I'm looking at trying to
11  proxy a total cost associated with the
12  development of the Compology, looking at it
13  from the plaintiff's perspective as a proxy
14  from the total cost associated with the
15  development.
16  Q   In that analysis, you're using
17  Compology's costs as a proxy for what
18  defendants would have spent, but you're not
19  analyzing what defendants actually spent in
20  development; is that accurate?
21  A   I'm not adjusting for what the
22  defendants actually spent.
23  Q   And why don't you perform that analysis?
24  A   Well, because they -- again, I'm looking
25  at the uniqueness of what Compology did in

91

1      developing its trade secrets and developing
2      its overall camera systems or reflection of
3      the total cost to arrive at that bundle of
4      rights and trade secrets for what it is, and
5      it was as a proxy for the overall spend
6      associated with developing that final --
7      well, that evolving system.
8  Q   Your analysis of avoided cost damages is
9  not a valuation of the alleged trade secrets,
10  correct?
11  A   It is not a valuation, no.
12  Q   You don't have an opinion of the alleged
13  value of the trade secrets?
14  A   I did not formulate an independent
15  opinion, valuation opinion associated with
16  the trade secrets.
17  Q   Okay.  In Page 6 of your reply report,
18  you state:
19      "Each of the above trade secrets
20      is part of the overall waste metering
21      system and earth recycling system and
22      each has independent economic value as
23      being part of a working system."
24      You didn't quantify the independent
25  economic value of any of the trade secrets,

92

1  correct?
2  A   I did not assign a dollar amount to
3  them.  I know that Mr. Hoarty, the technical
4  expert, testified that each of these has
5  independent economic value, and that each of
6  them on their own plays a role in the ability
7  of the business to facilitate products and
8  sales and then generate profit.
9  Q   Okay.  Further down the page, you state
10  that:
11      "Effectively, all of the trade
12      secrets in tandem work together as a
13      cohesive system to create outcomes that
14      have economic value."
15      You didn't put a dollar figure on the
16  outcomes derived from the system, correct?
17  A   I did not assign a dollar to that
18  economic value.  What I'm getting at there is
19  that, there is an economic benefit to the use
20  of the trade secrets.  Individually, they
21  have their own independent economic value,
22  and then together they create the system,
23  which is then deployed in business.
24  Q   Okay.  So without discerning what the
25  dollar value is, what's the basis for saying

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of Forrest A. Vickery

Conducted on October 2, 2024

24 (93 to 96)

93

1  that they have economic value?
2  A  Well, one basis of them having economic
3  value is that Roadrunner purchased --
4  purchased them, and my understanding is that
5  the primary driver behind that was getting
6  the trade secrets, and that was the principle
7  aspect of it.
8  Q  You don't put a dollar value on the
9  waste metering system itself, correct?
10  A  I did not appraise or value the system
11  itself.  Rather, it was just looking at the
12  avoided cost.
13  Q  You didn't calculate the value of any
14  particular trade secret within the waste
15  metering system, correct?
16  A  I didn't do valuations of any of the
17  individual trade secrets.
18  Q  You didn't analyze the relative value of
19  any particular trade secrets within the
20  overall waste metering recycling system,
21  correct?
22     MR. GIBSON:  Objection, form.
23  A  I didn't perform any valuations. So,
24  therefore, I didn't assign any relative
25  value. Rather, I looked at the total

94

1  avoiding costs in developing all of them.
2  Q  So you don't have an opinion about
3  whether the smart camera apparatus, for
4  example, is more valuable to the system than
5  the optical assembly, for example?
6  A  Well, I mean, I think Hoarty touched on
7  this a little bit in his deposition where he
8  addressed the point that these all work
9  together as a cohesive system, and they all
10  are necessary in the sense that you need the
11  camera to get an image, you need the image to
12  machine learn, et cetera.
13     But I did not parse to say, look, I'm
14  going to allocate certain portions of these
15  total costs to each of the different trade
16  secrets.  Rather, looking at it as a cohesive
17  whole, as I understand it from Mr. Hoarty's
18  report and testimony.
19  Q  Okay.  Did you try to analyze how it
20  changes the individual components covered by
21  a trade secret changed the value of the
22  system?
23  A  Well, again, you're using value.  I
24  didn't perform any valuations, per se.
25  Q  Okay.  Do you agree with the premise

95

1  that trade secrets only have value as long as
2  they are maintained in secrecy?
3     MR. GIBSON:  Objection, form.
4  A  I guess, my understanding is that
5  secrecy or publicly ascertainable, I think is
6  another term, that they have to be -- again,
7  it's a legal question, but my general
8  understanding is that they are supposed to be
9  maintained as secret.
10  Q  Do you think that once a trade secret
11  becomes publicly ascertainable, it loses its
12  value?
13     MR. GIBSON:  Objection, form.
14  A  Well, I mean, I think there's a legal
15  question buried in there as to making that
16  determination.
17     So I would say that, if a legal
18  determination made that way, so it would
19  qualify as a trade secret, but, I mean, I
20  think that would be something that would need
21  to be determined by either attorneys or
22  technical experts as it relates to the
23  disclosure and what's available.
24  Q  Do you think it's appropriate to
25  calculate damages on a trade secret beyond

96

1  the date it becomes publicly ascertainable?
2     MR. GIBSON:  Objection, form.
3  A  Well, again, I think it would be a
4  determination -- there would have to be that
5  determination that it became publicly
6  available and it's not longer a secret.  And
7  so that aspect of it, or on a stand alone
8  basis.
9  Q  Assuming that the trade secret became
10  publicly ascertainable, would you think it
11  would be appropriate to calculate damages
12  beyond that point?
13     MR. GIBSON:  Objection, form.
14  A  Again, I would say that if it were
15  determined, certainly legally determined that
16  were the case that it's not longer a secret
17  at a particular point in time, then,
18  theoretically, holding us equal, that there
19  may not be any damages associated with that
20  no longer a secret.  But, again, I think
21  that's a complicated question as it relates
22  to the determination of that.
23  Q  Okay.  If, for example, Compology
24  publicly displayed its hardware and the
25  associated trade secrets in 2019, do you

97

1  think it would be entitled to recover
2  avoiding cost damages beyond that date?
3        MR. GIBSON:  Objection, form.
4  **A  I would say that is a legal**
5  **determination.  And I would have to rely on**
6  **legal counsel or a legal determination of**
7  **that.**
8  Q   So my question is, assuming that took
9  place, assuming Compology displayed its
10  hardware and associated trade secrets in
11  2019, do you think it would be appropriate to
12  calculate damages beyond that point?
13        MR. GIBSON:  Objection, form.
14  **A   Well, I think, again, there's going to**
15  **be different trade secrets involved there,**
16  **too, right.**
17  **     So this is a system which has multiple**
18  **trade secrets.  So I think it would have to**
19  **be -- there would have been to be some**
20  **determination as to what is the effect of**
21  **that, whatever was revealed, you know, in**
22  **terms of the overall system.**
23  Q   Okay.  You are generally aware that
24  Compology was the assignee of several patents
25  that were developed by its employees,

98

1  correct?
2  **A   Yes.**
3  Q   Is it your opinion that Compology's
4  patents that were acquired by Roadrunner have
5  no economic value?
6  **A   So my understanding is that those**
7  **patents were not a desirable part of this**
8  **transaction with Roadrunner.  I think both**
9  **Greg Grant and Steve Krebs testified as such.**
10  **And that they would really have no**
11  **consequence in terms of the acquisition by**
12  **Roadrunner.  And I'm not aware of any sort of**
13  **commercial activity associated with the**
14  **patents historically either.**
15  Q   Is it your understanding that's what
16  Roadrunner, the Compology patents had no
17  economic value?
18  **A   Well, no, I mean, I can't put words in**
19  **their mouth, but my understanding is that, in**
20  **this acquisition, what they wanted was a**
21  **trade secrets in the system.  And that the**
22  **patents themselves, you know, didn't --**
23  **weren't like the focus of the transaction,**
24  **didn't really -- that wasn't the alluring**
25  **part of the deal, right.  The patents were**

99

1  **developed throughout the entire process, but**
2  **it was really the trade secrets and the**
3  **technology.**
4  Q   Did you independently analyze any value
5  of Compology's patents?
6  **A   I did not assign any values to**
7  **Compology's patents.  I looked at it as that**
8  **was part of the overall process of developing**
9  **the trade secrets, but I didn't perform any**
10  **valuations of the patents.**
11  Q   In part of your reply report you read
12  Mr. Chehebar's transcript, correct?
13  **A   Yes.  I did.**
14  Q   Do you understand that he's a named
15  inventor on a few patents that were assigned
16  to Compology?
17  **A   That's -- well, I recall that he's named**
18  **on some of the patents.  I don't recall the**
19  **assignments, et cetera.**
20  Q   You understand that he believes that the
21  Compology R Series cameras practiced the
22  Compology patents?
23  **A   I don't recall that testimony.**
24  Q   Well, if it's true that the Compology R
25  Series cameras -- and by that, I mean the R0

100

1  through R14 practiced the patents, would that
2  impact your analysis?
3        MR. GIBSON:  Objection, form.
4  **A   I'd have to dig into that a little bit**
5  **more.  But the perspective that I took on it**
6  **was that if we're looking at the costs**
7  **associated with all the trade secrets,**
8  **there's a cost associated with developing all**
9  **of the trade secrets.**
10  Q   Is it your opinion that Compology's
11  engineers spent no time on the development of
12  Compology's patented technology?
13  **A   Well, my understanding is that the**
14  **engineers were fully devoted to the overall**
15  **development of the technologies, that**
16  **participated in the trade secrets.  I don't**
17  **recall testimony about how much time may have**
18  **been associated with the patents, per se.**
19  **But, regardless, the engineers would have**
20  **been, you know, as part of the company, are**
21  **being paid to develop the overall system.**
22  **And so I'm looking at the cost of developing**
23  **the overall system, which is inclusive of the**
24  **trade secrets.**
25  Q   Do you think trade secrets and patents

101

1  can be co-extensive?
2       MR. GIBSON:  Objection, form.
3  A   Yeah.  I don't recall -- there's a legal
4  sort of issue around that, and so I'm going
5  to leave that to the lawyers.
6       And I don't want to cut you off, but
7  when you do get to a stopping point, I'd like
8  to just get some water refill.
9       MR. THOMSON:  Let's take a break.
10  We'll go off the record.
11      VIDEOGRAPHER:  Stand by.  We are going
12  off the record at 13:25 Eastern time.
13         (Whereupon, a recess was taken
14         from 1:25 p.m. until 1:38 p.m.)
15  VIDEOGRAPHER:  We are back on the
16  record.  The time is 13:38 Eastern
17  time.
18 Q   Welcome back, Mr. Vickery.
19      Did you write your reports yourself?
20 A   Not the full content, but a -- quite a
21  bit of it, yes.
22 Q   And who else was involved in drafting
23  your reports?
24 A   Blake Milton and Carson Gross.
25 Q   And is it Ms. or Mr. Milton?

102

1  A   Oh, Mr. Blake Milton.
2  Q   Mr.  And who is Mr. Milton?
3  A   Oh, he's an associate at my firm.  He's
4  been with the firm for probably -- maybe 10
5  or 15 years now.
6  Q   No problem.
7       And so who is Mr. Gross?
8  A   Mr. Gross is an analyst, junior level.
9  Q   Outside of Messrs. Milton and Gross, did
10  anyone else help you draft your report?
11 A   The writings, I don't believe so, no.
12 Q   Okay.  What was Mr. Milton's role in
13  drafting the report?
14 A   Well, I mean, literally writing.  You
15  know, in terms of drafting the report, the
16  writings and reviewing documents and to
17  incorporate writings, preparation,
18  calculations in some of the exhibits.
19 Q   Okay.  And what was Mr. Gross' role in
20  drafting the report?
21 A   I don't know that he did much in the way
22  of narrative, more on the exhibits and
23  schedules.
24 Q   Okay.  In your report you calculate
25  avoided costs from pre-August 1, 2015 to

103

1  December 31, 2021; is that correct?
2  A   Yes.
3  Q   Okay.  I may have already asked you
4  this, I'm sorry:  Why did you pick
5  December 31 as the stop date -- of 2021?
6  A   That was the point -- well, that's the
7  end calendar year prior to some testimony as
8  well as a 409A valuation comments about the
9  financial condition of the company.  And I
10  believe there's either depo testimony or I
11  can't remember if the document -- where they
12  basically said things are slowing down in
13  terms of investment, they're conserving cash.
14  And so at that point, I felt like that's a
15  reasonable break in terms of the investment
16  and costs associated with the trade secrets.
17 Q   Your avoided-cost analysis, you only
18  used Compology's expense line items for
19  development costs; is that correct?
20 A   Okay.  So let me -- I'm just going to
21  make sure I understand what you're saying.
22  You said I only use Compology's expense line
23  items?
24 Q   Yeah, it might be help -- if you go to
25  Page 19 of your opening report.

104

1  A   Okay.  Let me just clear up some papers
2  here 'cause I got two piles.
3       Okay.
4  Q   I'm looking at Step 1, and just at a
5  high level, can you describe what Step 1
6  involves?
7  A   Oh, it's really ascertaining -- looking
8  at the income statement, looking at the
9  expenditures and basically determining, okay,
10  which of these are fully related to the
11  development and which of these maybe are
12  partially related to the development and
13  which of these are not related to the
14  development.
15 Q   Okay.  And how do you go about
16  determining which line items are related to
17  the development of the trade secrets?
18 A   I had conversations with Mr. Krebs to go
19  through the details of what is contained in
20  each of the different expense categories that
21  was part of the inappropriately labeled
22  "correspondence." So this was just through
23  conversation about understanding the
24  components of these different expenses.
25  And now I know we recently received the

105

1 launch finance production, so I may look at
2 that and see if there's any impact.  But
3 that's basically based upon my conversations
4 with him and then, you know, also partly depo
5 testimony from, you know, the various
6 components who talked about who was doing
7 what and how their time was allocated and,
8 you know, what was the nature of the business
9 and just sort of understanding, you know, the
10 facts about the nature of the business and
11 its start-up state and what it's intending
12 growing to do and then looking at the
13 financial trends of the business and seeing
14 the revenues change.
15     And then Mr. Krebs, who's a CPA, has a
16 lot of past audit and detailed experience in
17 financials.  And so he gave us responses as
18 it related to the composition of the
19 different expense categories.
20 Q   Okay.  As of today, you haven't reviewed
21 the launch finance documents that were
22 produced?
23 A   My staff started the review of it.  I
24 personally haven't had -- I've looked at some
25 components of it but not -- I have not

106

1 thoroughly reviewed it as of today.  But my
2 staff has reviewed it and communicated to me
3 about the composition.
4 Q   Earlier in your testimony, Mr. Krebs
5 helped you identify the composition of the
6 line items in Compology's financials?
7 A   Yes.  He gave us descriptions of how
8 expenses were classified and recorded within
9 the, you know, accounts.
10 Q   And those are Compology's financials and
11 accounts?
12 A   Yes.  Compology or its division of
13 Roadrunner.  But, yeah, going back 2021
14 prior, Compology, correct.
15 Q   You understand that Mr. Krebs never
16 worked at Compology, correct?
17 A   That's my understanding.
18 Q   Did you review Mr. Krebs' deposition
19 transcript?
20 A   Yes.
21 Q   Okay.  You understand that Mr. Krebs
22 couldn't testify as to the veracity of
23 Compology's financials?
24 A   I think -- no, I mean, I've had
25 conversations with him about this, is that

107

1 his comments were along the lines that the --
2 you know, Compology's -- I think -- the way
3 he described it to me is, like, look, all the
4 money is there.  It's just sometimes there
5 were shifts in classifications and how things
6 were reported.  And you can see it in the
7 historical trends, like some categories might
8 get moved around a little bit.
9     He's also coming from a CPA background,
10 you know, in audit, I believe, and so he has
11 not audited those financials himself.  But my
12 understanding is that he has a deep knowledge
13 in terms of what costs are included in what
14 account.
15 Q   Okay.  So you understand that Mr. Krebs
16 never audited Compology's financials,
17 correct?
18 A   Did not audit Compology's financials.
19 Q   You understand that Compology's
20 financials were never audited by anyone,
21 correct?
22 A   That is my understanding.
23 Q   Okay.  And you understand that Mr. Krebs
24 has no firsthand knowledge as to how
25 Compology's financials were created?

108

1 A   Well, firsthand knowledge, I don't
2 believe he would because he wasn't there, if
3 that's your question.
4 Q   Okay.
5 A   I mean, I think he has knowledge about
6 their accounting system, right.  So to the
7 extent that it's -- you know, he knows what
8 their accounting system is.  And then I
9 believe it changed, and he also knows that
10 Launch Finance came in in 2022, and I think
11 he knows information about the composition of
12 the different expense categories in the
13 balance sheet.
14     So he has knowledge relating to the
15 financials, but as to the creation of them
16 and data entry and whatnot, I don't know that
17 he would -- he may have knowledge as through
18 the acquisition, like, I don't think -- he
19 certainly wasn't involved.
20 Q   Despite Mr. Krebs lack of institutional
21 knowledge as to the creation of Compology's
22 financials, you still thought he was a good
23 source of information for identifying
24 categories of expenses in Compology's
25 financials?

109

1 A   Yeah, I mean, look, the -- and this is a
2 conversation I had with Krebs as well is that
3 the expenses are there, right.  And they may
4 have changed categories, and there may have
5 been some classifications issues here and
6 there, and that's not uncommon in small
7 businesses.
8    But he had -- he was clear about what
9 expenses were included in which categories.
10 And then he has knowledge about whether that
11 expense category might be a hundred percent
12 related to the research and development or
13 the development of trade secrets or, you
14 know, there was some bifurcated time or
15 category that might include partly -- I would
16 say it's, like, related to the sales
17 activities and then partly related to the
18 development.
19 Q   And Mr. Krebs is the only source of
20 information for rectifying all those
21 classification issues you just described and
22 other issues in the financials?
23    MR. GIBSON: Objection.  Form.
24 A   I'm not sure I understand your question.
25 Q   Okay.  So you just described a number of

110

1 issues with Compology's financials.  Was
2 Mr. Krebs the only source for trying to
3 rectify those issues with Compology's
4 financials?
5    MR. GIBSON: Objection.  Form.
6 A   Yeah, I guess -- I mean, you're saying
7 "rectify issues with their financials."  I
8 described earlier characteristics or, like,
9 how they were classified and his knowledge
10 about certain components.  So I guess I'm not
11 following your follow-up question to what I
12 said in my prior answer.
13 Q   Okay.  Was it Mr. Krebs who identified
14 the classification and categorization issues
15 that you described earlier in Compology's
16 financials?
17 A   He is the person who described to me
18 that there's -- there are historical account
19 classifications here or there were
20 reclassifications.  Yeah.  I mean, it
21 happens.  I see it all the time in private
22 businesses.
23 Q   So based your and Mr. Krebs' analysis,
24 you identified six categories of line items
25 that contained development costs; is that

111

1 accurate?
2 A   Yes.
3 Q   Okay.  And those are the ones listed on
4 Page 19 of your report?
5 A   Correct.
6 Q   Okay.  And how did you and Mr. Krebs
7 identify these specific categories of line
8 items that contained development costs?
9 A   Well, I mean, really I questioned
10 Mr. Krebs and got details on the different
11 categories.  He wasn't telling me, you know,
12 "This is this; this is that."  He was
13 describing to me what is contained in the
14 different expenses within those categories.
15    And then I took that consult and then
16 made the determination, like, okay, these are
17 the categories that I'm going to utilize to
18 determine Plaintiff's costs and therefore the
19 avoided cost.
20 Q   Can you give me an overview of what goes
21 into Step 2 in your analysis?
22 A   Well, that's what I described earlier
23 is, okay, let's look at these expenses; are
24 any of them 100 percent, right?  And if not,
25 then we'll adjust them proportionately,

112

1 allocated.
2 Q   Okay.  Within Step 2 you wrote:
3    "SP&H determined that Research
4 Expense was the only expense line item
5 that was exclusive to development and
6 the other selected categories or line
7 items required analysis to estimate
8 what portion of the expense should be
9 allocated to development costs."
10 Did someone else at your firm make that
11 determination of what should be -- that
12 research expense was the only expense line
13 item that was exclusive to development?
14 A   Are you asking that because it says
15 "SP&H"?
16 Q   Exactly, yeah.
17 A   Yeah.
18 Q   That's what I'm curious about.  Is that
19 your opinion or did someone else --
20 A   Well, believe it or not, I've been here
21 since 1995, and so it becomes an identity.
22 So, no, it's got nothing to do with -- I
23 think that's just sort of a habit of, you
24 know, my firm, which is a reflection of me,
25 so.

---

113

1  Q   Okay.  And I guess maybe we should clear
2  this up.  If you go to Page 10 of your reply
3  report.
4  A   Okay.
5  Q   At the very bottom of Page 10, it says,
6  "For our analysis, we assumed that RTS would
7  continue its month-to-month," is that your
8  determination or is that someone else at your
9  firm's determination?
10 A   No, I mean, in the end they're all my
11 determinations.  It's just a habit of writing
12 on behalf of the firm.
13 Q   All right.  Sorry to make you jump
14 around.  So back to Step 3 of your opening
15 report.
16     Step 3 looks like you estimate what
17 portion of the selected expenses should be
18 allocated to development costs; is that
19 accurate?
20 A   Yeah.
21 Q   Okay.  And what goes into that analysis?
22 A   Well, basically what we are looking at
23 is how to remove -- sort of, like, payroll,
24 for example, you know, how to remove some of
25 the costs that are in payroll that wouldn't

---

114

1  be related to, you know, the overall
2  development of the trade secrets.  And, you
3  know, these exhibits provide some
4  calculations to walk through that process.
5  But essentially in particular, the
6  profit/loss statements include an aggregate
7  category for payroll costs, right.
8      Now, we were able to -- we did receive
9  two documents, one for 2017 and one for 2021,
10 which actually provided detail of what was
11 included in the payroll costs, right.  And so
12 what we endeavored to do was remove the
13 payroll costs that were associated with sales
14 and marketing.  And then also we adjusted the
15 overhead -- or the admin -- office admin
16 folks so that some of their time is being
17 allocated to supporting the sales and
18 marketing versus the development.
19 Q   And how is it that you determined what
20 portion of admin professional time and
21 expenses were dedicated to development of the
22 trade secrets?
23 A   Well, I estimated it based upon the
24 proportioned amount of people and salaries,
25 right.  So, you know, the yardstick being,

---

115

1  okay, if we have this much staff on, you
2  know, on one side and another staff on the
3  other side that the relative support -- a
4  reasonable benchmark for that would be the
5  proportionate amount of the compensation or
6  the proportionate amount of the employees.
7  Q   Should have asked you this earlier, but
8  have you quantified economic damages for
9  other forms of intellectual property other
10 than trade secrets?
11 A   You're talking about in general?
12 Q   Yeah.
13     MR. GIBSON:  Form.
14 A   So I have calculated, I think, in the
15 litigation patents -- well, trademark
16 infringement, copyright.  Let me think.
17 There might have been some branding.  There
18 may be others.  It's been a long journey.
19 Q   Okay.  How many patent cases have you
20 worked on?
21 A   I'm sorry?
22 Q   How many patent cases have you worked
23 on?
24 A   Oh, for litigation or for valuation?
25 Q   Let's start with litigation.

---

116

1  A   I don't know that I've had -- I feel
2  like there's one or two in the past.  I can't
3  remember the names or the timing.
4  Q   How many trademark litigations have you
5  been involved in?
6  A   I'd say the same thing.  I know there's
7  one or two here and there, and I may have
8  supported my partners on some in the past.
9  Q   What about copyright litigation?  How
10 many copyright litigations have you been
11 involved in?
12 A   Litigation, I don't -- you know, I feel
13 like there's one or two in the background
14 there.
15 Q   Okay.  Can you identify any of the cases
16 that involved patents, trademarks or
17 copyrights on your CV?
18 A   Oh, on my CV.  I don't --
19 Q   If it's helpful.  If you know off the
20 top of your head, that's fine.
21 A   You know, I'm trying to remember if any
22 of them got to testimony.  I'd have to look.
23 A lot of times these things start and then
24 take a while.
25     Number 40, Raddavero v. Carvery, I don't

---

117

1  recall the IP that was -- I think it was --
2  that might have been trade name and some
3  other branding.
4  Q   We can move on unless you want to keep
5  looking.
6  A   No.  That's fine.
7  Q   Okay.  What types of litigations are you
8  typically involved in?
9  A   Lost profits, economic damages, dilution
10 of value, shareholder disputes.  Yeah.  But
11 usually the -- I would say the majority of my
12 litigation testimony centered around economic
13 damage in the form of lost profits, impact on
14 value.
15 Q   I know there's a number of cases.  What
16 are the underlying issues?  Is it breach of
17 contract?  Is it...
18 A   So -- I mean, so there's certainly
19 issues of breach of contract, stealing
20 confidential information.  Let's see.  I
21 mean, it's hard for me to reveal all the
22 causes of action.  It can be employment
23 issues, stealing information.  Let's see.
24 Other contract losses.
25     Usually there's some incident or some

118

1  event that has resulted in an economic loss
2  in terms of profit dilution or value dilution
3  or the opposite, right.  That there's been
4  some benefit accruing on the other side of
5  that equation.
6  Q   Is it fair to say that this case is the
7  first time that you've calculated avoided
8  cost damages for trade secret
9  misappropriation for litigation?
10 A   It's the first time I've personally done
11 it, yes.
12 Q   Okay.  So this three-step method in your
13 opening report, this is the first time you've
14 ever used this methodology?
15     MR. GIBSON:  Objection.  Form.
16 A   No.  I would say this methodology is a
17 process of identifying, well, I guess if you
18 think about it generally, the methodology
19 identifying the expenses and then
20 apportioning the expenses.  That's a common
21 methodology in terms of any kind of financial
22 statement adjustments or analysis associated
23 with assessing, you know, could be
24 profitability, it could be, you know,
25 divisional spin-offs, any number of things.

119

1     The concept of it is what's appropriate
2  and then making those calculations and then
3  making those adjustments and making those
4  allocations.  So the notion of it is very
5  commonly used, you know, from the perspective
6  of allocating expenses for any kind of
7  financial statement, adjustment purposes or
8  determining costs associated with whatever it
9  is.  Whether it's a division of a business or
10 costs associated with a particular asset and
11 so on.
12 Q   Is it fair to say that this is the first
13 time that you've used this methodology in the
14 context of calculating damages for trade
15 secrets misappropriation?
16     MR. GIBSON:  Objection.  Form.
17 A   I don't recall if we applied this
18 previously in other matters, but I would say
19 for the purpose of preparation of this report
20 for me this -- this methodology is the first
21 time I presented this in an avoided cost
22 analysis for the trade secret
23 misappropriation.
24 Q   Okay.  In rendering your opinion, you
25 used these three steps to determine the

120

1  reproduction costs of the trade secrets; is
2  that accurate?
3  A   Well, I think what I would say is this
4  is reflecting the actual cost incurred by the
5  plaintiffs in developing the trade secrets,
6  you know, reproduction costs can have
7  different concepts from a valuation
8  perspective.
9  Q   Are you familiar with the term
10 reproduction cost in the quantification of
11 damages?
12 A   Certainly.  I've certainly heard the
13 notion.
14 Q   Do you understand the difference between
15 reproduction costs and replacement costs?
16     MR. GIBSON:  Objection.  Form.
17 A   There is a nuance there which has to do
18 with, I think, the knowledge of replacing
19 something exactly as it is at a certain time
20 as opposed to a particular substitute we use,
21 I think, utility.
22 Q   Utility.
23     Would you agree that a reproduction
24 costs or the total cost to develop an exact
25 duplicate or replica of an intangible asset?

121

1      MR. GIBSON:  Objection to form.
2   **A   I don't think you completed your**
3   **question.**
4   Q   Might have gotten cut off.
5      Would you agree with the statement that
6   reproduction costs are a calculation of a
7   total cost to develop an exact duplicate or
8   replica of an intangible asset?
9      MR. GIBSON:  Objection to form.
10  **A   Well, I don't recall the exact nuance**
11  **meaning of that, but that's -- I would say**
12  **that is probably accurate because if the**
13  **intention is to duplicate and reproduce it as**
14  **it is, as opposed to replacing it with**
15  **something of similar utility, that's my**
16  **recollection, I would have to verify that.**
17  Q   Okay.  Is it your understanding that
18  replacement costs calculate the cost to
19  recreate the utility of an intangible asset?
20     MR. GIBSON:  Objection.  Form.
21  **A   I'm going to have to go back and review**
22  **the definition because there's a lot of**
23  **different forms and creation.  Recreation,**
24  **reproduction, replacement, and I don't have**
25  **those definitions here to review.  Generally**

122

1      **speaking, that's my recollection.**
2         MR. THOMSON:  Okay.  Mike, if we could
3      pull up document 4 in the Exhibit
4      folder we're going to premark this as
5      Exhibit 420.
6            (Whereupon, Valorem Principia
7            article was marked as Exhibit
8            420 for identification as of
9            this date.)
10  Q   Mr. Vickery, you should see that on your
11  screen shortly, you should be able to
12  manipulate the document, if needed, just let
13  me know when you can see it.
14        TECH MARTINEZ:  Counsel, sorry, you
15     said you need me to screen share
16     something?
17        MR. THOMSON:  It's document 4 in the
18     exhibit folder.
19        TECH MARTINEZ:  Gotcha.  Standby.
20     That will be marked as the --
21        MR. THOMSON:  Exhibit 420.
22        TECH MARTINEZ:  Exhibit has been
23     marked and is going to be screen
24     shared in a couple seconds.
25     Exhibit 420 on screen.

123

1   BY MR. THOMSON:
2   Q   Mr. Vickery, have you seen this document
3   before?
4   **A   Yeah.**
5   Q   And what is it?
6   **A   It's an article from my firm's old**
7   **publication.**
8   Q   When you say your firm's old publication
9   is it Valorem Principia?
10  **A   Yeah, we used to publish this.**
11  Q   Is this an article you wrote in June of
12  2023?
13  **A   Yeah.**
14  Q   Does this reflect your recollection of
15  the terms reproduction cost versus
16  replacement cost?
17  **A   I can't see --**
18        MR. GIBSON:  Objection to form.
19  **A   Oh, I'm sorry, I can't see the whole**
20  **thing, so is there more content here?**
21  Q   Yeah, do you have the ability to scroll
22  through?
23        MR. THOMSON:  Mike, we can give him
24     control of the document?
25        TECH MARTINEZ:  Yeah, give me one

124

1      second.
2   **A   So your question is do I see the**
3   **definitions of reproduction replacement cost**
4   **here.**
5   Q   Yeah, I can help you there.  It's on
6   Page 2, of the document, under a header
7   called cost approach, in this you write:
8         "Two common measures of cost
9      include reproduction cost and
10     replacement cost.  Reproduction cost is
11     the total cost at current prices to
12     develop an exact duplicate or replica
13     of the subject intellectual property."
14        Then it goes on, "replacement
15     cost on the other hand, contemplates
16     the cost to recreate the utility of the
17     subject intellectual property, but in a
18     form or appearance that may be
19     different."
20  **A   Okay.**
21  Q   Do you still agree with those
22  statements?
23  **A   Now, I've got to read them, again.**
24  Q   Take your time.
25  **A   This is going back to the utility as it**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

32 (125 to 128)

125

1  relates to the replacement cost, yeah, yeah,
2  I think from the valuation perspective,
3  that's my recollection in terms of like if
4  you were performing an appraisal of using a
5  cost approach at a particular date of
6  valuation.
7  Q   Did you not use a cost approach in this
8  litigation?
9     MR. GIBSON: Objection. Form.
10 A   I would say a proxy of the avoided cost
11 by looking at the actual cost that were
12 experienced by the -- by the plaintiff,
13 right. So the approach in that sense is a
14 sort of subset of the cost approach is to
15 say, look, the costs are a reflection -- of a
16 potential reflection of value as indicated
17 here and then the historical costs
18 experienced by the plaintiff are an
19 indication of what the actual cost were for
20 the plaintiff during the development period.
21 And that is an indication of the cost that
22 would be avoided by defendant by not having
23 incurred those costs.
24 Q   Okay. Would you consider the costs you
25 calculated reproduction costs or replacement

126

1  costs?
2     MR. GIBSON: Objection. Form.
3  A   Well, I guess I wouldn't characterize it
4  that way because I'm not using the current
5  prices. I'm relying upon the actual costs
6  that were incurred by the plaintiff in
7  developing all of the trade secrets and
8  aggregating those costs. Those costs had
9  been borne and they're an actual cost
10 indication of the process and the trial and
11 error to develop the trade secrets as they
12 exist.
13 Q   So it's absent not utilizing current
14 prices, did you otherwise calculate
15 reproduction costs for the trade secrets?
16    MR. GIBSON: Object to form.
17 A   Okay, so. Well, I guess the answer to
18 that would be the -- I think the way to
19 reflect it would be there's been a lot of
20 trial and error. There's been a lot of
21 evolution of the product, betterment as
22 described by Mr. Hoarty, and this is
23 reflecting all of the costs associated with
24 going through the process -- going through
25 the process of experiencing the trial and

127

1  error and then moving through to the next
2  improvement or betterment in the overall
3  trade secrets.
4  Q   I may be confusing things.
5     Is it your opinion that you didn't
6  calculate reproduction costs, correct?
7  A   I didn't calculate it from -- I didn't
8  perform any kind of valuation and in this
9  context here, reproduction cost as it relates
10 to the cost approach is under an evaluation
11 theory. Where you say, hey, I now at current
12 knowledge with all of the sort of known
13 failures, et cetera, of the known trial and
14 error already be known and knowable as
15 opposed to having experience that entire
16 process.
17 Q   Fair to say, you didn't calculate
18 replacement costs?
19 A   Well, I didn't perform a valuation using
20 a replacement cost approach. But you know,
21 the cost -- see this is the thing, the cost
22 to recreate the utility. But I'm looking at
23 the actual cost associated with the
24 historical cost, associated with developing
25 these trade secrets to date, right.

128

1     So the utility is still there because
2  it's the same trade secrets, but we're
3  looking at the -- in the form and appearances
4  is the same because we're looking at the same
5  trade secrets as they were developed and as
6  the costs were incurred.
7  Q   So you didn't consider how the trade
8  secrets could be replaced using more modern
9  methods; is that accurate?
10 A   Well, I think that the way to describe
11 it is I'm reflecting what actually happened
12 to the actual costs as the proxy for what is,
13 you know, the avoided cost by the defendants.
14 And so just what transpired over that time,
15 during that time, in terms of the cost to
16 create and develop those trade secrets, and
17 you know, Mr. Hoarty indicated that this six
18 to seven or 10-year period is credible as it
19 relates to the development of those trade
20 secrets and those historical costs are the
21 reflection of the actual costs that would be
22 incurred in order to develop these particular
23 trade secrets.
24 Q   So as described under this cost approach
25 for valuing intellectual property you didn't

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

33 (129 to 132)

129

1  use either a reproduction cost or replacement
2  cost methodology?
3      MR. GIBSON:  Object to form.
4  A  I didn't use a valuation methodology.  I
5  used, you know, the spirit of these things is
6  looking at the cost and building of the cost
7  to reproduce or replace what is the existing
8  intangible or intellectual property, right.
9      The distinction is that I'm looking at
10  the historical actual cost as opposed to
11  performing a valuation as of the date of
12  value utilizing current price and current
13  knowledge.
14  Q  You seem to be drawing a distinction
15  between valuing intellectual property and
16  calculating damages for intellectual
17  property.
18      Can you explain that distinction?
19  A  Oh, I think the only distinction is that
20  I'm looking at the historical actual cost as
21  an indication of the costs that were avoided
22  as opposed to performing an appraisal as of a
23  particular date, which is going take into
24  account a lot of other information in terms
25  of arriving at that valuation number.

130

1  Q  Could you have used either of these two
2  cost approaches in calculating avoided cost
3  damages?
4      MR. GIBSON:  Object to form.
5  A  Could I have?  I mean, potentially it
6  could be a potential approach.  I would have
7  to go through the process of it.  I mean, the
8  approach that I took was, look, we know we
9  have a start-up company here, we know that
10  they've been funded and capitalized to
11  develop these, this waste metering system and
12  to me, I saw it as most appropriate and
13  reasonable to look at what actually happened,
14  what monies were spent, how long did it take,
15  and then apportion or allocate the costs that
16  were related to that development and then you
17  have a reflection of this time period of
18  experiencing the expenses and the actual cost
19  it took to do it.  As the most reasonable
20  approach to looking at it.  Because it is a
21  reflection of what the purpose of the company
22  was, the time that it took and the actual
23  costs incurred.
24  Q  Did you make an affirmative
25  determination not to use either of these cost

131

1  approaches in this case?
2      MR. GIBSON:  Object to form.
3  A  I did not approach this as a valuation
4  of the trade secrets.  So I approached it
5  from the perspective of the avoided cost, of
6  the actual cost as a plaintiff as a proxy for
7  the avoided cost.  So that was the decision
8  that I made in terms of estimating the
9  avoided cost number.
10  Q  Did you ever consider how the trade
11  secrets could be replaced using more modern
12  methods?
13      MR. GIBSON:  Object to form.
14  A  I -- the way that I looked at it was,
15  the misappropriation happens, the trade
16  secrets were historically developed, I know
17  what those actual costs are and I know what
18  the timing is in order to have those trade
19  secrets in place at the time of this
20  misappropriation.  So from my perspective, I
21  looked at it as here's the timeline, here's
22  the actual cost, but for the misappropriation
23  you've avoided all of these costs in this
24  time period.
25  Q  When you say you looked at the timeline,

132

1  what do you mean by that?
2  A  Oh, just consideration of the period of
3  trial and error.  You know, the time that it
4  took.  And I think according to Hoarty talked
5  about the same thing that this -- that the
6  image and machine-learning took multiple
7  years, I think he said six to seven years in
8  order to generate the database of images.
9  And you know, so it was a process of learning
10  and with trial and error then learning and
11  modifying and bettering over time to get to
12  the point where the R12, the R13 were.
13  Q  Within that timeline you don't have any
14  specific dates for the conception of the
15  trade secrets, do you?
16      MR. GIBSON:  Object to form.
17  A  Well, I think this goes back to the
18  conversation earlier this morning, which is,
19  I don't recall that Hoarty had specific
20  opinions as to, okay, here's the particular
21  start date per se.  I don't remember if he
22  did that, it's not on the top of my mind.
23  And then further to that is the business was
24  created for the purpose of developing this
25  waste metering sort of solution or the waste

133

1  industry, and that, to a certain extent, the
2  whole notion of this developing this
3  technology commenced when the business
4  started.  But I don't believe that it's in
5  the record for Hoarty as to the like setting
6  a particular start date.
7  Q   Okay.  Are you aware of how
8  machine-learning has progressed since 2015?
9  A  I am not.  I believe that Mr. Hoarty may
10  have discussed, I know he discusses
11  machine-learning in his depo, but I don't
12  know that he discusses the evolution of it.
13  Q   Are you aware of how camera technology
14  has progressed since 2015?
15  A  I would leave that to Mr. Hoarty.
16  Q   Are you aware of how battery technology
17  has progressed since 2015?
18  A  Again, I mean, the specifics of the
19  battery technology, the choices around the
20  battery, you know, are the technical issues
21  for Mr. Hoarty.
22  Q   Okay.  Do you think the actual cost to
23  develop the alleged trade secrets would be
24  higher or lower than the replacement cost if
25  you calculated both?

134

1      MR. GIBSON:  Object to form.
2  A  You know, it depends, there's a lot that
3  goes into the cost and you have to look at
4  every single variable, so it's hard to know.
5  Q   Do you think replacing the trade secrets
6  at issue, in this case, would be less
7  expensive given modern technology?
8      MR. GIBSON:  Object to form.
9  A  I mean, like I said.  I don't know the
10  specific details as to the modern technology
11  and also you have different cost, different
12  cost structures and it's possible, but it's
13  also possible that it can be the same or more
14  depending upon all the different cost
15  elements.
16  Q   You haven't done that analysis, correct?
17  A  I did not do an analysis at current
18  pricing.
19  Q   Are you familiar with the term top down
20  approach as it relates to damages
21  calculations?
22      MR. GIBSON:  Objection, form.
23  A  Well, I'm familiar with the concept of
24  the top down approach and whether that term
25  is used loosely or not, but, yes, I'm

135

1  familiar with it.
2  Q   What is your understanding of the term
3  "top down approach"?
4  A  So the way I would describe it is
5  similar to what I've done here, which is, I
6  am looking at the -- an aggregate level and
7  bringing it down by adjusting or removing or
8  modifying certain expenses or other
9  categories in order to refine them down.
10     So you're basically starting as a whole,
11  you're adjusting, allocating and getting down
12  to a smaller part of the whole, as opposed to
13  bottom up, where you're going to
14  incrementally in a granular level try to add
15  the parts.
16  Q   Okay.  You would describe your analysis
17  in this case as a top down approach?
18  A  Well, I would say that it is starting
19  from a whole and it is reducing it down,
20  right.  And so I think in that sense, it is,
21  quote/unquote, top down as opposed to
22  granular detail going from each incremental
23  detail up.
24  Q   Is there a reason you didn't use
25  a bottom up approach in this case?

136

1  A  Well, you know, I looked at the sort of
2  facts of this case, and looked at the sort of
3  like the genesis of the company and the
4  products, and it seemed to me that this is a
5  very reasonable and appropriate way to
6  analyze the expenses of the overall
7  enterprise.  And because of the nature of the
8  evolution, the trial and error and the growth
9  of the company through the development of all
10  the trade secrets.
11     So the goal -- starting with the actual
12  cost and then making adjustments to remove
13  costs that were not related to the
14  development, is a reasonable way to get to
15  the avoided costs.
16  Q   Did you have enough granular data to
17  perform a bottom up approach?
18  A  Well, I don't believe the record had the
19  granular data for every single hours, costs,
20  et cetera, on different things.
21     So, I mean, that's just supportive of
22  the notion that the top down makes sense and,
23  frankly, that the top down in the
24  circumstance makes a lot of sense to me,
25  given the nature of the business and the

137

1  history of the development of the business
2  through the capital raises and the
3  investments, and just allocating out the
4  nondevelopment costs.
5  Q   Okay.  Having accurate and granular data
6  is important for a bottom up approach?
7  A   Say it again.
8  Q   Having granular and accurate data is
9  important for a bottom up approach?
10 A   Well, I would say that, yeah, if you're
11 going to perform those calculations applying
12 one factor times another, you certainly want
13 to understand the attributes.
14 Q   Using Compology's costs and financials,
15 you first calculated the avoided cost damages
16 as $23,752,286; is that accurate?
17 A   I'd have to verify that exact number,
18 yes.
19 Q   You corrected that figure in your reply
20 report to $22,316,290?
21 A   One second.
22    You're going really exact, so I want to
23 make sure.
24 Q   Take your time.  If I can help, it's
25 your reply report on Page 12, I believe.

138

1  A   I got it right here.  22,316,290.
2  Q   That's about a 1.4 million-dollar change
3  in your calculation, correct?
4  A   Yes.
5  Q   And what caused that figure to change?
6  A   There was some -- okay, sorry.
7     MR. GIBSON:  Objection, form.
8  A   I believe that resulted from some
9  mathematical error that we had in some of our
10 calculations, in terms of the spreadsheets.
11 Q   Did you have to correct engineering and
12 payroll expenses that you relied upon?
13 A   I believe it was the engineering side,
14 but I'll have to verify that.  We changed an
15 allocation based upon some depo testimony, if
16 I recall.
17    TECH MARTINEZ:  Counsel, would you
18    like to keep this document on the
19    screen?
20    MR. THOMSON:  You can take this down.
21    Thanks.
22 A   Okay.  So what is your question, sorry?
23 Q   At a high level, what precipitated the
24 need to change your calculations?
25 A   Oh, there were some identified math

139

1  errors on some of the spreadsheets.  And so
2  like certain things weren't been captured,
3  that they were linking incorrectly.  So we
4  modified those.
5  Q   Okay.  In looking at the bullet points
6  and numbered paragraphs under development of
7  other things, it seems like you had to change
8  some of your calculations based on the
9  testimony of Mr. Longson regarding other
10 products that Compology developed; is that
11 accurate?
12 A   That is correct.  Yeah.  I think he
13 identified some engineering time, time period
14 that was unrelated, like specifically
15 identifiably unrelated to the trade secrets.
16 Q   This is just one example of time that
17 was spent by Compology engineers that was
18 unrelated to the trade secrets; is that
19 correct?
20    MR. GIBSON:  Object to form.
21 A   That was specifically identified with
22 details as to the time involved for that
23 particular project, if I recall.
24 Q   Were there any other corrections in your
25 reply report related to your opening report?

140

1  A   Yeah.  I think there was three, if I
2  recall.
3  Q   Okay.
4  A   And they related to -- I think the other
5  ones were related to spreadsheet errors and
6  time period on the disgorgement.
7  Q   How did you become aware of those
8  errors?
9  A   Through Mr. Holzen's rebuttal report.
10 Q   As a result of those errors, you had to
11 adjust all of your damages calculations?
12 A   I believe they may have all been
13 impacted.  Yes.  All of them changed.
14 Q   As you sit here today, are you aware of
15 any errors in your reply report?
16 A   Not that I'm aware of right now.
17 Q   In making these corrections, did any of
18 your underlying assumptions as to the
19 allocation of line items directed to
20 development of the alleged trade secrets
21 change?
22 A   Let me see if I understand your
23 question.
24    In terms of the allocation, there may
25 have been a percentage change in terms of

141

1  allocation based upon the payroll.
2  Q    Is it still your opinion that
3  100 percent of Compology's engineers' time
4  was dedicated to development of the alleged
5  trade secrets?
6  A    I have to see if that was something that
7  we adjusted, based upon that adjustment we
8  just talked about.  So bear with me.  I need
9  to look at the -- there we go.
10      So adjusted engineering payroll expenses
11  associated with overhead costs related to
12  that.  So that would not be 100 Percent.
13  Q    What did you reduce that figure to?
14  A    So allocation -- let's see here.  I need
15  to review this exhibit.  One second.
16      Adjustment for the S01 development.
17  There it is.  Okay.  So that adjustment is
18  reflected on Exhibit 1F, in 2019 and 2020.
19      So this is adjusting out those expenses.
20  So, yeah, technically even that 100 percent
21  is not going to apply.
22  Q    Okay.  And you used the testimony of
23  Mr. Longson to make that adjustment?
24  A    Yes.
25  Q    And how did you determine the precise

142

1  amount to make the adjustment based on
2  Mr. Longson's testimony?
3  A    Okay.  So I'm going to try to back into
4  this.  Let's see here.  I think I'm missing a
5  page.
6      It looks like I'm missing a page when we
7  proposed that calculation.  There's a
8  reference to Exhibit 3F and that the actual
9  calculation there is not reflected.  I don't
10  have the 3F in the reports stack that I have.
11  I can represent, I don't think it's
12  there.  I don't know that it's in the copy
13  that I have either.
14  A    Yeah.  So that's something that needs to
15  be remedied.  But my recollection, as we went
16  through this, is that we utilized -- and
17  (inaudible).  We utilized the number of
18  months and percentage time, and I believe we
19  utilized the number of -- I think it's tied
20  to the engineer salaries and the number of
21  engineers to estimate a proxy for the
22  estimated engineering costs.
23      Oh, here we go.  Yeah.  Let's see,
24  number of months.  Actually, it should say
25  1F.

143

1  Q    Okay.
2  A    So go to Page 29.  Yeah.
3      So this lays it out.  So it's an
4  estimated hardware engineer salary benefits
5  total, the number they had, percent of the
6  number of months, and then the allocation of
7  time.
8      So basically the months, the time and an
9  estimated salary based upon the salary data
10  that was provided.
11  Q    Okay.
12  A    And that's basically what I recall
13  that's sort of laid out in the testimony,
14  percent time, number of months, and the piece
15  that had to be estimated was the -- an
16  operating salary, which is tied to the actual
17  salary data.
18  Q    So for the years 2019 and 2020 only, you
19  adjusted the 100 percent allocation for
20  engineer time dedicated to development only;
21  is that accurate?
22  A    Well, we started with a 100 percent and
23  we removed this estimated time.
24  Q    Okay.  So for the years 2017, 2018 and
25  2021 -- actually, withdrawn.

144

1      For the years 2016, 2017, 2018 and 2021,
2  you still allocate engineers time at
3  100 percent for development?
4  A    Yeah.  That's what we go to right now.
5  Q    In your reply report at Page 9 --
6  A    Yeah.  I'm looking at it.
7  Q    Okay.  You write toward the bottom of
8  the page, second sentence from the bottom:
9      "There is no clear evidence
10  provided to me that precisely
11  determined the percentage of time
12  engineers did not spend on
13  development."
14  Do you see that?
15  A    I do.
16  Q    What do you mean by that statement?
17  A    Well, I mean, I hadn't -- not that I'm
18  aware of in given very specific detailed
19  information pertaining to numbers of hours or
20  time, as we saw here, where there was an
21  example that these two individuals, spending
22  a certain percentage of their time doing
23  something different.
24  Q    You didn't have enough evidence to
25  determine what percentage of engineer time

Case 3:23-cv-04804-WHA Document 136-5 Filed 10/17/24 Page 38 of 63
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

37 (145 to 148)

145

1  was spent on development?
2  A  Well, I think the way that I look at it
3  is, they hired these engineers for the
4  purpose of developing all of these -- they
5  have the engineers in house, and the goal of
6  the company is to develop all of these -- to
7  develop the overall camera metering system.
8  And sort of the purpose of their job is to be
9  there to develop that system and develop the
10 hardware and software.
11     So their annual cost of being employees
12 is a reflection of their function, which is
13 primarily to be a system in development.
14 Q   Okay.  Your opinion is supposed to be
15 isolated to the development of the trade
16 secrets; is that accurate?
17 A   Yes.  And what I'm saying is that these
18 costs of having these engineers on board is
19 part of the development of -- part of the
20 goal of the company to develop the trade
21 secrets.
22 Q   The SC01 is just one example of time
23 engineers spent on development of a product
24 that did not involve the trade secrets,
25 correct?

146

1      MR. GIBSON:  Object to form.
2  A   That was an example provided.
3  Q   Is it fair to say you don't know
4  precisely how Compology's engineers spent
5  their time at work?
6      MR. GIBSON:  Object to form.
7  A   Well, precisely how they spent their
8  time.  I think my understanding from Jason
9  Gates, if I recall from his deposition, is
10 that these guys were totally dedicated to
11 building out the technology assets.
12 Q   If other examples of time spent on
13 development of technology or products not
14 related to the trade secrets came to light,
15 would you have to further revise your
16 allocation?
17     MR. GIBSON:  Object to form.
18 A   I think the way I deal with that is I
19 would say -- I would review the information
20 and make a determination as to what
21 adjustments, if any, would be necessary.  I
22 mean, it's just a matter of understanding the
23 facts.
24     THE WITNESS:  What are you thinking in
25     terms of the lunch break?

147

1      MR. THOMSON:  Let's take a break.
2      We'll go off the record.
3      VIDEOGRAPHER:  We are going off the
4  record.  The time is 14:46 Eastern
5  time.
6          (Whereupon, a recess was taken
7          from 2:46 PM until 3:34 PM.)
8      VIDEOGRAPHER:  We are back on the
9  record.  The time is 15:34 Eastern
10 time.
11 Q   Welcome back, Mr. Vickery.  If I could
12 draw your attention to Exhibit 1F in your
13 reply report.  It's on Page 27 if that helps.
14     Are you there?
15 A   One second.
16     Okay.
17 Q   Can you walk me through what you're
18 showing in this exhibit.
19 A   Yeah.  Essentially, what this is
20 reflecting is it's a reflection of the
21 payroll and benefits.  So what happened was,
22 we got data on -- so the financial -- the
23 income statements reflect only the aggregate
24 amount of salaries and wages.  And, then, we
25 were provided -- we wanted details on the

148

1  different salary categories.  And we were
2  provided 2021 and I think 2017, which is
3  shown on Exhibit 1E.
4      And we were -- then we basically kind
5  of -- we extrapolated between '17, '21 to
6  estimate the payroll benefits.  And,
7  essentially, what we're doing here is, I'm
8  looking at the different categories of
9  payroll and labor.  So you can see there's
10 hardware engineers, software engineers and
11 then sales and marketing, customer success,
12 operations, admin.
13     So I'm going to remove the sales,
14 marketing, customer success, because those
15 are related to actual sales activities of the
16 products.  So I'm going to remove those.  And
17 then operations and admin, they're going to
18 provide support to both the hardware,
19 software side, as well as the sales,
20 marketing, customer success side.
21     And so that's what's happening in the
22 second calculation here.  So you'll see the
23 total payroll and benefits, remove the
24 operations and admin.  And then total payroll
25 and benefits, excluding operation and admin.

Transcript of Forrest A. Vickery

38 (149 to 152)

Conducted on October 2, 2024

149

1   And then looking at the total hardware,
2   software as a percentage of the total
3   salaries and developing an allocation to see
4   what the total payroll associated with the
5   hardware and software is relative to the
6   remaining expenses.
7      So it's giving us a proportion
8   allocation of the hardware, software
9   engineers, plus an allocation for operations
10  and admin, excluding the sales, marketing,
11  customer support.
12 Q   So is it true for 2017, that 76 percent
13 of Compology's total payroll and benefits
14 went to engineers?
15 A   No.  I think the way to think about that
16 is, it's true that 76 percent of hardware and
17 software engineers, that represents
18 76 percent of the total payroll benefits,
19 excluding the operations and admin, right.
20      So what that's reflecting is, most of
21 the salaries in 2017 were associated with the
22 hardware and software engineers, right.  So
23 you can see, if you go to the top, hardware
24 engineers, software engineers, you've got
25 that 1.6 million, and if you exclude the

150

1   sales, marketing, customer success, right,
2   then you're left with the operations and
3   admin.  But that 1.95 million in the total
4   developer payroll of benefits is 76 percent
5   of the sum of hardware, software, sales,
6   marketing and customer success.
7      So what it's really indicating is that
8   the vast majority of staff and payroll at
9   Compology in 2017 is associated with hardware
10  and software engineers, and not so much in
11  the sales, marketing, customer success.  And
12  then you can see that evolved over time as
13  they have more sales, marketing activities.
14  And you can see that growth in customer
15  success, sales and marketing, over time to
16  the right, as the sales of the revenue
17  expands.
18      So what this is intending to reflect is,
19  okay, what percentage of all of the payrolls,
20  excluding the operations and admin, is tied
21  to the hardware and software.  And, then,
22  I'll use that percentage to allocate the
23  operations and admin.  Under the assumption
24  that the operations and admin is going to be
25  supportive to both the sales functions, as

151

1   well as the engineering and development
2   functions.
3   Q   Okay.  Why do you exclude operations and
4   admin from that initial calculation if
5   they're part of the total payroll and
6   benefits expenditure?
7   A   Because I'm trying to look at -- I'm
8   trying to allocate their -- the operations
9   admin relative support to the two groups.  So
10  basically I'm creating two groups, the
11  development group and then the sales group.
12  And I'm trying to see what is their
13  proportion or relative salaries, right.  And
14  then I'm going to use that relative
15  proportion to allocate the operations and
16  admin under the idea that, look, they're
17  going to provide, you know, support to the
18  overall company's operation.  And I'm using
19  the total payroll of the company as an
20  indication of the amount of activity and, you
21  know, relative contribution that they may
22  support on the payroll side.
23  Q   So you mentioned that you didn't have
24  detailed payroll and income benefits
25  information for 2018 through 2020; is that

152

1   correct?
2   A   I don't have the same level of detail
3   that we do for '17 and '21.  That's correct.
4   It just wasn't provided.
5   Q   So you had to estimate those figures for
6   2018 through 2020?
7   A   Those are estimated based upon the 2017
8   and the 2021.
9   Q   Okay.  So you don't know how those
10  figures actually changed between the years
11  2018 and 2020 if at all?
12      MR. GIBSON:  Object to form.
13 A   Well, I'm pretty sure we have a sanity
14  check on that.  Let's see.  So if you look at
15  Exhibit 1E -- let's see here.  Let's see if I
16  can try to shortcut this.
17      So total actual payroll and benefits on
18  1E.  Let me see.  Yeah, so if you look at
19  Schedule 3B on Page 20, you'll see that
20  there's a line called Total Payroll and
21  Benefits.  And this is coming from -- let me
22  see if I can kind of tie this down for you.
23  It's just a lot of paper.
24      Actually, if you go to Page 14 and you
25  look at -- this is their income statements.

153

1  So Page 14 you'll see the total payroll and
2  benefits about two thirds the way down the
3  page, and you'll see the actual amounts
4  reflected from the income statements.
5      And so what we did is a comparison on
6  this 1E, our calculations compared to the
7  actuals. And it's close.
8  Q  Exhibit 1E shows where you think the
9  discrepancy is for the price difference?
10 A  The discrepancy for the price
11 difference. It's percentage difference
12 between our calculations, you know, utilizing
13 the mapping of the expenses and the actuals.
14 So what it's doing is it's setting the way
15 that we map the expenses is similar to the
16 actual expenses. So it's kind of a little
17 check. So we don't have the exact data, but
18 we developed a methodology to sort of get
19 between the bookends. And then we compared
20 it to the actual recorded totals, and you can
21 see year over year the recorded -- the total
22 actuals are not that different from our
23 estimates. So that means it's reasonable.
24 Q  Okay. So going back to 1F, under "Total
25 Developer Payroll and Benefits," your

154

1  percentage of developer to total payroll
2  excluding O/A, I assume that's operations and
3  admin?
4  A  Correct.
5  Q  Okay. And then the percentages that you
6  derived, those are meant to show the
7  percentage of time and expenses for engineers
8  in the given years?
9  A  No. Those percentages reflect -- okay.
10 So that percentage reflects the amount of
11 total salaries that are attributable to the
12 engineers and software relative to the
13 overall payroll burden, right, so it's
14 basically showing you that. And what you can
15 see is as the company develops more revenue
16 and has more sales, the engineer and the
17 hardware/software percentage of total
18 salaries goes down.
19     And then in the admin allocation, what
20 I'm doing is I'm allocating by the same
21 percentage the admin, saying like the admin
22 is now going to support sales and marketing
23 relatively more compared to prior years
24 because there's going to be more sales and
25 marketing activity.

155

1  Q  Okay. So the percentage is meant to
2  show the percentage of total payroll and
3  benefits directed to development of the trade
4  secrets in any given year?
5  A  Well, so I think you've got to unpack
6  that a little bit because we're using the
7  hardware and software engineer salaries
8  explicitly. The -- what it's telling you is
9  that if you're going to use the total
10 payroll, I first want to get rid of some of
11 the operations and admin expenses and
12 allocate those to sales activities, right.
13     But those -- say that same operations
14 admin and support staff is going to provide
15 support to the development team as well, as
16 part of overall overhead, right. And so the
17 purpose -- the first purpose of the
18 percentage is to say, okay, I've got to split
19 out the operations admin to allocate a
20 portion of it to the development team and a
21 portion of it to the sales team.
22     So that's why I did the relative cost of
23 how much of the engineers representing in
24 total payroll, and I'm going to use that as a
25 metric and a benchmark, you know, same thing.

156

1  It's like talking -- I'm going to take that
2  total. I'm going to take a metric to adjust
3  it. And then that's going to reduce the
4  expense.
5      And, you know, that's a common -- that
6  sort of top-down approach like that is a
7  common approach in allocating expenses using
8  metrics to remove expenses or to analyze
9  profitability or, you know, other financial
10 performance. You're trying to -- let's look
11 at how the expenses might relate to one
12 division or another or product or another and
13 use that sort of top-down allocation
14 methodology in order to ascribe that. Very
15 common.
16 Q  Okay. Can the percentage of total
17 payroll and benefits in any given year be
18 used as a proxy for time spent on development
19 in any given year? That's what I'm trying to
20 get at. These percentages, can they be used
21 to determine how much of an individual
22 employee's time was dedicated to any
23 particular function?
24     MR. GIBSON: Object to form.
25 A  So this percentage is calculated -- the

157

1    sales and marketing is getting excluded, and
2    the customer success is getting excluded.
3    And we're utilizing all of the -- you know,
4    the hardware/software engineers, subject to
5    the adjustment that we made, right.
6       And so those percentages are applying to
7    those amounts, right. They're being utilized
8    in order to derive the percentage. And then
9    the way I'm looking at it is the actual
10   costs, I know what the costs are.
11      I know what my relative contribution is
12   from my two groups of employees, on the sales
13   side versus the development side. And I'm
14   going to proportionately allocate the support
15   staff in the same way, right. And so it's
16   being used to take a known amount, an actual
17   amount, and then allocate a portion of it to
18   one bucket and another bucket, right. And so
19   it's really using the dollars.
20   Q   Okay. And the end result of that
21   allocation is determining what percentage
22   should be attributed to development of the
23   trade secrets?
24   A   Let me -- I would say what percentage of
25   the overhead related to the admin, right, and

158

1    operations should be allocated to development
2    as -- you know, just development, right,
3    because I want to strip out the -- their
4    support for the sales activities.
5    Q   Okay. So is it your opinion that
6    76 percent of operations and admin payroll in
7    2017 was directed to development of the trade
8    secrets?
9    A   Well, yeah. It's there to support the
10   overall operation of the -- support the trade
11   secrets, right, because you need the team,
12   you need the building, you need the other
13   attributes of the business in order to have
14   the trade secret development ongoing.
15   Q   Right. And that number goes down in
16   2018 to 71 percent?
17   A   Correct.
18   Q   And drops again in 2019 to 59 percent?
19   A   Correct.
20   Q   And 2020 it goes to 51 percent?
21   A   Correct.
22   Q   And then in 2021 it goes back up to
23   59 percent?
24   A   Correct.
25   Q   Okay. And those numbers are all based

159

1    on the respective percentage of the total
2    payroll and benefits being paid to
3    Compology's hardware and software engineers
4    during that time?
5    A   Well, you're missing part of it because
6    a percentage is a ratio, right, so it's a
7    relative calculation.
8    Q   Okay.
9    A   You need the numerator and the
10   denominator.
11   Q   Except for the reduction for three
12   engineers' time in 2019 and 2020 that you
13   backed out, your calculations rely on the
14   assumption that a hundred percent of
15   Compology's engineers' time was dedicated to
16   development of the trade secrets?
17   A   That's the starting point.
18   Q   Okay.
19   A   That is the cash compensation necessary
20   to have the cost of having those engineers,
21   you know, on the staff, supporting the
22   development of the trade secrets.
23   Q   How is the percentage of engineer
24   payroll and benefits relative to the total
25   payroll and benefits relevant to determining

160

1    the percentage of operations and admin
2    expenses attributable to the development of
3    the trade secrets?
4       MR. GIBSON: Object to form.
5    A   So, I mean, operations and admin is
6    there as a support function for the functions
7    of the business. And actually I think, you
8    know, you also have your executive level team
9    in there, the owners. And, you know, so
10   there's active involvement of the executives
11   as well as the support team and -- both the
12   sales side as well as the engineering side.
13      And so I'm using the total amount of --
14   so I'm looking for a metric that's basically
15   saying, like, okay, how do I -- how can I
16   relate these two functions in terms of
17   overall business operations. And so how the
18   admin may be allocating their time. And I'm
19   using that compensation metric as an
20   indicator of that time.
21      We also did a test in here, I think,
22   with the number of people. And it was
23   different. You could see it on 1F B, but it
24   wasn't that different. But you can see. If
25   you just do it based on bodies, right, so how

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

41 (161 to 164)

161

1 many people are at the company and how many
2 people need to be taken care of and
3 supported, right, depending upon the
4 departments they're in.
5     And so I look at that operations admin
6 as an overhead that can reasonably be
7 calculated based upon the people and their
8 compensation in there.
9 Q    Would you agree that operation and admin
10 professionals typically have a variety of job
11 responsibilities?
12     MR. GIBSON:  Object to form.
13 A   Well, I would say that it's going to
14 depend on what their functions are, but
15 that's part of the reason that I allocated
16 the cost between the sales and marketing and
17 customer support and the engineering, you
18 know, the overall trade secret development.
19 So that's part of the function here is to
20 allocate it because they do have different
21 responsibilities.
22 Q   Okay.  Did you actually determine the
23 specific job responsibilities that operations
24 professionals had at Compology?
25 A   Well, I -- you know, to the extent it's

162

1 Gates and Chehebar included in there, you
2 know, I'm aware of their responsibilities,
3 you know, through the depo testimony and
4 their functions and support in part.
5     And then I don't think we have any
6 employee lists, you know, determining the
7 actual functions of the other admin staff, so
8 I'm looking at it as sort of a holistic
9 approach of operations and admin is there to
10 support the functions of the business.  And,
11 you know, in those earlier years the function
12 of the business is less on the revenue and
13 more on the, you know, development.
14     And it became -- you know, they started
15 to intersect a little bit where the gravity
16 of the functions are increasing, and
17 therefore the sales and marketing is going to
18 need more support and get a higher functional
19 allocation.
20 Q   What's your basis for the statement that
21 in those earlier years the function of the
22 business was less on revenue and more on
23 development?
24 A   So if we go to Schedule 1.  So in 2017
25 the revenues were only 538,000.  And by 2021

163

1 it was 10 million.  So, you know, the
2 business is not actively engaged in a lot of
3 sales activity.  So those overhead costs are
4 going to be supportive to the engineering
5 side.
6 Q   Okay.  So you're assuming because
7 Compology didn't have a lot of revenue in
8 2017 that its employees weren't focused on
9 revenue?
10 A   No.  I think that mischaracterizes what
11 I'm saying.
12     I'm saying that the amount of employees
13 that are dedicated to different functions
14 shifted from 2017 to 2021.  And that's just
15 reflected in the salaries, right.  And it's
16 also reflected in the realized revenues.
17     I mean, that's -- I mean, it basically
18 the numbers kind of tell the story, right,
19 because there's not a lot of revenue in 2017,
20 and there's not a lot of sales compensation
21 in 2017.  But the revenues increased greatly
22 up to '21.  And then you can see all the
23 compensation associated with the sales,
24 marketing and customer support also increased
25 commensurately.

164

1 Q   Do you know in 2017 if admin and
2 operations professionals at Compology were
3 involved in soliciting funding?
4 A   To the extent that -- so Gates, for
5 example, is included there in that category,
6 and I believe he may be -- that he would have
7 been involved in soliciting funding.
8 Q   Okay.  Do you know what percent to
9 taking Mr. -- to Mr. Gates?
10 A   What's that?
11 Q   Did you say Mr. Gates?
12 A   Jason Gates.
13 Q   Jason Gates.
14     Taking Mr. Gates as an example, do you
15 know what portion of his time was dedicated
16 to soliciting funding for Compology?
17 A   I don't recall if that's specifically
18 stated in the deposition.  I don't recall.
19 Q   If you could go, still in your reply
20 report, to Schedule 3A.  I have it on
21 Page 19.
22 A   Making it easier on me.  There we go.
23     All right.
24 Q   This is your calculation of development
25 of total avoided costs?

Case 3:23-cv-04804-WHA Document 136-5 Filed 10/17/24 Page 43 of 63
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

42 (165 to 168)

165

1  A   Is that a question?
2  Q   Yes.
3  A   Oh, I thought you were just stating
4  that.
5  Q   No, no.  Is it -- I mean, I don't know,
6  would you add more detail to that?
7  A   No.  I would say that this summarizes
8  the avoided costs, you know, two to the three
9  tranches of time that we had different data
10 to calculate it.
11 Q   Okay.  And this is based on your
12 accounting of Compology's actual expenses in
13 developing the trade secrets?
14 A   I would say that it's comprised of a
15 couple of things.  The -- you know,
16 January 1, '16 -- well, 8/1/15 through
17 12/31/21, it's based upon the determination
18 of the costs associated with development from
19 their profit and loss statements and income
20 statements.  So where we have the actual
21 financial statements.
22     And then the pre-8/1/15 is based upon
23 what was represented as the cost to reproduce
24 the technology assets they had at that time
25 prior to 2015.  So in the end it's tied to

166

1  the actual costs, the 8/1/15.  And my
2  understanding is that was something that the
3  management provided to the valuation firm as
4  an estimate.  But I don't have the details
5  that were provided for that.
6  Q   So this pre-8/1/15 number is derived
7  from the August 1, 2015 409A valuation cited?
8  A   So I wouldn't say it's derived.  I would
9  say that it is stated in that report.  And
10 we're using the amount that they said was the
11 reproduction cost as of that date, as
12 estimated by management.
13     MR. THOMSON:  Can you put up
14     Document 3 in the folder.  We'll mark
15     this as Exhibit 421.
16        (Whereupon, August 1, 2015 409A
17        valuation report (Bates No.
18        Roadrunner_00069596) was marked
19        as Exhibit 421 for
20        identification as of this date.)
21     MR. THOMSON:  For the record, it's
22     Bates beginning Roadrunner_00069596.
23 Q   Sir, do you recognize this document?
24 A   Oh, yes.
25 Q   Okay.  And what is it?

167

1  A   This is the August 1, 2015 409A
2  valuation report.
3  Q   Okay.  And if we go to Page 13 of this
4  document with Bates ending in 69608, you see
5  that?
6  A   I do.
7  Q   Is that $2,112,049 figure the one you
8  rely upon for pre-August 1st 2015 expenses?
9  A   Yes.
10 Q   And in this document it says this
11 represents the total reproduction cost based
12 on estimates provided by management; is that
13 accurate?
14 A   That's the start of it, yeah.
15 Q   Okay.  Does this document include those
16 underlying estimates or is this the only
17 description of them?
18 A   This is the extent of the description of
19 it.  I haven't seen the actual estimates.
20 Q   Okay.  By August 1, 2015, do you know
21 what hardware Compology had developed?
22 A   Let's see.  I had a timeline.  I think
23 they're close to R10.  I would have to look
24 in the details of the timeline.  I don't
25 recall like, off the top of my head where

168

1  they were on the R series at that point.  But
2  I believe it was somewhere around there, but
3  I'm not sure I would have to look in my file.
4  I know there was the R0 to R7 time frame and
5  that might just proceed this or be very close
6  to it.  And then -- I don't recall if that
7  was as of '15 or not.
8      But I can check.
9  Q   Is the timeline you're referencing
10 something you created?
11 A   Yeah.  It's basically just a sort of a
12 summary of notes as to dates.  Comparing
13 different dates.
14 Q   You include that in either of your
15 reports?
16 A   No.  It was basically something that I
17 did for my own sort of review purposes in
18 preparation for the depo.
19 Q   Okay.  As you sit here today, you don't
20 know what hardware Compology developed by
21 August 1st, 2015; is that correct?
22 A   No.  That's not correct.  I can go get
23 that answer by looking at a timeline.  In my
24 memory I don't recall, but I can certainly go
25 get an answer.

---

169

1  Q   Without reviewing that timeline do you
2  know what software Compology had developed by
3  August 1, 2015?
4  A   I don't know the software that they are
5  referring to in that cost estimate because we
6  don't have the details. I couldn't specify
7  the specific software they had at that time.
8  What I do know is that, you know, from the
9  beginning they were developing these assets,
10 modifying them, approving them, making tweaks
11 to make them better in a trial and error
12 process in an effort to constantly improve
13 and make improvements as they go along.
14 Q   Okay. Do you know what the IP
15 development assets being referred to on this
16 page are?
17 A   Well, I can't say for certain and I
18 don't recall that from Gates' deposition
19 whether he actually specified any of that. I
20 believe he didn't recall, but that's off my
21 memory.
22 Q   Okay. The note says:
23      "Management detailed a total
24   spend represented market rates to
25   recreate the business."

170

1      What do you take that to mean?
2  A   I believe this was addressed in -- I
3  believe it was Gates' depo, I forgot which
4  deponent it was, but I'm pretty sure that the
5  idea was that actually reflected what was
6  above as opposed to recreating the business.
7  But frankly, at that point in time the
8  business is really young and if this goes
9  with the theme of, okay, we've got a
10 start-up. We're trying to develop these
11 technologies and using the start-up phase the
12 funds are going to be directed toward R&D, so
13 recreating these assets in the business I can
14 see the corollary there where it's like we're
15 in start-up mode, we're growing, we're
16 getting money, we're getting funds to
17 basically develop assets and you know,
18 typically you're on a pretty thin rope in
19 terms of expenses and so that reproduction is
20 really going to be geared towards the assets
21 and the R&D that's really where the business
22 is at that time. Very little revenue at that
23 the 2014, 2015 level.
24 Q   Is it your opinion that as of August 1,
25 2015 Compology's business and trade secrets

171

1  are synonymous?
2      MR. GIBSON: Object to form.
3  A   I'm not going to form that opinion that
4  words are synonymous. What I understand is
5  that label at the top describes the assets.
6  The story of the business is in a start-up
7  mode, you know, parallels with the notion
8  that this business is in a R&D stage. I
9  think even this greener equity report -- one
10 of these reports companies describe a stage
11 two, stage four, and that there's in this
12 early stage phase and most early stage
13 companies are really geared towards the need
14 to develop that.
15     I seem to recall that there was some
16 testimony and it may have been Gates, I just
17 don't remember with all the depos, that this
18 recreates the business was really directed
19 towards the assets, but I would have to
20 review that.
21 Q   Is it your understanding that the total
22 reproduction cost of software and hardware
23 and IP development assets only relates to the
24 trade secrets?
25 A   Well, we do not have the exact details

172

1  of what is in included in there, but I do
2  know from the story of the business and
3  narrative of the business that this is --
4  even Hoarty or Hoarty, indicates that this
5  business is in an evolutionary stage of
6  developing and refining and changing and you
7  can see the story of R0 through R7, R10, R12,
8  where it is at this stage is it's developing
9  towards these trade secrets and the overall
10 camera system.
11 Q   Do you know if Compology ever had
12 software that wasn't derived from it's trade
13 secrets?
14     MR. GIBSON: Object to the form.
15 A   That's I think, partly that might be a
16 technical question that Hoarty may -- Hoarty
17 would potentially have to chime in on.
18     But I can't say for certain that I
19 recall anything of that nature in terms of
20 the various depo testimony. I just don't
21 recall.
22 Q   Do you know if Compology ever had
23 hardware that didn't rely on the trade
24 secrets?
25 A   Any hardware? I don't recall.

173

1  Q   The SC01, for example, do you understand
2  that to be hardware?
3  A   Correct, yes.
4  Q   Okay.  Looking at this description, is
5  there any way for you to parse out what
6  software/hardware is included in this that
7  may not be related to Compology's trade
8  secrets?
9      MR. GIBSON:  Object to form.
10 A   As it -- the description here does not
11 contain any information that would indicate
12 the attribution or if there is anything
13 included relating to SC01.
14 Q   Is there anything in this document to
15 indicate that the reproduction costs
16 calculated here are only related to the trade
17 secrets?
18 A   Anything in the document?  I would have
19 to scroll through it.  I mean, I don't have
20 every page memorized.  I don't know.  I would
21 have to review all of the language and
22 indications.
23 Q   If the term trade secret doesn't appear
24 anywhere in the document would that help
25 expedite your review?

174

1      MR. GIBSON:  Form.
2  A   Not necessarily.  Because of the
3  evolution of the trade secrets that Hoarty's
4  identified and through this process of trial
5  and error and improvement over time.  This is
6  partly -- the early stages of the company as
7  I understand are part of the overall process
8  of the development and refinement of the
9  trade secrets.  And so that's -- those are
10 costs incurred through that trial and error
11 and the overall improvements that are
12 identified through the process.
13 Q   I was hoping to save you time digging
14 through this.
15     But can you find anything in this
16 document this forms the basis for your
17 opinion that these costs are directed to the
18 trade secrets, development of the trade
19 secrets?
20 A   So you want me to skim through it?
21 Q   Yeah.
22 A   Okay.
23 Q   You should have control of the document.
24 A   You know, I exited off the last round,
25 so I might have to get -- there we go.  All

175

1  right.  The overview is the analytics waste
2  companies that's indication of over all
3  approach of developing waste company sensors
4  is cameras.(Inaudible)
5      This company overview I think is giving
6  us an indication of the technology
7  development around the waste monitoring, so
8  that's an indication.
9  Q   Just on the page, do you have any idea
10 of what a waste OS is?
11 A   I don't recall.  I believe that came up
12 in one of the depositions.  I don't recall
13 the exact -- exactly what that was.  Well, I
14 mean, it says analytics smart device platform
15 for the waste companies, but I don't recall
16 the details.
17 Q   Do you have an understanding whether or
18 not waste OS relies on the trade secrets or
19 did?
20 A   Um, I don't know that that was -- I
21 don't recall.  It may have been addressed,
22 but I don't recall off the top of my head.
23 Q   If the cost associated with developing
24 waste OS were included in that $2 million
25 figure, would you back them out?

176

1      MR. GIBSON:  Object to form.
2  A   I would have to have an understanding of
3  it and actually understand how -- whether
4  that was in relation towards developing the
5  trade secrets.
6      So what this is telling us about the
7  overall Compology waste sensors and just the
8  idea of the spirit of the company.
9      Yeah, so I would say the company
10 overview combined with my general
11 understanding of Mr. Hoarty about the
12 evolution of the investment of the trade
13 secrets.
14 Q   Going back to that page that ends in
15 69596.
16     So we're looking -- so we should be
17 looking at 69596.  I'm sorry 69608.
18     So you assume that every dollar of the
19 $2,112,049 was spent developing the trade
20 secrets?
21 A   The assumption is that it is spent in
22 the overall development of the trade secrets,
23 right.  That these costs are there to develop
24 and some contribution to the development of
25 the trade secrets.

Case 3:23-cv-04804-WHA Document 136-5 Filed 10/17/24 Page 46 of 63
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery                                    45 (177 to 180)
Conducted on October 2, 2024

177

1    MR. THOMSON: All right. We can put
2    this document down.
3  Q   Looking again at Schedule 3A of your
4  reply report. It should have Page 19 at that
5  the bottom.
6  A  I have it.
7  Q   And can you explain again where that
8  226,981 figure comes from?
9  A  Yeah, it says two-step process. See you
10 can see the note to represent four months of
11 total expenses in 2015, multiply it by that
12 49.3 percent. So the 8-1-15 is what you just
13 looked at, right, so now we're trying to get
14 September through December and Schedule 1.
15 You can see total expenses are $1.1 million
16 on Page 16, and so basically allocated those
17 expenses pro rata, monthly, right. So we
18 don't have the monthly data, I'm just going
19 to assume it's four months out of 12, right.
20 And then we have an allocation percentage
21 that was developed previously and for 2016
22 'cause we didn't have the data to do the
23 2015. So we allocated '15 in a similar
24 fashion as '16 in light of the fact that the
25 state of the company at that time. Like, in

178

1  the terms of overall revenue and growth that
2  was the most approximate indication of how
3  that allocation would happen at that time
4  given the nature of the business at that
5  time.
6  Q   And what is the basis for that
7  assumption?
8  A  The basis for that assumption is the
9  income statements and just the testimony
10 about the overall growth in the company and
11 the evolution of the company, right. So if
12 you look at Schedule 1, which is -- starts on
13 Page 13 you'll see that revenues where
14 $60,000 in '15, 116,000 in '16 and then they
15 start to pick up, right. So we have '15 and
16 '16 are very low revenue, so from a revenue
17 perspective those years are fairly similar.
18 Revenue really picks up in '17 and then
19 you've got 3 million plus thereafter. So for
20 the purposes of the allocations and the
21 absence of the 2015 data, to me this 2016 was
22 the reasonable benchmark given this sort of
23 state of the company at the time.
24    And we can see also that they are, you
25 know, continue to high years as well. So

179

1  it's a company that's early stage. It's
2  still bleeding through its investments, very
3  low revenue. So it's still in that
4  early stage of operations, haven't really
5  kicked off the revenue yet. So '16 is
6  relatively similar in that fashion so I can
7  use the same percentage.
8  Q   Okay. Your total avoided the cost
9  calculation of $22,316,290 represents all of
10 the total avoided cost related to the alleged
11 trade secrets?
12 A  All of the total avoided costs as
13 calculated in my report which reflects the
14 Plaintiff's actual cost during that time.
15 Q   That's a lump sum for all of the trade
16 secrets?
17 A  That's a lump sum.
18 Q   Okay. And that's the amount that would
19 make Roadrunner whole for the alleged
20 misappropriation?
21 A  That's the amount of unjust enrichment
22 that's been experienced by RecycleSmart. And
23 so it's a measure of the unjust enrichment
24 that RecycleSmart experienced by virtue of
25 the misappropriated trade secrets.

180

1  Q   Okay. We touched on this earlier, but
2  you didn't calculate the avoided cost for any
3  individual trade secrets, correct?
4    MR. GIBSON: Object to form.
5  A  Sorry. I did not. I calculated the
6  total cost associated with all of the trade
7  secrets because essentially they're all
8  interconnected in the sense of how they're
9  related to the overall camera system and
10 device. Or the media technology camera.
11 Q   You didn't proportion your avoided cost
12 damages calculation by trade secret?
13    MR. GIBSON: Object to form.
14 A  I did not specifically try to allocate
15 those costs. They were all developed, you
16 know, on the one hand developed sort of
17 simultaneously, they're interrelated and they
18 all participate in terms of this larger
19 holistic system of the waste metering
20 technology, so I'm looking at it as a
21 composite cost for all the trade secrets.
22 Q   And that assumes misappropriation and
23 liability, a finding of liability on all of
24 the trade secrets at issue in this case?
25    MR. GIBSON: Object to form.

181

1  A   No.  I think if some of the -- if the
2  court were to determine some modification on
3  some of the trade secrets, then the remaining
4  trade secrets still have to be -- if the
5  remaining trade secrets are still here then
6  all those costs are necessary to get those
7  trade secrets to where they are.  Because
8  this is the total spend by Compology in order
9  to derive the -- their overall trade secrets
10  to have that waste metering device.
11  Q   Okay.  If the judge or jury does not
12  find liability on any particular trade
13  secret, have you provided any way for the
14  jury to determine the avoided cost for the
15  remaining trade secrets?
16      MR. GIBSON: Object to form.
17  A   What I think what I'm trying to explain
18  is that the trade secrets, all of these trade
19  secrets, they work together to -- and this is
20  explained by Hoarty, too, is that you need --
21  the camera takes an image, the image does the
22  learning, and they all sort of work together.
23  It cost them in terms of overall development
24  of the trade secrets for this overall waste
25  metering technology, this is a reflection of

182

1  those total costs.
2      So from my perspective it's like this is
3  the total cost associated with the developing
4  the trade secrets associated with that sort
5  of interwoven bundle of trade secrets.  So
6  the waste meter technology can have effect
7  and be effective.
8  Q   Okay.  So say trade secrets two through
9  seven drop out of the case, would you opine
10  that the development costs associated with
11  Trade Secret No. 1 are the entire $2,316,290?
12      MR. GIBSON: Object to form.
13  A   Well, I guess the point would be that
14  you need to still do all of the other costs
15  in order for that trade secret to generate
16  the work within the context of the overall
17  waste metering technology.
18      So all of those costs have to be
19  incurred even for that one trade secret to be
20  economically exploited.
21  Q   So to develop any one of the trade
22  secrets here you have to -- would have had to
23  expend the entire 200 and -- or $22 million?
24  A   It's not any one.  It's the combination
25  of them.  It's the synergy of them as Hoarty

183

1  explained that you need these things to work
2  together and that to develop this in a way
3  that is -- has the secret that is -- makes
4  that the unit or that makes the overall waste
5  metering system, which is the combination of
6  these different assets, to get there you've
7  got to get all these other things developed
8  and it's going to cost that much to get there
9  and so it's like an aggregate cost.
10  Q   All right.
11      Is it your opinion that you cannot
12  develop one of these trade secrets in
13  isolation?
14      MR. GIBSON: Object to form.
15  A   So again, what I would say is the way I
16  understand the Hoarty testimony is that each
17  of these things, they work hand-in-hand, they
18  work together, in that it is a system and
19  they are coupled together to work together in
20  an effective systematic union, right.  And
21  that the -- so from my perspective it's like
22  if you look at the evolution of the company,
23  you look at how they developed all of these
24  individual items, they work together and
25  you've got to have each of those elements in

184

1  order to -- so if you're down to that last
2  one you still have to spend the money to
3  create the knowledge and know-how, which it
4  was a trade secret, right, and so those are
5  still costs associated with getting to that
6  point of having that functional camera -- or
7  that the functional waste metering technology
8  as it was.
9  Q   So if the jury finds, for example,
10  defendants only misappropriated Trade Secret
11  4, it's your opinion that the jury should
12  still award $22 million in avoided costs?
13  A   That was the cost to get it to the point
14  of getting that overall waste metering system
15  to its current state.
16  Q   And that cost is agnostic of when the
17  misappropriation allegedly took place,
18  correct?
19      MR. GIBSON: Object to form.
20  A   That cost is -- can you say that again?
21  I'm trying to put that together.
22  Q   The cost is agnostics of when the
23  misappropriation took place?
24      MR. GIBSON: Objection.
25  A   I'm sorry.  You said when it took place?

185

1   Q   Yes.
2   A   Agnostic to when it took place. Well,
3   the misappropriation continues going on. And
4   so what I understand is that the continuation
5   of the misappropriation is going on. And we
6   looked at the cost up through 2021.
7   Q   Based on your analysis, if the jury
8   finds misappropriation of all of the trade
9   secrets, they should award $22 million; is
10  that correct?
11  A   For the avoided costs and unjust
12  enrichment.
13  Q   And if the jury only finds
14  misappropriation of one of the trade secrets,
15  the jury should award $22 million for avoided
16  costs?
17  A   I think the point is that the total
18  costs associated with creating trade secrets
19  with the waste metering system is the
20  $22 million. And that the -- that they work
21  systematically together, and that's the total
22  cost of the trade secrets.
23  Q   Okay. So you treat the trade secrets as
24  a monolithic block that can't be separated;
25  is that accurate?

186

1       MR. GIBSON: Object to form.
2   A   No. I mean, I think the way I look at
3   it is, Hoarty is the technical expert.
4   Hoarty has identified these seven trade
5   secrets. Hoarty has identified that they
6   have independent economic value, because each
7   one of them contribute to sort of the
8   economic outcome or benefit, right. In
9   having some -- the ability to generate
10  revenues and profits, right. And I think
11  that's the way he even described it, is, like,
12  they all contribute to that, but they are
13  also -- they need each other, so to speak,
14  because it's a systematic system.
15  Q   If the jury were to find that defendants
16  did not misappropriate the trade secret
17  related to the optical assembly, is there any
18  way to excise out the costs associated with
19  development of the optical assembly?
20      MR. GIBSON: Object to form.
21  A   Well, I guess the way I would think
22  about it is, the cost associated with
23  developing -- all the costs associated with
24  developing the overall functionality because
25  of the dependence of the interrelationship of

187

1   the other trade secrets, because they use
2   each other, that's a cost of that other trade
3   secret being connected into the waste
4   metering unit.
5   Q   On Page 23 of your opening report.
6   A   Oh, opening report, okay. Waste
7   metering.
8   Q   Once you have this page, I want to
9   direct your attention to the section that's
10  entitled, "The past valuations letter of
11  potential acquisition."
12  A   Yep. I'm here.
13  Q   The last sentence of the paragraph
14  following that title says:
15      "As a sanity check for my cost avoidance
16  analysis, I consider the various indications
17  of value and offers."
18      Can you explain what you mean by that
19  sanity check?
20  A   Yeah. I mean, I wanted to get a sense
21  of -- well, I knew they had the various LOIs,
22  and I knew we had these 409A valuations.
23      Now, the cost associated with the trade
24  secrets is just the cost associated with the
25  trade secrets. The valuations are reflective

188

1   of enterprise values. Which, theoretically,
2   would include, you know, the potential
3   economic benefits of the trade secrets as
4   reflected in the reports. And then we have
5   the Roadrunner transaction, which is an
6   indication of value.
7       So what I'm really getting at here is if
8   you go the exhibit, what we see is this
9   evolution over time, in terms of the value or
10  the perceived value over time from 2014, you
11  know, through 2019, 2020. And then in '22
12  you see the drop off in value.
13      But what this indicates to me is what
14  we've got here is our trade secret costs are,
15  for the most part, as of this 19, 20, et
16  cetera, below some of the indications of
17  value, meaning that these appraisers who are
18  valuing are giving indications of potential
19  future cash flows based upon the exploitation
20  of the trade secrets.
21      What I observed in looking at the data
22  that was provided by Roadrunner is, you can
23  see that there they see the ability to
24  exploit and realize significant economic
25  benefits from the trade secrets, and that's

Case 3:23-cv-04804-WHA Document 136-5 Filed 10/17/24 Page 49 of 63



**189**

1  part of their sort of approach to value.  And
2  that's why I included the projections and
3  cash flow projections, gross profit
4  contributions, that Roadrunner had produced,
5  because what that -- Krebs indicated what
6  that's effectively showing is that they
7  wanted the trade secrets for their business
8  model, and what they see is that business
9  model results in a significant value to them,
10  and by way of reduced costs and potentially
11  more revenue.  And you can see that there's a
12  significant value associated with the trade
13  secrets.
14     And for Roadrunner, you know, I think --
15  I don't remember his words in the deposition,
16  but I think he feels like they got a pretty
17  good deal.  And the nature of the sale at the
18  time was considered a distress sale, right.
19  And there was an opportunity for a
20  significant increase in profits and increase
21  in value associated with the trade secrets.
22     So it's just -- it's more like a
23  comparative guide in terms of where that
24  value has fluctuated over time.  As there's a
25  progression in the development, then we have

**190**

1  a drop off around the time of their financial
2  distress.  Those trade secrets now in the
3  hands of Roadrunner have significant
4  profitability and potential value.
5     And so it's just part of the overall
6  understanding of, like, as those trade
7  secrets are, you know, being developed and
8  the costs are increasing, there was a
9  perception of increased value associated with
10  that.
11 Q   Is it your understanding that Roadrunner
12  paid $27 million          to acquire
13  Compology?
14     MR. GIBSON:  Object to form.
15 A   No.  My understanding is that they paid
16
17
18
19
20  So the asset purchase agreement reports a
21  $27 million price.  And that was priced at
22  their, I think their most recent preferred
23  rate as the stated price in the transaction.
24 Q   Did you review Mr. Krebs' testimony on
25  the Deloitte audit following the acquisition

**191**

1  and its impact on that share value?
2 A   Well, yeah.  Yeah.  I mean, I'm aware of
3  that.  And basically what I understand is
4  that Deloitte -- so, you know, you have a
5  deal and now Deloitte's got to report the
6  deal on the balance sheet for financial
7  reporting purposes.  And they made a
8  determination that they thought it was more
9  appropriate to characterize the price as the
10  most recent 409A common stock pricing for the
11  shares.
12     So what that resulted in was -- I forget
13  the words that he used, was like normalized
14  down or something.
15
16
17
18
19 Q   Do you understand that the
20
21             you understand that?
22 A   Well, I think the way I would say it is,
23  they
24
25

**192**

1
2
3
4
5
6
7
8
9
10
11
12
13 Q   Okay.  Do you understand that part of
14  that audit they only valued the acquired
15  technology at
16 A   Yes.
17 Q   Okay.  And you understand that figure
18  included patents as well?
19 A   Oh, I think it was a -- it included
20  anything and everything.  I don't think they
21  broke out that category, if I recall.
22 Q   Did that at all change your opinion of
23  the sanity of your cost avoidance figure?
24 A   No.  Because that's just one -- that's
25  just one number based upon the auditor's

Case 3:23-cv-04804-WHA   Document 136-5   Filed 10/17/24   Page 50 of 63
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

49 (193 to 196)

193

1  adjustment of the price in the transaction,
2  right.
3      And then, secondly, you're in an
4  environment of a distress sale, right.  And
5  so there's going to be some movement there.
6  I also understand that, you know, I just got
7  Chehebar's depo recently, I think he said he
8  sold his shares for about ▒▒▒▒  And I
9  believe on Exhibit A of the Asset Purchase
10 Agreement is -- ▒▒▒▒▒▒
11 ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
12 And I think Chehebar's allocation in there
13 was just under ▒▒▒▒
14     So it looks like to me like Chehebar
15 got -- he got allocated shares that were
16 deemed to be worth like ▒▒▒▒▒▒▒, and
17 then he ended up selling for ▒▒▒▒
18 ▒
19     So I don't have all of the details on
20 it.  But that is an indication that he ended
21 up recovering about the amount that he would
22 have on that 27 million-dollar price, as far
23 as I can tell.
24     And I think the investor who had the
25 ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

194

1  ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
2  ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
3  ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
4  ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
5      So we do have these different sort of
6  measuring sticks.
7      But in the end, this -- I look at this
8  all kind of collectively from the perspective
9  of the value trends that were being indicated
10 by the 409A appraisers, relative to the cost
11 to develop, right, and then we have these
12 other swings in value, and then we bring into
13 that Roadrunner's own calculations of the
14 significant economic benefits they're going
15 to realize from the trade secrets, right.
16     And, you know, so they're going to, from
17 the perspective of the price that they pay
18 relative to the benefits they're going to
19 get, it just -- it helps shape the story
20 around, look, that cost of acquisition,
21 right, was distressed, and then it is also
22 much less than the benefits that you're going
23 to get.  So what's it worth to Roadrunner, I
24 don't know, there's a huge contribution
25 that's coming through.

195

1  Q   Okay.  So you understand that Compology
2  was distressed at the time the business was
3  acquired by Roadrunner?
4  A   I understand that the 409A report
5  describes -- I think it's in the 409A report
6  that they describe the financial challenges.
7  And I believe Krebs characterized it as
8  distressed.  I think there might be other
9  deposition testimony that refers to the word
10 distressed.
11     But it was clear that there was a moment
12 there where they're facing cash flow issues.
13 And I think that's why they were cutting
14 costs because they wanted to manage cash.
15     And so you have an operating structure
16 or a business that is struggling with cash
17 flow, but the assets that were created to the
18 trade secrets have a significant value, and
19 you have an operator like Roadrunner who sees
20 how to exploit it and realize significant
21 economic benefit.
22 Q   In most of your review of Compology's
23 financials, you understand that Compology was
24 spending a lot more money than it was
25 bringing in?

196

1      MR. GIBSON:  Object to form.
2  A   Well, I mean, they're reporting losses,
3  right, and they are getting investment money,
4  and it's not unusual for companies that are
5  in development that, you know, you might be
6  running in the red as you're developing
7  things.
8  Q   Did you form an opinion as to whether
9  Compology's development costs were
10 reasonable, in light of its overall business?
11     MR. GIBSON:  Object to form.
12 A   Well, I guess -- I think what I would
13 understand is that the costs were necessary
14 in order to get the trade secrets to where
15 they were.  It's the actual cost that they
16 actually experienced.  And Mr. Hoarty
17 indicated that this ten-year cycle was
18 credible, right.
19     And I think he talked about six or
20 seven years on another stage.  So I'm looking
21 at the actual cost that they actually
22 experienced during that time.  And then the
23 trial and error and experience that they had
24 over that time through the trial and error
25 steps and the refinements as it relates to

197

1 the development costs, and what it took to do
2 it, right.
3     And they have three rounds of money
4 coming in, and the investors contributing
5 funds for three consecutive rounds. And so
6 the investors are seeing that there's an
7 opportunity here and willing to make
8 additional investments.
9     MR. THOMSON: I was going to shift
10 gears. Is now a good time for a
11 break?
12 THE WITNESS: Sure.
13     MR. THOMSON: Let's go off the record.
14 VIDEOGRAPHER: We're going off the
15 record at 16:50 Eastern time.
16     (Whereupon, a recess was taken
17     from 4:50 PM until 4:57 PM.)
18 VIDEOGRAPHER: We are back on the
19 record. The time is 16:57 Eastern
20 time.
21 Q   Welcome back, Mr. Vickery.
22     On Page 23 of your opening report, you
23 reference an Appendix A.
24     If I go to Page 48 of your opening
25 report, is that Appendix A?

198

1 A   Okay. So it says Roadrunner's '24 board
2 approved P&L projections illustrate the
3 economic benefit.
4     What page was it, sorry?
5 Q   Page 48 of your opening report.
6 A   Okay. No. Well, that's part of it. I
7 mean, this is basically -- I think this is
8 the board approved projections, and then
9 subsequent to that is the consolidated data
10 which was also produced by them. And then --
11 let's see -- well, let me look at the
12 sentence and then we can maybe put this
13 together.
14     Well, that whole package is Appendix A,
15 all of that stuff.
16 Q   So from Page 48 on is all Appendix A?
17 A   Well, it's all interrelated so that the
18 data that starts on 48, so 48, 49, 50, 51 --
19 so 48 through 51 is what I understand to be
20 the board approved projections for 2024 going
21 forward.
22     And then they prepared 52 through 55, as
23 a reflection of the cost savings -- well, the
24 impact on gross profit cost savings that's
25 resulting from the acquisition of the trade

199

1 secrets from Compology.
2     So I think Krebs did an analysis to
3 indicate the economic impact in terms of
4 gross profit over the next three years,
5 potentially from the Compology trade secrets
6 being part of the Roadrunner overall
7 business.
8 Q   Am I missing something? Is this labeled
9 Appendix A somewhere, this document that
10 starts on Page 48?
11 A   Is there not a page saying Appendix A in
12 front of it?
13 Q   I don't have one. That's what I'm
14 trying to figure out.
15     In my version, Pages 48 through 56 just
16 run together, and there's no real indication.
17 So I think, as I understand it, Appendix A is
18 Pages 48 through 51.
19 A   No. It would be 48 through 56.
20 Q   Where is Appendix B?
21 A   One second. Let me go back to the
22 narrative.
23     Remind me the page number we were just
24 on?
25 Q   So Page 23. But I'm also using the

200

1 Table of Contents.
2 A   Got it. I apologize. Yep. Thank you.
3     So Roadrunner's -- yeah, sorry, I was
4 reading ahead of myself.
5     Roadrunner's 2024 board approved
6 projection illustrates the economic benefit
7 expected. So that's Appendix A.
8     COURT REPORTER: Excuse me.
9     Mr. Vickery, can you please read
10     slower.
11 THE WITNESS: Yeah, I apologize.
12 A   So, just to clarify, Appendix A, you
13 were correct, is 48 through 51. Appendix B
14 is 52 through 56.
15 Q   So looking at Appendix A, starting on
16 Page 48, these are monthly projections, P&L
17 projections for 2024 through 2026?
18 A   Yes.
19 Q   Okay.
20 A   These are board approved projections.
21 Q   And these projections were created by
22 Mr. Krebs?
23 A   Well, I don't know that I would limit it
24 to Krebs. These are -- I think he's the
25 primary finance guy who's going to be in

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

51 (201 to 204)

---

201

1   charge of it.
2       So I would say he's definitely
3   sophisticated with the spreadsheets and the
4   numbers.  So I think he's in charge of this.
5   He's marching it forward, but in the end, it
6   goes through the board, and this I recall was
7   the board approved budget.
8   Q   Do you know when Roadrunner created this
9   document?
10  A   I might have it reflected in my notes.
11  I think he described the board meeting date
12  when we spoke.  I'd have to refer to my notes
13  on the date.
14  Q   And those are the notes you took of the
15  conversations you had with Mr. Krebs?
16  A   One of the conversations I had with
17  Mr. Krebs.
18  Q   Okay.  Did you -- is it your
19  understanding that those notes are
20  privileged?
21  A   No.  I don't have an indication one way
22  or the other.  I just -- my staff got a
23  notification from the attorney's office that
24  we did not need to produce our file.  That's
25  all I know.

---

202

1   Q   Would you be able to produce those notes
2   if we requested them?
3   A   I would have to --
4       MR. GIBSON:  I'll object.  That
5       potentially calls for privilege, and
6       that certainly has not been the
7       practice on -- with your experts.  You
8       haven't produced any notes.
9       MR. THOMSON:  I'll note the objection.
10  Q   I was just -- you still have the notes;
11  you retained them?
12  A   What's that?
13  Q   I said I'll note the objection, but you
14  still have those notes, you retained them?
15  A   The notes are in my file.
16  Q   Okay.  Do you know how Mr. Krebs and
17  whoever else at Roadrunner helped create this
18  put this together, these projections?
19  together?
20  A   So which ones are you talking about
21  because we have A and B?
22  Q   Let's focus on Appendix A for right now.
23      Do you know how this document was
24  created?
25  A   Well, what I know from Krebs when I

---

203

1   talked with him about the income statements
2   and then other aspects of the business is
3   that they look at -- he's got modeling for
4   the -- basically all their customers and
5   clients and the scheduled revenues coming in,
6   the expenses.  So my understanding is that he
7   has a fairly sophisticated model built for
8   his financials.  And that it's a very robust
9   tool that he develops based upon all the
10  customers and the sort of timing of the flows
11  of revenues and the associated cost.
12  Q   Have you seen the actual model build
13  that you just described?
14  A   I have not seen the actual model.  It's
15  in -- it's probably in Excel or some other
16  software.
17      But he explained to me some of the
18  inputs that go into, like, the forecasting.
19  I think he calls them cohorts.  You know,
20  different projections and estimates of types
21  of client and different cohorts and how the
22  revenue flows and how they do their cost
23  estimations.  It's -- you know, the way he
24  describes it is fairly sophisticated but also
25  rational.

---

204

1   Q   Do you know all of the data that
2   Mr. Krebs uses in that model?
3   A   All of the data?
4   Q   Yeah.
5   A   I -- well, I don't know that I know all
6   of the data.  I do know that he described,
7   you know, the general process for doing the
8   projections and how he -- the mechanics of,
9   like, deriving the revenues and the related
10  expenses.
11  Q   Did you review any of the underlying
12  data that went into this projection?
13  A   The underlying data.  I don't recall if
14  we had Roadrunner -- the Roadrunner data that
15  preceded this.  But, no, this is their board
16  approving these projections.  So it's not
17  just Krebs; it's everybody -- it's whoever is
18  on the board reviewing the data, reviewing
19  the inputs and approving the budget.
20      And they do this in the normal course of
21  their business, and the board's got to
22  approve it.  And, you know, people can be
23  held accountable.
24  Q   Why did you include this in your expert
25  report, this analysis provided by Roadrunner?

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

52 (205 to 208)

205

1   A   Because it -- to me, it's an indication
2   of the economic benefits to be derived by
3   the -- these trade secrets, that they're
4   significant in the hands of -- you know,
5   Roadrunner was interested in these trade
6   secrets and saw an opportunity to acquire
7   them, right.  And so, you know, there's an
8   acquisition of the trade secrets in a
9   distressed environment.
10      So to me it shows that this bundle of
11  trade secrets has -- you know, it has
12  economic value, and, again, it's just a
13  notion of, like, you know, value versus those
14  historical costs.  And that in the hands of a
15  different operator, can generate significant
16  profits.  And that, you know, the cost to
17  develop this are far outweighed by the
18  economic benefits that Roadrunner would
19  certainly realize, regardless of whatever the
20  price that they paid for it.  And that, you
21  know, I think Roadrunner with these assets is
22  in a position of significant potential profit
23  growth.
24      So it's really -- again, it's a way of
25  analyzing the -- or understanding the ability

206

1   to use the trade secrets in the marketplace
2   and that they have significant benefits.
3   Q   Do you know the exact methodology used
4   to create these projections?
5       MR. GIBSON:  Objection to form.
6   A   A or B?
7   Q   Still in Appendix A.  Do you know the
8   exact methodology used to create Appendix A?
9       MR. GIBSON:  Objection to form.
10  A   So I guess I would describe the
11  methodology as he has the relative inputs
12  based upon the modeling that he does
13  especially as it relates to revenue because
14  he -- the way I understand it is he has a
15  fairly robust model based upon what he calls
16  cohorts where he's sort of modeling out
17  ██████████████████████████████████
18  ████████████
19      And so he has analytical tools to be
20  able to project and model the different
21  classes of customers.  And that drives his
22  revenues and cost of revenue.  And then I
23  believe his projected expenses are tied
24  towards, you know, trending.
25  Q   Do you know if these projections are

207

1   accurate?
2   A   If they're accurate?  Well, I mean, I
3   think the board approves.  He's a
4   sophisticated financial guy, and the board
5   adopted them.  So I would say, you know, the
6   board is validating the expectations and
7   accuracy from their perspective knowing
8   Roadrunner's historical operations.
9   Q   Did you independently verify the
10  accuracy of Appendix A?
11  A   I guess the -- I didn't verify every
12  single data point there.  I independently
13  talked to Krebs about the underlying
14  development here and how he arrived at these
15  different components of costs or revenues and
16  costs of sales.  But I do not have the
17  underlying data to spot-check every
18  calculation that is going into that.
19  Q   So shifting to Appendix B now on
20  Page 52.  Are these Mr. Krebs' subtotal
21  revenue projections?
22  A   So I think maybe the easier way to look
23  at this is if you observe -- so, for example,
24  if you compare A to B, you can see how these
25  things connect.  So if you look at

208

1   January 2024 on A, and you'll see revenue
2   ██████████  That ties out to January 24 in
3   B.
4       And then cost of revenue, same thing, it
5   ties out; gross profit ties out, right.  So
6   that's the projected total gross profit.
7   And -- oh, one second.  My computer got
8   unplugged, and it's giving me a big warning.
9   I'll be right back.  Apologies.
10      So the top part of it is just
11  summarizing information on revenues, cost of
12  goods sold and gross profits.  So that links,
13  right.
14      And then what he did is he identified
15  the Compology technology-driven revenues --
16  so this is, I think, coming from the
17  Compology, you know, customer base and
18  revenues associated with Compology, right.
19  And then he has -- he's derived through his
20  analysis of the historicals on the Roadrunner
21  cost to consult and applied that to the
22  Roadrunner revenues.
23      And then he reflects all the
24  remaining -- cost to consult based on the
25  projection then gets allocated to Compology.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

53 (209 to 212)



**209**

1  So what ends up happening is -- it may be a
2  little bit difficult to follow, but
3  essentially what happens is the -- on the
4  Compology side,
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**210**

1
2
3
4  Q   Within this, Mr. Krebs is offering an
5  opinion on which revenues are driven by the
6  Compology technology versus which revenues
7  are not driven by the Compology technology;
8  is that accurate?
9  A   I think --
10     MR. GIBSON:  Object to form.
11 A   I apologize.
12     I think what I understood, and I -- you
13 know, I would have to go back and look at it
14 again -- but is that the -- what is -- it was
15 shown as Compology technology driver.  See,
16 he says, as contemplated here, revenue costs
17 or revenue deemed to be driven by Compology
18 technology relates to that portion, right.
19 And services that are dependent upon -- blah,
20 blah, blah.
21     So, you know, that has legacy Compology
22 customers in it.  And then to the extent, I
23 think, that there's other specific Compology
24 elements, that might be what he's also
25 including there, I would have to verify that

**211**

1  in my notes.
2     I mean, clearly there's ▓▓▓▓ of
3  revenue a month, which would translate into
4  about ▓▓▓▓▓▓ in '24.  And
5  if we look at their history, yeah, they were
6  doing ▓▓▓ in '21.  And about -- well,
7  they had ▓.  Yeah, so that might -- you
8  know, if you look at the trend of revenues at
9  Compology, 2020 was ▓; '21, ▓; '22
10 dropped; '23's up.  And then -- sorry, that's
11 the wrong numbers, I apologize, in the
12 balance sheet.
13     Yeah, so revenues -- the revenues,
14 again -- the revenues at Compology, '23, were
15 ▓▓▓; in '22, was ▓▓▓; '21 was
16 ▓▓▓, right.  So if we look at January
17 '24 at ▓▓▓▓▓▓▓
18 ▓▓▓▓▓
19     So that's pretty dialed in to about the
20 levels Compology had for the last
21 three years, right.  So I think, you know,
22 this is mostly legacy customers coming from
23 Compology and potential growth, I suppose.
24 Q   Do you know how Mr. Krebs deemed which
25 revenue streams were driven by the Compology

**212**

1  technology exactly?
2  A   Well, he was very clear that he has
3  clear identification of all of the Compology
4  clients that came over.
5  Q   Okay.  So is it your understanding that
6  the revenue projections driven by Compology
7  technology are only associated with legacy
8  Compology customers?
9  A   I know it's at least that and -- but
10 there is revenue growth, and I can't
11 remember, you know, just off the top of my
12 head, whether the growth was from the legacy
13 customers' growth or that they would have
14 some additional clients in that space.
15     I -- my impression and recollection from
16 his deposition and in talking with him is
17 that that's not their focus, you know, the
18 Compology customers.  They've got their own
19 business model, and they're really focused on
20 what's happening above that, right, in the
21 ▓▓▓ a month.  And that they've got
22 some legacy contracts and Compology
23 customers, they're carrying out of
24 contractual obligations or otherwise.
25 Q   Okay.  So that footnote that says, "As

213

1   contemplated here revenue and cost of revenue
2   deemed to be driven by Compology technology,"
3   Mr. Krebs is one who did the deeming there,
4   right?
5   A   Well, Mr. Krebs is the one that I
6   understand prepared this document.  Whether
7   he was given that instruction by somebody
8   else, I don't know, but I would assume that,
9   you know, this is the analysis he prepared to
10  convey this.  So I would assume that.  He
11  definitely knew all the details behind it.
12  Q   So this is Mr. Krebs' opinion of revenue
13  and cost of revenue driven by Compology
14  technology?
15      MR. GIBSON:  Object to form.
16  A   Yeah, I mean, I guess his opinion.  I
17  mean, it's his calculation, and he developed
18  these calculations.  So these are his
19  estimates of the financial impact on the
20  gross profit of Roadrunner in light of the
21  acquisition of the trade secrets from
22  Compology and how it's affected the business
23  model.  And he's the financial guy there,
24  and, you know, he understands the economics
25  of the business.

214

1   Q   If we go Page 47 of your opening report.
2   Should be Exhibit 4.
3   A   Okay.
4   Q   What is this Exhibit showing?
5   A   Oh, you know, I took what Krebs did just
6   to another step, and so it's summarizing what
7   he did.  And then from my perspective,
8   there's another layer to this which is the
9   gross profit or the cost of goods gross
10  profit that would have ordinarily been
11  realized on the Compology technology based
12  upon the Compology historical gross margins.
13      So, you know, that would -- what I'm
14  doing here is, let's say, look, you normally
15  would have had ▮▮▮▮▮▮ gross profits on
16  the ▮▮▮▮▮▮  So if I want to see the
17  incremental change, I've got to take that
18  out.
19  Q   And how does this -- that analysis
20  factor into your opinion on avoided cost
21  damages?
22  A   Again, it's just -- it's an analysis of
23  the economic benefits that are bestowed to
24  Roadrunner by virtue of having the trade
25  secrets.  And it's demonstrating that the --

215

1   you know, even though the cost may be
2   $22 million based upon the actual costs
3   incurred to develop the trade secrets, there
4   is significant economic benefit to cross that
5   hurdle and have an incremental -- and have
6   additional profit.
7   Q   You reviewed Mr. Holzen's expert
8   report --
9   A   Yes.
10  Q   -- in this case?
11  A   Yes.
12  Q   Okay.  On Page 10 of your reply report,
13  you state that "the cost avoided from having
14  to develop the initial camera system and the
15  years of trial and error are missing aspects
16  of Mr. Holzen's calculation."
17      Can you explain that?
18  A   I've got to find that.
19  Q   It's Page 10 of your reply report.  It's
20  the paragraph under "Opinion" on Mr. Holzen's
21  alternative development cost calculations and
22  methodologies.
23  A   Let's see here.  And I may have to go to
24  his report just to get context.  Okay.  So
25  10.

216

1       Yeah, so he does -- I think this is what
2   he does some kind of bottom-up approach to
3   the single trade secret and -- if I'm
4   recalling correctly.  And so that he's
5   concluding that that's the cost to replace
6   it.
7       And I guess the point that I'm making
8   here is that there was a lot of trial and
9   error that went into developing all of the
10  trade secrets over the years, right.  And
11  that those are -- that trial and error, and
12  delay, is also something that's avoided by
13  misappropriating the trade secrets.  Like,
14  you don't have to go through that process of
15  trial and error, delay and costs of the
16  evolution to that particular point, right.
17      And so how did they get the knowledge
18  and know-how and information to know what had
19  to happen at the sixth trade secret at that
20  time.  What preceded that in terms of, you
21  know, the evolution of getting to the sixth
22  trade secret.  So that's what -- that's the
23  point that I'm trying to make is that, you
24  know, Compology had ten years of costs and
25  six or seven years of machine learning, et

Transcript of Forrest A. Vickery

Conducted on October 2, 2024

217

1 cetera, and they went through iterations to
2 get to a certain place.
3      And Holzen's basically saying, "Well,
4 you know, if I just did it right now based
5 upon these assumptions, that this is what it
6 would cost right now" as opposed to "I don't
7 have to go through all the trial and error
8 and the delays to get to where I am right
9 now." That's the point.
10 Q   You also critique Mr. Holzen for not
11 including the cost of -- from having to
12 develop the initial camera system; is that
13 correct?
14 A   I didn't catch the first part.
15 Q   You also critique Mr. Holzen for not
16 including the cost avoided from having to
17 develop the initial camera system?
18 A   I don't know if you -- if that's on a
19 particular page, but I guess the spirit of
20 what I'm trying to say is that in order to
21 get the trade secrets to where they are,
22 there was significant trial and error,
23 significant investment, significant time
24 expenditure, effort, resources in order to
25 get the trade secrets to where they are. And

218

1 those actual costs were actually experienced
2 by Compology during that entire time period.
3 Q   Trade secret 6 on your original list,
4 relates to algorithms and processes, correct?
5 A   Okay. So Exhibit 6 on my original list?
6 Q   Trade Secret No. 6 from the original
7 list. It's "Algorithms and processes to
8 generate data" is the start of it.
9 A   Okay. Are you wanting me to go to that,
10 or?
11 Q   Would you agree that original Trade
12 Secret No. 6 relates to algorithms and
13 processes?
14 A   I'm sorry. I would have to go -- the
15 funny thing because I don't see it. Page?
16 See here. "Algorithms and processes to
17 generate data analysis and recommendations to
18 customers, including fullness, emptiness,
19 contaminations, schedules, data injection,
20 efficiencies and location analysis of waste
21 containers." Okay.
22 Q   Do you generally understand that trade
23 secret to relate to algorithms and processes
24 software?
25      MR. GIBSON: Object to form.

219

1 A   Well, I mean, what I can understand is
2 what is being described there. I don't have
3 the Hoarty report to, like, give all of the
4 details associated with that. But it looks
5 like it's algorithm and processes related to
6 a variety and a number of aspects of the
7 system.
8 Q   You understand that Mr. Holzen
9 calculated the cost of development for Trade
10 Secret 6?
11      MR. GIBSON: Object to form.
12 A   Well, what I understand is that he
13 received information from, I think, one of
14 the other technical experts for assumptions.
15 And then he made calculations based upon
16 those assumptions. And I believe it was
17 Trade Secret 6.
18 Q   Okay. Is it your opinion that Trade
19 Secret 6 relates to camera hardware?
20      MR. GIBSON: Object to form.
21 A   Well, I mean, that Trade Secret 6 is
22 not -- I mean, I don't know that that's on
23 Hoarty's list. Let me look at that. And
24 then see how he characterizes the trade
25 secret relative to hardware/software.

220

1 Q   I think we're going to run into the
2 issue again that you don't know the
3 differences between the list you used in your
4 initial report and your reply report, do you?
5 A   Not with explicit detail because
6 Mr. Hoarty provided the explicit detail in --
7 for the purpose of the -- you know, the
8 revised report. And the -- I did not have
9 the detail of the Hoarty explanations, you
10 know, the comparable detail for the purposes
11 of the first report. And then how he's, you
12 know, modifying them or making them in
13 parallel.
14 Q   All right. What is your understanding
15 of the breach of contract allegations in this
16 litigation?
17      MR. GIBSON: Object to form.
18 A   So my understanding is that but for them
19 having -- well, I think -- so I think there
20 might be a legal issue there as opposed --
21 you know, as it relates to the notion of the
22 breach, which I'm not going to, you know,
23 provide any, you know, sort of color to.
24      But had they -- the way I'm looking at
25 it is had they not breached the contract,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

56 (221 to 224)

---

221

1  they would have -- they would have continued
2  working with Compology as it relates to the
3  camera system that Compology had.  And that
4  the breach, if I recall, relates to, you
5  know, some of the activities that are being
6  alleged in the complaint.
7  Q   Were the breach of contract claims only
8  related to the misappropriation of the trade
9  secrets?
10     MR. GIBSON: Object to form.
11 A  I don't recall, and I think that's a --
12 that might be more that's in the hands of the
13 attorneys to determine, like, the -- or even
14 the trier of fact to determine how the breach
15 or the misappropriation relayed from a legal
16 perspective.  But the contract relates to the
17 revenue relationship between Compology and
18 RecycleSmart.
19 Q   Okay.  Sitting here today, do you know
20 if there are any other allegations of breach
21 that are unrelated to the misappropriation of
22 trade secrets?
23     MR. GIBSON: Object to the form.
24 A  Well, I think -- like I said, I'm not
25 here to offer any kind of opinion about the

---

222

1  interconnectedness legal nature of the breach
2  of contract, misappropriation.  I understand
3  that there's a breach of contract claim, and
4  I understand that there's a misappropriation
5  allegation.  And I'm calculating damages
6  associated with those categories that would
7  be pertinent to those claims being made.
8      But I think in the end it's lawyers, the
9  trier of the fact, the jury, that judge is
10 going to make a determination as to the
11 characterizations.
12 Q   Okay.  You -- (inaudible) -- that
13 Roadrunner has not alleged that Defendants
14 terminated the contracts early, correct?
15     MR. GIBSON: Object to form.
16 A  They're not alleging that they
17 terminated the contracts early.  I don't
18 recall all of the specific details in the
19 breach of contract claim, as I'm sitting here
20 right now.  I do know that the contract
21 terminated and there's -- you know, there are
22 various allegations.
23     The question is if the contract were not
24 terminated or if the contract were to
25 continue, due to the connection of the

---

223

1  activities that happened, then we would
2  expect the revenues to continue going
3  forward.
4  Q   Do you calculate damages related to the
5  breach of contract based on the assumption
6  that Defendants would have had to renew the
7  contract absent the misappropriation of trade
8  secrets?
9      MR. GIBSON: Object to form.
10 A  Well, I don't know that it's -- so I
11 guess I looked at it like they had been in
12 contract with Compology going forward.  I
13 mean, they had been in contract with
14 Compology since -- I think it was 2017.  And
15 they were utilizing the cameras, and they
16 were interested in the cameras.
17     And, you know, they -- had the -- you
18 know, so there's the misappropriation issue,
19 and then there's, you know, the development
20 of their own camera by way of
21 misappropriation, which they couldn't have
22 the Pello camera without the trade secrets
23 that were misappropriated from Compology.  So
24 the assumption is that had these actions not
25 happened, that the contract likely would have

---

224

1  continued going forward because they wanted
2  the camera system for monitoring, that is a
3  historical monitoring device that they had in
4  their containers or in their clients'
5  containers.
6  Q   Did you review the contracts at issue in
7  this case?
8  A  I did not personally review the details
9  of the contracts.  My staff looked through
10 some of the details of the contracts.
11 Q   Do you know why the contracts aren't
12 listed on your list of materials considered
13 then?
14 A  I thought we got those.  Hold on.  Is
15 that on the updated report?
16     Maybe I misspoke.  Maybe it wasn't the
17 contract; maybe it was some other summary
18 document.  But I thought I had heard some
19 commentary about that.  But I haven't looked
20 at it.  I might be conflating two different
21 documents.
22 Q   You didn't personally review the
23 contracts at issue in this case?
24 A  I didn't personally review the contract.
25 Q   Okay.  Did you think it was -- or you

---

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

57 (225 to 228)

225

1  didn't think it was necessary to review the
2  contracts at issue in this case?
3  A   Well -- I'm sorry.  Well, I had the data
4  on the historical pricing and the data on the
5  historical relationship, which indicated sort
6  of the pattern or the behavior and the -- I
7  already had the termination -- you know, the
8  termination dates, the data surrounding that.
9  And so what I'm doing is looking at if they
10 continued this similar pattern going forward
11 in renewing the contracts.
12 Q   The three theories of economic damages
13 that you would advance are meant to be in the
14 alternative; is that correct?
15     MR. GIBSON:  Object to form.
16 A   Well, there's unjust enrichment, which
17 is -- and then you have the lost profits.  So
18 we're obviously not going to duplicate on the
19 profits side.  So the unjust enrichment, as
20 it relates to the avoided cost, is an element
21 of unjust enrichment if that's a benefit to
22 the -- in terms of those avoided costs.
23     Similarly, you have an unjust enrichment
24 from, you know, having the cost savings.  To
25 me the cost savings or lost profits are

226

1  alternative ways of looking at the impacts of
2  the contract issue.  But either one of those
3  is going to be added to the avoided cost.
4  Q   Okay.  So it was your opinion that
5  Defendants can recover avoided costs for the
6  misappropriation of trade secrets and then
7  either 2 or 3 --
8  A   Well, Defendants won't recover the
9  avoided costs.  It will be deemed that the
10 defendants had the avoided costs, right, so
11 that's the unjust enrichment piece of it,
12 right.
13     And then as it relates to the contract,
14 there's -- you know, it's either the lost
15 profits or the cost savings to RecycleSmart
16 for that contract period.
17 Q   I misspoke.
18     It's your opinion that Plaintiffs can be
19 awarded avoided cost damages as well as
20 either lost profits or cost savings damages
21 related to the breach of contract?
22 A   Well, I think the determination of the
23 awards on the different elements is going to
24 be a trier-of-fact issue.  I'm providing the
25 calculations that are relevant to each of

227

1  those components.
2      And so I think in the end, the
3  determination of the awards is going to come
4  down to whatever the trier of fact
5  determines.  And what I'm indicating is that
6  those should not overlap, you know, and
7  double-dip to the extent they're all deemed
8  applicable.  And that the unjust enrichment
9  avoided cost is a calculation that is related
10 to unjust enrichment realized by the
11 defendant.
12     And then -- as it relates to the
13 contract where there's either -- there's
14 unjust enrichment for the -- or for
15 RecycleSmart or lost profits by the -- sorry,
16 I'm tired -- Compology.  But in the end, you
17 know, from my perspective, I'm doing the
18 calculations; the trier of fact makes the
19 determination as to the appropriate awards.
20 Q   Why did you provide alternative
21 calculations of damage for the breach of
22 contract?
23     MR. GIBSON:  Object to form.
24 A   Well, so what I saw in the documents of
25 RecycleSmart was that there was this -- there

228

1  had been discussions about a -- some disputes
2  about that price increase, you know, and its
3  application.  But what I saw was that the
4  data and the records reflected that was a
5  price that Compology otherwise was, you know,
6  considering charging and that it was
7  acknowledged by RecycleSmart.
8      So I'm just showing, like, hey, look, if
9  it goes to either one of these prices that
10 the trier of fact determines, like the $25 is
11 more appropriate than the 15, then, you know,
12 this would be the impact on the damages.  We
13 know the historical at 15.50.  We know that
14 it had been proposed at 25, and so there is
15 this -- you know, is there a middle ground
16 there as to where that price would go and
17 sort of the ongoing relationship.
18     But now at least we know what the two
19 contemplated prices were for that prospective
20 going-forward relationship.
21 Q   Okay.  Let's look at your first opinion
22 related to the breach of contract damages.
23 It looks like you calculated damages for
24 breach of contract measured by Roadrunner's
25 lost profits from the date of contract

229

1   expiration up to December 31, 2024.
2       You used Roadrunner's lost profits as a
3   result of the lost contracts with the
4   defendants to calculate that?
5   A   Okay.  So hold on.  So what we used was
6   the historical pricing and numbers associated
7   with the units.  Let me find my -- my reports
8   are getting overlapped.
9       Are you looking at the revised report?
10  Q   Yeah.  I'm looking at your reply report
11  at Page 12 if that helps.
12  A   Oh, you're at the narrative.  Okay.
13  Here we go.  I thought you were looking at
14  the schedule.  I apologize.
15  Q   Once you get oriented, can you walk me
16  through that?  The narrative is on Page 12,
17  and then which schedule does that narrative
18  relate to?
19  A   So -- oh, so you're just looking at the
20  narrative that I calculated damages to the
21  breach of contract mentioned by Roadrunner's
22  lost profits, right, up to 12/31/24?
23  Q   Yes.
24  A   Okay.  And then we'll go to the
25  schedules.

230

1       Okay.  So Schedule 4, Page 31.
2       Do you have a question?  I wasn't sure
3   what -- you said tell me what schedule it
4   was.
5   Q   Yeah.  I'm there with you, Schedule 4
6   that you're on.
7       Why did you use December 31, 2024 as the
8   date for the end-of-year calculations?
9   A   I think it's just through trial.
10  Q   And for the date of contracts lapse for
11  RecycleSmart, you used 10/31/2022?
12  A   Yeah.  That was the end of, I think, the
13  original contract.
14  Q   Okay.  That's the date the contract was
15  terminated?
16  A   Yes.
17  Q   Okay.  For Recycle Track Systems, you
18  used June 30th of 2023?
19  A   Yes.
20  Q   Okay.  And is that the actual date that
21  the contract was terminated?
22  A   I think that's the last date that
23  they -- there was going to be monetary
24  compensation between RecycleSmart and
25  Compology.  Yeah.  So basically that's when

231

1   that stopped, yeah.
2   Q   So after October 31, 2022, you assumed
3   that absent the misappropriation of the trade
4   secrets, that RecycleSmart would have had to
5   have renewed its contract with Compology?
6       MR. GIBSON:  Object to form.
7   A   I don't think you have to say "had to."
8   I think the idea is that, you know, absent
9   the misappropriation, you know, even with the
10  historic pricing, you have continuity of the
11  relationship.  And you have a situation where
12  you've had this lengthy relationship over the
13  years, and you have all the cameras
14  installed, and it's -- you know, the
15  expectation is that it would be continued to
16  be renewed --
17  Q   Okay.  So your calculations --
18  A   -- it would continue on, right.
19  Q   So your calculations are based on the
20  assumption that RecycleSmart would have
21  renewed the contract for another 26 months,
22  at least through the end of trial?
23  A   That -- yeah, that contracted
24  relationship would have continued going
25  forward as it had in the prior several years.

232

1   Q   Okay.  Did you consider whether
2   Defendants had an alternative choice in not
3   renewing a contract?
4   A   Well, I mean, there's a variety of
5   choices.  One is, like, not doing the service
6   anymore, but I'm not going to put that one
7   out there.
8       My understanding is that there are
9   competing products, and they went through a
10  process of looking at the competing products
11  and, you know, saw Compology as the one with
12  the camera and I think with -- I don't recall
13  the exact words but, you know, sort of the
14  more advanced certain level that they saw in
15  the market at the time that they did that
16  study.  And, you know, obviously the camera
17  was part of it.
18  Q   Okay.  So you're aware that there were
19  other waste meter offerings in the market at
20  the time?
21  A   Yeah.  I mean, I think there was
22  several, and this has been identified in the
23  depos and, you know, even by RecycleSmart's
24  own, you know, sort of research and studies,
25  right, where they had a comparison and grids

Case 3:23-cv-04804-WHA   Document 136-5   Filed 10/17/24   Page 60 of 63
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024

59 (233 to 236)

233

1  of "Here are the offerings by different
2  people in the market."
3      And I know Compology, I think, was the
4  one sort of standout, I think, that they
5  identified in terms of market participants at
6  the time.
7  Q   So if I understand Schedule 4, you
8  assume the number of months that RecycleSmart
9  would have renewed the contract for, and you
10 multiply the number of units that were out
11 under the last contract by the unit price for
12 that period of time?
13 A   Yeah. It's the unit price that was
14 extended, and the number of units that were
15 out then, and then the number of months from
16 the prior ending lapse through 12/31/24
17 trial.
18 Q   Okay. So baked into that you also
19 assume that RecycleSmart would have the same
20 number of Compology units in operation over
21 this period?
22 A   Well, you know, it is assumed to be
23 stagnant, absent, you know, 'cause there
24 could be growth, there could be decline. And
25 so what I chose to do is take the middle

234

1  ground and just keep it stagnant, as opposed
2  to forecasting certain growth in units or
3  some kind of anticipated decline.
4  Q   Okay. Your initial calculation for
5  these breach of contract damages was between
6  $1,062,156 and about 1.5 million, and you
7  corrected that to, it's just shy of a million
8  dollars to 1.5 million again in this reply
9  report.
10     What lead to that revision?
11 A   The contract lapse date on Recycle Track
12 was an error. So that was changed to
13 6/30/23.
14 Q   Part of your calculation you assume that
15 RecycleSmart would have agreed to pay
16 25-dollars per unit, even though it had never
17 historically paid that?
18 A   Well, I've offered that as a
19 consideration for future pricing, in light of
20 the fact that Compology had indicated they
21 may charge 25, and that RecycleSmart had
22 utilized that 25-dollar price on some of
23 their internal records. Right.
24     So the price is out there. I don't know
25 what would have happened absent the

235

1  misappropriation. So I have a range of
2  prices. One, which was the past known. And
3  then, two, is that Compology had indicated
4  through some channels that the price might go
5  to 25. And, obviously, RecycleSmart had
6  received that, because they're reflecting it
7  in their internal records.
8      So I just have two indications of price
9  in the evidence. And obviously the
10 historical's kind of known, that what's
11 happened. And the 25 is out there as a
12 possible price.
13 Q   Did you consider the impact of a
14 potential cost increase on the number of
15 units RecycleSmart would have maintained
16 under the contract?
17     MR. GIBSON: Object to form.
18 A   I want to see if I can understand that
19 better. Can you ask it again.
20 Q   Did you consider the impact of the
21 potential cost increase on the number of
22 units that RecycleSmart would have maintained
23 under the contract?
24 A   The cost increase in the number of
25 units.

236

1  Q   That's a clunky way of asking.
2      Do you think that there's any price
3  elasticity there if Compology raised the cost
4  of the units by ten dollars, which is 40 plus
5  percent increase. Do you think RecycleSmart
6  would have reduced the number of units it was
7  willing to maintain under contract?
8  A   Understood. Okay. That's easier to
9  follow.
10     Well, I think you can look at it a
11 couple of different ways. One is, is
12 RecycleSmart going to remove the units from
13 existing customer locations in light of the
14 price increase. That's a business decision.
15     And, then, on the other hand, how do you
16 deal with the increased costs from a business
17 and cash flow perspective.
18     So I'm not -- certainly there is a
19 possibility, if they're saying, well, we're
20 constrained by how much money we're willing
21 to spend at our customer locations, but that
22 would result in significant reduction in
23 coverage of the customers with the cameras.
24     So, then, basic question, what's going
25 to happen then, in changing that customer

237

1  relationship.
2  Q   Did you consider that potential impact
3  in your cost estimate, your damages estimate?
4      MR. GIBSON:  Object to form.
5  A   So did I consider that in rendering
6  these calculations here on the 25?
7  Q   Yes.
8  A   Certainly there's a possibility of it.
9  But I took the approach of this is just --
10 we're going to stick with the number of
11 units, and they're going to find a way to
12 deal with that, in terms of business and
13 dealing with their customers.  And so that's
14 an assumption that they would continue the
15 same number of units.
16 Q   Moving on to your last damages
17 calculation.
18     What is the basis for the disgorgement
19 of defendants profits as a calculation of
20 damages?
21 A   Okay.  What is the basis for it.
22     Well, the basis for it is that they --
23 by misappropriating the trade secrets,
24 they're unjustly enriched through the cost
25 savings that they have.  Right.  And those

238

1  cost savings could be reflected as an unjust
2  enrichment as savings that they've
3  experienced as a result of having the
4  technology.
5  Q   Okay.
6  A   And, then, you have this during the term
7  of the contract.
8  Q   Is this measure of damages meant to
9  capture defendants cost savings from the date
10 of the contract expiration?  I didn't really
11 understand the last part of your answer.
12 A   Oh, yes.
13 Q   Okay.  This unjust enrichment
14 disgorgement of profits calculation relies on
15 the assumption that RecycleSmart would have
16 agreed in an increase in unit price from the
17 $25, too?
18 A   We did incorporate the $25 here, as that
19 was -- yes.
20 Q   Are you aware that RecycleSmart
21 historically resisted price increases?
22     MR. GIBSON:  Object to form.
23 A   I don't recall all of the testimony as
24 it related to price increases.  I do recall
25 that there was discussions about negotiation

239

1  and contracts and changes and sort of terms.
2  I vaguely remember that.
3  Q   Okay.  Your disgorgement of profits
4  analysis takes into account some of
5  defendants costs, correct?
6  A   Yes.
7  Q   How did you determine which of
8  defendants cost to use for this analysis?
9  A   It was based upon a -- some projections
10 that were done by the defendants.
11 Q   Is there a reason you didn't deduct the
12 cost of making the actual Pello system?
13 A   Making the entire Pello system?
14 Q   Yes.
15 A   So the cost of making the entire system
16 and then relating that to just this limited
17 amount of units, that would seem to be an
18 overreach in terms of like the cost of the
19 entire system relative to this.  'Cause I
20 think the system would be advertised over any
21 number of going forward revenues, right, not
22 just these units.
23 Q   Is it your understanding that defendants
24 were only able to avoid paying Compology
25 under the contracts because they have had the

240

1  Pello system?
2      MR. GIBSON:  Object to form.
3  A   Well, I think that, you know, obviously
4  there's this simultaneous issue.  One is the
5  misappropriation that happens.  And they have
6  the Pello system because of misappropriation,
7  because of the utilizing some of the trade
8  secrets.  But as it relates to the contract,
9  like, this kind of goes back to the other
10 issue, which is, had the Pello not been
11 there, right, then they were assuming on the
12 loss profits side that they would continue to
13 use the Compology.
14     So, now the question is, from this
15 unjust enrichment perspective, is well, how
16 much money are you saving by having the Pello
17 and removing the relationship with Compology.
18 Q   So in that analysis, it doesn't -- you
19 don't consider the costs that defendants
20 expended in actually developing the Pello
21 camera?
22 A   Well, I think to develop the entire
23 Pello camera and amortize it against this,
24 all of that R&D during this time frame, I
25 think -- I have not included any such task,

241

1  no.
2  Q    Do the defendants necessarily incur the
3  cost of making the Pello system in switching
4  to the Pello?
5  A    They would have to switch to the Pello.
6  They can only switch to the Pello because of
7  misappropriation because they got the trade
8  secret information from Compology.
9  Q    And part of having the ability to switch
10 is based on the cost of making the Pello
11 system in the first place, correct?
12 A    They would have to make the entire --
13 they would have to bear the cost of having
14 the Pello system made.
15 Q    Including the cost of making the Pello
16 and the cost of transitioning to use of the
17 Pello, would you agree that defendants have
18 not made any profits in switching to the
19 Pello system?
20     MR. GIBSON:  Object to form.
21 A    Well, I guess, when I think about
22 profit, right, I'm thinking about the income
23 side of it.  As opposed to, when you think
24 about the developing the entire system,
25 that's an investment in capital expenditure.

242

1      And so that's something really you're
2  looking at, all right, that's an investment
3  that is not going to be hitting the profit
4  side of it except for depreciation, because
5  they'll amortize those costs over the life of
6  the system, right.
7      So you spend money on capital
8  expenditure, and then you move that asset to
9  the balance sheet, and then you're going to
10 amortize depreciation costs for tax purposes.
11     So when I'm looking at the profit, I'm
12 looking at this income differential, as
13 opposed to this cash flow differential based
14 upon past expenses associated with the
15 investment capital.
16     So this is really like more of an income
17 statement profit issue, in looking at
18 incremental gain.
19 Q    Is your calculation of profit
20 disgorgement detailed in Schedule 5 of your
21 reply report?
22 A    Yes.
23 Q    Okay.  In that -- under the Pello cost
24 included in Schedule 5, you include two third
25 party sensor rental costs?

243

1  A    Yes.
2  Q    What do those sensor rental costs relate
3  to?
4  A    Well, I'd have to go back to the
5  testimony, I think Carl Anderson explained
6  these different elements -- I don't
7  require -- I don't recall, off the top of my
8  head, I just remember his deposition went
9  through the various aspects of these costs,
10 and then the document may actually have
11 footnotes on that.  Oh, here we go.  Let's
12 see.  Nope.
13     Okay.  So third party sensor -- okay.
14 It doesn't detail what those are.  And I just
15 don't remember.
16     MR. THOMSON:  I have no further
17 questions.
18     MR. GIBSON:  I'm going to designate
19 the entire deposition as highly
20 confidential attorney's eyes only,
21 since we've been going through the
22 entirety of his report.  And I have no
23 questions.
24     VIDEOGRAPHER:  Stand by.  Let me read
25 us off the record.

244

1      This marks the deposition of Forrest
2      Vickery.  We are going off the record
3      at 18:03 Eastern time.
4      COURT REPORTER:  Mr. Gibson, are you
5      ordering a copy of the transcript?
6      MR. GIBSON:  Yes.  On a regular basis.
7      COURT REPORTER:  And do you want a
8      rough?
9      MR. GIBSON:  No.  And I don't need a
10     video.
11         (Whereupon, this examination was
12         concluded at 6:03 PM.)
13
14
15 _____
16 FORREST A. VICKERY
17
18
19 Subscribed and sworn to
    before me on this _____ day
20 of _____, _____.
21
22 _____
    Notary Public
23
24
25

Case 3:23-cv-04804-WHA   Document 136-5   Filed 10/17/24   Page 63 of 63
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of Forrest A. Vickery
Conducted on October 2, 2024                                62 (245 to 248)

245

1        I N D E X

2   WITNESS: FORREST VICKERY

3   EXAMINATION BY                      PAGE

4   MR. THOMSON                    6
5
6        E X H I B I T S
7   VICKERY        DESCRIPTION        PAGE

8   Exhibit 420    Valorem Principia    122
                   article
9
    Exhibit 421    August 1, 2015 409A    166
10                 valuation report
                   (Bates No.
11                 Roadrunner_00069596)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

246

1        C E R T I F I C A T E
2
3   I, KIARA MILLER,
4   a Shorthand Reporter and Notary Public of the
5   State of New York, do hereby certify:
6
7   That the witness whose examination is
8   hereinbefore set forth, was duly sworn or
9   affirmed by me, and the foregoing transcript is
10  a true record of the testimony given by such
11  witness.
12
13  I further certify that I am not related to any
14  of the parties to this action by blood or
15  marriage, and that I am in no way interested in
16  the outcome of this matter.
17
18  *Kiara Miller*
19  _____
20        KIARA MILLER
21
22
23
24
25