# EXHIBIT 6

ATTORNEYS' EYES ONLY
Transcript of Steven Krebs, Corporate Designee & Individually
Conducted on August 23, 2024

---

**1**

```
1           UNITED STATES DISTRICT COURT
2           NORTHERN DISTRICT OF CALIFORNIA
3   - - - - - - - - - - - - - -x
4   ROADRUNNER RECYCLING, INC.,   :
5                Plaintiff,       :   No 3:23-cv-04804-WHA
6   vs.                          :
7                                :
8   RECYCLE TRACK SYSTEMS, INC., :
9   AND RECYCLESMART SOLUTIONS,
10  INC.,
11              Defendants.
12  - - - - - - - - - - - - - -x
13
14           ATTORNEYS' EYES ONLY
15  VIDEOTAPED DEPOSITION OF ROADRUNNER RECYCLING, INC.,
    By and through its Designated Representative,
16                 STEVEN KREBS,
    and in his Individual Capacity
17               Pittsburgh, PA
18            Friday, August 23, 2024
                   9:34 a.m.
19
20
21
22  Job No.: 548737
23  Pages: 1 - 330
24  Reported By: Brooklyn E. Schweitzer
25           RPR, CRR, CA CSR
```

**2**

```
1           Videotaped Deposition of STEVEN KREBS,
2   conducted at the offices of:
3
4
5           Hilton Garden Inn
6           Pittsburgh University Place
7           3454 Forbes Avenue
8           Pittsburgh, PA 15213
9
10
11          Pursuant to Notice, before Brooklyn E.
12  Schweitzer, Registered Professional Reporter,
13  Certified Realtime Reporter, Notary Public in and
14  for the Commonwealth of Pennsylvania, and California
15  CSR No. 14612.
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1              A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF:
4       JOSEPH J. MELLEMA, ESQUIRE
5       JEFFER MANGELS BUTLER & MITCHELL LLP
6       3 Park Plaza, Suite 1100
7       Irvine, California 92614
8       Phone: (949)623-7200
9       E-mail: Jmellema@jmbm.com
10
11
12  ON BEHALF OF THE DEFENDANTS:
13      JAMES J. THOMSON, ESQUIRE
14      AMY K. LOBUE, ESQUIRE
15      MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
16      AND POPEO, P.C.
17      One Financial Center
18      Boston, Massachusetts 02111
19      Phone: (617)542-6000
20      E-mail: JJThomson@mintz.com
21
22  Also Present:  Dylan Keisler, Videographer
23
24
25
```

**4**

```
1              C O N T E N T S
2   EXAMINATION                           PAGE
3     By Mr. Thomson                        8
4
5
6              E X H I B I T S
7   EXHIBIT                               PAGE
8   Exhibit 369  Defendants' Amended 30(b)(1)
9                Notice of Deposition of
10               Steve Krebs              36
11  Exhibit 370  Defendants' 30(b)(6) Notice
12               of Deposition of Steve Krebs   36
13  Exhibit 371  Non-Binding Confidential Term
14               Sheet - for Discussion Purposes
15               Only - Date: June 30, 2022
16               ROADRUNNER000072915 -
17               ROADRUNNER000072919     114
18  Exhibit 372  Compology Summary Financials
19               and Valuation
20               ROADRUNNER000073296     118
21  Exhibit 373  ROADRUNNER000021514     132
22  Exhibit 374  ROADRUNNER000070214     157
23  Exhibit 375  ROADRUNNER000072913     158
24  Exhibit 376  ROADRUNNER000068663     164
25  Exhibit 377  ROADRUNNER000072914     201
```

Case 3:23-cv-04804-WHA   Document 136-7   Filed 10/17/24   Page 3 of 9
ATTORNEYS' EYES ONLY
Transcript of Steven Krebs, Corporate Designee & Individually
Conducted on August 23, 2024                               2 (5 to 8)

5

```
1              E X H I B I T S
2  EXHIBIT                      PAGE
3  Exhibit 378   Compology Inc. Valuation Report
4         ROADRUNNER000069596 -
5         ROADRUNNER000069642      208
6  Exhibit 379   Common Stock Valuation for
7         Compology - March 22, 2018
8         ROADRUNNER000069918 -
9         ROADRUNNER000069988      219
10 Exhibit 380   Common Stock Valuation for
11        Compology - March 29, 2019
12        ROADRUNNER000069990 -
13        ROADRUNNER000070064      222
14 Exhibit 381   Common Stock Valuation for
15        Compology - February 14, 2020
16        ROADRUNNER000070141 -
17        ROADRUNNER000070213      224
18 Exhibit 382   Common Stock Valuation for
19        Compology - March 8, 2021
20        ROADRUNNER000069765 -
21        ROADRUNNER000069841      228
22 Exhibit 383   Common Stock Valuation for
23        Compology - March 9, 2022
24        ROADRUNNER000069842 -
25        ROADRUNNER000069917      231
```

7

```
1              E X H I B I T S
2  EXHIBIT                      PAGE
3  Exhibit 389   Competition - May 2021
4         ROADRUNNER000028172 -
5         ROADRUNNER000028183      280
6  Exhibit 390   Exhibit A - Compology Terms
7         and Conditions
8         ROADRUNNER000073224 -
9         ROADRUNNER000073251      286
10 Exhibit 391   Compology Terms and Conditions
11        ROADRUNNER000073345 -
12        ROADRUNNER000073355      305
13 Exhibit 392   Electronic Document      317
14
15
16
17
18
19
20
21
22
23
24
25
```

6

```
1              E X H I B I T S
2  EXHIBIT                      PAGE
3  Exhibit 384   5/23/22 Letter
4         ROADRUNNER000017851 -
5         ROADRUNNER000017853      236
6  Exhibit 385   Roadrunner Recycling, Inc.
7         and Subsidiary - Consolidated
8         Financial Statements as of and
9         for the Years Ended December 31
10        2023 and 2022, and Independent
11        Auditor's Report        239
12 Exhibit 386   Compology Q1
13        ROADRUNNER000074869 -
14        ROADRUNNER000074887      263
15 Exhibit 387   Plaintiff's Identification of
16        Trade Secrets - Filed Under Seal
17        ROADRUNNER000000002 -
18        ROADRUNNER000000023      269
19 Exhibit 388   Plaintiff Roadrunner Recycling,
20        Inc.'s Supplemental Response
21        to Interrogatory Nos. 2, 5, 7,
22        and 10, of the First Set of
23        Interrogatories Propounded by
24        Defendants Recycle Track Systems,
25        Inc. and RecycleSmart Solutions 277
```

8

```
1            P R O C E E D I N G S
2       VIDEOGRAPHER:  Here begins Media No. 1 in
3  the videotaped deposition of Steven Krebs in the
4  matter of RoadRunner Recycling, Inc., V. Recycle
5  Track Systems, et al., in the United District Court,
6  Northern District of California, Case
7  No. 3:23-CV-04804-WHA.
8       Today's date is August 23rd, and the time
9  on the video monitor is 9:34 a.m. Eastern Standard
10 Time.  The videographer today is Dylan Keisler
11 representing Planet Depos, and this videotaped
12 deposition is taking place at 3454 Forbes Avenue,
13 Pittsburgh, PA 15213.
14      Would counsel please voice identify
15 themselves and state whom they represent.
16      MR. MELLEMA:  Joseph Mellema of Jeffer
17 Mangels Butler and Mitchell on behalf of Plaintiff.
18      MR. THOMSON:  James Thomson of Mintz Levin
19 representing the Defendants, Recycle Track, Inc.,
20 and RecycleSmart Solutions, Inc., and with me also
21 is Amy LoBue of Mintz Levin.
22      VIDEOGRAPHER:  The court reporter today is
23 Brooklyn Schweitzer representing Planet Depos, and
24 the witness will now be sworn.
25      STEVEN KREBS,
```

ATTORNEYS' EYES ONLY

Transcript of Steven Krebs, Corporate Designee & Individually

Conducted on August 23, 2024

24 (93 to 96)

93

1     A.  I think the key stakeholders in both
2  institutions.  Obviously -- I don't know if you --
3  meet and greet, you obviously care about dynamic and
4  style, and the intention was for them to come be a
5  part of us.  Right?  You don't want to -- there has
6  to be a connection, get along.  I don't know the
7  best way to say it.  A fit.  I guess that's the best
8  way to say it.
9     And, yeah.  Just kind of proceeds from
10 there, and you just continue to get more and more
11 into it.  Right?
12    Q.  Do you recall who the key stakeholders at
13 Compology were?
14    A.  Sure.  Jason Gates and Ben Chehebar are
15 the two that any business discussions were had with
16 me.
17    Q.  Okay.  And from the RoadRunner side, who
18 were the key stakeholders?
19    A.  Our main point person was Graham Rihn and
20 myself, you know, decide for myself, and then
21 obviously our CTO, Cason Male.  Others were involved
22 in the domains of interest, you know, particularly
23 validating the technology, those kinds of things.
24 You know, everybody has their own realms, obviously.
25 So everybody got involved to the extent it made

94

1  sense.
2     Q.  Okay.  And you mentioned Graham.  Is that
3  Graham Watson?
4     A.  Graham Rihn.
5     Q.  Graham Rihn.  I'm sorry.
6     A.  R-I-H-N.  He's our CEO.
7     Q.  So Graham Rihn, Cason Male, yourself?
8     A.  Leadership team folks that -- again, if it
9  was like, hey, our HR was going to talk to your HR,
10 you know, we would get our HR person involved.  You
11 know what I mean?  It's kind of domain-specific
12 things kind of prevailed.
13    Q.  Okay.  During those discussions, did
14 Compology share any documents, financials, or other
15 information?
16    A.  Yeah, I'm sure there was -- you know,
17 there was documents, financials provided, et cetera,
18 et cetera.  We did a quality of earnings just to
19 make sure we got comfortable with what they had and
20 how they did it, and that's a very common procedure.
21    Q.  Okay.
22    A.  But, yeah.  They -- they shared things
23 that were of interest to us.
24    Q.  Okay.  Outside --
25    A.  Probably not as -- to the extent we would

95

1  normally like at times, but yeah.
2     Q.  Okay.  How --
3     A.  Best they could.
4     Q.  Outside of the quality of earnings
5  analysis, did RoadRunner do any other type of due
6  diligence?
7     A.  Like I said, I think there was a lot of
8  tech considerations, that kind of stuff.  Obviously
9  not my world, but that was obviously an independent
10 mode of understanding, and it's important to make
11 sure that's where it needs to be.  Obviously it's a
12 technology offering.  The hardware piece in there,
13 obviously.
14    Q.  Who handled the tech consideration
15 analysis?
16    A.  That was spearhead by Cason.
17    Q.  Was anyone else involved in that from your
18 recollection?
19    A.  I couldn't say, but really from my
20 perspective, I perceived him being on it was all I
21 needed to know.
22    Q.  Okay.  Did you conduct that quality of
23 earnings analysis yourself?
24    A.  No.  Q of E's done by a firm, typically.
25 I've never seen one that somebody does themselves.

96

1  That being said, I review it, and obviously once you
2  get your hands on the information yourself, you do
3  your own little poke-arounds.  But, no, that was
4  done by PWC.
5     Q.  Okay.  Are you aware of what -- what they
6  did to -- what was involved in that quality of
7  earnings analysis?
8     A.  Yeah.  I mean, like any engagement,
9  there's a rough scope of work, and the quality of
10 earnings is -- it is what it is.  It's not a
11 comprehensive audit or anything like that by any
12 means.  But, again, everybody's focused on material
13 findings and general process information and
14 uncovering potential exposures or considerations.
15    But, no, they did basic -- what we would
16 call standard procedures, you know.
17    Q.  Do you -- I think I've asked you this, but
18 do you know specifically what documents Compology
19 provided?
20    A.  No.  They would just have cooperated to
21 the best of their ability with the basic things,
22 what's called a PBC list, which is essentially -- as
23 I understand, it's probably very similar in the
24 legal realm, but it's essentially a
25 provided-by-client-type list, and you do your best

97

1 to meet the requests to the best of their ability.
2         Some need tweaked as you go.  You know,
3 not applicable, doesn't make sense, et cetera.
4    Q.  Do you know if they supplied profit and
5 loss statements?
6    A.  I'm sure they did.
7    Q.  Do you know if they had audited
8 financials?
9    A.  Yes.  I know they do not.
10   Q.  Do not?
11   A.  Yeah.  That was part of the reason that
12 getting -- surmise is probably a good idea.
13   Q.  Okay.  Did you personally review the
14 profit and loss statements they provided?
15   A.  Yeah, at high level.
16   Q.  Okay.
17   A.  Yeah.
18   Q.  And what was your --
19   A.  Simple things.  Does it -- does it foot?
20 You know, things like that.  Directionally, you
21 know, inquisitive-type stuff leading up to it.
22 Sure.
23   Q.  What was your impression of Compology's
24 financial health at the time of the acquisition?
25   A.  Their health as far as, yeah, they -- they

98

1 were in distress for sure.  That was clear.  But I
2 already knew that.
3    Q.  Okay.
4    A.  I knew pretty clear about that.
5    Q.  Okay.  How did you know that Compology was
6 in distress?
7    A.  Just kind of the conversations of leading
8 up to how we got there.  Right?  The company is
9 looking to sell.  They've got to do something quick.
10 Yeah.  I'm not sure what their actual runway is, per
11 se, but it's very clear that their backing, their
12 board, et cetera, et cetera, is looking for a new
13 way.
14   Q.  Okay.
15   A.  New path.
16   Q.  How did RoadRunner come up with a
17 valuation for Compology?
18      MR. MELLEMA:  Objection; form.
19   A.  When you speak to the valuation, you mean
20 the purchase price?
21   Q.  Yeah.  How did RoadRunner decide what to
22 pay for Compology?
23   A.  I think the purchase price is around --
24 again, it's a negotiation.  The negotiation is --
25 and it was had mostly by Graham because he,

99

1 obviously, piped authorization to and from the
2 board.
3         But the number in those situations is more
4 what do you guys need to get out and be semi whole?
5 Everybody knew they weren't going to be whole where
6 they needed to be.
7         But, yeah, that's kind of the negotiation
8 that -- and, again, RoadRunner is a high-growth
9 business.  We're very much stewards of the capital
10 we've raised and how we do things.  I take pride in
11 that, but ███████████████████████████████████
12 ███████████████████████████████████████████████
13 ███████ that way and things like that.
14         So the deal had to be the way we needed it
15 as well.  That's why it's ████████████████████
16 ████
17   Q.  Mm-hmm.
18   A.  But yeah.  As far as the number you arrive
19 at at that point, it's basically what they needed to
20 get out of it.  And obviously if it was within
21 reason, it'd be something we'd be willing to do.
22 ███████████████████████████████████████████████
23 ███████████████████████████████████████████████
24 ██████████ and as we've all learned from COVID and
25 everything like that, you've got to be mindful of

100

1 all those things.
2         So it's just -- we got where we needed to
3 get, and moved on.
4    Q.  Did RoadRunner acquire 100 percent of
5 Compology's stock?
6    A.  Yes.
7    Q.  Okay.  Did RoadRunner acquire all of
8 Compology's assets in that transaction?  Was
9 anything carved out?
10   A.  No.
11   Q.  Okay.  What did RoadRunner ultimately pay
12 to acquire 100 percent of Compology's stock?
13   A.  The price was $27 million.
14   Q.  Was that the initial --
15   A.  Mm-hmm.
16   Q.  -- offer that RoadRunner made to
17 Compology?
18   A.  I really don't know that, but that's where
19 it ended up.
20   Q.  All right.
21   A.  And that obviously is a fully baked number
22 with transaction costs and just different
23 considerations.  Right?  You establish a bunch of
24 different things and just go from there.
25   Q.  Okay.  Do you know if Compology countered

117

1      THE WITNESS:  Sorry.
2      MR. MELLEMA:  So objection; form.  You can
3  answer.
4      THE WITNESS:  Okay.  No.  Leading up to
5  this, no, I don't.
6  BY MR. THOMSON:
7      Q.  All right.  Do you know if RoadRunner did
8  any assessment of the value of Compology's
9  trademarks?
10     MR. MELLEMA:  Same objection.
11     **A.  I'm not sure.**
12     Q.  Okay.  Do you know if RoadRunner tried to
13  value Compology's trade secrets?
14     MR. MELLEMA:  Same objection.
15     **A.  I don't think so.**
16     Q.  Okay.  You can put that aside.  I'm
17  handing you what will be premarked as 327.
18     (Exhibit 372 was marked for identification
19  and is attached to the transcript.)
20     Q.  For the record, this is a document bearing
21  Bates ROADRUNNER00007329.
22     MR. MELLEMA:  29 --
23     MR. THOMSON:  6.
24     MR. MELLEMA:  Yeah.
25  BY MR. THOMSON:

118

1      Q.  Do recognize this document?
2      **A.  I don't.  Nope.**
3      Q.  Okay.  So prior to today, you've never
4  seen this document?
5      **A.  I don't believe so.**
6      Q.  Okay.  Are you aware whether or not this
7  document was provided to RoadRunner?
8      MR. MELLEMA:  Objection; form.
9      **A.  I mean, how you got it, if it came from**
10  **RoadRunner, it must have been, but I don't know.**
11     Q.  Okay.  I guess the clearer yes, do you
12  know if this is one of the documents that Compology
13  provided to RoadRunner during the due diligence?
14     **A.  I don't know.**
15     Q.  Okay.  Looking at it now, do you have any
16  understanding of what this document provides?
17     MR. MELLEMA:  Objection; form.
18     **A.  I'd be speculating, but I believe -- I**
19  **roughly believe it's an attempt at some kind of a**
20  **valuation.**
21     Q.  Okay.  Are you familiar with the acronym
22  EBITDA?
23     **A.  I'm not.**
24     Q.  Okay.
25     **A.  Wait, I'm sorry.  Which acronym?**

119

1      Q.  EBITDA?
2      **A.  EBITDA, yes, of course.**
3      Q.  What do you understand EBITDA to mean?
4      **A.  Earnings before interest, taxation,**
5  **depreciation, and amortization.**
6      Q.  Okay.  And are you familiar with what the
7  brackets around the numbers following EBITDA
8  represent?
9      MR. MELLEMA:  Do you want parentheses?
10     MR. THOMSON:  Parentheses, yeah.
11     Q.  Do you understand what the parentheses
12  mean in this document?
13     **A.  Yeah.  They're negative.**
14     Q.  Okay.  So following this EBITDA line, does
15  it appear that Compology had negative EBITDA?
16     **A.  It does.**
17     Q.  Okay.  Were you aware that Compology had
18  negative EBITDA --
19     MR. MELLEMA:  Objection; form.
20     Q.  -- prior to the acquisition?
21     MR. MELLEMA:  Objection; form.
22     **A.  I knew that the company was distressed,**
23  **and I knew that, again, their current financial**
24  **standing was not as much of a concern to me as to**
25  **knowing if we brought them on what kind of cash, and**

120

1  **if I had enough cash to essentially do it, knowing**
2  **we would sunset the business and everything, because**
3  **our intention was to bring it into RoadRunner.**
4      **But their historical track record and that**
5  **stuff was not really of interest to me --**
6      Q.  Okay.
7      **A.  -- in that regard.**
8      Q.  So what was of interest to you in bringing
9  them on?
10     **A.  Their --**
11     MR. MELLEMA:  Hold on.  Objection; form.
12     **A.  I guess what was most of interest, right,**
13  **was not about what they've done but what we're going**
14  **to do with it, but knowing that you're bringing on**
15  **this customer -- I'm sorry, this company, you have**
16  **to be mindful of -- because you're going to take on**
17  **their debts, you're going to essentially assume**
18  **everything in that regard.  What is their financial**
19  **standing from a balance sheet perspective?  Review**
20  **that in totality, get comfortable with it, which is**
21  **part of the Q of E effort.  Right?**
22     **And then ensure that we could obviously**
23  **fund anything that they -- they had from an**
24  **obligation perspective thereafter.**
25     Q.  Okay.  For Compology's legacy customers,

121
1  has RoadRunner retained a pricing structure?
2        MR. MELLEMA: Objection to form.
3     A.  For ones that there was -- again, in the
4  spirit of what we called the sunset, right, there
5  was an attempt to get the -- you know, mess with
6  prices and reengage customers, per se, where we can.
7  Right? If they wanted to stay.
8        But, again, if they were to leave, it
9  wouldn't be regrettable for us. So that would be
10  okay. You know? Meaning opportunities in renewal
11  is an opportunity to change price, and to the extent
12  it seemed low or whatever, certainly we would
13  encourage our customer success people to reengage at
14  a higher number, and especially if it was a customer
15  we weren't necessarily interested in retaining, then
16  if we couldn't agree or they didn't agree to our
17  price, then so be it; we would just go our separate
18  ways, and that would be okay.
19     Q.  Okay. Why is it that RoadRunner wouldn't
20  want to retain certain of Compology's customers?
21     A.  It's not the same business model. Right?
22  And it wasn't a big business, per se, anyways. To
23  the extent you keep it running, you need to have
24  customer success and the team to do all that kind of
25  stuff, and I think part of the reason -- obviously

122
1  their business model was not a winner, per se.
2        I guess your question is easily answered.
3  Like, you want to obviously not prioritize and keep
4  that business model running because it obviously had
5  flaws, but that doesn't necessarily mean the entire
6  thing is spoiled, per se, but we were just choosy
7  about which ones would continue to do it.
8        And as long as the lift matched the yield,
9  and the use was worth the squeeze, then sure, we'll
10  keep them as customers.
11     Q.  Okay.
12     A.  But we haven't -- there's no new
13  customers. There's no -- we're not watering that
14  garden, if you will, really.
15     Q.  Okay. So all new customers are
16  RoadRunner's customers?
17     A.  Correct. Yeah, there's no -- we don't
18  engage any counterparties under Compology.
19     Q.  Okay. So to clarify, RoadRunner is not
20  interested in retaining a certain of Compology's
21  legacy customers because of the price structure?
22        MR. MELLEMA: Objection; form.
23     A.  They -- you need people to keep that
24  running. That business model is not a winner. To
25  spend time on wages and benefits and associated

123
1  operating expenses and everything in something that
2  was -- it was distressed. Right? It's not a great
3  business model.
4        That doesn't mean when you buy the company
5  you don't have a requirement to fulfill and see it
6  through. They're very different concepts. Right?
7        And operating a different business, a
8  bigger business, you obviously need to be mindful
9  that that doesn't -- you would never acquire a
10  company and have it disrupt your current -- you
11  know, minimal disruption while being able to take,
12  bolster, integrate that technology into our own --
13  you know, our own company was the main goal.
14     Q.  Okay. Is the disruption you're describing
15  due to increased labor and cost associated with that
16  model?
17        MR. MELLEMA: Objection; form.
18     A.  It's people, process, different systems,
19  how you do things, bookkeeping, this, this, and
20  that, customer interactions. You want to put your
21  resources -- the idea of deploying capital and
22  deploying resources is you deploy it in the avenues
23  that are most beneficial for you and for your
24  long-term growth as a business, and doing that in
25  Compology's old business was not necessarily that

124
1  for us.
2     Q.  Okay. Are Compology's legacy customers a
3  different variety than RoadRunner's current
4  customers?
5        MR. MELLEMA: Objection to form.
6     A.  I don't know them all that well beyond the
7  names. You know, even if I saw -- I've seen the
8  name several times. My level of understanding --
9  even RTS or RecycleSmart, no, there's nothing
10  categorically different. They're just different --
11  they're just businesses.
12     Q.  Okay. So it's not that RoadRunner
13  wouldn't want the business; it just doesn't want the
14  business under the terms that Compology was
15  servicing them?
16        MR. MELLEMA: Objection; form.
17     A.  The -- yeah. We don't -- I don't know
18  enough about those businesses to say if they would
19  or wouldn't be a good candidate for RoadRunner. But
20  if they had waste and recycling services and they
21  had the opportunity to do our commission of lowering
22  spend and recycling more.
23        It wouldn't necessarily be -- again, if it
24  made sense for them to do it, and I'm sure there are
25  situations where that has happened, but

133

1  things like that.
2      Q.  Okay.
3      A.  But going back to our previous discussion,
4  what you're being mindful of there, right, is not
5  what they did in the past and their past business.
6  We're focused more on just getting the lay of the
7  land to the extent we're able to bring it into our
8  business.
9          So the level of depth there was -- the
10 term "materiality" and some of those directional
11 concepts I was explaining, we wanted to make sure
12 directionally it all made sense and everything like
13 that.  We didn't -- we didn't need them to be Ernst
14 & Young reincarnated.  We needed to make sure it was
15 reasonable.
16     Q.  Okay.  So if you weren't looking at these
17 granular financials, what were you using to analyze
18 Compology's value to RoadRunner?
19     A.  Again, there --
20         MR. MELLEMA:  Hold on.  Objection to form.
21     A.  The value to RoadRunner and what their
22 value was and their business, they're not related.
23     Q.  Okay.
24     A.  Right?  Again, I -- what they did -- sure,
25 it's mindful you're going to bring this amount of

134

1  customers in and that kind of stuff, but again,
2  that's not really what the point of emphasis was.
3  The thought process is what it could do for our
4  business.
5      Q.  Okay.  Looking at this document, do you
6  have any reason to dispute the veracity of the
7  information?
8      A.  I'm sorry.  What word did you use there?
9      Q.  Do you have any reason to dispute the
10 veracity --
11     A.  What does veracity mean?
12     Q.  Do you think these are accurate numbers?
13 Do you have any reason to disagree that these are
14 accurate numbers?
15     A.  I wouldn't be able to tell you.
16     Q.  Okay.  Only somebody from Compology would
17 be able to verify the accuracy?
18         MR. MELLEMA:  Sorry.  Objection to form.
19     A.  Yeah.  I -- they would have to be
20 corroborated by something.  I would not know off the
21 top of my head.
22     Q.  Okay.  Is there anyone at RoadRunner who
23 would be able to look at Compology's financials and
24 verify the accuracy?
25     A.  No.  I mean, if it -- me looking at it, I

135

1  mean, obviously, but, again, I don't think it was
2  necessarily a point of emphasis.  But it would,
3  again, have been a part of the Q of E.  But, again,
4  you're more understanding where they are at that
5  time, which is what that whole process is about, and
6  the exposure to our business should be bringing
7  on -- what are the working capital requirements.
8          They had a lot of aged payables.  They
9  owed a lot of people money, particularly AQS.  So,
10 again, those are the things you're keen on
11 understanding because you're going to have to make
12 good on all of that.
13     Q.  Did you discuss the amount of money that
14 Compology owed to AQS?
15     A.  You mean --
16         MR. MELLEMA:  Objection; form.
17     Q.  How did you become aware that Compology
18 owed money to AQS?
19     A.  So as you're going through the Q of E,
20 right, their balance sheet, there's payables.
21 There's liabilities.  A balance sheet is assets and
22 liabilities and equities.  Collectively, your assets
23 less your liabilities is your net assets.  Right?
24         The net assets of the business, you need
25 to know what's going on there.  So knowing they had

136

1  payables.
2      Q.  Okay.
3      A.  You know, and then obviously conversation
4  with Jason and Ben about -- again, going back to the
5  distressed nature of their business.  That really
6  wasn't a surprise.
7      Q.  Okay.  Did you discuss what the money owed
8  to AQS was for?
9      A.  No, but -- I mean, I guess not in
10 specifics, but it would obviously be for orders, you
11 know.
12     Q.  Orders of what?
13     A.  Cameras.
14     Q.  Is it your understanding that AQS made all
15 of the cameras that Compology was selling?
16     A.  Yes.
17     Q.  Okay.
18     A.  Beyond -- like we talked about, initial
19 prototype or things, right.  But when you talk
20 "manufacturing" manufacturing, yeah, they're the
21 only manufacturer I'm aware of.
22     Q.  Okay.  I have a lot the of questions about
23 this document, but it doesn't sound like you're the
24 right person to ask.  Is there anything in this
25 document that looks familiar to you or that you

329

1         ACKNOWLEDGMENT OF DEPONENT
2
3         I, STEVEN KREBS, do hereby acknowledge
4    that I have read and examined the foregoing
5    testimony, and the same is a true, correct and
6    complete transcription of the testimony given by me
7    and any corrections appear on the attached errata
8    sheet signed by me.
9
10
11
12   _____  _____
13   (DATE)          (SIGNATURE)
14
15
16
17
18
19
20
21
22
23
24
25

330

1         REPORTER'S CERTIFICATE
2
3         I, BROOKLYN E. SCHWEITZER, CSR NO. 14612,
4    RPR, CRR, in and for the State of California, do
5    hereby certify:
6         That prior to being examined, the witness
7    named in the foregoing deposition was by me duly
8    sworn to testify the truth, the whole truth and
9    nothing but the truth and that the witness reserved
10   the right of signature;
11        That said deposition was taken down by me
12   in shorthand at the time and place therein named,
13   and thereafter reduced to typewriting under my
14   direction, and the same is a true, correct and
15   complete transcript of said proceedings.
16        I further certify that I am not interested
17   in the event of the action.
18        Witness my hand this 30th day of August,
19   2024.
20
21
22   _____
23   Certified Shorthand
24   Reporter for the
25   State of California