# EXHIBIT 9

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually  1 (1 to 4)
Conducted on August 15, 2024

```
                                    1
 1           UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3         -----------------
 4
 5  ROADRUNNER RECYCLING, INC.,  )
                                 )
 6          Plaintiff,           )
    vs.                          ) Case No.
 7                               ) 3:23-cv-04804-WHA
    RECYCLE TRACK SYSTEMS, INC., )
 8  and RECYCLESMART SOLUTIONS   )
    INC.,                        )
 9                               )
            Defendants.          )
10  -----------------------------)
11
12            ATTORNEYS' EYES ONLY
13
    VIDEOTAPED DEPOSITION OF ROADRUNNER RECYCLING, INC.,
14      By and through its Designated Representative,
                   TIMOTHY JAY LONGSON,
15           and in his Individual Capacity
                 Thursday, August 15, 2024
16              San Francisco, California
17
18              9:32 a.m. PDT
19                   to
20              6:01 p.m. PDT
21
22
23  Stenographically Reported by:
    Burgundy B. Ryan, RPR,
24  CSR No. 11373
    Job No. 549087
25  Pages 1-232
```

```
                                    2
 1              A P P E A R A N C E S
 2
 3  ON BEHALF OF THE PLAINTIFF:
 4      JEFFER MANGELS BUTLER & MITCHELL LLP
        By:   JOSEPH J. MELLEMA, Esquire
 5      3 Park Plaza
        Suite 1100
 6      Irvine, California 92614
        949.623.7200
 7      jmellema@jmbm.com
 8  ON BEHALF OF THE DEFENDANT:
 9      MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, and
        POPEO, P.C.
10      By:   MATHEW S. GALICA, Esquire
        One Financial Center
11      Boston, Massachusetts 02111
        617.542.6000
12      msgalica@mintz.com
13  ALSO PRESENT:
14      KEN LAUGUICO, Videographer
        Planet Depos
15
```

```
                                    3
 1              DEPOSITION SUPPORT INDEX
 2
 3  QUESTIONS INSTRUCTED NOT TO ANSWER:
 4  PAGE    LINE
 5  (None)
 6
 7
 8  REQUEST FOR PRODUCTION OF DOCUMENTS
 9  PAGE    LINE
10  (None)
11
12
13  STIPULATIONS
14  PAGE    LINE
15  (None)
16
17
18  QUESTIONS MARKED
19  PAGE    LINE
20  (None)
21
22
23            REPORTER'S NOTE:
24  QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
25  NECESSARILY REFLECT A DIRECT QUOTE.
```

```
                                    4
 1                  I N D E X
 2                                         PAGE
 3  EXAMINATION BY MR. GALICA.............   8
 4
 5              --o0o--
 6
 7              E X H I B I T S
 8  EXHIBIT      DESCRIPTION              PAGE
 9   323     30(b)(1) Deposition Notice    13
10   324     30(b)(6) Deposition Notice    14
11   325     Early Block Diagram           47
12   326     Identification of Trade Secret 79
13   327     Identification of Trade Secret 156
14   328     Unidentified Document         187
15   329     Security Measurements         188
16   330     Compology System Architecture 196
                and Security
17
     331     Diagram of SC01               198
18           Bluetooth Communication
19   332     Compliance Document           202
20   333     FCC Submission                205
21   334     CeteCom Report                206
22   335     Compology Camera Installation 209
                Guide
23
     336     FCC Submission                212
24
25
```

Page 5

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 337 | FCC Submission | 214 |
| 338 | FCC Submission | 215 |
| 339 | FCC Submission | 215 |
| 340 | FCC Submission | 216 |
| 341 | FCC Submission | 216 |
| 342 | FCC Submission | 219 |
| 343 | Block Diagram and Schematics | 220 |
| 344 | Schematic | 228 |

--o0o--

Page 6

BE IT REMEMBERED that, pursuant to Notice of Taking Deposition, and on Thursday, August 15, 2024, commencing at 9:32 a.m. PDT thereof, at Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, 44 Montgomery Street, San Francisco, California, before me, Burgundy B. Ryan, a Certified Shorthand Reporter in and for the State of California, personally appeared

TIMOTHY JAY LONGSON,

a witness called on behalf of DEFENDANT, pursuant to all applicable sections of the Federal Rules of Civil Procedure, and who, having been first duly sworn by me to testify to the truth, was examined and testified as follows:

THE VIDEOGRAPHER: Here begins Media No. 1 in the videotaped deposition of Timothy Longson in the matter of RoadRunner Recycling Inc. vs. Recycle Track Systems Inc., et al, in the United States District Court, Northern District of California, Case No. 3:23-cv-04804-WHA.

Today's date is August 15th, 2024.

The time on the video monitor is 9:32.

The videographer today is Ken Lauguico, representing Planet Depos.

This video deposition is taking place at 44

Page 7

Montgomery Street, 36th Floor, in San Francisco, California.

Would counsel please voice-identify themselves and state whom they represent?

MR. GALICA: Matthew Galica from Mintz Levin on behalf of the Defendant.

MR. MELLEMA: Joseph Mellema, Jeffer Mangels, on behalf of plaintiff RoadRunner Recycling Inc.

THE VIDEOGRAPHER: The court reporter today is Brooke Ryan, representing Planet Depos.

The witness will now be sworn.

(Whereupon, the witness was sworn.)

COURT REPORTER: Thank you very much.

Would you please state your name for the record?

THE WITNESS: My name is Timothy Jay Longson.

COURT REPORTER: Would you please spell it?

THE WITNESS: T-i-m-o-t-h-y J-a-y L-o-n-g-s-o-n.

COURT REPORTER: Thank you very much.

Counsel, you may proceed.

/////
/////

Page 8

TIMOTHY JAY GALICA,

having been first duly sworn to tell the truth, testified as follows:

EXAMINATION

By MR. GALICA:

Q. Good morning.

A. Good morning.

Q. How are you?

A. Good.

Q. Do you go by Tim?

A. I go by Jay.

Q. Jay. All right, Jay. Where do you currently reside?

A. Okay. I currently reside in Sebastopol, California.

Q. Okay. Have you been deposed before?

A. No.

Q. Okay. So I'll just walk through some ground rules just so we're on the same page, if that's all right.

A. Yes.

Q. So as you know, today your testimony is being taken under oath as if it were going to be presented before a judge or jury.

Do you understand that?

Case 3:23-cv-04804-WHA   Document 138-7   Filed 10/18/24   Page 4 of 14
ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually    23 (89 to 92)
Conducted on August 15, 2024

**Page 89**

1  software of any Compology or RoadRunner device?
2      MR. MELLEMA: Objection. Form.
3      THE WITNESS: By front-end software, are
4  you talking about the web app?
5  By MR. GALICA:
6    Q. Yes.
7    A. I have not been involved in the development
8  of the web app.
9    Q. Do you understand front-end software to
10 include anything beyond the web app?
11   A. My understanding is front-end specifically
12 relates to the web app.
13   Q. Okay. And you have not been involved in
14 the development related to that?
15   A. Correct.
16   Q. Okay. All right. I'll have you read
17 lines 23 -- starting on page 4, starting on line 23,
18 going over to line 5 on page 5. And let me know
19 when you're done.
20   A. Where did you want to stop?
21   Q. Line 5 on page 5.
22   A. Okay. I'm done.
23   Q. All right. So line 23, page 4 alludes to
24 overall know-how and design and then it lists a
25 number of aspects of Compology and RoadRunner

**Page 90**

1  products.
2      Do you see that?
3    A. Yes.
4    Q. Okay. Can you describe the overall
5  know-how of Compology's waste metering system?
6    A. My interpretation is this line is all of
7  the elements that go into make our product valuable
8  to our customers.
9    Q. And what are all of those elements that
10 make the product valuable to your customers?
11     MR. MELLEMA: Objection. Form.
12     THE WITNESS: Well, this is not
13 comprehensive. I don't think I can comprehensively
14 list all of them, but it may include the physical
15 hardware components, such as the smart camera
16 apparatus, optical assembly and design, firmware,
17 such as image preprocessing techniques implemented
18 in the camera apparatus, training data, machine
19 learning models, an AI system implementing the
20 machine learning models, and algorithms and purposes
21 to generate data analysis and recommendations to
22 customers, including fullness, emptiness,
23 contamination schedules, data ingestion,
24 efficiencies, location analysis of waste
25 containers.

**Page 91**

1  By MR. GALICA:
2    Q. So you're saying that's the trade secret?
3      MR. MELLEMA: Objection. Form.
4      THE WITNESS: I didn't say that.
5  By MR. GALICA:
6    Q. What is that then?
7    A. I said -- well, I don't know. Maybe
8  somebody can read off what I said.
9    Q. Are you done?
10   A. I'm done.
11   Q. Okay. So line 23, page 4, first phrase
12 says, "RoadRunner's trade secrets include the
13 overall know-how and design" and then it lists a
14 number of components; correct?
15     MR. MELLEMA: Objection. Form.
16     THE WITNESS: Are you asking me what's
17 written here?
18 By MR. GALICA:
19   Q. Do you understand what this document is
20 supposed to do?
21     MR. MELLEMA: Objection. Form.
22     THE WITNESS: Maybe you can tell me and
23 I'll tell you if that's congruent with my
24 understanding.
25 By MR. GALICA:

**Page 92**

1    Q. Well, I'm asking the questions. Do you
2  understand what this document is supposed to do?
3      MR. MELLEMA: Same objection.
4      THE WITNESS: I believe so.
5  By MR. GALICA:
6    Q. What do you understand it to be?
7    A. The plaintiff's identification of trade
8  secrets.
9    Q. Okay. And then on line 23, page 4, you see
10 how it says, "RoadRunner's trade secrets include the
11 overall know-how and design of its waste metering
12 system"?
13   A. Yes.
14   Q. Okay. So what is -- can you explain what
15 the overall know-how and design is of the waste
16 metering system?
17     MR. MELLEMA: Objection. Form.
18     THE WITNESS: I don't understand what
19 you're trying to ask me.
20 By MR. GALICA:
21   Q. I'm trying to understand what your trade
22 secrets are, and in line 23 on page 4, it says they
23 include the overall know-how and design. Do you see
24 that?
25     So I'm trying to figure out what that

Case 3:23-cv-04804-WHA   Document 138-7   Filed 10/18/24   Page 5 of 14

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually    24 (93 to 96)
Conducted on August 15, 2024

**Page 93**

1  overall know-how and design is.
2  A. I think it relates to those things listed
3  underneath that line.
4  Q. So that's what -- the overall know-how and
5  design is verbatim lines 23 on page 4 to lines 5 on
6  page 5?
7     MR. MELLEMA: Objection. Form.
8     THE WITNESS: I didn't write this, but I
9  believe that those are some of the included trade
10 secrets.
11 By MR. GALICA:
12 Q. What are other trade secrets?
13 A. As I said, I don't have a comprehensive
14 list of all of the trade secrets, so I can't answer
15 that question.
16 Q. This document is supposed to be that
17 list?
18 A. I think this document --
19    MR. MELLEMA: Hold on. Objection form.
20 By MR. GALICA:
21 Q. You can answer.
22 A. My understanding is that this document
23 outlines trade secrets that relate to this case.
24 Q. Right. And I'm asking you questions about
25 them.

**Page 94**

1     Do you understand that?
2  A. Yes. I understand that.
3  Q. Okay. So do you not know one way or
4  another what overall know-how and design, as used in
5  line 23 on page 4, means?
6     MR. MELLEMA: Objection. Form.
7     THE WITNESS: I understand my
8  interpretation of overall know-how and design.
9  By MR. GALICA:
10 Q. What's your interpretation of overall
11 know-how and design?
12    MR. MELLEMA: Objection. Form.
13    THE WITNESS: I believe it to mean all of
14 the information needed to create the system.
15 By MR. GALICA:
16 Q. And what is all of the information needed
17 to create the system?
18    MR. MELLEMA: Objection. Form.
19    THE WITNESS: I can't answer that. That's
20 literally a decade's worth of work that me and my
21 colleagues undertook.
22 By MR. GALICA:
23 Q. Can you name one thing?
24 A. Yep. So in order to get very good GPS
25 reception, [REDACTED]

**Page 95**

1  [REDACTED]
2  [REDACTED]
3  [REDACTED]
4  [REDACTED]
5  [REDACTED]
6  [REDACTED] That's just one example.
7  Q. Okay. Can you think of any others?
8  A. I can think of probably hundreds.
9  Q. Can you name another?
10 A. Yeah. So, I mean, a big part of what
11 provides value to the system is that it's able to
12 withstand the harsh environments of a trash
13 container and live out in the field for multiple
14 years. So much of the work that we do is aimed at
15 making sure that the devices are rugged and that
16 they can withstand this environment, and we've spent
17 thousands of hours performing highly-accelerated
18 life cycle testing to ensure that our cameras can
19 withstand this harsh environment.
20 Q. Okay. So are you saying that the trade
21 secret is the cameras can withstand harsh
22 environments or the design choices that you made
23 that allows them to withstand harsh environments?
24 A. It's the design choices are the -- the
25 trade secret.

**Page 96**

1  Q. Okay. So what are the design choices that
2  you made so that your products could withstand harsh
3  environments?
4  A. There's many, as I said, but one example
5  could be the choice of materials used in the
6  housing.
7  Q. Any others?
8  A. The geometry of the housing.
9  Q. And with respect to the materials chosen,
10 do all of the Compology and RoadRunner devices use
11 the same materials?
12    MR. MELLEMA: Objection. Form.
13    THE WITNESS: I don't remember all of the
14 materials we've used throughout all of the revisions
15 or versions of the camera.
16 By MR. GALICA:
17 Q. What about as between the R11 and R12?
18 A. I believe both of the front housings for
19 those parts were [REDACTED]
20 Q. Okay. Do they have the same shape?
21 A. No.
22 Q. So are those different trade secrets, one
23 for the R11 and one for the R12?
24 A. There are certainly different trade secrets
25 within each version of the camera.

**Page 97**

1    Q. Okay. So focusing on the one that
2 encompasses the design choices you made that enable
3 your products to withstand harsh environments, is
4 that a different trade secret for the R11 and the
5 R12?
6    A. I believe there are overlaps between the
7 two, but there may be specific design choices that
8 are different within those two that could be
9 considered trade secrets.
10   Q. So what are -- what's the overlap?
11   A. They have many features that overlap. One
12 example is that they both use [REDACTED] as the
13 front housing.
14   Q. And what are the different trade secrets?
15   A. I would have to go and review the -- the
16 designs in order to try to come up with some list.
17   Q. So where -- yeah. Where is the information
18 defining these trade secrets located?
19       MR. MELLEMA: Objection. Form.
20       THE WITNESS: Can you give me a specific
21 trade secret that you're asking about?
22 By MR. GALICA:
23   Q. Yeah. The two we've just been talking
24 about, so the material and the shape.
25       MR. MELLEMA: Objection. Form.

**Page 98**

1       THE WITNESS: The materials and the shape
2 are defined in the technical drawings.
3 By MR. GALICA:
4    Q. Okay. Anywhere else?
5    A. That is the document of truth for the
6 material and shape.
7    Q. Okay. And so it's your position that
8 you've never disclosed the shape of your products to
9 the public?
10   A. I never said that.
11   Q. Well, you said it was a trade secret;
12 right?
13   A. I said that the shape helps with making
14 sure that it can survive harsh environments.
15   Q. And is that a trade secret?
16   A. I don't believe that the shape is a trade
17 secret. I'm sure there's elements within the
18 enclosure that are trade secret.
19   Q. And you've never shown the inside of your
20 enclosures to the public?
21       MR. MELLEMA: Objection. Form.
22       THE WITNESS: There are FCC filings that
23 include pictures of the inside of the devices.
24 By MR. GALICA:
25   Q. So you've shown them to the public then;

**Page 99**

1 correct?
2       MR. MELLEMA: Objection. Form.
3       THE WITNESS: As I said, there are some
4 images that show some portion of the inside of
5 the -- inside of the device that are public.
6 By MR. GALICA:
7    Q. So what -- what is the portion that isn't
8 shown to the public that's a trade secret?
9    A. I would have to review all of those
10 documents to be able to comment further.
11   Q. You don't know as you sit here right now?
12   A. No. I don't remember what specifically was
13 shown in the FCC filing.
14   Q. All right. If you could turn to page 5 and
15 read lines 7 through 11 and let me know when you're
16 done.
17   A. Okay. I'm done.
18   Q. Okay. So can you explain the unique
19 configuration of the parts in the smart camera
20 assembly, what that means?
21   A. I'm struggling to explain it any more
22 clearly than it's already stated here.
23       So unique, as in it doesn't exist
24 elsewhere. Configuration, like how they're
25 arranged.

**Page 100**

1       Is there something else you're looking for?
2    Q. Well, let me ask it a different way. So
3 for the -- strike that.
4       What's the overall waste metering system?
5       MR. MELLEMA: Objection. Form.
6       THE WITNESS: Yeah. That's too broad of a
7 question. I don't -- I can't -- I can't summarize
8 it in the time that we have here.
9 By MR. GALICA:
10   Q. What -- what are the high level components
11 of it?
12   A. I think at a high level, we're providing
13 insights to our customers from how their containers
14 fill up and what are the contents of those
15 containers.
16   Q. So using the phrase "overall waste metering
17 system", is that too broad of a phrase?
18       MR. MELLEMA: Objection. Form.
19       THE WITNESS: Too broad of a phrase for
20 what?
21 By MR. GALICA:
22   Q. For you to understand what the trade secret
23 is associated to that?
24   A. As I said before, I think there are many
25 trade secrets that are encompassed within that broad

**101**

1  statement.
2  Q. So the overall waste metering system, that
3  itself is not a trade secret?
4  A. I think we have it listed as a trade secret
5  right there on line 22 of page 4.
6  Q. Okay. That's what I'm trying to
7  understand.
8  What is the overall waste metering system?
9  MR. MELLEMA: Objection. Form.
10  THE WITNESS: I think the overall waste
11  metering system encompasses many parts. This
12  includes the hardware, the software, the algorithms,
13  the labeled and trained data. There is many
14  elements.
15  BY MR. GALICA:
16  Q. But it's that unique configuration of those
17  specific elements and how they're connected that
18  constitutes the trade secret; is that correct?
19  MR. MELLEMA: Objection. Form.
20  THE WITNESS: Can you rephrase the
21  question?
22  BY MR. GALICA:
23  Q. What was unclear about it?
24  A. To be honest, I'm going around in circles.
25  I don't know what you're asking me.

**102**

1  Q. We share the same frustration.
2  Can you define, as you sit here right now,
3  what the trade secret is for your overall waste
4  metering system?
5  A. As I said, I think it encompasses multiple
6  trade secrets. I don't think it's one single trade
7  secret.
8  Q. So there is not one single trade secret for
9  your overall waste metering system; correct?
10  A. As far as I understand it, correct.
11  Q. Okay. If you could turn to page 7 and read
12  through lines 6 through 14. Let me know when you've
13  had a chance to review that.
14  A. I've read that paragraph.
15  Q. Okay. So do you understand that to mean
16  that there is a single trade secret for the smart
17  camera apparatus?
18  A. I believe this to be a -- a trade secret
19  that describes the overall apparatus but that does
20  not exclude the possibility that there are
21  additional trade secrets that are basically sub
22  elements of that.
23  Q. Okay. And just for the record, you're
24  reading line 6, "Compology's smart camera apparatus
25  trade secret includes", you -- you see the phrase

**103**

1  "trade secret" is in the singular form there?
2  A. Yes. But we also talk about the optical
3  assembly and design as a separate trade secret, but
4  that is part of the smart camera apparatus. That's
5  why I was saying there may be, basically, like, sub
6  trade secrets included within that overarching trade
7  secret.
8  Q. Well, just focusing on line 6 through 14 on
9  page 7, you would agree that that -- what's
10  described there is intended to be a single trade
11  secret; correct?
12  A. Yeah. By the use of singular versus
13  plural, that's what I'm lead to believe.
14  Q. Okay. And that trade secret includes
15  everything that's listed in lines 6 through 14;
16  correct?
17  A. Correct.
18  Q. What's the difference between the optical
19  assembly and the smart camera?
20  A. So as we've defined it, the optical
21  assembly includes [redacted]
22  [redacted]
23  Q. I'm sorry. What was the last --
24  A. And a -- and a -- [redacted]
25  [redacted]

**104**

1  Q. Okay. And -- and going back to lines 6
2  through 14 on page 7, is the smart camera apparatus
3  the same in the R11 and R12 device?
4  A. No.
5  Q. Is it the same -- let me ask it a different
6  way.
7  Is the smart camera apparatus different for
8  the R11, R12 and R13?
9  A. Yes. I would call each of those a separate
10  smart camera.
11  Q. So would you also call each of those a
12  separate trade secret?
13  A. I believe so.
14  Q. And is the trade secret in line 6 through
15  14 just the fact that it includes these components,
16  or is it the specific components in the smart camera
17  of each device?
18  MR. MELLEMA: Objection. Form.
19  THE WITNESS: I believe this paragraph just
20  is -- is just listing some of the components but
21  that those do not constitute the trade secret.
22  BY MR. GALICA:
23  Q. So this isn't the trade secret?
24  MR. MELLEMA: Objection. Form.
25  THE WITNESS: I think this describes at a

Case 3:23-cv-04804-WHA   Document 138-7   Filed 10/18/24   Page 8 of 14

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually     27 (105 to 108)
Conducted on August 15, 2024

**Page 105**

1  high level the trade secret, but I would not call
2  this the trade secret.
3  By MR. GALICA:
4      Q.  What would you call the trade secret?
5      A.  All of those design files that we've
6  provided in discovery.
7      Q.  All of what design files?
8      A.  All of the design and know-how needed to
9  build these smart camera apparatuses.
10     Q.  So you would need to have all of the design
11 files for every single component listed here in each
12 specific component, including all data sheets, to
13 know what the trade secret is?
14         MR. MELLEMA:  Objection.  Form.
15         THE WITNESS:  No.
16 By MR. GALICA:
17     Q.  How is that incorrect?
18     A.  There are -- we have -- we're describing
19 the camera apparatus as a trade secret, and that
20 includes many design choices within that camera
21 apparatus that are all -- that are all trade
22 secrets, as in they're not public knowledge.  So if
23 someone were to reverse engineer our product and
24 pick out any of those design choices that were not
25 public knowledge, then they would be infringing upon

**Page 106**

1  our trade secret.
2      Q.  You said it would be all of the information
3  in the design files that you provided; correct?
4          MR. MELLEMA:  Objection.  Form.
5          THE WITNESS:  No, I did not say that.
6  By MR. GALICA:
7      Q.  So then what -- what's the boundary?
8  What's the scope of the trade secret?
9      A.  I think any of the privately-held design
10 choices that we used in these cameras are within the
11 overarching trade secret.
12     Q.  But we already established those 6 -- lines
13 6 through 14, that's one trade secret; right?
14         MR. MELLEMA:  Objection.  Form.
15 By MR. GALICA:
16     Q.  So -- and you can't -- beyond what you've
17 testified to today, you can't define the scope or
18 boundary of the trade secret identified in lines 6
19 through 14?
20         MR. MELLEMA:  Objection.  Form.
21         THE WITNESS:  I'm not sure if I can answer
22 that question.
23 By MR. GALICA:
24     Q.  Why can't you answer that question?
25     A.  Because I feel like this is an issue of

**Page 107**

1  semantics, and I'm not trained as a lawyer to be
2  able to differentiate the semantic differences
3  between what you're trying to get at.
4      Q.  You understand that RoadRunner's alleging
5  that RecycleSmart has misappropriated trade secrets;
6  right?
7      A.  I do.
8      Q.  Okay.  That's not a matter of semantics;
9  correct?  That's what is going on; correct?
10     A.  Right.
11     Q.  Okay.  And you, in line 6 through 14, on
12 page 7 of your trade secret identification, you say
13 that your trade secret includes, and then you list
14 eight lines of technical description.
15         Do you see that?
16     A.  Yeah.
17     Q.  I'm trying to figure out what is the scope
18 of that technical description defining your trade
19 secret.
20         Do you understand that?
21     A.  How do you define scope in this context?
22     Q.  What does this mean?  What is the scope and
23 boundary of the trade secret information, line 6
24 through 14?
25     A.  So the physical camera, the smart camera

**Page 108**

1  apparatus that we designed and built, any aspect of
2  that that's not public knowledge, that is the trade
3  secret.
4      Q.  Is the battery pack public knowledge?
5      A.  No.
6      Q.  So you've never disclosed to the public
7  what type of batteries you use?
8      A.  That's not what I said.
9      Q.  Have you disclosed to the public what type
10 of batteries you used?
11     A.  I believe marketing has, yes.
12     Q.  Okay.  So that's not a trade secret, then.
13     A.  The battery chemistry isn't, but the
14 battery pack is.
15     Q.  Okay.  And what is secret about the battery
16 pack?
17     A.  There's a number of elements that we've
18 included in that battery pack that make it into a
19 pack, as opposed to just a single battery.
20     Q.  And what are those elements that you've
21 included?
22     A.  We've included a ████████████████
23 ████████████████████████████████████████
24 ████████████████████████████████████████
25     Q.  And you've never disclosed a picture of

**121**

1  20 on page 7 of Exhibit 326. Just let me know when
2  you get there.
3     A. Line 20, page 6?
4     Q. Page 7.
5     A. Yep. I'm here.
6     Q. Okay. So you see it says "optical assembly
7  and design"?
8     A. Uh-huh.
9     Q. Okay. Is there one trade secret for the
10 optical assembly and design?
11    A. I guess I don't know exactly what the legal
12 definition of the trade secret here is, but I think
13 this identifies pieces of it. Let me just read it.
14    Q. Sure.
15    A. Yeah. I guess from a legal perspective, I
16 don't -- I don't know whether there is one trade
17 secret or multiple trade secrets encompassed in
18 this, but...
19    Q. Did you have any conversations with your
20 counsel about the subject of your testimony during
21 lunch?
22    A. Yeah.
23    Q. You discussed the subject of your testimony
24 during lunch?
25    A. Oh, sorry. We just discussed generally

**122**

1  the -- the testimony and, you know, how things are
2  going.
3     Q. Okay. Nothing specific?
4     A. No.
5     Q. He didn't suggest how to answer questions
6  when you return from break?
7     A. No.
8     Q. Okay. I will turn your attention to lines
9  3 through 10 on page 8. Can you just give that a
10 read and let me know when you've had a chance to do
11 that?
12    A. Okay.
13    Q. Do you see line 4 -- end of line 3,
14 beginning of line 4, where it says, "over the course
15 of many years to optimize the captured images"?
16    A. Yes.
17    Q. How did you optimize the captured images
18 for the R11?
19    A. Well, a big piece was, you know, designing
20 the whole lens assembly, so making sure that we had
21 an adequate ▮▮▮, adequate ▮▮▮▮ that
22 the image sensor had ▮▮▮▮ I'm
23 trying to think what else was important in those
24 design decisions.
25    R11 actually had two cameras, so two image

**123**

1  sensors, two lenses, et cetera, so we were working
2  at the time on doing ▮▮▮▮ to assist
3  with the fullness evaluation.
4     Q. Okay. So -- excuse me. There were two
5  cameras with the R11, you said; correct?
6     A. Uh-huh.
7     Q. Did those have different fields of view?
8     A. No. In fact, when you're doing ▮▮▮
9  ▮▮▮▮▮▮▮▮▮▮
10 ▮▮▮▮▮▮▮▮▮▮
11 ▮▮
12    Q. Okay. So ideally you want them to be
13 ▮▮; correct?
14    A. It really depends on what you're trying to
15 achieve. I can imagine a scenario in which if
16 you're only interested in ▮▮ content within some
17 small range, that you might want one large field of
18 view camera to capture the entire contents and then
19 a smaller one to capture just the ▮▮ information
20 in that small range. But for our purposes at the
21 time, we were interested in having ▮▮▮
22 ▮▮
23    Q. And just to be clear, ▮▮▮
24    A. These two cameras were ▮▮ short of
25 manufacturing tolerances.

**124**

1     Q. So within manufacturing tolerances, they
2  were designed to be ▮▮
3     A. There may have been ▮▮▮▮
4  ▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮ but I believe they were ▮▮▮
6     Q. Okay. And you referred to ▮▮▮
7  ▮▮▮ Do you recall that?
8     A. Yes.
9     Q. What is a ▮▮ camera?
10    A. ▮▮▮▮▮▮▮▮▮▮
11 ▮▮▮▮▮▮▮▮▮▮
12 ▮▮▮▮▮▮▮▮▮▮
13 ▮▮▮▮
14    Q. I didn't mean to cut you off.
15    A. Assuming you have two eyes.
16    Q. And are the image sensors used in a ▮▮
17 ▮▮ configuration specifically define -- designed
18 for that purpose?
19    A. Yes. I would recommend that. If you're
20 designing a ▮▮▮▮ then you should probably
21 consider how you're designing it.
22    Q. So there are image sensors that are
23 dedicated for use in ▮▮ camera systems; is that
24 correct?
25    A. There are image sensors that allow you to

Case 3:23-cv-04804-WHA   Document 138-7   Filed 10/18/24   Page 10 of 14

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually   32 (125 to 128)
Conducted on August 15, 2024

```
                                                        125
 1  synchronize the image capture so that both image
 2  sensors capture an image simultaneously, at the
 3  exact same time.  However, we did not use such
 4  synchronized image sensors for this product.
 5      Q.  So you didn't use ones that were specific
 6  for █████ camera systems; correct?
 7      A.  That's correct.  If --
 8  ████████████████████████████████████████████
 9  ████████████████████████████████████████████
10  ██████
11      Q.  Okay.  Does the R12 incorporate a ████
12  camera?
13      A.  No.  R12 had just one single lens and image
14  sensor.
15      Q.  And is that true for the R13 and its
16  variants as well?
17      A.  Yes.
18      Q.  Okay.  You previously said that you
19  designed it to have adequate ████  Do you recall
20  that?
21      A.  I think I said ██████████████████
22      Q.  What is an ████
23      A.  It's a ████████████████████████████
24  ████████████████████████
25      Q.  And what is the amount adequate that ████
```

```
                                                        126
 1  ████████
 2      A.  So if you don't --
 3  ████████████████████████████████████████████
 4  ████████████████████████████████████████████
 5  ████████████████████████████████████████████
 6  ██████
 7      Q.  So you incorporated an ████ to prevent
 8  that from occurring?
 9      A.  That's correct.
10      Q.  And did you design the ████████
11      A.  No.
12      Q.  Who did?
13      A.  I don't know the company for this specific
14  one.  I would have to go and look at our
15  documentation.
16      Q.  So you just purchased the part; correct?
17      A.  Yeah, effectively.  I'm -- I'm sure it was
18  not a relatively off-the-shelf part.
19      Q.  In lines 5 to 6 on page 8, you state that
20  "the camera lens is a ████████████
21      Do you see that?
22      A.  Yes.
23      Q.  What does that mean?
24      A.  That means it cannot ██████████████
25  ████████████████████
```

```
                                                        127
 1  that's set at time of manufacturing.
 2      Q.  And did you set the focus?
 3      A.  I did.  I set the focus in the design
 4  specifications and then our manufacturer assembled
 5  the parts to our specifications.
 6      Q.  And who assembled the parts?
 7      A.  We've used a few different camera module
 8  vendors over the years.  The one we're using
 9  currently is called ████
10      Q.  And how do you set the focus on a camera
11  lens?
12      A.  For these particular lenses, they have a
13  screw thread, which threads into a lens mount, and
14  the amount that you screw it down influences the
15  focus.
16      Q.  And did you set the same focus for the
17  cameras in the R11, R12, and R13?
18      A.  It's similar, but we've used different
19  lenses for different products, so there's some
20  variation between them.
21      Q.  Okay.  And is setting the focus, for
22  example, a trade secret?
23      A.  I wouldn't characterize it as that, but I
24  suppose maybe somebody could.
25      Q.  Why wouldn't you characterize it as that?
```

```
                                                        128
 1      A.  It's not something that -- well, I think
 2  because there's probably a variety of focuses that
 3  would be acceptable, and so there's not a whole lot
 4  of, kind of, ingenuity that went into that decision.
 5      Q.  And then reading, again, lines 5 and 6, it
 6  says, "The camera lens is a ██████████ with an
 7  optimal field of view and focal length."
 8      Do you see that?
 9      A.  Uh-huh.
10      Q.  What is the focal length for the R11?
11      A.  I don't remember the specific focal length,
12  but it's around ████
13      Q.  And what is a focal length?
14      A.  Focal length basically dictates where --
15  where the light convergences, like, how far away
16  from the lens the light is converging.
17      Q.  Okay.  And when you said that the focal
18  length for the R11 is around ████ in what form of
19  measurement is that?
20      A.  To be honest, I've forgotten the -- the
21  metric, but I think it's ████████████  It's a --
22  yeah.  I think it's in the ████████
23      Q.  Okay.  And is it different for the R12?
24      A.  I'm sure it's subtlety different, but it's
25  probably pretty similar.
```

---

**Page 129**

1  Q. Okay. Would you say the focal length is a
2  trade secret?
3  A. I think -- as far as I know, the focal
4  length has never been shared with anyone else
5  publicly, so -- and it does derive value to us, so
6  you could characterize it that way.
7  Q. What is the value that it derives to you?
8  A. It allows us to capture images that are
9  appropriate for the -- both the environment that
10 we're in and the machine learning algorithms that
11 are analyzing those images.
12  Q. Okay. So you set the focal length, so --
13 based on the environment that you're in and the
14 machine learning algorithms that you are using;
15 correct?
16  A. The focal length allows you -- I mean, the
17 focal length and field of view are similar and, kind
18 of, go hand-in-hand, but they -- they basically
19 dictate what you're able to capture, what -- what
20 the images look like.
21  Q. And the focal length and field of view are
22 specific, though, to the R11, for example; correct?
23  A. Each camera has a specific focal length and
24 field of view, that's correct.
25  Q. Okay. So a camera with a different field

---

**Page 130**

1  of view and focal length would not be the trade
2  secret; correct?
3  A. Yeah. Again, I don't know exactly how the
4  law defines the trade secret in this case, but --
5  Q. So you don't know one way or the other?
6  A. No.
7  Q. So -- okay. Strike that.
8     Do you see further down lines 18 through 20
9  on page 8? If you would just review that and let me
10 know when you've had a chance to.
11 A. Yes. I see that.
12  Q. Okay. Do you recall the different types of
13 lens assemblies that you experimented with for the
14 R11?
15 A. Very generally. I mean, I don't remember
16 specifics, but, yeah, we -- we worked with a number
17 of lens vendors to select an appropriate lens for
18 our application.
19  Q. But -- but specifically the material;
20 correct?
21 A. Yes. So there was a -- I don't know when
22 we ▇▇▇▇▇▇▇▇▇▇▇▇▇ I don't remember what
23 product that was, but we did find that ▇▇▇▇
24 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
25 ▇▇▇▇▇▇ which was problematic for both our human

---

**Page 131**

1  and machine learning classification.
2  Q. Why did you use ▇▇▇▇▇▇▇ in the
3  first place?
4  A. Typically, lens vendors will include
5  ▇▇▇▇▇▇▇▇▇▇ to make the lenses cheaper.
6  Q. So you didn't actually choose to use ▇▇
7  ▇▇▇▇▇▇▇ That was just a byproduct of the
8  component you purchased from a third party?
9  A. We chose the component to meet other design
10 criteria, and it happened to be ▇▇▇▇▇▇▇▇▇▇
11 ▇▇▇▇ and we found that that was problematic and
12 we at some point shifted to ▇▇▇▇▇▇▇▇
13  Q. Okay. Is it uncommon for cameras to have
14 an ▇▇▇▇▇▇▇▇?
15 A. For relatively inexpensive cameras, that is
16 uncommon. For more expensive, like, you know,
17 DSLRs, for example, they're ▇▇▇▇▇▇▇ You will
18 never see ▇▇▇▇▇▇▇▇▇ in a DSLR.
19  Q. So if you just purchase a more expensive
20 component, you would get ▇▇▇ correct?
21     MR. MELLEMA: Objection. Form.
22     THE WITNESS: I'm sure there's expensive
23 ▇▇▇▇▇▇▇ too.
24 By MR. GALICA:
25  Q. Are you aware of any?

---

**Page 132**

1  A. No. This is all speculation.
2  Q. Okay.
3     MR. MELLEMA: I keep thinking we're going
4  to get spied on over here. It keeps turning on, and
5  the cameras look at us.
6     MR. GALICA: Is that an ▇▇▇▇▇▇▇ It
7  might be.
8     MR. MELLEMA: It looks expensive.
9  By MR. GALICA:
10  Q. I'm going to direct your attention to lines
11 7 through 19 on page 9. If you could just read
12 through that and let me know when you've had a
13 chance to review it.
14 A. I've read it.
15  Q. So lines 16 and 17 reference a
16 ▇▇▇▇▇▇▇▇ Do you see that?
17 A. Yes.
18  Q. And what is the purpose of the
19 ▇▇▇▇▇▇▇▇?
20 A. To facilitate debris shutting.
21  Q. Okay. And do you believe that the
22 ▇▇▇▇▇▇▇▇ is a trade secret?
23 A. I do.
24  Q. What's the value of it?
25 A. It prolongs the life of our cameras.

133

1  Q. Can you quantify that in a dollar amount?
2  A. I might be able to with some research, but
3  I can't off the top of my head.
4  Q. Does it provide any other benefits?
5  A. It may ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, but
6  I'm not 100 percent sure on that.
7  Q. Any other ones?
8  A. It may provide some ▮▮▮▮▮▮▮ but,
9  again, I'm not sure about that.
10 Q. Okay. How would you quantify the value in
11 a dollar amount?
12 A. I would look at our fleet of cameras,
13 identify ones with and without the ▮▮▮▮▮▮ and
14 look at the failure rates over time ▮▮▮▮▮▮
15 ▮▮▮▮▮▮.
16 Q. And how would that provide a dollar amount?
17 A. So based on that distribution of time to
18 failure due to optical occlusions, you can assign a
19 dollar amount based on either the cost of a
20 technician to go out and clean that window or the
21 cost of replacing that camera.
22 Q. In the context of your overall product, how
23 valuable is the ▮▮▮▮▮▮▮▮?
24    MR. MELLEMA: Objection. Form.
25    THE WITNESS: Again, I don't know the exact

134

1  value. We would have to do a study to understand
2  that.
3  By MR. GALICA:
4  Q. Do you see lines 17 through 19 on page 9?
5  A. Yes.
6  Q. It says that, "The window geometry of the
7  camera assembly housing was recessed."
8     Do you see that?
9  A. Yes.
10 Q. What does that mean?
11 A. I think what we're getting at here is that
12 the -- the way in which the geometry is formed
13 minimizes trash from the container coming into
14 contact with the window.
15 Q. And what is the window?
16 A. The window is the area where we let light
17 in to the image sensor and lens.
18 Q. Okay. So is that visible from the outside
19 of your product?
20 A. Part of it is, yes.
21 Q. What part is?
22 A. The outside.
23 Q. And what part isn't?
24 A. The inside.
25 Q. And what is valuable about the inside of

135

1  the window geometry?
2  A. We often employ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
4  ▮▮▮▮▮▮▮▮▮▮, so that's not visible and the
5  ▮▮▮▮▮▮▮▮▮▮▮▮ inside is not visible.
6  Q. So -- and none of those relate to waste and
7  debris sliding off the camera; correct?
8  A. Somewhat. You can have ▮▮▮▮▮▮▮▮▮
9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ --
10 ▮▮▮▮▮▮▮▮, so I wouldn't say that just as an
11 overarching blanket statement.
12 Q. Well, how does the internal geometry make
13 sure that waste and debris slide off?
14 A. Well, the internal geometry obviously
15 supports the outside geometry as well. You can't
16 just have one without the other.
17 Q. So what's unique about the internal
18 geometry so that it allows the external geometry to
19 have waste and debris slide off?
20 A. I would have to review the design drawings,
21 but I'm sure there's elements that are required in
22 order to provide the geometry that we have on the
23 outside.
24 Q. Can you think of any right now?
25 A. For example, these are ▮▮▮▮▮▮▮▮▮

136

1  parts, and there's a number of design constraints
2  that you have to use in order to successfully
3  produce parts via injection molding.
4  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
5  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
6  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
7  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
9  Q. But you just need to do that in order to
10 make a product, though; correct?
11 A. Yeah. I mean, that is generally needed for
12 any injection molded part.
13 Q. Okay. So that isn't specific, though, to
14 the geometry that ensures that waste and debris
15 slide off; correct?
16 A. Well, I'm sure that there were specific
17 design choices made on the internal geometry to
18 accommodate the external geometry.
19 Q. Okay. Do you see line 26 on page 9?
20 A. Yes.
21 Q. Actually, I'm sorry. Let me -- let me back
22 up.
23    You said that the R11 includes a
24 nano-coating; correct?
25 A. I didn't say that, no.

Case 3:23-cv-04804-WHA   Document 138-7   Filed 10/18/24   Page 13 of 14
ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually   35 (137 to 140)
Conducted on August 15, 2024

```
                                                    137
 1   Q.  Does the R11 include a ████████?
 2   A.  No.
 3   Q.  Does the R12 include a ████████?
 4   A.  Actually, let me take a step back.  R11 and
 5   R12 both include UV coating, which one could
 6   potentially characterize as a ████████, but the
 7   way in which we're describing ████████ here is a
 8   little bit different.  So it's a separate coating
 9   than the UV coat.  Neither R11 nor 12 had the
10   ████████.
11   Q.  Okay.  Does the R13 include a ████████?
12   A.  Yes.
13   Q.  All of its variants?
14   A.  Yes.
15   Q.  Okay.  Does the R13 include the UV coating?
16   A.  Yes.
17   Q.  All of the variants?
18   A.  Yes.
19   Q.  The window geometry is different for the
20   R11 and R12; correct?
21   A.  Yes.
22   Q.  And for the R13 and its variants?
23   A.  Yes.
24   Q.  Okay.  All right.  Going to line 26 on page
25   9.
```

```
                                                    138
 1       "The low powerless -- power wireless
 2   communication module and location sensors", do you
 3   see that?
 4   A.  Yes.
 5   Q.  Is that a single trade secret?
 6   A.  Again, I don't know how these trade secrets
 7   are being defined in the legal context.  There were
 8   many design choices that we made to optimize both of
 9   those systems.  I -- from my understanding of what
10   trade secret means, I think many of those design
11   choices could be considered a trade secret.
12   Q.  Let's start with LTE Cat-M1.  What is
13   that?
14   A.  This is a variant of the LTE network that's
15   specifically targeting low power, low bandwidth
16   machine to machine or IoT devices.
17   Q.  And was that used in the R11?
18   A.  No.
19   Q.  Was it used in the R12?
20   A.  Yes.
21   Q.  Okay.  And, in fact, you've publicly
22   disclosed that that's been used; correct?
23   A.  Yes.  It's disclosed in the FCC filing.
24   Q.  Okay.  So just the fact that the R12 uses
25   LTE Cat-M1, you're not saying that's a trade secret;
```

```
                                                    139
 1   right?
 2   A.  I don't believe that that would be
 3   considered a trade secret based on the fact that
 4   it's public knowledge.
 5   Q.  Okay.  And what about GPS or GNSS?  Let's
 6   start with what are those?
 7   A.  GPS stands for global positioning system.
 8   I have forgotten what GNSS stands for, but it's
 9   basically the same thing.  GPS is the United States
10   version of GNSS.
11       So other countries have deployed
12   satellites -- oh, it says right there, global
13   navigation satellite system.
14       So, for example, Europe has their own
15   variant of GPS and China has their own variant and
16   Russia has their own variant.
17   Q.  And when you said "there it is right
18   there", are you referring to lines 19 and 20 on page
19   10?
20   A.  Yeah.  19 defines GNSS, global navigation
21   satellite system.
22   Q.  Okay.  Did the R11 include GNSS and GPS
23   support?
24   A.  Yes.
25   Q.  Okay.  And you're not alleging that the
```

```
                                                    140
 1   fact that it includes GNSS and GPS capabilities,
 2   that's a trade secret; right?
 3   A.  I don't believe so.  I think those are both
 4   public knowledge.
 5   Q.  If I could go back to lines 3 through 6 on
 6   page 10.  If you would just read that and let me
 7   know when you have.
 8   A.  I've read that.
 9   Q.  So it says that "the RF performance must be
10   optimized."
11       Do you see that?
12   A.  Yep.
13   Q.  How did you optimize the RF performance in
14   the R11?
15   A.  The methods used in the R11 are consistent
16   with the other devices. ████████████████████████
17   ████████████████████████████████████████████████
18   ████████████████████████████████████████████████
19   ████████████████████████████████████████████████
20   ████████████████████████████████████████████████
21   ████████████████████████████████████████████████
22   ████████████████████████████████████████████████
23   ████████████████████████████████████████████████
24   ████████████████████████████████████████████████
25   ████████████████████████████████████████████████
```

Case 3:23-cv-04804-WHA   Document 138-7   Filed 10/18/24   Page 14 of 14

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually
58 (229 to 232)
Conducted on August 15, 2024

**229**

1  Q. Okay. Can you identify any trade secret in
2  this schematic?
3  A. No.
4  Q. Okay.
5  A. I believe this is part of the design for
6  R12, which, if not, should publicly could constitute
7  a trade secret.
8  Q. Then I'm going to direct your attention to
9  page RoadRunner 000000153.
10     Do you recognize that?
11  A. This looks like part of the schematic for
12  R13.
13  Q. Can you point to any trade secret in that
14  schematic?
15  A. Again, I can't point out specific trade
16  secrets, but this is part of the R13 camera, which,
17  if kept secret, could be considered a trade secret.
18  Q. Can you go to the previous page, so the
19  number ending 152?
20     Do you recognize this?
21  A. This is the system block diagram for R13.
22  Q. Can you point to a trade secret here?
23  A. Again, this is part of R13, overall camera
24  system. If kept confidential, it could be
25  considered a trade secret.

**230**

1  Q. What aspects of it could be considered a
2  trade secret?
3  A. The overall design of the electronic
4  system.
5  Q. Anything beyond that?
6  A. I can't think of anything at this time.
7     MR. GALICA: Just note a few things. We
8  received a document production late last night, so
9  to the extent that anything in that document
10 production warrants further questioning, we're going
11 to reserve the right on that. I think there were a
12 few topics where the deponent witness was not
13 prepared to testify, and then we'd also request the
14 document that he said he prepared related to the
15 comparison of FCC or the Pello system and Compology
16 system.
17    With that said, I don't have further
18 questions right now.
19    MR. MELLEMA: What specific topics do you
20 contend he wasn't prepared for?
21    MR. GALICA: Sure. I think at a minimum,
22 in a non-exhaustive way, the time spent developing
23 each product.
24    MR. MELLEMA: Did you ask him about that?
25    MR. GALICA: Yeah, I did. He said he

**231**

1  didn't know. The value ascribed to each trade
2  secret, the algorithms, and those are the ones that
3  immediately come to mind.
4     MR. MELLEMA: Okay. No questions for me.
5     MR. GALICA: All right.
6     THE VIDEOGRAPHER: Okay. This marks the
7  end of the deposition -- the deposition of Timothy
8  Longson. We are going off the record at 18:01.
9        (Proceedings concluded.)
10           ---o0o---

**232**

1           CERTIFICATE OF STENOGRAPHIC REPORTER
2
3
4     I, BURGUNDY B. RYAN, a Certified Shorthand
5  Reporter, hereby certify that the witness in the
6  foregoing deposition,
7        TIMOTHY JAY LONGSON,
8  was by me duly sworn to tell the truth, the whole
9  truth, and nothing but the truth, in the
10 within-entitled cause; that said deposition was
11 taken at the time and place therein named; that the
12 testimony of said witness was stenographically
13 reported by me, a disinterested person, and was
14 thereafter transcribed into typewriting.
15    I further certify that I am not of counsel
16 or attorney for either or any of the parties to said
17 deposition, nor in any way interested in the outcome
18 of the cause named in said caption.
19
20    DATED: Wednesday, August 21, 2024.
21
22
23    Burgundy B. Ryan, CSR No. 11373, RPR