# EXHIBIT 10

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

ROADRUNNER RECYCLING, INC.,

    Plaintiff,

       v.

RECYCLE TRACK SYSTEMS, INC., and
RECYCLESMART SOLUTIONS INC.,

    Defendants.

Case No. 3:23-cv-04804-WHA

**HIGHLY CONFIDENTIAL – ATTORNEYS
EYES ONLY**

## REBUTTAL EXPERT REPORT OF PHILIP GREENSPUN, PH.D.

## Table of Contents

I.    Introduction and Summary of Opinions ................................................................................. 1

II.   Background & Credentials ..................................................................................................... 3

III.  Materials Considered and Investigation Conducted .............................................................. 4

IV.   Legal Concepts ..................................................................................................................... 4

V.    Technical Background ........................................................................................................... 5

VI.   OPINIONS ............................................................................................................................ 6

   A.   Analysis of Mr. Hoarty's Identification of Trade Secrets ................................................ 6

     1.   Alleged Trade Secret 1: Overall Waste Metering and Recycling Technology for a Smart Waste Container Mounted Device .................................................................................... 9

       a.   Mr. Hoarty Has Not Demonstrated that the Overall Waste Metering and Recycling Technology For a Smart Waste Container Mounted Device is a Trade Secret 10

       b.   Mr. Hoarty And Roadrunner Have Failed to Point to Tangible Trade Secret Material For The "Overall Waste Metering And Recycling Technology For A Smart Waste Container Mounted Device" ........................................................................................ 11

       c.   Mr. Hoarty Fails to Demonstrate that These High-Level Hardware Components and Product Features are Combined in Any Unique Configuration That Might Qualify It for Trade Secret Protection ........................................................................................ 14

     2.   Alleged Trade Secret 4: Training Data for an AI/ML System Analyzing Data from a Smart Waste Container Mounted Device .......................................................................... 15

       a.   Mr. Hoarty has not demonstrated that the training data for an AI/ML system analyzing data from a smart waste container mounted device is a trade secret ............ 15

     3.   Alleged Trade Secret 5: Subpar Image Detection (SPID) ........................................ 17

       a.   Mr. Hoarty has not demonstrated that the subpar image detection (SPID) is a trade secret 18

     4.   Alleged Trade Secret 6: Contamination Detection/Content Identification Service ... 19

       a.   Mr. Hoarty Has Not Demonstrated That the Contamination Detection/Content Identification Service Is a Trade Secret ........................................................................ 19

     5.   Alleged Trade Secret 7: Container Fullness Analysis .............................................. 20

       a.   Mr. Hoarty Has Not Demonstrated That the Container Fullness Analysis Is a Trade Secret ........................................................................................................... 21

   B.   RecycleSmart/RTS Did Not Have Access to RoadRunner's Alleged Trade Secrets ..... 22

     1.   RTS Did Not Misappropriate Any Trade Secrets Via Access to a Disassembled Device .............................................................................................................................. 23

     2.   RTS did not misappropriate any trade secrets via access to the alleged training data. 25

3.   RTS did not misappropriate any trade secrets via access to the alleged web application. ............................................................................................................ 26

4.   RTS Did Not Misappropriate Any Trade Secrets Via Access To The Technical and Engineering Team ........................................................................................................ 28

C.   RoadRunner's Alleged Trade Secrets are Publicly Available ........................................ 29

   **1.   Compology's Co-Founder Performed a Teardown of an R11 Device and Put it on YouTube** ........................................................................................................ 30

   **2.   An R13 Device is Available for Sale on eBay** ........................................................ 31

   **3.   Verizon Wireless R11 Web Page Discloses Its Key Components** ...................... 32

   **4.   The FCC Website Includes External and Internal Images of the Compology Devices** .................................................................................................................. 33

   **5.   Overall Waste Metering and Recycling Technology for a Smart Waste Container Mounted device** .................................................................................. 34

   **6.   Smart Camera Apparatus for a Smart Waste Container Mounted Device** ....... 39

   **7.   Optical Assembly and Design of a Smart Waste Container Mounted Device** ... 41

   **8.   Training Data for an AI/ML System** ...................................................................... 41

   **9.   Subpar Image Detection (SPID) is disclosed in Compology's Patents** ............... 41

   **10.   Contamination Detection/Content Identification Service** ................................... 42

   **11.   Container Fullness Analysis** ................................................................................... 42

D.   The Pello System Was Not Derived from any RoadRunner Devices. .......................... 43

   1.   The Pello Device was not derived from any RoadRunner device ............................ 44

      a.   Mr. Hoarty is wrong in his assessment that it would be impossible to train a pre-trained model with a small set of images as Mr. Laraki alleges .................................... 44

         i.   Google's Teachable Machine ............................................................................. 48

      b.   RTS did not use Compology images to train its ML model for dirty lens detection 49

E.   Opinions Regarding Trade Secret Value ...................................................................... 49

VII.   Conclusion .......................................................................................................................... 52

ii

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

1.      My name is Philip Greenspun. I have been retained by counsel for Defendants'
Recycle Track Systems, Inc., and RecycleSmart Solutions Inc., ("RTS" or "Defendants") in
connection with this case.  I have personal knowledge of all the facts set forth herein. The facts
and data recited in this expert report are true and accurate to the best of my knowledge and
belief.  This report is in response to the report submitted by W. Leo Hoarty (the "Hoarty
Report"), an expert retained by RoadRunner Recycling Inc., ("RoadRunner" or "Plaintiff") on
August 30, 2024.

## I.      INTRODUCTION AND SUMMARY OF OPINIONS

2.      The Hoarty Report assumes that the only path to success in the market for
computerized trash containers is the path that Compology took. Thus, the Hoarty Report's
opinions on the values of the individual purported trade secrets don't compare using them to
pursuing an alternative technical approach. Given the ███████████████████████████
██████████████████████████████ the most obvious and simplest
alternative is to have humans evaluate each image. Is it cheaper to use machine learning?
Perhaps, but the Hoarty Report doesn't begin to attempt to calculate the initial and ongoing costs
of a machine learning project versus simply using humans in a low-wage country either directly
or via an Amazon service. Nor does the Hoarty Report consider that if RTS had taken that
approach and saved the images captured along with the human workers' classifications, it would
have built up a substantial size set of training data after just a few months of operation.

3.      The Hoarty Report also fails to consider computerized, but not machine learning,
approaches to various challenges. Computers have been doing useful work in image processing
since the 1960s[1], long before the current vogue for machine learning. Adobe Photoshop was

---

[1] https://www.digitalkameramuseum.de/en/history.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

to standard practices within the machine learning industry. See, for example, "How many images do you need to train a neural network?"[4] (2017, Pete Warden): "having a very approximate rule of thumb is useful, so here it is for posterity: You need 1,000 representative images for each class. … The origin of the 1,000-image magic number comes from the original ImageNet classification challenge, where the dataset had 1,000 categories, each with a bit less than 1,000 images for each class (most I looked at had around seven or eight hundred). This was good enough to train the early generations of image classifiers like AlexNet, and so proves that around 1,000 images is enough."

22.     Mr. Hoarty's assumption also fails to comport with common sense. Why would Google release the Teachable Machine (latest version from 2019; see my Opening Report) to consumers if millions or even hundreds of thousands of classified images were required to create a working image classifier? Where would a consumer get millions of images that all fell within a category? How would the consumer have space for these images on his or her personal computer? Even the best-funded academic researcher would struggle to build an image library anywhere near this size. Consider a face recognition challenge where each person is one category of images. Where would a researcher get hundreds of thousands or millions of images of the same person?

## VI.     OPINIONS

### A.     Analysis of Mr. Hoarty's Identification of Trade Secrets

23.     I understand that to qualify for trade secret protection, it is a Plaintiff's burden to clearly identify and describe what exactly the trade secret is.  Mr. Hoarty, and RoadRunner, fail to describe or identify any of RoadRunner's alleged trade secrets with specificity regarding the

---

[4] https://petewarden.com/2017/12/14/how-many-images-do-you-need-to-train-a-neural-network/.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

parts, files, configurations, or relationships which make up each alleged trade secret.  For example, Mr. Hoarty never cites to any hardware schematics, Gerber files, or source code files.  Indeed, Mr. Hoarty never explains any unique configuration, combination, or relationships among these types of files that may qualify for trade secret protection.  Instead, Mr. Hoarty cites to high-level hardware components and features in broad terms, without any support or argument, and concludes that these high-level concepts constitute trade secrets.  They do not, and it is not RTS' burden to attempt to determine what RoadRunner/Compology allege their trade secrets really are.

24.     RoadRunner inadequately pleaded its alleged trade secret claims in its Second Amended Complaint ("SAC").  I understand Judge Alsup dismissed RoadRunner's first complaint against RTS for misappropriation of trade secrets because RoadRunner failed to adequately define its trade secrets.  I further understand that Judge Alsup indicated that RoadRunner's secrets "started out overbroad (Dkt. No. 43) and may still be due for sacking (Dkt. No. 71)."  *See* Dkt. No. 93.  My understanding is that as of August 30, 20204 fact discovery has ended, and despite repeated Interrogatories and deficiency letters from RTS requesting RoadRunner to identify its trade secrets adequately, RoadRunner has not to pared down or updated any of its amended allegations since its Second Amended Complaint.  I find RoadRunner's trade secret allegations, and Mr. Hoarty's interpretation of them, to be inadequately explained and unsupported as to what they exactly are.  I will walk through each of RoadRunner's alleged trade secrets, as defined by Mr. Hoarty and demonstrate their infirmities.  Mr. Hoarty's analysis of RoadRunner's alleged trade secrets is as follows:

- Trade Secret 1: Overall Waste Metering and Recycling Technology for a Smart Waste Container Mounted Device;

- Trade Secret 2: Smart Camera Apparatus for a Smart Waste Container Mounted Device;

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

- Trade Secret 3: Optical Assembly and Design of a Smart Waste Container Mounted Device;

- Trade Secret 4: Training Data for an AI/ML System Analyzing Data from a Smart Waste Container Mounted Device;

- Trade Secret 5: Subpar Image Detection (SPID);

- Trade Secret 6: Contamination Detection/Content Identification Service; and

- Trade Secret 7: Container Fullness Analysis

25.     I note that the list of trade secrets that Mr. Hoarty purported to analyze in his report does not even match the list of trade secrets he listed in the "Assignment" section of his report.  *See* Hoarty Report at ¶8.  I further understand that Mr. Hoarty's list of trade secrets does not match RoadRunner's Identification of Trade Secrets or the list of trade secrets in RoadRunner's damages expert's report.  *See* ROADRUNNER000000001; Expert Report of Forrest Vickery at 15.  While Mr. Hoarty, slightly changes the list of RoadRunner's alleged trade secrets, Mr. Hoarty largely copies and pastes, without any explanation or support, the disclosure of the trade secrets from RoadRunner's Identification of Trade Secrets.

26.     For example, compared to the Identification of Trade Secrets, Mr. Hoarty appears to slightly change the names of the trade secrets.  For example, the "Overall Waste Metering System" from the ID of Trade Secrets is now the "Overall Waste Metering and Recycling Technology for a Smart Waste Container Mounted Device."  *See* Hoarty Report at 11.  This is inconsistent with RoadRunner's Identification of Trade Secrets and raises the question of whether what's disputed is shifting.[5]

27.     Beyond changing the names of certain alleged trade secrets, Mr. Hoarty adds little

---

[5] To the extent this is RoadRunner's attempt to narrow its trade secrets, this title change does not help to identify or describe any of RoadRunner's alleged trade secrets.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

to the disclosures of the alleged trade secrets.  For example, Mr. Hoarty copies RoadRunner's Identification of Trade Secrets nearly word-for-word, including case law, and then concludes they are trade secrets.  *Compare* ROADRUNNER000000001 with Hoarty Report at ¶¶30-111. This failure to clarify RoadRunner's trade secret disclosure makes Mr. Hoarty's opinions difficult to understand and rebut.  Hoping to find additional clarity, I reviewed deposition transcripts of RoadRunner's employees who were designated to identify and testify about RoadRunner's trade secrets. *See* Justin Armstrong Depo. Tr. and Timothy (Jay) Longson Depo. Tr. They similarly describe RoadRunner's trade secrets in lists of broad hardware components and software features without being able to tie the hardware components and software features to any schematics, Gerber files, or source code files to demonstrate any unique configuration amongst these components. For this reason alone, RoadRunner's alleged trade secrets should be rejected.  I will walk through Mr. Hoarty's "analysis" of RoadRunner's trade secrets and demonstrate why they do not qualify for trade secret protection and instead only point to broad concepts and features.

### 1.    Alleged Trade Secret 1: Overall Waste Metering and Recycling Technology for a Smart Waste Container Mounted Device

28.    Mr. Hoarty claims that the overall waste metering and recycling technology including its R11-R13/S/L camera systems, its firmware, and its software qualifies for trade secret protection.  *See* Hoarty Report at ¶¶30-35.  I disagree for at least three reasons.  First, Mr. Hoarty has not demonstrated that the "overall waste metering and recycling technology for a smart waste container mounted device" is a trade secret.  Second, as I will show later in my report RTS did not have access to the alleged "overall waste metering and recycling technology for a smart waste container mounted device" trade secret. *Infra*.  And third, the alleged "overall

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

waste metering and recycling technology for a smart waste container mounted device" trade secret was in the public domain.  *Infra*.

> **a.     Mr. Hoarty Has Not Demonstrated that the Overall Waste Metering and Recycling Technology For a Smart Waste Container Mounted Device is a Trade Secret**

29.     Mr. Hoarty has not demonstrated that the "overall waste metering and recycling technology for a smart waste container mounted device" is a trade secret.  *See* Hoarty Report at ¶¶30-35.  As an initial matter, I understand Mr. Jay Longson, one of RoadRunner's corporate witnesses designated to testify about the RoadRunner/Compology trade secrets testified that the overall waste metering system is not a trade secret.  I agree.

**ATTORNEYS' EYES ONLY**
**Transcript of Timothy Jay Longson, Corporate Designee & Individually**
**Conducted on August 15, 2024**                                    102

```
1      Q.   We share the same frustration.
2           Can you define, as you sit here right now,
3  what the trade secret is for your overall waste
4  metering system?
5      A.   As I said, I think it encompasses multiple
6  trade secrets.  I don't think it's one single trade
7  secret.
8      Q.   So there is not one single trade secret for
9  your overall waste metering system; correct?
10     A.   As far as I understand it, correct.
```

Timothy (Jay) Longson Depo. Tr. at 102:1-10.

30.     Further, Mr. Hoarty's description of the "overall waste metering and recycling technology for a smart waste container mounted device" is not a trade secret for at least two reasons.  First, Mr. Hoarty recites a laundry list of high-level hardware components and product

features, without citing to any schematics, Gerber files, or source code files.  Second, Mr. Hoarty

fails to demonstrate that these high-level hardware components and product features are

combined in any unique configuration that might qualify it for trade secret protection.

31.     I have reproduced Mr. Hoarty's description of the "overall waste metering and

recycling technology for a smart waste container mounted device" below:

> I find that RoadRunner's trade secrets include the overall know-how and design
> of its waste metering system including physical hardware components such as the
> camera system, optical assembly and design, firmware such as its image
> preprocessing techniques implemented in the camera apparatus, training data,
> machine learning models, an AI system implementing the machine learning
> models, and algorithms and processes to generate data, analysis, and
> recommendations to customers, including fullness, emptiness, contamination,
> schedules, data ingestion efficiencies, and location analysis of waste containers.
> As more fully described below, Compology developed a convolutional neural
> network ("CNN") as its AI system to implement the machine learning models for
> accurate machine labeling and tagging of images from Compology's smart
> cameras.  The combination of these hardware, firmware, and software elements as
> implemented in a waste metering system is itself a trade secret.

Hoarty Report at ¶31.

32.     Mr. Hoarty's broad list of physical hardware components and features are not a

trade secret. Here, Mr. Hoarty, at best, gives a list of components and features in reference to a

concept of an overall waste system rather than a fully specified trade secret, which is in line with

how Mr. Longson, RoadRunner's corporate designee on the identity of trade secrets, understands

it. *Supra*. Mr. Hoarty, as RoadRunner did in their Identification of Trade Secrets, recites vague

components and features of the "overall waste metering and recycling technology for a smart

waste container mounted device," and concludes without any evidence or analysist that it is a

trade secret.  I will discuss each of these elements of the alleged "overall waste metering and

recycling technology for a smart waste container mounted device."

**b.     Mr. Hoarty And Roadrunner Have Failed to Point to Tangible
Trade Secret Material For The "Overall Waste Metering And**

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

**Recycling Technology For A Smart Waste Container Mounted Device"**

33.     At the outset, I note that Mr. Hoarty never points to any schematics, Gerber files, source code files, or where in those files RoadRunner's alleged overall waste metering system resides.  *See* Hoarty Report at ¶¶30-35.  This is surprising because in its Identification of Trade Secrets RoadRunner included several exhibits that seem to include at least schematics in some instances.  *See* ROADRUNNER000000024-095.  Yet, Mr. Hoarty and RoadRunner have not tied any of these exhibits to its alleged overall waste metering system trade secret.

34.     Mr. Hoarty never indicates which RoadRunner device, if any, he is referring to which is confusing because he refers to the overall waste metering system in the singular. For example, it is not clear if Mr. Hoarty considers the R11, R12, and R13 and its variants, its own trade secrets, when Mr. Hoarty refers to the singular "overall waste metering and recycling technology for a smart waste camera mounted device." Further, Mr. Hoarty never reveals what, if any, analysis he performed or how he reached the conclusion that the system is a trade secret. Instead, Mr. Hoarty recites a list of vague components and features and then concludes without any analysis that the combination of vague features constitutes a trade secret.  It is not.

35.     For example, Mr. Hoarty includes the "overall know-how and design of its waste metering system" but never educates the reader what exactly this "know-how and design" is. Further, Mr. Hoarty lists "physical hardware components" but does not list any physical hardware components beyond the camera system and its optical assembly, which for reasons explained below are not trade secrets themselves.  *Infra.*

36.     Mr. Hoarty continues by citing to the "firmware such as its image preprocessing techniques" but never indicates what this firmware is, which source code files define it, how it interacts with the "physical hardware components."  Firmware describes how a system operates,

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

and I would expect that for an overall system, it would be integral in its description.  Further, Mr. Hoarty never discusses any specific image preprocessing techniques in his entire report.  These conclusory statements regarding the "firmware such as its image preprocessing techniques" do not adequately identify the alleged trade secret and put RTS on notice.

37.     Mr. Hoarty next cites to "training data, machine learning models, [and] an AI system implementing the machine learning models," but never informs what the training data is, which machine learning models he is referring to, and never describes the AI system implementing the machine learning models.  *See* Hoarty Report at ¶31.  Further, Mr. Hoarty never cites to a specific machine learning model or any line of code from that model nor does he identify or describe the AI system that implements it.  *Id*.

38.     Finally, Mr. Hoarty refers to generic "algorithms and processes to generate data, analysis, and recommendations to customers, including fullness, emptiness, contamination, schedules, data ingestion efficiencies, and location analysis of waste containers."  Mr. Hoarty does not indicate what those algorithms and processes are, nor does he cite to a source code file or the lines of code within a source code file that defines those "algorithms and processes."  Further, Mr. Hoarty does not even state where these "algorithms and processes" reside.  Is it in the camera apparatus?  Is it on some backend server?  These questions are left for the reader to wonder.

39.     Mr. Hoarty's description of the "overall waste metering and recycling technology for a smart waste container mounted device" trade secret is so broad, encompassing apparently nearly everything that anyone in a technical role at Compology or RoadRunner ever did, that it is impossible for even a technical expert to determine what is included. For these reasons, it is my opinion that Mr. Hoarty's and RoadRunner's description of the alleged "overall waste metering

and recycling technology for a smart waste container mounted device" trade secret is too broad to qualify for trade secret protection.

> **c.      Mr. Hoarty Fails to Demonstrate that These High-Level Hardware Components and Product Features are Combined in Any Unique Configuration That Might Qualify It for Trade Secret Protection**

40.      Mr. Hoarty ends his section on the overall waste metering system with some generic, boilerplate arguments attempting to demonstrate that there is some "unique configuration" that qualifies the "overall waste metering and recycling technology for a smart waste container mounted device" for trade secret protection.  It does not.

41.      For example, Mr. Hoarty claims the following regarding the "overall waste metering and recycling technology for a smart waste container mounted device":

> As described herein, RoadRunner expended millions of dollars in efforts to design its product in an iterative process over the past decade.  Although certain components of RoadRunner's smart camera design employ commercially available parts, **the combination of those parts, with non-commercially available parts, and the unique configuration of the parts in a smart camera assembly, integrates significant know-how and techniques learned during its development and testing process.**  Courts recognize that a trade secret exists when such combinations exist, even when the combinations might include commercial or generally known components.

Hoarty Report at ¶32.

42.      But neither Mr. Hoarty nor RoadRunner has ever described the "combination of those parts" and has never demonstrated that a "unique configuration of the parts in a smart camera" exists.  Further, Mr. Hoarty, and RoadRunner, have never disclosed the "significant know-how and techniques learned during its development and testing process."  My understanding of the law is that RoadRunner cannot be afforded trade secret protection if it cannot describe with particularity what its trade secret is.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

### 2.    Alleged Trade Secret 4: Training Data for an AI/ML System Analyzing Data from a Smart Waste Container Mounted Device

43.    Mr. Hoarty claims that the alleged "training data for an AI/ML system analyzing data from a smart waste container mounted device" qualifies for trade secret protection.  *See* Hoarty Report at ¶¶76-92.  I disagree for at least three reasons.  First, Mr. Hoarty has not demonstrated that the alleged "training data for an AI/ML system analyzing data from a smart waste container mounted device" is a trade secret.  Second, as I will show later in my report, RTS never had access to RoadRunner/Compology training data.  *Infra.*  And third, the alleged "training data for an AI/ML system analyzing data from a smart waste container mounted device" trade secret was in the public domain.  *Infra.* Let's step back for a moment and remember that "training data" for image classification merely consists of sorting digital photos into subfolders. Suppose that someone with a passion for waste sets up a GoPro to take pictures of a dumpster outside of his apartment every day and later sorts them into "empty", "half full", and "full" folders on his desktop computer. These folders could be used as training data for Google Teachable Machine or any other machine learning system. Has the GoPro owner copied anyone's trade secret?

### a.    Mr. Hoarty has not demonstrated that the training data for an AI/ML system analyzing data from a smart waste container mounted device is a trade secret

44.    As an initial matter, I note that Mr. Hoarty offers little opinion in this section and instead nearly copies from RoadRunner's Identification of trade secrets.  *Compare* Hoarty Report at ¶¶76-92 with ROADRUNNER000000001 at ROADRUNNER000000012-016. Further, Mr. Hoarty has not demonstrated that the "training data for an AI/ML system analyzing data from a smart waste container mounted device" is a trade secret for several reasons.  *See* Hoarty Report at ¶¶76-92.

45.     First, Mr. Hoarty, and RoadRunner, conclude that the alleged "training data for an AI/ML system analyzing data from a smart waste container mounted device" is a trade secret without providing any analysis as to how he arrived at that conclusion.  For example, at the end of the second paragraph of this section, Mr. Hoarty mentions training data for the very first time: "[t]o automate Compology's process of analyzing images of waste containers, Compology used **training data to train** its ML models such that, when sufficiently trained, the ML models could be used in an AI system to label and tag images of waste containers without significant human involvement."  Hoarty Report at ¶77 (emphasis added).  In the very next sentence, Mr. Hoarty concludes without any analysis: "**Compology's training data is a trade secret** and is central to Compology's training of its ML models and operation of its services."  Hoarty Report at ¶78 (emphasis added).

46.     Mr. Hoarty never discusses what is in the Compology training data that qualifies it for trade secret protection.  Mr. Hoarty never includes any example of any training data to illustrate why in his opinion it qualifies for trade secret protection.  Instead, Mr. Hoarty makes broad statements unsupported by citations, such as "[t]he training data includes only manually tagged labels of container fullness, content identification, empty events, among others," and "[b]ased on my own research and knowledge of ML training, as well as through interviews with RoadRunner's engineers, no training data set like it exists except for Compology's own training data set."  *See* Hoarty Report at ¶80 and ¶78.  Based on my understanding of the law, just because Mr. Hoarty and RoadRunner claim that training data is a trade secret does not make it a trade secret.  In my opinion, broad statements regarding training data, without providing any analysis as to why the training data qualifies for trade secret protection, is not a trade secret.

47.     For the next 8 paragraphs (¶¶81-88) Mr. Hoarty, like RoadRunner in its Identification of Trade Secrets, includes a discussion about convolutional neural networks that is irrelevant to whether training data qualifies for trade secret protection.  *See* Hoarty Report at ¶¶81-88.

48.     In paragraphs 89-90, Mr. Hoarty continues where he began, with more conclusions without any analysis that the training data is a trade secret.  *See* Hoarty Report at ¶89 ("**I find that Compology's high-quality training data** compiled, labeled, and tagged over the course of year **is an important trade secret**") (emphasis added); *see also* Hoarty Report at ¶90 ("**[t]his is itself a trade secret**.  **I also find** that labeled and tagged images of the interior of waste containers in sufficient volumes to train an ML model **is also a trade secret**.") (emphasis added).  Mr. Hoarty's conclusion that training data is a trade secret without any analysis does not make it a trade secret.  Because Mr. Hoarty has not sufficiently demonstrated that the alleged "training data for an AI/ML system analyzing data from a smart waste container mounted device" is a trade secret, Mr. Hoarty's, and RoadRunner's, assertions that it is a trade secret are not persuasive.

### 3.     Alleged Trade Secret 5: Subpar Image Detection (SPID)

49.     Mr. Hoarty claims that the alleged "subpar image detection (SPID)" qualifies for trade secret protection.  *See* Hoarty Report at ¶¶93-98.  I disagree for at least three reasons.  First, Mr. Hoarty has not demonstrated that the alleged "subpar image detection (SPID)" is a trade secret.  Second, as I will show later in my report, RTS never had access to RoadRunner/Compology "subpar image detection (SPID)."  *Infra*.  And third, the alleged "subpar image detection (SPID)" trade secret was in the public domain.  *Infra*.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

### a.   Mr. Hoarty has not demonstrated that the subpar image detection (SPID) is a trade secret

50.     As an initial matter, I note again that Mr. Hoarty offers little opinion in this section and instead nearly copies verbatim from RoadRunner's Identification of trade secrets. *Compare* Hoarty Report at ¶¶93-98 with ROADRUNNER000000001 at ROADRUNNER000000016-017.  Further, Mr. Hoarty has not demonstrated that the "subpar image detection (SPID)" is a trade secret for several reasons.  *See* Hoarty Report at ¶¶93-98.

51.     First, Mr. Hoarty, and RoadRunner, only describe the alleged "subpar image detection (SPID)" high-level features.  *Id*.  While Mr. Hoarty reveals that the alleged "subpar image detection (SPID)" is an ML model and that "Compology's source code reveals that the SPID ███████████████████████████ Mr. Hoarty does not point to any source code files, or any lines of code in those files, or any file, which describe the alleged "subpar image detection (SPID)" ██████████████████████

52.     Further, Mr. Hoarty indicates that SPID is the first step in the image processing pipeline, but never shows what this image processing pipeline is, how SPID fits into this image processing pipeline, and how SPID screens incoming images "for certain problems that would make the images unable to deduce an accurate fullness or contaminants within the normal image processing pipeline."  *See* Hoarty Report at ¶94.

53.     Instead, Mr. Hoarty lists some high-level features of the alleged "subpar image detection (SPID)" and then concludes, without any analysis, that it is a trade secret.  *See* Hoarty Report at ¶¶94-95; *see also* Hoarty Report at ¶94 ("[i]n my opinion, the use of a ████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████ is a trade secret."); *see also* Hoarty Report at ¶96 ("I find that SPID is an important trade secret that ████████████████

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

██████████████████████████████████████

████████████████ ").

54.     In my opinion listing high-level features of the alleged "subpar image detection (SPID)" trade secret, without citing to any source code or other files, and then concluding it is a trade secret does not qualify it for trade secret protection.

### 4.     Alleged Trade Secret 6: Contamination Detection/Content Identification Service

55.     Mr. Hoarty claims that the alleged "contamination detection/content identification service" qualifies for trade secret protection.  *See* Hoarty Report at ¶¶99-104.  I disagree for at least three reasons.  First, Mr. Hoarty has not demonstrated that the alleged "contamination detection/content identification service" is a trade secret.  Second, as I will show later in my report, RTS never had access to RoadRunner/Compology "contamination detection/content identification service."  *Infra*.  And third, the alleged "contamination detection/content identification service" trade secret was in the public domain.  *Infra*.

#### a.     Mr. Hoarty Has Not Demonstrated That the Contamination Detection/Content Identification Service Is a Trade Secret

56.     As an initial matter, I note again that Mr. Hoarty offers little opinion in this section and instead nearly copies verbatim from RoadRunner's Identification of trade secrets.  *Compare* Hoarty Report at ¶¶99-104 with ROADRUNNER000000001 at ROADRUNNER000000018-019.  Further, Mr. Hoarty has not demonstrated that the "contamination detection/content identification service" is a trade secret for several reasons.  *See* Hoarty Report at ¶¶99-104.

57.     First, Mr. Hoarty, and RoadRunner, only describe high-level features of the alleged "contamination detection/content identification service."  *Id*.  While Mr. Hoarty reveals

that the alleged "contamination detection/content identification service" is an ML model and that "Compology's source code reveals that ███████████████████████████ Mr. Hoarty never points to any source code files, or any lines of code in those files, or any file whatsoever, which describe the alleged "contamination detection/content identification service" ████████████████████ *Id.*

58.     Instead, Mr. Hoarty lists some high-level features of the alleged "contamination detection/content identification service" and then concludes, without analysis, that it is a trade secret.  *See* Hoarty Report at ¶¶100-101; *see also* Hoarty Report at ¶100 ("I find that the selection and combination of these seven kinds of potential contamination, ████████ ████████████████████████████, is a trade secret."); *see also* Hoarty Report at ¶101 ("I find that the methodology Compology employed to implement the service is a trade secret"); *see also* Hoarty Report at ¶102 ("[c]onsequently, I find that the contamination/content ID service is an important trade secret that identifies seven unique types of contaminants/content in waste containers and █████████████████████████ █████████████████████").

59.     Based on my understanding of the law, listing high-level features of the alleged "contamination detection/content identification service" trade secret, without citing to any source code or other files, and then concluding it is a trade secret does not qualify it for trade secret protection.

### 5.     Alleged Trade Secret 7: Container Fullness Analysis

60.     Mr. Hoarty claims that the alleged "container fullness analysis" qualifies for trade secret protection.  *See* Hoarty Report at ¶¶105-111.  I disagree for at least three reasons.  First, Mr. Hoarty has not demonstrated that the alleged "container fullness analysis" is a trade secret.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

Second, as I will show later in my report, RTS never had access to RoadRunner/Compology

"container fullness analysis" *Infra*.  And third, the alleged "container fullness analysis" trade

secret was in the public domain.  *Infra*.

> **a.     Mr. Hoarty Has Not Demonstrated That the Container
> Fullness Analysis Is a Trade Secret**

61.     I note again that Mr. Hoarty offers little opinion in this section and instead copies

nearly verbatim from RoadRunner's Identification of Trade Secrets.  *Compare* Hoarty Report at

¶¶105-111 with ROADRUNNER000000001 at ROADRUNNER000000017-018.  Further, Mr.

Hoarty has not demonstrated that the "container fullness analysis" is a trade secret for several

reasons.  *See* Hoarty Report at ¶¶105-111.

62.     First, Mr. Hoarty and RoadRunner describe only high-level features of the alleged

"container fullness analysis."  *Id*.  While Mr. Hoarty reveals that the alleged "container fullness

analysis" is an ML model and that "Compology's source code reveals that the ML models are

██████████████████████████  Mr. Hoarty never points to any source code files, or any lines of

code in those files, or any file whatsoever, which describe the alleged "contamination

detection/content identification service" ████████████████████████ *Id*.

63.     Further, Mr. Hoarty lists some high-level features of the alleged "container

fullness analysis." One of these high-level features listed by Mr. Hoarty is a "process [that]

consists of ████████████████████████████████████████

████████████████████████████████████████████"  *See* Hoarty Report at

¶106.  However, Mr. Hoarty does not even describe how this process works.  *Id*.  Mr. Hoarty

claims that "████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████  *Id*.  Missing details such as this occurs throughout Mr.

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

Hoarty's analysis of RoadRunner's trade secrets.  Mr. Hoarty, and Roadrunner, provide so few details that it is impossible to determine what the alleged "container fullness analysis" trade secret is.  For this reason alone, the "container fullness analysis" trade secret should be rejected.

64.     As with the other trade secrets that Mr. Hoarty discusses, Mr. Hoarty provides few high-level details and then concludes, without analysis, that it is a trade secret.  *See* Hoarty Report at ¶¶105-109; *see also* Hoarty Report at ¶109 ("I find that the container fullness analysis

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████

65.     Based on my understanding of the law, listing high-level features of the alleged "container fullness analysis" trade secret, without citing to any source code or any other files, not describing ████████████████████████████████████ and then concluding it is a trade secret does not qualify it for trade secret protection.

**B.     RecycleSmart/RTS Did Not Have Access to RoadRunner's Alleged Trade Secrets**

66.     To demonstrate trade secret misappropriation, as RoadRunner has alleged RTS has done, Mr. Hoarty, and RoadRunner, must show that RTS had access to the alleged trade secrets.  Here, Mr. Hoarty, and RoadRunner, has not alleged that RTS had access to any hardware schematics, Gerber files, source code files (for firmware or backend software), machine learning models, RoadRunner's convolutional neural network, or any other file resident on RoadRunner's devices or servers.  *See* Hoarty Report at ¶¶22-26.  Instead, Mr. Hoarty, and RoadRunner has alleged that RTS has misappropriated RoadRunner's trade secrets via access to

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

95.     Based on my review of the Ben Chehebar video, and the teardown of the R11 smart camera apparatus for a smart waste container mounted device, which shows all of the components of the device and how those components are configured, and the other publicly available documents I highlighted, as well as the disclosure of the '356 patent which reiterates all of those components, it is my opinion that the smart camera apparatus for a smart waste container mounted device is in the public domain.  *Supra.*

### 7.     Optical Assembly and Design of a Smart Waste Container Mounted Device

96.     Based on my review of the Ben Chehebar video, and the teardown of the R11 smart camera apparatus for a smart waste container mounted device, which shows all of the components of the device including the optical assembly and design, and the other publicly available documents I highlighted as well as the disclosure of the '356 patent which also discloses the components of the optical assembly, it is my opinion that the optical assembly and design of a smart waste container mounted device is in the public domain.  *Supra.*

### 8.     Training Data for an AI/ML System

97.     From my review of Compology's patents and patent applications, it is my opinion that Compology has disclosed its Container Fullness Analysis in US Patent No. 10,943,36 (the "'356 patent") and US Patent Publication No. 2021/0158308 (the "'308 patent publication") and it is in the public domain.  For example, in exhibit 1, I provide a comparison between Mr. Hoarty's description of the Container Fullness Analysis with the disclosure of the '356 patent. *See* Exhibit 1 at 40-49.

### 9.     Subpar Image Detection (SPID) is disclosed in Compology's Patents

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

98.     From my review of Compology's patents and patent applications, it is my opinion that Compology has disclosed SPID in US Patent No. 10,943,36 (the "'356 patent") and it is in the public domain.  For example, in exhibit 1, I provide a comparison between Mr. Hoarty's description of the Subpar Image Detection with the disclosure of the '356 patent.  While the '356 patent does not use the term SPID, it is clear from my review that the disclosed ████████ ████████████████████████████ *See* Exhibit 1 at 2-13.

### 10.     Contamination Detection/Content Identification Service

99.     From my review of Compology's patents and patent applications, it is my opinion that Compology has disclosed its Contamination Detection/Content Identification service in US Patent Publication No. 2021/0158308 (the "'308 patent publication") and it is in the public domain.  For example, in exhibit 1, I provide a comparison between Mr. Hoarty's description of the Contamination Detection/Content Identification with the disclosure of the '308 patent publication.  *See* Exhibit 1 at 14-29. Additionally, I note there is an article titled "Contamination Notifications" from a website titled Compology Help Center which shows an example contamination notification mentioning a bulky item and uncollapsed cardboard boxes. *See* RTS_00335704 at RTS_00335707.

### 11.     Container Fullness Analysis

100.    From my review of Compology's patents and patent applications, it is my opinion that Compology has disclosed its Container Fullness Analysis in US Patent No. 10,943,356 (the "'356 patent") and it is in the public domain.  For example, in exhibit 1, I provide a comparison between Mr. Hoarty's description of the Container Fullness Analysis with the disclosure of the '356 patent.  *See* Exhibit 1 at 30-40. Additionally, I note there is an article titled "Fullness

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

Notifications" from a website titled Compology Help Center which shows an average fullness at time of collection.  *See* RTS_00335524 at RTS_00335525.

### D.    The Pello System Was Not Derived from any RoadRunner Devices.

101.    From reading Mr. Hoarty's report, it is unclear to me whether Mr. Hoarty is even alleging trade secret misappropriation.  *See generally* Hoarty Report.  For example, Mr. Hoarty never uses the term "misappropriation" during his analysis, nor is it found in his "Summary of Opinions" section.  *See* ¶¶16-19.  And it is my understanding, during his deposition Mr. Hoarty explained that he was not qualified to perform an analysis of trade secret misappropriation.

```
1        Q.   So you don't know whether RoadRunner's trade
2    secrets have been misappropriated by defendants;
3    correct?
4              MR. MELLEMA:  Objection, form.
5        A.   That's a legal question.  Again, I'm only an
6    amateur lawyer, but I'm a fairly skilled technologist.
7    And I can't make that assessment -- or I wouldn't try,
8    put it that way.
```

W. Leo Hoarty Depo. Tr. at 36:1-8.  This is in accordance with his "Assignment" section where he indicates that he was retained "to provide opinions and analysis regarding the technology relevant to this case."  *See* Hoarty Report at ¶8.

102.    Instead of providing an analysis of trade secret misappropriation, based on his conclusions regarding derivation, it appears that Mr. Hoarty is providing opinion regarding a breach of contract.  *See, e.g.*, Hoarty Report at ¶17.  While I provided my opinions regarding the independent development of the Pello System, and the substantial differences between the Pello

HIGHLY CONFIDENTIAL – ATTORNEYS EYES ONLY

## VII.   CONCLUSION

117.     The Hoarty Report proves that it is impossible to build an image classifier via machine learning if one does not try.

118.     The Hoarty Report does not begin to explore the question of whether Compology's image classifier was better or more valuable in some way than an independently developed image classifier (e.g., done on a desktop computer browser in Google's Teachable Machine) or, indeed, simply hiring humans via Amazon or some other method. Thus, Mr. Hoarty has failed to establish that any of Compology's machine learning-based alleged trade secrets are trade secrets because value is one element of being a trade secret.

Dated: September 13, 2024

*Philip Greenspun*

—————————————————
Philip Greenspun, Ph.D.

**Exhibit 1 – Public Knowledge of Software Algorithms Trade Secret in view of the US10943356 (RTS_00332217/Armstrong Exhibit 365) and US 2021/0158308 (RTS_00333188/Armstrong Exhibit 366)**

The software algorithms SPID, Contamination Detection, and Container Fullness Analysis ("Software Trade Secrets") are disclosed in US10943356 and US 2021/0158308. Patent disclosure of the Software Trade Secrets includes the below documents.

The cited portions of the patent and patent application are merely illustrative, and Defendants reserves the right to rely on alternative or additional evidence, including uncited portions or photographs of the patent and patent application.

Various positions put forth in this document are predicated on Plaintiff's vague and ever changing interpretation of its alleged trade secrets as evidenced by its multiple attempts to seal and differences between the complaint, Identification of Trade Secrets, numerous depositions, and expert reports. Those positions are not intended to and do not necessarily reflect Defendants' interpretation of the true and proper scope of the asserted trade secrets.

| Trade Secret 5: Subpar Image Detection (SPID) | |
| --- | --- |
| **Paragraph/Element)** | **Evidence US10943356** |
| 94a) ███████████████████████ | ████████████████████████ |
| | 8:40-50 discloses ██████████████ |
| | 40  S**200** can additionally or alternatively include training the diverter model (e.g., unsuitable label determination model), which can function to train a model for determining an image depicting a suitable container interior (e.g., determine whether an image depicts a suitable container interior, score 45  images based on suitability, etc). The model is preferably trained using the training data received in S**100** (e.g., using the additional training set described above, using images and/or other information from the training set for the fullness model, etc.), but can additionally or alternatively be 50  trained using any other suitable data. |
| | 9:16-34  discloses ███████████████ |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| Paragraph/Element) | Evidence US10943356 |
| | The diverter model preferably includes a neural network, such as a network including one or more layers such as described above with respect to the fullness model (e.g., including one or more aspects in common with and/or similar to the fullness model, including aspects associated with alternative elements of the fullness model described above, etc.), but can additionally or alternatively include neural networks of any other suitable structure, and/or can include any other suitable model elements.  The diverter model preferably provides multiple output values, each preferably corresponding to a different label (e.g., candidate label, unsuitable label, unsuitable label reason, etc.), such as depicted by way of example in FIG. **12**. In a first example, the CNN includes 4 outputs, each corresponding to a different label, such as a candidate label and three unsuitable label reasons. In a second example, the CNN includes 2 outputs, the first corresponding to a candidate label and the second corresponding to an unsuitable label. |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| Paragraph/Element) | Evidence US10943356 |
| |  |

FIGURE 12

Page 4 of 50

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
| 94b) SPID is ███████████████ | **9:16-24 discloses that** ███████████<br><br>The diverter model preferably includes a neural network, such as a network including one or more layers such as described above with respect to the fullness model (e.g., including one or more aspects in common with and/or similar to the fullness model, including aspects associated with alternative elements of the fullness model described above, etc.), but can additionally or alternatively include neural networks of any other suitable structure, and/or can include any other suitable model elements.<br><br>**7:23-36 discloses** ████████████<br>The neural network is preferably a convolutional neural network (CNN), but can additionally or alternatively include (e.g., be) a fully connected neural network, a V-NET, a Siamese network, and/or any other suitable network. The CNN preferably includes an assortment of one or more of convolutional (CONV) layers, pooling (POOL) layers (e.g., max pooling layers), activation layers (e.g., rectified linear unit (ReLU)), fully-connected layers, and/or any other suitable layers. In one example, the CNN includes a series of convolutional layers, optionally including pooling and/or activation (e.g., ReLU) layers after some or all convolutional layers, and one or more fully connected layers (e.g., as shown in FIG. **6**). However, the CNN can additionally or alternatively have any other suitable structure. |
| 95a) in operation, | |
| 95b) SPID ███████████████████ | █████████████████████ |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
|  |  |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
| | S410 preferably includes receiving an image (or image group) of a container (e.g., received in association with the container ID). The image is preferably an image such as described above (e.g., regarding S100), but can additionally or alternatively be any other suitable image. The image can be received from an imaging device (e.g., transmitted by the imaging device upon capture, in response to data connection availability, etc.), received from storage (e.g., from a database of a computing system, such as the remote server), received from a user (e.g., uploaded by the user in order to be assessed), received from the diverter model, and/or received from any other suitable entity. 40 45<br><br>In some embodiments, S410 is performed for one or more containers (e.g., includes receiving images of the one or more containers), such as containers represented in the training set and/or containers not represented in the training set. However, S410 can additionally or alternatively include receiving any other suitable images in any suitable manner. 50 55<br><br>In some embodiments, receiving the subject image can include processing the subject image using the diverter model (e.g., to determine if the image depicts a suitable container interior). In such embodiments, the image can be selectively served or not served to the fullness model based on the output of the diverter model. For example, images determined (e.g., by the diverter model) to be candidate images and/or to have a likelihood of being a candidate image greater than a threshold (e.g., 30%, 50%, 80%, 90%, 95%, 99%, less than 30%, 30-50%, 50-80%, 80-95%, 95-99%, 99-100%, etc.) can be provided as input to the fullness model, whereas other images (e.g., determined to be 60 65 |

| Trade Secret 5: Subpar Image Detection (SPID) | |
| --- | --- |
| Paragraph/Element) | Evidence US10943356 |
| | unsuitable, likely to be unsuitable, probability of being unsuitable greater than a threshold, etc.) can be not provided as input (e.g., can be discarded, can be directed for alternate analysis such as human analysis, etc.), such as shown by 5 way of example in FIG. **13**. However, S**400** can additionally or alternatively include combining (e.g., chaining) the diverter model and fullness model in any other suitable manner, or can include not combining the models.<br><br>S**420** preferably includes determining the associated ref-10 erence image (or image group) for the subject image. The reference image is preferably determined based on the associated container (e.g., based on the container ID), but can additionally or alternatively be determined in any other suitable manner. The same reference image can be used for 15 a given container for each performance of S**400**. Alternatively, different reference images can be determined and/or used: each time the container is emptied, after (e.g., in response to) receipt of additional training data (e.g., used to updated the neural network training), at a predetermined 20 frequency, and/or with any other suitable timing. S**420** preferably includes inputting the subject and reference images into the trained neural network, and determining the fill level of the subject image based on the neural network output.<br><br>Figure 13 discloses that ███████████████████ ████████████████ |



FIGURE 13

Page 9 of 50

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| Paragraph/Element) | Evidence US10943356 |
| 95c) The SPID process as ▮▮▮▮▮ | 11:56-67 discloses that ▮▮▮▮▮ |



In some embodiments, receiving the subject image can include processing the subject image using the diverter model (e.g., to determine if the image depicts a suitable container interior). In such embodiments, the image can be selectively served or not served to the fullness model based on the output of the diverter model. For example, images determined (e.g., by the diverter model) to be candidate images and/or to have a likelihood of being a candidate image greater than a threshold (e.g., 30%, 50%, 80%, 90%, 95%, 99%, less than 30%, 30-50%, 50-80%, 80-95%, 95-99%, 99-100%, etc.) can be provided as input to the fullness model, whereas other images (e.g., determined to be unsuitable, likely to be unsuitable, probability of being unsuitable greater than a threshold, etc.) can be not provided as input (e.g., can be discarded, can be directed for alternate analysis such as human analysis, etc.), such as shown by way of example in FIG. **13**. However, S**400** can additionally or alternatively include combining (e.g., chaining) the diverter model and fullness model in any other suitable manner, or can include not combining the models.

| 95d) ▮▮▮▮▮ | 11:56-67 discloses that ▮ |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
| | In some embodiments, receiving the subject image can include processing the subject image using the diverter model (e.g., to determine if the image depicts a suitable container interior). In such embodiments, the image can be selectively served or not served to the fullness model based on the output of the diverter model. For example, images determined (e.g., by the diverter model) to be candidate images and/or to have a likelihood of being a candidate image greater than a threshold (e.g., 30%, 50%, 80%, 90%, 95%, 99%, less than 30%, 30-50%, 50-80%, 80-95%, 95-99%, 99-100%, etc.) can be provided as input to the fullness model, whereas other images (e.g., determined to be unsuitable, likely to be unsuitable, probability of being unsuitable greater than a threshold, etc.) can be not provided as input (e.g., can be discarded, can be directed for alternate analysis such as human analysis, etc.), such as shown by way of example in FIG. **13**. However, S**400** can additionally or alternatively include combining (e.g., chaining) the diverter model and fullness model in any other suitable manner, or can include not combining the models.<br><br>11:38-49 discloses ██████████████████████ ███████ |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
| | **S410** preferably includes receiving an image (or image group) of a container (e.g., received in association with the container ID). The image is preferably an image such as described above (e.g., regarding **S100**), but can additionally or alternatively be any other suitable image. The image can be received from an imaging device (e.g., transmitted by the imaging device upon capture, in response to data connection availability, etc.), received from storage (e.g., from a database of a computing system, such as the remote server), received from a user (e.g., uploaded by the user in order to be assessed), received from the diverter model, and/or received from any other suitable entity. 40 ... 45 |
| 95e) | 11:56-67 discloses that ████████████████ ████████████████████████████████ ████████████████████████████████ ████████████████████ In some embodiments, receiving the subject image can include processing the subject image using the diverter model (e.g., to determine if the image depicts a suitable container interior). In such embodiments, the image can be selectively served or not served to the fullness model based 60 on the output of the diverter model. For example, images determined (e.g., by the diverter model) to be candidate images and/or to have a likelihood of being a candidate image greater than a threshold (e.g., 30%, 50%, 80%, 90%, 95%, 99%, less than 30%, 30-50%, 50-80%, 80-95%, 65 95-99%, 99-100%, etc.) can be provided as input to the fullness model, whereas other images (e.g., determined to be |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
| | unsuitable, likely to be unsuitable, probability of being unsuitable greater than a threshold, etc.) can be not provided as input (e.g., can be discarded, can be directed for alternate analysis such as human analysis, etc.), such as shown by way of example in FIG. **13**. However, S**400** can additionally or alternatively include combining (e.g., chaining) the diverter model and fullness model in any other suitable manner, or can include not combining the models. |



FIGURE 13

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| Paragraph/Element) | Evidence US10943356 |
| **Trade Secret 6: Contamination Detection / Content Identification (COR-Classification)** | |
| Paragraph/Element) | Evidence US 2021/0158308 |
| 100a) Over time, Compology developed the contamination detection / content identification analysis service to detect seven types of contamination: | [0015] discloses ▮▮▮▮▮▮▮▮▮▮▮▮▮▮<br><br>**[0015]**   A method **10** for contamination assessment preferably includes: receiving a set of images **S100**, sorting the images **S200**, assessing the images **S300**, assessing container fill zones **S400**, and/or assessing the container **S500**, and can optionally include acting based on the container assessment **S600** and/or training an image classifier **S700** (e.g., as shown in FIG. **1**). However the method **10** can additionally or alternatively include any other suitable elements.<br><br>[0038]-[0040]   discloses ▮▮▮▮▮▮▮▮▮▮▮▮ |

| Trade Secret 5: Subpar Image Detection (SPID) ||
| Paragraph/Element) | Evidence US10943356 |
| | [0038]   In one example, the network include detection elements at multiple scales. For example, one or more DSNs (e.g., each including a 1×1 detection kernel) can be applied to different-sized outputs from different locations in the network. In a specific example, the network can include (as a subset of the overall network, such as a network including many alternating CONV and POOL layers) downsampling (e.g., at a POOL layer), outputting at the downsampled scale to a first DSN, upsampling, and outputting at the upsampled scale to a second DSN. Preferably, in this specific example, the network further includes one or more skip connections that bridge (e.g., via concatenation) from a layer prior to the downsampling to a layer following the upsampling, such as wherein the skip connection bridges between layers of equal scale (e.g., as shown by way of examples in FIGS. 7A-7B). In some variations, the network includes multiple nested iterations of this concept (e.g., including, in order: multiple downsamplings, outputting to a first DSN, upsampling, outputting to a second DSN, upsampling, and outputting to a third DSN; preferably including a high-level skip connection that bridges from before the first downsampling to after the second upsampling, and a low-level skip connection that bridges from before the first DSN to after the first upsampling), such as wherein the network defines a U-shaped architecture.<br><br>[0039]   However, the method can additionally or alternatively include using any other suitable neural network(s) to determine the contamination of the image, and/or using no such networks. |

| Trade Secret 5: Subpar Image Detection (SPID) ||
| Paragraph/Element) | Evidence US10943356 |
|---|---|
| | **[0040]**   The contaminants can include specific items, such as bags of one or more particular compositions and/or colors (e.g., black bags, clear bags, plastic bags, etc.), bulky items (e.g., items exceeding one or more threshold dimensional constraints; item types such as pallets, furniture, tires, etc.; items in bulky configurations, such as uncollapsed cardboard boxes and/or other boxes; etc.), styrofoam, wood (e.g., tree branches, construction scraps, etc.), hazardous contaminants (e.g., pressurized vessels, propane tanks, etc.), electronic waste (e.g., televisions, displays, speakers, computers, portable electronics, etc.), items prone to tangling (e.g., garden hoses, light strings such as Christmas lights, packing straps, etc.), concrete, soil, and/or any other suitable specific contaminant items. Although described herein as contaminants, a person of skill in the art will recognize that the method and/or system can additionally or alternatively include characterizing any other suitable contents and/or content types, such as metal content types (e.g., metal form factors such as turnings, piping, stamping, mixed materials, etc.; metal compositions, such as steel, brass, etc.), material types (e.g., metal, rigid plastic, flexible plastic, organic, etc.), and/or any other suitable content characteristics. |
| 100b) (1) plastic bags | [0040] discloses that the contaminants can include specific items, one of these items is plastic bags. *See* line 3. |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
| | **[0040]**   The contaminants can include specific items, such as bags of one or more particular compositions and/or colors (e.g., black bags, clear bags, plastic bags, etc.), bulky items (e.g., items exceeding one or more threshold dimensional constraints; item types such as pallets, furniture, tires, etc.; items in bulky configurations, such as uncollapsed cardboard boxes and/or other boxes; etc.), styrofoam, wood (e.g., tree branches, construction scraps, etc.), hazardous contaminants (e.g., pressurized vessels, propane tanks, etc.), electronic waste (e.g., televisions, displays, speakers, computers, portable electronics, etc.), items prone to tangling (e.g., garden hoses, light strings such as Christmas lights, packing straps, etc.), concrete, soil, and/or any other suitable specific contaminant items. Although described herein as contaminants, a person of skill in the art will recognize that the method and/or system can additionally or alternatively include characterizing any other suitable contents and/or content types, such as metal content types (e.g., metal form factors such as turnings, piping, stamping, mixed materials, etc.; metal compositions, such as steel, brass, etc.), material types (e.g., metal, rigid plastic, flexible plastic, organic, etc.), and/or any other suitable content characteristics. |
| 100c) (2) electronic waste (e.g., microwaves, etc) | [0040] discloses that the contaminants can include specific items, one of these items is electronic waste. *See* line 9-10. |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
| | **[0040]**   The contaminants can include specific items, such as bags of one or more particular compositions and/or colors (e.g., black bags, clear bags, plastic bags, etc.), bulky items (e.g., items exceeding one or more threshold dimensional constraints; item types such as pallets, furniture, tires, etc.; items in bulky configurations, such as uncollapsed cardboard boxes and/or other boxes; etc.), styrofoam, wood (e.g., tree branches, construction scraps, etc.), hazardous contaminants (e.g., pressurized vessels, propane tanks, etc.), electronic waste (e.g., televisions, displays, speakers, computers, portable electronics, etc.), items prone to tangling (e.g., garden hoses, light strings such as Christmas lights, packing straps, etc.), concrete, soil, and/or any other suitable specific contaminant items. Although described herein as contaminants, a person of skill in the art will recognize that the method and/or system can additionally or alternatively include characterizing any other suitable contents and/or content types, such as metal content types (e.g., metal form factors such as turnings, piping, stamping, mixed materials, etc.; metal compositions, such as steel, brass, etc.), material types (e.g., metal, rigid plastic, flexible plastic, organic, etc.), and/or any other suitable content characteristics. |
| 100d) (3) bulky items | [0040] discloses that the contaminants can include specific items, one of these items is bulky items. *See* line 3-7. |

| Trade Secret 5: Subpar Image Detection (SPID) | |
| --- | --- |
| Paragraph/Element) | Evidence US10943356 |
| | [0040]   The contaminants can include specific items, such as bags of one or more particular compositions and/or colors (e.g., black bags, clear bags, plastic bags, etc.), bulky items (e.g., items exceeding one or more threshold dimensional constraints; item types such as pallets, furniture, tires, etc.; items in bulky configurations, such as uncollapsed cardboard boxes and/or other boxes; etc.), styrofoam, wood (e.g., tree branches, construction scraps, etc.), hazardous contaminants (e.g., pressurized vessels, propane tanks, etc.), electronic waste (e.g., televisions, displays, speakers, computers, portable electronics, etc.), items prone to tangling (e.g., garden hoses, light strings such as Christmas lights, packing straps, etc.), concrete, soil, and/or any other suitable specific contaminant items. Although described herein as contaminants, a person of skill in the art will recognize that the method and/or system can additionally or alternatively include characterizing any other suitable contents and/or content types, such as metal content types (e.g., metal form factors such as turnings, piping, stamping, mixed materials, etc.; metal compositions, such as steel, brass, etc.), material types (e.g., metal, rigid plastic, flexible plastic, organic, etc.), and/or any other suitable content characteristics. |
| 100e) (4) uncollapsed cardboard boxes | [0040] discloses that the contaminants can include specific items, one of these items is uncollapsed cardboard boxes. *See* line 6-7. |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
| | [0040]   The contaminants can include specific items, such as bags of one or more particular compositions and/or colors (e.g., black bags, clear bags, plastic bags, etc.), bulky items (e.g., items exceeding one or more threshold dimensional constraints; item types such as pallets, furniture, tires, etc.; items in bulky configurations, such as uncollapsed cardboard boxes and/or other boxes; etc.), styrofoam, wood (e.g., tree branches, construction scraps, etc.), hazardous contaminants (e.g., pressurized vessels, propane tanks, etc.), electronic waste (e.g., televisions, displays, speakers, computers, portable electronics, etc.), items prone to tangling (e.g., garden hoses, light strings such as Christmas lights, packing straps, etc.), concrete, soil, and/or any other suitable specific contaminant items. Although described herein as contaminants, a person of skill in the art will recognize that the method and/or system can additionally or alternatively include characterizing any other suitable contents and/or content types, such as metal content types (e.g., metal form factors such as turnings, piping, stamping, mixed materials, etc.; metal compositions, such as steel, brass, etc.), material types (e.g., metal, rigid plastic, flexible plastic, organic, etc.), and/or any other suitable content characteristics. |
| 100f) (5) construction materials and yard debris | [0040] discloses that the contaminants can include specific items, these items include construction materials and yard debris. *See* line 8 and line 13. |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
| | **[0040]**  The contaminants can include specific items, such as bags of one or more particular compositions and/or colors (e.g., black bags, clear bags, plastic bags, etc.), bulky items (e.g., items exceeding one or more threshold dimensional constraints; item types such as pallets, furniture, tires, etc.; items in bulky configurations, such as uncollapsed cardboard boxes and/or other boxes; etc.), styrofoam, wood (e.g., tree branches, construction scraps, etc.), hazardous contaminants (e.g., pressurized vessels, propane tanks, etc.), electronic waste (e.g., televisions, displays, speakers, computers, portable electronics, etc.), items prone to tangling (e.g., garden hoses, light strings such as Christmas lights, packing straps, etc.), concrete, soil, and/or any other suitable specific contaminant items. Although described herein as contaminants, a person of skill in the art will recognize that the method and/or system can additionally or alternatively include characterizing any other suitable contents and/or content types, such as metal content types (e.g., metal form factors such as turnings, piping, stamping, mixed materials, etc.; metal compositions, such as steel, brass, etc.), material types (e.g., metal, rigid plastic, flexible plastic, organic, etc.), and/or any other suitable content characteristics. |
| 100g) (6) styrofoam | [0040] discloses that the contaminants can include specific items, one of these items is styrofoam. *See* line 7. |

| Trade Secret 5: Subpar Image Detection (SPID) | |
| --- | --- |
| **Paragraph/Element)** | **Evidence US10943356** |
| | [0040]   The contaminants can include specific items, such as bags of one or more particular compositions and/or colors (e.g., black bags, clear bags, plastic bags, etc.), bulky items (e.g., items exceeding one or more threshold dimensional constraints; item types such as pallets, furniture, tires, etc.; items in bulky configurations, such as uncollapsed cardboard boxes and/or other boxes; etc.), styrofoam, wood (e.g., tree branches, construction scraps, etc.), hazardous contaminants (e.g., pressurized vessels, propane tanks, etc.), electronic waste (e.g., televisions, displays, speakers, computers, portable electronics, etc.), items prone to tangling (e.g., garden hoses, light strings such as Christmas lights, packing straps, etc.), concrete, soil, and/or any other suitable specific contaminant items. Although described herein as contaminants, a person of skill in the art will recognize that the method and/or system can additionally or alternatively include characterizing any other suitable contents and/or content types, such as metal content types (e.g., metal form factors such as turnings, piping, stamping, mixed materials, etc.; metal compositions, such as steel, brass, etc.), material types (e.g., metal, rigid plastic, flexible plastic, organic, etc.), and/or any other suitable content characteristics. |
| 100h) (7) tanglers ██████ ████████ | [0040] discloses that the contaminants can include specific items, one of these items is tanglers. *See* line 11. |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
| | **[0040]** The contaminants can include specific items, such as bags of one or more particular compositions and/or colors (e.g., black bags, clear bags, plastic bags, etc.), bulky items (e.g., items exceeding one or more threshold dimensional constraints; item types such as pallets, furniture, tires, etc.; items in bulky configurations, such as uncollapsed cardboard boxes and/or other boxes; etc.), styrofoam, wood (e.g., tree branches, construction scraps, etc.), hazardous contaminants (e.g., pressurized vessels, propane tanks, etc.), electronic waste (e.g., televisions, displays, speakers, computers, portable electronics, etc.), items prone to tangling (e.g., garden hoses, light strings such as Christmas lights, packing straps, etc.), concrete, soil, and/or any other suitable specific contaminant items. Although described herein as contaminants, a person of skill in the art will recognize that the method and/or system can additionally or alternatively include characterizing any other suitable contents and/or content types, such as metal content types (e.g., metal form factors such as turnings, piping, stamping, mixed materials, etc.; metal compositions, such as steel, brass, etc.), material types (e.g., metal, rigid plastic, flexible plastic, organic, etc.), and/or any other suitable content characteristics. |
| 101a) The service ███████████<br>███████████████████████████████<br>███████████████████████████████<br>███████████████████████████████<br>███████████████████████████ . | [0027] discloses ███████████<br>███████████████████████████████<br>███████████████████████ |

| Trade Secret 5: Subpar Image Detection (SPID) | |
| --- | --- |
| **Paragraph/Element)** | **Evidence US10943356** |
| | **[0027]**   Receiving a set of images **S100** preferably functions to provide data associated with the contents of the container (e.g., data indicative of the contents). Each image of the set is preferably a photograph (e.g., as shown in FIGS. **4A-4E**) or a group of photographs, such as photographs from multiple cameras (e.g., captured within a threshold time interval of each other, such as captured substantially concurrently), but can additionally or alternatively include any other suitable sensor information (e.g., spatial sensor information such as from an ultrasound sensor).<br><br>[0036]   discloses ███████████████████████████████████████████████████████████████████████████████████████████████ |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
| | **[0036]**   In some variations, the neural network is (or includes) a region proposal classification network (RPCN). In a first variation, the RPCN determines a set of regions of interest (e.g., bounding boxes) within an image, and then performs object classification of the content of each region of the set. In a second variation, the RPCN implements a "single look" approach (e.g., as described in Redmon, Joseph, and Ali Farhadi. "YOLOv₃: An incremental improvement." arXiv:1804.02767v1 (2018), which is herein incorporated in its entirety by this reference). For example, in this variation, such a network can: determine regions of interest (e.g., with associated "objectness" scores indicative of the probability that the region of interest appropriately bounds an object of interest); classify content of sectors (e.g., grid squares) of the image (e.g., wherein a sector depicting a portion of a plastic bag is preferably classified into the plastic bag class), optionally wherein this classification is performed independent from the region of interest determination; and determine a set of classified regions based on both the determined regions of interest and the sector content classifications.<br><br>Figures 4A-4E disclose examples of photographs ████ |



container image

detected
contaminant
(bulky item)

**FIGURE 4A**

container image

detected
contaminant
(bulky item)

**FIGURE 4B**

container image

detected
contaminant
(bulky item)

**FIGURE 4C**

| Trade Secret 5: Subpar Image Detection (SPID) | |
| --- | --- |
| Paragraph/Element) | Evidence US10943356 |
| |  |

| Trade Secret 5: Subpar Image Detection (SPID) | |
| --- | --- |
| **Paragraph/Element)** | **Evidence US10943356** |
| | [0045]  discloses<br><br>[0045]  The method can optionally include classifying the image (or set thereof) as "unknown." Images can be classified as "unknown" when: the classification confidence level falls below a predetermined threshold, when the images cannot be classified as "clean" ("uncontaminated") or "contaminated", and/or otherwise classified as "unknown." In one variation, images classified as "unknown" are sent for manual review (e.g., by a user), wherein the user reviews and labels the image with a "contaminated" or "clean" label (e.g., preferably identifying each contaminant item in the image, such as by selecting the image region corresponding to the contaminant item, labeling the contaminant item based on the contaminant type, and/or providing a contaminant count associated with the image). In a second variation, the "unknown" images can be sent to auxiliary detectors (e.g., with lower classification errors, different kappa coefficients, higher precision, higher recall, etc.), wherein the auxiliary detectors label the "unknown" images with the contamination status (e.g., "contaminated," "clean"), contamination assessment (e.g., contaminant count), and/or the contaminant type(s). The labeled images can subsequently be used as training data to update the contamination detection system (e.g., train or update the neural network). |

| Trade Secret 5: Subpar Image Detection (SPID) | |
|---|---|
| Paragraph/Element) | Evidence US10943356 |
| 101b)  | [0042] discloses<br><br>[0042] Additionally or alternatively, some contaminant types (e.g., more common contaminants, such as plastic bags, uncollapsed cardboard boxes, etc.) may be detected specifically (e.g., wherein the classifier classifies an object specifically as a plastic bag or an uncollapsed cardboard box), whereas other contaminant types (e.g., less common contaminants, such as styrofoam, items prone to tangling, bulky items, construction debris, yard debris, electronic waste, etc.) may be grouped together into an "anomalous object" class (e.g., wherein the classifier classifies an object as anomalous, but not as any specific contaminant class). Optionally, some or all such objects (e.g., those classified as anomalous) maybe passed to one or more additional classification resources (e.g., human classifiers) for contaminant confirmation, further classification, and/or other processing. |

| Trade Secret 7: Container Fullness Analysis | |
|---|---|
| **Paragraph/Element)** | **Evidence US10943356** |
| 106a) Compology developed its fullness level ▮▮▮▮ over the course of many years. The process consists of ▮▮▮▮ ▮▮▮▮ which consists of ▮▮▮▮ | 1:59-64 discloses a system for fill level determination.<br><br>    A method to for fill level determination preferably includes receiving a training set S**100**, training a neural network S**200**, selecting reference images S**300**, and/or determining a container fill level S**400** (e.g., as shown in FIG. **1**). However, the method to can additionally or alternatively include any other suitable elements.<br><br>5:64-67 discloses training a neural network for determining the container fill level based on container images.<br><br>3.2 Training a Neural Network.<br>    Training a neural network S**200** preferably functions to train a model (e.g., trained neural network) for determining the container fill level based on container images. Training<br><br>7:23-36 discloses that the neural network is preferably a convolutional neural network (CNN) |

The neural network is preferably a convolutional neural network (CNN), but can additionally or alternatively include (e.g., be) a fully connected neural network, a V-NET, a 25 Siamese network, and/or any other suitable network. The CNN preferably includes an assortment of one or more of convolutional (CONV) layers, pooling (POOL) layers (e.g., max pooling layers), activation layers (e.g., rectified linear unit (ReLU)), fully-connected layers, and/or any other suit- 30 able layers. In one example, the CNN includes a series of convolutional layers, optionally including pooling and/or activation (e.g., ReLU) layers after some or all convolutional layers, and one or more fully connected layers (e.g., as shown in FIG. 6). However, the CNN can additionally or 35 alternatively have any other suitable structure.

4:36-49 discloses that the training set for the CNN can be labeled by humans.

The training set is preferably a labeled set (e.g., wherein each image is associated with a known fill level). The fill level (e.g., fullness metric) preferably represents an occupied fraction of container storage volume (e.g., wherein an 40 empty container has a fill level of 0% and a completely full container has a fill level of 100%). The fill level does not necessarily represent a uniform level of container filling (e.g., wherein a tall mound of contents within a corner of the container may represent the same fill level as a shallow layer 45 of contents spread uniformly across the container floor, despite reaching a much higher maximum height). In one example, the known fill levels can be determined by providing the images to human classifiers and using their fill level determinations as the known fill level. In another

10:3-21  discloses  that  ███████████████████████████
███████████████████

    For a particular container, **S310** preferably includes considering the set of scored images (or image groups) of the container. A scored image is preferably an image for which the true fill level is known, but can additionally or alternatively be an image for which a scored fill level distribution (e.g., associated with estimate(s) of the fill level) is known, and/or can be an image associated with any other suitable fill level label. Estimating the fill level can include evaluating the average of the scored distribution, evaluating the weighted average of the scored distribution, and/or otherwise estimating the fill level. The set of scored images preferably includes only images for which the fill level was determined by one or more humans, but can additionally or alternatively include images associated only with computer-determined fill levels (e.g., determinations made using sensor fusion, determinations made auxiliary sensor signals, determinations made image analysis such as by a neural network, etc.) and/or images associated with fill levels determined in any other suitable manner.

13:7-25  discloses  that  ████████████████████████████
█████████████████████████████████████

Reassessing the subject image S440 can function to determine the fill level with additional certainty. The subject image is preferably reassessed using a different assessment technique than used in S420. For example, the subject image can be assessed using a human classifier (or set of multiple humans, such as operating on a consensus basis), assessed using a different neural network than the trained neural network, and/or reassessed in any other suitable manner. S440 is preferably performed for images for which the neural network outputs exhibit low confidence (e.g., as described above regarding S430). S440 can additionally or alternatively be performed for randomly selected images (e.g., a predetermined fraction of all images assessed in S420) and/or any other suitable images. Images reassessed in S440 are preferably added to a training set (e.g., the training set received as described above regarding S100), in association with the fill value determined in S440, such as for future performance of other elements of the method (e.g., such as S200 and/or S300). 10 15 20 25

| 106b) In this system, ██████████████ ███████████ | 13:7-25 discloses ████████ ████████████████████████ |



Reassessing the subject image S440 can function to determine the fill level with additional certainty. The subject image is preferably reassessed using a different assessment technique than used in S420. For example, the subject image can be assessed using a human classifier (or set of multiple humans, such as operating on a consensus basis), assessed using a different neural network than the trained neural network, and/or reassessed in any other suitable manner. S440 is preferably performed for images for which the neural network outputs exhibit low confidence (e.g., as described above regarding S430). S440 can additionally or alternatively be performed for randomly selected images (e.g., a predetermined fraction of all images assessed in S420) and/or any other suitable images. Images reassessed in S440 are preferably added to a training set (e.g., the training set received as described above regarding S100), in association with the fill value determined in S440, such as for future performance of other elements of the method (e.g., such as S200 and/or S300).

106c)

13:7-25 discloses

Reassessing the subject image S440 can function to determine the fill level with additional certainty. The subject image is preferably reassessed using a different assessment technique than used in S420. For example, the subject image can be assessed using a human classifier (or set of multiple humans, such as operating on a consensus basis), assessed using a different neural network than the trained neural network, and/or reassessed in any other suitable manner. S440 is preferably performed for images for which the neural network outputs exhibit low confidence (e.g., as described above regarding S430). S440 can additionally or alternatively be performed for randomly selected images (e.g., a predetermined fraction of all images assessed in S420) and/or any other suitable images. Images reassessed in S440 are preferably added to a training set (e.g., the training set received as described above regarding S100), in association with the fill value determined in S440, such as for future performance of other elements of the method (e.g., such as S200 and/or S300).

10:3-21 discloses that the ███████



| | |
|---|---|
| | For a particular container, **S310** preferably includes considering the set of scored images (or image groups) of the container. A scored image is preferably an image for which the true fill level is known, but can additionally or alternatively be an image for which a scored fill level distribution (e.g., associated with estimate(s) of the fill level) is known, and/or can be an image associated with any other suitable fill level label. Estimating the fill level can include evaluating the average of the scored distribution, evaluating the weighted average of the scored distribution, and/or otherwise estimating the fill level. The set of scored images preferably includes only images for which the fill level was determined by one or more humans, but can additionally or alternatively include images associated only with computer-determined fill levels (e.g., determinations made using sensor fusion, determinations made auxiliary sensor signals, determinations made image analysis such as by a neural network, etc.) and/or images associated with fill levels determined in any other suitable manner. |
| 106d) ██████████████████████<br>██████████████████ | 10:3-21 discloses that ████████<br>████████████████████████<br>████████████████████████<br>████████████████████ |

For a particular container, S310 preferably includes considering the set of scored images (or image groups) of the container. A scored image is preferably an image for which the true fill level is known, but can additionally or alternatively be an image for which a scored fill level distribution (e.g., associated with estimate(s) of the fill level) is known, and/or can be an image associated with any other suitable fill level label. Estimating the fill level can include evaluating the average of the scored distribution, evaluating the weighted average of the scored distribution, and/or otherwise estimating the fill level. The set of scored images preferably includes only images for which the fill level was determined by one or more humans, but can additionally or alternatively include images associated only with computer-determined fill levels (e.g., determinations made using sensor fusion, determinations made auxiliary sensor signals, determinations made image analysis such as by a neural network, etc.) and/or images associated with fill levels determined in any other suitable manner.

| 107a) In operation, the container fullness analysis ███████ | Claim 1 at 15:47-52 discloses ████ ██████████ |
| ███████████ | |
| | receiving the subject image from a content sensor associated with the subject container interior; and after training the neural network, determining the fullness metric using the neural network, comprising 50 providing the subject image and the subject reference image to the neural network as the input. |
| 107b) ██████████████ | FIG 8. discloses ███████████ |



FIGURE 8

| 108a) The container fullness analysis █████████ determines the estimated fullness of the waste container | Claim 1 at 15:49-50 discloses a CNN determining the estimated fullness using a neural network. |
|---|---|
| | after training the neural network, determining the full- ness metric using the neural network, comprising 50 |
| 108b) ████████████████████ | 7:37-49 discloses ████████████████████ |
| | The neural network preferably provides multiple output values, each corresponding to a different fill level (e.g., fill level range or bucket). The fill levels are preferably evenly spaced (e.g., over the entire possible range between 0 and 40 100%), such as spaced every 1%, 2%, 5%, or 10%. In one example, the CNN includes 21 outputs, each corresponding to a different bucket between 0 and 100% (e.g., spaced every 5%). Alternatively, the fill levels can be spaced unevenly, have logarithmic spacing, and/or have any other suitable 45 spacing. |
| | Preferably, each output represents a likelihood of and/or confidence in the corresponding fill level (e.g., the output values sum to 1). For example, the outputs can be the outputs |
| | 12:49-13:6 discloses ████████████████████ ████████ |

Assessing confidence of the neural network output S430 preferably includes determining a metric associated with spread of the outputs. In examples, the spread metric can include the range, interquartile range, variance, standard deviation, density within a threshold band, and/or any other suitable metric. In a specific example, the metric is the sum of outputs within a threshold distance from the determined fill level (e.g., within 5%, 10%, 15%, 20%, etc.). If the spread metric is beyond a threshold spread value (e.g., the outputs exhibit more spread than the threshold), the neural network output confidence is low. For example, if less than a threshold sum falls within the threshold distance of the determined fill level (e.g., less than 50% of the output value is within plus or minus 15% of the value determined in S420), the confidence is determined to be low.

In response to determining that the neural network confidence is low, S400 preferably includes reassessing the subject image (e.g., as described below regarding S440). Alternatively, if the neural network output confidence is determined to be sufficient (e.g., if the spread of the neural network outputs is less than the spread threshold), the value determined in S420 is preferably used (e.g., preferably stored in association with the image). However, S430 can additionally or alternatively include assessing confidence of the neural network output in any other suitable manner.

| Trade Secret 4: Training Data | |
|---|---|
| **Paragraph/Element)** | **Evidence** |
| 80a)  The_training_data_includes ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇ | Disclosures by US10,943,356<br><br>4:36-41 discloses ▇▇▇▇▇▇▇▇▇<br><br>    The training set is preferably a labeled set (e.g., wherein each image is associated with a known fill level). The fill level (e.g., fullness metric) preferably represents an occupied fraction of container storage volume (e.g., wherein an 40 empty container has a fill level of 0% and a completely full container has a fill level of 100%). The fill level does not<br><br>5:13-35 discloses ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ |

Each image in the additional training set can be associated with information indicative of the image's suitability for use as an input to the fullness model (e.g., labeled with labels such as a candidate label or an unsuitable label, labeled with a suitability score, an unsuitability score, and/or a score associated with one or more unsuitable conditions, etc.). The suitable images (e.g., images labelled with a candidate label, with high suitability scores, and/or with low unsuitability scores, etc.) can include: images depicting a container interior, images captured by a content sensor that is not obscured (e.g., the content sensor is not covered by a box, the content sensor includes a clean lens, and/or the content sensor is otherwise not blocked), and any other suitable image depicting a container interior. The unsuitable images (e.g., images labelled with an unsuitable label) and/or the reason for unsuitability can include: images captured by a content sensor experiencing a malfunction, images captured by a content sensor that is obscured (e.g., the content sensor is covered by a box, the content sensor includes a dirty lens, and/or the content sensor is otherwise blocked), images captured by a content sensor wherein the content sensor field-of-view does not depict a container interior, and/or any other unsuitable images captured by the content sensor.

5:36-49 discloses that ███████████████████████
████████████████████

The candidate model label can be a value (e.g., fill level, a binary value such as to indicate the image is associated with a candidate label, etc.), can be alphabetic (e.g., "candidate", "yes", etc.), and/or can be any other suitable label. The unsuitable label can be a value (e.g., binary value, such 40 as to indicate the image is associated with an unsuitable label; integers mapped to different unsuitable label reasons, such as a 2 mapped to unsuitable reason 2, 3 mapped to unsuitable reason 3, etc.), can be alphabetic (e.g., "N/A", the unsuitable label reason, "no", etc.), and/or can include any 45 other suitable label(s). Examples of candidate labelled images and unsuitable labelled images are depicted in FIG. **11**. However, the additional training set can additionally or alternatively be labeled in any other suitable manner.

7:37-46 discloses that █████████████████████████
███████████████████████████████████████████████
████████████████████████████

The neural network preferably provides multiple output values, each corresponding to a different fill level (e.g., fill level range or bucket). The fill levels are preferably evenly spaced (e.g., over the entire possible range between 0 and 40 100%), such as spaced every 1%, 2%, 5%, or 10%. In one example, the CNN includes 21 outputs, each corresponding to a different bucket between 0 and 100% (e.g., spaced every 5%). Alternatively, the fill levels can be spaced unevenly, have logarithmic spacing, and/or have any other suitable 45 spacing.



9:25-37 discloses that

The diverter model preferably provides multiple output 25
values, each preferably corresponding to a different label
(e.g., candidate label, unsuitable label, unsuitable label rea-
son, etc.), such as depicted by way of example in FIG. **12**.
In a first example, the CNN includes 4 outputs, each
corresponding to a different label, such as a candidate label 30
and three unsuitable label reasons. In a second example, the
CNN includes 2 outputs, the first corresponding to a candi-
date label and the second corresponding to an unsuitable
label.

Preferably, each output represents a likelihood of and/or 35
confidence in the corresponding candidate label and/or
unsuitable label. In one such example, the outputs can be the

80a) The training data includes

Disclosures by US 2021/0158308

[0028] discloses that

[0028]   The set of images can optionally include auxiliary data (e.g., associated with each image of the set, associated with the entire set, etc.). The auxiliary data can include, for example, image capture time, container fill level, auxiliary sensor information (e.g., container weight, container state, ultrasound sensor information, etc.) and/or any other suit-able information. The auxiliary data is preferably captured within a threshold time interval (e.g., 1, 3, 10, 30, 60, 150, 300, 600, 1200, 0.1-1, 1-10, 10-100, 100-1000, or 1000-10, 000 s; 1, 3, 10, 30, 60, 120, 300, 600, 1200, 2400, 4800, 10,000, 0.1-1, 1-10, 10-100, 100-1000, 1000-10,000, or 10,000-100,000 min; etc.) around the capture time of the associated image (e.g., substantially concurrent with image capture) but can additionally or alternatively be associated with any other suitable time(s).

[0035] discloses ███████████████████████████████████

[0035]  In one example of the first embodiment, the image can be provided as input to one or more CNNs (e.g., as a 3-channel RGB image, single channel greyscale image, etc.), wherein each CNN is trained to detect the presence of one or more types of contaminants in the image (e.g., wherein each CNN is trained to detect a different contaminant type, wherein a single CNN is responsible for detecting any contaminants, etc.). The CNN (or CNNs) preferably includes one or more: convolutional layers, pooling layers (e.g., max pooling layers), activation layers (e.g., rectified linear units), fully-connected layers, and/or any other suitable layers. The neural network preferably provides multiple output values, each corresponding to a different number of contaminant items (e.g., first output corresponding to 0 contaminant items, second output corresponding to 1 contaminant item, third output corresponding to 2 contaminant items, etc.). Preferably, each output represents a likelihood of and/or confidence in the corresponding contaminant count (e.g., the output values sum to 1). For example, the outputs can be the outputs of a softmax classifier. Alternatively, the output values can be arbitrary, such as output values of an SVM classifier and/or any suitable classifier. Alternatively, the neural network can have one or more regression outputs (e.g., wherein the output value represents the contaminant count). In a specific example, the CNN includes multilabel classification layers, such as a plurality (e.g., array) of output layers (e.g., multiple softmax output layers, multiple independent logistic classifiers, etc.), each associated with a different contaminant type.

[0042] discloses █████████████

| | |
|---|---|
| | **[0042]**   Additionally or alternatively, some contaminant types (e.g., more common contaminants, such as plastic bags, uncollapsed cardboard boxes, etc.) may be detected specifically (e.g., wherein the classifier classifies an object specifically as a plastic bag or an uncollapsed cardboard box), whereas other contaminant types (e.g., less common contaminants, such as styrofoam, items prone to tangling, bulky items, construction debris, yard debris, electronic waste, etc.) may be grouped together into an "anomalous object" class (e.g., wherein the classifier classifies an object as anomalous, but not as any specific contaminant class). Optionally, some or all such objects (e.g., those classified as anomalous) maybe passed to one or more additional classification resources (e.g., human classifiers) for contaminant confirmation, further classification, and/or other processing.<br><br>[0044] discloses ████████████████████ |

[0044]   Assessing the images S300 can optionally include classifying the images as "contaminated" or "clean" (uncontaminated), but can include classifying the image with any other suitable classifier (e.g. classifying the image with the specific contaminant). In variants, the "clean" images can be discarded or retained for training purposes. The contaminant detector can: classify the image as "contaminated" upon detecting the presence of contaminants (e.g., determining that one or more non-conforming items appear in the image); determine a contaminant count by counting the number of non-conforming items and/or known contaminants in each image (e.g., wherein layers of a neural network, such as each layer in an array of output layers, such as softmax output layers, can be specific to a given contaminant), optionally classifying the images as "contaminated" when the number exceeds 0; and/or otherwise classify the images as "contaminated" or "clean." However, S300 can optionally include labeling the images with the specific contaminant (e.g., based on the elements of the output layers specific to the given contaminant), and/or any other suitable process.

[0045] discloses ███████████

[0045]   The method can optionally include classifying the image (or set thereof) as "unknown." Images can be classified as "unknown" when: the classification confidence level falls below a predetermined threshold, when the images cannot be classified as "clean" ("uncontaminated") or "contaminated", and/or otherwise classified as

"unknown." In one variation, images classified as "unknown" are sent for manual review (e.g., by a user), wherein the user reviews and labels the image with a "contaminated" or "clean" label (e.g., preferably identifying each contaminant item in the image, such as by selecting the image region corresponding to the contaminant item, labeling the contaminant item based on the contaminant type, and/or providing a contaminant count associated with the image). In a second variation, the "unknown" images can be sent to auxiliary detectors (e.g., with lower classification errors, different kappa coefficients, higher precision, higher recall, etc.), wherein the auxiliary detectors label the "unknown" images with the contamination status (e.g., "contaminated," "clean"), contamination assessment (e.g., contaminant count), and/or the contaminant type(s). The labeled images can subsequently be used as training data to update the contamination detection system (e.g., train or update the neural network).

[0070]  discloses

1

## CERTIFICATE OF SERVICE

I am a resident of the Commonwealth of Massachusetts, over the age of eighteen years, and not a party to the within action.  My business address is One Financial Center, Boston, MA 02111.  On September 13, 2024, I served true and correct copies of the following documents:

### REBUTTAL EXPERT REPORT OF PHILIP GREENSPUN, PH.D.

| ☒ | **BY E-MAIL**:  By electronic mail transmission on September 13, 2024, by transmitting a PDF format copy of such document(s) to each such person at the e-mail address listed below.  The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error. | |
|---|---|---|
| | Stanley M. Gibson<br>James Neudecker<br>**JEFFER MANGELS BUTLER &<br>MITCHELL LLP**<br>2 Embarcadero Center, 5th Floor<br>San Francisco, CA 94111<br>Telephone: (415) 398-8080<br>Facsimile: (415) 398-5584<br>sgibson@jmbm.com<br>jneudecker@jmbm.com<br><br>*Attorneys for Plaintiff*<br>*ROADRUNNER RECYCLING, INC.* | Lena Streisand<br>Shavon Henry<br>**JEFFER MANGELS BUTLER &<br>MITCHELL LLP**<br>1900 Avenue of the Stars, 7th Floor<br>Los Angeles, California 90067-4308<br>Telephone:(310) 203-8080<br>Facsimile: (310) 230-0567<br>lstreisand@jmbm.com<br>shenry@jmbm.com<br><br>*Attorneys for Plaintiff*<br>*ROADRUNNER RECYCLING, INC.* |
| | Joseph J. Mellema<br>**JEFFER MANGELS BUTLER &<br>MITCHELL LLP**<br>3 Park Plaza, Suite 1100<br>Irvine, California 92614-2592<br>Telephone: (949) 623-7200<br>Facsimile: (949) 623-7202<br>jmellema@jmbm.com<br><br>*Attorneys for Plaintiff*<br>*ROADRUNNER RECYCLING, INC.* | |

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 13, 2024, at Boston, MA.

*Stephanie Stutzmann*
STEPHANIE STUTZMANN