# EXHIBIT 4

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONEY
Transcript of William Leo Hoarty
Conducted on September 12, 2024

1 (1 to 4)

---

**Page 1**

```
 1            UNITED STATES DISTRICT COURT
 2           NORTHERN DISTRICT OF CALIFORNIA
 3   - - - - - - - - - - - - - -x
 4   ROADRUNNER RECYCLING, INC.,    :
 5          Plaintiff,             :
 6      v.                         :   Civil Action No.
 7   RECYCLE TRACK SYSTEMS, INC.,   :   3:23-cv-04804-WHA
 8   AND RECYCLESMART SOLUTIONS,    :
 9   INC.,
10          Defendants.
11   - - - - - - - - - - - - - -x
12
13      HIGHLY CONFIDENTIAL, ATTORNEYS' EYES ONLY
14
15    Videotaped deposition of William Leo Hoarty
16              Conducted Remotely
17              September 12, 2024
18            12:09 p.m., Eastern Time
19
20
21
22   Job No.: 552618
23   Pages: 1 - 241
24   Reported By: Alan H. Brock, RDR, CRR
25
```

---

**Page 2**

```
 1            A P P E A R A N C E S
 2   ON BEHALF OF PLAINTIFF:
 3     JEFFER MANGELS BUTLER AND MITCHELL LLP
 4     JOSEPH J. MELLEMA, ESQ.
 5     3 Park Plaza, Suite 1100
 6     Irvine, California 92614
 7     949.623.7200
 8     jmellema@jmbm.com
 9
10   ON BEHALF OF DEFENDANTS:
11     MINTZ, LEVIN, COHN, FERRIS, GLOVSKY &
12        POPEO, P.C.
13     MATTHEW S. GALICA, ESQ.
14     One Financial Center
15     Boston, Massachusetts 02111
16     617.542.6000
17     msgalica@mintz.com
18
19
20   ALSO PRESENT:
21     Brian Krieger, Videographer
22     Lucian Newell, Remote Technician
23
24
25
```

---

**Page 3**

```
 1            C O N T E N T S
 2
 3   EXAMINATION OF WILLIAM LEO HOARTY      PAGE
 4     By Mr. Galica                         5
 5     By Mr. Mellema                       226
 6     By Mr. Galica                        232
 7
 8            E X H I B I T S
 9          (Attached to transcript.)
10   DEFENDANTS' DEPOSITION EXHIBITS        PAGE
11   Exhibit 413 Curriculum Vitae of W. Leo Hoarty   46
12   Exhibit 414 "Exhibit C, Materials Considered"   46
13   Exhibit 415 Expert Report of W. Leo Hoarty      46
14   Exhibit 416 "Exhibit A," Plaintiff's            46
15       Identification of Trade Secrets,
16       ROADRUNNER 000000096 - 118
17   Exhibit 417 "1. Trade Secret 1:  Overall        66
18       Waste Metering and Recycling
19       Technology for a Smart Waste
20       Container Mounted Drive"
21   Exhibit 418 Diagrams, ROADRUNNER000000119 -     71
22       190
23   Exhibit 419 "Trade Secret 2:  Smart Camera      88
24       Apparatus for a Smart Waste
25       Container Mounted Device"
```

---

**Page 4**

```
 1      September 12, 2024      12:09 p.m.
 2      P R O C E E D I N G S
 3      THE TECHNICIAN:  Thank you to everyone for
 4   attending this proceeding remotely, which we
 5   anticipate will run smoothly.  Please remember to
 6   speak slowly and do your best not to talk over one
 7   another.  Please be aware that we are recording this
 8   proceeding for backup purposes.  Any off-the-record
 9   discussions should be had away from the computer.
10   Please remember to mute your mike for those
11   conversations.
12      Please have your video enabled to help the
13   reporter identify who is speaking.  If you are unable
14   to connect with video and are connecting via phone,
15   please identify yourself each time before speaking.  I
16   apologize in advance for any technical- related
17   interruptions.  Thank you.
18      THE VIDEOGRAPHER:  Please stand by for the
19   video read-on.  Here begins Media No. 1 in the
20   videotaped deposition of Leo Hoarty.  This is in the
21   matter of RoadRunner Recycling, Inc. versus Recycle
22   Track Systems, Inc. et al.  This is in the United
23   States District Court, Northern District of
24   California, filed as Case No. 3:23-cv-04804-WHA.
25      Today's date is Thursday, September 12,
```

**5**

1  2024.  Our time on the video monitor is 12:11 p.m.
2  Eastern Time.  The remote videographer today is Brian
3  Krieger, representing Planet Depos.  All parties of
4  this video deposition are attending remotely.
5          If counsel would please identify
6  themselves for the record and state whom they
7  represent.
8          MR. GALICA:  Matthew Galica, from Mintz,
9  on behalf of defendants.
10         MR. MELLEMA:  Joe Mellema, from Jeffer
11  Mangels, on behalf of plaintiff.
12         THE VIDEOGRAPHER:  The court reporter
13  today is Alan Brock, also representing Planet Depos.
14  And the witness will now be sworn.
15              WILLIAM LEO HOARTY,
16  being first duly sworn or affirmed to testify to the
17  truth, the whole truth, and nothing but the truth, was
18  examined and testified as follows:
19              EXAMINATION
20  BY MR. GALICA:
21    Q.  Good morning, Mr. Hoarty.  How are you?
22    **A.  I'm fine, thanks.  Good morning -- or good**
23  **afternoon to you.**
24    Q.  Afternoon now.  Could you state your full
25  name for the record and spell your last name.

**6**

1    **A.  Certainly.  My full name is William Leo**
2  **Hoarty.  Last name is spelled H, as in "hotel,"**
3  **o-a-r-t, like "Tom," y.**
4    Q.  And where do you currently reside?
5    **A.  I live in Morgan Hill, California.**
6    Q.  Why can you provide an address, please?
7    **A.  3465 Oak Hill Court, in Morgan Hill.  And my**
8  **ZIP code, 95037.**
9    Q.  And I see from the materials that you've
10  submitted as part of this case that you've been
11  deposed before; is that correct?
12    **A.  Correct.**
13    Q.  In fact, a number of times on IP-related
14  matters.  Is that fair to say?
15    **A.  Correct.**
16    Q.  So you're kind of a veteran at this point,
17  but I'd still like to run through some ground rules
18  for the day.  Is that okay?
19    **A.  Of course.**
20    Q.  As you know, your testimony today is under
21  oath, as if it were being taken before a judge who
22  will preside over this proceeding.  Do you understand
23  that?
24    **A.  I do.**
25    Q.  And your testimony today may be presented

**7**

1  before a judge or jury as part of this proceeding.  Do
2  you understand that?
3    **A.  I do.**
4    Q.  Because of that, do you understand that it's
5  important that you testify truthfully and to the best
6  of your ability?
7    **A.  I do.**
8    Q.  So I'll be asking questions today, and I'd
9  ask that if you do not understand one of my questions,
10  you ask me to clarify.  Is that fair?
11    **A.  Of course, yes.**
12    Q.  Because if you do answer the question, I'll
13  assume that you understood it.  Is that fair?
14    **A.  Understood.**
15    Q.  If you need to take a break at any point, let
16  me know.  I would just ask that you answer any pending
17  question that I have.  Is that fair?
18    **A.  Yes.**
19    Q.  You're doing a great job so far, but verbal
20  answers are going to be required, so no head nods,
21  head shakes.  Please answer with "yes," "no," or
22  whatever else the question requires.  Is that fair?
23    **A.  Yes.**
24    Q.  And I think the technician alluded to it
25  before, but because we're doing the deposition via

**8**

1  Zoom, that presents challenges of talking over one
2  another.  So all I'd ask is that you wait until I
3  finish my question before you start your answer, and I
4  will wait until you finish your answer before I start
5  my next question.  Fair?
6    **A.  Yes.**
7    Q.  Also, you understand that your attorney may
8  object from time to time today, but you're still
9  obligated to answer my question unless you're
10  specifically instructed not to.  Do you understand
11  that?
12    **A.  Yes.**
13    Q.  Is there any reason why you can't testify
14  fully and truthfully today?
15    **A.  No reason.**
16    Q.  Where are you right now?
17    **A.  I'm in my home office in Morgan Hill,**
18  **California.**
19    Q.  And that's at your home address?
20    **A.  Home address, correct.**
21    Q.  Is anyone there with you?
22    **A.  No, by myself.**
23    Q.  And how are you interacting with Zoom right
24  now?
25    **A.  I'm looking at the screen on my laptop.**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONEY
Transcript of William Leo Hoarty
Conducted on September 12, 2024

---

29

1    Q.  So you attended from 1970 to 1973 but did not
2  obtain a college degree; correct?
3    A.  I left Ohio State to come to California, with
4  the intention of establishing residency, which took a
5  year.  And then I intended to enroll in U.C. Berkeley,
6  which is a most excellent school.  In the year that I
7  was out here I got involved in a startup, medical
8  electronics, and one thing led to another --
9         MR. GALICA:  I'll just move to strike as
10 nonresponsive and I'll reask the question.
11   Q.  You attended Ohio State from 1970 to 1973 but
12 did not obtain a college degree; correct?
13   A.  That's correct.
14   Q.  When did you become engaged in this case?
15   A.  I would have to look at my notes.  Last year.
16 I would have to look at my notes.
17   Q.  Do you have a general time frame?  I'm not
18 asking you to look at notes.
19   A.  Okay.  I'm sorry, I just -- I think around
20 December -- November, December, that year.
21   Q.  And what are the notes that you have on your
22 table right now?
23        MR. MELLEMA:  Objection to form.
24   A.  I have my declaration.
25   Q.  And that's it?

---

30

1    A.  That's it.  The exhibits are on my screen.
2    Q.  I guess I'd ask that you close any open
3  windows and put your declaration aside.
4    A.  Okay.
5    Q.  Thank you.  I appreciate it.
6         How much are you being paid for your
7  services as part of this case?
8    A.  475 an hour for research, declarations, and
9  525 for deposition or court appearances.
10   Q.  And about how much time have you spent
11 working on this case so far?
12   A.  I would have to relook at my notes.  I can't
13 say off the top of my head.
14   Q.  Do you know how much you've been paid to work
15 on this case so far?
16   A.  I can check my invoices very quickly, if you
17 would like a real number.
18   Q.  Do you know, off the top of your head, do you
19 have an estimate?
20   A.  I don't, off the top of my head.
21   Q.  Is it a thousand dollars?
22   A.  I really don't.  I mean, I've billed since
23 December about maybe 20 to 40 hours a month, depending
24 on what we are working on.
25   Q.  And that was 20 to 40 hours a month since the

---

31

1  beginning of your engagement?
2    A.  Correct.
3         MR. GALICA:  We can add another document
4  to the chat.  It's the one that starts with Attachment
5  C.
6         THE TECHNICIAN:  Attachment C is in the
7  chat.  Were you able to find out the exhibit number,
8  or on the next break maybe?
9         MR. GALICA:  Yeah, on the next break.
10 Sorry about that.
11        THE TECHNICIAN:  No worries.
12   A.  I have it in front of me.
13   Q.  Thank you.  Do you recognize this?
14   A.  I do.
15   Q.  And what is this?
16   A.  This is a list of material that I considered,
17 listed by Bates number.
18   Q.  And is this the entire set of documents that
19 you reviewed or considered when writing your report?
20   A.  Yes, it is.
21   Q.  It's not missing any?
22   A.  If it is missing a Bates number, I wouldn't
23 be able to tell with this many documents.  But I'm
24 pretty sure it's complete.
25   Q.  Do you see on the third page there's a

---

32

1  heading Deposition Transcripts?
2    A.  Yes.
3    Q.  Are those the only deposition transcripts
4  you've reviewed?
5    A.  Correct.
6    Q.  So it's fair to say if a document isn't
7  listed on this exhibit, you haven't reviewed it?
8         MR. MELLEMA:  Objection, form.
9    A.  To the best of my knowledge.
10   Q.  Fair enough.
11        MR. GALICA:  We can also add to the chat
12 one of the documents that starts with the date August
13 30th, 2024.  It's the Hoarty expert report.
14        THE TECHNICIAN:  It's now in the chat.
15   Q.  Mr. Hoarty, if you could just let me know
16 when you've had a chance to download that.
17   A.  Okay.  It's still coming toward me.  There we
18 go.
19        It is in front of me.
20   Q.  And I'm going to do my best to focus
21 questions on specific areas of your report.  I know
22 it's a little difficult when we're all on Zoom to
23 follow along.  So I'll do my best to keep us focused
24 and just try to stay with the sections that I'm
25 directing you to for now.  Is that fair?

Transcript of William Leo Hoarty
Conducted on September 12, 2024

33

1   A.   Yes, it is.
2   Q.   We may even bounce between a couple of
3   documents as we're going through the deposition.  I'll
4   do my best to identify where I'm focusing, but if you
5   have any questions, just let me know.
6   A.   Understood.
7   Q.   Thank you.  So if we could first go to
8   Paragraph 8 of your report.  Let me know when you get
9   there.
10  A.   I am there.
11  Q.   Do you see it lists a number of trade secrets
12  that you say your opinions and analysis relate to?
13  A.   I see it.
14  Q.   Do you see No. 4, image preprocessing
15  techniques for images captured by a smart waste
16  container mounted device?
17  A.   I see that.
18  Q.   You're not alleging that that's a trade
19  secret; correct?
20  A.   That is incorrect.  I am alleging that it is
21  a trade secret as developed by Compology.
22  Q.   Let's go to your table of contents in your
23  report, then.
24  A.   I'm there.
25  Q.   And you see Section VIII, Opinions?

34

1   A.   I do.
2   Q.   Subsection B, RoadRunner's Trade Secrets?
3   A.   I see them.
4   Q.   Where is image preprocessing?
5   A.   It is not in this list.
6   Q.   So, then, where in your document is it?
7   Where in your report is it?
8   A.   I elected to not include it in the report.
9   Q.   So, then, you're not alleging it's a trade
10  secret; correct?
11  A.   It is a trade secret.  I didn't have enough
12  information.
13  Q.   What information were you missing?
14  A.   Basically, the software of the
15  third-party-developed camera that the Pello used.
16  Q.   What do you mean by that?
17  A.   It wasn't complete.  I couldn't find what I
18  was looking for, and I moved on, and this is what I
19  focused on for the report.
20  Q.   Well, when you say you couldn't find what you
21  were looking for, did you ask anybody to provide you
22  additional information?
23  A.   We did.  I don't recall -- I didn't
24  personally.  I just worked with what -- I conducted an
25  independent investigation, and I worked with the

35

1   information provided, which included two trips to
2   Boston -- three trips, including the prototype
3   examination, but two software exploration trips.  And
4   I worked with what I had.
5   Q.   Did you tell counsel that you are missing
6   something?
7       MR. MELLEMA:  Objection, privileged.  You
8   can answer only to the extent you're not going to
9   reveal attorney-client-privileged communications.
10  A.   I discussed that fundamentally what I found,
11  or reported what I found, and then went to work on
12  what is in this report.
13  Q.   I just want to understand, then:  Are you
14  saying that you believe RoadRunner has a trade secret
15  related to image preprocessing and that defendants
16  just don't use it?
17  A.   No, I'm not saying that.  I'm just saying I
18  could not -- I'm not saying that.
19  Q.   What couldn't you do to -- or why didn't you
20  include it, then, in your trade secrets section?
21      MR. MELLEMA:  Objection, form.
22  A.   I couldn't find the information that I needed
23  with all the other work I had to do.  I just put it
24  aside and went to work on what I had -- what I had in
25  front of me.

36

1   Q.   What information did you need?
2   A.   The same I used for all the rest of this
3   report, and that is examining the devices, which I
4   did; examining the software, to understand -- to
5   understand the entirety of the system.
6   Q.   Is that another way of saying you just
7   couldn't find evidence of defendants using what you
8   allege the image preprocessing trade secret is?
9       MR. MELLEMA:  Objection, form.
10  A.   There is evidence in the emails between the
11  RTS employees.  There is discussions of image
12  enhancement that I found.  I was unable to find
13  specific software or the things I was looking for to
14  make a -- to include that in this report.  So we
15  decided -- made a decision to move with the seven
16  sections here that are in front of you.
17  Q.   So you're not alleging, then, that defendants
18  misappropriated RoadRunner's image preprocessing trade
19  secret; correct?
20  A.   Incorrect.  I'm not a lawyer.  I can't make
21  that judgment.  I'm just a technologist.  I know the
22  area very, very well.  I know what I was looking for.
23  I had a lot to do, and I think I did a pretty good
24  job, having mountainous software with no
25  documentation.  There was a lot to do.

37

1   Q.  So you don't know whether RoadRunner's trade
2   secrets have been misappropriated by defendants;
3   correct?
4         MR. MELLEMA:  Objection, form.
5   A.  That's a legal question.  Again, I'm only an
6   amateur lawyer, but I'm a fairly skilled technologist.
7   And I can't make that assessment -- or I wouldn't try,
8   put it that way.
9   Q.  So your report does not allege that any trade
10  secrets have been misappropriated by defendants;
11  correct?
12        MR. MELLEMA:  Objection, form.
13  A.  That's awfully broad.  You said "any."  I see
14  seven in front of me.
15  Q.  But you're not alleging they're
16  misappropriated; correct?
17        MR. MELLEMA:  Objection, form.
18  A.  I don't quite understand the question.  It's
19  written -- what I state is stating --
20        You're asking me about the trade secrets
21  that I've enumerated in Section VIII, and what is in
22  front of us is what I enumerated.  I don't know how
23  to -- I'm not clear on your question on anything
24  further.
25  Q.  You can't assess whether RoadRunner's trade

38

1   secrets have been misappropriated by defendants;
2   correct?
3         MR. MELLEMA:  Objection, form.
4   A.  If that's a general question, yes, I can.
5   Q.  What do you mean by "if that's a general
6   question"?
7   A.  You're asking about trade secrets in general,
8   I assume, not a specific one, such as image connection
9   or contamination detection, et cetera.  You're
10  saying -- you're asking me, as I understand it, a
11  general question of any RoadRunner trade secrets being
12  misappropriated.  Is that correct?
13  Q.  Well, can you do that?
14  A.  Yes.  It's in my report here.
15  Q.  What about with respect to specific trade
16  secrets?  Can you assess whether any of those have
17  been misappropriated by defendants?
18        MR. MELLEMA:  Objection, form.
19  A.  What I wrote in my report documents what I
20  considered misappropriation -- excuse me, use of --
21  use of the Compology technology.
22  Q.  Do you think you're able to identify trade
23  secrets that RoadRunner has?
24        MR. MELLEMA:  Objection, form.
25  A.  Yes, I can.

39

1   Q.  How did you go about doing that?
2   A.  Well, I considered what the legal standards
3   of Section V are for a trade secret.  I considered
4   what the term "misappropriation" means in regards to
5   trade secrets, also enumerated in Section V.  And
6   using those standards and my knowledge, deep knowledge
7   of the technology, I compared the two systems, and my
8   conclusions are in this report, as we see in Opinions.
9         MR. GALICA:  I'm going to add another
10  document.  It starts with the number 12.
11        THE TECHNICIAN:  The exhibit is now in the
12  chat.
13  Q.  Mr. Hoarty, if you could just download that.
14        MR. MELLEMA:  I'm going to take the time
15  right now to identify the transcript as highly
16  confidential, attorneys' eyes only, under the
17  protective order.
18  A.  It is downloaded.
19  Q.  Do you recognize that document?
20  A.  I believe I've seen this before.
21  Q.  What do you recognize it as?
22  A.  Excuse me, I'm sorry.  It's not quite
23  displaying.  Give me one more second.  I thought it
24  was loading.
25        I've got it here.  It is the RoadRunner

40

1   identification of trade secrets.
2   Q.  Have you seen that document before?
3   A.  Yes, I have.
4   Q.  Were you involved in writing it?
5   A.  No.
6   Q.  Do you know who did?
7         MR. MELLEMA:  Objection, privileged.  To
8   the extent that you can reveal -- or that you can
9   answer without revealing attorney-client
10  communications, you can do so.
11  A.  I don't, other than I believe it lists the
12  participants -- or it lists -- I believe this document
13  lists its sources.
14  Q.  Okay.  We may be doing a little bouncing
15  around here.
16  A.  Okay.
17  Q.  I'm going to direct your attention back to
18  your report, Paragraph 16.
19  A.  I'm there.
20  Q.  It says that you conclude that Compology
21  R11-R13 includes at least the following trade secrets,
22  and then it lists 1 through 7.  Do you see that?
23  A.  Yes.
24  Q.  Did you review the R13S and R13L products?
25  A.  I did.

Case 3:23-cv-04804-WHA   Document 153-5   Filed 10/29/24   Page 7 of 40
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024

11 (41 to 44)

41

1    Q.  Why didn't you list that here?
2    A.  I was instructed that it is past the -- it is
3  past the date of interest to this -- to the subject of
4  this -- my research.  I did look at it.  I understood
5  what it was made up of.  I took it apart.  I examined
6  it.  And it was -- I was informed by counsel that I
7  was not to focus on it, as it was similar to R12 and
8  past the date of the research I was doing.
9    Q.  So is that with respect to all versions of
10 the R13 or just the R13S and R13L?
11   A.  To my knowledge, the R13 family is built on
12 the same core, the same circuit board.  The
13 differences are in the case design -- the R family, R
14 series -- the R series camera sensors have unique case
15 designs, enclosures, for specific tasks but internally
16 are electronically similar.
17   Q.  Well, you agree that the R11 and R12 use
18 different cameras, for example; right?
19   A.  They are similar.
20   Q.  How are they similar?
21   A.  Well, the R11 used two cameras.  The R12 used
22 one.  But I believe it's the same.  They perfected
23 optics.  They fine-tuned their lenses for better
24 wide-angle -- or better view of both field of view as
25 well as look angle.  So there were adjustments.  The

42

1  image sensors of the cameras were, I believe, the
2  same, which is similar to the image sensor that Pello
3  uses.
4    Q.  Well, let me unpack that.  So you're saying
5  that if one product uses two cameras, the other uses
6  one, and they have different fields of view, different
7  angles, different lenses, other adjustments, those are
8  still the same, in your mind?
9    A.  I wouldn't say "the same."  They're similar.
10   Q.  So even with all those differences, you think
11 those -- you would use the word "similar" to describe
12 those two.
13   A.  Correct, because the goal of the device --
14 the goal of the device is to provide an image to a
15 neural network, and they both achieve the same goal.
16 One is better than -- one proved to not be
17 necessary -- in other words, two cameras proved not to
18 be helpful.  So it's just an additional cost.  So R12
19 dropped one of the two cameras and achieves the same
20 goals at least complexity and higher reliability.
21   Q.  So as long as it provides an image to a
22 neural network, that's all that matters?
23        MR. MELLEMA:  Objection, form.
24   A.  No, it's not all.
25   Q.  What else matters?

43

1    A.  Durability, the ability to withstand the
2  extreme environment of a dumpster, of a recycle bin,
3  would be one example.
4    Q.  Does field of view matter?
5    A.  Yes.
6    Q.  I thought you just said it didn't.
7    A.  I did not say it didn't.
8    Q.  So, then, is there a meaningful difference
9  between the R11 and R12 because they have different
10 fields of view?
11   A.  Only with respect to field of view.  In other
12 words, R11 had more field of view than they needed, so
13 having two cameras.  So it was found that cost savings
14 and reliability increase could be achieved by using
15 just one camera and adjusting the lens.
16   Q.  Who told you that?
17        MR. MELLEMA:  Objection, form.
18   A.  The documents, one of the Bates documents
19 from the engineers.
20   Q.  Which engineer?
21   A.  That would be Jay -- I'm sorry, I don't have
22 his last name in front of me.  But the hardware
23 engineer.  And I did talk to him briefly about it last
24 winter.
25   Q.  What have you talked about with Jay Long Son?

44

1        MR. MELLEMA:  Objection, form.
2    A.  I had had two conversations, one in, I think,
3  February of this year, and the second a few months
4  later, just to follow up with questions I had on the
5  design.
6    Q.  Have you met with him in order to prepare
7  this report?
8    A.  No, I didn't.
9    Q.  Have you spoken with any other RoadRunner
10 employee or ex-Compology employee in order to prepare
11 this report?
12   A.  No, I haven't.
13   Q.  Have you spoken with Forrest Vickery at all?
14   A.  No, I haven't.
15   Q.  Turning back to Paragraph 16.
16   A.  Okay.
17   Q.  Do you see the overall waste metering and
18 recycling technology for a smart waste container
19 mounted device trade secret?
20   A.  I see it.
21   Q.  Is that the same trade secret for the R11,
22 R12, R13, R13S, R13L?
23   A.  Yes.
24   Q.  So there's no difference between the trade
25 secrets?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024

45

1      MR. MELLEMA:  Objection, form.
2   **A.  I'm not clear on the implications of that.**
3   **They all serve as the input sensor for the system**
4   **devised by Compology for these purposes, waste**
5   **metering and recycle technology, optimizing the whole**
6   **process.**
7   Q.  But they do it in different ways; correct?
8   **A.  If you would let me know what you mean by**
9   **"ways," I'll try to answer that.**
10  Q.  Well, for example, we were just talking about
11  field of view.  They all have different fields of
12  view; correct?
13  **A.  Yes, I would say -- that's correct, yeah.**
14  Q.  So even though they all have different fields
15  of view, it's still the same trade secret, in your
16  mind?
17     MR. MELLEMA:  Objection, form.
18  **A.  Yes, it is.**
19  Q.  What is the range of the field of view that
20  defines the trade secret, then?
21     MR. MELLEMA:  Objection to form.
22  Q.  I'll reask it.  What is the range of fields
23  of view that defines the trade secret?
24     MR. MELLEMA:  Objection, form.
25  **A.  Apologies.  I heard you clearly.  I'm just**

46

1   **trying to think how to respond in a meaningful way.**
2   **I think that would be a more appropriate**
3   **question for Trade Secret No. 2, the overall waste**
4   **metering and recycling can work with a wide variety of**
5   **images.**
6   Q.  Going back to the ground rules we had:  I'd
7   ask you to answer my question.  Okay?
8   **A.  I'll try.**
9      MR. MELLEMA:  Is now a good time for a
10  break?
11     MR. GALICA:  Sure.
12     THE VIDEOGRAPHER:  We're off the record at
13  1:23 p.m.
14     (Recess taken.)
15     (Exhibit 413 marked for identification.)
16     (Exhibit 414 marked for identification.)
17     (Exhibit 415 marked for identification.)
18     (Exhibit 416 marked for identification.)
19     THE VIDEOGRAPHER:  The time is 1:32 p.m.
20  We're back on the record.
21  Q.  I'm going to turn to Exhibit 416, which is
22  the identification of trade secrets.  Let me know when
23  you get back to that one.
24  **A.  I'm there.**
25  Q.  And if you could go to Section E, that starts

47

1   on Page 15.
2   **A.  I'm there.**
3   Q.  And then beneath Section E, No. 4, on Page
4   18.  Let me know when you get there.
5   **A.  I'm there.**
6   Q.  Do you see the Empty Event Detection?
7   **A.  I do.**
8   Q.  That's not a trade secret that you opine on
9   in your report; correct?
10  **A.  Give me a second.  I'm going to look at it.**
11  **Just one second.  It's right here.**
12     **I did not.  I did not opine on that.**
13  Q.  Why didn't you?
14  **A.  It was just -- as it's stated in my report, I**
15  **chose the seven trade secrets as I enumerated in**
16  **Section VIII, and it was not part of my conclusion --**
17  **it was not part of my report.**
18  Q.  You reviewed the ID of trade secrets; right?
19  **A.  I did.**
20  Q.  So why then didn't you include empty event
21  detection, or why did you conclude that you shouldn't
22  include it in your report?
23     MR. MELLEMA:  Objection, form.
24  **A.  Again, it was a matter of having the**
25  **information to assemble, and I had plenty of other**

48

1   **work to do, so I didn't have what I needed and I just**
2   **continued with what I've written.**
3   Q.  Did you ask for any additional information?
4      MR. MELLEMA:  Objection, privileged.  You
5   can answer only to the extent that you're not going to
6   reveal attorney-client-privileged communications.
7   **A.  I don't recall the -- I don't recall what**
8   **the -- -- I don't recall what the communication was on**
9   **the topic.  I'd have to look at my notes.  It was a**
10  **while ago, and I've written a lot since.**
11  Q.  Going to No. 5, Page 19 of Exhibit 4.
12  **A.  I'm there.**
13  Q.  You see Rightsizing Recommendation
14  Generation?
15  **A.  I see it.**
16  Q.  You don't include any opinions on rightsizing
17  recommendation generation in your report; correct?
18  **A.  Correct.**
19  Q.  If you could go to No. 6, on Page 20.
20  **A.  I'm there.**
21  Q.  Do you see Post Auto-balancing ALJ?
22  **A.  Correct.**
23  Q.  You don't include any opinions on post
24  auto-balancing ALJs in your report; correct?
25  **A.  That is correct.**

---

**49**

1    Q.   And then further down on the Page 7, location
2  soft-locking technique.  Do you see that?
3    A.   I do.
4    Q.   And you don't include any opinions with
5  respect to location soft-locking techniques in your
6  report; correct?
7    A.   Correct.
8    Q.   And then you see on Page 21, 8.
9    A.   Yes.
10    Q.   Overall Software System?  Do you see that?
11    A.   I do.
12    Q.   You don't include any opinions with respect
13  to Overall Software System in your report; correct?
14    A.   Indirectly I do.
15    Q.   What do you mean by "indirectly"?
16    A.   The overall software system is discussed in
17  my report in many different sections.
18    Q.   I'm referring to Overall Software System as
19  you used it in Exhibit 416, No. 8, on Page 21.  Do you
20  understand what I mean by that?
21    A.   I do.
22        MR. MELLEMA:  Objection, form.
23    Q.   When I use "overall software system" in that
24  context, you would agree that you don't include any
25  opinions on the overall software system in your

---

**50**

1  report; correct?
2        MR. MELLEMA:  Objection, form.
3    A.   I'm not clear.  I don't have a -- I did not
4  speak to that in the combination of the technologies
5  enumerated here, but in different combinations I do
6  speak to this.
7    Q.   Well, in your report you don't have a section
8  called Overall Software System; correct?
9    A.   Well, Section 1, I would think Trade Secret
10  1, the overall waste metering and recycling technology
11  for a smart waste container mounted device, is similar
12  to the overall software system.  It's software-driven.
13    Q.   Do you see in Exhibit 416, the section we've
14  been talking about, that was alleged to be a
15  standalone trade secret.  Do you see that?
16    A.   I do.
17        MR. MELLEMA:  Objection, form.
18    Q.   You're not alleging that that's a standalone
19  trade secret in your report; correct?
20        MR. MELLEMA:  Objection, form.
21    A.   I'm offering not an opinion -- I'm not
22  offering an opinion.  It's just not included in that
23  combination in my report.
24    Q.   We can go back to your report, Exhibit 415,
25  and Paragraph 17.  What do you mean by "the Pello

---

**51**

1  device was derived from the Compology R12 camera
2  system"?
3    A.   Let me review my notes.  Would you give me
4  the page number again?  I had to switch documents on
5  my screen.
6    Q.   Sure, Paragraph 17 in Exhibit 415.
7    A.   Okay, I'm there.
8    Q.   What do you mean by "the Pello device was
9  derived from the Compology R12 camera system"?
10    A.   The components of the R12 were examined by
11  RTS, and the resulting prototype, the Pello camera,
12  showed to be derived from the R12 product.
13    Q.   And are you alleging that that is trade
14  secret misappropriation?
15        MR. MELLEMA:  Objection, form.
16    A.   I am merely -- I'm stating, as it read, that
17  the RTS team studied the R12 and used that as a basis
18  for building their camera system.
19    Q.   And I'm just trying -- these are the summary
20  of your opinions.  I'm trying to understand them.  Are
21  you alleging that that is trade secret
22  misappropriation?
23        MR. MELLEMA:  Objection, form.
24    A.   Some of it, yes.
25    Q.   Just some of it?

---

**52**

1    A.   No, I'm sorry.  Excuse me.  I was about to
2  say, I enumerate what I think -- what I think of
3  the -- what was taken from the learning that was
4  gained by the RTS team, and then later I discuss what
5  trade secrets were extracted from that examination of
6  the camera, I should say -- R12 -- excuse me, what was
7  learned by examining the R12 camera system, to be more
8  precise.
9    Q.   I'll see if you can provide a yes or no
10  answer.  Are you alleging that what you say in 17 is
11  trade secret misappropriation?
12        MR. MELLEMA:  Object to form.
13    A.   Yes.
14    Q.   And you don't offer the opinion that the
15  Pello device was derived from the R11 product;
16  correct?
17        MR. MELLEMA:  Objection, form.
18    A.   Yes, it was.  Just R12 was the closest, which
19  is why I studied R12.  But yes, it was also R11.
20    Q.   Why do you just say R12 here?
21    A.   It's just the closest match to what they
22  built, "they" being -- excuse me, what RTS built.
23    Q.   Was it derived from the R13?
24    A.   The -- I'd have to check my notes, but I
25  don't believe the R13 was a product at the time the

Case 3:23-cv-04804-WHA   Document 153-5   Filed 10/29/24   Page 10 of 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024
14 (53 to 56)

53

1  team began building the Pello device, or engineering
2  the Pello device. I'm sure it wasn't on the market
3  yet.
4      Q.  Do you see in Paragraph 18, towards the
5  bottom half, you state that you conclude "Compology's
6  training data was used to train Pello's dirt lens ML
7  model; two, Compology's training data was used to
8  train Pello's contamination ML models; and three,
9  Compology's training data was used to train Pello's
10 fill level determination ML models"? Do you see that?
11     A.  I do.
12     Q.  Are you offering the opinion that that is
13 trade secret misappropriation?
14         MR. MELLEMA:  Objection to form.
15     A.  Yes, I am.
16     Q.  So the act of training is trade secret
17 misappropriation?
18         MR. MELLEMA:  Objection to form.
19     A.  The training data is misappropriation.
20     Q.  But not the act of training itself?
21     A.  That I think speaks for itself.
22     Q.  I don't think it does. Is that a yes or a
23 no?
24     A.  Sorry, counselor. I apologize. The "act of
25 training" is a general term, as you pose it, is well

54

1  known to the industry. It's a standard -- it's a
2  standard practice, training a model.
3      Q.  Turning to Paragraph 19.
4      A.  Okay. I'm there.
5      Q.  You state that the Compology camera system
6  "has economic value by virtue of the trade secrets
7  embodied therein remaining secret. As but one
8  example, it took Compology 10 years and tens of
9  thousands of person-hours to develop the Compology
10 camera system and software, as well as expenditures of
11 $40 million in investment capital to develop and
12 refine." Do you see that?
13     A.  I do.
14     Q.  What's the basis for that opinion?
15     A.  The basis of -- I would just read it back.
16 But ten years to develop the product. Part of the
17 reason it took so many years is it requires a
18 tremendous amount of images and data to train a model,
19 which they laboriously spent. Training, the process
20 of training, is one thing, but the most time-consuming
21 element of the entire system was acquiring the images
22 and then labeling them accurately. Without that data,
23 the system will not operate very well or at all.
24     Q.  And how long did it take to develop the R11?
25         MR. MELLEMA:  Objection to form.

55

1      A.  What part of it? There's many --
2      Q.  Any part of it.
3      A.  I don't know.
4          MR. MELLEMA:  Objection, form.
5      A.  I can look at the timeline. You know, it's
6  circuit board design, choosing the lens, the image
7  sensor, solving the problem of temperature extremes as
8  ████████████████████ -- solving many, many
9  problems, of radio data transmissions inside a lens.
10 There was a lot of hard problems to solve.
11     Q.  So do you know how long it took?
12     A.  They said ten years. I'll stick with what I
13 wrote.
14     Q.  Who said ten years?
15     A.  The company has stated that it took ten years
16 and tens of thousands of person-hours to develop their
17 Compology camera system and --
18     Q.  What did you do to independently verify that?
19     A.  I can't.
20     Q.  So you just took the company's word for it.
21 Correct?
22     A.  Yes.
23     Q.  How long did it take to develop the R12?
24         MR. MELLEMA:  Objection to form.
25     A.  Excuse me, I wish to amend my last comment.

56

1  Can I do that, that I took the company's word for it?
2      Q.  We already have the answer, so that's fine.
3      A.  Okay.
4      Q.  How long did it take to develop the R12?
5      A.  The R12 is a derivative of the R11, so I
6  would expect the ordinary engineering cycle of
7  probably a year in the lab, they had a prototype to go
8  to production, from my own experience.
9      Q.  How long did it take to develop the R13?
10         MR. MELLEMA:  Same objection.
11     A.  I would guess roughly the same, for further
12 refinement of the technology.
13     Q.  And so did the R11 take the full ten years to
14 develop?
15         MR. MELLEMA:  Objection, form.
16     A.  I believe, from the data I examined, the
17 number of images that were used to train indicates it
18 took at least two thirds of that time to build that
19 image database -- in other words, six or seven years
20 to have enough data to train a full ML model.
21         And so the rest of that's engineering
22 time. I guess you could guess, as I said,
23 approximately one year per revision of the hardware.
24 So they have three -- the equivalent of four revisions
25 from prototypes. That adds up; six years of image and

---

**57**

1  training research, four years of hardware -- including
2  the fact that during the hardware development they're
3  also continuing training. So they didn't just stop
4  cold after the first, say, six years.
5      I just say from the data examined and the
6  amount of data they built, I think ten years looked
7  very credible.
8      Q. How long did it take to develop the R13?
9          MR. MELLEMA: Objection, form.
10     A. The three models, the hardware is -- the
11 printed circuit board probably took a year, as I said,
12 and then whatever the mechanical issues were with the
13 different case designs that they were working on. I
14 don't particularly -- other than my own experience --
15 I can take a guess, it's six months to a year to --
16 six months for case design, to say we're happy with
17 the rest of the design.
18     Q. Did you review any financial documents as
19 part of your analysis in authoring your report?
20     A. I didn't -- I did not use them as part of my
21 report. I did see a few estimates, including bill of
22 materials, the production run costs, et cetera.
23     Q. So how do you know that $40 million in
24 investment capital was received?
25     A. I'm sure that's public. I mean, if they

**58**

1  raised funds -- I've started six companies in my
2  career and been part of two others, and when you raise
3  money, it's public information.
4      Q. Did you look it up?
5      A. No.
6      Q. How much of the $40 million in investment
7  capital was used to develop the R11 hardware?
8          MR. MELLEMA: Objection, form.
9      A. That wasn't relevant to my discovery, to my
10 examination of the products.
11     Q. So you don't know how much; correct?
12     A. I don't have a meaningful number, correct.
13     Q. Do you know how much money of that $40
14 million investment capital was used to develop the R11
15 software?
16     A. I think my previous answer applies to
17 anything to do with the capital outlay, other than
18 what was stated.
19     Q. I appreciate that. So maybe to short-circuit
20 it: You don't have any idea how the $40 million in
21 investment capital was spent?
22          MR. MELLEMA: Objection to form.
23     Q. I'll reask it. You don't know how the $40
24 million in investment capital was spent; correct?
25          MR. MELLEMA: Objection, form.

**59**

1      A. I can estimate, based on the work product of
2  the team.
3      Q. That would be speculating, though; correct?
4      A. Well, the 30 years of experience starting
5  companies, it would be pretty -- it would be well-in-
6  the-ballpark estimates.
7      Q. Did you look at a financial document from
8  Compology or RoadRunner to verify that?
9      A. No, I didn't.
10     Q. Do you know what the economic value of each
11 RoadRunner trade secret is?
12          MR. MELLEMA: Objection.
13     A. I wasn't asked to ascertain that.
14     Q. So you don't know?
15          MR. MELLEMA: Objection, form.
16     A. I'm not prepared to make a comment -- to
17 comment on that.
18     Q. But you did not perform an analysis to
19 identify the independent economic value of any trade
20 secret; correct?
21          MR. MELLEMA: Objection, form.
22     A. Although my expertise is broad in software
23 and hardware, I am not a damages expert, so I'll stay
24 out of that arena.
25     Q. You didn't have any conversations with the

**60**

1  damages expert in this case; correct?
2      A. Correct.
3      Q. If we could turn to Paragraph 28 in your
4  report.
5      A. I'm there.
6      Q. In that paragraph you state that your
7  inspection revealed that the web application
8  identifies the major building blocks of RoadRunner's
9  algorithms and processes. Do you see that?
10     A. Yes.
11     Q. What are the major building blocks of
12 RoadRunner's algorithms and processes?
13     A. Let me check my declaration. I do believe I
14 discuss that. One second here.
15     Q. And maybe I'll try to short-circuit it, so we
16 don't have you searching through everything. We'll
17 get to where I think you're probably headed.
18     A. Okay.
19     Q. So I'll withdraw my previous question, ask
20 another one.
21     A. All right.
22     Q. Do you think that Compology's web application
23 discloses Compology's trade secrets?
24          MR. MELLEMA: Objection, form.
25     A. Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024                    16 (61 to 64)

61

1    Q.  And then further in that paragraph you see
2  that "RoadRunner's algorithms and processes to its
3  customers (under confidentiality agreements)"?  Do you
4  see that?
5    A.  Sorry.  I just turned away.
6        MR. MELLEMA:  Where are we now you?
7        MR. GALICA:  Still in Paragraph 28.
8    Q.  I'll withdraw the question, ask it again.  In
9  the same sentence we were just discussing, "My
10  inspection revealed that the web application
11  identifies the major building blocks of RoadRunner's
12  algorithms and processes to its customers (under
13  confidentiality agreements)."  Do you see that?
14    A.  Yes.
15    Q.  What confidentiality agreements are you
16  referring to?
17    A.  My understanding is, under contract, the
18  tagged images are a good example.  The customer, in
19  this case RTS, is allowed to look at them for the
20  purposes of understanding what the various conditions
21  have been, but they are not permitted to keep the
22  images and then use them to train their own machine
23  learning model, is one.
24        The general business of -- strike that; I
25  didn't mean "business."  The general operation of the

62

1  software system of Compology is revealed -- like, how
2  they do what they call -- well, their version of
3  geofencing, soft-locking, they called it, and how they
4  managed other aspects, such as having the bins report
5  slightly random, is a good example, so they don't
6  overload a server system -- and thereby ALJs that
7  reach the overall goal for the whole system as a
8  general -- excuse me, algorithms that give the purpose
9  of the whole system, and that is to optimize pickup,
10  optimize pickup cycles, the number of bins needed, et
11  cetera.
12    Q.  You're saying that's all in the
13  confidentiality agreements, what you just said?
14        MR. MELLEMA:  Objection, form.
15    A.  That's the -- those are just examples of what
16  is the confidential business of -- or the -- sorry,
17  the purpose of the system software that Compology
18  shared with RTS.
19    Q.  I'm talking about the confidentiality
20  agreements you refer to in Paragraph 28 of your
21  report.  Do you see that?
22    A.  Yeah.
23    Q.  Have you ever seen those confidentiality
24  agreements that you reference?
25    A.  I do.  It's been -- I'd have to pull them up

63

1  from the exhibits, if you'd like me to make reference
2  to it.
3    Q.  Well, in your report or your materials
4  considered?
5    A.  I'm sorry, I'm just reading.  My apologies.
6  Between paper and the screen, I lost my place.
7    Q.  I have a question pending, so I'll ask them.
8  What confidentiality agreements are you referring to
9  there?
10    A.  I'm referring to none.  I'm sorry, I got off
11  base here.
12    Q.  So you would amend your report to delete
13  "under confidentiality agreements" in Paragraph 28?
14        MR. MELLEMA:  Objection, form.
15    A.  No, I wouldn't delete it.
16    Q.  So, then, what confidentiality agreements are
17  you talking about?
18    A.  The overall understanding that in the
19  confidentiality -- that the -- the examples I gave,
20  such as the image data coming back from the camera
21  sensors was confidential.  It revealed -- the images
22  came back with correctly tagged labels, which were a
23  part of a confidentiality agreement not to share
24  those -- not to use those for machine learning, is one
25  example.

64

1    Q.  And did you -- have you seen those
2  agreements?
3    A.  That is what I was circling back to a moment
4  ago.  I thought they were in the exhibits, but -- I
5  certainly have it somewhere.  I can find it.
6    Q.  I'm trying to stick within your report.
7    A.  I don't have it within the context -- within
8  the realm of my report and exhibits, I don't have that
9  confidentiality agreement.  It's just general, from
10  examining the overall case work.
11    Q.  Do you know who owns the images?
12        MR. MELLEMA:  Objection, form.
13    A.  I would probably decline to answer.  I didn't
14  pay attention to that.  I don't think -- it wasn't
15  relevant to my analysis, so I didn't pay attention to
16  that nuance, if you will.
17    Q.  The nuance of who owns the trade secret you
18  allege exists in this case?
19        MR. MELLEMA:  Objection.
20    A.  I'm sorry, counsel, would you repeat the
21  question?
22    Q.  That you didn't pay attention to the nuance,
23  if you will.  Do you recall that?
24    A.  Yes.
25    Q.  And I asked "the nuance of who owns the trade

Case 3:23-cv-04804-WHA   Document 153-5   Filed 10/29/24   Page 13 of 40
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024                17 (65 to 68)

65

1  secret you allege exists in this case"?
2      **A.  The answer is no.**
3          MR. MELLEMA:  Objection, form.
4      **A.  No, that's not what I meant.**
5      Q.  What did you mean?
6      **A.  You asked me who owns the images.  That's not**
7  **to do -- that's a separate issue from what you can do**
8  **with them.**
9      Q.  Well, does it relate to whether a trade
10 secret exists?
11         MR. MELLEMA:  Objection, form.
12     **A.  I'm sure it does.**
13     Q.  And you didn't endeavor to find out who owns
14 the images?
15         MR. MELLEMA:  Objection, form.
16     **A.  I did not endeavor.  I just understood that**
17 **the user of the Compology system agrees to not use the**
18 **images to train a machine learning model.**
19     Q.  We can go ahead to Paragraphs 31 and 32 in
20 your report.
21     **A.  I'm there.**
22     Q.  I'll just let you read through them.
23         MR. GALICA:  I'm going to add an exhibit
24 as well.  We can add TS1 into the chat.
25         THE TECHNICIAN:  TS1, Exhibit 417, is now

66

1  in the chat.
2          (Exhibit 417 marked for identification.)
3      Q.  Could you just grab that and let me know when
4  you've had a chance to review it -- or download it, I
5  should say.
6      **A.  I have something in front of me.**
7      Q.  Have you had a chance to download it?
8      **A.  Yes, I've downloaded it.**
9      Q.  And I'll represent to you that we did a PDF
10 compare of Paragraphs 31 and 32 of your report with
11 lines -- starting on Line 23, Page 4, to Line 19 of 5,
12 from Exhibit 416, the identification of trade secrets.
13         So you didn't write that section of your
14 report; correct?
15         MR. MELLEMA:  Objection, form.
16     **A.  I certainly read it.  I wrote this with the**
17 **able help of counsel.  I did not write that paragraph,**
18 **other than reading it and accepting it.  I did do**
19 **that.**
20     Q.  So you just took what counsel wrote and put
21 it into your report?
22         MR. MELLEMA:  Objection, form; also
23 objection, privilege.  You can answer only if you can
24 do so without revealing attorney-client
25 communications.

67

1      **A.  Please restate your question, counsel.**
2      Q.  So you took what counsel wrote and put it
3  into your report; correct?
4          MR. MELLEMA:  Same objections.
5      **A.  For that paragraph that we have in front of**
6  **us in TS1.pdf, I did cut and paste.**
7      Q.  And this is your identification of the trade
8  secrets in this case in your report; correct?
9      **A.  Correct.**
10         MR. MELLEMA:  Objection, form.
11     **A.  Yes.**
12     Q.  We can return back to your report, just so we
13 stay in one document, Paragraph 32.
14     **A.  I am there.**
15     Q.  You see starting about halfway continuing to
16 the bottom of that paragraph there's a string of legal
17 citations.
18     **A.  Yes.**
19     Q.  Did you review those?
20     **A.  Actually, most of them, yes -- summaries, but**
21 **just what they were.**
22     Q.  So you pulled the cases and read through the
23 entirety of them?
24         MR. MELLEMA:  Objection, form.
25     **A.  No.**

68

1      Q.  Did you direct -- look up the last one that
2  you added?
3          MR. MELLEMA:  Objection, form; also,
4  objection, privilege.  To the extent you can answer
5  without revealing attorney-client communications, you
6  can do so.
7      **A.  That was a fascinating case.**
8      Q.  You read it?
9      **A.  Not entirely; only a summary.**
10     Q.  Just what's stated in Paragraph 32?
11         MR. MELLEMA:  Objection, form.
12     **A.  Basically.**
13     Q.  Do you know what products were involved in
14 that case?
15     **A.  Well, 214, the Minolta -- Minolta is, of**
16 **course, a camera manufacturer, and I believe the --**
17         **I would have to refer to my notes.  But**
18 **just basically, it's to do with photography for image**
19 **capture, and Minolta was a trade leader at the time.**
20     Q.  Going back to Paragraph 31.  Your report
21 states that the trade secrets include the overall
22 know-how.  Do you see that?
23     **A.  Yes.**
24     Q.  What's the know-how?
25         MR. MELLEMA:  Objection, form.

69

1    A.  That would be -- the overall know-how would
2  be the construction and operation -- successful
3  operation of a camera system in an adverse
4  environment, the requirements of the job the camera is
5  to do for the customer utilizing the system -- just
6  as -- I think it's reasonably well stated here.
7    Q.  Is there a specific hardware file that
8  defines it?
9        MR. MELLEMA:  Objection, form.
10    A.  I don't think I understand what you mean by
11  "hardware file."
12    Q.  Well, where in Compology's engineering
13  documents does the know-how exist?
14        MR. MELLEMA:  Objection, form.
15    A.  I believe I wrote the trade secrets include
16  the overall know-how.  That means the system --
17  understanding the system as a whole.  And then I
18  enumerate some of the components in the rest of this
19  paragraph.  I don't know if I could express it
20  differently.
21    Q.  What's the difference between the know-how
22  and the design?
23        MR. MELLEMA:  Objection, form.
24    A.  A design would be specific components of the
25  overall system, which it states right after that word.

70

1    Q.  So what components define the trade secret
2  here?
3        MR. MELLEMA:  Objection, form.
4    A.  I'm stating that the overall system is --
5  includes the overall know-how, meaning all of the
6  components together.
7    Q.  So it has to be all of the components that
8  the Compology device uses; correct?
9        MR. MELLEMA:  Objection, form.
10    A.  If that's a legal determination, I'm not --
11  I'm not equipped to answer.
12    Q.  I don't think it is.  I'm just trying to
13  understand what components you're talking about.
14    A.  I list them here.
15    Q.  So it's all of these components that need to
16  be there for this trade secret?
17        MR. MELLEMA:  Objection, form.
18    A.  I'm not prepared to answer what percentage of
19  all of my enumerations have to be present.
20    Q.  So you don't know what percentage of your
21  enumerations need to be present; correct?
22        MR. MELLEMA:  Objection to form.
23    A.  To answer your question specifically on how
24  to define "overall know-how," in that context, I don't
25  know if you could drop off a particular step and then

71

1  declare you're not -- declare you're free of trade
2  secrets.  So I don't know how to determine that.
3    Q.  So you don't know what's in or out of this
4  trade secret; correct?
5        MR. MELLEMA:  Objection, form.
6    A.  I'm giving an example of an overall system
7  that required an extraordinary amount of novelty to
8  create and operate as a system to produce a useful
9  product for a customer to rent, purchase, or lease.
10  And this is -- these are the parts that I saw going
11  into it that define overall know-how.
12        MR. GALICA:  I'm going to add another
13  exhibit.  It's actually titled Exhibit 1-19.
14    Q.  If you could just let me know when you get
15  that downloaded.
16        THE TECHNICIAN:  In the chat, Exhibit 418.
17        (Exhibit 418 marked for identification.)
18    A.  I have it.
19    Q.  Within the document, just so we can navigate
20  it more easily, there's a number of exhibits in the
21  exhibit, if that makes sense.  Do you see it starts
22  with Exhibit 1?
23    A.  Yes, I see it.
24    Q.  So let's just focus on Exhibit 1.  You see
25  that?

72

1    A.  I do.
2    Q.  What on this drawing is in the overall waste
3  metering trade secret?
4        MR. MELLEMA:  Objection, form.
5    A.  This is the exploded view of part of the
6  chassis of what looks like the R12 camera unit.  And
7  it's simply a part of the -- a crucial part of the
8  technology.
9    Q.  So can you point me where in this document
10  the trade secret is?
11        MR. MELLEMA:  Objection, form.
12    A.  This is an assembly drawing, and I don't
13  think there's anything I can point to that would --
14  other than the whole R12 assemblies, as part of many
15  drawings defining the product.
16    Q.  So it has to be everything in this drawing,
17  then; right?
18        MR. MELLEMA:  Objection, form.
19    A.  I can't answer.
20    Q.  Going to Exhibit 2.  Let me know when you get
21  there.
22    A.  I'm there.
23    Q.  What about this drawing is a trade secret?
24        MR. MELLEMA:  Objection, form.
25    A.  The choice of -- it's the -- this is a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024

19 (73 to 76)

73

1 schematic of a circuit, and it's that you would learn
2 a -- a trade secret perhaps would be the light for the
3 flash, although the specific model of the LED labeled
4 D as in "delta" 1 is not material, the general notion
5 of how a flash could be incorporated in a low-power
6 system is valuable, and it required research to derive
7 this.
8     Q.  So you're saying this unique implementation
9 and configuration is the trade secret?
10     MR. MELLEMA:  Objection, form.
11     A.  Not the unique circuit, but the circuit
12 design would teach -- would teach a skilled person how
13 to build a flash in a low-power environment and how --
14     Q.  What about this specific drawing would teach
15 you that?
16     MR. MELLEMA:  Objection, form.
17     A.  Looking up the part, seeing what delta 1, D1,
18 and understanding it's very different from a
19 traditional LED; then looking further at the circuit
20 and understanding the -- how the flash is fired.
21     Q.  So you would agree this is a nontraditional
22 LED, then?
23     A.  Yes, I would.
24     MR. MELLEMA:  Objection, form.
25     Q.  Do you know whether RecycleSmart ever had

74

1 access to Compology's schematics?
2     A.  I don't know if they did.  I doubt they did.
3     Q.  But so it's your position that the unique
4 configuration and implementation of this specific
5 flash is part of the trade secret?
6     MR. MELLEMA:  Objection, form.
7     A.  The RTS team disassembled R12, and they were
8 able to examine the flash and learn what D1 was, and
9 that would be very simple to trace the circuit to gain
10 knowledge of how they -- how Compology operates this
11 critical component.
12     Q.  So you think it's critical Compology uses a
13 flash?
14     MR. MELLEMA:  Objection, form.
15     A.  In certain -- in certain lighting situations,
16 a flash is necessary; and when you're operating --
17 when it's engineered, must operate for five or more
18 years on a nonrechargeable battery, this becomes a
19 very important decision for the successful operation
20 of the product.
21     Q.  Do you think Compology kept it confidential
22 that it uses a flash with its camera?
23     MR. MELLEMA:  Objection, form.
24     A.  The use of a flash is not -- is evident by
25 looking at the product.

75

1     Q.  Anywhere else that it's evident?
2     A.  I'm sorry, I don't know how to answer that.
3     Q.  I'll ask a better question.  Do you think
4 it's public knowledge that Compology uses a flash with
5 its camera?
6     A.  It depends on their marketing literature and
7 how they -- I did not study their marketing
8 literature.  So if they have -- if they have a website
9 or marketing literature and they display the product,
10 one could see there is something that is un -- it may
11 not be on the face of the product, but this part is
12 visible.
13     Q.  Do you know what flash circuit Compology
14 uses?
15     MR. MELLEMA:  Objection, form.
16     A.  I assume these schematics were accurate.
17     Q.  Who makes it?
18     MR. MELLEMA:  Objection, form.
19     A.  I'm sorry, who makes what?
20     Q.  The flash component.
21     A.  You mean the actual diode?
22     Q.  Yeah.
23     A.  It's on their -- it's on their BOM.  They had
24 a couple of choices, but it's on their bill of
25 materials.

76

1     Q.  Do you know, as you sit here right now?
2     A.  I can very easily look it up for you.
3     Q.  My question was a little different.  Do you
4 know, as you sit here right now?
5     A.  There are three or four companies, and I
6 don't recall which one they chose.
7     Q.  Do you know what flash component the Pello
8 system uses?
9     A.  I -- in disassembling their system, they had
10 a similar family of LED that they use.  It's not
11 broadly used elsewhere.
12     Q.  What do you mean, it's not broadly used
13 elsewhere?
14     A.  I mean it is not a common LED seen in, say,
15 consumer products or even many commercial products.
16 It's a specialty part.
17     Q.  What led you to that conclusion?
18     A.  My deep knowledge of semiconductors and
19 looking up the part that is used by Compology.
20     Q.  And what part was that?
21     A.  We're referencing the diode.
22     Q.  Is that depicted in Exhibit 2, that we have
23 up?
24     MR. MELLEMA:  Exhibit 2?  I'm sorry.
25     MR. GALICA:  It's Exhibit 2 within Exhibit

77

1  417.
2        MR. MELLEMA:  Oh, I see.
3     A.  I believe so.
4     Q.  Where?
5     A.  We've been talking about it, D delta 1, is
6  the designator on the schematic, and the diode with
7  the two arrows emanating from its cathode is the flash
8  LED.
9     Q.  So that and all the configuration
10 implementation details depicted here, that's the trade
11 secret?
12       MR. MELLEMA:  Objection to form.
13    A.  My report does not -- excuse me a second.  I
14 need to refer to my report on the details of that.
15       Okay, I'm back, I'm ready.
16    Q.  Okay.
17    A.  So unfortunately you'll have to restate your
18 question so I'm answering properly.
19    Q.  What were you looking for in your report?
20    A.  I was just looking for how I express the
21 specialty of that diode.
22    Q.  And how do you express it?
23    A.  I was pointing out that the RTS team, if I
24 may use a colloquial expression, went to school on the
25 R12 design and learn many important design functions

78

1  of a successful and deployable camera system in a
2  harsh environment.  And amongst those -- I am so
3  sorry.  I meant to put that on silent.  It's on
4  silent.
5        And this is just an example.  Other
6  examples were enumerated elsewhere in that section of
7  my report that I was reading.
8     Q.  And how does that express the specialty of
9  the diode?  Explain that again.
10    A.  Each component in the R12 was carefully
11 chosen -- or, sorry, many of the components in R12
12 were carefully chosen to perform a specific and
13 rare -- generally rare task relative to ordinary
14 electronic systems.  And the diode chosen was one of
15 those specialty products that's not commonly known or
16 used.  So that was along with the many others that I
17 enumerated.
18    Q.  So, then, it would have to be the specific
19 diode that you're saying is part of the trade secret;
20 right?
21    A.  I'm saying that family of diodes is part of a
22 trade secret -- sorry, is part of the design of the --
23 strike that.  It's part of the design of a specialized
24 product that the RTS team copied to build their
25 device -- design their device, I should say -- design

79

1  and build their Pello device.
2     Q.  And I understand that you want to answer my
3  questions in that way.  I'm only asking about the
4  identity of the trade secret you allege exists.  I
5  understand you have allegations as to what my client
6  has done.  But I need to understand with specificity
7  the trade secrets that you allege exist.  So I'd
8  appreciate if you try to answer my questions with that
9  in mind.  Is that fair?
10       MR. MELLEMA:  Objection, form.
11    A.  I understand.  I will attempt to comply.
12    Q.  Thank you.  So let's go back to -- well,
13 we're still on Exhibit -- within Exhibit 417, I'm
14 going to have you go to the next page within Exhibit
15 2.
16       MR. MELLEMA:  I think you mean 418?
17       MR. GALICA:  You're right, 418.
18    A.  Would a Bates number on the page be easier?
19    Q.  It's ROADRUNNER123.
20    A.  I'm there.
21    Q.  So what in here defines a trade secret?
22       MR. MELLEMA:  Objection, form.
23    A.  I do not offer an opinion on that.
24    Q.  Let's go to ROADRUNNER125.
25    A.  I'm there.

80

1     Q.  What on this page defines a trade secret?
2        MR. MELLEMA:  Objection, form.
3     A.  As a system block diagram, this conveys the
4  critical part -- or the architecture of the camera,
5  which is a unique design that required years of
6  research and development to derive.
7     Q.  So it's this unique design and architecture
8  that's the trade secret; is that correct?
9        MR. MELLEMA:  Objection, form.
10    A.  In checking my declaration, Trade Secret 2 is
11 the smart camera apparatus for a waste container
12 mounted device.  I enumerate the various features that
13 are required to perform the function in a waste
14 container.  This block diagram represents the R12
15 system as it was designed and built.  And as that is
16 part of the waste container camera system, it is a
17 trade secret.
18    Q.  This whole thing -- this -- everything on
19 ROADRUNNER125 is part of the trade secret?
20       MR. MELLEMA:  Objection, form.
21    A.  As a system diagram, it represents the design
22 of the -- of the Compology camera.
23    Q.  Designed differently, it wouldn't be the
24 trade secret; right?
25       MR. MELLEMA:  Objection, form.

81

1    A.  Not necessarily.  There are alternate ways to
2  achieve the same -- the same functions.
3    Q.  So you're saying a different design would
4  still be the trade secret, the unique trade secret?
5        MR. MELLEMA:  Objection, form.
6    A.  Because that gets back to case law, and I'm
7  not -- I'm not prepared to draw a line where you could
8  change elements and avoid the trade secret.
9    Q.  So you can't draw a boundary as to what the
10  trade secret is and what the trade secret isn't; is
11  that correct?
12    A.  No, it's not correct.
13    Q.  So, then, please identify the boundaries of
14  the trade secret.
15        MR. MELLEMA:  Objection, form.
16    A.  I would refer to my definition in my expert
17  report on Trade Secret 2.  I believe that enumerates
18  my opinion, that is Section B, Trade Secret No. 2, and
19  a smart camera apparatus for a smart waste container
20  mounted device.  And it defines what constitutes the
21  trade secret.  I'm happy to read it, but I think
22  it's --
23    Q.  That's quite all right, sir.  We have the
24  words.  I'm trying to understand what they mean.
25        Let's go to ROADRUNNER126.

82

1    A.  I'm there.
2    Q.  Is this part of the overall waste metering
3  trade secret?
4    A.  This is the MCU, the microprocessor control
5  unit, from the previous block diagram.
6    Q.  Is this part of the overall waste metering
7  trade secret?
8    A.  It is a component of the system.
9    Q.  And is it this unique configuration component
10  in its implementation that's part of the trade secret?
11    A.  I would -- I would have to answer that its
12  contribution to the device is part of the trade
13  secret, which would include the software side.  But
14  that's the best I can answer that.
15    Q.  So it's not the unique configuration, then;
16  correct?
17        MR. MELLEMA:  Objection, form.
18    A.  I don't actually understand what your point
19  is on this.  I apologize.  But I'll try and --
20    Q.  Start with the component.  Does the trade
21  secret -- strike that.
22        Is the specific component,
23  microcontroller, part of the trade secret?
24        MR. MELLEMA:  Objection, form.
25    A.  The microcontroller is almost identical to

83

1  the one used in the Pello device, in the ST part,
2  which is a well-known MPU.  The device itself is
3  available from multiple vendors, and so I believe --
4    Q.  So what's unique about it?
5    A.  I don't believe the microcontroller is unique
6  as a piece of hardware.  Excuse me, let me conclude.
7  It's not unique as an element on a circuit board.
8    Q.  How is it a trade secret, then?
9    A.  Again, my Section 2 on the camera apparatus
10  is to the combination of parts that were chosen to
11  build the camera, or the camera systems, is enumerated
12  in this section.  And a chip selection can be
13  almost -- there are dozens of choices.  So I would not
14  say choice of chip.  But the type of chip could be.
15  If somebody discovered if there is a particular
16  subsystem that depended on it, that it could be a
17  critical part.  But as an MCU that's used in the
18  billions, I would not say the hardware chip itself
19  represents anything but the choice of a common -- a
20  common part for an embedded -- for a system of this
21  type.
22    Q.  You'll recall we were talking about how you
23  said there's know-how and design that make up the
24  overall waste metering trade secret; right?
25    A.  Correct.

84

1    Q.  I mean, you just said that the choice of the
2  microcontroller doesn't matter; right?
3        MR. MELLEMA:  Objection to form.
4    A.  I just said it's a common choice.
5    Q.  So is that part of the know-how and design?
6    A.  It's part of know-how, I agree.
7    Q.  Is it just the idea of using a
8  microcontroller, is that part of the know-how and
9  design?
10        MR. MELLEMA:  Objection, form.
11    A.  The type of microcontroller could be in a
12  low-power system, because not all microcontrollers
13  operate well in a low-power environment, would be a
14  good example.
15    Q.  You said could be.  I'm asking you what it
16  is, what the trade secret is.  Do you understand that?
17    A.  I do.
18    Q.  Okay.  So is the type of microcontroller --
19  strike that.
20        Is the type of microcontroller part of the
21  know-how and design that makes up the trade secret?
22        MR. MELLEMA:  Objection, form.
23    A.  The combination of parts represents know-how
24  that is -- that is a trade secret, yes.  It becomes
25  part of the trade secret in combination with the other

---

85

1  choices made to produce a functioning product.
2      Q.  Can you identify with any more specificity
3  what the know-how and design is that you say is part
4  of the overall waste metering trade secret?
5          MR. MELLEMA:  Objection, form.
6      A.  I thought I did that in my Section 2, Camera
7  Apparatus.
8      Q.  That's a separate trade secret; correct?
9          MR. MELLEMA:  Objection, form.
10     A.  My apologies.  I thought we were speaking
11 about the smart camera apparatus, of which that block
12 diagram was the core.
13     Q.  Turn back to the overall waste metering trade
14 secret.  So in the overall waste metering trade
15 secret -- do you understand what I'm talking about?
16 The first trade secret.
17     A.  We're back.  Okay.
18     Q.  Can you identify with as much specificity as
19 you can what you mean when you say "the overall
20 know-how and design" is part of the trade secret?
21     A.  Allow me to review what I wrote on Trade
22 Secret 1.  I'm sorry, I was off by one with you.
23     I define the system in the enumeration --
24 in the Trade Secret 1, overall waste metering and
25 recycling technology for a smart waste container

---

86

1  mounted device -- I stated that the overall waste
2  metering and recycling technology, including the
3  cameras, available cameras from Compology, its
4  firmware and -- in other words, the cameras, its
5  firmware and its software.  As I describe in detail,
6  the Compology camera R11 through R13, S and L
7  variations, includes electronics -- includes
8  electronic, optoelectronic, and mechanical active and
9  passive components and design implementations.  I also
10 examine the Compology source code, which implements
11 sophisticated machine learning techniques and data
12 analytics in the form of algorithms and processes,
13 which it distributes to its customers via a web
14 application, which I also examined.
15         In summary, that's the whole system.  If
16 we want to focus specifically on the camera apparatus,
17 in Paragraph 31, I find that "RoadRunner's trade
18 secrets include the overall know-how and design of its
19 system, including physical hardware components, such
20 as the camera system, optical assembly, and design;
21 firmware, such as its image processing techniques
22 implemented in the camera apparatus, training data,
23 machine learning models, and AI system implementing
24 the machine learning models, which includes algorithms
25 and processes to generate data, analysis, and

---

87

1  recommendations to the customer, including fullness,
2  emptiness, contamination schedules, data ingestion
3  efficiencies and location analysis of waste
4  containers."
5      Q.  All right.
6      A.  I can keep going, but I think that covers
7  what I think -- and I have paragraphs here that -- the
8  parts of the camera, if that would be helpful.
9      Q.  I don't need you to reread your report.  I'm
10 giving you the opportunity to provide any additional
11 detail beyond what's just written in your report.
12         MR. MELLEMA:  Objection to form.
13     A.  I don't have any additional detail than what
14 I wrote.
15     Q.  Okay.  We can go to Paragraph -- actually,
16 we've been going for a while, I think.
17         MR. GALICA:  Is now a good time for a
18 quick break?
19         MR. MELLEMA:  Mr. Hoarty has something
20 that he has to attend to right at noon today, Pacific
21 Time.  We could do it now, or we could wait a few
22 minutes, whatever you'd like to do.
23         MR. GALICA:  How long is the thing going
24 to take?
25         THE WITNESS:  Fifteen minutes.

---

88

1          MR. GALICA:  We'll just keep going, then,
2  until -- I guess it's only another ten minutes or so.
3          THE WITNESS:  Okay.
4      Q.  I'm going to direct your attention to
5  Paragraph 46 of your report.  I have another exhibit
6  for you to pull down, TS2.
7          MR. GALICA:  I guess it will be Exhibit
8  419.
9          THE TECHNICIAN:  TS2, Exhibit 419, is now
10 in the chat.
11         (Exhibit 419 marked for identification.)
12     A.  It just took a second here.  All right.
13     Q.  So Exhibit -- sorry, Exhibit 419 I'll
14 represent to you, we did a PDF compare of Paragraph 46
15 in your report and then Lines 6 through 14 on Page 7
16 of the identification of trade secrets.  So you'd
17 agree that this is just a copy-and-paste from the
18 identification of trade secrets; correct?
19     A.  Correct.
20     Q.  And you didn't write the identification of
21 trade secrets; correct?
22     A.  I did not write this paragraph.
23     Q.  Is there just one camera apparatus trade
24 secret, or is there a different one for the R11, R12,
25 and R13 and its variants?

89

1    A.  In my report I discuss the R family, 11
2  through 13, under the -- within the context of trade
3  secrets.
4    Q.  So is there a separate trade secret for the
5  R11 and then a different one for the R12, a different
6  one for the R13, a different one for the R13S, and a
7  different one for the R13L?
8    A.  In my Trade Secret 2 I discuss all of the R
9  family products together under the camera apparatus.
10   Q.  My question calls for a yes or no answer.  Is
11 there a different smart -- trade secret for the R11
12 and then a different one for the R12 and then a
13 different one for the R13 and then a different one for
14 the R13S and then a different one for the R13L?
15   A.  That's a legal question.  I'm not prepared --
16 I treated them as one.  I'm not prepared to discuss if
17 there's any legal difference.  To me they're one --
18 they're a group --
19        I treated them together, and I'm not
20 making an opinion on that issue.
21   Q.  So in Paragraph 46 you state that the "trade
22 secret includes a smart camera, including a CCM with
23 wide FOV camera lens, battery pack, high-durability
24 injection-molded parts, including a 'double shot' rear
25 housing with TPE overmolding, front housing with

90

1  recessed sensors for debris shielding, and camera and
2  flash PCBA cutouts and mounting, and optical windows
3  with high scratch-resistance and specialized coatings;
4  printed circuit board assemblies containing
5  microcontrollers, external RAM integrated circuit,
6  environmental sensors, and a camera flash LED."
7  Correct?
8    A.  Yes, that is correct.
9    Q.  So the trade secret has to include all those
10 components; correct?
11       MR. MELLEMA:  Objection, form.
12   A.  I don't believe to -- I don't believe there's
13 a requirement for all of the -- all of these elements
14 to be present for there to be trade secret
15 misappropriation.
16   Q.  What components do not need to be present for
17 there still to be a trade secret, in your mind?
18       MR. MELLEMA:  Objection, form.
19   A.  I would have to -- I would have to consider
20 that.  I don't have an answer at this point.
21   Q.  Is there anything unique about the
22 components -- strike that.
23       Are there any unique requirements about
24 the individual components that need to be present for
25 the trade secret to exist?

91

1       MR. MELLEMA:  Objection, form.
2    A.  The components -- the components chosen
3  fulfill a difficult function that required a careful
4  selection of parts.  There are equivalent parts that
5  are not identical to these that could do the same job,
6  but the general combination of these components -- for
7  instance, ████████████████████████████████████
8  ████████████████████████████████████        There
9  are other ways -- the point being of the enumeration
10 is that you cannot just place a standard plastic
11 electronic enclosure in a harsh environment.  There
12 are only a few ways to make it rugged, which the teams
13 researched.
14       So to that extent, the combination of
15 components that fulfill this job took research and
16 development and know-how that was not obvious, and
17 from my experience to constitute -- for the definition
18 of trade secret, would constitute a trade secret.
19   Q.  What's the non-obvious know-how you just
20 alluded to?
21       MR. MELLEMA:  Objection to form.
22   A.  Excuse me, we're coming up on noon.  An
23 example would be the battery pack.  I have decades of
24 experience, and the choice of battery that they came
25 upon was not obvious for this very harsh environment,

92

1  where it was not in a situation where it could be
2  recharged.  So that's one example.
3    Q.  What was non-obvious about the battery
4  choice?
5       MR. MELLEMA:  Objection, form.
6    A.  The chemistry chosen was not obvious.
7    Q.  Do you know whether or not Compology has
8  disclosed the battery chemistry that it uses publicly?
9    A.  I don't believe it -- I'd have to check my
10 notes.  But I don't believe they advertise the parts
11 they use.
12   Q.  Did you try to figure out whether or not any
13 of the items listed in Paragraph 46 that you identify
14 as being included in the smart camera apparatus trade
15 secret were publicly disclosed by Compology?
16       MR. MELLEMA:  Objection, form.
17   A.  I did read their patents, to be sure I
18 understood what was disclosed in the patents.  I've
19 seen -- I have only seen their presentations to their
20 customers.  I don't believe I've seen any public
21 disclosure of their system and its components.
22   Q.  What patents did you review?
23   A.  They're listed in the exhibits that we gave
24 you, I think.  Let me check.
25   Q.  They're not.

93

1    A.  Would you like me to tell you what they are?
2    Q.  How would you determine that?
3    A.  Just what's in my -- what's in my possession.
4    Q.  Can you point me to it in your report?
5    A.  Yes.
6    Q.  Is it on your materials-considered list?
7    A.  I think so.  Let me check.
8        I don't know if it's in one of these
9  RoadRunner Bates, but it was just for my background
10  information -- it is background information on the
11  company, and at the beginning of this engagement I was
12  interested in learning what they had done.  So I
13  reviewed them.  It's a public document.  I'm free to
14  do that, of course.  I don't believe if --
15        Anyway, I did review them, but many months
16  ago.  It's also 12:00 noon.  Could I ask for a quick
17  break?
18        MR. GALICA:  We can go off.
19        THE VIDEOGRAPHER:  We are off the record
20  at 3:00 p.m.
21        (Recess taken.)
22        THE VIDEOGRAPHER:  The time is 3:51 p.m.
23  We are back on the record.
24    Q.  Did you have any conversations about the
25  substance of your testimony with counsel during the

94

1  break?
2    A.  I just simply asked him if I had the patents
3  in the exhibits, because I thought I did.  I just
4  couldn't find them.
5    Q.  Did you?
6    A.  I think so.  I haven't examined each one, but
7  I'm pretty sure they're in the packet.
8    Q.  Which one?
9    A.  I don't know.  I just asked if he thought
10  they were there, and he was pretty sure they got put
11  in.  I'd be happy to search for it for you.
12    Q.  That's fine for now.  We can circle back to
13  it.
14        What analysis did you perform with respect
15  to the patents?
16    A.  Just to familiarize myself with them and what
17  the claims were about, basically.
18    Q.  How many did you review?
19    A.  I believe there were four.  Pretty much they
20  were continuations.  They were largely the same body,
21  you know, disclosure.
22    Q.  Do you recall the titles of them or what
23  subjects they related to?
24    A.  I can look that up in two seconds for you, if
25  you wish.

95

1    Q.  How would you look it up in two seconds?
2    A.  Well, my computer -- on my laptop.  I mean, I
3  can go to a folder where I have them, and I can read
4  the names of them to you.
5    Q.  Okay.  We've searched in your report, and
6  they aren't cited.  So, you know, maybe that's
7  something that Joe can clear up on break and let us
8  know whether or not they made it into your report.
9        MR. MELLEMA:  I'll try to do so.  There's
10  a lot of the documents cited there.
11        MR. GALICA:  Okay.
12    Q.  Did you perform any specific analysis of
13  them?
14        MR. MELLEMA:  Objection, form.
15    A.  I merely read them, to understand what they
16  were disclosing.
17    Q.  And what were you looking for them to
18  disclose?  Anything in particular?
19    A.  No, I was just new to the case.  I just
20  wanted some background.
21    Q.  Did you find that they related at all to any
22  of the trade secrets in your report?
23    A.  Not directly.
24    Q.  Do you remember the subject matter at all of
25  any of the patents?

96

1    A.  It was more on the mechanisms of the machine
2  learning and how to differentiate the contamination,
3  which was a very big problem with this industry.  So I
4  think it was mostly the AI aspects of their
5  technology.
6    Q.  So they have a patent that discloses the AI
7  aspects of their contamination technology?
8        MR. MELLEMA:  Objection, form.
9    A.  I'm happy to pull them up and go through them
10  with you.  But this was, you know, last January,
11  February, March, so I'm not going to be too -- I
12  haven't looked at them since.  So I'm not going to be
13  too helpful with any further detail.
14    Q.  As part of your report, did you undertake any
15  effort to determine whether or not the trade secrets
16  you identified have been publicly disclosed?
17        MR. MELLEMA:  Objection, form.
18    A.  As any -- do you mean -- to clarify, do you
19  mean other than reading their patents?
20    Q.  Well, you said you did that in January.  It's
21  September.  So that wasn't with respect to drafting
22  this report; correct?
23    A.  Correct.
24        MR. MELLEMA:  Objection, form.
25    Q.  In preparation of submitting your report,

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024

97

1  what did you do to independently verify that the trade
2  secrets you identify in your report haven't been
3  publicly disclosed?
4      **A.  Let me make reference to my report, to**
5  **refresh my memory.**
6          **I think the best I could help with**
7  **answering that question is the materials that I**
8  **considered, Section IV represents the documents that I**
9  **reviewed to create the report.**
10     Q.  I mean, this all would have been done in the
11 last couple of weeks; correct?
12         MR. MELLEMA:  Objection, form.
13     **A.  This done?  You mean the writing of the**
14 **report?**
15     Q.  Yeah.
16     **A.  It took a while.  It wasn't just a couple of**
17 **weeks.  But we wrapped up editing the last couple of**
18 **weeks and got everything -- I's dotted and T's**
19 **crossed.**
20     Q.  What methodology did you use to determine
21 whether any of the trade secrets you've identified in
22 your report have been publicly disclosed by Compology
23 or RoadRunner?
24     **A.  I didn't regard that as a part of my overall**
25 **assignment, to examine the public domain.  I did ask**

98

1  **what -- earlier on in the -- earlier on in the year,**
2  **when talking to the employees, that just basically how**
3  **the business -- a big overview of the business,**
4  **particularly how they fit into the industry.  I**
5  **don't -- I didn't do anything in particular -- any**
6  **particular research in advertising or trade journals.**
7      Q.  Okay.  Turn back to Paragraph 46.
8      **A.  My disclosure, of course?**
9      Q.  Yeah, so Exhibit 415.
10     **A.  Okay.**
11     Q.  And then Paragraph 46.
12     **A.  I am there.**
13     Q.  Do you see that the trade secret includes a
14 wide FOV camera lens?  Correct?
15     **A.  I see it.**
16     Q.  What does FOV stand for?
17     **A.  It was defined earlier in the document, but**
18 **it's field of view.**
19     Q.  And what's the range of the field of view,
20 when you say it's "wide"?
21     **A.  Let me check what I wrote about that in my**
22 **report.  And I think you find that -- there are two**
23 **places.  The smart camera apparatus that we were**
24 **working on prior to the break, which would be Opinion**
25 **8, Section B, baker, Section 2.**

99

1      Q.  So we're all on that paragraph right now.
2  We're in that section.  Correct?
3      **A.  Correct.**
4      Q.  We're on Paragraph 46.
5      **A.  All right.  Then I'm saying from there the**
6  **misappropriations -- the comparisons, I should say, on**
7  **D, delta -- I would say Page 58, and that section from**
8  **there compares the --**
9          **So let me take a look before I answer.**
10         **Paragraph 138, I mention by inspecting the**
11 **functional block diagram,** ███████████████
12 ███████████████████████████████████████████
13 █████████████████ **it is my opinion that they are**
14 **functionally equivalent for purposes of camera design**
15 **and assembly.**
16         **Then I say importantly, the manufacture**
17 **and the specific family of camera CMOS sensors could**
18 **not be obtained without disassembling the Compology**
19 **R12, which they did.  In addition, the camera and lens**
20 **elements are substantially the same, with a**
21 **substantially similar FOV, or field of view, and**
22 **angle, as published in their documentation.  This**
23 **further confirms my conclusion that the Pello camera**
24 **system was derived from the Compology camera system.**
25     Q.  My question was what is the field of view

100

1  that defines your trade secret?
2      **A.  The field of view that is required by a**
3  **camera in a bin of any kind is to see the entire**
4  **contents of the bin in one image.**
5      Q.  So you're saying it's a trade secret that the
6  image sensor is able to take a picture of the thing
7  it's trying to take a picture of?
8          MR. MELLEMA:  Objection, form.
9      **A.  The trade secret is the image sensor and the**
10 **lens in front of the image sensor to achieve the goal**
11 **of seeing the entire insides clearly, in high quality,**
12 **of the recycle bin, or the dumpster.**
13     Q.  How does the field of view impact the quality
14 of the image?
15     **A.  It would be fairly self-evident that you need**
16 **to see the contents of the bin in order to make an**
17 **opinion on fullness, for example, or contamination.**
18 **It has to be within the visible range for the machine**
19 **learning application to spot a problem or report a**
20 **state of the bin.**
21     Q.  So it's a trade secret if the camera can take
22 a picture of the thing it's trying to take a picture
23 of?
24         MR. MELLEMA:  Objection, form.
25     **A.  I would say it is misappropriation that I was**

Case 3:23-cv-04804-WHA  Document 153-5  Filed 10/29/24  Page 22 of 40
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024

29 (113 to 116)

113

1    Q.  Let me ask a different question.  Is the
2  pixel size of an image sensor an important design
3  consideration for the Compology devices?
4    A.  It's like -- yes, it is.
5    Q.  Is the image area of an image sensor an
6  important design consideration for the Compology
7  devices?
8        MR. MELLEMA:  Objection, form.
9    A.  Less important, as the lens matches the area
10  that it's projecting onto.
11    Q.  Well, if there were two different image
12  areas, you'd have to have two different lenses;
13  correct?
14        MR. MELLEMA:  Objection, form.
15    A.  Not in the sense of learning from one product
16  to apply to another.  It's a minor adjustment, as I
17  describe in my discussion on the comparison of the two
18  products.
19    Q.  So are you saying that if a product uses an
20  image sensor with a different image area, a different
21  pixel size, a different lens size, a different lens
22  chief ray angle, different power supply, different
23  power requirements, and has a different field of view,
24  those are still the same or similar?
25        MR. MELLEMA:  Objection, form.

114

1    A.  In my report I describe the knowledge
2  transfer of taking apart the R12 unit.  The parameters
3  you just cited are not relevant to the RTS team
4  learning a lot about how to build a rugged camera
5  system for the purpose of monitoring -- monitoring the
6  dumpsters.
7    Q.  I'm going to move to strike.  I'm trying to
8  understand what in -- when you say that everything's
9  similar.  So is it your position that if a product
10  uses an image sensor that has a different image area,
11  a different pixel size, a different lens size, a
12  different lens chief ray angle, different power
13  supply, different power requirements, and has a
14  different field of view than another product, that
15  those two products are still similar?
16        MR. MELLEMA:  Objection. Same objection,
17  actually.
18    A.  I would say -- I'm tempted to read what I
19  wrote, but I'll just answer that question:  Yes, they
20  are similar.
21    Q.  So that's what you -- with all those
22  differences, you'd still say they're similar.
23    A.  Correct.  Those differences are well within
24  the ballpark of ranges of components that are typical
25  in a similarly designed system.

115

1    Q.  Why do you think, if RTS had access to all of
2  this, why didn't they just use the same thing?
3        MR. MELLEMA:  Objection, form.
4    A.  I'm reading what I wrote in my declaration.
5        Okay, I've read.  Please repeat your
6  question.
7    Q.  If you're suggesting that RTS had access to
8  all of these different design specifications, why
9  didn't they just use the same components as Compology?
10        MR. MELLEMA:  Objection, form.
11    A.  Two factors.  One is, it doesn't matter to
12  have exactly the same view if you know generally where
13  to look -- like ███████ looking, and basically
14  the lens with ███████.  The other issue
15  is -- this was two years -- this was years after
16  Compology designed the original product.  There are
17  new chips on the market that weren't available when
18  Compology did their work.  They're perhaps a little
19  more power-efficient or a little better specification.
20  But it's still the idea of the lens in the position
21  that it's in, the look angle into the bin that it's
22  mounted at, the type of lens used.
23        And so the specs are not really relevant
24  to the issue of misappropriation.
25    Q.  Why doesn't Compology use the newer image

116

1  sensor?
2    A.  Well, it's not part of my report, but I'll
3  tell you why.  The software is -- the software and the
4  training -- the six years of training were based on
5  the image sensor they currently make.  That would
6  change it.  The number of pixels that goes into a
7  neural network is only 400 by 400, ███████
8  ███████.  That's nice
9  for the humans.  But as far as the effectiveness of
10  the product, there's no need to do that.  It's nice to
11  have -- it's what you call a nice-to-have, but it's
12  not at all relevant to the success of the product in
13  its designated function.
14    Q.  So the training that they did was based on
15  the image sensor that they have; correct?
16    A.  The image -- I'm saying -- no, that's not
17  correct.
18        This isn't really -- I'm simply saying
19  that the image sensor -- either image sensor is more
20  than enough for training.  The rest of it is, you
21  know, other purposes.  It's not that critical, is my
22  point.  And that's -- that either one does the job
23  well.  It's nice to have the newer one, but that's
24  just the advantage of starting later, if you're in the
25  ballpark with your competitor, now you get to pick a

30 (117 to 120)

117

1  better chip because you're starting your own design.
2      Q.  Okay.  I'll move to strike that.
3      A.  Okay.
4      Q.  Does the field of view that you would
5  implement depend on whether the image sensor is in a
6  waste container?
7          MR. MELLEMA:  Objection, form.
8      A.  Yes, it does.
9      Q.  If you had an image sensor in a different
10  location than another one, you'd have different field
11  of views?
12         MR. MELLEMA:  Objection, form.
13     A.  That is correct, by definition.
14     Q.  Turning back to Paragraph 46 in your report,
15  and I think we've come full circle.  We kind of went
16  off there.
17         MR. MELLEMA:  Sorry, where?
18         MR. GALICA:  Paragraph 46.
19         MR. MELLEMA:  Thank you.
20     Q.  Is there a specific field of view that is
21  part of this trade secret?
22         MR. MELLEMA:  Objection, form.
23     A.  I will stay with what I wrote.  Compology's
24  smart camera apparatus trade secret includes a smart
25  camera, including a CCM with a wide field-of-view

118

1  camera lens, battery pack, high-durability injectable
2  parts, et cetera, et cetera.  I'll stick with what I
3  wrote.
4      Q.  How wide does it need to be to be considered
5  a wide-field-of-view camera lens?
6          MR. MELLEMA:  Objection, form.
7      A.  I say later, the images and the notion of --
8  excuse me, let me just consult my document here, and I
9  will attempt to answer.
10         To answer your question of how wide the
11  field-of-view camera lens is:  There's no fixed
12  requirement other than to meet the needs of the
13  machine learning system to be able to monitor contents
14  of the bin, of the dumpster.
15     Q.  Do all of the components that you list in
16  Paragraph 46 need to be present to make up the trade
17  secret?
18         MR. MELLEMA:  Objection, form.
19     A.  I believe the -- I would be happy to recite
20  to my learning -- my -- my understanding of a trade
21  secret.  It's in my legal standards, Page 4.  And I
22  think that defines that pretty clearly.  If you'd
23  like, I'll be happy to believe what I believe it is.
24     Q.  Well, I'd like you to....
25         I think this is a yes-or-no:  Does the

119

1  smart camera apparatus trade secret you've identified
2  require all the components listed in Paragraph 46?
3          MR. MELLEMA:  Same objections.
4      A.  Give me one second here, to get clear on what
5  I wish to say.
6          I believe that is more of a legal
7  question, what percentage of the collection of
8  components conveys an advantage that was learned by
9  RTS by examining Compology's camera, as I discussed in
10  my declaration with regards to misappropriation.  So I
11  don't have an opinion on what percentage of components
12  have to be present.
13     Q.  Is it your belief that all the components
14  listed in Paragraph 46 have been kept confidential by
15  Compology?
16         MR. MELLEMA:  Objection, form.
17     A.  It is my understanding that these components
18  were not disclosed to the public.
19     Q.  If they were, would you still consider it a
20  trade secret?
21         MR. MELLEMA:  Objection, form.
22     A.  Again, we're wandering into legal territory,
23  and I really don't have an answer for that.
24     Q.  With respect to the first sentence in
25  Paragraph 46, you don't cite to any hardware

120

1  schematics, source code files.  Does that mean you
2  think trade secret isn't defined with that level of
3  granularity?
4          MR. MELLEMA:  Objection, form.
5      A.  Again, I don't have an opinion on that.
6      Q.  What is unique about using high-durability
7  injection-molded parts?
8      A.  I'm not declaring that unique.
9      Q.  Okay.
10     A.  By itself.
11     Q.  Is it unique to use it with an embedded
12  system?
13     A.  I -- my opinion is written, and there's -- I
14  didn't -- I did not provide an opinion on each and
15  every individual element because they don't stand
16  alone.  You are discussing a system, and the system is
17  composed of the elements that I describe.
18     Q.  The specific elements; correct?
19     A.  Well, a battery pack, for instance, is a
20  pretty general element.  There's many types of battery
21  packs, so obviously that -- if you say specific and
22  then look at battery pack, you have to say what.  And
23  later I do describe what's specific about the battery
24  pack.
25         So in this paragraph it is what it reads.



121
1    MR. GALICA:  I think we've probably been
2 going about an hour.  Do we want to take a quick
3 break?
4    MR. MELLEMA:  Sure.
5    THE VIDEOGRAPHER:  We are off the record
6 at 4:48 p.m.
7    (Recess taken.)
8    THE VIDEOGRAPHER:  4:55 p.m., back on the
9 record.
10   Q.  If we can move to Paragraph 42 of your
11 report.  Let me know when you get there.
12   **A.  I am there.**
13   Q.  Right about in the middle of the paragraph,
14 where it says, "Each version refined the performance
15 in critical areas unique to this challenging product
16 field."
17   **A.  Okay, I see that.**
18   Q.  Then it goes on to list environmental
19 challenges, optical challenges, radio frequency
20 performance, and battery life?
21   **A.  Okay.  This is Paragraph 42?**
22   Q.  Yes.
23   **A.  Okay, I see it.**
24   Q.  Moving from the R11 to the R12:  How does the
25 R12 refine performance with respect to environmental

122
1 challenges?
2    **A.  Let me read what I wrote.**
3        **As I wrote, the R11 system was iteratively**
4 **developed, migrated to the R12 camera system, a single**
5 **camera system that also** ███████████████
6 ████████████, **in addition to a number of other**
7 **improvements and features.**
8        **As far as the environmental improvement,**
9 **the fewer batteries, the better, the more reliable it**
10 **is.  Certainly moving from two cameras to one reduced**
11 **both the complexity and therefore the failure rate of**
12 **any device.  The fewer the better -- the fewer parts**
13 **the better in harsh environments.  And it allowed the**
14 **team to focus on images -- on the image quality for**
15 **their machine learning application.**
16       **Pretty much as written.  I don't have**
17 **anything really to add to that.**
18   Q.  Did you write that yourself?
19   **A.  I did.**
20   Q.  So are all those unique changes you just
21 stated part of the camera apparatus trade secret?
22   **A.  They are part of -- they are part of the**
23 **camera system, yes.**
24   Q.  My question was a little different.  Are all
25 those unique changes part of the camera -- smart

123
1 camera apparatus trade secret?
2    MR. MELLEMA:  Objection, form.
3    **A.  I would say yes.**
4    Q.  Moving from the R11 to the R12:  How did the
5 R12 refine performance with respect to optical
6 challenges like lighting, image dynamic range, and
7 field of view?
8    **A.  With one camera, it's -- actually, if you'd**
9 **give me -- if you'd permit me one moment, I will find**
10 **the section that I wanted to quote.**
11       **In Paragraph 63, I start with the optical**
12 **assembly and design of a smart waste container mounted**
13 **device, and I explain that I examined the optical**
14 **assembly and design of the Compology systems R11**
15 **through R13 as described herein.  First I disassembled**
16 **each of the devices -- I'm just paraphrasing -- by**
17 **opening the case and removing the optical/camera**
18 **components.  I took high-resolution photos to identify**
19 **the components and design of the camera subsystem,**
20 **which is in my Exhibit 20.**
21       **Based on my experience in over 40 years**
22 **designing embedded and integrated hardware and**
23 **software for commercial products, I understand that**
24 **designing any electronics, let alone optical**
25 **electronic devices such as Compology's smart camera**

124
1 **apparatus, to survive and continue functioning without**
2 **intervention in a waste container for at least five**
3 **years and in temperature conditions poses significant**
4 **challenges.  The severity and nuances of these issues**
5 **are not obvious and have been mitigated through many**
6 **iterations by the Compology smart camera -- of the**
7 **Compology smart camera apparatus.  Compology designed**
8 **the camera optics and the accompanying physical**
9 **elements, including the components of the CCM, such as**
10 **the CMOS sensor, camera flash, printed circuit board**
11 **assembly, camera flash LED, for use with harsh weather**
12 **conditions and durability to withstand physical damage**
13 **from impact.**
14       **Compology iteratively developed the camera**
15 **lens and materials over the course of many years to**
16 **optimize the captured image for use with Compology**
17 **machine learning, algorithms to determine fullness**
18 **levels, emptying events, contamination events.  And**
19 **that might be a typo -- or, empty events and types.**
20       **The camera lens is a** ████████████ **with**
21 **an optimal field of view and focal length for the**
22 **harsh/constrained environment and requirements for**
23 **capturing waste container images.  The field of view**
24 **for the R12 was** ██████ **and I earlier stated** ████, **but**
25 **close enough --** ██████████████████ **the**

---

125

1 R13 lens was ███████████████████████
2 ███████.
3     And then I quote -- I point to the
4 Exhibits 1 to 14 as various assembly drawings and
5 specifications of the R12 CMOS modules, which is
6 Exhibits 1 to 7, and the R13 modules, Exhibits 8 to
7 14.
8     So I think in that I explained at least
9 some of the advancements they made.
10 Q. Okay. So I'm in Paragraph 42, which is in
11 your smart camera apparatus trade secret section;
12 correct?
13 A. Correct.
14 Q. You just identified a list of technical
15 aspects that you defined in your optical assembly
16 trade secret; correct?
17 A. Correct.
18 Q. What's the difference between the smart
19 camera apparatus -- well, strike that.
20     Are all those things you just listed part
21 of the smart camera apparatus trade secret?
22 A. Yes.
23 Q. So is the -- what's the difference between
24 the optical assembly trade secret and the smart camera
25 apparatus trade secret?

---

126

1 A. The smart camera -- let me refer again to my
2 report.
3 Q. Well, I'll withdraw the question. Let me ask
4 it a little differently. Is everything that's in the
5 optical assembly trade secret also in the smart camera
6 apparatus trade secret?
7 MR. MELLEMA: Objection, form.
8 A. Yeah, actually I don't know how to --
9 actually -- I don't fully understand what the
10 differentiation you're asking me to -- to opine on.
11 Q. Well, I asked you a question about the smart
12 camera that is trade secret, and you referenced the
13 section of your optical assembly trade secret. So I'm
14 trying to understand the relationship between the two.
15 A. Okay. The relationship is you asked me what
16 was the difference in -- what were the improvements
17 from R11 to R12, and I was pointing to the steps they
18 took for the optical design as one of the
19 improvements.
20 Q. I'm just trying to understand your report.
21 Why did you include that in your smart camera
22 apparatus trade secret section and not in your optical
23 assembly trade secret section?
24 MR. MELLEMA: Objection, form.
25 A. You asked me why I didn't include what in

---

127

1 each section? I'm not following. I'm sorry.
2 Q. We're having the same problem with the
3 report.
4     Are all the changes you described that
5 took place between the R11 and R12 that refined the
6 performance with respect to optical challenges like
7 image dynamic range and field of view part of the
8 smart camera apparatus trade secret?
9 MR. MELLEMA: Objection, form.
10 A. The smart camera apparatus, which is Part 2
11 on Page 14, I think that it's pretty clear what I
12 wrote -- I'm happy to read it.
13 Q. You can point me to a paragraph number.
14 A. Start at 36. You're asking what the
15 components are of the smart camera apparatus as a
16 trade secret, and I wrote, starting in Paragraph 36,
17 what I found in examining the product.
18 Q. I'll ask it differently, then. So everything
19 that you write in Paragraphs 36 to 62 need to be there
20 for the smart camera apparatus trade secret?
21 MR. MELLEMA: Objection, form.
22 A. No, definitely not. I think the law's pretty
23 clear: You don't have to exactly replicate one
24 product to be misappropriating trade secret in
25 another.

---

128

1 Q. What law are you relying on there?
2 A. Oh, dear.
3 MR. MELLEMA: Objection, form.
4 A. I think -- I'm sorry, you -- I would have
5 to -- I'm not prepared to delve into what I thought
6 was obvious. My apologies.
7     I did write, for your reference, on Page
8 4, Trade Secrets, under V, Subsection A, what I've
9 been informed is defined as trade secret.
10 Q. Okay. Is there anything that you write in
11 Paragraphs 36 to 62 that doesn't need to be there --
12 MR. MELLEMA: Objection.
13 Q. -- for a camera apparatus trade secret to
14 exist?
15 MR. MELLEMA: Objection, form.
16 A. I think it is well understood that the
17 components to produce a device that substantially
18 provides the same service is sufficient to infringe
19 and to represent misappropriation, based on the trade
20 secrets that I enumerate here in Trade Secret 2.
21 Q. So you think just the performing a feature
22 but not the specific methodology for performing that
23 feature can constitute a trade secret?
24 MR. MELLEMA: Objection, form.
25 A. I think the product of these devices are

---

129

1  images to feed -- to be applied to machine learning.
2  Both Compology and Pello deliver images to be applied
3  to a machine learning system. In that regard, in my
4  discussion of misappropriation, I show how substantial
5  components, subsystems of Compology were learned by
6  the RTS team to create their product and substantially
7  offer the same service as Compology.
8      Q.  I'm just going to direct you to 46, Paragraph
9  46.  Is that a description of the smart camera
10 apparatus trade secret?
11         MR. MELLEMA:  Objection, form.
12     A.  These are the components that define -- these
13 are the components of Compology's smart camera
14 apparatus, as listed, among other things.
15     Q.  What other things?
16     A.  I'm sorry, I didn't mean to say -- strike
17 that.  What I meant to say is, I didn't read all of --
18 I'm just looking at the first few sentences. I didn't
19 read through all of them -- or I didn't enumerate all
20 of these.  I'm just pointing out that this paragraph
21 does, though, define the effort that went into
22 creating the Compology smart camera and to which they
23 regard that to be a trade secret.
24     Q.  Do you regard it to be a trade secret?
25     A.  Yes.

130

1      Q.  And at the level of detail in Paragraph 46,
2  do you believe that sufficiently describes Compology's
3  smart camera apparatus trade secret?
4          MR. MELLEMA:  Objection, form.
5      A.  It is my summary of the components that
6  comprise the system.  I later enumerate the
7  components, later in my declaration, and explain --
8      Q.  Sorry, I didn't mean to cut you off.
9      A.  That's all right.  Good.
10     Q.  So do we need to look elsewhere to understand
11 more specific details about the smart camera apparatus
12 trade secret?
13         MR. MELLEMA:  Objection, form.
14     A.  This is my opinion.  It's actually -- it's my
15 opinion of -- starting on -- starting on Page 14, it
16 is my opinion of the smart camera apparatus.  There's
17 many pages here.  I point to what is regarded as
18 hard-won knowledge that becomes part of the Compology
19 trade secret for their camera apparatus.  It's a lot
20 of pages here.
21         So you're just on one paragraph of an
22 entire section.  I'd be happy to walk through this
23 section and point more discretely to each of the
24 subsystems as they are described in this section
25 starting on Page 14.

131

1      Q.  Well, let's turn back, then, to Paragraph 42,
2  and we'll take another look at what you just suggested
3  in that paragraph.
4          MR. MELLEMA:  Do you mean --
5          MR. GALICA:  Paragraph 42.
6          MR. MELLEMA:  Okay.
7      Q.  Do you recall we were talking about the
8  changes that were made from the R11 to the R12?
9      A.  I do.
10     Q.  And you listed a set of specific changes that
11 were made; correct?
12     A.  I listed -- I spoke about a number of changes
13 that were made.
14     Q.  And some of them were located in the optical
15 assembly trade secret section; right?
16     A.  Correct.
17     Q.  I'm just asking, are those also part of the
18 smart camera apparatus trade secret?
19     A.  They are contributing elements of the smart
20 camera, so therefore they are part of the smart camera
21 trade secret apparatus.
22     Q.  Staying in Paragraph 42:  I guess another
23 question.  There are no references -- you don't have
24 any citations in Paragraph 42; correct?
25         MR. MELLEMA:  Objection, form.

132

1      A.  As I look, no, I don't.
2      Q.  You don't cite to any documents; correct?
3      A.  In Paragraph 42, I do not cite --
4      Q.  And you don't have internal citations to
5  anywhere else in your report; correct?
6          MR. MELLEMA:  Objection, form.
7      A.  I would have to have -- I believe there are
8  some somewhere.  But it's 120 -- 110 pages, so --
9      Q.  Can you point me to an internal citation you
10 have in Paragraph 42?
11     A.  I don't in Paragraph 42.  I thought you meant
12 through the document.  No, I don't.
13     Q.  So I guess how would somebody have known to
14 look at Paragraph 68 in the optical assembly section
15 to know what you were talking about in Paragraph 42?
16         MR. MELLEMA:  Objection, form.
17     A.  I think what would -- a person reading this
18 would first look at the table of contents, and they
19 would see trade secrets, what the subsections are.  If
20 they are curious about improvements from one model to
21 another, they could -- they would be compelled to look
22 at the other -- the other sections, like optical
23 assembly, to see what's happening.  And otherwise,
24 they're just -- there's just a linear progression
25 through the system.  And that's all I would be able

---

133

1  to -- all I would be able to assume, is that you read
2  the index and you figure -- you know, you find what
3  you're looking for.
4      Q.  Moving to the R12:  How did the R12 refine
5  performance with respect to radio frequency
6  performance?
7      A.  There were changes in antenna position.  I
8  believe also the antenna -- the antenna that they used
9  changed from 11 to 12.  And particularly --
10         Tell you what, once again, I'm speaking
11  before I'm looking.  Let me find it for you, and I'll
12  come back to that.
13     Q.  Well, you already provided part of your
14  answer, so let me work with that.  So at least the
15  specific antenna position and the specific antenna are
16  part of the smart camera apparatus trade secret;
17  correct?
18         MR. MELLEMA:  Objection, form.
19     A.  I'm just referring to my comments.  I go back
20  to -- I'm going back to Page 14.
21         Ask me again, please, your question.
22     Q.  Do you agree that the specific antenna
23  position and the antenna is part of the smart
24  camera apparatus trade secret; correct?
25     A.  No, I don't agree.

134

1         MR. MELLEMA:  Objection to form.
2      Q.  Why don't you agree with that?
3      A.  You said "specific."  You could put the
4  antenna -- the antenna can be placed in numerous
5  positions potentially.  It's the use of these low-band
6  data that may not be obvious to the skilled person,
7  who then learns about it opening up the R12 product.
8      Q.  How would you learn about it opening up the
9  R12 product?
10     A.  You would see a chip there with a lead
11  running into an antenna, and you'd look up the chip and
12  find out what that company does for -- does for a
13  living.
14     Q.  Are you aware whether or not Compology
15  publicly disclosed the chip that it uses?
16     A.  I don't believe it does, but I can check.
17  But I don't believe it does.
18     Q.  Have you reviewed any FCC submissions that
19  Compology made?
20     A.  I did, yes.
21     Q.  And that discloses what chip Compology uses;
22  correct?
23     A.  Correct.
24     Q.  So you'd agree that's public knowledge?
25     A.  I agree that that is.  I agree.

---

135

1      Q.  How does the placement of the antenna from
2  the R11 to the R12 improve performance?
3      A.  By radiating more energy out of the device
4  into the atmosphere -- into the air, if you will.
5      Q.  How much more?
6      A.  I don't know.
7      Q.  Did you try to quantify it?
8      A.  It didn't matter, so -- it wasn't relevant --
9  it wasn't relevant to my observation.
10     Q.  Why didn't it matter?
11         MR. MELLEMA:  Objection to form.
12     A.  It is the device as I defined it, the
13  combination of components that can withstand the
14  environment that they're operating in and provide a
15  service in -- running on the battery for five years.
16  So if you're able to transmit one mile or one and a
17  half miles with a new placement of an antenna, it's
18  nice, but it is still a performance enhancement, but
19  not relevant to the trade secret status.
20     Q.  So a performance enhancement does not matter
21  to the trade secret?
22         MR. MELLEMA:  Objection, form.
23     A.  An improvement in a part is a natural
24  evolution of technology.  So it's the components that
25  is what I regard as the relevant issue.  So --

136

1      Q.  Sorry, I didn't mean to cut you off.
2      A.  I'm good.
3      Q.  So the natural evolution of technology,
4  that's not a trade secret; right?
5         MR. MELLEMA:  Objection to form.
6      A.  Everybody knows Moore's law by now, yes.
7      Q.  And Moore's law isn't a trade secret;
8  correct?
9      A.  No, it's not.  It's well known to the world.
10     Q.  I agree.  So I'm trying to understand:  Are
11  these performance improvements that you identified in
12  Paragraph 42 part of the trade secret or not?
13     A.  I'm identifying in 42 the progress of product
14  development.  The product itself is the trade secret.
15  I'm simply defining the progression through the
16  versions of the product.  But the goal of the product
17  remains -- remains the same.  The purpose of the
18  refinements is to produce a more-reliable and a
19  better-quality product, but the secret remains
20  similar -- remains the same.
21     Q.  And that's just what the goal of the product
22  is; correct?
23         MR. MELLEMA:  Objection, form.
24     A.  It is certainly one of the goals, amongst
25  others, to balance a business.  But it's one of many.

Case 3:23-cv-04804-WHA  Document 153-5  Filed 10/29/24  Page 28 of 40
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024                    40 (157 to 160)



157

1    Q.  That discharging a battery more slowly would
2  extend its lifetime?
3    A.  Right. In other words -- yes. I'd be happy
4  to clarify what that means. But it's obvious to an
5  engineer what they're saying. The total amp-hours
6  is -- in other words, the amount of water in the
7  bucket's fixed. It's just how you drain the bucket
8  can allow the water to last longer.
9    Q.  And if you drain that water slowly, it lasts
10 longer; right?
11   A.  Correct.
12   Q.  You're saying that's non-obvious?
13   A.  Right.
14   Q.  Do you think using a ███████████'s
15 non-obvious?
16   A.  Definitely not obvious.
17   Q.  You've never encountered that in all your
18 years of product design and engineering?
19   A.  That's correct.
20       MR. MELLEMA:  Objection, form.
21   A.  Actually, let me state it another way. The
22 problem I'm working on, again, just as a reference,
23 only uses a ███████████ It's a seven-year
24 battery, but it's huge. So ███████████ are well
25 known. ███████████ was a

158

1  surprise to me, and I do know a lot about batteries.
2    Q.  And Compology kept it confidential that they
3  used lithium thionyl chloride batteries?
4    A.  What they kept confidential was ██████████
5  ████████████████████████████████████
6  ████████████████████████████████████
7  ████████████████████████████████████
8  ████████████████████████████████████
9  ████████████████████████████████████
10 ████████████████████████████████████
11 ████████████████████████████████████
12 ████████████
13 ████████
14   Q.  Let's go to Paragraph 65, which is on Page
15 32. It's in your Optical Assembly and Design of a
16 Smart Waste Container Mounted Device section. Do you
17 see that?
18   A.  I do.
19   Q.  What in Paragraph 65 is part of the optical
20 assembly trade secret?
21       MR. MELLEMA:  Objection, form.
22   A.  I'm reading my declaration. I'll answer in
23 one moment.
24       I don't have much to add to what is there.
25 The effort is one of the iterative processes to find

159

1  an optimal field of view and focal length, so that
2  both the machine learning could be happy as well as
3  humans who are doing the manual tagging or
4  verification of the image. And it represents
5  engineering that was not immediate or obvious.
6    Q.  So the fourth line says, "The camera lens is
7  a fixed-focus lens with an optimal FOV and focal
8  length." Do you see that?
9    A.  Yes.
10   Q.  So I'm going to try these with a series of
11 yes-or-nos. So the optical assembly trade secret
12 needs to include a fixed-focus lens; correct?
13       MR. MELLEMA:  Objection, form.
14   A.  No, it doesn't. But you would -- no, it
15 doesn't.
16   Q.  Okay, so what's confusing to me is, you just
17 said 65 describes the trade secret, and then I asked
18 you if a portion of 65 is part of the trade secret,
19 and you said no. So can you specifically point to
20 me -- point me where in the Paragraph 65 is the
21 optical assembly trade secret or part of it?
22       MR. MELLEMA:  Objection, form.
23   A.  You asked me if it was required. You could
24 use a zoom lens. It would be crazy, because it would
25 fail on you in a couple of months. But ██████████

160

1  ████████████████████████████████████
2  ████████████████████ for that image sensor. It would
3  still work. It would be a very poor substitution.
4  But it would work.
5        So you asked me if you had to have a
6  ████████████ No, you don't, but for a very
7  practical product that could live for five years under
8  the stress of the recycle bin or the dumpster and to
9  achieve the optimal field of view for the combination
10 of human -- human parameters and machine learning
11 systems, machine-taught systems, those are the
12 parameters they found through lots of experimentation.
13   Q.  So what is the optimal field of view?
14   A.  For the use, in Paragraph 65, for use with
15 the sensor that they chose, the optimal field of view
16 is as listed, ████████████████
17 for the R12 system.
18   Q.  So that field of view is the optical assembly
19 trade secret for the R12 product; correct?
20       MR. MELLEMA:  Objection, form.
21   A.  It is the resulting parameters of their
22 research of that critical component of a camera
23 system.
24   Q.  And that's the trade secret; correct?
25       MR. MELLEMA:  Objection, form.



161

1    A.  It is part of the trade secret.
2    Q.  What do you mean by that?
3    A.  ███████████████████████████████
4    ███████████████████████████████████
5    ███████████████████████████████████
6    ███████████████████████████████
7    ███████████████████████████████
8    ███████████████████████  So it is part of a
9    combination of research that got them to that lens in
10   that configuration, along with the other parts that
11   comprise a successful optical system.
12   Q.  I'm going to try a yes-or-no.  The optical
13   assembly trade secret for the R12 device has to have a
14   lens with a field of view that is
15   ████████████████████████  Correct?
16       MR. MELLEMA:  Objection, form.
17   A.  No, it doesn't have to be.
18   Q.  I'm just trying to understand more generally:
19   Is it -- your opinion seems to be that the optical
20   assembly for the product just needs to work.  Is that
21   what you're generally saying?
22       MR. MELLEMA:  Objection, form.
23   A.  I'm generally saying that it needs to provide
24   a certain coverage of the -- actually, I'm not saying
25   anything.  I'm just reporting on what they developed.

162

1    If you're asking me as a person what would I know, I
2    would guess you have to cover -- you have to be able
3    to image as much of the container as you can.  This is
4    what they came up with with their research and
5    development.  You don't have to be precise with any
6    parameter to make something work.
7    Q.  So is it what they came up with that is the
8    optical assembly trade secret?
9        MR. MELLEMA:  Objection, form.
10   A.  It is as I wrote, as I enumerated here in the
11   optical assembly.  It's the combination of all of
12   these components, and then I specifically mention the
13   result of their research that was optimal for their
14   system.
15       This will be helpful.  In Chapter 66 I say
16   the camera lens and its field of view were chosen to
17   address several trade-offs.  In order to be usable and
18   optimal for use in an ML model -- that's machine
19   learning --
20   ███████████████████████████████████
21   ███████████████████████████████████
22   ███████████████████████████████████
23   ███████████████████████████████████
24   ███████████████████████████████████
25   ███████████████████████████████████

163

1    ███████████████████████████████████
2    ███████████████████████████████████
3    ███████████████████████████████████
4    ███████████████████████████████████
5    ███████████████████████████████████
6    ███████████████████████
7    And et cetera.
8        So this is an example of the coverage
9    that -- the compromises that they found that were
10   optimal and that worked well with their intended
11   outcomes or information product from the images
12   captured.
13   Q.  So you just described the research that was
14   performed; correct?
15   A.  Yes, as written, yes.
16   Q.  And is that the trade secret?
17       MR. MELLEMA:  Objection to form.
18   A.  Again, it is part of the camera system.  It
19   works in conjunction with the other parts that I have
20   enumerated to produce a product -- further on in 66,
21   it explains the ██████████████████████
22   ███████████████████████████████████
23   ███████████████████████████████████
24   ███████████████████████████████████
25   ████████████████████████████  as

164

1    identified herein.
2        So it is a member of a series of technical
3    innovations that together form a trade secret of how
4    to build a camera that can operate in an extremely
5    harsh environment for five years.  Anyway, for a
6    number of reasons.
7        MR. MELLEMA:  I think we've been going for
8    an hour and a half, maybe a little less than that.  Do
9    you want to take a break?
10       MR. GALICA:  Sure.
11       THE VIDEOGRAPHER:  We are off the record
12   at 6:19 p.m.
13       (Recess taken.)
14       THE VIDEOGRAPHER:  6:37 p.m.  Back on the
15   record.
16   Q.  I'm going to turn to Paragraph 78 in your
17   report.  Let me know when you get there.
18   A.  I'm there.
19   Q.  And this is in the section of your report
20   called Trade Secret 4, Training Data.  Do you see
21   that?
22   A.  Yes.
23   Q.  And it's your opinion that Compology's
24   training data is a trade secret; correct?
25   A.  Yes.



165

1    Q.  And to try to short-circuit things:  Your
2   Section 4 just focuses on training data as a trade
3   secret; correct?
4          MR. MELLEMA:  Objection, form.
5    **A.  Let me just review quickly, make sure.**
6    **I'll answer yes.**
7    Q.  Further down on Paragraph 78 there's a
8   sentence that starts, "The metadata included opinion
9   data."  Do you see that?
10   **A.  I do.**
11   Q.  So are you saying that the metadata is part
12  of the trade secret, too?
13   **A.  Definitely, yes.**
14   Q.  And just for clarity:  Further in that
15  sentence you refer to labels and tags.  Do you see
16  that?
17   **A.  I do.**
18   Q.  What is a label?
19   **A.  Let me shake sure I quote this properly.**
20   **I believe a label is the identification of**
21  **the purpose of the image, like, say, contamination**
22  **detection.  The tag I believe is whether it is**
23  **correctly labeled or not initially.**
24   **So the labeling and the tag -- I may have**
25  **inverted that.  The labeling and tag identifying the**

166

1   **context of the image, and then the -- it could be, for**
2   **instance, the quality of the -- of the tag.  If it's**
3   **coming from --**
4          **Let me step back one second so I don't mix**
5   **this human and machine tagging, but they're different.**
6   **Pardon me; I'm going to step back one second.**
7          **I believe that labeling and tagging are**
8   **just basically**
9
10
11
12
13   Q.  Have you encountered the terms "labeling" and
14  "tagging" before?
15   **A.  I have not in my own context, but I believe**
16  **it was -- there's a scheme that the developers do help**
17  **with categorizing the millions of images they were**
18  **collecting.**
19   Q.  So you're not aware of what "labeling" means
20  in the context of machine learning?
21   **A.  No.**
22          MR. MELLEMA:  Objection to form.
23   **A.  No, I didn't say that.  That's not correct.**
24   Q.  What does "labeling" mean in the context of
25  machine learning?

167

1    **A.  It is the -- machine learning is identifying**
2   **the image, which is what the machine is being trained**
3   **on -- you know, yellow cat, white dog, banana,**
4   **pineapple, monkey.  Those are the labels that a**
5   **machine learning system uses for what's called the**
6   **classification, the ultimate output of the system.**
7    Q.  What's the difference between labeling and
8   classifications?
9    **A.  Classification's output.  That means the**
10  **decision that the machine learning system makes --**
11  **like is it a yellow cat, is it a dog, is it a fire**
12  **hydrant.  And then labeling is what it was trained**
13  **where, so it can learn what a fire hydrant looks like**
14  **and what a yellow cat looks like.**
15   Q.  What does "tagging" mean in the context of
16  machine learning?
17   **A.  I think in this context the tagging is**
18  **additional information -- I paused for a second,**
19  **because it's right here underneath, in Paragraph 81.**
20
21
22
23
24          **So I believe in that context they're**
25  **talking about**

168

1
2
3
4    Q.  Sorry, I didn't mean to cut you off.
5    **A.  Go ahead.  That's fine.**
6    Q.  So then what's the difference between
7   labeling and tagging?
8    **A.  They're the same.  It's just one's a subset**
9   **of the other.**
10   Q.  What do you mean by they're the same but
11  one's a subset of the other?
12   **A.  They're labels, and the tag is just a further**
13  **identification of the label -- what it's used for or**
14  **what -- is the example I gave.  It could have other**
15  **uses.  But in general it is the labeling system.**
16   Q.  Going to Paragraph 90.
17          MR. MELLEMA:  What number did you say?
18          MR. GALICA:  Nine zero.
19   Q.  The first two sentences read, "I understand
20  that Compology's training data comprises many millions
21  of labeled and tagged images of the interior of waste
22  containers.  This is itself a trade secret."  Do you
23  see that?
24   **A.  Yes.**
25   Q.  So does it need to be millions of labels

Case 3:23-cv-04804-WHA   Document 153-5   Filed 10/29/24   Page 31 of 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024
43 (169 to 172)

169

1  or -- strike that -- millions of labeled and tagged
2  images to be the trade secret?
3      **A.  The trade secret is the labeled images**
4  **sufficient to train the model.  So in this context**
5  **there would be a recommended threshold for training,**
6  **but the number 1 million indicates the effort to which**
7  **the team went to accurately train their model.  But**
8  **no, it's not required to be 1 million.**
9      Q.  So, then, why do you say that the millions of
10  labeled and tagged images is itself a trade secret?
11     **A.  That's what they did to create their very**
12  **accurate machine learning models.  So it covers two**
13  **bases.  It conveys that the tagged images are the**
14  **value asset of their technology, and that the millions**
15  **was just an example of how much effort they put into**
16  **creating that valuable asset.**
17     Q.  So Compology required millions of labeled and
18  tagged images of its models?
19     **A.  They used millions, yes, to get to the**
20  **accuracy they found.**
21     Q.  Did they require millions?
22     **A.  Probably a good -- I would only guess that**
23  **since they are not gluttons for punishment, and having**
24  **gone through this process many times myself, you don't**
25  **keep teaching if you don't need to.  So I think they**

170

1  **were trying to -- I think they used the number that I**
2  **quoted as what they found to be sufficient over the**
3  **years to get to the accuracy that they were hoping to**
4  **achieve.**
5      Q.  So is it your position that you just use the
6  number of images that are required and then you don't
7  need any more, you just stop?
8      **A.  No.**
9          MR. MELLEMA:  Objection, form.
10     **A.  That's not how it works.  But it's a starting**
11  **point, where you can then use it in a production**
12  **system and then further refine it.**
13     Q.  The next -- the fourth sentence in Paragraph
14  90 states "certain ML models may require millions,
15  tens of thousands, hundreds of thousands, or millions
16  of labeled and tagged images to sufficiently train an
17  ML model." Do you see that?
18     **A.  I do.**
19     Q.  What models only require thousands of images
20  to be trained?
21     **A.  Well, if you had a simple classifier, where**
22  **you were trying to identify, you know, types of cats,**
23  **you could use ImageNet, which has thousands of images**
24  **of cats, and then use a subset of your own, and it**
25  **would probably work to identify 12 cats or 20**

171

1      **different species of cats, as an example.**
2      Q.  So if you are just trying to classify a few
3  things, you could get away with only using a thousand
4  images?
5          MR. MELLEMA:  Objection to form.
6      **A.  If the required classification is very**
7  **simple, yes, you can.**
8      Q.  What models require tens of thousands of
9  images to be trained?
10     **A.  Harder.  Let's say you have 100**
11  **classifications of something, like you want to include**
12  **dogs and lots of dogs look like cats, and so you need**
13  **to have more images to train the ML.**
14     Q.  What models require millions of images to be
15  trained?
16     **A.  In the case of -- Compology is a good**
17  **example.  They had a model that detected multiple**
18  **attributes,** ██████████████████████████████
19  ████████████████████**, for detecting**
20  **contamination, and fullness level.  And so their**
21  **trained model could do all three, and it would -- it**
22  **required a lot of training to get to accurate**
23  **particularly contamination, but....**
24     Q.  Is it your understanding that Compology just
25  uses one model to make all the classifications you

172

1  just described -- subpar image detection,
2  contamination, and fullness?
3      **A.  No, I'm sorry.  I meant to say their**
4  **models --** ████████████████████████████
5  ████████████████████████████████████████
6  **And subpar image detection was very important because**
7  ████████████████████████████████████████
8  ██████████████**-- I'm sorry to keep going back to**
9  **it.  It's what I'm trying to do with my sensors out in**
10  **the wild.**
11  ████████████████████████████████████████
12  ████████████████████████████████████
13         **So they have a model that detects subpar**
14  **images.**
15  ████████████████████████████████████████
16  ████████████████████████████████████████
17  ████████████████████████████████████████
18  ████████████████████████████████████████
19  ████████████████████ █ ████████████████
20  ████████████████████████████████████████
21     Q.  You mentioned that one of the things that
22  you're trying to do with your product is analogous to
23  Compology's subpar image detection. ████████████████
24  ████████████████████████████████████████
25  right?

Case 3:23-cv-04804-WHA   Document 153-5   Filed 10/29/24   Page 32 of 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024
44 (173 to 176)

173

1   A. ████████████████████████████
2   ████████
3   Q. So that's a pretty obvious design decision;
4   correct?
5        MR. MELLEMA: Objection, form.
6   Q. Can you answer?
7   A. I'm sorry, are you saying to have a pretty
8   obvious design decision? Is that what you mean? Like
9   superior image detection?
10  Q. Yes.
11  A. Some people would just let the ML do the work
12  and not worry about it. ████████████████████████
13  ██████████████████████████████████████████████
14  ████████████████████████████████████ So no,
15  it's not obvious. It's a lot of work.
16  Q. It took you a lot of time to think of that
17  for your product?
18       MR. MELLEMA: Objection to form.
19  A. It is not equivalent.
20  Q. Why did you bring it up in your previous
21  answer?
22  A. Just as an example of what a filter is in
23  general. There are lots of different purposes. It's
24  just an example.
25  Q. What models does Compology use in conjunction

174

1   with its subpar image detection?
2        MR. MELLEMA: Objection, form.
3   A. Well, I happen to have a section on that.
4   Let me consult my declaration.
5        So I understand your question, it's what
6   model did Compology use or architecture, was
7   specifically the question?
8   Q. I'll withdraw it for now.
9        Going back to our previous discussion
10  about the number of images required to train different
11  models. Do you recall us talking about that
12  generally?
13  A. Yes, I do.
14       MR. MELLEMA: Objection, form.
15  Q. Some models only require a thousand images to
16  train. Some models require millions of images to
17  train. Correct?
18  A. Correct.
19  Q. Would you agree, then, that for a model that
20  only requires a thousand images to train, the images
21  aren't as important?
22       MR. MELLEMA: Objection, form.
23  A. I'm sorry, you need to clarify. Do you
24  mean -- you said the images aren't that important.
25  What do you mean by that?

175

1   Q. Well, are images more important to a model
2   that only requires a thousand of them or to a model
3   that requires a million of them to train?
4        MR. MELLEMA: Objection, form.
5   A. They're equally important. You can't train
6   without images. It's just you need fewer of them for
7   differentiating oranges from apples. You need more
8   when you have complex images to differentiate. So the
9   images by themselves are the core important element,
10  and training doesn't happen without them.
11  Q. You'd agree that it would take less time to
12  label and tag a thousand images than it would to label
13  and tag a million images; correct?
14  A. Of course.
15  Q. Okay. Now, in your report you opine that it
16  would have been impossible for Mr. Laraki to train
17  Pello models using only a thousand images; correct?
18       MR. MELLEMA: Objection, form.
19  A. For contamination and for dirty lens
20  detection, I stand by that. You could not do that
21  with a thousand images.
22  Q. And using a ConvNeXt open source model;
23  correct?
24  A. Right. That's not that big a deal. I mean,
25  it's not weaker or stronger than other models in this

176

1   context. So that's not a determining factor. It can
2   take more images to train ConvNeXt because it's more
3   complex. If you want to get it to actually work as
4   you would expect, it could actually be -- take longer
5   to train than ResNet, which is a simpler, earlier
6   model.
7   Q. So you think it would be impossible to train
8   an open source ConvNeXt model using a thousand images
9   to get the accuracy Mr. Laraki obtained?
10  A. For what purpose?
11       MR. MELLEMA: Objection.
12  Q. Can you answer my question?
13  A. I can't without further context. You're
14  talking about using a thousand images to classify
15  something. What is the something you're trying to
16  classify?
17  Q. Let's start with contamination.
18  A. Definitely not. That's a definite no, you
19  cannot.
20  Q. Did you try to do that?
21  A. I wouldn't bother. It would be like trying
22  to fly an airplane made out of cinder blocks. It
23  won't lift off the ground. No, you can't do it. It's
24  unequivocal. It's well known to the skilled person
25  that would that would not even be worth a try.

Case 3:23-cv-04804-WHA   Document 153-5   Filed 10/29/24   Page 33 of 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024                    45 (177 to 180)



177
1    Q.  So you didn't try to do it.
2    A.  Of course not.  I'm a skilled person.
3    Q.  You couldn't even think of a way that it
4  would work?
5    A.  No.
6        MR. MELLEMA:  Objection, form.
7    A.  No.
8    Q.  What about with respect to fill level?
9    A.  Well, fill level, really simple -- like, just
10  four levels, and there's no other requirements.  You
11  could probably train with one or two thousand images
12  per fill level.  You know, 8,000 -- 8,000 images you
13  could get a reasonably usable classification.
14  Obviously that's assuming you've pretrained it with
15  something -- maybe ImageNet or something.
16        But after that the rule of thumb is one to
17  two thousand images per classification.  And so fill
18  level is simpler because it's just the contrast -- or
19  the horizon versus the background of the container.
20  If it's only four, then you could probably get that to
21  work.  But just four -- well, excuse me.  Get that to
22  work.  I'll leave it at that.  Excuse me.
23    Q.  Going to Paragraph 91.
24    A.  I am there.
25    Q.  First sentence states, "I understand that

178
1  Compology kept its training data secret by entering
2  into contractual restrictions on use and disclosure."
3  Do you see that?
4    A.  I do.
5    Q.  We may have touched on it earlier:  What
6  contractual restrictions are you referring to there?
7    A.  The contractual restrictions are in the
8  service contract between Compology and its customers,
9  such as RTS.  And it states plainly they are -- the
10  use restrictions of the images.
11    Q.  And have you read those contracts?
12    A.  I did a while ago.  I don't know if it's in
13  my exhibits, but I did see that.
14    Q.  You know they're multiple; right?
15    A.  What's "they're"?
16    Q.  Contracts.
17    A.  Yes, I know.
18    Q.  Which ones have you reviewed?
19    A.  I think the first was, what, 2017.  There are
20  three contracts I know of 20-teens, and then 2020 and
21  2022.  I think 2016 was the start.  I've got to look
22  it up.  There's no point in guessing out loud here.  I
23  apologize.  Would you like me to?
24    Q.  No, you don't need to right now.
25        Based on your recollection of those, do

179
1  you know who owns the images and training data?
2        MR. MELLEMA:  Objection, form.
3    A.  They are the property of the user of the
4  system, with restrictions.
5    Q.  Turning to Paragraph 93.
6    A.  Okay.
7    Q.  And this is in the Subpar image Detection
8  section of your report.
9        And the second sentence there,
10  "Compology's source code reveals that
11
12
13
14         Do you see that?
15    A.  I do.
16    Q.  Are you saying that the specific way that
17  Compology trains and implements its SPID machine
18  learning model is a trade secret?
19        MR. MELLEMA:  Objection to form.
20    A.  No, I'm not.
21    Q.  Okay.  Who did you speak with about the
22
23        MR. MELLEMA:  Objection, form.
24    A.  Who I spoke with in the past was their
25  software engineer, named Justin.  And let me look up

180
1  his last name.
2    Q.  Does Armstrong ring a bell?
3    A.  Yes.  Thank you.
4    Q.  When did you speak with him?
5    A.  Last was several months ago.  I think it was
6  about the middle of the summer, even, was the last
7  time we.  He was --
8    Q.  And then Paragraph 95?
9    A.  I do.
10    Q.  You state, "I understand that, in operation,"
11  and it looks like you describe what the SPID does.  Do
12  you see that?
13    A.  I do.
14    Q.  Is that the SPID trade secret?
15        MR. MELLEMA:  Objection, form.
16    A.  It is part of the process of running the SPID
17  function.
18    Q.  Okay.  And is that part of the process of
19  running the SPID function what you would say defines
20  the SPID trade secret?
21        MR. MELLEMA:  Objection, form.
22    A.  I'm sorry, I'm just reviewing what I wrote.
23        So again, it is part of a process of the
24  trade secret SPID.
25    Q.  Paragraph 99.  You can let me know when you

Case 3:23-cv-04804-WHA   Document 153-5   Filed 10/29/24   Page 34 of 40
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024                    46 (181 to 184)



**181**

1  get there.
2  **A.  I'm there.**
3  Q.  Are you saying that the specific way
4  Compology trains its contamination detection ML models
5  is part of the contamination detection trade secret?
6  MR. MELLEMA:  Objection, form.
7  **A.  Again I ask to review my words.**
8  **Okay, I've reviewed.**
9  Q.  Can you answer my question?
10 **A.  It would be similar to my previous response.**
11 **This is part of the process of providing contamination**
12 **services.**
13 Q.  Is the specific types of contamination
14 detection that Compology's devices form part of the
15 trade secret?
16 **A.  I would say yes.**
17 Q.  So a product may identify different types of
18 contamination.  That wouldn't be the trade secret.
19 Correct?
20 MR. MELLEMA:  Objection, form.
21 **A.  I think that's similar to what I've said**
22 **earlier, that if it's substantially the same thing,**
23 **and it would still fall under this trade secret.**
24 Q.  Well, Compology's models are designed and
25 trained on specifically labeled and tagged images to

**182**

1  detect specific types of contamination; right?
2  MR. MELLEMA:  Objection, form.
3  **A.  Correct.**
4  Q.  So a model using images labels and tags to
5  detect different types of contamination you're still
6  saying is the same?
7  MR. MELLEMA:  Objection, form.
8  **A.  The description of this process, if I may, on**
9  **Paragraph 101, for instance,**
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**183**

1
2  Q.  You're saying Hershey bars and milk cartons
3  are the same as contamination?
4  **A.  If they are contamination, they are the same**
5  **as the enumerated contaminated items here, such as**
6  **Styrofoam or uncollapsed cardboard boxes.**
7  Q.  So what do the labels and tags and images
8  matter, then?
9  **A.  You have to choose what you train the machine**
10 **learning system to recognize.**
11 Q.  So it doesn't matter what you're looking for;
12 correct?
13 **A.  Of course, by definition.**
14 Q.  So if you're looking for something different,
15 that's not the trade secret; right?
16 MR. MELLEMA:  Objection, form.
17 **A.  No.  No, that's incorrect.  The ability to**
18 **look for any particular contaminant in the midst of**
19 **desired or acceptable items is a trade secret, how to**
20 **do that accurately.**
21 Q.  You've already said the specific types of
22 contamination is part of the trade secret; right?
23 **A.  I didn't say that, actually.**
24 Q.  Well, the transcript says what it says.  So
25 are you saying --

**184**

1  MR. MELLEMA:  Objection, form.
2  Q.  I'll start over.  Sorry.
3  **A.  I'm sorry, counsel.  I'm getting a little**
4  **tired.  But I promise to -- I can't imagine -- you're**
5  **three hours ahead of us, too.  So apologies.**
6  Q.  Is the specific type of contamination that
7  Compology's contamination detection model looks for
8  part of the trade secret?
9  MR. MELLEMA:  Objection, form.
10 **A.  I would say no, it's not.  It is the ability**
11 **to look for contamination of pretty much any type.**
12 Q.  Turning to Paragraph 105.
13 **A.  Okay, I'm there.**
14 Q.  Similar to some previous questions:  You're
15 not alleging that the way Compology's trained its
16 container fullness model is a trade secret; correct?
17 MR. MELLEMA:  Objection, form.
18 **A.  Again, I'm reading what I wrote.**
19 **I guess I stand by what I wrote, that it**
20 **describes their process of the steps they take for**
21 **training their model --**
22
23
24
25

Case 3:23-cv-04804-WHA   Document 153-5   Filed 10/29/24   Page 35 of 40

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024                    47 (185 to 188)

185

▮▮▮

4          So that is a trade secret -- the entire
5     process as I described in my independent analysis
6     starting on Paragraph 105 through, I guess, 107, 108,
7     through 109.
8        Q.  So if somebody doesn't use that process,
9     that's not your trade secret; right?
10           MR. MELLEMA:  Objection, form.
11     A.  I think any user of artificial intelligence
12  is free to train in any manner they wish, and if it
13  works for them, then good luck to them.  This was a
14  very effective way to create an accurate, versatile
15  container fullness analysis that could function across
16  a wide variety of containers, including the --
17  anyway....
18          For the purposes or the use of their
19  system, it's proved to be an accurate and very
20  reliable system.
21     Q.  If somebody used a different machine learning
22  model framework and performed different steps than
23  what's described in Paragraphs 107 and 108 and applied
24  different classifications, that wouldn't be your trade
25  secret; correct?

186

1           MR. MELLEMA:  Objection, form.
2     A.  If using their own images and training their
3  own model, it would not be -- they would not be
4  utilizing the trade secret.
5     Q.  Paragraph 112 --
6           MR. MELLEMA:  Counsel, we've been going
7  maybe another hour again.  Do you want to take another
8  break?
9           MR. GALICA:  Sure.
10           THE VIDEOGRAPHER:  We're off the record at
11  7:21 p.m.
12           (Recess taken.)
13           THE VIDEOGRAPHER:  7:33 p.m.  Back on the
14  record.
15     Q.  I'm going to turn to Paragraph 112.  Do you
16  see that?
17     A.  I'm there.
18     Q.  You see there's a section RoadRunner's Trade
19  Secrets Have Independent Economic Value?
20     A.  I do.
21     Q.  What is the independent economic value of the
22  overall waste metering trade secret?
23     A.  The overall system, I assume you mean, of
24  waste metering?
25     Q.  Yeah, the first trade secret in your report.

187

1     A.  The economic value is the value of the -- of
2  being able to offer that -- offer that business.  Let
3  me make sure I'm saying the right thing.  Excuse me.
4  I'm just getting things organized.
5          So the overall value is the ability to
6  apply that device to a business and make money.
7     Q.  Can you quantify that with any metric?
8     A.  I'm not the damages expert, so I didn't try.
9  But I have seen spreadsheets where they project
10  business -- potential business of their technology, or
11  the potential projected -- excuse me, projected
12  business.  But I'm not concerned with -- I didn't
13  spend any time with estimating to any degree of
14  accuracy.
15     Q.  Did you try to review any realized value of
16  the trade secrets?
17           MR. MELLEMA:  Objection, form.
18     A.  Again, I'm not asked to -- I have not been
19  asked to opine on that.  My sole focus was on the
20  technology and -- as I have reported.
21     Q.  Do you know whether Compology devices were
22  successful?
23     A.  Well, the RTS folks have 2,615 of them, so
24  they must be doing something useful.  That's a lot of
25  capital.

188

1     Q.  How much capital is that?
2     A.  If I look at their spreadsheet, I can tell
3  you.  But I don't have a number off the top of my
4  head.  But that's a lot of count, a lot of hardware.
5     Q.  Do you know whether or not Compology was a
6  successful company?
7     A.  I would have to get a little more information
8  on what you define as success, successful.
9     Q.  How would you define it?
10     A.  Well, I've founded six startups out here in
11  Silicon Valley.  The overall definition for me is
12  exit, you know -- was I able to exit the effort and
13  get my investors' money back and make some myself.  I
14  did two out of six, which is not too bad.
15          So it's basically -- the issue is their
16  definition, not mine.  And again, it wasn't really my
17  concern.
18     Q.  Maybe the answer is going to be the same, so
19  I'll just ask:  Do you know the independent economic
20  value for any of the trade secrets?
21           MR. MELLEMA:  Objection, form.
22     A.  I don't know as a quantifiable number.  I
23  just know that there is value in what I observed, and
24  in some cases high value, like the millions of images
25  it took six years to accumulate, or more.

189

1    Q.  How much does it cost to label an image?
2    A.  Well, there are two costs.

8                                   I don't know what
9  they spent or what it ultimately cost.
10       But the fact that it took that many years
11  to accumulate the valuable tagged image databases of a
12  very high-value item—plus, as I said earlier, I
13  know from my own experience that nothing works without
14  cleanly tagged images.  No machine learning occurs
15  without that.
16    Q.  Can you assign a value to that, a
17  quantifiable value to any of that?
18    A.  Sure.  Here's how I would do it.  They had
19  a—they planned a budget of 40 million over the ten
20  years, which I find incredibly modest.  I would say
21  good on you for being able to do it for that little.
22       But at any rate, let's just take the six
23  years to get to their initial stable image database.
24  I would attribute at least, you know, half of those
25  funds with the image tagging and acquisition.

190

1       But again, I'm not a damages expert, so
2  I'm just humoring you with a guess, because I don't
3  really know.
4    Q.  Fair enough.  I'm going to turn to Paragraph
5  141.  Do you see that?  Or let me know when you get
6  there.  Sorry.
7    A.  I am there.
8    Q.  And you see there's a picture beneath
9  Paragraph 141; correct?
10    A.  Yes.
11    Q.  On the left is a printed circuit board of the
12  Compology R12.  On the right is a printed circuit
13  board from the Pello.  Correct?
14    A.  Yes, correct.
15    Q.  You would agree that those are very different
16  circuit boards; correct?
17    A.  In shape they're different, yeah.
18    Q.  How else are they different?
19    A.  They're not much different other than shape.
20  The different -- the substantial difference between
21  Compology and Pello is, as I wrote, the Pello
22  incorporates ultrasonic sensors, where Pello -- where
23  Compology does not.  Other than that, they have a 4G
24  radio LTE, the mobile radio, low power.  They both
25  have an ARM CPU inside their respective MPU -- that's

191

1  Michael, Peter, uniform -- microprocessor unit.  They
2  both use SIM cards.  Both use a GPS chip.  And
3  miscellaneous other -- but those are the primary
4  similarities.  And then, of course, the camera
5  interface.
6    Q.  They use different GPS chips; correct?
7    A.  Yeah.  There are a couple of dozen choices
8  you could pick.  They all do pretty much the same
9  thing.  But yes.
10    Q.  And it was publicly known that the Compology
11  uses a GPS chip?
12    A.  I don't know if I could say publicly, other
13  than they had to report that to the FCC.  I guess that
14  is public.  The FCC, you and I pay for their wonderful
15  services.  So yes, it's known to the public.
16    Q.  And then the 3G/LTE radio IC, those are
17  different between the two products?
18    A.  Yes.
19    Q.  And the MPUs are different; correct?
20    A.  In a way.  The core is an ARM.  They're a
21  very similar -- ARM processor.  The Pello unit uses
22  the Nordic semiconductor system in a package, or SiP,
23  inside of the chip that I highlighted.
24       When it comes to -- again, there's a wide
25  range of choices to get to the same goal.  So

192

1  architecturally it is -- a block diagram without part
2  names would look very similar, other than the
3  ultrasonic sensors.
4    Q.  What about all the know-how that went into
5  implementing these different chips on a facially
6  different printed circuit board?
7       MR. MELLEMA:  Objection, form.
8    A.  I've designed dozens of complex circuits, and
9  it's not -- it's not rocket science to apply, you
10  know -- to pick a chip.  You don't have a lot of
11  choices, you know.  It's the functions that you're
12  collecting -- the collective functions, I should say,
13  that matter.  Laying the parts down, if they're radio
14  frequency chips, like for the LTE radios, you have to
15  be very careful with what are called -- you have
16  basically -- you have to be careful with your copper
17  widths, because you have waveguide-like conditions.
18  And it just requires for the RF section lots of
19  thought of decoupling of copper traces.  RAM chips to
20  a high-speed CPU, if you're using them, have to have
21  their trace links attended to so they're all equal.
22       So there's a lot of work.  So it's well
23  known for the individual steps.  It's the architecture
24  that really matters:  What are you bringing together
25  to solve a problem?  I'll leave it at that.



229

1  You have to manually tag images as they are generated,
2  and it is a very time-consuming and hence valuable
3  asset for the purpose of training models to perform
4  the function of the overall system.  And those are the
5  two high points.
6      Q.  Does the camera system itself have an
7  economic value?
8          MR. GALICA:  Objection.
9      A.  In my opinion it does, because the choice of
10 sensor that can withstand the environment, the choice
11 of
12
13
14
15
16
17         -- all of those combine to a fairly -- by itself
18 a fairly valuable asset.
19     Q.  Did the optical assembly and design have
20 independent economic value, in your opinion?
21         MR. GALICA:  Objection.
22     A.  Yes.
23     Q.  And what is the independent economic value of
24 the optical assembly and design?
25         MR. GALICA:  Objection.

230

1      A.  If the optical assembly means just the lenses
2  or the lenses and the sensor -- if it's lenses and the
3  sensor, it was, I think I was trying to state, that
4  the lens with sensor has to be carefully matched for a
5  variety of different optical requirements.  The lens
6
7
8
9
10
11         It certainly requires a knowledge of the
12 overall requirements of machine learning to be able to
13 utilize the images for purposes of training, meaning
14 machine learning training.  And then following that
15 would be the need for humans to be able to look at the
16 image and see what the image is about in order to be
17 able to label and tag it.
18     Q.  Does Compology or Recycle -- or RoadRunner's
19 contamination detection machine learning model have
20 independent economic value?
21         MR. GALICA:  Objection.
22     A.  Yes.
23     Q.  And what is that independent economic value
24 of Compology's contamination detection machine
25 learning model?

231

1          MR. GALICA:  Objection.
2      A.  That is probably one of the most important
3  services to a customer, to be able to detect and
4  correct contamination.  Several bad things happen when
5  bins are picked up that are contaminated.  It can be
6  very costly for the company utilizing the container.
7  And it is also very useful for helping the users of
8  the container track down what is going wrong or what's
9  causing the contamination -- uncollapsed cardboard
10 boxes or contaminants in an organic recycle bin, for
11 instance.  If you have an oily pizza box or a black
12 plastic bag that's not organic, it helps the users of
13 a system find and correct these errors.
14     Q.  And does the                        have
15 independent economic value?
16         MR. GALICA:  Objection.
17     A.  I would say it has --
18
19
20
21
22
23
24
25

232

1          MR. MELLEMA:  No further questions at this
2  time.
3          MR. GALICA:  I have a handful of
4  followups.
5              RE-EXAMINATION
6  BY MR. GALICA:
7      Q.  So counsel just asked you does the camera
8  system itself have economic value.  Do you recall
9  that?
10     A.  Yes.
11         MR. MELLEMA:  Objection to form.
12     Q.  Do you -- well, strike that.  He didn't ask
13 you does the camera -- I'll withdraw that.
14         Counsel asked you does the camera system
15 itself have an economic value.
16         MR. MELLEMA:  Objection, form.
17     Q.  Do you recall that?
18     A.  Yes.
19         MR. MELLEMA:  Objection to form.
20     Q.  What's the economic value, in dollars?
21     A.  I have not attempted to assess that.
22     Q.  And what trade secrets relate to Compology's
23 camera system?
24     A.  I wrote a whole section about that in my
25 declaration here.  I think the Trade Secret 3 would be

233

1   a starting place, the optical assembly and design --
2       Q.  Well -- sorry.  I didn't mean to cut you off.
3       A.  You're asking me -- so that is my opinion of
4   the trade secret.  What else would you like me to
5   opine upon?
6       Q.  You said that the camera system has an
7   economic value.
8       A.  The camera system, the whole thing -- you
9   mean, the whole sensor?
10      Q.  I'm just using your words, yes.
11      A.  Okay, the whole sensor enables the service
12  being reliable, by providing images that are
13  processable by either humans or machine learning
14  systems.
15      Q.  And -- sorry.  Did you have anything else?
16      A.  No, that's fine.
17      Q.  Okay.  When you said "camera system," what
18  did you mean?
19      A.  The smart camera apparatus, as defined in
20  Trade Secret 2.
21      Q.  Anything else?
22      A.  What I mean by smart camera apparatus, my
23  definition is in Trade Secret 2, and starting on Page
24  14.
25      Q.  Okay.  You said the optical assembly and

234

1   design has independent economic value.  Do you recall
2   that?
3       A.  I do.
4       Q.  In dollars what is the independent economic
5   value?
6       A.  That again is something I would rely on a
7   damages expert to determine.
8       Q.  Okay.  And when you said optical assembly and
9   design, what trade secrets did that relate to?
10      A.  That would be Trade Secret 3.
11      Q.  And when you said that it had economic value,
12  your answer was, "If the optical assembly means just
13  the lenses or the lenses and the sensor -- if it's
14  lenses and the sensor, it was, I think I was trying to
15  state, that the lens with sensor has to be carefully
16  matched for a variety of different optical
17  requirements.  The lens has to fill the image sensor
18  fully with light.  That means issues like vignetting
19  and other common lens problems have to be addressed.
20  ███████████████████████████████████
21  ███████████████████████████████
22      "It certainly requires a knowledge of the
23  overall requirements of machine learning to be able to
24  utilize the images for purposes of training, meaning
25  machine learning training.  And then following that

235

1   would be the need for humans to be able to look at the
2   image and see what the image is about in order to be
3   able to label and tag it."
4       Do you recall stating that?
5       A.  I do.
6       Q.  And that was the economic value you
7   associated with the optical assembly and design?
8       A.  Yes.
9       Q.  So everything there is part of the optical
10  assembly and design trade secret?
11      MR. MELLEMA:  Objection, form.
12      A.  I'd rather -- since this is written, and
13  we've discussed it many times, I would -- in order to
14  answer that, I will have to go back and make sure that
15  I -- that is contained within what I wrote.
16      I will stay with what I wrote.  You're
17  asking me about the value.  My only way to assess even
18  a partial --
19      My way of responding to economic value is
20  with my knowledge of the difficulty of the engineering
21  that it took to create the -- that particular
22  component.  And therefore -- and as such, it has
23  economic value because it is as a critical part of the
24  system.
25      Q.  Is it more critical than the smart camera

236

1   apparatus?
2       A.  It's part of the smart camera apparatus.
3       Q.  Well, so, then, that economic value also
4   relates to the smart camera apparatus trade secret?
5       MR. MELLEMA:  Objection, form.
6       A.  No, it relates to the economic value of the
7   smart camera, which we're talking about economic
8   value.  I'm saying the way I as an engineer, and not a
9   damages expert, assess economic value is my knowledge
10  of how much work it would take to replicate that
11  critical element, or any element.  The same with the
12  tagged images:  the sheer pain of collecting millions
13  of images over years, it's obvious to me that that has
14  an extraordinarily high economic value -- as an
15  example.
16      Q.  You can't quantify it in a dollar amount,
17  though; correct?
18      A.  I have said repeatedly I'm not a damages
19  expert.  I did give you an effort at it based on how
20  much money was spent to -- you know, to get there.
21  But that is only a past value, not a future value.
22      Q.  Do you recall counsel asking you whether the
23  contamination detection machine learning model has
24  independent economic value?
25      A.  Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024

60 (237 to 240)



237

1  Q.  And you stated that it does.
2  A.  Correct.
3  Q.  You said, "That is probably one of the most
4  important services to a customer, to be able to detect
5  and correct contamination.  Several bad things happen
6  when bins are picked up that are contaminated.  It can
7  be very costly for the company utilizing the
8  container.  And it is also very useful for helping the
9  users of the container track down what is going wrong
10 or what's causing the contamination -- uncollapsed
11 cardboard boxes or contaminants in an organic recycle
12 bin, for instance.  If you have an oily pizza box or a
13 black plastic bag that's not organic, it helps the
14 users of a system find and correct these errors."
15     Do you recall saying that?
16 A.  Yes, I do.
17 Q.  And do you know how many customers use the
18 contamination model?
19 A.  Actually, I don't.
20 Q.  Do you know whether or not Compology charges
21 an extra fee for using the contamination model?
22 A.  I don't -- I'm afraid I don't know their fee
23 structure.  I've seen some --
24     I don't know their fee structure off the
25 top of my head here.

238

1  Q.  And you can't assign a dollar value to the
2  contamination model?
3  A.  I would be reluctant to try.  So I don't have
4  an opinion on dollar values.
5  Q.  Do you recall counsel asking you whether
6  Compology's SPID machine learning model has
7  independent economic value?
8  A.  Yes.
9  Q.  And you said, "I would say it has --
10
11
12
13
14
15
16
17
18     Do you recall saying that?
19 A.  Yes.
20 Q.  Do you know whether the ▓▓▓▓▓ is used in
21 conjunction with Compology's
22 A.  Is this with regards to RTS's use of the
23 system, or is this in general?
24 Q.  No, it's with regard to the answer you just
25 provided.

239

1     MR. MELLEMA:  Objection, form.
2  A.  Its reason to exist is to perform those
3  functions.
4  Q.  I'll ask -- sorry, I didn't mean to cut you
5  off.
6  A.  Go ahead, please.
7  Q.  I'll try to ask a better question.  You
8  stated that the economic value of the SPID machine
9  learning model, for example, is ▓▓▓▓▓▓▓▓▓▓▓▓
10 ▓▓▓▓▓▓▓▓▓▓▓  Do you remember that?
11 A.  Yes.
12     MR. MELLEMA:  Objection, form.
13 Q.  Do you know if Compology uses its ▓▓▓▓▓▓
14 ▓▓▓▓▓
15 A.  It is my understanding that they do.
16 Q.  And that's what you're basing your conclusion
17 that the SPID has independent economic value on;
18 right?
19     MR. MELLEMA:  Objection, form.
20 A.  It is one of its uses.
21     MR. GALICA:  No further questions.
22     MR. MELLEMA:  No further questions from
23 me.
24     THE VIDEOGRAPHER:  This concludes the
25 videotaped deposition of --

240

1     MR. MELLEMA:  Hold on.  I'm sorry.
2     I forgot to mention that the deponent has
3  given his testimony in Pacific Time, even though the
4  record reflects Eastern Time.  With that, we can
5  conclude.
6     THE VIDEOGRAPHER:  This concludes the
7  videotaped deposition of Leo Hoarty.  The time is 8:28
8  p.m.  We are off the record.
9     (The deposition concluded at 9:28 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

Transcript of William Leo Hoarty
Conducted on September 12, 2024

241

```
1        CERTIFICATE OF COURT REPORTER
2
3        I, Alan H. Brock, Registered Diplomate
4   Reporter and Notary Public, the officer before whom
5   the foregoing deposition was taken, do hereby certify
6   that the foregoing transcript is a true and correct
7   record of the testimony given; that said testimony was
8   taken by me stenographically and thereafter reduced to
9   typewriting under my supervision; that reading and
10  signing was not requested; and that I am neither
11  counsel for nor related to nor employed by any of the
12  parties to this case and have no interest, financial
13  or otherwise, in its outcome.
14        IN WITNESS WHEREOF, I have hereunto set my
15  hand and affixed my notarial seal this 16th day of
16  September, 2024.
17        My commission expires March 25, 2027.
18
19
20
21  _____
22  Alan H. Brock, RDR, CRR
23
24
25
```