# EXHIBIT 25

# EXHIBIT D

# REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED

Master Services Agreement ("MSA")

This Agreement ("Agreement") is made and entered into as of September 26, 2007, ("Effective Date") between Lenovo (Singapore) Pte Ltd, with offices at 151 Lorong Chuan, #2-01 new Tech Park, Singapore 556741 ("Customer") and Lithium Technologies ("Lithium"), a Delaware corporation with offices at 5980 Horton St, Suite 370, Emeryville, CA, 94608 (together, the "Parties"). It applies to the purchase of Services by Customer.

## 1 Definitions

1.1 "Applications" or "Software Applications" means software of any kind, type and representation, inclusive of any customer ECRs, along with its documentation and its programming and user interfaces, provided by Lithium, whether or not hosted by Lithium.

1.2 "Contract Volume", at any time, means the volume of Pageviews or other units of volume that Customer books by contract from Lithium, and is invoiced for, for the coming quarter.

1.3 "Content" means information processed or stored by the Applications.

1.4 "Engineering Change Request" or "ECR" means a request by Customer to have Lithium develop custom functionality within the Applications, and the work product thereof.

1.5 "Good Standing" is Customer status when all undisputed fees are paid if due.

1.6 "Hosting" of the Applications (the "Hosting Service") means the activities conducted by Lithium in providing an environment of hardware and systems within which the Applications are running and the Content is being stored.

1.7 "Pageview" is a single valid HTTP request to a server, excluding static non-HTML files such as images such as JPEG or GIF files, or java applets. Lithium stores all javascript functions in a single browser-cached page ("JS Page"), and the first, or refreshed, load of the JS Page counts as a Pageview. Pageview metrics are available in-Application.

1.8 "PII" is (i) personally identifiable information collected from an end user, (ii) stored in the Applications (iii) where both Parties have agreed in writing that they are stored in the Applications (so that Lithium can ensure it is stored and processed appropriately) in an appropriately protected environment, (iv) which is not shared with or published to groups of other end users. Lithium is not liable for personally identifiable information that is not PII. PII is the only Confidential Information stored in the Applications.

1.9 Reasonable and industry. The standard to apply to any "reasonable" or "industry standard" obligations set forth herein is that of an Application in general used by an enterprise to publish end-user-generated content to other end users.

1.10 "Service Duration", specified in the Service Order, starts on the Service Start Date, and establishes the period during which (i) Services are provided by Lithium to Customer and (ii) Customer pays recurring fees for Services.

1.11 "Service Start Date" shall mean the date when the Applications are first provisioned by Lithium for Customer, unless such release is subsequently rejected by Customer according to the Statement Of Work ("SOW").

1.12 "Services" may include Hosting Service, Engineering Services where the specification of deliverables is embodied in an ECR, or other Professional Services such as moderation or community management.

1.13 "User Interface Elements" means any proprietary software of Customer that can be inserted into or around the Applications user interface area through the hosting, administration or Content management interfaces. They include the following elements: (i) header, footer, left and right sidebars, which are all elements in general surrounding, on the page, the Applications' user interface area; and (ii) text, graphic files, and Cascading Style Sheets, which directly apply to the Applications' user interface area.

## 2 Services

2.1 Hosting Service. Lithium shall be responsible for ... [illegible] compliance with the Service Level Agreement, from the Service Start Date to the expiration of the final term. Lithium will comply with the principles of the EU Data Protection Directive 95/46 and the Telecoms Data Protection Directive as amended and any successor legislation, in relation to any "personal data" received by or originating from Customer and Customer clients, to the extent that the Directives apply to "data processors" in general, and to Lithium in particular expressly as per this Agreement. Notwithstanding such application, Customer acknowledges and understands that Lithium shall not be liable for any personally identifiable information or Confidential Information processed or stored by the Applications and Customer shall hold Lithium harmless if any such information is so processed or stored.

2.2 Duties of Customer. Customer shall be responsible for administering the Applications and managing Content. Customer shall do so in a lawful manner and in compliance with the requirements of this Agreement. Customer shall provide Lithium with all information, access, and full good faith cooperation reasonably necessary to facilitate the provision of the Services, and shall do any thing that is identified in the Service Order or the SOW as the Customer's responsibility. If Customer fails or delays in its performance of any of the foregoing, Lithium shall be relieved of its obligations hereunder to the extent that such obligations are dependent upon such performance.

2.3 Restriction on use. Customer shall not copy, reproduce, distribute, modify, reverse engineer, decompile, attempt to determine source code or algorithms of, sell, rent, lease, license, sublicense, resell, transfer or assign Applications nor any of its rights to it. Customer shall not use the Applications to spam, send unsolicited e-mail, or conceal the identity of an e-mail sender. Customer shall not use Applications as a service bureau or for the benefit of any third party other than end users of the Applications, whether on a paid or unpaid basis. Customer shall not store, distribute or transmit any unlawful material through the Applications. Customer shall not export or re-export, directly or indirectly, any Applications, documentation or Confidential Information to any countries outside the United States except as permitted under the U.S. Commerce Department's Export Administration Regulations.

## 3 Grant of rights

3.1 Reserved Intellectual Property Rights. Notwithstanding anything else to the contrary, there shall be no transfer of intellectual property rights between the Parties as a result of this Agreement.

3.2 User Interface Elements. All rights to any and all User Interface Elements remain exclusively Customer property. Subject to this Agreement, Customer grants to Lithium, a temporary, limited, non-exclusive, non-transferable, world-wide, royalty-free license solely for the purpose of displaying such Elements within Customer's deployment of the Applications.

3.3 Content. All rights to Content remain exclusively Customer property. Lithium shall (a) treat the Content with the standard of care described in Section 10.3 of this Agreement ("Protection of Confidential Information"); and (b) use the Content strictly as necessary to carry out its obligations hereunder, and for no other purpose whatsoever.

3.4 Software Applications. All rights to all Applications, including their specifications, their programming and user interfaces, and the implementation of Customer ECRs or feature requests, remain exclusively Lithium property. Subject to this Agreement, Lithium grants to Customer, a temporary, limited, non-exclusive, non-transferable, world-wide, royalty-free use license to use the administration, content management, and end user interfaces of the Applications, solely under the conditions defined in this Agreement.

3.5 General use of Trademarks. Each Party grants the other Party the [illegible]

furtherance of this Agreement. Trademarks of either Party shall remain the exclusive property of that Party and the other Party has and shall have no right to such Trademarks. All use of the Trademarks of a Party shall be deemed to inure only to the benefit of such Party. Each Party shall ensure that the use of the other Party's Trademarks conforms to the other Party's expressed specifications. Initial specifications are listed in the Branding Specifications, and may be changed by either party from time to time. Other than as stated, neither party shall make any use of the other's trademarks or logos without the other party's prior written consent.

5 Marketing. Each page served by the Applications will contain a link identified by the Lithium logo and trademark similarly to equivalent Lithium deployments. Lithium may use Customer's name and logo on Customer's Applications deployment and identify Customer as a Lithium customer. Lithium may issue a press release and a case study about Customer's selection and use of the Service provided that Lithium submit any such press release/ case study to Customer for timely written approval prior to release. Customer does not guarantee of such approval.

## 6 Term and termination

6.1 Term and termination of this Agreement. This Agreement may be terminated for convenience by either Party with 60 days' written notice to the other starting on the one year anniversary of the Effective Date. However, notwithstanding anything else to the contrary, it shall remain valid, past termination, as long as there is a valid Service Order between the Parties that is not terminated as per the terms of such Service Order.

6.2 Term of a Service Order. The initial term of any Service Order under this Agreement shall start on its Effective Date, and last, through the Service Start Date when the Service Duration starts, until the last day of the Service Duration. A Service Order shall automatically and recurrently renew for subsequent terms of same Service Duration, until either Party explicitly terminates such Service Order as provided herein. Either Party may terminate a Service Order through scheduled termination at the expiration of the initial term or of any subsequent renewal term by giving written notice to the other Party at least ninety (90) days prior to date of expiration of the then current term.

6.3 Termination for cause of a Service Order. If either Party materially breaches any material term of a Service Order and fails to cure such breach within thirty (30) days ("Curing Period") after receiving written notice thereof, the other Party may terminate such Service Order for cause immediately upon written notice at any time following the end of the Curing Period and for as long as such breach is not cured.

6.4 Termination for insolvency of a Service Order. A Service Order will terminate immediately upon notice by the other Party if either Party is or becomes insolvent, files a petition seeking bankruptcy protection that is not dismissed within 60 days, ceases to function or conduct operations in the normal course of business without a successor, or makes an assignment for the benefit of creditors.

6.5 Consequences of termination. Immediately upon termination of a Service Order: all grants to either Party shall immediately terminate and revert to the original grantor; each Party shall destroy or return to the other Party any and all Confidential Information received from the other Party pursuant to such Service Order; each Party shall discontinue the use of the other Party's Trademarks under such Service Order; Customer shall cease to use Applications under such Service Order, and Lithium shall terminate the Hosting of such Applications. Fees for partial completion of Engineering Services are due in proportion to the number of hours expended or the milestones reached unless such breach or termination without cause are initiated by Lithium. Termination does not relieve Customer's obligation to pay all charges that accrued before the effective date of termination or that are otherwise owed by it. The parties' rights and obligations under this section 6, and under sections 3 (Grant of rights), 8 (Indemnification), 9 (Limitation of liability), 10 (Confidentiality), and 11 (General provisions) shall survive termination or expiration of this Agreement and of any Service order.

## 7 Limited warranties

7.1 Infringement. Lithium warrants to customer that it owns Applications or has the right to grant use rights for the Applications under this Agreement In the event any Application is held or believed by Lithium to infringe or misappropriate, or its provision is enjoined, Lithium will have the option, at its expense, to (a) modify the Application so that it no longer infringes or misappropriates, (b) obtain for Customer the right to continue accessing the appropriate interfaces of the Application, (c) substitute the Application with another, reasonably comparable, Application, or (d) if none of the foregoing remedies are commercially feasible, terminate the Hosting Service for such Application and refund Customer any fees prepaid for that portion of the Service which has not yet been rendered. Together with section 8.2, the present section states Lithium's entire liability and Customer's exclusive remedy for infringement.

7.2 Warranty for the Applications. Lithium warrants to Customer that its Applications will substantially achieve the functionality described in this Agreement, documented in their online documentation, or experienced in their staging site for their latest release in operation as of the Effective Date. If Customer rejects the Software Applications prior to launch per the SOW and subsequently terminates for cause, Customer shall be due a full refund of all monies. If the Applications Hosted by Lithium for Customer do not substantially achieve their warranted functionality and Customer notifies Lithium of such in a timely manner, Lithium shall promptly modify the Applications to conform, or Customer shall be due a refund of recurring fees paid for the specific Applications over the duration of non-achievement, to the pro-rata of the missing or broken functions to the total number of functions, options and configurations provided by the Applications. This shall be Lithium's sole liability and Customer's sole recourse for any such breach of the limited warranty for the Applications.

7.3 Warranty for the Engineering Services. Lithium warrants to Customer that (i) the work product for the Engineering Services shall substantially conform to the SOW detailed in the ECR; and (ii) the Engineering Services will be performed with reasonable skill, care and diligence. If Customer rejects an ECR and Lithium is not able to cure per the SOW, Customer shall be due a full refund of monies paid for such ECR. This shall be Lithium's sole liability and Customer's sole recourse for any such breach of the limited warranty for the Engineering Services.

7.4 Warranty for the Hosting Service. Lithium warrants to Customer that the Hosting Service will substantially implement the requirements of the Service Level Agreement and that it will be performed in a

failure to provide appropriate level of Hosting Service shall be those service credits made available in the Service Level Agreement. Exclusive of sections 7.2 and 7.3, and subject only to Customer's right to terminate this Agreement pursuant to section 6, they shall constitute Lithium's sole liability and Customer's sole recourse for any breach of a warranty provided by Lithium.

7.5 Exclusions to the warranty. While due care and diligence have been applied in the development of products, Lithium does not warrant that the Software Applications, or the Hosting Service, or the Engineering Services, will be error-free or uninterrupted. The general architectures and the security algorithms implemented by Lithium's Software Applications and Hosting Service have inherent limitations and Customer is solely responsible for determining that the Software Applications, the Hosting Service and the Engineering Services sufficiently meet Customer's functionality, security, confidentiality and operational needs.

7.6 DISCLAIMER. THE WARRANTIES IN THE PRESENT LIMITED WARRANTEES SECTION ARE LIMITED WARRANTIES, AND ARE THE ONLY WARRANTIES PROVIDED BY LITHIUM IN CONNECTION TO THIS AGREEMENT, THE APPLICATIONS OR THE SERVICES. LITHIUM DOES NOT WARRANT THAT THE APPLICATIONS OR SERVICES SHALL BE UNINTERRUPTED OR ERROR-FREE. LITHIUM DISCLAIMS ALL WARRANTIES OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE EXCEPT FOR FUNCTIONALITY.

**8 Indemnification**

8.1 Conditions of indemnification. Within the limitations of liability defined in this Agreement, the indemnifying Party shall indemnify, defend and hold harmless the other Party and its officers, directors, shareholders, employees, agents and affiliates, subsidiaries, successors and assigns from and against any and all third party claims, damages, liabilities, costs and expenses, including reasonable legal fees and expenses (together, the "Losses") brought against the other Party as a result of the cause of indemnification. Each Party's indemnification obligations hereunder shall be conditioned upon: (i) prompt written notice by the indemnified Party to the indemnifying Party of any claim, action or demand for which indemnity is claimed; (ii) complete control of the defense and settlement thereof by the indemnifying Party; and (iii) such reasonable cooperation by the indemnified Party in the defense as the indemnifying Party may request.

8.2 Indemnification by Lithium. Lithium shall indemnify Customer as per section 8.1 for any claim that the Applications, used within the scope of this Agreement, infringe a U.S copyright or patent or misappropriate a trade secret, unless such claim is based on (i) ECRs based on specifications provided by Customer, or (ii) Customer-provided User Interface Elements, or other software or data provided by Customer.

8.3 Indemnification by Customer. Customer shall indemnify Lithium as per section 8.1 for any claim (i) alleging Customer's use of Software Applications in an unlawful manner or in a manner inconsistent with the terms of this Agreement, or (ii) related to Content.

9 **LIMITATION OF LIABILITY.** SUBJECT TO THE FOLLOWING SENTENCE, (A) NEITHER PARTY SHALL BE LIABLE FOR INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL, OR COVER DAMAGES INCURRED BY THE OTHER PARTY OR BY ANY THIRD PARTY, INCLUDING BUT NOT LIMITED TO DAMAGES BASED ON LOSS OF PROFITS, REVENUE, DATA, SERVICE OR USE, HOWEVER ARISING, EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND (B) IN NO CASE WILL EITHER PARTY'S AGGREGATE LIABILITY FOR DAMAGES IN CONNECTION [illegible] DURING THE TWELVE (12) MONTHS PRECEDING THE FIRST APPLICABLE CLAIM. THIS LIMITATION ON LIABILITY WAS AND IS AN EXPRESS PART OF THE BARGAIN BETWEEN LITHIUM AND CUSTOMER AND WAS A CONTROLLING FACTOR IN THE SETTING OF THE FEES PAYABLE TO LITHIUM HEREUNDER. THE FOREGOING SHALL NOT LIMIT EACH PARTY'S LIABILITY TO THE OTHER PARTY FOR INFRINGEMENT OF INTELLECTUAL PROPERTY RIGHTS, OR THE PARTIES' OBLIGATIONS UNDER SECTION 4 (PAYMENT OF FEES) AND SECTION 10.3 (PROTECTION OF CONFIDENTIAL INFORMATION).

**10 Confidentiality and data privacy**

10.1 Confidential Information. "Confidential Information" means information, disclosed by a Party to the other in connection to this Agreement, which is either marked confidential or disclosed in circumstances in which a reasonable person would consider the information to be confidential. The terms of this Agreement, the present or future functionality of the Software Applications that is not fully exposed to the public, and all technical information underlying such functionality shall be deemed Confidential Information, although this Agreement may be disclosed as needed in the context of a merger. Each Party acknowledges that disclosure of the other Party's Confidential Information would cause irreparable harm to the other Party. Each Party shall be entitled to seek injunctive relief upon a disclosure or threatened disclosure of any Confidential Information, without a requirement to prove irreparable harm or the posting of a bond.

10.2 Exclusions to Confidential Information. Confidential Information does not include information that (i) was in receiving Party's possession before receipt from the disclosing party, (ii) is or becomes publicly available other than through a breach of this Agreement, or (iii) is rightfully received from a third party or by a third party without a duty of confidentiality. Where Confidential Information is required to be disclosed by a court, a government agency or similar disclosure requirement, the receiving party shall immediately notify the disclosing party upon learning of the existence or likely existence of such requirement in order to allow the disclosing party to make reasonable efforts to avoid such disclosure and obtain confidential treatment or protection by order of any disclosed Confidential Information. Notwithstanding anything to the contrary, this Agreement does not regulate the use of non-Confidential Information.

10.3 Protection of Confidential Information. A party receiving Confidential Information from the other shall use the same degree of care as it uses to protect its own confidential information of a like nature, but no less than a reasonable degree of care, to prevent (a) use of such Confidential Information for any purpose other than to carry out the terms of this Agreement, and (b) disclosure of such Confidential Information to any person or party other than those who need to know such Confidential Information to carry out the terms of this Agreement and who are bound by written confidentiality agreements, except in accordance to this Agreement.

**11 General provisions**

11.1 Entire Agreement. The Parties are independent contractors and neither party can be construed in any way as the agent of the other. This Agreement, together with its Service Orders, contains the entire agreement of the parties and supersedes any prior or present exchange in respect to its subject matter. It may not be amended, waived or modified except as expressly provided herein or in writing by the parties. Headings in this Agreement are inserted for convenience only and shall not affect the construction or interpretation of any provision. In the event any provision of this Agreement is held by a court of law or other governmental agency to be void or unenforceable, the remaining portions

11.2 Assignment. Neither party to this Agreement shall assign any of its rights or obligations hereunder without the other party's prior written consent, which shall not be unreasonably withheld. Notwithstanding the foregoing, either party may assign its rights and obligations hereunder pursuant to a merger, consolidation or sale of substantially all of its assets related to this Agreement, provided it promptly notifies the non-assigning party in writing of the assignment and the assignee agrees in writing to be bound by the terms of this Agreement. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns.

11.3 Governing law and Forum; Waiver of Jury Trial. This Agreement shall be governed by the laws of Delaware without regard to its conflict of law principles. The parties expressly waive any right to a jury trial regarding disputes related to this Agreement. Unless otherwise provided by local law, any legal or other action related to a breach of this Agreement must be commenced in a court cited within the country in which the breach occurred.

The parties' authorized representatives have executed this Agreement as of the Effective Date.

For Lithium:

Name [signature]

Title CEO

Date Signed 10/1/07

For Customer: LENOVO

Name [signature]

Title ANG SOON TEE, PROCUREMENT MANAGER

Date Signed 26 SEPT 2007

## Appendix 1: Service Level Agreement

2007-09-27 13:34 919-294-3339 919-294-3339 >> P 7/14

Master Services Agreement ("MSA")

## Appendix 2: Statement of Work

2007-09-27 13:35 Case 3:20-cv-06389-WHO Document 156-11 Filed 07/31/24 Page 9 of 16 919-294-3539 P 8/14

Master Services Agreement ("MSA")





Quoted by: Karen Orton
Date: Sept 11, 2007
Quote Name: Lenovo Support Community
Quote Number: Lensupp01
Valid Until: October 31, 2007

Lithium Technologies, Inc.
5980 Horton St., Suite 370, Emeryville, CA 94708
Phone: 510-653-6800 Fax: 510-653-6801
www.lithium.com sales@lithium.com

Lithium Receivables Contact: Lily Chi
Phone: 510-653-6800 x126
lily@lithium.com

*Service Order For:*

Company Name: Lenovo
Sales Contact: Mark Hopkins
Sales Contact Title: Project Manager - WW Customer Satisfaction Programs
Mailing Address:
City: State: Zip Code:
New Deployment

Phone: (919) 254- 2774
Fax:
Contact Email:
markah@us.lenovo.com
Country: USA
Service Duration: 24 months

## *Hosted Services Purchased*

[redacted]

## *Standard Conditions*

1. By signing this Service Order, you are offering to purchase the services listed above. Your offer to purchase becomes a binding commitment upon acceptance by Lithium, and is not subject to the issuance of any further purchase orders, confirmations or other events.
2. At any time, the terms of the most recent Master Services Agreement executed between the Parties apply to this Service Order.
3. The Master Service Agreement and this Service Order represent the entire agreement between the parties and cannot be overridden by terms contained in any later received document, unless the additional terms are accepted in writing by Lithium.
4. Special Conditions override Standard Conditions in the event of an inconsistency.

## *Special Conditions*

[redacted]

AGREED:

Signature: [signature] Date: 27 SEPT 2007

Name: ANG SOON TEE PO Number: ______

Title: PROCUREMENT MANAGER

Accounts Payable:
Contact Name: ______
Contact Phone: ______
Contact Email: ______

Please note that invoices will be delivered via e-mail.

Lenovo will provide Direct Deposit – Please supply data:

~~All payments will be directly debited from Customer's bank account. The following information is required:~~
Company ABA (bank routing #): ______
Bank Account Type (checking/savings): ______
Account Number (checking/savings): ______
Legal Name on Account: ______
Name of Authorized Signatory for Account: ______
Title of Authorized Signatory for Account: ______
Signature of Authorized Signatory for Account: ______

This page blank

*Description of Services*





Lithium Confidential — Service Order — page 5 of 6



1009 ThinkPlace
Morrisville, NC 27560

**LENOVO**

To: Karen Orton | From: Virginia McAfee
Fax: 510-653-6801 | Date:
Phone: | Pages:
Re: | CC:

☒ Urgent ☐ For Review ☐ Please Comment ☐ Please Reply ☐ Please Recycle

•Comments: