# EXHIBIT B-R

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROADRUNNER RECYCLING, INC.,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>RECYCLE TRACK SYSTEMS, INC.,<br>RECYCLESMART SOLUTIONS, INC.,<br><br>　　　　Defendants. | Case No. 3:23-cv-04804-WHA |

**<u>OPPOSITION EXPERT REPORT OF W. LEO HOARTY</u>**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    QUALIFICATIONS .............................................................................................1

III.   ASSIGNMENT ....................................................................................................3

IV.    MATERIALS CONSIDERED ............................................................................4

V.     LEGAL STANDARDS .......................................................................................4

    A.    Trade Secrets ..........................................................................................4

    B.    Misappropriation ...................................................................................5

VI.    SUMMARY OF OPINIONS ...............................................................................5

VII.   RTS DID NOT INDEPENDENTLY DEVELOP THE PELLO CAMERA
      SYSTEM ...............................................................................................................6

    A.    The Reports do not Establish that Any Compology Camera System
        Was Ever Disassembled or Reverse Engineered Except by RTS .....................6

    B.    RTS Destroyed Evidence of its ML Models and Compology Image
        Data used to Train its Models and Thus Cannot Establish
        Independent Development ........................................................................10

    C.    The RTS, NRCC and IRAP Reports Are Not Evidence of Independent
        Development of the Pello Camera System ..................................................12

    D.    Any Purported Differences Between the Compology Camera Systems
        and the Pello Camera System Are Immaterial ...........................................18

        1.    Features of the Pello Device That Are Irrelevant .................................19

            a.    Ultrasonic sensors .......................................................................19

            b.    External antennas ........................................................................20

            c.    Daughter board ...........................................................................21

        2.    Features of the Pello Device That Perform the Same or
            Substantially Similar Functions ..............................................................21

            a.    Camera and flash module ...........................................................22

                i.    Image sensor .....................................................................22

                ii.   Flash board and the location of camera modules .........23

            b.    Main Circuit Board ....................................................................24

            c.    Packaging ....................................................................................24

            d.    Microcontrollers .........................................................................25

            e.    Accelerometers ...........................................................................26

i

### TABLE OF CONTENTS
### (CONTINUED)

**Page**

      f.     GPS/GNSS ...................................................................26

      g.    Wireless Communication Module/Cellular modem ................27

E.    **Compology's Trade Secrets are not Publicly Disclosed or Generally Available** .............................................................................28

    1.    General components and features ..................................29

    2.    Other waste management systems ................................31

F.    **Any Purported Differences Between Compology and Pello Machine Learning Systems, Architectures, or Libraries Used are Immaterial** .............35

VIII.  **CONCLUSION** ..............................................................40

## I.     <u>INTRODUCTION</u>

1.     I have been retained as an independent technical expert by counsel for Plaintiff RoadRunner Recycling, Inc. in *RoadRunner Recycling, Inc. v. Recycle Track Systems, Inc. et al.*, N.D. Cal. Case No. 3:23-cv-04804-WHA. Counsel has asked me to render opinions regarding the issues raised by RoadRunner and Recycle Track Systems ("RTS") and RecycleSmart Solutions, inc. ("RecycleSmart", together with RTS, "Defendants") in connection with the above-referenced lawsuit. Specifically, I have been asked to review the Opening Expert Report of R. Jacob Baker, Ph.D., P.E. ("Baker Report"), and the Opening Expert Report of Phillip Greenspun, Ph.D ("Greenspun Report"). My conclusions are based on my review of these reports and the materials referenced therein, the materials provided to me in connection with my engagement, and my professional experience.

2.     I reserve the right to supplement, change, clarify, or modify my opinions should additional information and/or documentation become available to me. I also reserve the right to submit a rebuttal declaration in response to any expert declaration(s) submitted on behalf of the owner of the Defendants.

## II.     <u>QUALIFICATIONS</u>

3.     I am a professional engineer with over 40 years of experience in both electronics engineering and computer science. I have considerable experience in the development of all levels of complex software systems as well as designing and bringing to market electronic hardware products. My areas of expertise include artificial intelligence (AI) and machine learning (ML), audience measurement, automatic content recognition (ACR), audio and video encoding, decoding, and transmission, cable and satellite settop design, consumer electronics product design, digital signal processing (DSP), digital watermarking, digital rights management,

1

electronic circuit design, interactive television systems, mobile application development in iOS and Android, speech recognition, and video-on-demand, among other things. I am also versed in many computer languages, including all C languages, F#, Java, Python, and HTML/CSS/JavaScript; operating systems including Android, Linux, iOS, MacOS, and Windows; platforms including VMware and AWS; development tools including Android Studio, adb, Eclipse, Understand, Wireshark, and Xcode; and ML/AI tools including TensorFlow, PyTorch, and GPT API. A copy of my CV is attached here as Attachment A.

4.      I hold 51 patents in various areas of technology. I have authored numerous technology papers on data communications, consumer electronics, and broadcast and cable television technology. For example, I have delivered papers to and presented at numerous technical conferences in the United States, Asia, and Europe, including the National Association of Broadcasters (NAB), National Cable Television Association (NCTA), Society of Cable Telecommunication Engineers (SCTE), International Broadcast Conference (IBC), and the Montreux International Television Symposium, as well as many Institute of Electrical and Electronics Engineers (IEEE) conferences and other industry related trade shows. I have also published technical articles in trade magazines on graphics systems and networking.

5.      I am a member of IEEE, the Society of Motion Picture and Television Engineers (SMPTE), the Society of Cable Telecommunications Engineers (SCTE), and the Association of Computing Machinery (ACM). I have also served on many standards bodies, including ISO MPEG2 (digital television standards), ATSC (HDTV standards), IEEE 802.14 (standards for digital convergence), CableLabs (plant and set-top standards), EIA (cable television compatibility (IR pass-through) and interfaces).

6.      I have also received numerous awards including Best New Technology at the

2

National Cable Television Association (NCTA) 1996 for ICTV's interactive television and video-on-demand service; Best of Show at CES 2004 and 2005 for MovieBeam set-top and service.  In 2003, Vizio won an Emmy Award for its precision audience measurement service, which utilizes my patented audio automated content recognition (ACR) technology as the measurement means.

7.      I am also an experienced expert witness consultant with over 15 years of experience.  I have been engaged as an expert witness in over 40 cases in state and federal court and over ten proceedings before the Patent Trial and Appeal Board (PTAB) for companies including, but not limited to AC Nielsen, ActiveVideo Networks, Amazon, Arris Corp., DirecTV, DISH Networks, Fandango, Google, LG Electronics, Motorola, Roku, Rovi (TiVo), Samsung, Solaborate, and Vizio. A detailed history of my expert consultant work for the past five years is attached here as Attachment B.

## III.    <u>ASSIGNMENT</u>

8.      I have been retained by the law firm of Jeffer Mangels Butler & Mitchell LLP, counsel for Plaintiff RoadRunner Recycling, Inc., to provide opinions and analysis regarding the technology relevant to this case, *RoadRunner Recycling, Inc. v. Recycle Track Systems, Inc. et al.*, N.D. Cal. Case No. 3:23-cv-04804-WHA. My opinions and analysis relate to my review of the Baker Report and the Greenspun Report, the materials referenced in those reports, and the materials provided to me in connection with this engagement.

9.       I submit this opposition expert report in accordance with Fed. R. Civ. P. 26. My analysis of the information relevant to this case is ongoing. I expect to continue reviewing information as it is presented to me, and it is possible that this new information may affect

certain conclusions in this report. I reserve the right to supplement or amend this report, such as

based on additional documents, testimony, and/or other information in this case.

10.     I expect to testify at trial regarding the opinions rendered in this opposition report

and in any supplemental report that I may provide in this litigation. I reserve the right to provide

an expert report addressing any issues or claims raised by Defendants or its experts with respect

to the technology in this case.

## IV.     <u>MATERIALS CONSIDERED</u>

My opinions are based on my experience in this field and are necessarily formed by my

own experiences and the materials I have reviewed.  A list of materials that I have reviewed and

considered is attached here as Attachment C.

## V.     <u>LEGAL STANDARDS</u>

11.     I am not a legal expert and offer no opinions on the law. However, I have

informed by counsel of the legal standards that apply with respect to trade secret

misappropriation and other issues, which I have applied in arriving at my conclusions.

### A.     <u>Trade Secrets</u>

12.     I have been informed that a claim for trade secret misappropriation under both the

California Uniform Trade Secrets Act ("CUTSA") and the Defend Trade Secrets Act ("DTSA")

requires the possession of a valid trade secret. CUTSA defines a "trade secret" as follows:

"'Trade secret' means information, including a formula, pattern, compilation, program, device,

method, technique, or process, that: (1) Derives independent economic value, actual or potential,

from not being generally known to the public or to other persons who can obtain economic value

from its disclosure or use; and (2) Is the subject of efforts that are reasonable under the

circumstances to maintain its secrecy." DTSA defines "trade secret" as follows: "'trade secret'

4

means all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if— (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."

13.     I have been informed that to qualify as a trade secret, the trade secret owner must have made reasonable efforts under the circumstances to keep it secret. "Reasonable efforts" are the efforts that would be made by a reasonable business in the same situation and having the same knowledge and resources as the owner, exercising due care to protect important information of the same kind.

### B.     Misappropriation

I have been informed that misappropriation refers to the disclosure or use of a trade secret without consent by someone who used improper means to acquire knowledge of the trade secret, or at the time of use, knew or had reason to know that their knowledge of the trade secret was acquired under circumstances creating a legal obligation to limit use of the trade secret information.

## VI.     SUMMARY OF OPINIONS

14.     Based on my review and analysis of the Baker Report and the Greenspun Report, the materials referenced in those reports, and RoadRunner and RTS documentation provided to

5

me, I conclude that RTS did not independently develop the Pello system. Specifically, I conclude that (1) the reports do not establish that any Compology camera system was ever disassembled or reverse engineered except by RTS, (2) RTS destroyed evidence of its ML models and Compology image data used to train the models and therefore cannot establish independent development, (3) RTS, NRCC and IRAP reports are not evidence of independent development of the Pello camera system, (4) any purported differences between the Compology camera systems and the Pello camera system are immaterial, (5) Compology's trade secrets are not publicly disclosed or generally available, and (6) any purported differences between Compology and Pello machine learning systems or architecture used are immaterial.

## VII.   RTS DID NOT INDEPENDENTLY DEVELOP THE PELLO CAMERA SYSTEM

15.     The Baker and Greenspun Reports wrongly conclude that the Pello camera system was independently developed. I disagree with that conclusion, as set forth in detail below.

### A.     The Reports do not Establish that Any Compology Camera System Was Ever Disassembled or Reverse Engineered Except by RTS

16.     Dr. Greenspun opines that a Compology R13 camera system "is available on eBay for anyone willing to spend $100 and, therefore, it is my opinion that anything that can be learned from the kind of disassembly process that I undertook cannot be a trade secret." Greenspun Report at ¶ 112. On this basis, he conducts a teardown and comparison of the Compology camera systems and the Pello camera system, wrongly concluding that whatever he finds there is public or well known. *See id.* at ¶ 135 ("The RoadRunner devices all contained similar common well-known hardware components that one would expect to find in many other IoT devices and, thus, the use of these components does not qualify as a trade secret."). I disagree on several grounds as discussed below.

17.     I find that Dr. Greenspun's starting point for his analysis—that he disassembled an R13—does not mean that anyone else *did* so.[1] This is mere speculation. Dr. Greenspun does not provide any evidence showing anyone disassembled an R13, much less any R-series camera system. I also understand that RoadRunner took steps to ensure that any such purported sales were resolved. For example, I understand from Cason Male's deposition that RoadRunner "[c]ontacted eBay. Told them that the sales were fraudulent. That that they were violating [RoadRunner's] contracts with the customers and with technicians and that they needed to take those posts down from eBay. I believe the technicians were also contacted." Male Dep. Tr. at 117:11-17. Regarding the technicians, Mr. Male testified that RoadRunner contacted "whoever was responsible for attempting to resell the cameras." *Id.* at 117:18-21. Dr. Greenspun has provided no evidence that any R13 camera system was sold to a third party or that any R13 camera system was available to be disassembled and reverse engineered. Dr. Greenspun's Report does not identify any circumstance in which a competitor of RoadRunner or one with skill to understand the inner-workings of the R13 camera system obtained an R13 camera system and disassembled or reverse engineered it.

18.     Indeed, not just anyone can disassemble and gain insight into the inner-workings of an R13 camera system. I find that even if a person of the general public disassembled an R13 camera system, that person would require a level of sufficient skill and expertise, and that skilled individual typically would understand that the means by which they received the R13 camera system was illicit. Nothing in Drs. Baker or Greenspun's reports suggest that any such thing happened.

---

[1] Of course, RecycleSmart disassembled more than one R12 camera system in 2019 in violation of their promises not to do so, and Drs. Baker and Greenspun appear to have done so in accordance with their expert reports.

7

19.     As noted by Mr. Male in his deposition, and as I understand it, no customer or technician is allowed to resell a Compology camera system. In addition, I understand that no customer or technician is allowed to disassemble or reverse engineer the Compology camera systems, or to disclose the Compology camera systems to third parties.

20.     Dr. Greenspun seems to suggest that the methodology to open the Compology camera systems was easy and did not require any specialized tools to do so. *See, e.g.*, Greenspun Report at ¶¶ 112, 116, 130. I do not find this material. For example, Dr. Greenspun opines, "[t]he disassembly that I conducted was done with Torx screwdrivers, sets of which are available from Amazon.com for less than $20." *Id.* at 112. It does not matter that Dr. Greenspun makes it sound easy to disassemble with Torx tools. In addition, Dr. Greenspun opines, "[t]he main circuit board is not potted for protection against reverse engineering, nor have any of the labels on the integrated circuits been removed." *Id.* at 116. It also does not matter that RoadRunner does not coat the board with epoxy. I understand that every customer or technician agreed not to disassemble or reverse engineer the Compology camera systems, and also agreed not to resell them to third parties or disclose them to third parties. *See* ROADRUNNER000073345; ROADRUNNER000073224. This is sufficient protection in my opinion and does not absolve RTS of its wrongdoing.

21.     Dr. Greenspun also opines, "I also understand that the R11 device is featured on a Verizon Wireless website, and the page reveals several components within the device. *See* RTS_00335965. In my opinion, this is further evidence that RoadRunner did not take the necessary steps to protect what it now says are trade secrets." Greenspun Report at ¶ 130. Dr. Greenspun does not analyze what components he claims were revealed, nor does he show that any such revealing of components were material to disclosing Compology's trade secrets. I have

reviewed the materials cited by Dr. Greenspun and do not find that Compology's trade secrets were disclosed to the public or that any such disclosure was reckless or constituted a lapse of necessary steps to protect Compology's trade secrets.

22.    Dr. Greenspun opines that because R13 camera systems were offered for sale on eBay, that third parties could have disassembled and reverse engineered them and learned everything Dr. Greenspun learned from his own teardown. *Id.* at ¶ 112. For example, he opines, "[m]y understanding is that the selection of the battery is claimed as a trade secret. The battery is marked ██████████████████████.'" *Id.* at ¶ 116. Dr. Greenspun suggests that "[t]he RoadRunner devices all contained similar common well-known hardware components that one would expect to find in many other IoT devices and, thus, the use of these components does not qualify as a trade secret." *Id.* at 135. First, only customers or technicians are permitted to obtain Compology camera devices, and as I understand it, with restrictions on disassembly and reverse engineering, disclosure, and resale. Thus, no customer is permitted to disassemble and inspect the Compology camera systems, and nothing Dr. Greenspun learned from his teardown is available to them. Dr. Greenspun provides no evidence that any third parties obtained any Compology camera systems, and no evidence that they were available for disassembly and reverse engineering. Simply put, there is no evidence that anyone other than RTS and the experts in this case have disassembled or reverse engineered any Compology camera system. Stated otherwise, Dr. Greenspun has presented no evidence that any Compology camera system was sold to any third party or that they were available to be disassembled or reverse engineered. Moreover, RoadRunner has taken reasonable steps to stop any illicit sales and recover any Compology R13 camera systems.

23.     Based on the foregoing, I disagree with Dr. Greenspun's opinion that R13 devices are available for purchase, that they may have been disassembled and reverse engineered, and that the Compology camera system and trade secrets are available to the public.

**B.      RTS Destroyed Evidence of its ML Models and Compology Image Data used to Train its Models and Thus Cannot Establish Independent Development**

24.     Dr. Greenspun opines that RTS independently developed its ML models using pre-trained ML models and fine-tuned on Pello image data. *See, e.g.*, Greenspun Report at ¶ 154-164. However, Mr. Laraki, RTS's Senior Machine Learning engineer, testified that he did not migrate (i.e., save) the ML projects when transferring data from RecycleSmart to RTS during their acquisition and deleted Compology images used for contamination ML model training. *See* Laraki Dep. Tr. at 57:14-59:12:

> Q.  And you still have the results from this model?
> A.  No.
> Q.  Where did it go?
> A.   During the acquisition of RecycleSmart by RTS, we migrated all the data we had on our laptops from the old -- from Recycle Smart to RTS, and we had to transfer the data.  I had all the machine learning projects on my local computer, and I decided to only transfer the data that we actually use and was relevant for us.  And -- because we -- like at the iterations, the later iteration, we didn't use any Compology images, I just didn't transfer them when we did the migration.
> Q.   **And when you say you didn't migrate them, what happened to -- what happened to the -- what happened to the data when it wasn't migrated?**
> A.  **It was deleted.**
> Q.  It was?
> A.  **It was deleted or non-migrated to be more precise.**
> Q.  What happened to the device that was on?  Well, it was on a device that wasn't migrated.  What happened to the original --
> A.  **It was formatted, so.**
> Q.  **So it was reformatted and erased?**
> A.  **Yeah.**
> Q.  And you don't remember the exact date this happened?
> A.  No.
> Q.  **What was on the device that was reformatted and erased?**
> MR. GALICA:  Objection.

THE WITNESS:  **So, for the plastic contamination project had multiple folders. One of them is Compology images and other images. So the Compology images contained two subfolders:  Contaminated images; non-contaminated images.**

25.      Mr. Laraki also erased the AutoML version of RecycleSmart's contamination ML

model that was trained on Compology image data. *See* Laraki Dep. Tr. at 70:19-71:3:

> Q.  I take it you don't have the **AutoML version** that was trained on the Compology images anymore?
> MR. GALICA:  Objection.
> THE WITNESS:  No.
> Q.  **That was one of the things that on this device that was reformatted and erased?**
> A.  **Exactly, yes.**

26.      Further, Mr. Laraki erased a contamination ML model titled "RS trained model

V1PT" trained using Compology image data. *See* Laraki Dep. Tr. at 107:8-108:2:

> Q.   All right.  Regardless, the model was trained with 1600 Compology images, **800 with contamination** --
> A.  Yes, yes, yes.
> Q.  You just need to let me finish. That's correct?  Yes?
> MR. GALICA:  Objection.
> THE WITNESS:  Yes.
> Q.  And then there's an attachment or there's a link.  It says "The trained model can be found here," and there's an underline "RS trained model V1PT."  Right?
> A.  Yes.
> Q.  **And that no longer exists?**
> A.  **No.  No.**
> Q.  **This is the model that was --that was on your device that was reformatted and erased?**
> A.  **Yes.**

27.      Mr. Laraki further erased an ML model trained on, purportedly, 2,000 Compology

images. *See* Laraki Dep. Tr. at 121:7-122:4:

> Q.  Does that refresh your memory that you used **2000 Compology images**?
> A.  Yes.
> Q.  And you put aside 400 to be used as test images?
> A.  Yes.
> Q.   And you say: "FYI, the interface and the model are locally hosted on my laptop." What did you mean by that?

A.   Like, this is still the development phase.  So **the model still resided on my laptop and I created a web interface – you see the link here - so that the team can go access this web interface where they can try the model that was trained on images and see how they perform.**
Q.   **But the model itself is just residing in your laptop.**
A.   **Yes.**
Q.   **And this is the one that got erased when it was reformatted?**
A.   **Yes.**

28.     It is therefore my opinion that RTS cannot establish that its ML models were independently developed without using Compology image data because Mr. Laraki did not migrate that information from his laptop and erased the ML models and Compology image data on which they were based. Rather, as I conclude in my opening report and in this opposition report, Mr. Laraki undoubtedly learned from these ML models and used what he had learned to train the Pello ML models that RTS claims it currently uses or, alternatively, trained the ML models on Compology image data and fine-tuned those ML models on Pello images.

C.     **The RTS, NRCC and IRAP Reports Are Not Evidence of Independent Development of the Pello Camera System**

29.     Dr. Baker opines that summary reports provided to the Sustainable Development Technology Canada ("SDTC") are evidence of RTS' independent development of the Pello System. Baker Report at ¶¶ 58-63. So does Dr. Greenspun. Greenspun Report at ¶¶ 99-110. I have reviewed the reports cited by Drs. Baker and Greenspun and disagree that they show the independent development of the Pello system.

30.     As an initial matter, while these reports purport to summarize the development of certain components and software, they do not identify how RTS determined the hardware and software specifications and requirements. This is significant because, as Dr. Baker correctly notes, "[b]ecause RTS was not a hardware or a software house, RTS outsourced most of the development of the DDW system." Baker Report at ¶ 61.

31.     In this regard, it is noteworthy that RTS' Proposal to SDTC was submitted on July 15, 2019. RTS_00263020-125. By that time, RTS and its technical consultant had been examining photographs of the internal components of Compology's R12 camera system for over three months. On March 29, 2019, RTS employee Lex Jansen emailed exchanged detailed pictures to RTS' chief technology consultant, Mr. Anderson[2], showing the internal components used in Compology's R12 camera. *See* RTS_00318118-22; RTS_00339710-16; Anderson Dep. Tr. at 54:24-56:2. For example, in emails dated March 29, 2019, Mr. Anderson asks about the part number and spec sheet for Compology's D-cell battery, and the photographs of the inside of the camera version currently in use. RTS_00339711. Mr. Jansen complies, also suggesting that he has taken apart multiple camera systems. *Id*. ("Note: I only have one uCAM that's still intact and functional, so I hope these two pictures (attachments) offer the info you need."). The knowledge RTS gained by taking apart Compology's R12 camera system was invaluable.

32.     Rather than show independent development, these SDTC summary reports listed in Dr. Baker's report provide evidence that their Pello camera system was derived using Compology's trade secrets. *See e.g.,* RTS_00001064 ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████) (emphasis added). As such, these reports confirm my opinion that the Pello device was derived from the Compology R12 camera system as evidenced by RTS's lack of expertise developing hardware and software products such as the Pello camera system (*e.g.*,

---

[2] In their proposal to SDTC, RTS states that "[o]n the technology side we are currently working with: Carl Anderson who has 40+ years in the Tech Industry as founder, entrepreneur, inventor and CEO with product development experience in military and harsh environments." *See* RTS_00263025. Mr. Anderson later became VP, Pello Division, RTS.

████████████████████████████████████

Baker Report at ¶ 61), RTS's examination of the internal components of Compology's R12 camera system and their use of the very large database of Compology tagged images (discussed above and below), and the absence of any discussion in the SDTC reports regarding how RTS determined the hardware and software components of the proposed RTS camera system.

33.     Dr. Greenspun suggests that RTS found problems with the Compology camera systems and highlighted these problems in SDTC reports. *See, e.g.,* Greenspun Report at ¶¶ 91-93. First, I find that these are self-serving statements to SDTC (one of RecycleSmart's funders) and RTS does not provide any evidence backing up the assertions that there were problems with Compology camera systems leading RecycleSmart to develop the Pello camera system. I understand that Compology had deployed at least 2,300 Compology camera systems in RecycleSmart's waste containers. *See, e.g.,* Anderson Dep. Tr. at 151:12-15 (2,400 sensors). From these 2,300 deployed camera systems, RecycleSmart downloaded millions of labeled and tagged images, suggesting that RecycleSmart saw the benefit from Compology's technology. *See, e.g.*, ROADRUNNER000028673; ROADRUNNER000028683; ROADRUNNER000028688-89; ROADRUNNER000028691; *see also* RTS_00060550 ("RecycleSmart also has access to a larger data lake of several million images from Compology cameras."). I understand that Compology's AI system detected ███████████ ██████████████████, and its Subpar Image Detection ("SPID") ██████████ ███████████████, at the time Compology was providing image data to RecycleSmart. I find these statistics to be highly relevant and disprove RTS's suggestion to SDTC that Compology's camera system had problems.

34.     Though I do not find Dr. Greenspun's explanation credible, even if Dr. Greenspun is correct (he is not) and RecycleSmart identified purported problems with Compology's camera

14     ████████████████████████████████

system, it does not absolve RecycleSmart from disassembling the Compology R12 camera system, learning from it, and then deriving their own Pello camera system from what they learned. In other words, seeing an opportunity to improve on a misappropriated camera system is still misappropriation.

35.    RecycleSmart's real motivation to deploy its own camera systems in its waste containers appeared to be cost savings, which Mr. Anderson testified was a reason for replacing Compology camera systems with the Pello camera system. *See* Anderson Dep. Tr. at 152:13-22; 206:1-2:

> 13· · · Q.· ·But based on the budgeting that you did and the
> 14· projections that you did, you would expect there would be
> 15· a cost savings, and I take it that was probably part of
> 16· the reason for doing the Pello project?
> 17· · · · · ·MR. GALICA:· Objection.
> 18· · · · · ·THE WITNESS:· Yes.
> 19· BY MR. GIBSON:
> 20· · · Q.· ·Was that part of the reason for doing the Pello
> 21· project?
> 22· · · A.· ·Yes.
> · · · · · ***
> 1· · · Q.· ·So this is for replacing Compology with Pello,
> ·2· the total savings each year would be about ▮▮▮▮▮?
> ·3· · · A.· ·Yes.

I find it significant that RecycleSmart used Compology camera systems in significant numbers, and that it did not have the capability itself of measuring fullness or contamination. Thus, I disagree with Dr. Greenspun's suggestion that RecycleSmart's reporting of purported problems with Compology camera systems are evidence of the independent development of the Pello camera system.

36.    Dr. Baker similarly opines that summary status reports prepared for the National Research Council of Canada Industrial Research Assistance Program ("First IRAP") are evidence of the independent development of RTS's camera system, particularly the work on the

15   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

sensors. Baker Report at ¶ 66. I disagree that these reports show the independent development of RTS's camera system. As noted below, the development work on RTS's ultrasonic sensors is irrelevant because this is not an aspect of Compology's trade secrets from which RTS's Pello device was derived. As with the SDTC reports, these IRAP summary reports also lack details regarding the initial work to identify the hardware requirements and are entirely consistent with the fact that RTS learned much about designing a waste metering camera system from Compology's R12 camera system. Thus, for the same reasons given above (and discussed in detail in my opening report), these reports do not alter my opinion that the Pello device was derived from the Compology R12 camera system.

37.     Dr. Baker again opines that summary status reports prepared for the National Research Council Canada purportedly relating to "RTS' investigation into applying machine learning to the DDW system" ("Second IRAP") "show the independent development of RTS' AI and ML models." Baker Report at ¶ 68. I disagree with Dr. Baker. Among other things, these reports actually confirm that RTS used Compology's images to develop their machine learning/artificial intelligence for their Pello camera system. *See e.g,* RTS_00001028 ("Data collection: Download images in bulk from old system. In total, 150000 images are downloaded."); *see also* ROADRUNNER000028673; ROADRUNNER000028683; ROADRUNNER000028688-89; ROADRUNNER000028691. Mr. Anderson understood "old system" to refer to Compology's camera system. Anderson Tr. 184:11-185:12. While Dr. Baker states that RTS has assistance of the Alberta Machine Intelligence Institute ("AMII") with the AI and ML models, Dr. Baker fails to address that the expensive and painstaking part of building an ML model is the manual tagging of hundreds of thousands of images needed to run through the

AI to develop and train the ML model. In this respect, RTS depended almost entirely on the work Compology did and Compology's resulting enormous library of tagged images.

38.     Dr. Greenspun also opines that use of AMII somehow suggests that RecycleSmart independently developed their own ML models. Greenspun Report at ¶ 107. I disagree. Dr. Greenspun does not identify anything that RecycleSmart and AMII developed that shows independent development; rather, as noted above, substantial evidence exists that RecycleSmart developed ML models using Compology image data. The purported "Second IRAP" referred to by Dr. Greenspun in his report establishes that any joint work conducted reveals use of Compology image data. For example, the portion of that Second IRAP recites "Complete AMII AI/ML Project Validation work to determine best path forward for ML models, recommended tagging for training data set and suggested personnel experience background considering **RTS's massive data lake of images and RTS's needs going forward for contamination and fill detection**." *Id.* at 107, quoting RTS_00064266 at RTS_00064269-270 (emphasis added). RTS does not suggest that it had a massive datalake of *Pello* image data. Correspondence between AMII and Mr. Anderson of RecycleSmart states "**RecycleSmart also has access to a larger data lake of several million images from Compology cameras**," confirming that the massive datalake was proposed to being used in connection with contamination ML model training. *See* RTS_00060550 (emphasis added). I understand that the only "massive data lake of images" available to RTS was Compology image data downloaded *en masse*. It also suggests that RTS was obfuscating the true source of its data lake of images, and admits its need for contamination and fill detection using image data.

39.     I find it immaterial to Dr. Greenspun's conclusion that RTS independently developed the Pello camera system that "RTS [purportedly] created 'a sensor agnostic cloud

based analysis system' that included what they believed to be the first waste monitoring sensor that used both ███████████████ for fill level detection and a camera to confirm that fill level" as stated by Dr. Greenspun. Greenspun Report at ¶ 110. At best, this suggests that RTS was motivated to derive its ML models for fill level from Compology image data.

40.     In sum, I find that the SDTC and IRAP reports do not suggest independent development of the Pello camera system or ML models, but rather, indicates that RTS was motivated to derive its system from Compology's technology.

**D.     <u>Any Purported Differences Between the Compology Camera Systems and the Pello Camera System Are Immaterial</u>**

41.     I disagree with Drs. Baker and Greenspun's contentions that there are material differences between the Pello camera system and the components embodying Roadrunner's trade secrets. Dr. Baker identifies differences in the packaging, main circuit board, cellular modem, ultrasonic sensors, daughter board with a camera and flash module, and the external antennas. Baker Report at ¶ 83. Dr. Greenspun identifies some of the same differences as Dr. Baker. Greenspun Report at ¶ 147. As explained below, the supposed differences relate to features that are immaterial to Compology's trade secrets, or the supposed differences are insignificant because the components perform the same or substantially similar functions. Notably, while Dr. Baker lists purported differences between RecycleSmart's and RoadRunner's devices,[3] he does not explain how these differences are relevant to Compology's trade secrets. Instead, he summarily concludes that the mere existence of any differences necessarily means that the Pello device was independently developed. As set forth in my opening report and below, I strongly disagree with Drs. Baker and Greenspun's analysis and opinions.

---

[3] Dr. Baker refers to Compology's devices as Roadrunner devices. As I understand these terms as used by Dr. Baker, I assume that both terms refer to Compology's R11-R13/S/L camera systems.

████████████████████████

42.     In addition, Drs. Baker and Greenspun's methodology of identifying differences in individual components is irrelevant to Compology's trade secrets because those trade secrets cover the combination of components that RoadRunner painstakingly determined over thousands of hours of trial and error that collectively form a camera system suitable for waste metering and recycling applications.

### 1.     Features of the Pello Device That Are Irrelevant

#### a.     Ultrasonic sensors

43.     Drs. Baker and Greenspun heavily focus on Pello's use of ultrasonic sensors to distinguish the Pello device from Compology's trade secrets. Baker Report at ¶ 83 ("The Pello device looks strikingly different than the RoadRunner devices as the ultrasonic sensors are featured prominently in the Pello's device's packaging."); *id.* at ¶¶ 121-122, 131 ("Because the RoadRunner devices do not include ultrasonic sensors, that fact reverberates through the entire comparison."); Greenspun Report at ¶ 136 ("The use of ultrasonic sensors, which none of the RoadRunner devices include, makes the packaging and outside much different than any of the RoadRunner devices. Compare the Pello device with the RoadRunner devices. This independent design decision alone makes the Pello device substantially different than all the RoadRunner devices.").[4]

44.     Despite the inclusion of ultrasonic sensors, the Pello device uses the same or substantially similar camera apparatus and container fullness analysis to determine fill level because, as RecylceSmart's Senior Machine Learning Developer Mr. Laraki testified, "roll-off

---

[4] I also disagree with Dr. Greenspun's conclusion that "ultrasonic sensors detect fill level more reliably than other types of sensors . . . ." Greenspun Report at ¶ 136. He offers no evidence or any other basis to support this assertion. It is also unfounded, as Compology camera sensors outperform Pello ultrasonic sensors for purposes of fill level.

containers are very big container where the ultrasonic signal is not working well there. And the camera is kind of solving the problem." *See* Laraki Dep. Tr. at 35:8-36:6; 40:9-24.

45.     It is my understanding that the Pello device also does not use its ultrasonic sensors to identify contamination or whether the lens is dirty. In fact, I am not aware that anyone has successfully used sonar-based distance measurements such as that used in ultrasonic sensors to determine the identity or content of a waste container, much less any object, nor would I expect that anyone could be successful in attempting to do so. A lens is an integral part of a camera system, not an ultrasonic sensor system; I am aware of no system in which an ultrasonic sensor is used to determine if a camera lens is dirty, nor would I expect to find any. As such, the inclusion of the ultrasonic sensors in the Pello camera system does not support Drs. Baker or Greenspun's opinions that the Pello device was independently developed.

46.     Drs. Baker and Greenspun's analysis also ignores the combination of components used in the Pello system that were derived from Compology's trade secrets as embodied in its R12 camera system. Thus, even if RecycleSmart independently developed the use of ultrasonic sensors in its camera system, it says nothing about the other aspects of its camera system that were derived from Compology's trade secrets.

### b.     External antennas

47.     Drs. Baker and Greenspun's opinions that the use of external antennas in the Pello device are material is irrelevant because RoadRunner does not claim the use of antennas alone is one of its trade secrets. *See* Baker Report at ¶ 125; Greenspun Report at ¶ 146. Thus, their opinions regarding any supposed advantages of using external antennas as opposed to Compology's devices that use internal antennas are irrelevant.

48.     Dr. Greenspun suggests that Compology's internal antenna would not work. *See* Greenspun Report at ¶ 146 ("The RoadRunner devices relied on antennae that were surface mounted to their internal printed circuit boards. To the extent that the devices were installed inside a metal container, for example, these antennae would not be able to connect to mobile data networks nor receive signals from GPS satellites."). I strongly disagree. There is ample evidence showing that Compology's antenna worked in the field, particularly on RecycleSmart's 2,300 locations where Compology camera systems were deployed.

### c.     Daughter board

49.     I also disagree with Dr. Baker's contention that the use of a daughter board in the Pello device is a material difference and shows independent development of the Pello device. Baker Report at ¶ 116. This distinction is immaterial because RoadRunner does not claim that the use of a daughter board is a trade secret. It also is an insignificant difference because it merely adds additional processing power to that of the main processor, which both the Compology and RTS's camera systems include. As with the ultrasonic sensors and external antennas, it is my opinion that the fact that the Pello device includes a daughter board does not undermine or is otherwise inconsistent with my opinion that RecycleSmart derived its Pello device from Compology's trade secrets, which consist of a unique combination of specific components.

### 2.     Features of the Pello Device That Perform the Same or Substantially Similar Functions

50.     Dr. Baker identifies two features of the camera module of the Pello device that purportedly are different from the Compology devices having Compology's trade secrets. The two features are the image sensor and the location of the camera module. Baker Report at ¶ 106.

### a.   **Camera and flash module**

#### i.   **Image sensor**

51.   With respect to the image sensor, Dr. Baker concedes that Pello, like Compology's R12 device, uses an image sensor ███████████████ (in fact, they are part of the same family of image sensors). Dr. Baker identifies numerous differences, none of which are material or disprove that RecycleSmart's Pello camera system was derived from Compology's R12 camera system.

52.   Dr. Baker initially states that the image sensors are "designed for completely different applications." Baker Report at ¶ 112. That is untrue. Both the Compology camera systems and the Pello camera system use the image sensor for precisely the same purpose, taking images of the interior of waste containers. Further, this distinction is irrelevant. Indeed, neither of the manufacturer's stated applications for either image sensor identify waste metering and recycling technology as an application. Similarly, I disagree with Dr. Baker's contention that any differences regarding "power supply, power requirements, temperature range, output formats, lens size, lens chief angle, sensitivity, dynamic range, maximum exposure interval, pixel size, image area, and package dimensions" between Pello's image sensor and the one used in Compology's R12 device are material. The image sensors used in the Pello and Compology's camera systems are the same or similar in these respects, and the neural network only requires less than 400x400 pixels to process the image through a convolutional neural network. More importantly, both the Compology camera systems and Pello device use image sensors having ███████████████████████████████████████████████████████████████ ████████████████████████████████████. The other capabilities of the imaging sensors are largely irrelevant and thus any differences in these capabilities is immaterial.

22   ████████████████████████████████████████████

###### ii.    Flash board and the location of camera modules

53.    Dr. Baker contends that Pello's use of ████████████████████

████████████████—is "substantially different" from the flash board in the RoadRunner

devices. Baker Report at ¶¶ 118-119. I disagree that these features render Pello's flash module

substantially different than the flash module in Compology's devices. RecycleSmart would have

learned from disassembling Compology's R12 device that ████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

████████████████████████. As long as the flash module includes a visible light

LED, that would be sufficient ████████████████████████. Here, there

is not a material difference in the color ranges in the visible LED flashes used in the Pello device

and Compology's R12 device. The ████████████████ in the Pello device thus are

immaterial.

54.    I disagree with Dr. Baker's opinion that any differences in the location of the

camera modules are material. Baker Report at ¶ 119. In my opinion, the location of the camera

subsystem in the Pello device does not support Dr. Baker's contention that such differences are

material or otherwise "demonstrate that the Pello device was independently developed…" *Id*. Dr.

Baker does not provide any basis that the location is materially different between the two camera

systems. As with the Compology R12 device, the Pello camera subsystem is located lower

portion of the case looking out at a downward angle. In my opinion, RecycleSmart would have

learned from disassembling any of the R-models that the camera module should be located in a

place that meets these criteria.

23                          ████████████████████████████

55.     As with other components identified by Dr. Baker, the image sensor, flash module and location of the camera module are just a few aspects of RoadRunner's camera system trade secret, and thus any differences in these individual components does not demonstrate that the Pello device was not derived from Compology's trade secrets.

### b.     Main Circuit Board

56.     Dr. Baker contends that Pello's PCBA is unique in terms of its shape and the configuration of the components. Baker Report at ¶¶ 101-105. I disagree that the differences identified by Dr. Baker are significant and reflect the independent development of the Pello device. As with other components, RecycleSmart would have learned from disassembling Compology's R12 device that the important aspects of the PCBA are the components attached to the circuit board along with their relative configuration rather than its shape or specific configuration. In particular, both RecycleSmart's Pello and Compology's R12 device include mainboard system architectures feature a GPS receiver IC, an LTE mobile band radio IC, ARM CPU, RAM and flash storage, SIM security card, an accelerometer, and a gyro sensor.

### c.     Packaging

57.     Dr. Baker contends that the Pello's packaging (which I refer to as the case mold or housing) is unique and evidence supporting his opinion that the Pello device was independently developed. Baker Report at ¶¶ 92-100. Specifically, Dr. Baker discusses the differences in the size and shape of the Pello device and the Compology devices. I disagree that the differences identified by Dr. Baker are significant and reflect the independent development of the Pello device. Again, rather than the particular size and shape of the packaging, the important features are that ████████████████████████████████████████████

████████████████████████████████████████. By disassembling

24     ████████████████████████████████████████████

Compology's R12 device, RecycleSmart would have learned that the packaging of Compology's

R12 device includes ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████. RecycleSmart's Pello camera system includes █

████████████████████████████████ to provide this same functionality.

58.     Another important feature in the packaging is the mounting system. The mounting

system in a waste container ████████████████████████████████████████████

████████████████████████. Compology employed a unique three-point mounting system

in its devices, which the current Pello camera system also includes.

59.     In short, the differences in the packaging's size and shape are irrelevant whereas

the critical features Compology employed in the packaging for its R12 device similarly were

incorporated into the Pello device to provide the same functionality. And, as noted, it is the

combination of the components rather than the use of a specific component such as the

packaging that constitutes Compology's trade secrets.

**d.     Microcontrollers**

60.     Dr. Baker merely notes that RecycleSmart's Pello device uses a different

microcontroller than the microcontroller used in the Compology devices. Baker Report at ¶ 123.

Dr. Baker offers no opinion regarding the significance of this difference. To the extent that he

contends this difference is evidence of the independent development of the Pello device, I

disagree. Any differences in the two devices' microcontrollers is immaterial as they provide the

same functionality required for the camera systems of ████████████████████████████

████████████████████████████████████████████████████████████████████

25               ██████████████████████████████████████████████

██████████████████████████████████████████████. In fact, both are ARM devices, and both are running Linux. As noted above, by dissembling Compology's R12 device RecycleSmart would have learned of the necessary components Compology employed in its camera systems, including the use of a microcontroller. Because Compology's trade secrets consist of a specific combination of the components rather than the use of a specific component such as a microcontroller, it does not follow that any differences in the microcontrollers demonstrate that the Pello device was not derived from Compology's trade secrets.

### e.   Accelerometers

61.      Dr. Baker further notes that RecycleSmart's Pello device uses a different accelerometer than the particular IC used in the Compology devices.  Baker Report at ¶ 126.  Dr. Baker offers no opinion regarding the significance of this difference.  To the extent that he contends this difference is evidence of the independent development of the Pello device, I disagree.  Any differences in the two devices' accelerometers is immaterial as they provide ███ ████████████████████████████████████████████████████████ ████████████████████████████████████.  As noted above, by dissembling Compology's R12 device, RecycleSmart would have learned of the necessary components Compology employed in its camera systems, including the use of an accelerometer, and RoadRunner's trade secret consist of a combination of components rather than a single component.

### f.   GPS/GNSS

62.      Dr. Baker further notes that RecycleSmart's Pello device uses a different global GPS/Global Navigation Satellite System (GNSS) module than the GPS/GNSS module used in

████████████████████████████████████████

the Compology devices. Baker Report at ¶ 127. Dr. Baker offers no opinion regarding the

significance of this difference. To the extent that he contends this difference is evidence of the

independent development of the Pello device, I disagree. Any differences in the two devices'

GPS/GNSS modules is immaterial as they provide the same functionality required for the camera

systems of ███████████████████████████████████████████

██████████████████. As noted above, by dissembling Compology's R12 device RecycleSmart

would have learned of the necessary components Compology employed in its camera systems,

including the use of GPS/GNSS modules. Again, the use of GPS/GNSS is only one component

in the combination of components that constitutes Compology's trade secrets.

### g.   Wireless Communication Module/Cellular modem

63.   Dr. Baker further notes that RecycleSmart's Pello device uses a different cellular

module than the cellular module used in the Compology devices. Baker Report at ¶ 128. Dr.

Baker offers no opinion regarding the significance of this difference. To the extent that he

contends this difference is evidence of the independent development of the Pello device, I

disagree. Any differences in the two devices' cellular modules is immaterial as they provide the

same functionality required for the camera systems of ████████████████████████

█████████████████████████████. In fact, Compology's

R12 device and the Pello device both use LTE CAT-M1 wireless communication modules, and

both are low-power modules. As noted above, by dissembling Compology's R12 device

RecycleSmart would have learned of the necessary components Compology employed in its

camera systems, including the use of an LTE CAT-M1 wireless communication module. As with

the other individual components, any differences in a single component is immaterial because it

was RecycleSmart's use of the combination of components as embodied in Compology's camera systems that constitutes a trade secret.

### E.   Compology's Trade Secrets are not Publicly Disclosed or Generally Available

64.     Throughout the Greenspun Report, Dr. Greenspun suggests that earlier general components or other waste management systems cannot be Compology's trade secret because they are public. For example, Dr. Greenspun points to weight-based strain gauges being used in waste containers as somehow equivalent to Compology's trade secrets. *See* Greenspun Report at ¶ 38. They are not. This is just one example of many in which Dr. Greenspun creates a false equivalency between publicly available components or systems and Compology's trade secrets. These findings are immaterial and irrelevant to Dr. Greenspun's opinion that Compology's trade secrets are publicly disclosed or generally available.

65.     Dr. Greenspun also mischaracterizes and downplays the identity and nature of Compology's trade secrets. For example, Dr. Greenspun opines, "as of 1997 the kind of machine learning that RoadRunner claims as a trade secret was being assigned as homework for undergraduates." *Id.* at ¶ 59. RoadRunner is not suggesting that a kind of machine learning is a Compology trade secret. Further, Dr. Greenspun opines, "[t]he use of a different size Torx screw cannot be anyone's trade secret since U.S. Patent 3,584,667 on the Torx system was published in 1971." *Id.* at ¶ 122. RoadRunner is not claiming that a different size Torx screw is a Compology trade secret. Still further, Dr. Greenspun opines, "the idea of using computer vision-based machine learning models for detecting contamination in the recycling industry is not a RoadRunner trade secret," and thus, "use of a CNN in this context is not a RoadRunner trade secret but rather an obvious application of a popular technology in the field of image-based

machine learning." *Id.* at ¶ 178. RoadRunner is not claiming that the use of a CNN for detecting contamination is a Compology trade secret. Many other examples exist, and are all red herrings, just like the examples above.

### 1.   General components and features

66.   Dr. Greenspun identifies separate components or features and concludes that these components and features are known. For example, Dr. Greenspun states "all of the components for a server-supported smart device are decades old: strain gauges (1938); ultrasonic sensors (1960s); LIDAR (1970s); inexpensive digital cameras (2000); inexpensive silicon-based accelerometers (1991); single-chip GPS receivers (2005); cellular data modems to extend the Internet (1969) to battery-powered mobile devices (late 1990s); web servers and relational database management systems (1990 and 1970s); standard geospatial processing techniques (1980s)." Greenspun Report at ¶ 67. Dr. Greenspun appears to suggest that these components or features are not trade secrets because they are generally known or publicly available. I find this analysis to be unhelpful and immaterial. Notably, Compology's trade secrets include *combinations* of hardware and software components and subsystems and training data (i.e., images obtained from Compology camera systems and relationally labeled and tagged for use in training ML models).

67.   Dr. Greenspun opines that several types of sensors have been used to detect fullness levels in waste containers. *Id.* at ¶ 38-41. Specifically, he opines that strain gauges, ultrasonic sensors, LIDAR, and digital cameras are known. *Id.* I find this to be immaterial to determine whether Compology's trade secrets are generally known or publicly available. To the extent Dr. Greenspun suggests these sensors and their ability to detect fullness levels is the same as Compology's camera system or camera subsystem, I disagree.

68.     Dr. Greenspun further opines that accelerometers have been used in waste containers, GPS receivers have been used in mobile phones, mobile data or cellular data has been used in Amazon Kindle devices, database management systems have been used for payroll services, database-backed web applications have been used to gather and store information from geographically dispersed devices, CNNs have been used in academia and industry, and machine learning has been used to implement image classification. *Id.* at ¶¶ 38-66. Again, I find all of this to be immaterial to determine whether Compology's trade secrets are generally known or publicly available.

69.     Dr. Greenspun, in connection with machine learning used for image classification, suggests that "as of 1997 the kind of machine learning that RoadRunner claims as a trade secret was being assigned as homework for undergraduates." *Id.* at ¶ 59. I do not find this to be a material distinction, as Compology does not claim that the use of machine learning or CNNs are the Compology trade secrets. Rather, as discussed herein, Compology's training data is a trade secret that was used to train RTS's ML models. Similarly, Dr. Greenspun suggests that the use of open-source libraries to train ML models discloses Compology's trade secrets because the libraries are publicly available. However, Compology does not claim that the use of TensorFlow or PyTorch ML frameworks or the use of ImageNet or other pre-trained libraries are Compology trade secrets. Again, this is immaterial to Dr. Greenspun's (incorrect) overall conclusion that Compology's trade secrets are publicly available or generally known. Still further, Dr. Greenspun states that "a substantial portion of this case seems to stem from the Plaintiff alleging that techniques available to anyone who subscribes to ChatGPT are a trade secret." *Id.* at ¶ 66. This is incorrect. Not only are these not claimed as Compology's trade secrets, but the use of

pretrained models as described in paragraphs 64-65 of Dr. Greenspun's Report do not result in a

sufficiently trained model on the interior of waste containers, as more fully described herein.

### 2. <u>Other waste management systems</u>

70.      Dr. Greenspun heavily focuses on the existence of other waste management

systems to opine that their existence shows that Compology's waste metering and recycling

technology, or the trade secrets contained therein, are publicly available or generally known. *See*

*Id.* at ¶¶ 68-86. I disagree for at least the reasons below, including that the existence of other

waste management systems not using Compology's camera system, camera subsystem, or

training data to train ML models for purposes of waste metering and recycling technology as

offered by Compology is immaterial. In short, these other systems are not Compology's systems.

In addition, Dr. Greenspun cites to patents and published patent applications disclosing other

waste management systems to support his opinion, claiming that "my understanding is that

nothing in a published patent can be considered a trade secret" (*id.* at ¶ 71) and "[t]his

application was published in January 2018 and, thus, nothing in it can be considered a trade

secret after that date" (*id.* at ¶ 73). Dr. Greenspun also cites to a Compology patent for the

purpose of suggesting that the Compology trade secrets must be disclosed in its patent. I disagree

that simply because a product or process incorporates commercial off-the-shelf components or

known processes forecloses the product or process from being a trade secret.

71.      First, Dr. Greenspun highlights the BigBelly trash receptacle as an example of a

system that somehow discloses Compology's trade secrets to the public. *Id.* at ¶ 68-70. Dr.

Greenspun states "after 2003 (the prototype being sold to a ski resort) or 2005 (the article being

published) it couldn't have been anyone's trade secret to equip a dumpster or other trash or

recycling receptable with a sensor capable of determining fullness and a data radio for sending

fullness data to a server. At that point, a software developer with limited imagination would certainly be capable of building a database of bins and reports of fullness, then using that information to direct trucks for pickups." *Id.* at 68. Dr. Greenspun continues by stating "It is explicit that the bins include a fullness sensor, a battery, and a mobile ("cellular") data modem." *Id.* at 70. This is not the same as any of Compology's trade secrets. The materials cited by Dr. Greenspun do not show what sort of sensor is used, the battery type or assembly, or that it can work without solar panels, or that it is used in large containers, or that it implements computer vision or labeled and tagged images to train an ML model for fullness, or otherwise.

72.     Dr. Greenspun then relies on US Patent No. 7,481,159 as a specific implementation of the BigBelly system. *Id.* at ¶ 71. Dr. Greenspun states that "the patent describes the use of photo-electric and pressure sensors to determine fullness," not a camera sensor or system. *Id.* For that reason alone, neither the patent nor the BigBelly system is material to Dr. Greenspun's opinion that this discloses Compology's trade secrets.

73.     Second, Dr. Greenspun relies on a Turkish system to suggest that Compology's trade secrets are public. *See id.* at ¶ 72. That reference, however, discloses that "The measurement system of fullness is calculated by subtracting the measurable empty volume of the container from the recorded total volume of the container in the collection center or in the collecting vehicle. The measurement of the empty volume is executed by the area scanning or by the detection of the empty height. For scanning the full or empty area volume-distance sensor (8) is used. Volume-distance sensor (8) consists of ultrasonic, radar, laser and other distance measurement sensors." U.S. Patent No. 11,836,687 at 3:23-31. Notably, the Turkish system uses a volume-distance sensor or distance measurement sensor, not a camera or image-based system.

74.     Third, Dr. Greenspun cites a CleanRobotics patent and generally concludes that it discloses use of a camera in a trash bin and downstream use of vision algorithms or machine learning. *See* Greenspun Report at ¶¶ 73-75. While this patent generically discloses use of a camera and machine learning, it does not disclose anything material that would make Compology's trade secrets public. Compology has been explicit that use of a camera or use of machine learning is not Compology's trade secrets.

75.     Fourth, Dr. Greenspun cites a Nordsense patent publication using a TOF camera. *See id.* at ¶ 76. The TOF camera disclosed in the Nordsense patent publication is not remotely similar to Compology's camera system.

76.     Fifth, Dr. Greenspun cites a Compology patent, opining (1) Compology's trade secrets cannot be a particular sensor and particular CNN if Compology's "best mode" was disclosed in the patent (*id.* at ¶ 80), and (2) Compology's trade secrets cannot be the inclusion of an accelerometer, GPS, and communication capability within dumpster electronics, accelerometer data to infer that a trash container was emptied, ██████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████ (*id.* at ¶¶ 81-82). Dr. Greenspun concludes, "Compology patent applications . . . disclose what the company now says are valuable trade secret ideas . . . ." *Id.* at ¶ 83.

77.     As to Dr. Greenspun's "best mode" opinion, I am not a lawyer, but I understand that Dr. Greenspun's characterization of Compology's trade secrets as to this opinion is unfounded. Dr. Greenspun mischaracterizes Compology's trade secrets as "using a particular sensor ████████████████ and particular convolutional neural network." *Id.* at ¶ 80. This is not any of Compology's trade secrets. I also note that the Compology patent referenced is titled

33                        ██████████████████████████████████████

"Method and system for fill level determination," not "Compology camera system" or "optical assembly and design," and thus, I would not expect to find the details concerning the trade secrets embodied in those systems or designs in the Compology patent. Moreover, I note that no Compology image data or training data is disclosed in the patent.

78.     As to Dr. Greenspun's unfounded assertion that Compology's trade secrets cannot be the inclusion of the aforementioned features above, I disagree. I note that some of Dr. Greenspun's list includes components (e.g., accelerometer) as well as features or processes (e.g., ███████████████████). These components or features may be part of the Compology trade secrets, but not the entirety, and thus, Dr. Greenspun's finding that these components and features are public—and therefore Compology's trade secrets are not able to function as trade secrets—is unfounded.

79.     Sixth, Dr. Greenspun suggests, in connection with Google's CircularNet, that "It is difficult to understand how a company could hope to maintain a valuable trade secret in the area of a convolutional neural network for classifying images of waste when one of the world's largest and most capable software companies is offering to give away software and collaborate without a fee. Stated another way, would you expect to find better machine learning ideas from a small company that had successfully downloaded and worked with TensorFlow or from the huge company that had developed TensorFlow in the first place?" *Id.* at ¶¶ 84-86. I find this to be sheer speculation. Dr. Greenspun offers no evidence that suggests Google has created the Compology trade secrets, nor that RecycleSmart or RTS collaborated with Google to develop anything.

80.     Seventh, Dr. Greenspun suggests "if either party in this matter had wished to outsource its machine learning and image processing software development, VVDN was ready to

take over those parts of the project." *Id.* at ¶ 144. This is a distinction without a difference. That RTS could have outsourced its ML and AI system design to VVDN (though that is highly disputable), it does not make any difference because RTS did not, in fact, do so. It is immaterial that VVDN offers services in ML and image processing software development because none of that work appears to have been done or documented, and Dr. Greenspun does not suggest otherwise.

81.     Based on the foregoing, Dr. Greenspun's opinion that Compology's trade secrets are public or generally available based on publicly disclosed general components or features, or other waste management systems, is unfounded and immaterial.

F.     **Any Purported Differences Between Compology and Pello Machine Learning Systems, Architectures, or Libraries Used are Immaterial**

82.     Dr. Greenspun opines that the differences between ML models, ML architecture, libraries, and the like, is evidence that RTS independently developed the Pello camera system and software. I disagree.

83.     Dr. Greenspun ignores the ample evidence from SDTN and IRAP reports, RTS emails, reporting documents, and deposition testimony, that establish RecycleSmart trained ML models on contamination, dirty lens detection, and fill level using Compology image data, as set forth in my opening report. My analysis is not dependent on the particular models, architecture, or libraries used to develop an AI system; rather, it is the use of Compology image data to train ML models that I find important, as confirmed by that ample evidence.

84.     Dr. Greenspun also opines, "[t]he RoadRunner/Compology system ██████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████ A pre-trained ConvNeXt machine learning model is used. All the above tools and subsystems are free and open source." Greenspun Report at ¶¶ 148-149. First, I note that several of these elements described by Dr. Greenspun are the same between Compology and Pello systems, for example, ███████████████████████████████████████████ ████████████████████████████████████████. The other distinctions such as ███ ████████████████████████ I do not find to be material, as each are equivalent frameworks able to be used to train ML models and develop an AI system. That these tools are open source is not material.

85.     I also do not find it relevant that RTS claims to have built a fill level ML model that is based on a pre-trained model from ImageNet. I understand that the main distinction identified by Dr. Greenspun, and on which he heavily relies, is RTS's purported use of ConvNeXt in connection with ImageNet pre-trained models. *Id.* at ¶¶ 154-164. Dr. Greenspun identifies a single ████████████████████████████████████████ ████████████████████ (RTS_SC_000000254) to suggest that RTS (e.g., Mr. Laraki) used pre-trained models from ImageNet on all of its ML models. First of all, this is only a single model on

██████████████████████████████████████████

fill estimation, and does not suggest that this same methodology is appropriate for other ML models such as contamination or dirty lens detection. Second, nothing in the code itself suggests that RTS is actually using this ██████████████████ in its Pello system, or that other ML models for fill level are not used, such as those Mr. Laraki admitted to developing using Compology image data. I do not find these distinctions to lead to the conclusion that RTS did not use Compology's trade secrets, including Compology image data, to develop its ML models.

86.     I find it material that Dr. Greenspun appears to provide no source code or other documentation to show that RTS uses its purported pre-trained model from ImageNet and fine-tune with Pello images to train its contamination or dirty lens detection ML models. Mr. Laraki's deposition testimony is only used to suggest a broader point that Dr. Greenspun appears to make, namely, that in his opinion, this same methodology was used to train all of RTS's ML models. *See id.* at ¶ 162 ("As such the training that RTS did do was finetuning this already-very-capable starting point. This meant RTS needed a much smaller training set, on the order of 2,000 images, and RTS was able to train the pre-trained model faster. Deposition of Yahya Laraki at p. 180:19-181:7. This allowed RTS to get to market quickly with a smaller amount of training data than that collected by Compology over the course of multiple years."). I do not find this explanation credible given that Mr. Laraki admitted to using Compology image data to train ML models on contamination, dirty lens detection, and fill level. Moreover, nothing in Dr. Greenspun's report suggests that images of the interior of waste containers containing labels and tags relating to contamination in the waste containers is available from ImageNet, or otherwise. It is worth noting again, however, that RecycleSmart and Mr. Laraki already had a massive, rich datalake of Compology image data of the interior of waste containers with labels and tags to contamination. *See* Greenspun Report at 107, quoting RTS_00064266 at RTS_00064269-270 ("Complete AMII

AI/ML Project Validation work to determine best path forward for ML models, recommended tagging for training data set and suggested personnel experience background considering RTS's massive data lake of images and RTS's needs going forward for contamination and fill detection."); *see also* RTS_00060547 at 60550 ("RecycleSmart also has access to a larger data lake of several million images from Compology cameras."). My conclusion is that Mr. Laraki did, in fact, train contamination ML models using Compology image data and used that information to conduct further training of separate contamination ML models on Pello image data or simply fine-tuned the contamination ML models on Pello image data after having trained on Compology image data.

87.     Dr. Greenspun cites in his report that Mr. Laraki suggested that the results from using Compology image data were "poor" (*see id.* at ¶ 163), but I understand that Mr. Laraki's laptop, on which this information was purportedly stored, was reformatted and is no longer available. *See* Laraki Dep. Tr. at 107:8-108:2. However, I understand that RTS, when reporting its progress on ML models for contamination, suggested that it was obtaining good results from use of Compology image data. *See* RTS_00017645. Stated otherwise, Mr. Laraki's statements are unfounded and conflict with RTS reports, and his laptop, which may have provided that information, was erased by RTS.

88.     I find it irrelevant and immaterial that Dr. Greenspun opines that Compology and RTS used different development environments to develop their ML models, namely, that Compology used ███████████████████████████████, and RTS used PyTorch and stored its models in .pt format. *See id.* at ¶ 164 ("The companies' respective software also differ in that ████████████████████████████ for their models while RTS used PyTorch (https://pytorch.org/). (See above for a description of what Google, the original

38     ████████████████████████████████████████

author of TensorFlow, has to offer in the area of a TensorFlow-based model for classifying images of waste.) Likewise, Compology stores its machine learning models using the ████████████████████████████████ whereas RTS stores its models in the PyTorch Tensors (.pt) format. Each company chose to employ a widely used industry-standard framework and file format, but the fact that they made different choices is further evidence that RTS was not copying Compology's machine learning models."). All knowledgeable experts know that Dr. Greenspun's distinction based on the two development environments used is irrelevant, and each is compatible with the use of Compology image data to train ML models.

89.     Dr. Greenspun opines, "[i]n my review of the RTS system I did not find any ████████████████████████████████████████████████████████████████ ███████████████████████████████████████. Specifically, I reviewed the Pello server code ███████████████████████████████████████████ ██████████████████████████████████. This code ██████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████. Nowhere in this process did I observe ████████████████ ████████████████████████████████████████████████████████████ ███████████" *See id.* at ¶ 166. I find this distinction immaterial because RTS has admitted that it used Compology image data to ████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████.

90.     I do find it significant that Dr. Greenspun distinguishes roll-off containers from other types of containers. *See id.* at ¶ 171 ("Based on my conversations with RTS employees it is my understanding that the only container types configured by RTS to use the PhotoAi

FillCalculationType are roll-off containers. Furthermore, the fill estimation machine learning model is implemented quite differently than Compology's model. As described above in the Training Data section RTS utilized a pre-built and pre-trained ConvNeXt model whereas Compology manually built their own CNN."). I take this to be an admission that at least to roll-off containers, RTS used Compology images to train, and continues to use that model to this day.

## VIII.   <u>CONCLUSION</u>

91.     My opinions are based on the information that has been provided to me as of the date of my report. As additional information becomes available, I reserve the right to review such information and amend my opinions, if necessary. Also, if requested, I will analyze and provide opinions about the work performed by other experts or individuals involved in this case.

DATED:       <u>September 13, 2024</u>

_W Leo Hoarty_
_____
W. Leo Hoarty

40

# Expert Witness Consultant—Curriculum Vitae

**W. Leo Hoarty**                                            leo@wlhconsulting.llc
**Mountain View, CA**                                        **408-500-9999**

## Professional Profile

A professional engineer with over 40 years of experience in both electronics engineering and computer science holding 48 granted US patents in many areas of technology. He is an experienced Expert Witness consultant with over 15 years of experience in multiple patent infringement matters in jury trials as well as with IPRs/PTAB. His background includes considerable experience in the development of all levels of complex software systems as well as designing and bringing to market electronic hardware products. He has authored numerous technology papers on data communications, consumer electronics, and broadcast & cable television technology and he has served on the Standards Committees of ATSC, ISO/MPEG, OpenCable, and IEEE.

## Technology Background

**Technology Expertise:**
Artificial Intelligence (AI/ML), [Enterprise Neurosystem, Vizio]
Audience measurement [Vizio]
Automatic Content Recognition (ACR), audio&video [Viggle, SweetVinyl, Vizio]
Cable and satellite settop design [Motorola, ActiveVideo, MovieBeam]
Consumer electronics product design [MovieBeam, Mediatronics, SweetVinyl]
DSP, audio/video codecs [ActiveVideo, Dotcast, SweetVinyl, Vizio]
Digital watermarking, digital rights mgmt. [19 Entertainment, MovieBeam, Vizio]
Electronic circuit design [ActiveVideo, Dotcast, SweetVinyl, Enterprise Neurosystem]
Interactive television systems [ActiveVideo, Inscape]
Mobile app development, iOS & Android [Aviga, 19 Entertainment, SweetVinyl]
Speech recognition [Aviga, 19 Entertainment, Vizio]
Video-on-demand [Inscape, ActiveVideo, Google]

**Software Languages and Tools:**
Languages: all C languages, F#, Java, Python, HTML/CSS/JavaScript
OS: Android, Linux, iOS, MacOS, Windows
VM & Cloud: VMware, AWS
Debug: Android Studio, adb, Eclipse, Understand, Wireshark, Xcode
ML/AI Tools: TensorFlow, PyTorch, GPT API

## Expert Witness Summary

Expert witness, PTAB declarations, source code reviews, depositions, court appearances for:
AC Nielsen, ActiveVideo Networks, Amazon, Arris Corp., DirecTV, DISH Networks, Fandango, Google, LG Electronics, Motorola, Roku, Rovi (TiVo), Samsung, Solaborate, Vizio

Total cases: 40 | PTAB: 11 | Depositions: 20 | Court appearances: 3
Detailed case history available on request.

# Expert Witness Consultant—Curriculum Vitae

## Employment History

| To | Present | **WLH Consulting, LLC** |
|---|---|---|
| From | 2011 | Mountain View, CA |
| Position | *Principal* | |

**Expert Witness Consultant**: Expert witness consulting for patent litigation matters with significant experience in prior art analysis; expert witness/IPR report generation; software analysis of complex code bases; court room testimony experience in US federal court and the High Court of England including significant international patent litigation experience.

**IP Development Summary**: Intellectual property consulting for technology companies drafting patent applications and assisting in patent prosecution. Companies include: Vizio, Google, ActiveVideo Networks, Viggle, epoxy.ai

**Technology Consultant** in cloud-based media management, automated content recognition (ACR), voice recognition systems, video-on-demand, targeted advertising and dynamic ad insertion, Internet streaming technologies, and mobile and automotive app development.

**Technology Manufacturing:** Owner and President of SweetVinyl, Inc., a boutique manufacturer of high-end audio products. The company imports Linux-based subsystems from Asia combined with locally manufactured components. Proprietary software integrated with imported subsystem. Published iOS and Android apps for tablets/smart phones for remote control of products.

| To | 2011 | **Interactive Mobile Media Inc.** |
|---|---|---|
| From | 2007 | Campbell, CA |
| Position | *President* | |

**Summary**: dba Aviga, company provided development of voice-activated mobile device applications for major media companies as well as embedded systems for automotive applications. Customers included: **19 Entertainment:** (Owner of *American Idol*) developed voice-response music player; **Viggle:** TV affinity iOS & Android app—developed proprietary automated content recognition (ACR) technology for identifying TV programming via a mobile app.

| To | 2007 | **Google Inc.** |
|---|---|---|
| From | 2006 | Mountain View, CA |
| Position | *Technology Consultant* | |

**Summary**: Managed special projects group in the development of a new product division for auctioning of television ad time for placement with major satellite and cable television operators. Developed architecture for ad network-connected ingest system that automated the processing of television ads for the Google service.

| To | 2006 | **Dotcast Inc.** |
|---|---|---|
| From | 2000 | Mountain View, CA |
| Position | *Founder, President & Chief Technology Officer* | |

**Summary**: Formed company and raised significant funds of over $250 million from a mix of strategic partners and VC's; grew company to over 170 employees; as CTO, built group to developed proprietary TV settop box using custom system-on-a-chip (SoC) for a consumer service called *MovieBeam* that won Best of Show at the Consumer Electronics Show in Las Vegas two years (2004 & 2005); the settop was distributed nationwide in top 100 DMAs thru major consumer product outlets and provided first-run (day and date) feature films from all major film studios.

## Expert Witness Consultant—Curriculum Vitae

| | | |
|---|---|---|
| To | 1999 | **EnCamera Sciences Corp.** |
| From | 1997 | Scottsdale, AZ |
| Position | *Partner* | |

> **Summary**: Developed novel metropolitan-area wireless data transmission technology embedding high-speed data signal in existing TV broadcast channels as well as developed a novel MPEG video compression system. Acquired by The Walt Disney Company, both technologies became foundation for its *MovieBeam* wireless set-top service.

| | | |
|---|---|---|
| To | 1997 | **ICTV Inc. (renamed ActiveVideo Networks in 2006)** |
| From | 1990 | San Jose, CA |
| Position | *Founder, President & Chief Technology Officer* | |

> **Summary**: Developed and deployed one of the first interactive TV and video-on-demand systems for cable TV. Designed and built custom interactive TV settop box integrated with GI/Motorola base. Worked with CableLabs on many cable TV standards including the OpenCable initiative. Partnered with IBM and deployed the first interactive TV/VOD system on Cox Cable in 1994.

| | | |
|---|---|---|
| To | 1989 | **PaineWebber** |
| From | 1986 | New York, NY |
| Position | *Vice President, Capital Market Systems* | |

> **Summary**: VP in charge of the development of advanced real-time equities trading and hedging advisory system. Deployed one of the first functioning artificial intelligence-based system on Wall Street providing real-time hedging advisories to the equities block desk.

| | | |
|---|---|---|
| To | 1986 | **Goldman Sachs & Co.** |
| From | 1984 | New York, NY |
| Position | *Vice President, Trading Support Systems* | |

> **Summary**: Developed real-time securities information systems. Designed and supervised trading systems installations in branch offices in London and Tokyo. Designed financial data analysis system working with the noted economist, Fischer Black, to develop real-time equities hedging analysis using the Black-Scholes pricing model.

| | | |
|---|---|---|
| To | 1984 | **United Nations** |
| From | 1979 | New York, NY |
| Position | *Technical Advisor, United Nations Development Program (UNDP)* | |

> **Summary**: served as Technical Advisor in Computer Methods in support of various projects in developing nations, based at UN headquarters in New York and Geneva. Traveled extensively to countries in Africa, South America, the Caribbean, and Asia to assist with providing computer automation for UNDP field projects including population census, agricultural surveys, and water resource development.

| | | |
|---|---|---|
| To | 1979 | **ACM Technology** |
| From | 1974 | San Francisco, CA |
| Position | *Owner* | |

> **Summary**: Operated a contract electronics engineering firm. Designed custom computer numerically controlled (CNC) systems using microprocessor and minicomputer-based controllers. Provided automation to medical research lab, professional photo printing, and wood products manufacturer. Contracted by the United Nations to design and build a digital voting system for the General Assembly Hall.

**Expert Witness Consultant—Curriculum Vitae**

**Extracurricular Activities:**

| | | |
|---|---|---|
| To | current | **Enterprise Neurosystem (sponsored by the Red-Hat division of IBM)** |
| From | 2022 | San Francisco, CA |
| Position | | *Data Acquisition, Signal Processing & ML Consultant* |

- Designed biological monitoring systems for agricultural and climate monitoring projects. Developed novel system for monitoring beehives using MEMS-based ultrasonic acoustic sensors. System design also includes atmospheric sensors to measure temperature, humidity, methane, $CO_2$, among other parameters. An on-site processor system digitizes and preprocesses the data for transmission to a machine learning system.

- Beehive clusters from all over the world will link to an IBM federated learning ML system allowing scientists to better understand stresses on honeybee colonies and help mitigate the significant decline in the honeybee population. The system will also be useful for monitoring regional climate change.

- The USDA announced collaborating with our group at the COP27 conference in Egypt (11/22). We co-sponsored in May 2023 a smart agriculture technology summit with the USDA called "AIM4C". I presented a paper on sensor systems for monitoring nature's networks. Al Gore and John Kerry both spoke at the conference along with Agriculture Secretary Vilsack.

- The group is further working with the United Nations CNTC, a peer group of the Inter-governmental Panel on Climate Change (IPCC). At COP28 in Dubai, the UN CNTC announce engaging Enterprise Neurosystem for multiple environmental monitoring projects in East Africa.

**Professional Associations, Standards Bodies Participation and Awards:**

- Delivered papers to and presented at numerous technical conferences in U.S., Asia and Europe including the National Association of Broadcasters (NAB), National Cable Television Association (NCTA), Society of Cable Telecommunication Engineers (SCTE), International Broadcast Conference (IBC) and the Montreux International Television Symposium, as well as many IEEE conferences and other industry related trade shows. (Papers available upon request.) Published two technical articles in trade magazines on graphics systems and networking.

- Member of IEEE, SMPTE, SCTE and Association of Computing Machinery (ACM).

- Served on many standards bodies over several decades including: ISO MPEG2, ATSC (HDTV standards), IEEE (802.14), CableLabs for plant and set-top standards efforts, EIA for cable TV compatibility (IR pass-through) and, in conjunction with CableLabs, cable TV interfaces such as CableCard.

- Awards: Society of Cable Television Engineers (SCTE)—Best New Technology at National Cable Television Association (NCTA) 1996 for ICTV's interactive TV and VOD service; Best of Show at CES 2004 and 2005, MovieBeam set-top and service; 2003 Emmy Award went to Vizio, Inc for their precision audience measurement service which utilizes my patented audio automated content recognition (ACR) technology.

**Education:**

| | | |
|---|---|---|
| To: | 1973 | **Ohio State University** |
| From: | 1970 | Electrical Engineering |

W. Leo Hoarty

# Expert Witness Consultant—Case History

**W. Leo Hoarty**                                    leo@wlhconsulting.llc
**Mountain View, CA**                                      **408-500-9999**

## Expert Witness Summary

Expert witness, PTAB declarations, depositions, and court appearances for:
ActiveVideo, Akami, Alphonso.tv, Amazon, Arris Corp., Charter Cable, Cox Communications,
DirecTV, DISH Networks, Fandango, Google, HSN, LG Electronics, Motorola, AC Nielsen,
NEC, Roku, Rovi (TiVo), Samsung, Solaborate, Vizio

Total cases: 40 | PTAB: 11 | Depositions: 20 | Court appearances: 3

## Litigation Support Experience: (Representing the underlined party)

### 40. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Theft of Trade Secret |
| Law Firm: | Sterne Kessler LLP |
| Case Name: | Global TelLink v. JACS Solutions |
| Services Provided: | Representing as expert witness |
| Disposition: | Trade Secret analysis and declaration drafting. Jury trial expected in 2024. |
| Date: | 2023 |

### 39. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Software Source Code Review |
| Law Firm: | Jeffer Mangels Butler & Mitchell LLP |
| Case Name: | Roadrunner Recycling v Recycle Track System |
| Services Provided: | Representing Road Runner as expert witness |
| Disposition: | Software source code analysis and declaration drafting. Jury trial expected in 2024. |
| Date: | 2023 |

### 38. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Law Firm: | Kilpatrick Townsend |
| Case Name: | Entropic Inc. v. Cox Communications, et al. |
| Services Provided: | Representing Cox Comm. as expert witness |
| Disposition: | Patent analysis and declaration drafting of infringement defense response. Jury trial expected in 2024. |
| Date: | 2023 |

### 37. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Law Firm: | Arnold & Porter Kaye Scholer LLP |
| Case Name: | Touchstream Technologies, Inc., v. Charter Cable, et al. |
| Services Provided: | Representing Charter as expert witness |
| Disposition: | Patent analysis and declaration drafting of infringement defense response. Jury trial expected in 2024. |
| Date: | 2023 |

# Expert Witness Consultant—Case History

### 36. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Inter-Partes Review |
| Law Firm: | Fish & Ricardson, P.C. |
| Case Name: | SafeCast Limited v. DISH Network |
| Services Provided: | Representing Dish Network as expert witness |
| Disposition: | Patent analysis and declaration drafting of IPR defense response. |
| Date: | 2023 |

### 35. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Inter-Partes Review |
| Law Firm: | Liston Abramson LLP |
| Case Name: | WAG Acquisitions v Walt Disney Company |
| Services Provided: | Representing WAG as expert witness |
| Disposition: | Patent analysis and declaration drafting of multiple IPR defense responses. Deposed on three declarations. |
| Date: | 2023 |

### 34. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Software Source Code Review |
| Law Firm: | Liston Abramson LLP |
| Case Name: | WAG Acquisitions v Walt Disney Company |
| Services Provided: | Representing WAG as expert witness |
| Disposition: | Completed software code review of Disney+, Hulu, MLB streaming software, prepared report |
| Date: | 2022 |

### 33. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Theft of Trade Secrets |
| Law Firm: | Goodwin Procter, LLP |
| Case Name: | Alphonso v. Tremor, Inc. |
| Services Provided: | Representing Alphonso as expert witness |
| Disposition: | Preparing expert report |
| Date: | 2022 |

### 32. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Software Source Code Review |
| Law Firm: | Fabricant LLP |
| Case Name: | Jawbone v. Samsung, Inc. et al. |
| Services Provided: | Representing Jawbone as expert witness |
| Disposition: | Complete code review of Samsung subsidiary digital signal process software system, preparing report. |
| Date: | 2022 |

### 31. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Court and No.: | D. Del. - No. 22-cv-00987 |
| Law Firm: | Baker Botts LLP |
| Case Name: | NEC Corporation v. Peloton Interactive, Inc. et al. |
| Services Provided: | Representing NEC as expert witness |
| Disposition: | Initial preparations delayed pending motions |
| Date: | 2022 |

### 30. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Theft of Trade Secrets |
| Court and No.: | California State Court - No. 1113 |

# Expert Witness Consultant—Case History

| | |
|---|---|
| Law Firm: | Jeffer Mangels Butler & Mitchell, LLP |
| Case Name: | <u>Solaborate</u> v. Avaya, Inc. |
| Services Provided: | Representing Solaborate as expert witness and providing both electronic hardware and software source code examination of their products compared to similar Avaya devices |
| Disposition: | Deposed 6/2022, defendant settled in 2023. |
| Date: | 2022 |

### 29. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Court and No.: | W.D. Tex. - No. 20-cv-00921 |
| Law Firm: | Fenwick & West LLP |
| Case Name: | Broadband iTV, Inc, v. <u>Amazon.com, Inc.</u> |
| Services Provided: | Representing Amazon as expert witness |
| Disposition: | Deposed 7/2021, matter settled |
| Date: | 2021 |

### 28. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Court and No.: | D.N.J. - No. 21-cv-13405 |
| Law Firm: | Irell & Manella, LLP |
| Case Name: | <u>WinView Inc.</u> v. DraftKings Inc. |
| Services Provided: | Representing Winview as expert witness. |
| Disposition: | Discovery phase, case on hold |
| Date: | 2021 |

### 27. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Court and No.: | W.D. Tex. - No. 19-cv-00044 |
| Law Firm: | Jackson Walker LLP |
| Case Name: | ESW Holdings, Inc. v. <u>Roku, Inc.</u> |
| Services Provided: | Representing Roku as expert witness |
| Disposition: | Deposed by ESW counsel. Case decided in favor of defendant in a summary judgement based on my expert report. |
| Date: | 2021 |

### 26. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Court and No.: | E.D. Tex. - No. 19-cv-00089 |
| Law Firm: | Choate Hall |
| Case Name: | Personalized Media Communications v <u>Akamai</u> |
| Services Provided: | Representing Akamai as technical expert; |
| Disposition: | Matter settled |
| Date: | 2020 |

### 25. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Court and No.: | D.N.J. - No. 18-cv-10238 |
| Law Firm: | Morgan, Lewis & Bockius LLP |
| Case Name: | TVnGO v <u>LG Electronics</u> |
| Services Provided: | Representing LG Electronics as expert witness; appeared in Federal court to testify as an expert at Markman hearing |
| Disposition: | Case dismissed on summary judgement |
| Date: | 2019 |

# Expert Witness Consultant—Case History

### 24. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Patent Infringement / Inter-Partes Review |
| Law Firm: | Goodwin Procter, LLP |
| Case Name: | First Media v Alphonso |
| Services Provided: | Represented Alphonso as expert witness; participated in two PTAB matters; filed expert declarations in defense of two Alphonso patents |
| Disposition: | Deposed 2020, both patents successfully defended, petitions rejected |
| Date: | 2019 |

### 23. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Patent Infringement |
| Court and No.: | C.D. Cal. - No. 17-cv-07534 |
| Law Firm: | Rothwell, Figg, Ernst & Manbeck, P.C. |
| Case Name: | Maxell v. Fandango |
| Services Provided: | Represented Fandango as expert witness |
| Disposition: | Matter settled |
| Date: | 2018 |

### 22. Expert Engagement:

| | |
|---|---|
| Type of Matter: | Patent Infringement / Inter-Partes Review |
| Court and No.: | PTAB – Nos. IPR2016-01469 and IPR2016-01470 |
| Law Firm: | Cooley LLP |
| Case Name: | TQ Delta v. DISH Network |
| Services Provided: | Represented DISH Network as expert witness; Prepared two expert declarations for IPR submission, deposed twice, once for each matter; Supported petitioner defense from appeal |
| Disposition: | Both petitions instituted and survived appeal |
| Date: | 2016-2018 |

**ATTACHMENT C**
**MATERIALS CONSIDERED**

**Bates Labeled Documents**[1]

| | | |
|---|---|---|
| RTS_00000709 | RTS_00000740 | RTS_00263857 |
| RTS_00263863 | RTS_00263886 | RTS_00322579 |
| RTS_00311065 | RTS_00311066 | RTS_00311067 |
| RTS_00311070 | RTS_00311084 | RTS_00311085 |
| RTS_00311090 | RTS_00311095 | RTS_00311105 |
| RTS_00311107 | RTS_00311108 | RTS_00311109 |
| RTS_00311115 | RTS_00311116 | RTS_00311117 |
| RTS_00311118 | RTS_00311119 | RTS_00311120 |
| RTS_00311121 | RTS_00311155 | RTS_00311156 |
| RTS_00000062 | RTS_00000077 | RTS_00000082 |
| RTS_00000083 | RTS_00000118 | RTS_00000126 |
| RTS_00000141 | RTS_00000255 | RTS_00000260 |
| RTS_00000474 | RTS_00000480 | RTS_00000503 |
| RTS_00000522 | RTS_00000581 | RTS_00000587 |
| RTS_00000599 | RTS_00000600 | RTS_00000608 |
| RTS_00000614 | RTS_00000617 | RTS_00000622 |
| RTS_00000624 | RTS_00000637 | RTS_00000638 |
| RTS_00000641 | RTS_00000663 | RTS_00000673 |
| RTS_00000679 | RTS_00000680 | RTS_00000735 |
| RTS_00000738 | RTS_00000756 | RTS_00000760 |
| RTS_00000761 | ROADRUNNER000000119 | ROADRUNNER000003423 |

---

[1] Documents are identified by the Bates Label appearing on the first page of the document.

| | | |
|---|---|---|
| ROADRUNNER000003580 | ROADRUNNER000017801 | ROADRUNNER000021240 |
| ROADRUNNER000021674 | ROADRUNNER000021690 | ROADRUNNER000021692 |
| ROADRUNNER000021819 | ROADRUNNER000021826 | ROADRUNNER000021672 |
| ROADRUNNER000021855 | ROADRUNNER000021913 | ROADRUNNER000021952 |
| ROADRUNNER000022503 | ROADRUNNER000022687 | ROADRUNNER000022749 |
| ROADRUNNER000022865 | ROADRUNNER000023077 | ROADRUNNER000023126 |
| ROADRUNNER000023128 | ROADRUNNER000023184 | ROADRUNNER000023307 |
| ROADRUNNER000023500 | RTS_00311157 | RTS_00311158 |
| RTS_00311159 | RTS_00311160 | RTS_00060876 |
| RTS_00087795 | RTS_00182278 | RTS_00001003 |
| RTS_00001064 | RTS_00016894 | RTS_00016984 |
| RTS_00017421 | RTS_00017465 | RTS_00108281 |
| RTS_00339710 | RTS_00318118 | RTS_00000790 |
| RTS_00000842 | RTS_00000908 | RTS_00000982 |
| RTS_00000987 | RTS_00259352 | RTS_00176591 |
| RTS_00176594 | RTS_00176597 | RTS_00189279 |
| RTS_00259310 | RTS_00066189 | RTS_00105953 |
| ROADRUNNER000063606 | ROADRUNNER000043285 | ROADRUNNER000028673 |
| ROADRUNNER000043283 | ROADRUNNER000028683 | ROADRUNNER000028688 |
| ROADRUNNER000028691 | ROADRUNNER000074158 | ROADRUNNER000073285 |
| ROADRUNNER000073283 | RTS_SC_0000160 | ROADRUNNER000073224 |
| RTS_00121802227 | RTS_SC_0000026-32 | RTS_SC_0000202 |
| RTS_SC_0000106-109 | RTS_SC_0000230 | RTS_SC_0000098-103 |
| RTS_SC_00000104 | RTS_SC_000097 | RTS_SC_0000229 |
| RTS_SC_0000073 | RTS_SC_0000238 | RTS_SC_0000012 |

| | | |
|---|---|---|
| RTS_SC_0000013 | RTS_SC_0000008-13 | RTS_SC_0000014 |
| RTS_SC_0000014-16 | RTS_SC_0000159-161 | RTS_SC_0000071 |
| RTS_SC_0000072 | RTS_SC_0000075 | RTS_SC_0000073 |
| RTS_SC_0000076 | ROADRUNNER000073345 | RTS_00335965 |
| RTS_00263020-125 | RTS_00318118-22 | RTS_00339710-16 |
| RTS_00339711 | RTS_00001064 | RTS_00263025 |
| RTS_00060547 | ROADRUNNER000028673 | ROADRUNNER000028683 |
| ROADRUNNER000028688 | ROADRUNNER000028691 | RTS_00001028 |
| RTS_00064266 | RTS_SC_000000254 | RTS_00064266 |
| RTS_00017645 | RTS_00263025 | |

**Deposition Transcripts**

- Deposition of Yahya Laraki
- Rule 30(b)(6) Deposition of Carl Anderson
- Rule 30(b)(6) Deposition of Cason Male

**Pleadings and Other Legal Filings**

- Plaintiff's Second Amended Complaint
- Plaintiff's Identification of Trade Secrets

**Physical Devices**

- Pello devices
- Pello prototypes/early devices (in person)
- Compology R11, R12, R13, R13S, R13L

**Source Code**

- RTS Source Code (Mintz Levin, Boston, Massachusetts)
- Compology Source Code

**Articles**

- Studer, L., *et al.*, A Comprehensive Study of ImageNet Pre-Training for Historical Document Image Analysis, *available at* https://ar5iv.labs.arxiv.org/html/1905.09113v1 (accessed Aug. 28, 2024)

- Zhang, J, *et al.*, ImageNet Pre-training also Transfers Non-robustness, *available at* https://ar5iv.labs.arxiv.org/html/2106.10989 (accessed Aug. 28, 2024)

- He, K., *et al.*, Rethinking ImageNet Pre-training, *available at* https://ar5iv.labs.arxiv.org/html/1811.08883v1 (accessed Aug. 28, 2024)

- EfficientNet: Rethinking Model Scaling for Convolutional Neural Networks, available at https://arxiv.org/pdf/1905.11946 (accessed Aug. 30, 2024), shows transfer learning between models.

**Patents and Patent Application Publications**

- U.S. Patent No. 10,943,356

- U.S. Patent No. 11,122,388

- U.S. Patent No. 11,172,325

- US Patent No. 10,332,197

- US Patent No. 9,930,429

- U.S. Patent Application Publication No. 2023/0196307

- U.S. Patent Application Publication No. 2014/0278630

- U.S. Patent Application Publication No. 2021/0158308

- U.S. Patent Application Publication No. 2020/0013024

- U.S. Patent Application Publication No. 2021/0158097

**Expert Reports**

- Opening Expert Report of Philip Greenspun and materials cited therein

- Opening Expert Report of R. Jacob Baker and materials cited therein

## **PROOF OF SERVICE**

**RoadRunner Recycling, Inc. v. Recycle Track Systems, Inc. et al.**
**3:23-cv-04804-WHA**

**STATE OF CALIFORNIA, COUNTY OF LOS ANGELES**

At the time of service, I was over 18 years of age and not a party to this action.  I am employed in the County of Los Angeles, State of California.  My business address is 1900 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067-4308.

On September 13, 2024, I served true copies of the following document(s) described as **OPPOSITION EXPERT REPORT OF W. LEO HOARTY AND ATTACHMENTS A, B, AND C** as follows:

| | |
|---|---|
| Arameh Zargham O'Boyle<br>MINTZ, LEVIN, COHN, FERRIS,<br>GLOVSKY, AND POPEO, P.C.<br>2049 Century Park East, Suite 300<br>Los Angeles, CA 90067<br>Email:  AZOBoyle@mintz.com<br>Amy LoBue<br>James J. Thomson<br>James M. Wodarski<br>Matthew S. Galica<br>Michael C. Newman<br>Stephen Huxton Chen<br>Tianyi Tan<br>MINTZ, LEVIN, COHN, FERRIS,<br>GLOVSKY, AND POPEO, P.C.<br>One Financial Center<br>Boston, MA 02111<br>Emails: alobue@mintz.com<br>jjthomson@mintz.com<br>JWodarski@mintz.com<br>msgalica@mintz.com<br>mcnewman@mintz.com<br>schen@mintz.com<br>TTan@mintz.com<br>CC:      rts-mintz@mintz.com | Attorneys for Defendants Recycle Track<br>Systems, Inc. and RecycleSmart<br>Solutions, Inc. |

**BY E-MAIL OR ELECTRONIC TRANSMISSION:**  I caused a copy of the document(s) to be sent from e-mail address Lstreisand@jmbm.com to the persons at the e-mail addresses listed in the Service List.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on September 13, 2024, at Los Angeles, California.

*/s/ Lena Streisand*

Lena Streisand