# EXHIBIT A

1  Arameh Zargham O'Boyle (SBN: 239495)
   AZOboyle@mintz.com
2  MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO, P.C.
   2049 Century Park East, Suite 300
3  Los Angeles, CA 90067
   Telephone:    (310) 586-3200
4  Facsimile:    (310) 586-3202

5  James M. Wodarski (Admitted *Pro Hac Vice*)
   JWodarski@mintz.com
6  Michael C. Newman (Admitted *Pro Hac Vice*)
   MCNewman@mintz.com
7  Matthew S. Galica (Admitted *Pro Hac Vice*)
   MSGalica@mintz.com
8  James J. Thomson (Admitted *Pro Hac Vice*)
   JJThomson@mintz.com
9  Sean M. Casey (Admitted *Pro Hac Vice*)
   SMCasey@mintz.com
10 Tianyi Tan (Admitted *Pro Hac Vice*)
   TTan@mintz.com
11 Stephen Chen (Admitted *Pro Hac Vice*)
   SChen@mintz.com
12 Amy LoBue (Admitted *Pro Hac Vice*)
   ALoBue@mintz.com
13 MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO, P.C.
   One Financial Center
14 Boston, MA 02111
   Telephone:    (617) 542-6000
15 Facsimile:    (617) 542-2241

16 Attorneys for Defendants
   RECYCLE TRACK SYSTEMS, INC., and
17 RECYCLESMART SOLUTIONS INC.

18                     **UNITED STATES DISTRICT COURT**

19                     **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 20  ROADRUNNER RECYCLING, INC., | Case No. 3:23-cv-04804-WHA |
| 21              Plaintiff, | **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| 22         v. | |
| 23  RECYCLE TRACK SYSTEMS, INC., and RECYCLESMART SOLUTIONS INC., | *Assigned for All Purposes to:* The Hon. William H. Alsup |
| 24              Defendants. | |
| 25  | Date: November 14, 2024 Time: 8:00 a.m. Place: Courtroom 12, 19th Floor |
| 26  | |
| 27  | Complaint Filed:   August 4, 2023 Trial Date:        December 9, 2024 |
| 28  | |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION .................................................................................................................. 1
II. REPLY TO ROADRUNNER'S "STATEMENT OF MATERIAL FACTS" .............................. 2
III. ARGUMENT ......................................................................................................................... 2
    A. Trade Secrets 1-3 Should Be Dismissed Out-of-Hand ................................................... 2
        1. Plaintiff's Overall Waste Metering System Trade Secret Should Be Dismissed .......................................................................................................... 2
        2. Plaintiff's Smart Camera Trade Secret Should Be Dismissed ......................... 3
        3. Plaintiff's Optical Assembly Trade Secret Should Be Dismissed ................... 5
        4. Plaintiff's Smart Camera Apparatus and Optical Assembly Trade Secrets Are Publicly or Generally Known ........................................................ 6
    B. Trade Secrets Nos. 4-7 Should Be Dismissed ............................................................... 7
        1. Plaintiff Concedes That Trade Secrets Nos. 5-7 Do Not Exist, So They Must Be Dismissed ................................................................................ 7
        2. Trade Secret Nos. 4-7 Should Be Dismissed Because Plaintiff's Brand-New Descriptions for Them Are Still Insufficient ....................................... 8
        3. Trade Secret Nos. 4-7 Should Be Dismissed Because Plaintiff's Brand-New Descriptions for Them Only Describe Publicly or Generally Known Information ........................................................................... 9
    C. The *Khoros* Case Does Not Salvage Plaintiff's Trade Secret Allegations ................ 10
        1. Plaintiff Does Not Own Its Alleged Training Data Trade Secret .................. 11
        2. Plaintiff Has Not Analyzed the Amendment to the Contract ........................ 11
        3. There Are Fundamental Differences Between *Khoros* and the Present Circumstances Making It Inapposite ................................................ 11
        4. The Cases Plaintiff References in Passing Are Inapposite ........................... 13
IV. CONCLUSION .................................................................................................................... 14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Beco Dairy Automation, Inc. v. Glob. Tech Sys., Inc.*,
   No. 1:12-cv-01310 LJO SMS, 2015 WL 5732595 (E.D. Cal. Sept. 28, 2015) ........................13

*HotSpot Therapeutics, Inc. v. Nurix Therapeutics, Inc.*,
   No. 22-cv-04109-TSH, 2023 WL 3259471 (N.D. Cal. Apr. 18, 2023) .............................. 4, 5-6

*InteliClear, LLC v. ETC Glob. Holdings*,
   978 F.3d 653 (9th Cir. 2020) ........................................................................................3, 5, 11

*Khoros, LLC v. Lenovo (United States), Inc.*,
   No. 3:20-cv-03399-WHO, 2020 WL 12655516 (N.D. Cal. Oct. 5, 2020) ...................... *passim*

*Waymo LLC v. Uber Techs., Inc.*,
   No. C 17-00939 WHA, 2017 WL 5000352 (N.D. Cal. Nov. 2, 2017) ..................................4, 5

ii
DEFENDANTS' REPLY ISO MOTION FOR SUMMARY JUDGMENT (CASE NO. 3:23-CV-04804-WHA)

Pursuant to Civil L.R. 7-3(c), Defendants Recycle Track Systems, Inc. and RecycleSmart Solutions Inc. (together, "Defendants") hereby submits the following Reply to Plaintiff RoadRunner Recycling Inc.'s ("Plaintiff" or "RoadRunner") Opposition to Defendants' Motion for Summary Judgment ("Opposition" or "Opp.") (Dkt. No. 145).

## I.     INTRODUCTION

Plaintiff still fails to identify its trade secrets with any degree of sufficiency or consistency. As evidence, Plaintiff has completely redefined half of its trade secrets in its Opposition. Specifically, Plaintiff argues that its Trade Secret Nos. 5-7—which have always been described as ***machine learning models***—are now defined as "***images plus metadata***." Plaintiff's machine learning model trade secrets (Nos. 5-7) must be dismissed because Plaintiff admits they do not exist. Worse, Plaintiff's change was made with little foresight as its ripple effect also dooms Trade Secret Nos. 1 and 4. This is because Plaintiff's new description of Trade Secret Nos. 5-7 is indistinguishable from its existing description of its Training Data trade secret (No. 4), and its Overall Waste Metering System trade secret (No. 1) still includes machine learning model and algorithm trade secrets despite now admitting those do not exist.

Plaintiff's hardware-related trade secrets (Nos. 2-3) fare no better. Plaintiff hides behind "schematics" and catchall phrases like "unique configuration," "know-how," and "overall design" as defining them. This charade fails. Plaintiff has never identified anything in its schematics that define its trade secrets. And, even if Plaintiff had done so, Plaintiff admit Defendants never had access to its schematics. Its catchall phrases suffer the same fate. Plaintiff cannot—or worse, will not—identify what it means by "unique configuration," "know-how," or "overall design" when explicitly asked to do so during depositions. So, Plaintiff's buckshot identification of its trade secrets amounts to a list of general components that Defendants have repeatedly shown are all public or generally known.

Ultimately, the main reason this case advanced past the pleading stage was due to confusion sowed by Plaintiff based on the *Khoros* case. Based on record evidence Defendants obtained during discovery, Plaintiff needs *Khoros* to stand for the proposition that publicly known information that Defendants own is somehow Plaintiff's trade secret. It does not stand for that proposition, and, after Defendants diligently developed the record evidence in this case, *Khoros* is inapposite and

1

inapplicable to the present circumstances.

## II. REPLY TO ROADRUNNER'S "STATEMENT OF MATERIAL FACTS"

Plaintiff identifies multiple contracts that have existed between the Parties. Opp. at 2-4. However, Plaintiff has not identified the most recent amendment to these contracts. On June 23, 2021, the Parties executed an amendment to the 2020 Terms and Conditions. Ex. 16. RoadRunner has not addressed this latest amendment.

Plaintiff also recites, as fact, a fanciful story about Defendants being "caught red-handed" "disassembling" and "reverse-engineering" Plaintiff's product. *See* Opp. at 2, 4-5. However, the only record evidence related to this story are four pictures that Defendants had of Plaintiff's product and an email to which they were attached. Opp. at 4 (citing Opp. Ex. 26). But the pictures are not evidence of reverse-engineering and they were never used by Defendants. Ex. 17 (Anderson 8/29 Depo. Tr.) at 14:13-18:11. Moreover, Defendants had Plaintiff's technical expert compare these pictures with Plaintiff's FCC submissions, and he admitted that Plaintiff's FCC submissions reveal *more* technical details about its products than the pictures Defendants had. Ex. 18 (Hoarty 10/7 Depo. Tr.) at 366:6-367:11, 439:2-440:1. Despite Plaintiff's unsupported tales, there is no record evidence beyond this. And Plaintiff cannot have it both ways. If the pictures Defendants had define or reveal the trade secrets, then they have been publicly disclosed through Plaintiff's admittedly *more revealing* FCC submissions.

## III. ARGUMENT

### A. Trade Secrets 1-3 Should Be Dismissed Out-of-Hand

#### 1. Plaintiff's Overall Waste Metering System Trade Secret Should Be Dismissed

Plaintiff does not meaningfully dispute Defendants' argument that its Overall Waste Metering System trade secret is insufficiently defined. *Compare* Opp. at 6-7, 16-17 *with* Mot.[1] at 9-11. Instead, in a paltry attempt to clarify what its Overall Waste Metering System trade secret is, Plaintiff recites the following testimony from its Hardware Director, Mr. Longson: "I think the overall waste metering system encompasses many parts. This includes the hardware, the software, the algorithms, the labeled

---

[1] "Motion" or "Mot." hereby refer to Defendants' Memorandum Points and Authorities in Support of Motion for Summary Judgment (Dkt. No. 132-1).

1   and trained data." Opp. at 6-7, 17 (quoting Mot. Ex. 9 (Longson Depo. Tr.) at 101:10-14). This
2   testimony provides no clarity and, ultimately, Plaintiff's Opposition only raises more questions about
3   the scope of its Overall Waste Metering System trade secret—underscoring its ill-defined nature.

4   First, despite always having contended that its ▓▓▓, Container Fullness, and Contamination
5   Detection ▓▓▓▓▓▓▓▓▓▓▓ *and algorithms* were trade secrets (*see, e.g.*, Dkt. No. 47 (Ex. A),
6   Plaintiff's Identification of Trade Secrets ("ITS") at 15-18; Opp. Ex. A (Hoarty Opening Rpt.) at
7   ¶¶ 16, 93-111), Plaintiff now concedes that *none* of its machine learning algorithms are a trade secret.
8   *See* Opp. at 9-10, 21. Instead, Plaintiff defines its ▓▓▓, Contamination Detection/Content
9   Identification Service, and Container Fullness Analysis "trade secrets" as "*images* plus specific
10  metadata." *Id.* (emphasis added); *see also* Section III.B, *infra*. Plaintiff's abandonment of its machine
11  learning algorithm trade secrets cannot be reconciled with the testimony that Plaintiff cites from Mr.
12  Longson explicitly saying its Overall Waste Metering System includes, *inter alia*, "the algorithms."

13  Second, Plaintiff admits that "Mr. Hoarty did not find evidence of misappropriation" for
14  numerous trade secrets *still* identified in its Overall Waste Metering System trade secret. Opp. at 17.
15  This is the exact issue Defendants pointed out in their motion, which Plaintiff failed to address. Mot.
16  at 10 (referring to Defendants' "second" point describing the fact that Mr. Hoarty's Overall Waste
17  Metering System includes numerous trade secrets for which there is no evidence of misappropriation).
18  In fact, Plaintiff compounds this problem by now additionally jettisoning its machine learning model
19  trade secrets.

20  Plaintiff's description of its Overall Waste Metering System trade secret is now comprised,
21  almost entirely, of features it admits are *not* trade secrets or have *not* been misappropriated. This is a
22  by-product of Plaintiff having never treated its Overall Waste Metering System "trade secret" as
23  anything more than a catchall bucket for its constantly changing trade secret disclosures. This is
24  impermissible as "Plaintiffs may not simply rely upon 'catchall' phrases or identify categories of
25  trade secrets they intend to pursue at trial." *InteliClear, LLC v. ETC Glob. Holdings*, 978 F.3d 653,
26  658 (9th Cir. 2020) (internal citations omitted).

27  **2.   Plaintiff's Smart Camera Trade Secret Should Be Dismissed**

28  Plaintiff does not meaningfully dispute Defendants' arguments that its Smart Camera

Apparatus trade secret is insufficiently defined. *Compare* Opp. at 7-8, 17-19 *with* Mot. at 11-13. Instead, Plaintiff's Opposition consists of (1) obfuscation and (2) "short-quotes" from Mr. Longson.

As for obfuscation, RoadRunner takes the 'smoke and mirrors' approach of saying that its "smart camera apparatus trade secret is *defined* in the *schematics*, *system block diagrams, and specifications* of Compology's R12 and R13 camera systems." Opp. at 7-8, 17-19 (emphasis added). But Plaintiff has not identified any aspect of its schematics or design files that describe its trade secret. *See* Mot. at 13 (citing Mot. Ex. 4 at 119:24-120:5); *see also* Ex. 19 (Hoarty 9/12 Depo. Tr.) at 71:12-87:14. It is not the Court's or Defendants' job to do so. *See, e.g.*, *Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 5000352, at *7-8 (N.D. Cal. Nov. 2, 2017); *see also HotSpot Therapeutics, Inc. v. Nurix Therapeutics, Inc.*, No. 22-cv-04109-TSH, 2023 WL 3259471, at *6 (N.D. Cal. Apr. 18, 2023). But, even if Plaintiff's schematics and design files define its trade secrets, Mr. Hoarty admitted that Defendants would not have had access to them, and there is no record evidence to the contrary. *See, e.g.*, Mot. at 14 (citing Mot. Ex. 4 (Hoarty 9/12 Depo. Tr.) at 73:25-74:2).

As for "short-quoting," Plaintiff cites Mr. Longson's testimony in an attempt to clarify how its Smart Camera Apparatus trade secret is defined. *See* Opp. at 7. The testimony does ***not*** provide any clarity, and Plaintiff conspicuously omits portions of Mr. Longson's testimony (emphasized below) that doom its trade secret for two additional reasons (Opp. Ex. 23 (Longson Depo. Tr.) at 115:1-25):

> Q. Can you describe what that is?
> A. The smart camera apparatus.
>
> Q. Is it the specific components identified in lines 6 through 14, the specific way that they are connected, and the specific model number of each component?
> A. I think it's the overall design that includes those components and the configuration of the components.
>
> ***Q. And what do you mean by "overall design"?***
> ***A. I'm not sure how to describe that further.***
>
> Q. And what do you mean by "the configuration"?
> A. So, configuration in my mind in this context refers to the placement of parts, how they're interconnected, ***what firmware is running on there to control them***, how the various materials interact, including what -- what ▉▉▉▉▉▉▉▉▉▉ and what optics you use.
>
> Q. And all of those constitute the trade secret?
> A. As I said before, I think there is this overarching trade secret and then there's these, like, you can consider them sub trade secrets within there.

First, Mr. Longson clearly identifies *firmware* as being a critical aspect of the Smart Camera Apparatus trade secret. Opp. Ex. 23 (Longson Depo. Tr.) at 115:12-19. But Plaintiff has never identified firmware as being part of its Smart Camera Apparatus trade secret, so it is inarguable that Plaintiff has failed to sufficiently describe this trade secret. Worse, Plaintiff has admitted that it has no evidence of Defendants accessing or using its firmware.

Second, throughout the duration of this case, Plaintiff has hidden behind catchall phrases like "know-how," "unique configuration" and "overall design" as allegedly describing its trade secrets. As a matter of law, Plaintiff cannot do that. *See, e.g.*, *InteliClear*, 978 F.3d at 658 ("Plaintiffs may not simply rely upon 'catchall' phrases or identify categories of trade secrets they intend to pursue at trial."). Regardless, it is clear that Plaintiff has no idea what the terms mean (Mot. Ex. 9 (Longson Depo. Tr.) at 89:16-94:21):

> Q. ***What's your interpretation of overall know-how and design***?
> MR. MELLEMA: Objection. Form.
> THE WITNESS: I believe it to mean all of the information needed to create the system.
>
> Q. And what is all of the information needed to create the system?
> MR. MELLEMA: Objection. Form.
> THE WITNESS: ***I can't answer that***. ***That's literally a decade's worth of work that me and my colleagues undertook***.

As the testimony above shows, RoadRunner's witnesses cannot describe the "overall know-how and design" or "configuration" of its products—further confirming their ambiguous nature.

### 3. Plaintiff's Optical Assembly Trade Secret Should Be Dismissed

Plaintiff does not meaningfully dispute Defendants' arguments that its Optical Assembly trade secret is insufficiently defined. *Compare* Opp. at 8, 19-20 *with* Mot. at 13-15. Again, Plaintiff simply tries to hide behind "schematics" as allegedly "defining" its Optical Assembly trade secret. Opp. at 8 ("The optical assembly and design trade secret is ***defined*** in the particular schematics, system block diagrams, and specifications of Compology's R12 and R13 camera systems.").

This fails for two reasons. First, as Defendants have already pointed out, Plaintiff has failed to identify anything in its schematics that defines its trade secrets. *See* Mot. at 13 (citing Mot. Ex. 4 at 119:24-120:5); *see also* Ex. 19 (Hoarty 9/12 Depo. Tr.) at 71:12-87:14. It is not the Court's or Defendants' job to do so. *See, e.g.*, *Waymo*, 2017 WL 5000352, at *7-8; *see also HotSpot*, 2023 WL

3259471, at *6. Second, if the schematics define Plaintiff's Optical Assembly trade secret, Mr. Hoarty admitted Defendants would not have had access to them, and there is no record evidence to the contrary. *See, e.g.*, Mot. at 14 (citing Mot. Ex. 4 (Hoarty 9/12 Depo. Tr.) at 73:25-74:2).

### 4. Plaintiff's Smart Camera Apparatus and Optical Assembly Trade Secrets Are Publicly or Generally Known

Plaintiff identifies a handful of components related to its Smart Camera and Optical Assembly trade secrets that it alleges are not disclosed in certain public sources. *See* Opp. at 11. Beyond this list of components, Plaintiff does not dispute that Defendants have shown every other component alleged to be in its trade secrets is publicly known. *See generally id.* The following demonstrates that the statements in Plaintiff's Opposition are demonstrably false or irrelevant:

- Plaintiff states that Dr. Baker could not see ▓▓▓▓▓▓▓▓ batteries in public disclosures. But he stated the opposite. *See* Opp. Ex. 40 (Baker Depo. Tr.) at 93:2-6. Moreover, it is publicly known that Plaintiff's products use ▓▓▓▓▓▓▓ batteries. *See, e.g.*, Dkt. No. 47 (Ex. A), ITS at 11; Dkt. No. 121 at 11 (citing Dkt. Nos. 121-5 and 121-7, *i.e.*, evidence of public disclosures of Plaintiff's use of ▓▓▓▓▓▓ batteries, including by its own employee).

- Plaintiff states that Dr. Baker could not see a ▓▓▓▓▓▓ in public disclosures. Dr. Baker stated the opposite. *See* Opp. Ex. 40 (Baker Depo. Tr.) at 92:11-93:6.

- Plaintiff states that Dr. Baker could not see "internal wiring" of a battery pack in public disclosures. But there is no internal wiring. The only wiring consists of red and black external wires, which are visible in FCC photos. *See, e.g.*, Dkt. No. 34-1, Weinger Decl. Ex. B (R12 internal photos submitted to the FCC).

- Plaintiff states that Dr. Baker could not see ▓▓▓▓▓▓ in public disclosures. But Dr. Baker explained that the use of ▓▓ in electronic devices is common. *See* Ex. 20 (Baker Depo. Tr.) at 88:9-13.

- Defendants have already demonstrated that Plaintiff's use of ▓▓▓▓▓▓▓ and a ▓▓▓▓▓▓ is publicly disclosed or generally known. Dkt. No. 121 at 6-9.

- Plaintiff states that Dr. Baker could not see the specific ▓▓▓▓▓ product number

|   |   |
|---|---|
| 1 | in public disclosures. But Mr. Hoarty testified that the specific model number is not significant. Ex. 18 (Hoarty 10/7 Depo. Tr.) at 477:3-20. As for Plaintiff's general use of an image sensor, that is generally known as Plaintiff's product is a camera sensor. |

- Plaintiff states that Dr. Baker could not see a camera board in public disclosures. But Defendants have already demonstrated that this is publicly disclosed in FCC photos. Mr. Hoarty admitted this is the case. *Id.* at 439:2-440:1.

- Plaintiff states that Dr. Baker could not see a specific camera flash LED in public disclosures. To the extent this is significant, Defendants would not have had this information either as it is located in schematics that they never accessed. *See, e.g.*, Mot. Ex. 4 (Hoarty 9/12 Depo. Tr.) at 72:20-73:20, 73:25-74:2. To the extent Plaintiff is referring to its general use of a camera flash, Defendants have demonstrated that is publicly known. *See, e.g.*, Dkt. No. 121 at 5-6 (citing evidence of multiple public disclosures of Plaintiff's general use of a camera flashing, including FCC photos, *i.e.*, Dkt. No. 121-9 and Dkt. No. 34-1, Weinger Decl. Exs. C and F).

- Plaintiff states that Dr. Baker could not see a specific mechanical design in public disclosures. But Defendants have already demonstrated that this is publicly disclosed in Plaintiff's internal photos of its R12 device submitted to the FCC. *See, e.g.*, Dkt. No. 34 at 8-11 (citing, *inter alia*, Dkt. No. 34-1, Weinger Decl. Ex. B (R12 internal photos submitted to the FCC)); Dkt. No. 121 at 21; *see also* Dkt. No. 43 (Court order noting that "the FCC webpages contain[] public images of the internal configuration of the cameras that RoadRunner submitted to the agency, which include *readily identifiable* chips, batteries, circuit board layout, and so forth[.]" (emphasis added)).

Defendants have demonstrated that every portion of Plaintiff's alleged Smart Camera Apparatus and Optical Assembly trade secrets is publicly or generally known.

### B. Trade Secrets Nos. 4-7 Should Be Dismissed

#### 1. Plaintiff Concedes That Trade Secrets Nos. 5-7 Do Not Exist, So They Must Be Dismissed

In its ITS, Plaintiff characterized its ███████ "Container Fullness Analysis," and

7

DEFENDANTS' REPLY ISO MOTION FOR SUMMARY JUDGMENT (CASE NO. 3:23-CV-04804-WHA)

"Contamination Detection / Content Identification (COR-Classifier)" trade secrets as "Software Algorithms and Processes." Dkt. No. 47 (Ex. A), ITS at 15-18. Mr. Hoarty confirmed this characterization in his opening report, where he inarguably described Plaintiff's ▇▇ "Container Fullness Analysis" and "Contamination Detection / Content Identification (COR-Classifier)" trade secrets ▇▇▇▇▇▇▇▇▇▇▇▇▇. *See* Opp. Ex. A (Hoarty Opening Rpt.) at ¶¶ 93-111. Defendants showed that these trade secrets must be dismissed, though, by demonstrating their ill-defined and public nature—most notably, because they are explicitly disclosed in Plaintiff's own patents. *See, e.g.*, Mot. at 16-19, 22. Unable to rebut Defendants' arguments, Plaintiff took another approach in its Opposition: completely change the identification of its trade secrets.

For the first time, *in its Opposition*, Plaintiff now concedes that none of its ▇▇▇▇ ▇▇▇ or algorithms are trade secrets. *See* Opp. at 9-10, 21. Instead, Plaintiff argues that Trade Secret Nos. 5-7 are "images plus metadata":

> The **SPID trade secret** is defined as the images plus metadata that identify that the camera lens is dirty/obstructed. …The **contamination detection/content identification service trade secret** is defined as the images plus metadata that identify contaminants /contents in the waste container. …The **container fullness analysis trade secret** is defined as the images plus metadata that identify fill level of the waste containers.

Opp. at 9 (emphasis added). Because Plaintiff has now abandoned its machine learning model Trade Secrets Nos. 5-7, they must be dismissed.

### 2. Trade Secret Nos. 4-7 Should Be Dismissed Because Plaintiff's Brand-New Descriptions for Them Are Still Insufficient

Even if Plaintiff's brand-new Trade Secret Nos. 5-7 were to be considered, they should be dismissed as insufficiently described because they are indistinguishable from Plaintiff's Trade Secret No. 4. This necessarily dooms Plaintiff's Trade Secret No. 4 as well. Despite being identified as *different* trade secrets, Plaintiff's new descriptions for Trade Secret No. 4 and Trade Secret Nos. 5-7 appear to wholly overlap, as depicted below:

| Plaintiff's Description of Trade Secret No. 4 | Plaintiff's Description of Trade Secret Nos. 5-7 |
|---|---|
| "The Compology-generated labeled and tagged images trade secret is defined by *images plus metadata associated with the images*." | "The SPID trade secret is defined as the *images plus metadata that identify that the camera lens is dirty/obstructed*." |

| Plaintiff's Description of Trade Secret No. 4 | Plaintiff's Description of Trade Secret Nos. 5-7 |
|---|---|
| "***The metadata associated with the images include fullness level of the waste container, contaminants visible in the image, and obstructed or blocked images***." Opp. at 8 (emphasis added). | "The contamination detection / content identification service trade secret is defined as the ***images plus metadata that identify contaminants / contents in the waste container***." "The container fullness analysis trade secret is defined as the ***images plus metadata that identify fill level of the waste containers***." Opp. at 9 (emphasis added). |

What is the difference between Trade Secret No. 4 and Trade Secret Nos. 5-7? As the table above shows, it is impossible to know. So, Plaintiff has failed to sufficiently describe Trade Secret Nos. 4-7. Accordingly, they should all be dismissed.

### 3. Trade Secret Nos. 4-7 Should Be Dismissed Because Plaintiff's Brand-New Descriptions for Them Only Describe Publicly or Generally Known Information

Even aside from the ill-defined nature of Plaintiff's Trade Secret Nos. 4-7, there is nothing secretive about associating metadata with images—even the particular types of metadata Plaintiff only specifically identifies for the first time ever in its Opposition (*i.e.*, "camera lens is dirty/obstructed," "contaminants/contents in the waste container," and "fill level of the waste container."). This is because it is all publicly disclosed by Plaintiff. Indeed, Plaintiff's website, "Compology Help Center," includes a resource titled "Compology 101," which is described as "the basics of how to use Compology." Exs. 21-22. In the "Compology 101" center, Plaintiff includes a link to "Compology APIs." Ex. 23. In this link, Plaintiff provides an "overview of available APIs and links to documentation." *Id.* It includes a link to Plaintiff's "Container API" which "allows you to query data about your containers." *Id.* The documentation publicly discloses Plaintiff's "Feed-style Device Posts" and provides the precise API response that Plaintiff provides to its customers when this query is made. Ex. 24.[2] In view of this, it is inarguable that Plaintiff publicly discloses that, *inter*

---

[2] Annotated screenshot of the Compology webpage titled "Compology Containers API" at the "Feed-style Device Post" section with the "200 OK" dropdown, publicly accessible at https://containersapi.docs.apiary.io/#/reference/0/feed-style-device-posts/list-all-device-posts/200?mc=reference%2F0%2Ffeed-style-device-posts%2Flist-all-device-posts%2F200 (last accessed Oct. 31, 2024).

*alia*, the following metadata is associated with each image it takes: an identification of the waste container ("id"), a link to the image ("imageURL"), the waste container's fill level ("level"), whether the camera in the waste container is blocked or obstructed ("cameraBlocked"), and whether the waste container contains specific types of contaminants, including the amount of each contaminant ("visibleContamination" including "plastic bag," "bulky item," "tanglers," "e-waste," "uncollapsed cardboard box," "styrofoam"). *Id.*

Beyond this, there is nothing secretive about how Plaintiff applies the labels or tags to its images. It is public knowledge that Plaintiff performs human- and computer-labeling. *See, e.g.*, Dkt. No. 121-4 at 05:15-05:36 (public MLconf presentation by Compology's Senior Backend Engineer, M.r Armstrong, specifically disclosing that Compology's camera sensor "takes pictures and uploads them to our cloud where we analyze them using a couple of pretty vanilla convolutional neural network processes and human-in-the-loop data science to analyze them for fullness and contamination."); Dkt. No. 121-5 at 19:45-20:52 (public presentation at the December 2016 Embedded Vision Alliance Member Meeting by Compology's co-founder and CPO, Mr. Chehebar, disclosing that Compology has "hundreds of people" look at and classify images); Dkt. No. 114-4, ITS at 12 (public version of the ITS stating without redaction that "Compology then ***manually*** labeled and tagged these images with particular information." (emphasis added)). Plaintiff also publicly discloses how it trains its ■■■■■■■■■■■■■■■■ *See, e.g.*, Dkt. No. 114-4, ITS at 11-18; Dkt. No. 121-3 (U.S. Patent No. 10,943,356); Dkt. No. 121-18 (U.S. Patent Appl. No. 17/145,021); *see also* Dkt. No. 121 at 12-17. Defendants' technical expert has presented unrebutted evidence demonstrating that the operation of each of Plaintiff's ■■■ Contamination Detection, and Container Fullness ■■■■■■■■■■■■■ is publicly disclosed in Plaintiff's patents. *See* Mot. Ex. 10 (Greenspun Rebuttal Rpt.) at ¶¶ 97-100, Ex. 1. There is *nothing* secretive about *any* aspect of Plaintiff's training data, how it is labeled, how it is provided to customers, how it is used to train ML models, or how the resulting ML models operate.

**C.     The *Khoros* Case Does Not Salvage Plaintiff's Trade Secret Allegations**

Plaintiff argues that Defendants' use of "Compology-generated labeled and tagged images to train its ML models" somehow constitutes trade secret misappropriation. Opp. at 23-24. Plaintiff's

argument fails for a multitude of reasons.

### 1. Plaintiff Does Not Own Its Alleged Training Data Trade Secret

First, Plaintiff appears to interpret this Court's reference to *Inteliclear* as meaning that one does not need to demonstrate *possession* of a trade secret in order to demonstrate *possession* of it; rather, one just needs to identify a trade secret. Opp. at 23 (citing Dkt. No. 43 at 3). Setting aside the fact that Plaintiff has yet to identify a trade secret, its suggestion is absurd. Plaintiff's logic strips "possession" from the inquiry altogether.

Second, relying on its flawed logic, Plaintiff argues that its identification of "Compology-generated labeled and tagged images" demonstrates its possession of them. It does not. "Compology-generated labeled and tagged images" are "Device Data" and "Derivative Data" as recited in the contract between Plaintiff and Defendants. *See* Mot. at 5-6. The contract unequivocally states that Defendants own "Device Data" and "Derivative Data." Mot. at 5-6.

### 2. Plaintiff Has Not Analyzed the Amendment to the Contract

Plaintiff argues that it has "established how the 2020 Terms prohibited Defendants from using Compology-generated labeled and tagged images to train its ML models." Opp. at 23. Plaintiff has not. The contract terms it identifies were replaced by amendment. *See* Section II, *supra*. Plaintiff has not acknowledged—much less analyzed—the operative contract between the parties. So, it is incorrect for Plaintiff to suggest that it has demonstrated how the 2020 Terms prohibit Defendants from using Defendants' "Device Data" and "Derivative Data."

### 3. There Are Fundamental Differences Between *Khoros* and the Present Circumstances Making It Inapposite

Plaintiff argues that "the 2020 Terms prohibited Defendants from using Compology-generated labeled and tagged images to train its ML models" and that "Defendants' breach of contract formed the wrongful act that establishes misappropriation." Opp. at 23. Plaintiff provides a parenthetical reference to *Khoros, LLC v. Lenovo (United States), Inc.*, No. 3:20-cv-03399-WHO, 2020 WL 12655516, at *9 (N.D. Cal. Oct. 5, 2020) as support. *Id*. Plaintiff does not analyze the *Khoros* case in any detail. A simple review reveals that *Khoros* is significantly different and distinguishable from the present set of circumstances—rendering it inapplicable.

First, the underlying trade secrets in *Khoros* involved a "Studio Tool," "APIs," and "Database Model" that were not publicly known and only accessible via a Master Services Agreement ("MSA") between the parties. *Khoros*, 2020 WL 12655516 at *2, 4-7. In fact, the "Database Model" that enabled Lenovo to create its copycat platform was not even accessible under the MSA. Lenovo had to ask Khoros to provide it to them. *Id.* No similar facts exist here. Instead, Defendants have shown that everything about Plaintiff's alleged, underlying "training data" trade secret is publicly known. *See* Section III.B.3, *supra*; Mot. at 16. Further, unlike the "Database Model" in *Khoros* not even accessible under the MSA, Plaintiff does not allege that Defendants did not have access to "Compology-generated labeled and tagged images" (*i.e.*, "Device Data" and "Derivative Data" under their contract). It cannot because Defendants own the data. *See* Section III.C.1, *supra*; Mot. at 5-6, 22-23.

Second, in *Khoros,* the underlying trade secrets that Khoros alleged were misappropriated by Lenovo were *not owned* by Lenovo. Here, the underlying trade secrets that Plaintiff alleges were misappropriated by Defendants *are owned* by Defendants. *See* Section III.C.1, *supra*.

Third, in *Khoros*, the MSA *did* identify information that *was owned* by Lenovo—analogous to how Defendants own "Device Data" and "Derivative Data" here. And Khoros *did not* allege that the information owned by Lenovo was (1) a trade secret or (2) misappropriated. Specifically, in *Khoros*, the underlying MSA defines "Content" as information processed or stored by the "Applications." *See* Ex. 25 at § 1.3. The MSA states that "Content" is owned by Customer (*i.e.,* Lenovo). *Id.* at § 3.3. This is analogous to "Device Data" and "Derivative Data" in the agreement between Plaintiff and Defendants. *See* Dkt. No. 29-1, Weigner Decl. Ex. B (2020 Terms) at §§ 1.7, 1.9, and 5.2. Separately, the MSA defines "Applications" as "software of any kind, type and representation, inclusive of any customer ECRs, along with its documentation and its programming and user interfaces, provided by Lithium, whether or not Hosted by Lithium." *See* Ex. 25 at § 1.1. The MSA applies use restrictions to "Applications." *See id.* at § 2.3. This is analogous to the "System" in the agreement between Plaintiff and Defendants. *See* Dkt. No. 29-1, Weigner Decl. Ex. B (2020 Terms) at § 1.18 (defining "System" as "the Devices, the Software and/or the combination thereof on an integrated basis to enable the collection, processing and/or delivery of Device Data and Derivative

12

Data"). Khoros does not allege that "Content"—which it does *not* own—is its trade secret. Instead, it argues that its "Applications"—which it owns—is the trade secret that was misappropriated. Applying *Khoros*' logic to the present case would preclude Plaintiff from arguing that "Device Data" and "Derivative Data" constitute its "Training Data" trade secret—even though this is precisely what Plaintiff argues.

Fourth, in *Khoros*, Lenovo was alleged to have used **three trade secrets** that Khoros owns in order to create a new "copycat" platform that embodied the same **three trade secrets** that Khoros owns. *Khoros*, 2020 WL 12655516 at *2-3. Plaintiff's allegations are inapposite. Here, Plaintiff accuses Defendants of using "Compology-generated labeled and tagged images to train its ML models." Opp. at 23. But Plaintiff no longer alleges that its "ML models" are trade secrets and Defendants have already established that it owns "Compology-generated labeled and tagged images"—which are also publicly-known. So, in stark contrast to *Khoros*, Plaintiff is accusing Defendants of using something that is demonstrably **not a trade secret** (*see* Section III.B.3, *supra*) and **not owned by Plaintiff** (*see* Section III.C.1, *supra*) in order to train something that **Plaintiff no longer contends is a trade secret** (*see* Section III.B.1, *supra*). This is antithetical to *Khoros*.

Ultimately, Plaintiff wants (and needs) *Khoros* to apply to the present circumstances. For the reasons articulated above, it does not. Plaintiff cannot convert its breach of contract allegations into trade secret misappropriation allegations.

### 4.     The Cases Plaintiff References in Passing Are Inapposite

The lynchpin of Plaintiff's attempt to convert its breach of contract allegation into a trade secret misappropriation allegation is, and always has been, the *Khoros* case. As shown, it is inapplicable and irrelevant. Plaintiff cites a few additional cases in passing, but does not attempt to show their applicability to the present circumstances. *See* Opp. at 23-24. They have none.

In *Creative Writer Software, LLC v. Schechter*, the APIs at issue were trade secrets. No. CV 23-02471-MWF (MAAx), 2024 WL 1098759, at *5 (C.D. Cal. Feb. 8, 2024). Here, Plaintiff does not allege its APIs are trade secrets. And, as shown above, everything about them is public. *See* Section III.B.3, *supra*.

In *Beco Dairy Automation, Inc. v. Glob. Tech Sys., Inc.*, unlike here, the Defendant did not

13
DEFENDANTS' REPLY ISO MOTION FOR SUMMARY JUDGMENT (CASE NO. 3:23-CV-04804-WHA)

own the alleged trade secret. No. 1:12-cv-01310 LJO SMS, 2015 WL 5732595, at *9 (E.D. Cal. Sept. 28, 2015). Separately, the alleged trade secret information in *Beco* was only known as a result of entering the contract. As shown above, everything about Plaintiff's training data—which Defendants own—is publicly known. *See* Section III.B.3, *supra*.

In *Reingold v. Swiftships, Inc.*, unlike here, the Defendant did not own the alleged trade secret. 126 F.3d 645, 650-51 (5th Cir. 1997). Moreover, the underlying, alleged trade secret in *Reingold* was not publicly known. The opposite is true here, because the metadata associated with Compology-generated labelled and tagged images is publicly known. *See* Section III.B.3, *supra*. Further, in *Reingold*, unlike here, the use of the underlying trade secret resulted in the production of a product embodying the trade secret. 126 F.3d at 650-51. Here, Plaintiff alleges that Training Data was used to train ML models, but it admits that its machine learning models are not trade secrets. *See* Section III.B.1, *supra*.

The cases Plaintiff cites are inapposite and have no applicability to the present circumstances.

**IV.   CONCLUSION**

For the foregoing reasons and the reasons stated in Defendants' Motion, summary judgment is warranted against Plaintiff with regard to both of its trade secrets misappropriation causes of action, and as to all of Plaintiff's alleged trade secrets.

Dated: October 31, 2024

Respectfully Submitted,

/s/ *Matthew S. Galica*

Arameh Zargham O'Boyle (SBN: 239495)
AZOboyle@mintz.com
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND
    POPEO, P.C.
2049 Century Park East, Suite 300
Los Angeles, CA 90067
Telephone:    (310) 586-3200
Facsimile:    (310) 586-3202

James M. Wodarski (Admitted *Pro Hac Vice*)
JWodarski@mintz.com
Michael C. Newman (Admitted *Pro Hac Vice*)
MCNewman@mintz.com
Matthew S. Galica (Admitted *Pro Hac Vice*)
MSGalica@mintz.com
James J. Thomson (Admitted *Pro Hac Vice*)
JJThomson@mintz.com

| | |
|---|---|
| 1 | Sean M. Casey (Admitted *Pro Hac Vice*) |
|   | SMCasey@mintz.com |
| 2 | Tianyi Tan (Admitted *Pro Hac Vice*) |
|   | TTan@mintz.com |
| 3 | Stephen Chen (Admitted *Pro Hac Vice*) |
|   | SChen@mintz.com |
| 4 | Amy LoBue (Admitted *Pro Hac Vice*) |
|   | ALoBue@mintz.com |
| 5 | MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO, P.C. |
| 6 | One Financial Center |
|   | Boston, MA 02111 |
| 7 | Telephone:    (617) 542-6000 |
|   | Facsimile:    (617) 542-2241 |
| 8 | |
|   | Attorneys for Defendants |
| 9 | RECYCLE TRACK SYSTEMS, INC., and RECYCLESMART SOLUTIONS INC. |