UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROADRUNNER RECYCLING, INC., <br><br>  Plaintiff, <br><br>  v. <br><br> RECYCLE TRACK SYSTEMS, INC. and RECYCLESMART SOLUTIONS, INC., <br><br>  Defendants. | No. C 23-04804 WHA <br><br> **ORDER RE SUMMARY JUDGMENT** |

## INTRODUCTION

In this contract and trade secret case, defendants move for partial summary judgment. Defendants do not challenge the contract claim brought by a former supplier. Instead, they contend plaintiff's asserted trade secrets respecting waste monitoring were not specified, secret, or valuable — and, as to one, not owned by plaintiff. The motion is **GRANTED.**

## STATEMENT

Parties contest seven remaining trade secrets, which bear repeating before reviewing the factual and procedural histories: (1) An overall waste monitoring system, (2) a smart camera apparatus for mounting in a dumpster, (3) the optical assembly within that apparatus, (4) a collection of images taken by such cameras of dumpsters and labeled with attributes like dumpster fullness, used for training computer models to identify when new images show the same attributes (training data), (5) a computer model for identifying images that are subpar or unworkable, (6) a computer model for identifying images showing the waste is contaminated, and (7) a computer model for identifying images showing a dumpster is full.

1.      **FACTUAL HISTORY.**

The following is undisputed or as a reasonable jury could find for plaintiff:

In 2013, Compology, Inc. — plaintiff RoadRunner Recycling, Inc.'s predecessor — began building prototypes for an internet-connected "smart camera" apparatus to be mounted in dumpsters (*see* Dkt. No. 145-24 at 26, 29).

That same year, Compology's co-founder, Benjamin Chehebar, began applying for patents for an overall waste monitoring system (*see, e.g.*, U.S. Patent App. Pub. No. 2014/0278630 (pub'd Sept. 18, 2014)). One patent publication described gathering data from dumpsters using wirelessly connected cameras or sensors, processing that data to identify the dumpster's fullness or attributes, and instructing what to do next, like empty it (*ibid.*).

In 2016, Chehebar later showcased one result: The R11 smart camera apparatus. In a YouTube video published online, Chehebar shared with a live audience and the video's viewer a "teardown" of the R11 camera apparatus, showing its insides and talking about many of its components (Dkt. No. 146-30 ¶¶ 13–15, 25). And, in 2018, Chehebar submitted filings for Compology's internet-connected cameras to the FCC for publication (*see id.* ¶¶ 16–17, 25). Chehebar requested that some schematics and diagrams not be published (*see* Dkt. 34-1 at ECF 25). But he did not object to the online publication of photographs showing parts of the camera apparatus's exterior, interior, circuitry, and other features (*see id.* at ECF 2 & Exhs.).

In 2018, Compology continued filing patent applications related to waste monitoring. One claimed to teach taking images of the inside of a dumpster, labeling them with dumpster or waste attributes (like fullness), and using those labeled images to train a computer model to identify when new images had the same attributes (*e.g.*, U.S. Patent App. Pub. No. 20/0013024 (pub'd Jan. 9, 2020); *cf.* Dkt. No. 133-9 Exh. 1).[*] Such methods became generally known by publication or otherwise before defendants used them (*see infra*).

---

[*] Other patents acknowledged in the record and pertaining to various parts of the overall waste monitoring system are: U.S. Patent App. No. 62/778,775 (filed Dec. 19, 2018); U.S. Patent No. 10,943,356 (pub'd June 18, 2020); U.S. Patent No. 11,122,388 (pub'd Dec. 24, 2020); U.S. Patent App. Pub. No. 2021/0158308 (pub'd May 27, 2021); U.S. Patent App. Pub. No. 2021/0158097 (pub'd May 27, 2021); U.S. Patent No. 11,172,325 (pub'd Nov. 9, 2021); and U.S. Patent App. Pub. No. 2023/0196307 (pub'd June 22, 2023).

United States District Court
Northern District of California

By this point, Compology had financial backing and a working business model (*cf.* Dkt. No. 145-33 at 54). It sold waste-monitoring services that deployed its cameras into its customers' dumpsters, analyzed the images with its computer models, and provided an online portal and APIs for customers to glean insights about the dumpsters — and even images with metadata (Dkt. No. 46-4 at 3–4). A contract limited customers' use of the system.

Also by this point, all parties agree much of the technology in the case was no longer secret: *As to the physical apparatus*, all agree that between the YouTube video, the FCC filings, and other disclosures, all parts of Compology's camera apparatuses were made public — except for twelve parts (Dkt. No. 146-30 ¶¶ 13–15). Defendants argue that even those twelve were disclosed or readily known (Reply 6–7). *As to the digital tools*, parties no longer dispute that the methods used for developing the computer models based on images had become known through the patent-related publications or otherwise (Opp. 21; Reply 7–9).

Then came the purported misappropriations: *As to the physical apparatus*, in 2019, one of Compology's contracting customers, defendant RecycleSmart Solutions, Inc., disassembled Compology's R12 camera, or so a jury could find. An email from RecycleSmart to a hardware designer requested a part number and attached four photographs like those published by the FCC (*compare* Dkt. No. 147-7 (email), *with* Dkt. No. 133-10 (FCC); Dkt. No. 158-3 at 366–67, 439–40). RecycleSmart began developing its own camera, called the Pello. *As to the digital tools*, between 2020 and 2021, RecycleSmart downloaded large volumes of labeled images with Compology's knowledge; the images were of RecycleSmart's dumpsters and labeled by Compology's software (*see* Dkt. No. 146-28 ("Hoarty Op.") ¶ 97; Dkt. No. 133-2 at 39). Parties dispute contract language establishing ownership and use rights in the labeled images (Opp. 24; Reply 11–14). A jury could find RecycleSmart used them to train its model.

In just a few years, RecycleSmart accomplished what had taken Compology ten (*cf.* Dkt. No. 145-33 at 54). In 2022, plaintiff RoadRunner Recycling, Inc. acquired Compology. And, in 2023, defendant RecycleTrack Systems, Inc. acquired defendant RecycleSmart. These corporate changes are not at issue.

2. **RELEVANT PROCEDURAL HISTORY.**

In August 2023, RoadRunner filed contract and trade secret claims in the County of San Francisco (Dkt. No. 1-1). The case was removed, the complaint amended (Dkt. No. 15), and the case reassigned to the undersigned judge (Dkt. No. 19).

The Court soon granted RecycleSmart's motion to dismiss the trade secret claims (Dkt. No. 43). RoadRunner had not identified "trade secrets." For starters, it had defined its "trade secrets" as "confidential information that includes trade secrets" (*id.* at 4). Even as the district court worked to construe bounds RoadRunner had not, it found no secrets:

- *The alleged smart camera apparatus* was publicly disclosed by sources like those above (*ibid.*);

- *The alleged "AI system"* was not even pleaded to have any "specific, non-public aspects" (*ibid.*); and,

- *The "machine-learning model and preexisting image database"* failed because these were defined for the first time as "cleanup work in the opposition brief" (*id.* at 5).

In forecasting any motion for leave to amend, the order underscored that the third category likely "conflate[d] access to interfaces that allowed RecycleSmart to ingest data [from] the Compology system," such as ones that allowed RecycleSmart to retrieve labeled images, "with access to the Compology system's backend source code," such as its computer model (*id.* at 6).

RoadRunner moved for leave to amend and filed an identification of its purported secrets (Dkt. Nos. 45–47). Among the fourteen combination or individual trade secret claims were:

(1) "Overall Waste Metering System," a combination now broader than the "AI system" earlier rejected (Dkt. No. 46-4 ("Identification") 4–5);

(2) "Smart Camera Apparatus," a combination rearticulating what was rejected (*id.* at 5–7);

(3) "Optical Assembly and Design," arising within the smart camera (*id.* at 7–9);

(4) "Training Data," a claim to collections of labeled images used for training computer models to recognize dumpster and waste attributes (*id.* at 11–15);

(5)–(7) claims to computer models trained by such data and used for "Subpar Image Detection," "Container Fullness Analysis," and "Contamination Analysis" — new articulations of the rejected machine-learning claims (*id.* at 15–18).

4

"Out of an abundance of caution," the motion was "GRANTED, subject to paring down these amended allegations during discovery and subsequent motion practice with the benefit of a better record" (Dkt. No. 71 ("Prior Order") at 2).

Relatedly, a sealing order in this case warned RoadRunner to narrow even its assertions of confidential information (Dkt. No. 93). RoadRunner sought sprawling redactions of marketing puffery, quotations from legal treatises, and more (*see id.* at 3–5). Even so, the sealing order provided RoadRunner another opportunity to request redactions to avoid deciding the substantive issues in a sealing motion (*id.* at 6). Notably, parties' exchanges were protected by a stipulated order that barred in-house counsel from accessing an opposing party's materials without its approval or a court order (*see* Dkt. No. 68 §§ 7.3–7.4; Dkt. No. 70).

RoadRunner never submitted an amended trade secret identification. Instead, a RoadRunner expert, Leo Hoarty, submitted reports opining on a subset of the identified trade secrets — the seven above — which parties debate in this motion. RoadRunner's trade secret identification and Expert Hoarty's identifications have areas of overlap and conflict. As does RoadRunner's opposition briefing, below.

This is the first substantive ruling in this case since the motion for leave to amend was granted "subject to paring down" the trade secret claims (Prior Order 2).

3. **THE INSTANT MOTION.**

With "the benefit of a better record," defendants now move for summary judgment on the trade secret claims (Dkt. Nos. 132–33). RoadRunner opposes (Dkt. No. 145–47). Defendants reply (Dkt. Nos. 156, 158–59; *see also* Dkt. No. 157 (request for notice)). These trade secret claims are asserted under the California Uniform Trade Secrets Act ("CUTSA") and the federal Defense of Trade Secrets Act ("DTSA"), and substantially the same standards apply to both. *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020); *see also* Cal. Civ. Code § 3426.1(b); 18 U.S.C. § 1836(b)(1).

Defendants do not challenge RoadRunner's breach-of-contract claim, though they contest the contract terms purporting to define the ownership and use of the labeled images (Reply 13). This order must construe any material facts that would determine these contract issues, like any

other facts, in favor of the non-moving party. *See, e.g.*, *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). Parties submitted supplementary briefing on contract terms that relate to a trade secret (Dkt. No. 182 ("Supp. Br."); Dkt. No. 205 ("Supp. Opp.")).

This order follows full briefing and argument.

## ANALYSIS

At trial, plaintiff RoadRunner ultimately must show (1) it possessed a trade secret that (2) defendant misappropriated, (3) causing plaintiff damage. *InteliClear*, 978 F.3d at 657–58. For this motion, defendants focus on dispatching the first prong. To meet even that prong at trial — possessing a trade secret — RoadRunner must (i) identify information (ii) it owned that was (iii) not readily known and (iv) valuable as a result, and for which (v) it took reasonable steps to keep secret. *See ibid.*; *see also Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 253 (1968). If no reasonable jury could find one (or more) of these elements, the claim fails. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

Nearly every claim here fails on the first sub-prong: On the eve of trial, RoadRunner still has not specified what it even claims are its trade secrets. No defendant could mount defenses, no reasonable jury could enter findings, and no court could tailor injunctive relief respecting purported trade secrets that plaintiff has not even clearly pointed out. *See Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998); *Adv. Modular Sputtering, Inc. v. Superior Ct.*, 132 Cal. App. 4th 826, 833–36 (2005). This order takes each topic area in turn:

### 1. THE OVERALL SYSTEM.

Defendants first challenge the purported "Overall Waste Metering System" trade secret (*see* Identification 4–5; Hoarty Op. ¶¶ 30–35). In its January 2024 disclosure, RoadRunner sought to claim an open-ended system that "include[s] the overall know-how and design of its waste metering system including" a list of every other asserted secret in this case (Identification 4–5). "The combination of these hardware, firmware, and software elements as implemented in an waste metering system [*sic*] is itself a trade secret" (*ibid.*). In August 2024, after seven months of discovery, RoadRunner's expert repeated those passages (*compare ibid.*, *with* Hoarty Op. ¶¶ 31–32). In its opposition here, RoadRunner emphasizes the state of its best

6

evidence by quoting one of its engineers: "I think the overall waste metering system [trade secret] encompasses many parts." (Opp. 17 (quoting Dkt. No. 133-8 at 101)).

No reasonable jury could conclude the claimed trade secret was misappropriated (or not) because not even plaintiff could say what the purported trade secret is. *Imax*, 152 F.3d at 1167.

This is not a trivial problem. Recall that a combination trade secret is drawn not to the components, because they can be claimed directly, but to a specific assemblage or tailoring of components (even non-secret ones). *E.g.*, *Metallurgical Indus. Inc. v. Fourtek, Inc.*, 790 F.2d 1195, 1202 (5th Cir. 1986). Here, no precise combination was claimed, so there is no way for a jury to determine whether this "overall" tailoring was the same "overall" tailoring from Compology's patent publications (*supra*). Likewise, there is no way for a jury to evaluate Expert Hoarty's statement that he is not "aware" of others using this "overall" system (¶ 35).

As no reasonable jury could find plaintiff met its burden to prove a secret plaintiff failed even to identify, summary judgment as to the "Overall Waste Metering System" is **GRANTED.**

### 2. THE PHYSICAL APPARATUS.

Defendants next challenge the smart camera apparatus and its optical assembly within.

#### A. SMART CAMERA APPARATUS.

In January 2024, plaintiff purported to identify a "Smart Camera Apparatus" trade secret (Identification 5–11). The open-ended claim "include[d] a smart camera, including a [camera] with wide field-of-view camera lens, battery pack, high-durability injection-molded parts, including . . . wireless communication systems, . . . GPS, . . . and a camera flash" (*id.* at 7). In August 2024, rather than focus this claim, plaintiff's expert kaleidoscopically expanded it from covering one generic apparatus (*ibid.*) to covering individually or together the R11, R12, and R13 camera apparatuses (Hoarty Op. ¶¶ 36–62). These have many but not all the same parts, as is undisputed. Now, facing summary judgment, RoadRunner contends the secret is somewhere "defined in the schematics, system block diagrams, and specifications of Compology's R12 and R13 camera systems," that is, somewhere in 17 exhibits (*see* Opp. 7).

7

The record provides no basis for a reasonable jury to decide that this purported trade secret was misappropriated (or not) because the purported trade secret is not identified in a tractable way, despite the Court's repeated instruction and seven months' discovery.

This conclusion is not changed by plaintiff's late-in-the-game admissions and arguments as to secrecy. Parties now agree that the YouTube video, FCC filings, and patent-related publications (*supra*) together disclose all the smart camera apparatus's elements but for twelve (Opp. 11–12, 21–22). Yet plaintiff could still claim a secret combination of even known elements. *InteliClear*, 978 F.3d at 659. Rather, the flaw here is more fundamental: Plaintiff never limited itself to claiming any particular combination, these twelve or otherwise.

As a result, summary judgment as to the "Smart Camera Apparatus" is **GRANTED.**

### B. OPTICAL ASSEMBLY.

In January 2024, plaintiff purported to identify an "Optical Assembly and Design" trade secret (Identification 7–8). It did so by explaining its trial-and-error efforts to determine the best lens and assembly for its application, without specifying which of these features or configurations (or all of them, identified one-by-one) was its asserted "Optical Assembly and Design" trade secret (*ibid.*). In August 2024, plaintiff's expert expanded on what was claimed. He ballooned the purported trade secret to include multiple optical assemblies having different specifications, as is undisputed (Hoarty Op. ¶¶ 63–75; *see, e.g.*, Dkt. No. 138-8 at 137; Br. 13–15; Opp. 19–20). In its opposition, plaintiff again seeks to save its trade secret identification by pointing to the entirety of the specifications for the R12 and R13 cameras (Opp. 19).

As no trade secret was reasonably identified, no reasonable jury could find it secret and misappropriated; summary judgment as to the "Optical Assembly and Design" is **GRANTED.**

### 3. THE DATA AND IMAGES.

Defendant next challenges the purported trade secrets in its computer models used to label images — as well as in the images labeled by plaintiff's models.

### A. MACHINE-LEARNING MODELS.

In January 2024, plaintiff purported to identify at least three trade secrets in "software algorithms and processes" (Identification 15–18). Each claimed "a machine learning model,"

8

that is, "a separate, specialized model to identify image[s]" containing the attributes desired. Those attribute-oriented models included ones for "Subpar Image[s]" (*id.* at 15–16), "Container Fullness" (*id.* at 16–17), and "Contamination" (*id.* at 17–18). Then, in August 2024, plaintiff's expert reiterated only the three just named (Hoarty Op. ¶¶ 93–98, 99–104, 105–111). He explained they "consist[ed] of a [machine-learning] model . . . and a time-efficient user interface for workers to record labels" (*id.* ¶ 106 (reciting Identification 16)).

RoadRunner's computer modeling claims proved troublesome for RoadRunner. Recall that its patent publications shared computer-modeling techniques for waste monitoring (*supra*). That put the "secrecy" of these trade secrets in grave doubt. Recall also that the Court's order dismissing them on the first go-round suggested that RoadRunner may have conflated access to computer-model outputs with access to the computer models themselves (*supra*). Defendants' access to the computer models has never been clear, putting "misappropriation" in doubt, too.

Whether for those reasons or others, plaintiff's opposition to summary judgment performs late-stage surgery on the computer-modeling claims, extracting all discussion of the computer modeling and treating only the *output* from these models: "images plus metadata" (*see* Opp. 9–10). But another identified trade secret already claimed "images plus metadata" (*see id.* at 8–9; *infra*). Either the asserted trade secrets are now equivalent, in which case this claim can be let go. Or, the trade secrets are not equivalent, in which case the difference is too unclear for a reasonable jury to be able to conclude this secret was misappropriated.

Bottom line: Plaintiff abandoned any pretense of identifying sufficiently stable trade secrets as to these machine-learning models; and, with none clearly pointed out, no jury could reasonably conclude they were in fact secret and misappropriated. As a result, the motion for summary judgment as to the "Sub-Par Image Detection," "Contamination Detection/Content Identification Service," and the "Container Fullness Analysis" trade secrets is **GRANTED.**

### B. TRAINING DATA.

#### (i) Identification?

Finally, plaintiff identified a purported "Training Data" trade secret (Identification 11–15). In August 2024, Expert Hoarty again articulated the trade secret (Hoarty Op. ¶¶ 76–92).

9

1   Although his was not identical (*cf.* Br. 16), the identification was sufficiently stable "to give
2   both the court and the defendant reasonable notice of the issues which must be met at the time
3   of trial." *Diodes*, 260 Cal. App. 2d at 253.

4   In briefing and oral argument, defendant ultimately acknowledged what plaintiff agreed
5   was the purported trade secret at issue: "[T]he images and data captured by the Compology
6   sensors installed in Defendants' containers" (Opp. 20–21 (quoting Br. 23)). Such a collection,
7   plaintiff said, is akin to a large, annotated customer list (Tr. 12–14). Recall that already-
8   labeled, known images (in the millions) are used to train machine-learning models, and that a
9   fully trained model can then newly label unknown images with the same attributes (*supra*).
10  Allegedly, Compology took pictures of RecycleSmart's dumpsters, Compology's model
11  labeled them as part of its service, and Compology permitted RecycleSmart to download
12  them — and RecycleSmart later used them to train its own model. Defendants say: So what?

### *(ii)   Other Possession Criteria?   Or Misappropriation?*

Defendants argue plaintiff's claim fails as a matter of law because plaintiff did not meet other criteria to "possess" the trade secret (Br. 5–6, 22–23) and because defendants did not "misappropriate" it (*cf. ibid.*). Why not? Defendants owned "all rights" to the labeled images (Br. 5–6, 22–23; Reply 10–14). Parties agree that the answer to who owned the labeled images and who could use them was buried in the operative contract, which they agree is their 2020 agreement as modified in 2021 (Supp. Br.; Supp. Opp).

Under the agreement as modified, Compology agreed to provide waste monitoring as a subscription service to RecycleSmart (*see* Dkt. Nos. 145-25 & 147-5 ("2020 Terms") §§ 1.17, 2.1.1). Compology installed cameras in RecycleSmart's dumpsters (*see id.* § 1.8, 1.17, 3.1). And, Compology used its software to analyze the images taken, then reported insights to RecycleSmart — and provided images labeled with metadata (*see id.* §§ 1.16, 1.17). The contract set basic definitions, usage limitations, and ownership rights (*see id.* §§ 1, 2, 5), all interpreted under California law (*id.* § 14.9). The 2021 modifications did not alter the 2020 provisions cited in this order except where stated here (*see* Dkt. Nos. 156-2 & 159-3 ("2021 Modifications")). So, who owned the labeled images? In relevant part:

10

Compology provided its "Software" to RecycleSmart:

> 1.16. **"Software" means any software program** or application, script, algorithm, database, application programming interface (API) or other processor instructions of any type, solely in object code format, **made available by Compology to Customer** on a software-as-a-service basis, and utilized by Compology for the purpose of (a) generating, accessing and processing Customer Data, Device Data and Derivative Data, (b) making such data available to Customer and (c) interfacing or interacting with the Equipment. Software shall be deemed **to include all enhancements**, improvements, corrections, updates and upgrade releases **made to the foregoing by Compology** from time-to-time.

That Software processed "Device Data":

> 1.9. **"Device Data" means** any data collected by Compology through the operation of a Device [where "'Device' means the cameras, GPS trackers," and so on], including, but not limited to, data relating to GPS location, container movement, and **images**.

By processing Device Data, the Software created "Derivative Data":

> 1.7. **"Derivative Data" means** any information or **data resulting from** the manipulation, processing or analysis of **Device Data based upon the operation of the Software**, which processing may involve associated databases, algorithms, external data, calculations and other processes, methods or tools.

And, the customer owned "all rights" to Device Data and Derivative Data:

> 5.2. Data [Ownership]. **Customer owns all rights and title to any Device Data and Derivative Data.** Customer hereby grants to Compology a limited, perpetual, irrevocable, **non-exclusive license** to copy, collect, process, store, generate, and display the Device Data and Derivative Data to the extent necessary to provide the System and to monitor and improve the performance of the System. Additionally, Customer acknowledges and agrees that during and after the Term of these Terms: (i) Compology and Compology Affiliates may retain and use Device Data and Derivative Data for purposes of providing the Software and Subscription Services to Customer, and for conducting research, product development and product improvement efforts . . . [and for other uses].

Indeed, defendant RecycleSmart's ownership was so fulsome that the agreement provided that RecycleSmart (defendant) granted to Compology (plaintiff's predecessor) a non-exclusive, limited license for the Device Data (images) and Derivative Data (metadata) for use in Compology's Service (*supra*). Plaintiff does not challenge these plain meanings (*see* Opp.; Supp. Opp.).

11

Because the contract shows defendants owned the images and metadata as a matter of law, and that plaintiff merely licensed them non-exclusively, plaintiff cannot bring an action asserting it possessed the trade secret, nor in any case prove that defendants misappropriated it:

*As to possession*, plaintiff did not "possess" the trade secret. Under federal law, "[p]laintiff [must] show[] that it is the owner of the alleged trade secret[]." *See uSens, Inc. v. Shi Chi*, No. 18-cv-01959-SVK, 2018 U.S. Dist. LEXIS 175570, at *8 (N.D. Cal. Oct. 11, 2018) (Judge Susan Van Keulen). A non-owner lacks even standing. 18 U.S.C. § 1836(b)(1). A non-exclusive, limited licensee is not "the person or entity" who owns the trade secret. 18 U.S.C. § 1839(4); *see also, e.g.*, *Genesis 1 Oil Servs. LLC v. Wismann Grp., LLC*, No. 820CV02114SSSADSX, 2023 WL 3040584, at *3–5 (C.D. Cal. Mar. 20, 2023) (Judge Sunshine S. Sykes). Under state law, no statutory provision or California Supreme Court decision is as clear. Still, California authorities articulate a similar standard: "[T]he plaintiff [must have] owned a trade secret." *See Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (2003); *cf. Memry Corp. v. Ky. Oil Tech., N.V.*, No. C-04-03843 RMW, 2006 WL 3734384, at *7-8 (N.D. Cal. Dec. 18, 2006) (Judge Ronald M. Whyte) (CUTSA).

*As to misappropriation*, even assuming plaintiff could meet "possession" by holding merely a nonexclusive license, plaintiff could not show that these defendants "misappropriated" what they owned outright. It is "factually impossible." *See Mann v. Bales*, No. 16-cv-9623, 2018 U.S. Dist. LEXIS 122754, at *4 (N.D. Ill. July 23, 2018) (Judge Sharon Johnson Coleman); *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 208 F. Supp. 3d 1193, 1201 (D. Utah 2016) (Judge Jill Parrish). Nothing "of another" was taken or used. *See* 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b). In short, the contract makes clear the labeled images are not "[Compology]-owned property acquired by [RecycleSmart]," but the opposite — with "all rights" residing in RecycleSmart and only a limited right to non-exclusive use residing in Compology. *See Silvaco Data Sys. v. Intel*, 184 Cal. App. 4th 210, 245, (2010), *abrogated on other claim by Kwikset Corp. v. Superior Ct.*, 246 P.3d 877, 894 (Cal. 2011).

*Finally*, plaintiff cannot escape these results (as litigants might in other settings) because what its trade secret identification claimed (images plus metadata) is what the contract

1  conceded (images plus metadata). If plaintiff meant to distinguish the two (as might a property
2  owner who distinguishes its mineral rights from another's surface rights), plaintiff was not up
3  to the task (*supra*). Plaintiff gave up trying to identify a trade secret in its computer models
4  that defendants might have taken. Plaintiff kept trying to assert a trade secret instead in the
5  "images and data captured by the Compology sensors installed in Defendants' containers"
6  (Opp. 20–21 (quoting Br. 23)). But "all rights" to them already belonged to defendants.

Plaintiff's counterarguments in its opposition and extra briefing are not persuasive:

*In opposition*, plaintiff first asserts that it can bring a trade secret claim because, notwithstanding the ownership and limited license provisions, a separate provision addresses usage rights (Opp. 24), about which more is said below. But in every case plaintiff cites for support, the plaintiff (or counter-plaintiff) owned "all rights" to the information asserted as the trade secret — and here it is just the opposite. In *Beco Dairy Automation, Inc. v. Global Tech Systems, Inc.*, the contract at issue stated that "[counter-plaintiff] owns all rights" and that "[counter-defendant] can't reproduce, copy, or distribute any hardware or software involved . . . [or] sell devices that are directly competitive." No. 1:12-cv-01310 LJO SMS, 2015 WL 5732595, at *9 (E.D. Cal. Sept. 28, 2015) (Judge Lawrence J. O'Neill). In *Khoros, LLC v. Lenovo (United States), Inc.*, the contract at issue asserted that "[a]ll rights to all [software] remain exclusively [plaintiff's]." No. 3:20-cv-03399-WHO, Dkt. No. 49-4 §§ 3.1, 3.4 (N.D. Cal. July 15, 2020). Moreover, the misappropriation plausibly alleged was that defendants gained access to the application source code and from it created a copycat application. 2020 WL 12655516, at *8 (N.D. Cal. Oct. 5, 2020) (Judge William H. Orrick). In *Creative Writer Software, LLC v. Schechter*, the contract at issue stated that "all title, copyright, intellectual property rights and distribution rights in and to the Software" were retained by plaintiff, and only a license for limited use transferred to defendant. No. CV 23-02471-MWF (MAAx), Dkt. No. 1-1 § 3 (C.D. Cal. Apr. 3, 2023). The misappropriation alleged was that defendant used the access to replicate the software. *See* 2024 WL 1098759, at *1 (C.D. Cal. Feb. 8, 2024) (Judge Michael W. Fitzgerald). And, in *Reingold v. Swiftships, Inc.*, the contract at issue was plaintiff's lease that granted defendant limited rights. 126 F.3d

13

645, 650 (5th Cir. 1997) (applying Louisiana's USTA statute). Plaintiff fails to grapple with the distinction (Opp. 24): Defendants fully owned what plaintiff claims was its trade secret.

*In supplemental briefing*, plaintiff again points to use provisions (*see* Supp. Opp. (citing Terms 2020 § 2.1.5)). But plaintiff again fails even to try to show how those provisions plausibly abridge that RecycleSmart "own[ed] all rights and title to any Device Data and Derivative Data" (Terms 2020 § 5.1). In the contract, each party took out a license in what the other owned (*id.* §§ 2.1, 5.2): the provider's software services, on the one hand, and the customer's data flowing through them, on the other. Compology owned the "System" (§ 5.1), that is, the "integrated" hardware and software services used "to enable the collection, processing, and/or delivery of Device Data and Derivative Data" (*id.* §§ 2.1.1, 1.17). And, RecycleSmart "own[ed] all rights and title to any Device Data and Derivative Data" (*id.* § 5.2). The use provisions plaintiff cites arose in the section that set out RecycleSmart's license to use Compology's System (*id.* § 2), specifically in the subsection stating what RecycleSmart could not do within "the scope of the license granted" to use Compology's System (*id.* § 2.1.5; *see* Supp. Opp. at 1 (discussing all of section 2.1.5)). Again, RecycleSmart did not need a license to use Device Data or Derivative Data in which it owned "all rights" (*see* Terms 2020 § 5.2). Lest there be any conflict as to the relationship between use rights in the System and use rights in the Device Data and Derivative Data, the contract plaintiff drafted deconflicted the two: Compology's license to use the Device Data and Derivative Data was limited as stated without exception (*id.* § 5.2), whereas RecycleSmart's license to use the System was limited as stated except "as expressly set forth" elsewhere (*id.* § 2.1.5). Similarly, as to ownership rights, Compology drew the short straw: Compology owned all rights to the "System," "*except* as otherwise expressly set forth," crimping its rights (*id.* § 5.1 (emphasis added)). RecycleSmart owned "all rights" to the "Device Data and Derivative Data," *without* exception (*id.* § 5.2).

Plaintiff never contested the contract's express language regarding RecycleSmart's ownership of the labeled images and its limited licensing of them to Compology (i.e., section 5.2), which is unambiguous and dispositive on this issue. Nor did plaintiff point to any extrinsic evidence to support its view or counter this conclusion (Opp. 23–24; Supp. Op. 5).

14

The contract (arguably) may create a contract claim against RecycleSmart. But it undercuts plaintiff's ability to assert a *trade secret* claim in the labeled images, which the contract established defendant fully owned, and licensed only non-exclusively to plaintiff. As a result, plaintiff's trade secret claim regarding the "Training Data" fails as a matter of law, and the motion for summary judgment as to it is **GRANTED.**

There is no need to reach parties' other arguments about whether any asserted trade secrets were "valuable to the business because they were not readily known."

## CONCLUSION

For reasons above, defendants' motion for partial summary judgment on the trade secret claims (Dkt. No. 132) is **GRANTED.** The Court earlier granted plaintiff's motion for leave to amend "subject to paring down" the claims (Prior Order 2). The claims instead shifted, kaleidoscopically expanded, or were improperly pleaded from the start. No reasonable jury could find plaintiff's trade secrets for plaintiff on this record. Our jury will not join plaintiff in striking about in the dark for "potential[]" trade secrets. *See Imax*, 152 F.3d at 1167. The request for notice (Dkt. No. 147) is **DENIED AS MOOT.**

Only contract claims remain in the case.

**IT IS SO ORDERED.**

Dated: November 23, 2024.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

15