# EXHIBIT H-R



## Planet Depos®
We Make It *Happen*™

**HIGHLY CONFIDENTIAL**
**ATTORNEYS' EYES ONLY**

# Transcript of William Leo Hoarty

**Date:** September 12, 2024
**Case:** Roadrunner Recycling, Inc. -v- Recycle Track Systems, Inc., et al.

**Planet Depos**
**Phone:** 888.433.3767 **| Email:** transcripts@planetdepos.com
**www.planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024

---

69

1     A. That would be -- the overall know-how would
2 be the construction and operation -- successful
3 operation of a camera system in an adverse
4 environment, the requirements of the job the camera is
5 to do for the customer utilizing the system -- just
6 as -- I think it's reasonably well stated here.
7     Q. Is there a specific hardware file that
8 defines it?
9         MR. MELLEMA: Objection, form.
10     A. I don't think I understand what you mean by
11 "hardware file."
12     Q. Well, where in Compology's engineering
13 documents does the know-how exist?
14         MR. MELLEMA: Objection, form.
15     A. I believe I wrote the trade secrets include
16 the overall know-how. That means the system --
17 understanding the system as a whole. And then I
18 enumerate some of the components in the rest of this
19 paragraph. I don't know if I could express it
20 differently.
21     Q. What's the difference between the know-how
22 and the design?
23         MR. MELLEMA: Objection, form.
24     A. A design would be specific components of the
25 overall system, which it states right after that word.

70

1     Q. So what components define the trade secret
2 here?
3         MR. MELLEMA: Objection, form.
4     A. I'm stating that the overall system is --
5 includes the overall know-how, meaning all of the
6 components together.
7     Q. So it has to be all of the components that
8 the Compology device uses; correct?
9         MR. MELLEMA: Objection, form.
10     A. If that's a legal determination, I'm not --
11 I'm not equipped to answer.
12     Q. I don't think it is. I'm just trying to
13 understand what components you're talking about.
14     A. I list them here.
15     Q. So it's all of these components that need to
16 be there for this trade secret?
17         MR. MELLEMA: Objection, form.
18     A. I'm not prepared to answer what percentage of
19 all of my enumerations have to be present.
20     Q. So you don't know what percentage of your
21 enumerations need to be present; correct?
22         MR. MELLEMA: Objection to form.
23     A. To answer your question specifically on how
24 to define "overall know-how," in that context, I don't
25 know if you could drop off a particular step and then

71

1 declare you're not -- declare you're free of trade
2 secrets. So I don't know how to determine that.
3     Q. So you don't know what's in or out of this
4 trade secret; correct?
5         MR. MELLEMA: Objection, form.
6     A. I'm giving an example of an overall system
7 that required an extraordinary amount of novelty to
8 create and operate as a system to produce a useful
9 product for a customer to rent, purchase, or lease.
10 And this is -- these are the parts that I saw going
11 into it that define overall know-how.
12         MR. GALICA: I'm going to add another
13 exhibit. It's actually titled Exhibit 1-19.
14     Q. If you could just let me know when you get
15 that downloaded.
16         THE TECHNICIAN: In the chat, Exhibit 418.
17         (Exhibit 418 marked for identification.)
18     A. I have it.
19     Q. Within the document, just so we can navigate
20 it more easily, there's a number of exhibits in the
21 exhibit, if that makes sense. Do you see it starts
22 with Exhibit 1?
23     A. Yes, I see it.
24     Q. So let's just focus on Exhibit 1. You see
25 that?

72

1     A. I do.
2     Q. What on this drawing is in the overall waste
3 metering trade secret?
4         MR. MELLEMA: Objection, form.
5     A. This is the exploded view of part of the
6 chassis of what looks like the R12 camera unit. And
7 it's simply a part of the -- a crucial part of the
8 technology.
9     Q. So can you point me where in this document
10 the trade secret is?
11         MR. MELLEMA: Objection, form.
12     A. This is an assembly drawing, and I don't
13 think there's anything I can point to that would --
14 other than the whole R12 assemblies, as part of many
15 drawings defining the product.
16     Q. So it has to be everything in this drawing,
17 then; right?
18         MR. MELLEMA: Objection, form.
19     A. I can't answer.
20     Q. Going to Exhibit 2. Let me know when you get
21 there.
22     A. I'm there.
23     Q. What about this drawing is a trade secret?
24         MR. MELLEMA: Objection, form.
25     A. The choice of -- it's the -- this is a

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024

19 (73 to 76)

---

**73**

1  schematic of a circuit, and it's that you would learn
2  a -- a trade secret perhaps would be the light for the
3  flash, although the specific model of the LED labeled
4  D as in "delta" 1 is not material, the general notion
5  of how a flash could be incorporated in a low-power
6  system is valuable, and it required research to derive
7  this.
8      Q.  So you're saying this unique implementation
9  and configuration is the trade secret?
10     MR. MELLEMA:  Objection, form.
11     A.  Not the unique circuit, but the circuit
12  design would teach -- would teach a skilled person how
13  to build a flash in a low-power environment and how --
14     Q.  What about this specific drawing would teach
15  you that?
16     MR. MELLEMA:  Objection, form.
17     A.  Looking up the part, seeing what delta 1, D1,
18  and understanding it's very different from a
19  traditional LED; then looking further at the circuit
20  and understanding the -- how the flash is fired.
21     Q.  So you would agree this is a nontraditional
22  LED, then?
23     A.  Yes, I would.
24     MR. MELLEMA:  Objection, form.
25     Q.  Do you know whether RecycleSmart ever had

**74**

1  access to Compology's schematics?
2      A.  I don't know if they did.  I doubt they did.
3      Q.  But so it's your position that the unique
4  configuration and implementation of this specific
5  flash is part of the trade secret?
6      MR. MELLEMA:  Objection, form.
7      A.  The RTS team disassembled R12, and they were
8  able to examine the flash and learn what D1 was, and
9  that would be very simple to trace the circuit to gain
10  knowledge of how they -- how Compology operates this
11  critical component.
12     Q.  So you think it's critical Compology uses a
13  flash?
14     MR. MELLEMA:  Objection, form.
15     A.  In certain -- in certain lighting situations,
16  a flash is necessary; and when you're operating --
17  when it's engineered, must operate for five or more
18  years on a nonrechargeable battery, this becomes a
19  very important decision for the successful operation
20  of the product.
21     Q.  Do you think Compology kept it confidential
22  that it uses a flash with its camera?
23     MR. MELLEMA:  Objection, form.
24     A.  The use of a flash is not -- is evident by
25  looking at the product.

**75**

1      Q.  Anywhere else that it's evident?
2      A.  I'm sorry, I don't know how to answer that.
3      Q.  I'll ask a better question.  Do you think
4  it's public knowledge that Compology uses a flash with
5  its camera?
6      A.  It depends on their marketing literature and
7  how they -- I did not study their marketing
8  literature.  So if they have -- if they have a website
9  or marketing literature and they display the product,
10  one could see there is something that is un -- it may
11  not be on the face of the product, but this part is
12  visible.
13     Q.  Do you know what flash circuit Compology
14  uses?
15     MR. MELLEMA:  Objection, form.
16     A.  I assume these schematics were accurate.
17     Q.  Who makes it?
18     MR. MELLEMA:  Objection, form.
19     A.  I'm sorry, who makes what?
20     Q.  The flash component.
21     A.  You mean the actual diode?
22     Q.  Yeah.
23     A.  It's on their -- it's on their BOM.  They had
24  a couple of choices, but it's on their bill of
25  materials.

**76**

1      Q.  Do you know, as you sit here right now?
2      A.  I can very easily look it up for you.
3      Q.  My question was a little different.  Do you
4  know, as you sit here right now?
5      A.  There are three or four companies, and I
6  don't recall which one they chose.
7      Q.  Do you know what flash component the Pello
8  system uses?
9      A.  I -- in disassembling their system, they had
10  a similar family of LED that they use.  It's not
11  broadly used elsewhere.
12     Q.  What do you mean, it's not broadly used
13  elsewhere?
14     A.  I mean it is not a common LED seen in, say,
15  consumer products or even many commercial products.
16  It's a specialty part.
17     Q.  What led you to that conclusion?
18     A.  My deep knowledge of semiconductors and
19  looking up the part that is used by Compology.
20     Q.  And what part was that?
21     A.  We're referencing the diode.
22     Q.  Is that depicted in Exhibit 2, that we have
23  up?
24     MR. MELLEMA:  Exhibit 2?  I'm sorry.
25     MR. GALICA:  It's Exhibit 2 within Exhibit

**77**

1   417.
2       MR. MELLEMA:  Oh, I see.
3   A.  I believe so.
4   Q.  Where?
5   A.  We've been talking about it, D delta 1, is
6   the designator on the schematic, and the diode with
7   the two arrows emanating from its cathode is the flash
8   LED.
9   Q.  So that and all the configuration
10  implementation details depicted here, that's the trade
11  secret?
12      MR. MELLEMA:  Objection to form.
13  A.  My report does not -- excuse me a second.  I
14  need to refer to my report on the details of that.
15      Okay, I'm back, I'm ready.
16  Q.  Okay.
17  A.  So unfortunately you'll have to restate your
18  question so I'm answering properly.
19  Q.  What were you looking for in your report?
20  A.  I was just looking for how I express the
21  specialty of that diode.
22  Q.  And how do you express it?
23  A.  I was pointing out that the RTS team, if I
24  may use a colloquial expression, went to school on the
25  R12 design and learn many important design functions

**78**

1   of a successful and deployable camera system in a
2   harsh environment.  And amongst those -- I am so
3   sorry.  I meant to put that on silent.  It's on
4   silent.
5       And this is just an example.  Other
6   examples were enumerated elsewhere in that section of
7   my report that I was reading.
8   Q.  And how was that express the specialty of
9   the diode?  Explain that again.
10  A.  Each component in the R12 was carefully
11  chosen -- or, sorry, many of the components in R12
12  were carefully chosen to perform a specific and
13  rare -- generally rare task relative to ordinary
14  electronic systems.  And the diode chosen was one of
15  those specialty products that's not commonly known or
16  used.  So that was along with the many others that I
17  enumerated.
18  Q.  So, then, it would have to be the specific
19  diode that you're saying is part of the trade secret;
20  right?
21  A.  I'm saying that family of diodes is part of a
22  trade secret -- sorry, is part of the design of the --
23  strike that.  It's part of the design of a specialized
24  product that the RTS team copied to build their
25  device -- design their device, I should say -- and

**79**

1   and build their Pello device.
2   Q.  And I understand that you want to answer my
3   questions in that way.  I'm only asking about the
4   identity of the trade secret you allege exists.  I
5   understand you have allegations as to what my client
6   has done.  But I need to understand with specificity
7   the trade secrets that you allege exist.  So I'd
8   appreciate if you try to answer my questions with that
9   in mind.  Is that fair?
10      MR. MELLEMA:  Objection, form.
11  A.  I understand.  I will attempt to comply.
12  Q.  Thank you.  So let's go back to -- well,
13  we're still on Exhibit 417 -- within Exhibit 417, I'm
14  going to have you go to the next page within Exhibit
15  2.
16      MR. MELLEMA:  I think you mean 418?
17      MR. GALICA:  You're right, 418.
18  A.  Would a Bates number on the page be easier?
19  Q.  It's ROADRUNNER123.
20  A.  I'm there.
21  Q.  So what in here defines a trade secret?
22      MR. MELLEMA:  Objection, form.
23  A.  I do not offer an opinion on that.
24  Q.  Let's go to ROADRUNNER125.
25  A.  I'm there.

**80**

1   Q.  What on this page defines a trade secret?
2       MR. MELLEMA:  Objection, form.
3   A.  As a system block diagram, this conveys the
4   critical part -- or the architecture of the camera,
5   which is a unique design that required years of
6   research and development to derive.
7   Q.  So it's this unique design and architecture
8   that's the trade secret; is that correct?
9       MR. MELLEMA:  Objection, form.
10  A.  In checking my declaration, Trade Secret 2 is
11  the smart camera apparatus for a waste container
12  mounted device.  I enumerate the various features that
13  are required to perform the function in a waste
14  container.  This block diagram represents the R12
15  system as it was designed and built.  And as that is
16  part of the waste container camera system, it is a
17  trade secret.
18  Q.  This whole thing -- this -- everything on
19  ROADRUNNER125 is part of the trade secret?
20      MR. MELLEMA:  Objection, form.
21  A.  As a system diagram, it represents the design
22  of the -- of the Compology camera.
23  Q.  Designed differently, it wouldn't be the
24  trade secret; right?
25      MR. MELLEMA:  Objection, form.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024

81

1      A.  Not necessarily.  There are alternate ways to
2  achieve the same -- the same functions.
3      Q.  So you're saying a different design would
4  still be the trade secret, the unique trade secret?
5          MR. MELLEMA:  Objection, form.
6      A.  Because that gets back to case law, and I'm
7  not -- I'm not prepared to draw a line where you could
8  change elements and avoid the trade secret.
9      Q.  So you can't draw a boundary as to what the
10 trade secret is and what the trade secret isn't; is
11 that correct?
12     A.  No, it's not correct.
13     Q.  So, then, please identify the boundaries of
14 the trade secret.
15         MR. MELLEMA:  Objection, form.
16     A.  I would refer to my definition in my expert
17 report on Trade Secret 2.  I believe that enumerates
18 my opinion, that is Section B, Trade Secret No. 2, and
19 a smart camera apparatus for a smart waste container
20 mounted device.  And it defines what constitutes the
21 trade secret.  I'm happy to read it, but I think
22 it's --
23     Q.  That's quite all right, sir.  We have the
24 words.  I'm trying to understand what they mean.
25         Let's go to ROADRUNNER126.

82

1      A.  I'm there.
2      Q.  Is this part of the overall waste metering
3  trade secret?
4      A.  This is the MCU, the microprocessor control
5  unit, from the previous block diagram.
6      Q.  Is this part of the overall waste metering
7  trade secret?
8      A.  It is a component of the system.
9      Q.  And is it this unique configuration component
10 in its implementation that's part of the trade secret?
11     A.  I would -- I would have to answer that its
12 contribution to the device is part of the trade
13 secret, which would include the software side.  But
14 that's the best I can answer that.
15     Q.  So it's not the unique configuration, then;
16 correct?
17         MR. MELLEMA:  Objection, form.
18     A.  I don't actually understand what your point
19 is on this.  I apologize.  But I'll try and --
20     Q.  Start with the component.  Does the trade
21 secret -- strike that.
22         Is the specific component,
23 microcontroller, part of the trade secret?
24         MR. MELLEMA:  Objection, form.
25     A.  The microcontroller is almost identical to

83

1  the one used in the Pello device, in the ST part,
2  which is a well-known MPU.  The device itself is
3  available from multiple vendors, and so I believe --
4      Q.  So what's unique about it?
5      A.  I don't believe the microcontroller is unique
6  as a piece of hardware.  Excuse me, let me conclude.
7  It's not unique as an element on a circuit board.
8      Q.  How is it a trade secret, then?
9      A.  Again, my Section 2 on the camera apparatus
10 is to the combination of parts that were chosen to
11 build the camera, or the camera systems, is enumerated
12 in this section.  And a chip selection can be
13 almost -- there are dozens of choices.  So I would not
14 say choice of chip.  But the type of chip could be.
15 If somebody discovered if there is a particular
16 subsystem that depended on it, that it could be a
17 critical part.  But as an MCU that's used in the
18 billions, I would not say the hardware chip itself
19 represents anything but the choice of a common -- a
20 common part for an embedded -- for a system of this
21 type.
22     Q.  You'll recall we were talking about how you
23 said there's know-how and design that make up the
24 overall waste metering trade secret; right?
25     A.  Correct.

84

1      Q.  I mean, you just said that the choice of the
2  microcontroller doesn't matter; right?
3          MR. MELLEMA:  Objection to form.
4      A.  I just said it's a common choice.
5      Q.  So is that part of the know-how and design?
6      A.  It's part of know-how, I agree.
7      Q.  Is it just the idea of using a
8  microcontroller, is that part of the know-how and
9  design?
10         MR. MELLEMA:  Objection, form.
11     A.  The type of microcontroller could be in a
12 low-power system, because not all microcontrollers
13 operate well in a low-power environment, would be a
14 good example.
15     Q.  You said could be.  I'm asking you what it
16 is, what the trade secret is.  Do you understand that?
17     A.  I do.
18     Q.  Okay.  So is the type of microcontroller --
19 strike that.
20         Is the type of microcontroller part of the
21 know-how and design that makes up the trade secret?
22         MR. MELLEMA:  Objection, form.
23     A.  The combination of parts represents know-how
24 that is -- that is a trade secret, yes.  It becomes
25 part of the trade secret in combination with the other



109

1    A.  I didn't say that at all.
2    Q.  You're simply -- I think that's what you just
3  said.
4    A.  No, I'm saying your question is not relevant
5  to how an engineer -- relevant to my assessment of
6  misappropriation.  That's what I considered, was that
7  they took the lens apart, many of them, disassembled
8  the camera, learned about the image sensor and the
9  family it came from, learned about that Compology used
10  ▆▆▆▆▆▆▆▆, instead of ▆▆▆▆▆▆▆▆▆▆, which
11  is much more common.  There are lots of valuable trade
12  secrets -- valuable insights, rather, to allow them to
13  build their product in far less time and far less
14  research.
15    Q.  So if Pello has a different lens assembly,
16  that wouldn't be the trade secret then; right?
17    A.  I actually wasn't referring to trade secret.
18  I was referring to misappropriation.  We were talking
19  about what they learned from disassembling, against
20  their contract, the Compology device.
21    Q.  Let's go back to, I think it was Page 59 and
22  60.
23    MR. MELLEMA:  59 and 60 of what?
24    MR. GALICA:  Of the report we've been in.
25    MR. MELLEMA:  Okay.

110

1    Q.  You said that RTS learned that Compology used
2  ▆▆▆▆▆▆▆▆.  What's your support for that?
3    A.  It's an unusual configuration, and the --
4  well, let me just read my report here.  Let me just
5  refresh my memory.
6    On Page 62, Mr. Anderson asks about the
7  part number and spec sheet for Compology's ▆▆▆▆
8  battery, and the photographs of the inside of the
9  camera version currently in use.  As I indicated
10  above, that camera and the Compology -- sorry, as I
11  indicated above, the camera in the Compology R12
12  camera system.  He also asks for internal photos of
13  the torn-apart plastic mount, and the PCB, as well as
14  the PCB's dimension.  Mr. Jansen complies, also
15  suggesting that he has taken apart multiple camera
16  systems, in RTS 339711, quote, "Note:  I have only one
17  u cam that's still intact and functional, so that I
18  hope these two buckets, attachments, offer the info
19  you need."
20    Q.  Where does it describe a ▆▆▆▆▆▆▆▆
21  assembly in anything you just read?
22    A.  It doesn't.  But by taking the camera apart,
23  it is obvious that you would learn what the two
24  elements are.  There are only ▆▆▆▆▆▆  It would be
25  obvious to learn that ▆▆▆▆▆▆▆, and it would be

111

1  part of the analysis -- part of the reason you take it
2  apart.
3    Q.  What other material are camera lenses made
4  out of?
5    A.  Usually one is ▆▆▆▆▆▆▆▆▆▆  And
6  then the ▆▆▆▆
7    Q.  Is it uncommon to use ▆▆▆ as material in a
8  camera lens?
9    A.  Yes, it is.  For embedded devices like this,
10  it's not common.
11    Q.  What do you base that on?
12    A.  My deep knowledge of optics and the fact that
13  I build sensors myself and I'm a camera expert.
14    Q.  So you're a camera expert.
15    A.  Well, I've been involved with photography for
16  many decades.  I own a Hasselblad, which is a very
17  serious camera.  And people tend to not support that
18  equipment if they are not serious in doing so.
19    So just over the decades a great deal of
20  knowledge about optics and sensors and of course the
21  work I'm doing for the United Nations.
22    Q.  How many cameras have you designed?
23    MR. MELLEMA:  Are you going to let him
24  finish his comments?
25    MR. GALICA:  I'm going to move to strike

112

1  as nonresponsive.
2    MR. MELLEMA:  You keep interrupting him.
3    Q.  Were you done?
4    A.  We'll call it done.
5    Q.  Can you name a camera that you've designed?
6    A.  Yes.  I was talking about it earlier, that
7  we're working on for the Congo, for species
8  identification, that we're working on a biodiversity
9  project.  And the camera -- they're basically -- I'm
10  using an assembly that looks somewhat like -- in fact,
11  it's a Bayer circuit board with a plastic lens
12  assembly on top.  I've got one right next to me here.
13  They're all made in China, but you get to specify what
14  lens you want, and there's a wonderful variety of
15  lenses of kinds that you can choose to use with the
16  camera device.  But that's still in R&D and will be
17  out hopefully the end of the year, early next year.
18    Q.  Do you know the -- strike that.
19    You'd agree that ▆▆▆▆▆ is a very
20  prominent manufacturer of image sensors?
21    A.  Yes, a very good company.
22    Q.  Do you know the pixel size of the ▆▆▆▆
23  image sensor?
24    A.  It's in my report.  I can look that up for
25  you.

117

1    better chip because you're starting your own design.
2    Q.  Okay.  I'll move to strike that.
3    A.  Okay.
4    Q.  Does the field of view that you would
5    implement depend on whether the image sensor is in a
6    waste container?
7         MR. MELLEMA:  Objection, form.
8    A.  Yes, it does.
9    Q.  If you had an image sensor in a different
10   location than another one, you'd have different field
11   of views?
12        MR. MELLEMA:  Objection, form.
13   A.  That is correct, by definition.
14   Q.  Turning back to Paragraph 46 in your report,
15   and I think we've come full circle.  We kind of went
16   off there.
17        MR. MELLEMA:  Sorry, where?
18        MR. GALICA:  Paragraph 46.
19        MR. MELLEMA:  Thank you.
20   Q.  Is there a specific field of view that is
21   part of this trade secret?
22        MR. MELLEMA:  Objection, form.
23   A.  I will stay with what I wrote.  Compology's
24   smart camera apparatus trade secret includes a smart
25   camera, including a CCM with a wide field-of-view

118

1    camera lens, battery pack, high-durability injectable
2    parts, et cetera, et cetera.  I'll stick with what I
3    wrote.
4    Q.  How wide does it need to be to be considered
5    a wide-field-of-view camera lens?
6         MR. MELLEMA:  Objection, form.
7    A.  I say later, the images and the notion of --
8    excuse me, let me just consult my document here, and I
9    will attempt to answer.
10       To answer your question of how wide the
11   field-of-view camera lens is:  There's no fixed
12   requirement other than to meet the needs of the
13   machine learning system to be able to monitor contents
14   of the bin, of the dumpster.
15   Q.  Do all of the components that you list in
16   Paragraph 46 need to be present to make up the trade
17   secret?
18       MR. MELLEMA:  Objection, form.
19   A.  I believe the -- I would be happy to recite
20   to my learning -- my -- my understanding of a trade
21   secret.  It's in my legal standards, Page 4.  And I
22   think that defines that pretty clearly.  If you'd
23   like, I'll be happy to believe what I believe it is.
24   Q.  Well, I'd like you to....
25       I think this is a yes-or-no:  Does the

119

1    smart camera apparatus trade secret you've identified
2    require all the components listed in Paragraph 46?
3         MR. MELLEMA:  Same objections.
4    A.  Give me one second here, to get clear on what
5    I wish to say.
6         I believe that is more of a legal
7    question, what percentage of the collection of
8    components conveys an advantage that was learned by
9    RTS by examining Compology's camera, as I discussed in
10   my declaration with regards to misappropriation.  So I
11   don't have an opinion on what percentage of components
12   have to be present.
13   Q.  Is it your belief that all the components
14   listed in Paragraph 46 have been kept confidential by
15   Compology?
16        MR. MELLEMA:  Objection, form.
17   A.  It is my understanding that these components
18   were not disclosed to the public.
19   Q.  If they were, would you still consider it a
20   trade secret?
21        MR. MELLEMA:  Objection, form.
22   A.  Again, we're wandering into legal territory,
23   and I really don't have an answer for that.
24   Q.  With respect to the first sentence in
25   Paragraph 46, you don't cite to any hardware

120

1    schematics, source code files.  Does that mean you
2    think trade secret isn't defined with that level of
3    granularity?
4         MR. MELLEMA:  Objection, form.
5    A.  Again, I don't have an opinion on that.
6    Q.  What is unique about using high-durability
7    injection-molded parts?
8    A.  I'm not declaring that unique.
9    Q.  Okay.
10   A.  By itself.
11   Q.  Is it unique to use it with an embedded
12   system?
13   A.  I -- my opinion is written, and there's -- I
14   didn't -- I did not provide an opinion on each and
15   every individual element because they don't stand
16   alone.  You are discussing a system, and the system is
17   composed of the elements that I describe.
18   Q.  The specific elements; correct?
19   A.  Well, a battery pack, for instance, is a
20   pretty general element.  There's many types of battery
21   packs, so obviously that -- if you say specific and
22   then look at battery pack, you have to say what.  And
23   later I do describe what's specific about the battery
24   pack.
25       So in this paragraph it is what it reads.



161

1    A.  It is part of the trade secret.
2    Q.  What do you mean by that?
3    A.  █████████████████████████
4    ████████████████████████████████████████
5    ████████████████████████████████████████
6    ████████████████████████████████████████
7    ████████████████████████████████████
8    ███████████████████████████  So it is part of a
9    combination of research that got them to that lens in
10   that configuration, along with the other parts that
11   comprise a successful optical system.
12   Q.  I'm going to try a yes-or-no.  The optical
13   assembly trade secret for the R12 device has to have a
14   lens with a field of view that is █████████████████
15   ████████████████████████  Correct?
16       MR. MELLEMA:  Objection, form.
17   A.  No, it doesn't have to be.
18   Q.  I'm just trying to understand more generally:
19   Is it -- your opinion seems to be that the optical
20   assembly for the product just needs to work.  Is that
21   what you're generally saying?
22       MR. MELLEMA:  Objection, form.
23   A.  I'm generally saying that it needs to provide
24   a certain coverage of the -- actually, I'm not saying
25   anything.  I'm just reporting on what they developed.

162

1    If you're asking me as a person what would I know, I
2    would guess you have to cover -- you have to be able
3    to image as much of the container as you can.  This is
4    what they came up with with their research and
5    development.  You don't have to be precise with any
6    parameter to make something work.
7    Q.  So is it what they came up with that is the
8    optical assembly trade secret?
9        MR. MELLEMA:  Objection, form.
10   A.  It is as I wrote, as I enumerated here in the
11   optical assembly.  It's the combination of all of
12   these components, and then I specifically mention the
13   result of their research that was optimal for their
14   system.
15       This will be helpful.  In Chapter 66 I say
16   the camera lens and its field of view were chosen to
17   address several trade-offs.  In order to be usable and
18   optimal for use in an ML model -- that's machine
19   learning --
20   ████████████████████████████████████
21   ████████████████████████████████████████
22   ████████████████████████████████████████
23   ████████████████████████████████████████
24   ████████████████████████████████████████
25   █████████████████████████████████████

163

1    ████████████████████████████████████████
2    ████████████████████████████████████████
3    ████████████████████████████████████████
4    This allows the ML model, or a human observer, i.e.
5    human in the loop, to be able to determine when the
6    container is full and when the container is empty.
7    And et cetera.
8        So this is an example of the coverage
9    that -- the compromises that they found that were
10   optimal and that worked well with their intended
11   outcomes or information product from the images
12   captured.
13   Q.  So you just described the research that was
14   performed; correct?
15   A.  Yes, as written, yes.
16   Q.  And is that the trade secret?
17       MR. MELLEMA:  Objection to form.
18   A.  Again, it is part of the camera system.  It
19   works in conjunction with the other parts that I have
20   enumerated to produce a product -- further on in 66,
21   it explains the images must capture areas of the
22   container so that the images can be manually or
23   automatically, i.e., through artificial intelligence,
24   tagged and labeled and used in data analytics
25   represented by the algorithms and processes as

164

1    identified herein.
2        So it is a member of a series of technical
3    innovations that together form a trade secret of how
4    to build a camera that can operate in an extremely
5    harsh environment for five years.  Anyway, for a
6    number of reasons.
7        MR. MELLEMA:  I think we've been going for
8    an hour and a half, maybe a little less than that.  Do
9    you want to take a break?
10       MR. GALICA:  Sure.
11       THE VIDEOGRAPHER:  We are off the record
12   at 6:19 p.m.
13       (Recess taken.)
14       THE VIDEOGRAPHER:  6:37 p.m.  Back on the
15   record.
16   Q.  I'm going to turn to Paragraph 78 in your
17   report.  Let me know when you get there.
18   A.  I'm there.
19   Q.  And this is in the section of your report
20   called Trade Secret 4, Training Data.  Do you see
21   that?
22   A.  Yes.
23   Q.  And it's your opinion that Compology's
24   training data is a trade secret; correct?
25   A.  Yes.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Transcript of William Leo Hoarty
Conducted on September 12, 2024

241

1    CERTIFICATE OF COURT REPORTER
2
3        I, Alan H. Brock, Registered Diplomate
4    Reporter and Notary Public, the officer before whom
5    the foregoing deposition was taken, do hereby certify
6    that the foregoing transcript is a true and correct
7    record of the testimony given; that said testimony was
8    taken by me stenographically and thereafter reduced to
9    typewriting under my supervision; that reading and
10   signing was not requested; and that I am neither
11   counsel for nor related to nor employed by any of the
12   parties to this case and have no interest, financial
13   or otherwise, in its outcome.
14        IN WITNESS WHEREOF, I have hereunto set my
15   hand and affixed my notarial seal this 16th day of
16   September, 2024.
17        My commission expires March 25, 2027.
18
19
20
21   _____
22   Alan H. Brock, RDR, CRR
23
24
25