# EXHIBIT M-R

**Page 1**

```
           UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
- - - - - - - - - - - - - -x
ROADRUNNER RECYCLING, INC.,    :
            Plaintiff,         : No 3:23-cv-04804-WHA
   vs.                         :
                               :
RECYCLE TRACK SYSTEMS, INC.,   :
AND RECYCLESMART SOLUTIONS,
INC.,
            Defendants.
- - - - - - - - - - - - - -x

               ATTORNEYS' EYES ONLY

   VIDEOTAPED DEPOSITION OF ROADRUNNER RECYCLING, INC.,
     By and through its Designated Representative,
                      STEVEN KREBS,
          and in his Individual Capacity
                     Pittsburgh, PA
                 Friday, August 23, 2024
                       9:34 a.m.


Job No.: 548737
Pages: 1 - 330
Reported By: Brooklyn E. Schweitzer
             RPR, CRR, CA CSR
```

**Page 2**

```
       Videotaped Deposition of STEVEN KREBS,
conducted at the offices of:



       Hilton Garden Inn
       Pittsburgh University Place
       3454 Forbes Avenue
       Pittsburgh, PA 15213


       Pursuant to Notice, before Brooklyn E.
Schweitzer, Registered Professional Reporter,
Certified Realtime Reporter, Notary Public in and
for the Commonwealth of Pennsylvania, and California
CSR No. 14612.
```

**Page 3**

```
              A P P E A R A N C E S

   ON BEHALF OF THE PLAINTIFF:
       JOSEPH J. MELLEMA, ESQUIRE
       JEFFER MANGELS BUTLER & MITCHELL LLP
       3 Park Plaza, Suite 1100
       Irvine, California 92614
       Phone: (949)623-7200
       E-mail: Jmellema@jmbm.com



   ON BEHALF OF THE DEFENDANTS:
       JAMES J. THOMSON, ESQUIRE
       AMY K. LOBUE, ESQUIRE
       MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
       AND POPEO, P.C.
       One Financial Center
       Boston, Massachusetts 02111
       Phone: (617)542-6000
       E-mail: JJThomson@mintz.com


Also Present:  Dylan Keisler, Videographer
```

**Page 4**

```
                C O N T E N T S
EXAMINATION                              PAGE
   By Mr. Thomson                           8



                E X H I B I T S
EXHIBIT                                  PAGE
Exhibit 369    Defendants' Amended 30(b)(1)
               Notice of Deposition of
               Steve Krebs                 36
Exhibit 370    Defendants' 30(b)(6) Notice
               of Deposition of Steve Krebs  36
Exhibit 371    Non-Binding Confidential Term
               Sheet - for Discussion Purposes
               Only - Date: June 30, 2022
               ROADRUNNER000072915 -
               ROADRUNNER000072919        114
Exhibit 372    Compology Summary Financials
               and Valuation
               ROADRUNNER000073296        118
Exhibit 373    ROADRUNNER000021514        132
Exhibit 374    ROADRUNNER000070214        157
Exhibit 375    ROADRUNNER000072913        158
Exhibit 376    ROADRUNNER000068663        164
Exhibit 377    ROADRUNNER000072914        201
```

Page 5

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 378 | Compology Inc. Valuation Report ROADRUNNER000069596 - ROADRUNNER000069642 | 208 |
| Exhibit 379 | Common Stock Valuation for Compology - March 22, 2018 ROADRUNNER000069918 - ROADRUNNER000069988 | 219 |
| Exhibit 380 | Common Stock Valuation for Compology - March 29, 2019 ROADRUNNER000069990 - ROADRUNNER000070064 | 222 |
| Exhibit 381 | Common Stock Valuation for Compology - February 14, 2020 ROADRUNNER000070141 - ROADRUNNER000070213 | 224 |
| Exhibit 382 | Common Stock Valuation for Compology - March 8, 2021 ROADRUNNER000069765 - ROADRUNNER000069841 | 228 |
| Exhibit 383 | Common Stock Valuation for Compology - March 9, 2022 ROADRUNNER000069842 - ROADRUNNER000069917 | 231 |

Page 6

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 384 | 5/23/22 Letter ROADRUNNER000017851 - ROADRUNNER000017853 | 236 |
| Exhibit 385 | Roadrunner Recycling, Inc. and Subsidiary - Consolidated Financial Statements as of and for the Years Ended December 31 2023 and 2022, and Independent Auditor's Report | 239 |
| Exhibit 386 | Compology Q1 ROADRUNNER000074869 - ROADRUNNER000074887 | 263 |
| Exhibit 387 | Plaintiff's Identification of Trade Secrets - Filed Under Seal ROADRUNNER000000002 - ROADRUNNER000000023 | 269 |
| Exhibit 388 | Plaintiff Roadrunner Recycling, Inc.'s Supplemental Response to Interrogatory Nos. 2, 5, 7, and 10, of the First Set of Interrogatories Propounded by Defendants Recycle Track Systems, Inc. and RecycleSmart Solutions | 277 |

Page 7

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 389 | Competition - May 2021 ROADRUNNER000028172 - ROADRUNNER000028183 | 280 |
| Exhibit 390 | Exhibit A - Compology Terms and Conditions ROADRUNNER000073224 - ROADRUNNER000073251 | 286 |
| Exhibit 391 | Compology Terms and Conditions ROADRUNNER000073345 - ROADRUNNER000073355 | 305 |
| Exhibit 392 | Electronic Document | 317 |

Page 8

P R O C E E D I N G S

 VIDEOGRAPHER:  Here begins Media No. 1 in the videotaped deposition of Steven Krebs in the matter of RoadRunner Recycling, Inc., V. Recycle Track Systems, et al., in the United District Court, Northern District of California, Case No. 3:23-CV-04804-WHA.
 Today's date is August 23rd, and the time on the video monitor is 9:34 a.m. Eastern Standard Time.  The videographer today is Dylan Keisler representing Planet Depos, and this videotaped deposition is taking place at 3454 Forbes Avenue, Pittsburgh, PA 15213.
 Would counsel please voice identify themselves and state whom they represent.
 MR. MELLEMA:  Joseph Mellema of Jeffer Mangels Butler and Mitchell on behalf of Plaintiff.
 MR. THOMSON:  James Thomson of Mintz Levin representing the Defendants, Recycle Track, Inc., and RecycleSmart Solutions, Inc., and with me also is Amy LoBue of Mintz Levin.
 VIDEOGRAPHER:  The court reporter today is Brooklyn Schweitzer representing Planet Depos, and the witness will now be sworn.
 STEVEN KREBS,

93

1  A. I think the key stakeholders in both
2 institutions. Obviously -- I don't know if you --
3 meet and greet, you obviously care about dynamic and
4 style, and the intention was for them to come be a
5 part of us. Right? You don't want to -- there has
6 to be a connection, get along. I don't know the
7 best way to say it. A fit. I guess that's the best
8 way to say it.
9      And, yeah. Just kind of proceeds from
10 there, and you just continue to get more and more
11 into it. Right?
12 Q. Do you recall who the key stakeholders at
13 Compology were?
14 A. Sure. Jason Gates and Ben Chehebar are
15 the two that any business discussions were had with
16 me.
17 Q. Okay. And from the RoadRunner side, who
18 were the key stakeholders?
19 A. Our main point person was Graham Rihn and
20 myself, you know, decide for myself, and then
21 obviously our CTO, Cason Male. Others were involved
22 in the domains of interest, you know, particularly
23 validating the technology, those kinds of things.
24 You know, everybody has their own realms, obviously.
25 So everybody got involved to the extent it made

94

1 sense.
2 Q. Okay. And you mentioned Graham. Is that
3 Graham Watson?
4 A. Graham Rihn.
5 Q. Graham Rihn. I'm sorry.
6 A. R-I-H-N. He's our CEO.
7 Q. So Graham Rihn, Cason Male, yourself?
8 A. Leadership team folks that -- again, if it
9 was like, hey, our HR was going to talk to your HR,
10 you know, we would get our HR person involved. You
11 know what I mean? It's kind of domain-specific
12 things kind of prevailed.
13 Q. Okay. During those discussions, did
14 Compology share any documents, financials, or other
15 information?
16 A. Yeah, I'm sure there was -- you know,
17 there was documents, financials provided, et cetera,
18 et cetera. We did a quality of earnings just to
19 make sure we got comfortable with what they had and
20 how they did it, and that's a very common procedure.
21 Q. Okay.
22 A. But, yeah. They -- they shared things
23 that were of interest to us.
24 Q. Okay. Outside --
25 A. Probably not as -- to the extent we would

95

1 normally like at times, but yeah.
2 Q. Okay. How --
3 A. Best they could.
4 Q. Outside of the quality of earnings
5 analysis, did RoadRunner do any other type of due
6 diligence?
7 A. Like I said, I think there was a lot of
8 tech considerations, that kind of stuff. Obviously
9 not my world, but that was obviously an independent
10 mode of understanding, and it's important to make
11 sure that's where it needs to be. Obviously it's a
12 technology offering. The hardware piece in there,
13 obviously.
14 Q. Who handled the tech consideration
15 analysis?
16 A. That was spearhead by Cason.
17 Q. Was anyone else involved in that from your
18 recollection?
19 A. I couldn't say, but really from my
20 perspective, I perceived him being on it was all I
21 needed to know.
22 Q. Okay. Did you conduct that quality of
23 earnings analysis yourself?
24 A. No. Q of E's done by a firm, typically.
25 I've never seen one that somebody does themselves.

96

1 That being said, I review it, and obviously once you
2 get your hands on the information yourself, you do
3 your own little poke-arounds. But, no, that was
4 done by PWC.
5 Q. Okay. Are you aware of what -- what they
6 did to -- what was involved in that quality of
7 earnings analysis?
8 A. Yeah. I mean, like any engagement,
9 there's a rough scope of work, and the quality of
10 earnings is -- it is what it is. It's not a
11 comprehensive audit or anything like that by any
12 means. But, again, everybody's focused on material
13 findings and general process information and
14 uncovering potential exposures or considerations.
15      But, no, they did basic -- what we would
16 call standard procedures, you know.
17 Q. Do you -- I think I've asked you this, but
18 do you know specifically what documents Compology
19 provided?
20 A. No. They would just have cooperated to
21 the best of their ability with the basic things,
22 what's called a PBC list, which is essentially -- as
23 I understand, it's probably very similar in the
24 legal realm, but it's essentially a
25 provided-by-client-type list, and you do your best

**97**

to meet the requests to the best of their ability.
Some need tweaked as you go. You know, not applicable, doesn't make sense, et cetera.
Q. Do you know if they supplied profit and loss statements?
A. I'm sure they did.
Q. Do you know if they had audited financials?
A. Yes. I know they do not.
Q. Do not?
A. Yeah. That was part of the reason that getting -- surmise is probably a good idea.
Q. Okay. Did you personally review the profit and loss statements they provided?
A. Yeah, at high level.
Q. Okay.
A. Yeah.
Q. And what was your --
A. Simple things. Does it -- does it foot? You know, things like that. Directionally, you know, inquisitive-type stuff leading up to it. Sure.
Q. What was your impression of Compology's financial health at the time of the acquisition?
A. Their health as far as, yeah, they -- they

**98**

were in distress for sure. That was clear. But I already knew that.
Q. Okay.
A. I knew pretty clear about that.
Q. Okay. How did you know that Compology was in distress?
A. Just kind of the conversations of leading up to how we got there. Right? The company is looking to sell. They've got to do something quick. Yeah. I'm not sure what their actual runway is, per se, but it's very clear that their backing, their board, et cetera, et cetera, is looking for a new way.
Q. Okay.
A. New path.
Q. How did RoadRunner come up with a valuation for Compology?
MR. MELLEMA: Objection; form.
A. When you speak to the valuation, you mean the purchase price?
Q. Yeah. How did RoadRunner decide what to pay for Compology?
A. I think the purchase price is around -- again, it's a negotiation. The negotiation is -- and it was had mostly by Graham because he,

**99**

obviously, piped authorization to and from the board.
But the number in those situations is more what do you guys need to get out and be semi whole? Everybody knew they weren't going to be whole where they needed to be.
But, yeah, that's kind of the negotiation that -- and, again, RoadRunner is a high-growth business. We're very much stewards of the capital we've raised and how we do things. I take pride in that, but ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮ that way and things like that.
So the deal had to be the way we needed it as well. That's why it's ▮▮▮▮▮▮▮▮▮▮
▮▮
Q. Mm-hmm.
A. But yeah. As far as the number you arrive at at that point, it's basically what they needed to get out of it. And obviously if it was within reason, it'd be something we'd be willing to do. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮ and as we've all learned from COVID and everything like that, you've got to be mindful of

**100**

all those things.
So it's just -- we got where we needed to get, and moved on.
Q. Did RoadRunner acquire 100 percent of Compology's stock?
A. Yes.
Q. Okay. Did RoadRunner acquire all of Compology's assets in that transaction? Was anything carved out?
A. No.
Q. Okay. What did RoadRunner ultimately pay to acquire 100 percent of Compology's stock?
A. The price was ▮▮▮▮▮▮▮
Q. Was that the initial --
A. Mm-hmm.
Q. -- offer that RoadRunner made to Compology?
A. I really don't know that, but that's where it ended up.
Q. All right.
A. And that obviously is a fully baked number with transaction costs and just different considerations. Right? You establish a bunch of different things and just go from there.
Q. Okay. Do you know if Compology countered

Case 3:23-cv-04804-WHA   Document 230-13   Filed 12/18/24   Page 6 of 9

ATTORNEYS' EYES ONLY
Transcript of Steven Krebs, Corporate Designee & Individually
Conducted on August 23, 2024
30 (117 to 120)

## 117

1  THE WITNESS: Sorry.
2  MR. MELLEMA: So objection; form. You can
3  answer.
4  THE WITNESS: Okay. No. Leading up to
5  this, no, I don't.
6  BY MR. THOMSON:
7  Q. All right. Do you know if RoadRunner did
8  any assessment of the value of Compology's
9  trademarks?
10  MR. MELLEMA: Same objection.
11  A. I'm not sure.
12  Q. Okay. Do you know if RoadRunner tried to
13  value Compology's trade secrets?
14  MR. MELLEMA: Same objection.
15  A. I don't think so.
16  Q. Okay. You can put that aside. I'm
17  handing you what will be premarked as 327.
18  (Exhibit 372 was marked for identification
19  and is attached to the transcript.)
20  Q. For the record, this is a document bearing
21  Bates ROADRUNNER00007329.
22  MR. MELLEMA: 29 --
23  MR. THOMSON: 6.
24  MR. MELLEMA: Yeah.
25  BY MR. THOMSON:

## 118

1  Q. Do recognize this document?
2  A. I don't. Nope.
3  Q. Okay. So prior to today, you've never
4  seen this document?
5  A. I don't believe so.
6  Q. Okay. Are you aware whether or not this
7  document was provided to RoadRunner?
8  MR. MELLEMA: Objection; form.
9  A. I mean, how you got it, if it came from
10  RoadRunner, it must have been, but I don't know.
11  Q. Okay. I guess the clearer yes, do you
12  know if this is one of the documents that Compology
13  provided to RoadRunner during the due diligence?
14  A. I don't know.
15  Q. Okay. Looking at it now, do you have any
16  understanding of what this document provides?
17  MR. MELLEMA: Objection; form.
18  A. I'd be speculating, but I believe -- I
19  roughly believe it's an attempt at some kind of a
20  valuation.
21  Q. Okay. Are you familiar with the acronym
22  EBITDA?
23  A. I'm not.
24  Q. Okay.
25  A. Wait, I'm sorry. Which acronym?

## 119

1  Q. EBITDA?
2  A. EBITDA, yes, of course.
3  Q. What do you understand EBITDA to mean?
4  A. Earnings before interest, taxation,
5  depreciation, and amortization.
6  Q. Okay. And are you familiar with what the
7  brackets around the numbers following EBITDA
8  represent?
9  MR. MELLEMA: Do you want parentheses?
10  MR. THOMSON: Parentheses, yeah.
11  Q. Do you understand what the parentheses
12  mean in this document?
13  A. Yeah. They're negative.
14  Q. Okay. So following this EBITDA line, does
15  it appear that Compology had negative EBITDA?
16  A. It does.
17  Q. Okay. Were you aware that Compology had
18  negative EBITDA --
19  MR. MELLEMA: Objection; form.
20  Q. -- prior to the acquisition?
21  MR. MELLEMA: Objection; form.
22  A. I knew that the company was distressed,
23  and I knew that, again, their current financial
24  standing was not as much of a concern to me as to
25  knowing if we brought them on what kind of cash, and

## 120

1  if I had enough cash to essentially do it, knowing
2  we would sunset the business and everything, because
3  our intention was to bring it into RoadRunner.
4  But their historical track record and that
5  stuff was not really of interest to me --
6  Q. Okay.
7  A. -- in that regard.
8  Q. So what was of interest to you in bringing
9  them on?
10  A. Their --
11  MR. MELLEMA: Hold on. Objection; form.
12  A. I guess what was most of interest, right,
13  was not about what they've done but what we're going
14  to do with it, but knowing that you're bringing on
15  this customer -- I'm sorry, this company, you have
16  to be mindful of -- because you're going to take on
17  their debts, you're going to essentially assume
18  everything in that regard. What is their financial
19  standing from a balance sheet perspective? Review
20  that in totality, get comfortable with it, which is
21  part of the Q of E effort. Right?
22  And then ensure that we could obviously
23  fund anything that they -- they had from an
24  obligation perspective thereafter.
25  Q. Okay. For Compology's legacy customers,

**121**

1  has RoadRunner retained a pricing structure?
2       MR. MELLEMA:  Objection to form.
3       A.  For ones that there was -- again, in the
4  spirit of what we called the sunset, right, there
5  was an attempt to get the -- you know, mess with
6  prices and reengage customers, per se, where we can.
7  Right?  If they wanted to stay.
8       But, again, if they were to leave, it
9  wouldn't be regrettable for us.  So that would be
10 okay.  You know?  Meaning opportunities in renewal
11 is an opportunity to change price, and to the extent
12 it seemed low or whatever, certainly we would
13 encourage our customer success people to reengage at
14 a higher number, and especially if it was a customer
15 we weren't necessarily interested in retaining, then
16 if we couldn't agree or they didn't agree to our
17 price, then so be it; we would just go our separate
18 ways, and that would be okay.
19      Q.  Okay.  Why is it that RoadRunner wouldn't
20 want to retain certain of Compology's customers?
21      A.  It's not the same business model.  Right?
22 And it wasn't a big business, per se, anyways.  To
23 the extent you keep it running, you need to have
24 customer success and the team to do all that kind of
25 stuff, and I think part of the reason -- obviously

**122**

1  their business model was not a winner, per se.
2       I guess your question is easily answered.
3  Like, you want to obviously not prioritize and keep
4  that business model running because it obviously had
5  flaws, but that doesn't necessarily mean the entire
6  thing is spoiled, per se, but we were just choosy
7  about which ones would continue to do it.
8       And as long as the lift matched the yield,
9  and the use was worth the squeeze, then sure, we'll
10 keep them as customers.
11      Q.  Okay.
12      A.  But we haven't -- there's no new
13 customers.  There's no -- we're not watering that
14 garden, if you will, really.
15      Q.  Okay.  So all new customers are
16 RoadRunner's customers?
17      A.  Correct.  Yeah, there's no -- we don't
18 engage any counterparties under Compology.
19      Q.  Okay.  So to clarify, RoadRunner is not
20 interested in retaining a certain of Compology's
21 legacy customers because of the price structure?
22      MR. MELLEMA:  Objection; form.
23      A.  They -- you need people to keep that
24 running.  That business model is not a winner.  To
25 spend time on wages and benefits and associated

**123**

1  operating expenses and everything in something that
2  was -- it was distressed.  Right?  It's not a great
3  business model.
4       That doesn't mean when you buy the company
5  you don't have a requirement to fulfill and see it
6  through.  They're very different concepts.  Right?
7       And operating a different business, a
8  bigger business, you obviously need to be mindful
9  that that doesn't -- you would never acquire a
10 company and have it disrupt your current -- you
11 know, minimal disruption while being able to take,
12 bolster, integrate that technology into our own --
13 you know, our own company was the main goal.
14      Q.  Okay.  Is the disruption you're describing
15 due to increased labor and cost associated with that
16 model?
17      MR. MELLEMA:  Objection; form.
18      A.  It's people, process, different systems,
19 how you do things, bookkeeping, this, this, and
20 that, customer interactions.  You want to put your
21 resources -- the idea of deploying capital and
22 deploying resources is you deploy it in the avenues
23 that are most beneficial for you and for your
24 long-term growth as a business, and doing that in
25 Compology's old business was not necessarily that

**124**

1  for us.
2       Q.  Okay.  Are Compology's legacy customers a
3  different variety than RoadRunner's current
4  customers?
5       MR. MELLEMA:  Objection to form.
6       A.  I don't know them all that well beyond the
7  names.  You know, even if I saw -- I've seen the
8  name several times.  My level of understanding --
9  even RTS or RecycleSmart, no, there's nothing
10 categorically different.  They're just different --
11 they're just businesses.
12      Q.  Okay.  So it's not that RoadRunner
13 wouldn't want the business; it just doesn't want the
14 business under the terms that Compology was
15 servicing them?
16      MR. MELLEMA:  Objection; form.
17      A.  The -- yeah.  We don't -- I don't know
18 enough about those businesses to say if they would
19 or wouldn't be a good candidate for RoadRunner.  But
20 if they had waste and recycling services and they
21 had the opportunity to do our commission of lowering
22 spend and recycling more.
23      It wouldn't necessarily be -- again, if it
24 made sense for them to do it, and I'm sure there are
25 situations where that has happened, but

133

1  things like that.
2     Q. Okay.
3     A. But going back to our previous discussion,
4  what you're being mindful of there, right, is not
5  what they did in the past and their past business.
6  We're focused more on just getting the lay of the
7  land to the extent we're able to bring it into our
8  business.
9        So the level of depth there was -- the
10 term "materiality" and some of those directional
11 concepts I was explaining, we wanted to make sure
12 directionally it all made sense and everything like
13 that. We didn't -- we didn't need them to be Ernst
14 & Young reincarnated. We needed to make sure it was
15 reasonable.
16    Q. Okay. So if you weren't looking at these
17 granular financials, what were you using to analyze
18 Compology's value to RoadRunner?
19    A. Again, there --
20       MR. MELLEMA: Hold on. Objection to form.
21    A. The value to RoadRunner and what their
22 value was and their business, they're not related.
23    Q. Okay.
24    A. Right? Again, I -- what they did -- sure,
25 it's mindful you're going to bring this amount of

134

1  customers in and that kind of stuff, but again,
2  that's not really what the point of emphasis was.
3  The thought process is what it could do for our
4  business.
5     Q. Okay. Looking at this document, do you
6  have any reason to dispute the veracity of the
7  information?
8     A. I'm sorry. What word did you use there?
9     Q. Do you have any reason to dispute the
10 veracity --
11    A. What does veracity mean?
12    Q. Do you think these are accurate numbers?
13 Do you have any reason to disagree that these are
14 accurate numbers?
15    A. I wouldn't be able to tell you.
16    Q. Okay. Only somebody from Compology would
17 be able to verify the accuracy?
18       MR. MELLEMA: Sorry. Objection to form.
19    A. Yeah. I -- they would have to be
20 corroborated by something. I would not know off the
21 top of my head.
22    Q. Okay. Is there anyone at RoadRunner who
23 would be able to look at Compology's financials and
24 verify the accuracy?
25    A. No. I mean, if it -- me looking at it, I

135

1  mean, obviously, but, again, I don't think it was
2  necessarily a point of emphasis. But it would,
3  again, have been a part of the Q of E. But, again,
4  you're more understanding where they are at that
5  time, which is what that whole process is about, and
6  the exposure to our business should be bringing
7  on -- what are the working capital requirements.
8        They had a lot of aged payables. They
9  ███████████████████████████████████████████ So,
10 again, those are the things you're keen on
11 understanding because you're going to have to make
12 good on all of that.
13    Q. Did you discuss the amount of money that
14 Compology owed to █████
15    A. You mean --
16       MR. MELLEMA: Objection; form.
17    Q. How did you become aware that Compology
18 owed money to █████
19    A. So as you're going through the Q of E,
20 right, their balance sheet, there's payables.
21 There's liabilities. A balance sheet is assets and
22 liabilities and equities. Collectively, your assets
23 less your liabilities is your net assets. Right?
24       The net assets of the business, you need
25 to know what's going on there. So knowing they had

136

1  payables.
2     Q. Okay.
3     A. You know, and then obviously conversation
4  with Jason and Ben about -- again, going back to the
5  distressed nature of their business. That really
6  wasn't a surprise.
7     Q. Okay. Did you discuss what the money owed
8  to █████ was for?
9     A. No, but -- I mean, I guess not in
10 specifics, but it would obviously be for orders, you
11 know.
12    Q. Orders of what?
13    A. Cameras.
14    Q. Is it your understanding that █████ made all
15 of the cameras that Compology was selling?
16    A. Yes.
17    Q. Okay.
18    A. Beyond -- like we talked about, initial
19 prototype or things, right. But when you talk
20 "manufacturing" manufacturing, yeah, they're the
21 only manufacturer I'm aware of.
22    Q. Okay. I have a lot the of questions about
23 this document, but it doesn't sound like you're the
24 right person to ask. Is there anything in this
25 document that looks familiar to you or that you

329

ACKNOWLEDGMENT OF DEPONENT

I, STEVEN KREBS, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct and complete transcription of the testimony given by me and any corrections appear on the attached errata sheet signed by me.

_____  _____
(DATE)           (SIGNATURE)

330

REPORTER'S CERTIFICATE

I, BROOKLYN E. SCHWEITZER, CSR NO. 14612, RPR, CRR, in and for the State of California, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify the truth, the whole truth and nothing but the truth and that the witness reserved the right of signature;

That said deposition was taken down by me in shorthand at the time and place therein named, and thereafter reduced to typewriting under my direction, and the same is a true, correct and complete transcript of said proceedings.

I further certify that I am not interested in the event of the action.

Witness my hand this 30th day of August, 2024.

_____
Certified Shorthand Reporter for the State of California