# EXHIBIT O-R

Case 3:23-cv-04804-WHA   Document 230-15   Filed 12/18/24   Page 2 of 11

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually   1 (1 to 4)
Conducted on August 15, 2024

```
                                                1
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3              -----------------
 4
 5   ROADRUNNER RECYCLING, INC.,  )
                                  )
 6             Plaintiff,         )
     vs.                          ) Case No.
 7                                ) 3:23-cv-04804-WHA
     RECYCLE TRACK SYSTEMS, INC., )
 8   and RECYCLESMART SOLUTIONS   )
     INC.,                        )
 9                                )
               Defendants.        )
10   -----------------------------)
11
12             ATTORNEYS' EYES ONLY
13
     VIDEOTAPED DEPOSITION OF ROADRUNNER RECYCLING, INC.,
14       By and through its Designated Representative,
                    TIMOTHY JAY LONGSON,
15             and in his Individual Capacity
                  Thursday, August 15, 2024
16                San Francisco, California
17
18                    9:32 a.m. PDT
19                         to
20                    6:01 p.m. PDT
21
22
23   Stenographically Reported by:
     Burgundy B. Ryan, RPR,
24   CSR No. 11373
     Job No. 549087
25   Pages 1-232
```

```
                                                2
 1                A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4       JEFFER MANGELS BUTLER & MITCHELL LLP
         By:  JOSEPH J. MELLEMA, Esquire
 5       3 Park Plaza
         Suite 1100
 6       Irvine, California 92614
         949.623.7200
 7       jmellema@jmbm.com
 8   ON BEHALF OF THE DEFENDANT:
 9       MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, and
         POPEO, P.C.
10       By:  MATHEW S. GALICA, Esquire
         One Financial Center
11       Boston, Massachusetts 02111
         617.542.6000
12       msgalica@mintz.com
13   ALSO PRESENT:
14       KEN LAUGUICO, Videographer
         Planet Depos
15
16
17
18
19
20
21
22
23
24
25
```

```
                                                3
 1              DEPOSITION SUPPORT INDEX
 2
 3   QUESTIONS INSTRUCTED NOT TO ANSWER:
 4   PAGE    LINE
 5   (None)
 6
 7
 8   REQUEST FOR PRODUCTION OF DOCUMENTS
 9   PAGE    LINE
10   (None)
11
12
13   STIPULATIONS
14   PAGE    LINE
15   (None)
16
17
18   QUESTIONS MARKED
19   PAGE    LINE
20   (None)
21
22
23            REPORTER'S NOTE:
24   QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
25   NECESSARILY REFLECT A DIRECT QUOTE.
```

```
                                                4
 1                    I N D E X
 2                                           PAGE
 3   EXAMINATION BY MR. GALICA................   8
 4
 5              --o0o--
 6
 7              E X H I B I T S
 8   EXHIBIT        DESCRIPTION              PAGE
 9   323       30(b)(1) Deposition Notice     13
10   324       30(b)(6) Deposition Notice     14
11   325       Early Block Diagram            47
12   326       Identification of Trade Secret 79
13   327       Identification of Trade Secret 156
14   328       Unidentified Document          187
15   329       Security Measurements          188
16   330       Compology System Architecture  196
                  and Security
17
     331       Diagram of SC01                198
18             Bluetooth Communication
19   332       Compliance Document            202
20   333       FCC Submission                 205
21   334       CeteCom Report                 206
22   335       Compology Camera Installation  209
                  Guide
23
     336       FCC Submission                 212
24
25
```

Case 3:23-cv-04804-WHA   Document 230-15   Filed 12/18/24   Page 3 of 11
ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually 2 (5 to 8)
Conducted on August 15, 2024

**Page 5**

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 337 | FCC Submission | 214 |
| 338 | FCC Submission | 215 |
| 339 | FCC Submission | 215 |
| 340 | FCC Submission | 216 |
| 341 | FCC Submission | 216 |
| 342 | FCC Submission | 219 |
| 343 | Block Diagram and Schematics | 220 |
| 344 | Schematic | 228 |

--o0o--

**Page 6**

BE IT REMEMBERED that, pursuant to Notice of Taking Deposition, and on Thursday, August 15, 2024, commencing at 9:32 a.m. PDT thereof, at Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, 44 Montgomery Street, San Francisco, California, before me, Burgundy B. Ryan, a Certified Shorthand Reporter in and for the State of California, personally appeared

TIMOTHY JAY LONGSON,

a witness called on behalf of DEFENDANT, pursuant to all applicable sections of the Federal Rules of Civil Procedure, and who, having been first duly sworn by me to testify to the truth, was examined and testified as follows:

THE VIDEOGRAPHER: Here begins Media No. 1 in the videotaped deposition of Timothy Longson in the matter of RoadRunner Recycling Inc. vs. Recycle Track Systems Inc., et al, in the United States District Court, Northern District of California, Case No. 3:23-cv-04804-WHA.

Today's date is August 15th, 2024.

The time on the video monitor is 9:32.

The videographer today is Ken Lauguico, representing Planet Depos.

This video deposition is taking place at 44

**Page 7**

Montgomery Street, 36th Floor, in San Francisco, California.

Would counsel please voice-identify themselves and state whom they represent?

MR. GALICA: Matthew Galica from Mintz Levin on behalf of the Defendant.

MR. MELLEMA: Joseph Mellema, Jeffer Mangels, on behalf of plaintiff RoadRunner Recycling Inc.

THE VIDEOGRAPHER: The court reporter today is Brooke Ryan, representing Planet Depos.

The witness will now be sworn.

(Whereupon, the witness was sworn.)

COURT REPORTER: Thank you very much.

Would you please state your name for the record?

THE WITNESS: My name is Timothy Jay Longson.

COURT REPORTER: Would you please spell it?

THE WITNESS: T-i-m-o-t-h-y J-a-y L-o-n-g-s-o-n.

COURT REPORTER: Thank you very much.

Counsel, you may proceed.

/////
/////

**Page 8**

TIMOTHY JAY GALICA,
having been first duly sworn to tell the truth, testified as follows:

EXAMINATION

By MR. GALICA:

Q. Good morning.

**A. Good morning.**

Q. How are you?

**A. Good.**

Q. Do you go by Tim?

**A. I go by Jay.**

Q. Jay. All right, Jay. Where do you currently reside?

**A. Okay. I currently reside in Sebastopol, California.**

Q. Okay. Have you been deposed before?

**A. No.**

Q. Okay. So I'll just walk through some ground rules just so we're on the same page, if that's all right.

**A. Yes.**

Q. So as you know, today your testimony is being taken under oath as if it were going to be presented before a judge or jury.

Do you understand that?

**Page 25**

A. Yes. That was another piece that I had forgotten about. We published a paper.
Q. Do you recall the title of the paper?
A. I don't.
Q. Do you recall when the paper was published?
A. I don't.
Q. Would it have been while you were involved in working on the project?
A. Either while or shortly after.
Q. And do you know who the authors of the publication were?
A. Myself, Rich Gibson, Molly Longson, Randy Sergeant, and Gene Cooper, I think, were all listed.
    (Court Reporter clarification.)
    THE WITNESS: Male.
By MR. GALICA:
Q. And do you know if the project continued after you stopped working on it?
A. I don't know what state the project is currently in.
Q. Were there any other projects that you worked on with Carnegie Mellon?
A. No.
Q. So outside of your work with Atlas

**Page 26**

Scientific, NASA Ames and Carnegie Mellon, were you employed by any other entities after receiving your Ph.D?
A. I think Atlas Scientific also had a name Atlas Nanotechnology. I don't know the distinction, but there were -- I think they had used more than one name at once -- at one point. I don't know if it was a completely separate company or what exactly the distinction was, but...
Q. Okay. And setting aside, you know, the -- any naming distinction between Atlas Scientific and Atlas Nano, did you work with any -- on any different projects than the ones we've already discussed?
A. No.
Q. And after all of those projects, what employment did you obtain?
A. I was employed by Compology.
Q. And when did that employment start?
A. It was fall 2023, I believe.
Q. Is it 2023 or 2013?
A. Sorry. 2013.
Q. And when you started, do you recall the role that you had?
A. I think my title starting out was Director

**Page 27**

of Electrical Engineering.
Q. And did you work on a team?
A. I was the first employee.
Q. Okay. And when you started, what was your understanding of your role?
A. I was there to help build the hardware required for Compology.
Q. For a specific product?
A. Yes. For our waste metering products.
Q. And were there any prototypes that existed when you started?
A. Yes, but they were in their infancy.
Q. What -- what does it mean to be in their infancy?
A. They were not well developed. They did not serve the functions needed.
Q. At what level of development were they?
A. I don't really know. I didn't interact with those prototypes. I quickly started prototyping a new solution.
Q. So when you started, you were aware of prototypes but set them aside and began work from scratch on a new project, is that fair to say?
A. Yes.
Q. Okay. And this would have been the first

**Page 28**

Compology sensor; correct?
A. Yes.
Q. Okay. Who else was working on that?
A. Initially Ben Chehebar and Jason Gates, although he was not involved in the hardware very much.
Q. Okay. Anybody else?
A. No.
Q. So who was involved in the hardware?
A. Initially just me and Ben Chehebar.
Q. Were you involved in any other aspects of the design beyond hardware?
A. Yes, to some extent, but my primary focus was hardware.
Q. What were the other aspects of the design that you were involved in?
A. The software architecture, the maintenance and installation.
Q. Anything else?
A. General issues relating to a small business.
Q. And what would those include?
A. Just helping out wherever needed.
Q. Okay. Fair enough. Were they technical in nature?

Case 3:23-cv-04804-WHA   Document 230-15   Filed 12/18/24   Page 5 of 11

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually 8 (29 to 32)
Conducted on August 15, 2024

### Page 29

1  A. No.
2  Q. And was there a model name for the first
3  sensor that you worked on?
4  A. Yes. We started building what we called R0
5  through R7. Those were all, kind of, hand-built
6  prototypes.
7  Q. And what do you mean by "hand-built
8  prototypes"?
9  A. We didn't use a contract manufacturer to
10 build these. These were all developed and built
11 in-house.
12 Q. And is it true that there was a model for
13 each number R0 through R7?
14    MR. MELLEMA: Objection. Form.
15    THE WITNESS: Can I say --
16    MR. MELLEMA: I just said "objection,
17 form." You can answer.
18    Every time -- just like he said, every time
19 I say "objection, form", you can answer.
20    THE WITNESS: Okay.
21    So R0 through R7 were just different
22 revisions of, basically, the same model.
23 By MR. GALICA:
24 Q. Were any of those commercialized?
25 A. Yes.

### Page 30

1  Q. Which ones?
2  A. I don't know specifically which version,
3  but I think we built possibly 200 of those early
4  prototypes and actually had them deployed to the
5  customers.
6  Q. Starting with the R0?
7  A. So, yes. We -- we deployed some R0s, but
8  not 200. I'm saying as a group, all of these, these
9  were incremental changes within, basically, one
10 product. And for all of those R0 through R7, we
11 probably built and deployed around 200.
12 Q. So after -- strike that.
13    To who were they -- to whom were those
14 deployed, the R0 through R7 prototypes?
15 A. The waste services at UC Santa Cruz.
16 Q. Okay. And you said that each prototype was
17 designed, manufactured, assembled entirely in-house
18 by Compology; is that correct?
19 A. That's correct.
20 Q. Okay. And who else worked on those
21 prototypes beyond yourself and Ben Chehebar?
22 A. No one.
23 Q. With respect to hardware, nobody else
24 worked on those prototypes other than yourself and
25 Ben Chehebar?

### Page 31

1  A. Possibly Jason Gates, but as I said, he was
2  busy with other things. He wasn't -- his primary
3  focus was not hardware.
4  Q. Okay. What was his primary focus?
5  A. The business side of the company, so
6  seeking funding, finding customers, that sort of
7  thing.
8  Q. Okay. So to the extent he was involved in
9  product development, it was on a minimal level; is
10 that fair?
11 A. That's fair.
12 Q. Okay. And can you walk through the
13 architecture of the R7 prototype as it relates to
14 hardware?
15    MR. MELLEMA: Objection. Form.
16    THE WITNESS: Can you be more specific?
17 By MR. GALICA:
18 Q. What components did it include?
19 A. I don't remember specific components. I
20 would have to look at old documentation in order to
21 answer that question.
22 Q. Do you remember general components?
23 A. I know it used a single board computer
24 called the BeagleBone. It used a LogiTech webcam
25 and a USB toggle modem.

### Page 32

1  Q. And the single board computer, do you
2  remember any of the components that resided on
3  that?
4  A. No.
5  Q. Generally do you recall what types of logic
6  components resided on that?
7  A. It uses some Texas Instruments part as the
8  primary compute -- processor.
9  Q. So a Texas Instruments microcontroller, is
10 that fair to say?
11 A. I think that's correct.
12 Q. And you don't recall the model number?
13 A. The -- well, the -- the overall product was
14 called BeagleBone, so it's easy to find out if you
15 look up BeagleBone.
16 Q. So the BeagleBone was a Texas Instruments
17 design; is that fair to say?
18 A. I don't know who designed that.
19 Q. Did Compology design it?
20 A. No.
21 Q. Who did you buy it from?
22 A. I don't know.
23 Q. Okay. What else existed on the BeagleBone
24 board?
25 A. I think all of the other, kind of, standard

**97**

1  Q. Okay. So focusing on the one that
2  encompasses the design choices you made that enable
3  your products to withstand harsh environments, is
4  that a different trade secret for the R11 and the
5  R12?
6  **A. I believe there are overlaps between the**
7  **two, but there may be specific design choices that**
8  **are different within those two that could be**
9  **considered trade secrets.**
10  Q. So what are -- what's the overlap?
11  **A. They have many features that overlap. One**
12  **example is that they both use polycarbonate as the**
13  **front housing.**
14  Q. And what are the different trade secrets?
15  **A. I would have to go and review the -- the**
16  **designs in order to try to come up with some list.**
17  Q. So where -- yeah. Where is the information
18  defining these trade secrets located?
19      MR. MELLEMA: Objection. Form.
20      THE WITNESS: Can you give me a specific
21  trade secret that you're asking about?
22  By MR. GALICA:
23  Q. Yeah. The two we've just been talking
24  about, so the material and the shape.
25      MR. MELLEMA: Objection. Form.

**98**

1      THE WITNESS: The materials and the shape
2  are defined in the technical drawings.
3  By MR. GALICA:
4  Q. Okay. Anywhere else?
5  **A. That is the document of truth for the**
6  **material and shape.**
7  Q. Okay. And so it's your position that
8  you've never disclosed the shape of your products to
9  the public?
10  **A. I never said that.**
11  Q. Well, you said it was a trade secret;
12  right?
13  **A. I said that the shape helps with making**
14  **sure that it can survive harsh environments.**
15  Q. And is that a trade secret?
16  **A. I don't believe that the shape is a trade**
17  **secret. I'm sure there's elements within the**
18  **enclosure that are trade secret.**
19  Q. And you've never shown the inside of your
20  enclosures to the public?
21      MR. MELLEMA: Objection. Form.
22      THE WITNESS: There are FCC filings that
23  include pictures of the inside of the devices.
24  By MR. GALICA:
25  Q. So you've shown them to the public then;

**99**

1  correct?
2      MR. MELLEMA: Objection. Form.
3      THE WITNESS: As I said, there are some
4  images that show some portion of the inside of
5  the -- inside of the device that are public.
6  By MR. GALICA:
7  Q. So what -- what is the portion that isn't
8  shown to the public that's a trade secret?
9  **A. I would have to review all of those**
10  **documents to be able to comment further.**
11  Q. You don't know as you sit here right now?
12  **A. No. I don't remember what specifically was**
13  **shown in the FCC filing.**
14  Q. All right. If you could turn to page 5 and
15  read lines 7 through 11 and let me know when you're
16  done.
17  **A. Okay. I'm done.**
18  Q. Okay. So can you explain the unique
19  configuration of the parts in the smart camera
20  assembly, what that means?
21  **A. I'm struggling to explain it any more**
22  **clearly than it's already stated here.**
23      **So unique, as in it doesn't exist**
24  **elsewhere. Configuration, like how they're**
25  **arranged.**

**100**

1      **Is there something else you're looking for?**
2  Q. Well, let me ask it a different way. So
3  for the -- strike that.
4      What's the overall waste metering system?
5      MR. MELLEMA: Objection. Form.
6      THE WITNESS: Yeah. That's too broad of a
7  question. I don't -- I can't -- I can't summarize
8  it in the time that we have here.
9  By MR. GALICA:
10  Q. What -- what are the high level components
11  of it?
12  **A. I think at a high level, we're providing**
13  **insights to our customers from how their containers**
14  **fill up and what are the contents of those**
15  **containers.**
16  Q. So using the phrase "overall waste metering
17  system", is that too broad of a phrase?
18      MR. MELLEMA: Objection. Form.
19      THE WITNESS: Too broad of a phrase for
20  what?
21  By MR. GALICA:
22  Q. For you to understand what the trade secret
23  is associated to that?
24  **A. As I said before, I think there are many**
25  **trade secrets that are encompassed within that broad**

**101**

statement.
Q. So the overall waste metering system, that itself is not a trade secret?
A. I think we have it listed as a trade secret right there on line 22 of page 4.
Q. Okay. That's what I'm trying to understand.
What is the overall waste metering system?
MR. MELLEMA: Objection. Form.
THE WITNESS: I think the overall waste metering system encompasses many parts. This includes the hardware, the software, the algorithms, the labeled and trained data. There is many elements.
BY MR. GALICA:
Q. But it's that unique configuration of those specific elements and how they're connected that constitutes the trade secret; is that correct?
MR. MELLEMA: Objection. Form.
THE WITNESS: Can you rephrase the question?
BY MR. GALICA:
Q. What was unclear about it?
A. To be honest, I'm going around in circles. I don't know what you're asking me.

**102**

Q. We share the same frustration.
Can you define, as you sit here right now, what the trade secret is for your overall waste metering system?
A. As I said, I think it encompasses multiple trade secrets. I don't think it's one single trade secret.
Q. So there is not one single trade secret for your overall waste metering system; correct?
A. As far as I understand it, correct.
Q. Okay. If you could turn to page 7 and read through lines 6 through 14. Let me know when you've had a chance to review that.
A. I've read that paragraph.
Q. Okay. So do you understand that to mean that there is a single trade secret for the smart camera apparatus?
A. I believe this to be a -- a trade secret that describes the overall apparatus but that does not exclude the possibility that there are additional trade secrets that are basically sub elements of that.
Q. Okay. And just for the record, you're reading line 6, "Compology's smart camera apparatus trade secret includes", you -- you see the phrase

**103**

"trade secret" is in the singular form there?
A. Yes. But we also talk about the optical assembly and design as a separate trade secret, but that is part of the smart camera apparatus. That's why I was saying there may be, basically, like, sub trade secrets included within that overarching trade secret.
Q. Well, just focusing on line 6 through 14 on page 7, you would agree that that -- what's described there is intended to be a single trade secret; correct?
A. Yeah. By the use of singular versus plural, that's what I'm lead to believe.
Q. Okay. And that trade secret includes everything that's listed in lines 6 through 14; correct?
A. Correct.
Q. What's the difference between the optical assembly and the smart camera?
A. So as we've defined it, the optical assembly includes a lens, an image sensor, a lens mount, and a flash flex.
Q. I'm sorry. What was the last --
A. And a -- and a -- an FCP, a flexible printed circuit board.

**104**

Q. Okay. And -- and going back to lines 6 through 14 on page 7, is the smart camera apparatus the same in the R11 and R12 device?
A. No.
Q. Is it the same -- let me ask it a different way.
Is the smart camera apparatus different for the R11, R12 and R13?
A. Yes. I would call each of those a separate smart camera.
Q. So would you also call each of those a separate trade secret?
A. I believe so.
Q. And is the trade secret in line 6 through 14 just the fact that it includes these components, or is it the specific components in the smart camera of each device?
MR. MELLEMA: Objection. Form.
THE WITNESS: I believe this paragraph just is -- is just listing some of the components but that those do not constitute the trade secret.
BY MR. GALICA:
Q. So this isn't the trade secret?
MR. MELLEMA: Objection. Form.
THE WITNESS: I think this describes at a

**121**

1  20 on page 7 of Exhibit 326. Just let me know when
2  you get there.
3      A.  Line 20, page 6?
4      Q.  Page 7.
5      A.  Yep. I'm here.
6      Q.  Okay. So you see it says "optical assembly
7  and design"?
8      A.  Uh-huh.
9      Q.  Okay. Is there one trade secret for the
10 optical assembly and design?
11     A.  I guess I don't know exactly what the legal
12 definition of the trade secret here is, but I think
13 this identifies pieces of it. Let me just read it.
14     Q.  Sure.
15     A.  Yeah. I guess from a legal perspective, I
16 don't -- I don't know whether there is one trade
17 secret or multiple trade secrets encompassed in
18 this, but...
19     Q.  Did you have any conversations with your
20 counsel about the subject of your testimony during
21 lunch?
22     A.  Yeah.
23     Q.  You discussed the subject of your testimony
24 during lunch?
25     A.  Oh, sorry. We just discussed generally

**122**

1  the -- the testimony and, you know, how things are
2  going.
3      Q.  Okay. Nothing specific?
4      A.  No.
5      Q.  He didn't suggest how to answer questions
6  when you return from break?
7      A.  No.
8      Q.  Okay. I will turn your attention to lines
9  3 through 10 on page 8. Can you just give that a
10 read and let me know when you've had a chance to do
11 that?
12     A.  Okay.
13     Q.  Do you see line 4 -- end of line 3,
14 beginning of line 4, where it says, "over the course
15 of many years to optimize the captured images"?
16     A.  Yes.
17     Q.  How did you optimize the captured images
18 for the R11?
19     A.  Well, a big piece was, you know, designing
20 the whole lens assembly, so making sure that we had
21 an adequate ▮▮▮▮▮, adequate ▮▮▮▮▮▮▮▮, that
22 the image sensor had ▮▮▮▮▮▮▮▮. I'm
23 trying to think what else was important in those
24 design decisions.
25     R11 actually had two cameras, so two image

**123**

1  sensors, two lenses, et cetera, so we were working
2  at the time on doing stereo photography to assist
3  with the fullness evaluation.
4      Q.  Okay. So -- excuse me. There were two
5  cameras with the R11, you said; correct?
6      A.  Uh-huh.
7      Q.  Did those have different fields of view?
8      A.  No. In fact, when you're doing stereo
9  photography, you typically want those two cameras to
10 be similar; otherwise, you have to account for those
11 dissimilarities.
12     Q.  Okay. So ideally you want them to be
13 identical; correct?
14     A.  It really depends on what you're trying to
15 achieve. I can imagine a scenario in which if
16 you're only interested in stereo content within some
17 small range, that you might want one large field of
18 view camera to capture the entire contents and then
19 a smaller one to capture just the stereo information
20 in that small range. But for our purposes at the
21 time, we were interested in having two similar
22 cameras.
23     Q.  And just to be clear, similar or identical?
24     A.  These two cameras were identical short of
25 manufacturing tolerances.

**124**

1      Q.  So within manufacturing tolerances, they
2  were designed to be identical?
3      A.  There may have been slight differences in
4  the way they were mounted and/or the connectors that
5  they used, but I believe they were nearly identical.
6      Q.  Okay. And you referred to stereo
7  functionality. Do you recall that?
8      A.  Yes.
9      Q.  What is a stereo camera?
10     A.  A stereo camera is one that uses two image
11 sensors and lenses to generate a single composite
12 image with depth information included, like your
13 eyes. Your eyes are stereo.
14     Q.  I didn't mean to cut you off.
15     A.  Assuming you have two eyes.
16     Q.  And are the image sensors used in a stereo
17 camera configuration specifically define -- designed
18 for that purpose?
19     A.  Yes. I would recommend that. If you're
20 designing a stereo camera, then you should probably
21 consider how you're designing it.
22     Q.  So there are image sensors that are
23 dedicated for use in stereo camera systems; is that
24 correct?
25     A.  There are image sensors that allow you to

Case 3:23-cv-04804-WHA  Document 230-15  Filed 12/18/24  Page 9 of 11

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually  32 (125 to 128)
Conducted on August 15, 2024

**125**

synchronize the image capture so that both image sensors capture an image simultaneously, at the exact same time. However, we did not use such synchronized image sensors for this product.

Q. So you didn't use ones that were specific for stereo camera systems; correct?

A. That's correct. If -- if your contents isn't changing very rapidly and you don't care about that synchronization, then you can get away with just a standard image sensor.

Q. Okay. Does the R12 incorporate a stereo camera?

A. No. R12 had just one single lens and image sensor.

Q. And is that true for the R13 and its variants as well?

A. Yes.

Q. Okay. You previously said that you designed it to have adequate ▮▮▮. Do you recall that?

A. I think I said ▮▮▮

Q. What is an ▮▮▮

A. It's a ▮▮▮

Q. And what is the amount adequate that ▮

**126**

▮

A. So if you don't -- ▮▮▮▮▮

Q. So you incorporated an ▮▮▮ to prevent that from occurring?

A. That's correct.

Q. And did you design the ▮▮▮

A. No.

Q. Who did?

A. I don't know the company for this specific one. I would have to go and look at our documentation.

Q. So you just purchased the part; correct?

A. Yeah, effectively. I'm -- I'm sure it was not a relatively off-the-shelf part.

Q. In lines 5 to 6 on page 8, you state that "the camera lens is a fixed focus lens."
    Do you see that?

A. Yes.

Q. What does that mean?

A. That means it cannot dynamically change focus. If it's a fixed focus, it has a single focus

**127**

that's set at time of manufacturing.

Q. And did you set the focus?

A. I did. I set the focus in the design specifications and then our manufacturer assembled the parts to our specifications.

Q. And who assembled the parts?

A. We've used a few different camera module vendors over the years. The one we're using currently is called ▮▮▮

Q. And how do you set the focus on a camera lens?

A. For these particular lenses, they have a screw thread, which threads into a lens mount, and the amount that you screw it down influences the focus.

Q. And did you set the same focus for the cameras in the R11, R12, and R13?

A. It's similar, but we've used different lenses for different products, so there's some variation between them.

Q. Okay. And is setting the focus, for example, a trade secret?

A. I wouldn't characterize it as that, but I suppose maybe somebody could.

Q. Why wouldn't you characterize it as that?

**128**

A. It's not something that -- well, I think because there's probably a variety of focuses that would be acceptable, and so there's not a whole lot of, kind of, ingenuity that went into that decision.

Q. And then reading, again, lines 5 and 6, it says, "The camera lens is a fixed focus lens with an optimal field of view and focal length."
    Do you see that?

A. Uh-huh.

Q. What is the focal length for the R11?

A. I don't remember the specific focal length, but it's around ▮

Q. And what is a focal length?

A. Focal length basically dictates where -- where the light convergences, like, how far away from the lens the light is converging.

Q. Okay. And when you said that the focal length for the R11 is around ▮ in what form of measurement is that?

A. To be honest, I've forgotten the -- the metric, but I think it's ▮▮▮▮ It's a -- yeah. I think it's in the ▮▮▮

Q. Okay. And is it different for the R12?

A. I'm sure it's subtlety different, but it's probably pretty similar.

137

1  Q. Does the R11 include a nano-coating?
2  **A. No.**
3  Q. Does the R12 include a nano-coating?
4  **A. Actually, let me take a step back. R11 and**
5  **R12 both include _____, which one could**
6  **potentially characterize as a nano-coating, but the**
7  **way in which we're describing nano-coating here is a**
8  **little bit different. So it's a separate coating**
9  **than the _____ Neither R11 nor 12 had the**
10 **nanocoat.**
11 Q. Okay. Does the R13 include a nano-coating?
12 **A. Yes.**
13 Q. All of its variants?
14 **A. Yes.**
15 Q. Okay. Does the R13 include _____
16 **A. Yes.**
17 Q. All of the variants?
18 **A. Yes.**
19 Q. The window geometry is different for the
20 R11 and R12; correct?
21 **A. Yes.**
22 Q. And for the R13 and its variants?
23 **A. Yes.**
24 Q. Okay. All right. Going to line 26 on page
25 9.

138

1      "The low powerless -- power wireless
2  communication module and location sensors", do you
3  see that?
4  **A. Yes.**
5  Q. Is that a single trade secret?
6  **A. Again, I don't know how these trade secrets**
7  **are being defined in the legal context. There were**
8  **many design choices that we made to optimize both of**
9  **those systems. I -- from my understanding of what**
10 **trade secret means, I think many of those design**
11 **choices could be considered a trade secret.**
12 Q. Let's start with LTE Cat-M1. What is
13 that?
14 **A. This is a variant of the LTE network that's**
15 **specifically targeting low power, low bandwidth**
16 **machine to machine or IoT devices.**
17 Q. And was that used in the R11?
18 **A. No.**
19 Q. Was it used in the R12?
20 **A. Yes.**
21 Q. Okay. And, in fact, you've publicly
22 disclosed that that's been used; correct?
23 **A. Yes. It's disclosed in the FCC filing.**
24 Q. Okay. So just the fact that the R12 uses
25 LTE Cat-M1, you're not saying that's a trade secret;

139

1  right?
2  **A. I don't believe that that would be**
3  **considered a trade secret based on the fact that**
4  **it's public knowledge.**
5  Q. Okay. And what about GPS or GNSS? Let's
6  start with what are those?
7  **A. GPS stands for global positioning system.**
8  **I have forgotten what GNSS stands for, but it's**
9  **basically the same thing. GPS is the United States**
10 **version of GNSS.**
11     **So other countries have deployed**
12 **satellites -- oh, it says right there, global**
13 **navigation satellite system.**
14     **So, for example, Europe has their own**
15 **variant of GPS and China has their own variant and**
16 **Russia has their own variant.**
17 Q. And when you said "there it is right
18 there", are you referring to lines 19 and 20 on page
19 10?
20 **A. Yeah. 19 defines GNSS, global navigation**
21 **satellite system.**
22 Q. Okay. Did the R11 include GNSS and GPS
23 support?
24 **A. Yes.**
25 Q. Okay. And you're not alleging that the

140

1  fact that it includes GNSS and GPS capabilities,
2  that's a trade secret; right?
3  **A. I don't believe so. I think those are both**
4  **public knowledge.**
5  Q. If I could go back to lines 3 through 6 on
6  page 10. If you would just read that and let me
7  know when you have.
8  **A. I've read that.**
9  Q. So it says that "the RF performance must be
10 optimized."
11     Do you see that?
12 **A. Yep.**
13 Q. How did you optimize the RF performance in
14 the R11?
15 **A. The methods used in the R11 are consistent**
16 **with the other devices. It's a bit of an iterative**
17 **process. It's -- we're working with a number of**
18 **design constraints beyond the RF performance that**
19 **shaped the overall system.**
20     **So, for example, _____**
21 _____
22 _____
23 _____
24     **So we typically will find components that**
25 **we think will perform well, given our constraints,**

**Page 229**

Q. Okay. Can you identify any trade secret in this schematic?
A. No.
Q. Okay.
A. I believe this is part of the design for R12, which, if not, should publicly could constitute a trade secret.
Q. Then I'm going to direct your attention to page RoadRunner 000000153.
Do you recognize that?
A. This looks like part of the schematic for R13.
Q. Can you point to any trade secret in that schematic?
A. Again, I can't point out specific trade secrets, but this is part of the R13 camera, which, if kept secret, could be considered a trade secret.
Q. Can you go to the previous page, so the number ending 152?
Do you recognize this?
A. This is the system block diagram for R13.
Q. Can you point to a trade secret here?
A. Again, this is part of R13, overall camera system. If kept confidential, it could be considered a trade secret.

**Page 230**

Q. What aspects of it could be considered a trade secret?
A. The overall design of the electronic system.
Q. Anything beyond that?
A. I can't think of anything at this time.
MR. GALICA: Just note a few things. We received a document production late last night, so to the extent that anything in that document production warrants further questioning, we're going to reserve the right on that. I think there were a few topics where the deponent witness was not prepared to testify, and then we'd also request the document that he said he prepared related to the comparison of FCC or the Pello system and Compology system.
With that said, I don't have further questions right now.
MR. MELLEMA: What specific topics do you contend he wasn't prepared for?
MR. GALICA: Sure. I think at a minimum, in a non-exhaustive way, the time spent developing each product.
MR. MELLEMA: Did you ask him about that?
MR. GALICA: Yeah, I did. He said he

**Page 231**

didn't know. The value ascribed to each trade secret, the algorithms, and those are the ones that immediately come to mind.
MR. MELLEMA: Okay. No questions for me.
MR. GALICA: All right.
THE VIDEOGRAPHER: Okay. This marks the end of the deposition -- the deposition of Timothy Longson. We are going off the record at 18:01.
(Proceedings concluded.)
---o0o---

**Page 232**

CERTIFICATE OF STENOGRAPHIC REPORTER

I, BURGUNDY B. RYAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition,

TIMOTHY JAY LONGSON,

was by me duly sworn to tell the truth, the whole truth, and nothing but the truth, in the within-entitled cause; that said deposition was taken at the time and place therein named; that the testimony of said witness was stenographically reported by me, a disinterested person, and was thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said deposition, nor in any way interested in the outcome of the cause named in said caption.

DATED: Wednesday, August 21, 2024.

Burgundy B. Ryan, CSR No. 11373, RPR