# EXHIBIT Z-R

Arameh Zargham O'Boyle (SBN: 239495)
AZOboyle@mintz.com
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO, P.C.
2049 Century Park East, Suite 300
Los Angeles, CA 90067
Telephone:    (310) 586-3200
Facsimile:    (310) 586-3202

James M. Wodarski (Admitted *Pro Hac Vice*)
JWodarski@mintz.com
Michael C. Newman (Admitted *Pro Hac Vice*)
MCNewman@mintz.com
Matthew S. Galica (Admitted *Pro Hac Vice*)
MSGalica@mintz.com
James J. Thomson (Admitted *Pro Hac Vice*)
JJThomson@mintz.com
Sean M. Casey (Admitted *Pro Hac Vice*)
SMCasey@mintz.com
Tianyi Tan (Admitted *Pro Hac Vice*)
TTan@mintz.com
Stephen Chen (Admitted *Pro Hac Vice*)
SChen@mintz.com
Amy LoBue (Admitted *Pro Hac Vice*)
ALoBue@mintz.com
MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND POPEO, P.C.
One Financial Center
Boston, MA 02111
Telephone:    (617) 542-6000
Facsimile:    (617) 542-2241

Attorneys for Defendants
RECYCLE TRACK SYSTEMS, INC., and
RECYCLESMART SOLUTIONS INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROADRUNNER RECYCLING, INC., | Case No. 3:23-cv-04804-WHA |
| Plaintiff, | **DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| RECYCLE TRACK SYSTEMS, INC., and RECYCLESMART SOLUTIONS INC., | *Assigned for All Purposes to:* The Hon. William H. Alsup |
| Defendants. | Date: November 14, 2024 Time: 8:00 a.m. Place: Courtroom 12, 19th Floor |
| | Complaint Filed:    August 4, 2023 Trial Date:    December 9, 2024 |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................................................ 1

II. STATEMENT OF RELEVANT FACTS ........................................................... 3

    A. Plaintiff's Insufficient Disclosure of Its Alleged Trade Secrets in This Case ............ 3

    B. Plaintiff Has Publicly Disclosed The Details Of Its Waste Metering Technology ...... 4

    C. Defendants Own Device and Derivative Data ............................................................ 5

III. LEGAL STANDARD ......................................................................................... 6

    A. Plaintiff Has Failed to Adequately Disclose Its Alleged Trade Secrets With the Required Reasonable Particularity ............................................................................ 7

        1. Plaintiff's Overall Waste Metering and Recycling Technology (ITS Trade Secret A / Hoarty Trade Secret No. 1) ......................................................... 9

        2. Smart Camera Apparatus, (ITS Trade Secret B, B.2, B.3 / Hoarty Trade Secret No. 2) ................................................................................................ 11

        3. Optical Assembly and Design (ITS Trade Secret B.1 / Hoarty Trade Secret No. 3) ............................................................................................... 13

        4. Training Data (ITS Trade Secret D / Hoarty Trade Secret No. 4) ............... 16

        5. Subpar Image Detection (SPID) (ITS Trade Secret E.1 / Hoarty Trade Secret No. 5) ............................................................................................... 16

        6. Contamination Detection/Content Identification (ITS Trade Secret E.3 / Hoarty Trade Secret Nos. 7) ..................................................................... 18

        7. Container Fullness Analysis (ITS Trade Secret E.2 / Hoarty Trade Secret No. 6) ............................................................................................... 19

    B. Plaintiff's Alleged Trade Secrets Are Public and/or Generally Known ................... 19

        1. Plaintiff's "Overall Waste Metering System" Is Public ............................. 20

        2. Plaintiff's "Smart Camera" Trade Secret Is Public .................................... 20

        3. Plaintiff's "Optical Assembly" Trade Secret Is Public ............................... 20

        4. Plaintiff's "Training Data," "Subpar Image Detection," "Contamination Detection," and "Container Fullness Analysis" Trade Secrets Are Public .... 22

    C. Plaintiff's "Training Data" Is Not a Trade Secret Because Defendants Own It ........ 22

    D. Plaintiff Has Failed to Show that Its Alleged Trade Secrets Derive Independent Economic Value ....................................................................................................... 24

IV. CONCLUSION ................................................................................................. 24

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

*Ackerman v. W. Elec. Co.,*
4     860 F.2d 1514 (9th Cir. 1988) ................................................................................6

5

*Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.,*
    226 Cal. App. 4th 26 (Cal. Ct. App. 2014) ...........................................................24
6

*Anderson v. Liberty Lobby, Inc.,*
7     477 U.S. 242 (1986) .................................................................................................6

8

*Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.,*
    660 Fed. App'x 600 (10th Cir. 2016) ....................................................................24
9

10

*Celotex Corp. v. Cattrett,*
    477 U.S. 317 (1986) .......................................................................................6, 7, 22
11

*Chung v. Intellectsoft Grp. Corp.,*
12     No. 21-cv-03074-JST, 2024 WL 813445 (N.D. Cal. Feb. 12, 2024) ...................7, 8

13

*Direct Techs., LLC v. Elec. Arts, Inc.,*
    836 F.3d 1059 (9th Cir. 2016) ...............................................................................24
14

15

*Eng'g Network Int'l, Inc. v. Lucent Techs., Inc.,*
    178 Fed. App'x 721 (9th Cir. 2006) .......................................................................23
16

*Freeman Inv. Mgmt. Co., LLC v. Frank Russel Co.,*
17     729 Fed. App'x 590 (9th Cir. 2018) .......................................................................22

18

*Harper v. Wallingford,*
    877 F.2d 728 (9th Cir. 1989) .............................................................................6, 22
19

20

*Hong Kong uCloudlink Network Tech. Ltd. v. Simo Holdings Inc.,*
    No. 18-CV-05031-EMC, 2019 WL 1767329 (N.D. Cal. Apr. 22, 2019)...............20
21

*HotSpot Therapeutics, Inc. v. Nurix Therapeutics, Inc.,*
22     No. 22-cv-04109-TSH, 2023 WL 3259471 (N.D. Cal. Apr. 18, 2023)....................9

23

*Imax Corp. v. Cinema Techs., Inc.,*
    152 F.3d 1161 (9th Cir. 1998) .................................................................................8
24

25

*Integral Dev. Corp. v. Tolat,*
    675 F. App'x 700 (9th Cir. 2017) .............................................................................7

26

*Integral Dev. Corp. v. Tolat,*
27     No. C 12–06575 JSW, 2015 WL 674425 (N.D. Cal. Feb. 12, 2015) ......................9

28

*InteliClear, LLC v. ETC Glob. Holdings, Inc.,*
    978 F.3d 653 (9th Cir. 2020) ......................................................................7, 8, 23

*MAI Sys. Corp. v. Peak Computer, Inc.*,
    991 F.2d 511 (9th Cir. 1993) ............................................................6, 17

*Nelson v. Pima Cmty. Coll.*,
    83 F.3d 1075 (9th Cir. 1996) ............................................................6, 22

*Regents of Univ. of Cal. v. Dako N. Am., Inc.*,
    No. 05–03955 MHP, 2009 WL 1083446 (N.D. Cal. Apr. 22, 2009).......................................6

*SocialApps, LLC v. Zynga, Inc.*,
    No. 11 Civ. 4910, 2012 WL 381216 (N.D. Cal. Feb. 6, 2012)................................20

*Swarmify, Inc. v. Cloudflare, Inc.*,
    No. C 17–06957 WHA, 2018 WL 2445515 (N.D. Cal. May 31, 2018).................................7

*Waymo LLC v. Uber Techs., Inc.*,
    No. C 17-00939 WHA, 2017 WL 5000352 (N.D. Cal. Nov. 2, 2017)............................8, 9, 14

*Wright v. Emps. Reins. Corp.*,
    No. C 04–03710 JW, 2005 WL 756618 (N.D. Cal. Mar. 31, 2005)...........................................7

# I.    INTRODUCTION

Plaintiff has had no fewer than seven chances—including at least three with express cautions from the Court—to pare down and to identify its alleged trade secrets with the required particularity. It never did. The Court noted that, in Plaintiff's January and February 2023 pre-suit letters to Defendants, plaintiff "never bothered to say what the trade secrets were." Dkt. 111, Tr. at 23:12-13 (Sept. 11, 2024). Next, Plaintiff filed its First Amended Complaint and again failed to identify its trade secrets, which resulted in the dismissal of its trade secret claims. The Court stated, then, that Plaintiff's allegations were nothing more than "a trade-secret tautology." Dkt. 43 at 4. With the Court's admonition that Plaintiff must "correct[] the deficiencies," Plaintiff filed a Second Amended Complaint and its Identification of Trade Secrets ("ITS"), which the Court expressly cautioned is "subject to paring down . . . during discovery and subsequent motion practice." Dkt. 71 at 2. Plaintiff ignored the Court's instructions.

Plaintiff clung to its generic ITS statements (and nothing more) throughout fact discovery, and Plaintiff's expert reports simply copied and pasted from the deficient ITS. Most recently, after the Court, once more, warned Plaintiff that its ITS is filled with irrelevant and/or public information (Dkt. 93), Plaintiff filed a renewed motion to seal (Dkt. 114), which essentially concedes that Plaintiff lacks, and never has had, any plausible good faith justification for redacting portions of its ITS. There is no secret to conceal, as Defendant's opposition (Dkt. 121) demonstrates.

Despite Plaintiff's general and constantly changing allegations, fact and expert discovery established that no specific component or attribute of Plaintiff's sensor, or "waste metering and recycling system" is a trade secret. Tellingly, Plaintiff's technical expert and the two "lead engineers," who Plaintiff attempts to designate as experts with respect to the "nature and identity" of Plaintiff's trade secrets, all have different opinions and testimony concerning what the trade secrets actually are. Nonetheless, any attempt at comparing Plaintiff's sensor with Defendants' accused product demonstrates that there are meaningful differences in the design, configuration, and implementations of the parties' sensors, or "systems." In that reality, Plaintiff's expert opinion is reduced to the position that it is the entire system, itself, that is the trade secret.

Plaintiff cannot demonstrate that the overall system is a trade secret where it is indisputable

1    that every technical feature of Plaintiff's sensor product, as well as the entire waste metering system
2    as assembled into the sensor product, has been publicly disclosed. Plaintiff has made public, in several
3    ways, everything that it attempts to claim as its trade secrets, including in its issued patents and patent
4    applications, its own publicly accessible websites, its public Federal Communications Commission
5    ("FCC") filings, several public presentations by Compology employees, and even its public filings in
6    this case. Defendants' experts undertook the burdensome task of mapping to a public disclosure or
7    generally-known source each of Plaintiff's trade secret allegations. Plaintiff's expert did nothing to
8    analyze or determine whether any alleged trade secret was publicly known or available.

9         Plaintiff has not met, and cannot meet, its burden of showing that any trade secret it attempts
10   to allege has independent economic value. Neither Plaintiff, nor either of its two experts, even tried.

11        Finally, Plaintiff cannot maintain a claim to any trade secret that concerns the use of "training
12   data" because Defendants, and not Plaintiff, own such data. Contractually, the "training data" falls
13   within the agreement's definition of Device Data and Derivative Data, all of which Defendants own.
14   Plaintiff is only allowed to use Defendant's Device Data and Derivate Data by way of license. So,
15   despite accusing Defendants of using Plaintiff's training data to train its machine learning models,
16   the reality is the exact opposite. Plaintiff needs to use Defendants' training data to train its models.
17   Regardless, Defendants cannot misappropriate something that they own. For this additional reason,
18   Plaintiff's "training data" trade secret allegations must be dismissed.

19        And so it is, despite nine months of elaborate fact and expert discovery, Plaintiff did nothing
20   to heed the Court's clear and repeated instruction. Plaintiff never pared down or narrowed its claims.
21   To the extent it may argue that it has jettisoned certain specific allegations, it has simply rearranged
22   it in its vague allegation of the entire system as a trade secret. Plaintiff never provided a constant, let
23   alone specific, or reasonably particular, definition or disclosure of any potential or viable trade secret.
24   Plaintiff has never moved beyond boilerplate assertions and high-level descriptions, which the Court
25   has already said are not sufficient. On the compiled record, the reason is plain: Plaintiff has no trade
26   secret to claim. No matter how one attempts to construe or understand the allegations, Plaintiff's
27   misappropriation action is untenable because it attempts to claim as trade secrets only things that are
28   publicly known or Defendants' property. No set of facts exists on which Plaintiff can prevail on its

1  trade secret misappropriation claim. Defendant's motion for summary judgement should be granted.

2  **II.    STATEMENT OF RELEVANT FACTS**

3      **A.    Plaintiff's Insufficient Disclosure of Its Alleged Trade Secrets in This Case**

4      In response to trade secret misappropriation allegations from Plaintiff's counsel in January

5  2023, Defendants' counsel sent numerous correspondence to Plaintiff's counsel attempting to

6  understand what Plaintiff contends its trade secrets were. *See* Dkt. Nos. 117-2, 117-3, 117-4. Plaintiff

7  failed to identify its trade secrets at that point in time. Dkt. 111, Tr. at 23:10-16.

8      Subsequently, Plaintiff filed the present lawsuit. After Defendants' removal of this Case from

9  the state court, Plaintiff filed its First Amended Complaint. *See* Dkt. 15. The Court dismissed the First

10 Amend Complaint, finding that it consisted of "trade-secret tautology," *i.e.*, that Plaintiff's "trade

11 secrets are included in confidential information that includes trade secrets." Dkt. 43 at 4. The Court

12 further found that: (1) "the arrangement and configuration of [Plaintiff's] smart cameras [cannot be]

13 a trade secret," at least because of their public visibility in waste bins and Plaintiff's own public

14 disclosures through its own webpage and its FCC filings; (2) Plaintiff's "AI system" as alleged cannot

15 be a trade secret when "no specific, non-public aspect of this system have been identified"; and

16 (3) Plaintiff has failed to address how Defendants could access its "machine-learning model and

17 preexisting image database." *Id.* at 4-6.

18     With the Court's leave to amend, Plaintiff filed a Second Amended Complaint (Dkt. 45-2)

19 along with its ITS (Dkt. 47 (Ex. A)). The Court declined to dismiss this Second Amended Complaint,

20 "wary of prematurely sacking the trade secret misappropriation claims at this early stage" before any

21 discovery. Dkt. 71 at 2. "Out of an abundance of caution," therefore, the Court permitted Plaintiff to

22 proceed with its trade secret claims, "subject to paring down these amended allegations during

23 discovery and subsequent motion practice with the benefit of a better record." *Id.*

24     During fact discovery, Defendants propounded multiple interrogatories to Plaintiff that seek

25 more specific, narrowed disclosure of its alleged trade secrets. Plaintiff provided generic responses.

26 *Compare, e.g.*, Ex. 1 at 8-12 (Plaintiff's Responses to Defendants' Interrogatory No. 3 asking about

27 any embodiment and/or implementation of Plaintiff's alleged trade secrets) *with* Dkt. 47 (Ex. A)

28 (ITS). Defendants have sent no fewer than eleven formal correspondences (not to mention emails)

1  during fact discovery and engaged in numerous meet-and-confers with Plaintiff—in connection with

2  both Plaintiff's discovery responses and its 30(b)(6) deposition testimony—asking that Plaintiff

3  disclose and establish its trade secrets. *See* Ex. 2 (compilation of Defendants' correspondence to

4  Plaintiff during fact discovery).

5       Two days before the end of fact discovery, on August 28, 2024, the Court noted that Plaintiff's

6  ITS has considerable information that cannot qualify as trade secrets, such as "marketing puffery,"

7  "boilerplate assertions," "statements from legal treatises," and "high-level descriptions of case

8  contentions." *See* Dkt. 93 at 3-4. The Court further stated that Plaintiff ought to "have a firmer grasp"

9  of its alleged trade secrets. *Id.* at 4. Two days later, Plaintiff's technical expert, Mr. Willian Leo

10 Hoarty, submitted an opening report including, *inter alia*, an identification of trade secrets. Ex. 3

11 (Hoarty Opening Rpt.) at ¶¶ 30-111. As to his identification of the first two trade secrets, he testified

12 that he copied and pasted them from the ITS—drafted by Plaintiff's attorneys. Ex. 4 (Hoarty 9/12 Tr.)

13 at 39:9-40:5, 65:23-67:11, 88:4-22. He recently testified that, in this case, he simply used the trade

14 secrets that were presented to him. Ex. 5 (Hoarty 10/7 Tr.) at 428:14-22.

15       **B.    Plaintiff Has Publicly Disclosed The Details Of Its Waste Metering Technology**

16       Compology—the company Plaintiff acquired—owns multiple patents and patent applications

17 on waste metering technology. For instance, U.S. Patent No. 10,943,356 (Dkt. 121-3), titled "Method

18 and System for Fill Level Determination," discloses *inter alia* "receiving a set training set, training a

19 neural network, selecting reference images, and/or determining a container fill level." *Id.* at Abstract.

20 Similarly, U.S. Patent Appl. No. 17/145,021 (Dkt. 121-18), titled "Method and System for

21 Contamination Assessment," discloses *inter alia* "receiving a set of images, sorting the images,

22 assessing the images, assessing container fill zones, assessing the container, and/or acting based on

23 the container assessment." *Id.* at Abstract.

24       Plaintiff's former and current employees have given public presentations and demonstrations

25 describing the detailed aspects of Plaintiff's sensors, including at least: (1) the MLconf presentation

26 by Justin Armstrong, Compology's Senior Backend Engineer (Dkt. 121-4); (2) the presentation and

27 public teardown at the December 2016 "Embedded Vision Alliance Member Meeting" by Ben

28 Chehebar, Compology's co-founder and CPO (Dkt. 121-5); and (3) the public CNN Business

interview of Jason Gates, Compology's co-founder and CEO (Dkt. 121-6). As detailed in Defendants' opposition to Plaintiff's renewed motion to seal (Dkt. 121), each of these public presentations reveals information alleged by Plaintiff to be trade secrets.

Plaintiff has supplied public information describing the technical details and features of its products through its own website and articles published on other websites. *See, e.g.*, Dkt. 34-1, Weinger Decl. Ex. A; Dkt. 53-1, Weinger Decl. Ex. 8; Dkt. 121-2, Galica Decl. Exs. 6, 9-12, 17-19, and 21-22. Compology's own website, "Compology Help Center,"[1] includes various articles providing detailed information regarding, *inter alia*, empty event detection, contamination detection, fill level determination, rightsizing recommendation, service detection. *See generally* Dkt. 121.

Plaintiff also made multiple FCC filings that reveal, *inter alia*, its sensors' internal and external photographs, chips, batteries, and circuit board layout. *See, e.g.*, Dkt. 34-1, Weinger Decl. Exs. B-G; Dkt. 53-1, Weinger Decl. Ex. 7; Dkt. 121-2, Galica Decl. Ex. 7; Dkt. 43 at 4-5 (noting that Compology's FCC filings "contain[] public images of the internal configuration of the cameras that RoadRunner submitted to the agency, which include readily identifiable chips, batteries, circuit board layout, and so forth").

C.      **Defendants Own Device and Derivative Data**

In 2017, Compology and RecycleSmart entered into an order form for Compology's sensor services, subject to the 2017 version of the Compology Terms and Conditions ("2017 Terms"). The 2017 Terms states: "Customer Data is and shall remain the sole and exclusive property of Customer," wherein "Customer Data" is defined as "the data collected, used, processed, stored, or generated as the result of Customer's use of the Services." Ex. 6 at § 8.1.

In November 2020, Compology and RecycleSmart entered into a renewal order form subject to the updated, 2020 version of the Compology Terms and Conditions ("Terms" or "2020 Terms," *i.e.*, Dkt. 29-1, Weinger Decl. Ex. B). The 2020 Terms again provides that "Customer owns all rights and title to any Device Data and Derivative Data." *Id.* at § 5.2; *see also id.* at § 1.9 (defining "Device Data" as "any data collected by Compology through the operation of a Device, including, but not

---

[1] Available at https://help.compology.com/en/ (last accessed October 10, 2024).

1  limited to, data relating to GPS location, container movement, and images"); *id.* at § 1.7 (defining

2  "Derivative Data" as any information or data resulting from the manipulation, processing or analysis

3  of Device Data based upon the operation of the Software, which processing may involve associated

4  databases, algorithms, external data, calculations and other processes").

5        Under both the 2017 Terms and 2020 Terms, therefore, RecycleSmart owns the Device Data

6  and Derivative Data, which cover both the images captured by Compology sensors in RecycleSmart's

7  containers and ***any*** data related thereto or derived therefrom.

8  **III.    LEGAL STANDARD**

9        "The court shall grant summary judgment if the movant shows that there is no genuine dispute

10  as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

11  A dispute is "genuine" only if there is sufficient evidence for a reasonable factfinder to find for the

12  non-moving party, and "material" only if the fact may affect the outcome of the case. *See Anderson*

13  *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "[M]ere disagreement or the bald assertion that

14  a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*,

15  877 F.2d 728, 731 (9th Cir. 1989); *see also Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081-82 (9th

16  Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary

17  judgment"). The nonmoving party "is entitled to the benefit of only reasonable inferences that may

18  be drawn from the evidence." *Ackerman v. W. Elec. Co.*, 860 F.2d 1514, 1520 (9th Cir. 1988).

19        A plaintiff seeking relief for misappropriation of trade secrets "must identify the trade secrets

20  and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d

21  511, 522 (9th Cir. 1993). "On an issue for which the opposing party will have the burden of proof at

22  trial, the moving party need only point out 'that there is an absence of evidence to support the non-

23  moving party's case.'" *Regents of Univ. of Cal. v. Dako N. Am., Inc.*, No. 05–03955 MHP, 2009 WL

24  1083446, at *5 (N.D. Cal. Apr. 22, 2009); *see also Celotex Corp. v. Cattrett*, 477 U.S. 317, 325 (1986)

25  (same). Once the moving party meets this burden, the opposing party cannot rest on the mere

26  allegation or denials of a pleading, but must "go beyond the pleadings and by [the party's] own

27  affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate

28  'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citing Fed.

1  R. Civ. P. 56(c)(1)(A)); *see also Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047,

2  1061 (9th Cir. 2011) ("To survive summary judgment, a plaintiff must set forth non-speculative

3  evidence of specific facts, not sweeping conclusory allegations."). "Summary judgment is, as some

4  courts have put it, the time to put up or shut up." *Wright v. Emps. Reins. Corp.*, No. C 04–03710 JW,

5  2005 WL 756618, at *8 (N.D. Cal. Mar. 31, 2005) (internal quotations and citation omitted).

6       "Courts have analyzed [the DTSA and CUSTA] claims together because the elements are

7  substantially similar." *InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir.

8  2020). Under both the DTSA and CUTSA, trade secrets are defined as information which must (1)

9  derive independent economic value, actual or potential, from not being generally known in the public

10  or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject

11  of efforts that are reasonable under the circumstances to maintain its secrecy. *See* 18 U.S.C. § 1839(3);

12  Cal. Civ. Code § 3426.1(d). To prevail on a trade secret misappropriation claim, "a plaintiff must

13  prove: (1) that the plaintiff possessed a trade secret[;] (2) that the defendant misappropriated the trade

14  secret; and (3) that the misappropriation caused or threatened damage to the plaintiff." *InteliClear*,

15  978 F.3d at 657-58 (citing 18 U.S.C. § 1839(5)); *see also Integral Dev. Corp. v. Tolat*, 675 F. App'x

16  700, 702 (9th Cir. 2017) (stating identical requirements under the CUTSA). "[J]udges in [this] district,

17  . . . faced with deficient disclosures under Section 2019.210[,] have routinely entertained defense

18  motions to defeat trade secret misappropriation claims after commencement of discovery," including

19  motions for summary judgment. *Swarmify, Inc. v. Cloudflare, Inc.*, No. C 17–06957 WHA, 2018 WL

20  2445515, at *2 (N.D. Cal. May 31, 2018) (collecting cases). Failure to demonstrate any of the above

21  essential trade secret elements suffice to warrant a summary judgment. *See, e.g., Chung v. Intellectsoft

22  Grp. Corp.*, No. 21-cv-03074-JST, 2024 WL 813445, at *9 (N.D. Cal. Feb. 12, 2024) (concluding

23  that "Plaintiffs cannot carry their ultimate burden of persuasion" and granting summary judgment,

24  without reaching other elements, when plaintiffs failed to describe trade secrets with particularity and

25  demonstrating independent economic value derived from secrecy).

26  **A.    Plaintiff Has Failed to Adequately Disclose Its Alleged Trade Secrets With the Required Reasonable Particularity**

27  The plaintiff "should describe the subject matter of the trade secret with sufficient particularity

28

1    to separate it from matters of general knowledge in the trade or of special knowledge of those persons

2    . . . skilled in the trade." *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164-65 (9th Cir. 1998)

3    (citations omitted). Summary judgment is warranted when plaintiff fails to identify its trade secrets

4    with particularity. *Id.* at 1166 (affirming summary judgment when plaintiff only provided general

5    statements such as "the manner of operation of the cam unit" and "the manner in which the cam unit

6    is lubricated" but failed to disclose particulars of alleged projection system); *see also, e.g.*, *Waymo*

7    *LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 5000352, at *7-10 (N.D. Cal. Nov. 2,

8    2017) (finding summary judgment proper as to an asserted trade secret as, *inter alia*, "it was

9    inadequately disclosed at the outset of this litigation"). To defeat a summary judgment, a plaintiff's

10   description "must do more than just identify a kind of technology and then invite the court to hunt

11   through the details in search of items meeting the statutory definition." *InteliClear*, 978 F.3d at 660.

12   But, that is precisely what Plaintiff has burdened Defendants and the Court with doing.

13        Unlike the ITS whose primary purpose may be such that the parties may "commence further

14   discovery," at this late stage of the case, Plaintiff must, but clearly fails to, meet its "higher substantive

15   burden of describing [its] trade secrets with 'sufficient particularity to separate it from matters of

16   general knowledge in the trade or of special knowledge of those persons skilled in the trade.'" *Chung*,

17   2024 WL 813445, at *8 (citing *Imax*, 152 F.3d at 1164); *see also* Dkt. 71 at 2 (ordering that Plaintiff

18   must "par[e] down [its] amended allegations during discovery"); Dkt. 93 at 3 (noting that Plaintiff's

19   ITS "may still be due for sacking").

20        As it stands, Plaintiff's apparent identification of trade secrets appears to be: (1) Plaintiff

21   counsel's October 8, 2024 correspondence listing the trade secrets it plans to marshal forward with,

22   (2) Mr. Hoarty's Opening Report, and (3) Plaintiff's ITS. *See generally* Ex. 7 (10/8 Letter from Joe

23   Mellema to Matthew Galica); Ex. 3 (Hoarty Opening Rpt.) at ¶¶ 30-111; Dkt. 47 (Ex. A) (ITS).

24   Notably, Plaintiff has not identified with specificity a single technical file, let alone specify which

25   portion(s) thereof may constitute its alleged trade secrets. *See, e.g.*, Ex. 8 (Plaintiff refusing to provide

26   any substantive responses to Defendants' fourth set of interrogatories, which requests, *e.g.*,

27   identification of files containing trade secrets); Ex. 3 (Hoarty Opening Rpt.) at ¶¶ 30-111 (failing to

28   identify or analyze any technical files in support of his alleged identification of trade secrets); *see*

1    *also, e.g.*, Dkt. 47 (ITS and Exhibits 1-17 thereto with multiple schematics and specifications but no

2    indication as to what part thereof might be trade secret); c*f. Waymo*, 2017 WL 5000352, at *7-8

3    (finding that even identification of a specific PCB schematic does not suffice, for it "included

4    hundreds of components and specifications with no clue as to what part thereof might be considered

5    trade secret"); *Integral Dev. Corp. v. Tolat*, No. C 12–06575 JSW, 2015 WL 674425, at *4 (N.D. Cal.

6    Feb. 12, 2015) ("[F]ailure to identify the specific source code files and the information within [the

7    allegedly copied source code] is fatal to [plaintiff's] claim."); *HotSpot Therapeutics, Inc. v. Nurix

8    Therapeutics, Inc.*, No. 22-cv-04109-TSH, 2023 WL 3259471, at *6 (N.D. Cal. Apr. 18, 2023) (even

9    if "a trade secret identification cannot be expected to list every document that contains them," a

10   combination of "a non-limiting list of documents with a meaningless description of the trade secret,"

11   which "says nothing more than 'solutions to a problem'" "does not serve to identify anything").

12       As discussed in further detail below, Plaintiff fails to identify any of its alleged trade secrets

13   with the required particularity.

### 1.  Plaintiff's Overall Waste Metering and Recycling Technology (ITS Trade Secret A / Hoarty Trade Secret No. 1)

16       Plaintiff has not identified, with particularity, what defines its "Overall Waste Metering" trade

17   secret. Mr. Hoarty, Plaintiff's technical expert, provided an opening report that states the alleged

18   overall waste metering trade secret encompasses "the overall know-how and design of its waste

19   metering system" which includes:

20       physical hardware components such as the camera system, optical assembly and
         design, firmware such as its image preprocessing techniques implemented in the
21       camera apparatus, training data, machine learning models, an AI system implementing
         the machine learning models, and algorithms and processes to generate data, analysis,
22       and recommendations to customers, including fullness, emptiness, contamination,
         schedules, data ingestion efficiencies, and location analysis of waste containers.

23   Ex. 3 (Hoarty Opening Rpt.) at ¶ 31. Mr. Hoarty then states that "[t]he combination of these hardware,

24   firmware, and software elements as implemented in a waste metering system is itself a trade secret."

25   *Id.* It is important to note, however, that Mr. Hoarty simply copied and pasted this description from

26   the attorneys who wrote Plaintiff's ITS. Ex. 4 (Hoarty 9/12 Tr.) at 39:9-40:5, 65:23-67:11, 88:4-22.

27   Mr. Hoarty admits that he did not independently identify any trade secrets—he just used the trade

28   secrets that were presented to him. Ex. 5 (Hoarty 10/7 Tr.) at 428:14-22. Either way, there are

1    numerous issues with Plaintiff's description that make it impossible for one to decipher what it alleges

2    constitutes its "overall waste metering system" trade secret.

3          First, Plaintiff's description of its "overall waste metering system" trade secret alludes to

4    "know-how and design," but Plaintiff cannot describe what that means. Ex. 9 (Longson Tr.) at 91:11-

5    94:21; Ex. 4 (Hoarty 9/12 Tr.) at 68:20-71:11. So, to the extent the "overall waste metering system"

6    trade secret is defined by Plaintiff's "know-how and design," it is impossible—even for its own

7    employees and hired expert—to understand.

8          Second, Plaintiff's ITS and Mr. Hoarty's opening report do not identify the same individual

9    trade secrets despite stating that the "overall waste metering system" trade secret is the combination

10   of all the trade secrets in Plaintiff's products. Specifically, Plaintiff's ITS includes the following trade

11   secrets within its "Overall Waste Metering System": "image preprocessing technique," "empty event

12   detection," "rightsizing recommendation generation," "post auto-balancing algorithm," "location

13   'soft-locking' technique," and "overall software system." Dkt. 47 (Ex. A) (ITS). Mr. Hoarty

14   jettisoned these trade secrets in his report, provides no analysis of them, and does not allege that

15   Defendants have misappropriated them. Ex. 4 (Hoarty 9/12 Tr.) at 33:7-36:16, 46:21-47:12, 48:11-

16   50:23. Problematically, Mr. Hoarty's "overall waste metering system" trade secret description ***still***

17   includes these trade secrets. Ex. 3 (Hoarty Opening Rpt.) at ¶ 31 ("Overall Waste Metering System"

18   trade secret still including "firmware such as its image preprocessing techniques implemented in the

19   camera apparatus," "and algorithms and processes to generate data, analysis, and recommendations

20   to customers, including . . . emptiness . . . schedules, data ingestion efficiencies, and location analysis

21   of waste containers"); Ex. 4 (Hoarty 9/12 Tr.) at 50:7-12. So, the problem becomes: Mr. Hoarty's

22   "overall waste metering system" trade secret includes numerous components he admits he has not

23   analyzed and does not allege Defendants have misappropriated. *Id.* at 33:7-36:16, 46:21-47:12, 48:11-

24   50:23. Accordingly, it is entirely unclear what Mr. Hoarty's "overall waste metering system" means

25   when it refers to "firmware such as [] image preprocessing techniques," "empty event detection,"

26   rightsizing recommendation generation," "post auto-balancing algorithm," "location 'soft-locking'

27   technique," and "software elements."

28         Third, Plaintiff's employee and expert cannot agree as to what the description of the "overall

waste metering system" trade secret means. Mr. Hoarty says the "overall waste metering system" is the same, single trade secret across Plaintiff's R11, R12, and R13. Ex. 4 (Hoarty 9/12 Tr.) at 44:17-23. This is a baffling statement given that the products are facially different, implement different components, and include different features. By way of quick examples: the R11 implements two stereo-vision cameras, whereas the R12 and R13 only implement a single camera (Ex. 9 (Longson Tr.) at 123:4-22, 125:11-17); the R13 includes a nanocoating on its lens, but the R11 and R12 do not (*id.* at 137:1-18), and all of the products have different fields of view (Ex. 4 (Hoarty 9/12 Tr.) at 45:10-13). How can products—that are different in so many ways—constitute the same trade secret? It is not clear from Mr. Hoarty's description. In fact, Plaintiff's Director of Hardware, Mr. Longson[2], could not understand what is meant by Mr. Hoarty's statements and says Plaintiff's "overall waste metering system" is ***not*** a trade secret. Ex. 9 (Longson Tr.) at 100:4-102:10; *see also* Ex. 10 (Greenspun Rebuttal Rpt.) at ¶¶ 23-42.

For these reasons, alone, Plaintiff's trade secret causes of action with respect to the "Overall Waste Metering System" trade secret should be dismissed.

## 2. Smart Camera Apparatus, (ITS Trade Secret B, B.2, B.3 / Hoarty Trade Secret No. 2)

Plaintiff has not described with particularity its "Smart Camera Apparatus" trade secret. Ex. 3 (Hoarty Opening Rpt.) at ¶¶ 36-62. Instead of refining its disclosure throughout the discovery period as urged by the Court, Mr. Hoarty's description is an enlargement of Plaintiff's original disclosure. Dkt. 47 (Ex. A) (ITS) at 5-11. In the ITS, Plaintiff included an identification of a "Smart Camera Apparatus" trade secret and three separate trade secrets in sub-sections titled "Optical Assembly and Design," "Low-Power Wireless Communication Module and Location Sensors," and "Power Subsystem and Design." *Id*. Instead of addressing the infirmities or clarifying the description of any one of those individual alleged trade secrets, it appears—but is not clear—that Mr. Hoarty just lumped the previously-separate trade secret descriptions of "Low-Power Wireless Communication and Location Sensors" or a "Power Subsystem and Design" into his "Smart Camera Apparatus" section.

---

[2] Mr. Longson was designated as a 30(b)(6) witness to testify on the "nature and identity" of Plaintiff's trade secrets. Plaintiff took the additional step of designating Mr. Longson as an ***expert*** on the "nature and identity" of Plaintiff's trade secrets.

1  *Compare* Ex. 3 (Hoarty Opening Rpt.) at ¶¶ 36-62 *with* Dkt. 47 (Ex. A) (ITS) at 5-11. Regardless,

2  extracting a single, coherent trade secret from Mr. Hoarty's description is simply not possible. When

3  asked bluntly if everything in paragraphs 36-62 of his report "need to be there" for the "smart camera

4  trade secret," Mr. Hoarty said "no, definitely not," but could not explain which portions do not need

5  to be there. Ex. 4 (Hoarty 9/12 Tr.) at 127:18-133:3. Defendants and the Court are left to guess what,

6  in Mr. Hoarty's report, actually describes the "Smart Camera Apparatus" trade secret.

7        But, Plaintiff's disclosure fails for a more fundamental reason before one even tries to

8  determine the substantive boundaries of Mr. Hoarty's "Smart Camera Apparatus" description.

9  Plaintiff's Lead Hardware Engineer and technical expert cannot agree on the most basic aspect of the

10  "smart camera apparatus" trade secret: how many different trade secrets is it? For his part, Mr. Hoarty

11  could not opine whether the smart camera apparatus is a separate trade secret for each of Plaintiff's

12  different sensors. *See, e.g.*, Ex. 4 (Hoarty 9/12 Tr.) at 88:23-89:20. In contrast, Mr. Longson is

13  unequivocal that each of Plaintiff's products embodies a different "smart camera apparatus" trade

14  secret. Ex. 9 (Longson Tr.) at 104:1-13. This makes sense, for example, because Compology's R11

15  device was a two-camera system deploying stereovision, whereas Compology's R12 and R13 devices

16  only employ one camera. It would not be credible to suggest that a two-camera, stereovision system

17  (R11) embodies the same trade secret as a single-camera system that does not utilize stereovision

18  (R12 and R13). Mr. Hoarty does not explain how or why Plaintiff's "Smart Camera Apparatus" trade

19  secret is different across each of Plaintiff's R11, R12, and R13 products. Defendants are left to guess

20  whether the "Smart Camera Apparatus" trade secret is one or more different trade secrets.

21        Beyond being unable to say how many trade secrets its "smart camera apparatus" actually

22  contains, Plaintiff's description of its "smart camera apparatus" trade secret(s) is/are hopelessly

23  ambiguous for another reason. Plaintiff includes (and Mr. Hoarty copies) one paragraph that clearly

24  lists a number of components that "Compology's smart camera apparatus trade secret includes."

25  Dkt. 47 (Ex. A) (ITS) at 7; Ex. 3 (Hoarty Opening Rpt.) at ¶ 46. At first glance, this appears to be the

26  only clear description of, at least, the general components Plaintiff alleges define the scope of its

27  "smart camera" trade secret(s). It is not, though. Mr. Hoarty admits that he cannot identify which of

28  the listed components actually define the scope of the "smart camera apparatus" trade secret. Ex. 4

(Hoarty 9/12 Tr.) at 89:21-90:20, 118:24-119:18. Worse, when Plaintiff's Lead Hardware Engineer examined the same list of components, he testified that he would "not call this the trade secret." Ex. 9 (Longson Tr.) at 104:14-105:2. Instead, he would call "all of those design files that we've provided in discovery" the trade secret. Ex. 9 (Longson Tr.) at 104:14-105:2. Neither Plaintiff nor Mr. Hoarty have identified any aspect of any design file that that defines any portion of the "Smart Camera Apparatus" trade secret, though. Ex. 4 (Hoarty 9/12 Tr.) at 119:24-120:5. In view of this, it's clear that Mr. Hoarty and Mr. Longson do not understand or cannot explain what is in or out of Plaintiff's "Smart Camera Apparatus" trade secret. Ex. 11 (Baker Rebuttal Rpt.) at ¶¶ 25-47. All anyone else can do is guess—which is precisely what Plaintiff asks Defendants and the Court to do.

The upshot is that Plaintiff has failed to establish (1) whether and how its "smart camera apparatus" trade secret differs across its products as Mr. Longson says it does, (2) what general components define the scope of its "smart camera apparatus" trade secret(s), and (3) what specific aspect of any design file defines the scope of its "smart camera apparatus" trade secret(s). These are table-stakes disclosures and Plaintiff failed to make them. For this reason alone, Plaintiff's trade secret causes of action with regard to the "Smart Camera Apparatus" trade secret should be dismissed.

### 3. Optical Assembly and Design (ITS Trade Secret B.1 / Hoarty Trade Secret No. 3)

Plaintiff has not described with particularity its "Optical Assembly and Design" trade secret. Ex. 3 (Hoarty Opening Rpt.) at ¶¶ 63-75. Reading Mr. Hoarty's description of Plaintiff's "optical assembly" trade secret provides no insight into what they actually are. *Id.* Instead of stating something along the lines of, "I believe Plaintiff's 'Optical Assembly' trade secret is . . . *this or that*," Mr. Hoarty's description only provides the '*this or that*' by way a meandering litany of high-level component specifications, marketing-level bluster, and references to elementary design considerations. In fact, Mr. Hoarty does not use the phrase "trade secret" anywhere in the section of his report purporting to define the "Optical Assembly and Design" trade secret. Reading paragraph 65 of his opening report is illustrative of Mr. Hoarty's inability to define a trade secret. Ex. 3 (Hoarty Opening Rpt.) at ¶ 65. It raises numerous questions: What does it mean to "optimize the captured images for use with Compology's machine learning models?" What specific, unique, and secret

1    design choice did Compology implement to achieve that? Does the trade secret require a "fixed-focus

2    lens?" What is the "optimal Field of View ("FOV")" and focal length?" Why does it matter that it is

3    in a "harsh/constrained" environment? Do the specific FOVs listed define the trade secret? There are

4    different FOVs listed, so are there different trade secrets based on each FOV? If not, what could

5    possibly be the significance or value of the FOV? Defendants sought answers to these questions but

6    Mr. Hoarty could not provide them. Ex. 4 (Hoarty 9/12 Tr.) at 158:14-164:6; Ex. 9 (Longson Tr.) at

7    126:19-130:6; *see also* Ex. 11 (Baker Rebuttal Rpt.) at ¶¶ 48-52.

8         Glaringly, Mr. Hoarty also cites to Exhibits 1-14. Ex. 3 (Hoarty Opening Rpt.) at ¶ 65. These

9    are design files. Does Mr. Hoarty point to specific hardware configurations or implementations that

10   tangibly define the trade secret? No—he fails to provide any analysis of them. Which begs the

11   question: why cite them? Defendants and the Court do not bear the burden of attempting to guess

12   whether they define a trade secret or not. *Waymo*, 2017 WL 5000352, at *7-8 (finding that even

13   identification of a specific PCB schematic does not suffice, for it "included hundreds of components

14   and specifications with no clue as to what part thereof might be considered trade secret"). Including

15   design files may have given Plaintiff's trade secrets the guise of complexity at the pleading stage of

16   this Case, but failing to suggest, much less identify, how they define the trade secret during discovery

17   renders them useless now. Ultimately, had Plaintiff relied on them, it would have had to demonstrate

18   Defendants accessed them—which it cannot. This places Plaintiff in between a rock and a hard place:

19   if it defines the trade secret with too much specificity, it cannot show that the trade secret was

20   misappropriated (Ex. 4 (Hoarty 9/12 Tr.) at 73:25-74:2), but if Plaintiff does not tangibly tie its trade

21   secret to a specific design file, it is left with the nebulous, amorphous, and ill-defined description it

22   has now, which does not entitle it to trade secret protection. Plaintiff has chosen the latter, and,

23   ultimately, paragraph 65 in Mr. Hoarty's opening report raises more questions than it answers.

24        The rest of Mr. Hoarty's description does not fare any better. For example, paragraph 74 of

25   Mr. Hoarty's report alludes to Plaintiff's inclusion of (1) specialized "window geometry" and (2)

26   "nanocoating" to "mitigate[] sources of debris." Ex. 3 (Hoarty Opening Rpt.) at ¶ 74. Do these

27   features define the trade secret? No, they cannot.

28        As for the "window geometry," Mr. Longson explained that it is different for all products, so,

1    again, it is unclear how Plaintiff can suggest its "optical assembly" design and resulting trade secret

2    are ***not*** different across all its products. Ex. 9 (Longson Tr.) at 126:19-130:6. This, again, places

3    Plaintiff in a tough spot: if the *specific* window geometry of each of Plaintiff's different products

4    defines the trade secret, a host of issues ensues: (1) Plaintiff has to concede there are multiple,

5    different trade secrets that they have failed to identify or describe and (2) Plaintiff would be unable

6    to show that Defendants use Plaintiff's *specific* geometry as Defendants' is demonstrably different.

7    So, Plaintiff's argument may be the alternative: the *general* act of using a "window geometry" is the

8    trade secret. Of course, the *general* idea of using a "window geometry," as opposed to a *specific*

9    "window geometry" design or configuration is not protectable as a trade secret. Ultimately,

10   Defendants and the Court cannot determine whether Plaintiff's "Optical Assembly and Design" trade

11   secret includes a specific "window geometry" or not. Either option is fatal to Plaintiff's allegations.

12          As for the nanocoating, Mr. Hoarty expounds on its significance. Ex. 3 (Hoarty Opening Rpt.)

13   at ¶ 74. He even includes an exhibit of Plaintiff's R12 device where he points to its inclusion of

14   nanocoating. *Id.* at ¶ 132. However, he is unaware that the R11 and R12 ***do not include nanocoating***.

15   Ex. 9 (Longson Tr.) at 137:1-18. As above, how can the R11, R12, and R13 define the same trade

16   secret—which Mr. Hoarty and Plaintiff state includes nanocoating—when the R11 and R12 ***do not***

17   ***include nanocoating***? Worse, how can Plaintiff and Mr. Hoarty allege that Defendants

18   misappropriated the nanocoating from a product (R12) that does not include it? These fundamental

19   issues are fatal to Plaintiff's and Mr. Hoarty's attempt to identify the "Optical Assembly and Design"

20   trade secret. As a result, Defendants and the Court cannot determine whether Plaintiff's "Optical

21   Assembly and Design" trade secret includes "nanocoating" or not.

22          These are but a few, basic examples that are fatal to Plaintiff's attempt to identify, with

23   requisite particularity, its "Optical Assembly and Design" trade secret. Having completed fact and

24   expert discovery, and especially in view of this Court's repeated guidance, it is unfathomable that

25   Plaintiff is still marshalling such ill-defined trade secrets and requiring Defendants and the Court to

26   undertake the burden of guessing what they are. For this reason, Plaintiff's trade secret causes of

27   action with respect to the "Optical Assembly and Design" trade secret should be dismissed.

28

### 4.    Training Data (ITS Trade Secret D / Hoarty Trade Secret No. 4)

Plaintiff has not described with particularity its "Training Data" trade secret. In effect, Mr. Hoarty's opinion boils down to the conclusory statement that "Compology's training data is a trade secret." Ex. 3 (Hoarty Opening Rpt.) at ¶¶ 78, 90. This conclusory statement does not sufficiently define Plaintiff's alleged "Training Data" trade secret as it fails to identify *what* in the training data qualifies for trade secret protection. Ex. 10 (Greenspun Rebuttal Rpt.) at ¶¶ 44-48. Moreover, Plaintiff has contradicted itself with its own filings, its ITS, and Mr. Hoarty's report. For example, Mr. Hoarty states that "Compology's *training data comprises* many millions of *labeled and tagged images*" and that "this is itself a trade secret." Ex. 3 (Hoarty Opening Rpt.) at ¶ 90. However, Plaintiff has already stated the opposite to the Court. Dkt. 61-2 at 15-16 (asserting that it "is *not* alleging that the *labeled and tagged images* are the *training data.*"). Plaintiff's ITS only adds more uncertainty. Dkt. 47 (Ex. A) (ITS) at 12 (stating that "[t]he training data includes *the processed images themselves* . . . *among others*" without specifying what "others" refers to here (emphases added)). Plaintiff's lack of consistencies begs the question of *what* "training data" Plaintiff alleges are at issue. Plaintiff cannot square this circle, and, again, Defendants and the Court should not be burdened with attempting to figure out what Plaintiff's allegations are at this stage of the case. For this reason alone, Plaintiff's trade secret causes of action with respect to the "Training Data" trade secret should be dismissed.

### 5.    Subpar Image Detection (SPID) (ITS Trade Secret E.1 / Hoarty Trade Secret No. 5)

Plaintiff has not identified with particularity its "Subpar Image Detection" trade secret. Ex. 3 (Hoarty Opening Rpt.) at ¶¶ 93-95; *see* Ex. 10 (Greenspun Rebuttal Rpt.) at ¶¶ 49-54. To start, Mr. Hoarty cites no source code that he alleges defines the trade secret. Ex. 3 (Hoarty Opening Rpt.) at ¶¶ 93-95. Instead, Paragraph 94 of Mr. Hoarty's report recites the general purpose of the SPID: "identify image problems." This description cannot be a trade secret. Worse, Mr. Hoarty's paragraph 94 is demonstrably inaccurate. Mr. Hoarty states that "[a]ll images are screened by SPID for certain problems that would make the images unable to deduce an accurate *fullness* or *contaminants* within

1    the normal image processing pipeline." *Id.* at ¶ 94. However, Mr. Armstrong[3], Plaintiff's Lead AI and

2    Algorithms Engineer, confirmed that the SPID is ***only*** used in conjunction with ***fullness***—not with

3    its contamination model. Ex. 12 (Armstrong Tr.) at 113:21-114:2. Paragraph 95 of Mr. Hoarty's report

4    goes on to recite how the SPID allegedly operates.

5         Two additional problems exist with this description, though.

6         First, when asked whether paragraph 95 defines the SPID trade secret, Mr. Hoarty states that

7    it is only "***part*** of a process of the trade secret." Ex. 4 (Hoarty 9/12 Tr.) at 180:8-24. But, he has never

8    defined what the ***other part*** is. In contrast, Mr. Armstrong states that the text on the page, nothing

9    more, ***does*** define the trade secret. Ex. 12 (Armstrong Tr.) at 110:22-113:4. Notwithstanding, and

10   underscoring Plaintiff's inability to identify what the "SPID" trade secret is, when questioned further

11   about the specific text on the page, Mr. Hoarty and Mr. Armstrong could not provide a harmonized,

12   coherent response that defines, with particularity, the "SPID" trade secret. *Compare* Ex. 4 (Hoarty

13   9/12 Tr.) at 179:5-180:24 *with* Ex. 12 (Armstrong Tr.) at 110:22-113:4, 114:12-117:1, 119:12-121:1.

14   The only thing clear is that Mr. Armstrong and Mr. Hoarty do not provide a consistent, particularized,

15   definition of Plaintiff's "SPID" trade secret. Worse, as shown in the deposition citations, neither of

16   them ***on their own*** can provide a consistent, particularized definition of Compology's "SPID" trade

17   secret. *Id.* Attempting to sift through Plaintiff's scattershot descriptions and piece together a

18   harmonized definition of the "SPID" trade secret is not possible, and it is also not Defendants' burden.

19   *See, e.g., MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993).

20        Second, Mr. Hoarty has tethered his identification of the "SPID" trade secret and his

21   understanding of its alleged economic value to his belief that Plaintiff's SPID is used in conjunction

22   with its ***contamination detection*** model. Ex. 4 (Hoarty 9/12 Tr.) at 231:14-25, 238:5-239:20. But, it

23   is not. Ex. 12 (Armstrong Tr.) at 113:21-114:2. It is only used in conjunction with Plaintiff's ***fullness***

24   model. *Id.* So, not only does Mr. Hoarty fail to identify Plaintiff's "SPID" trade secret, but he also

25   fails to understand how Plaintiff's "SPID" model actually works.

26

27

28   [3] Mr. Armstrong was designated as a 30(b)(6) witness to testify on the "nature and identity" of
     Plaintiff's trade secrets. Plaintiff took the additional step of designating Mr. Longson as an ***expert*** on
     the "nature and identity" of Plaintiff's trade secrets.

For this reason alone, Plaintiff's trade secret causes of action with respect to the "Subpar Image Detection" trade secret should be dismissed.

### 6. Contamination Detection/Content Identification (ITS Trade Secret E.3 / Hoarty Trade Secret Nos. 7)

Plaintiff has not identified with particularity its "Contamination Detection" trade secret. Ex. 3 (Hoarty Opening Rpt.) at ¶¶ 99-104; *see* Ex. 10 (Greenspun Rebuttal Rpt.) at ¶¶ 55-59. To start, Mr. Hoarty cites no source code that he alleges defines this trade secret. *Id.* Instead, Mr. Hoarty's report recites two high-level features of the "Contamination Detection" model: (1) the specific types of contamination it detects and (2) how it detects the specific types of contamination. Ex. 3 (Hoarty Opening Rpt.) at ¶¶ 100-101.

As to the first element, Mr. Hoarty states that "***the selection and combination of these seven kinds of potential contamination***, which balances potential harm with frequency of appearance in waste streams, ***is a trade secret***." Ex. 3 (Hoarty Opening Rpt.) at ¶ 100. So, it would appear the specific types of contamination define the trade secret, but not so fast. When questioned about this at his deposition, Mr. Hoarty's opinion changed over the course of four minutes.

| Mr. Hoarty's Opinion, 9/12/24 at 4:11 pm PT | Mr. Hoarty's Opinion, 9/12/24 at 4:15 pm PT |
| --- | --- |
| Q: Is the specific types of contamination detection that Compology's devices form part of the trade secret?<br><br>A: ***I would say yes***.<br><br>Ex. 4 (Hoarty 9/12 Tr.) at 181:13-16. | Q: Is the specific type of contamination that Compology's contamination detection model looks for part of the trade secret?<br><br>A: ***I would say no, it's not***.<br><br>Ex. 4 (Hoarty 9/12 Tr.) at 184:6-11. |

What are Defendants and the Court left to think in view of Mr. Hoarty's report and testimony? Are the specific types of contamination part of the trade secret or not? Plaintiff cannot answer the question, so it is entirely unclear what is in (or out of) the bounds of this trade secret.

As to the second element, Mr. Hoarty's recitation of the steps that he alleges define Plaintiff's "Contamination Detection" trade secret involves creating three, specific "box classes." Ex. 3 (Hoarty Opening Rpt.) at ¶ 101. The first two relate to ***specific contamination types***: "plastic bag and uncollapsed cardboard." *Id.* The third "box class" is for "anomaly" and "represents the five other very low-occurrence contaminants." *Id.* The problem, as explained above, is that no one knows whether

the specific types of contaminants are part of the trade secret. Without clarity on that, it is entirely unclear whether the steps Mr. Hoarty describes—which are dependent on the specific contamination types—define the trade secret. And if they do, how?

For this reason alone, Plaintiff's trade secret causes of action with respect to the "Contamination Detection" trade secret should be dismissed.

### 7.    Container Fullness Analysis (ITS Trade Secret E.2 / Hoarty Trade Secret No. 6)

Plaintiff has not identified with particularity its "Container Fullness" trade secret. Ex. 3 (Hoarty Opening Rpt.) at ¶¶ 105-108; *see* Ex. 10 (Greenspun Rebuttal Rpt.) at ¶¶ 60-65. To start, Mr. Hoarty states that he examined source code to understand Plaintiff's "Container Fullness" trade secret, but cites no source code. Ex. 3 (Hoarty Opening Rpt.) at ¶ 105-108. So, it is unclear what design files define this trade secret. Separately, Mr. Hoarty's trade secret description states that he "interviewed RoadRunner's engineers to understand ***how Compology trained its ML models associated with its fullness level ML model***." It is unclear, though, whether Mr. Hoarty believes the specific way "Compology trained its ML models associated with its fullness level ML mode" is part of the "Contamination Detection" trade secret. Ex. 4 (Hoarty 9/12 Tr.) at 184:12-185:7. To the extent it is, he has not described the specific way Compology trains its ML models associated with its fullness level ML model. Ex. 3 (Hoarty Opening Rpt.) at ¶¶ 105-108. For this reason alone, Plaintiff's trade secret causes of action with respect to the "Container Fullness" trade secret should be dismissed.

### B.    Plaintiff's Alleged Trade Secrets Are Public and/or Generally Known

Trade secrets are protectable only if the "owner thereof has taken reasonable measures to keep such information secret." 18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(b). It is well established that publicly known information, including information that is disclosed in a published patent or patent application, cannot be protectable as a trade secret. *See, e.g.*, *Hong Kong uCloudlink Network Tech. Ltd. v. Simo Holdings Inc.*, No. 18-CV-05031-EMC, 2019 WL 1767329, at *1 (N.D. Cal. Apr. 22, 2019); *SocialApps, LLC v. Zynga, Inc.*, No. 11 Civ. 4910, 2012 WL 381216, at *2 (N.D. Cal. Feb. 6, 2012) (striking trade secret allegations as they were publicly available on the plaintiff's website).

Plaintiff's renewed motion to seal (Dkt. 114) plainly concedes that most of its ITS is in fact

---

19

not confidential at all and necessarily does not identify any trade secret. As detailed in Defendants' opposition thereto (Dkt. 121), the remaining portions that Plaintiff sought to seal have also been publicly disclosed, through at least Plaintiff's patents and patent applications, its own public websites, its public FCC filings, its employees' various public presentations, and its own public filings.

Notably, Plaintiff's technical expert did not do anything to independently verify whether the alleged trade secrets in this case have been publicly disclosed. Ex. 4 (Hoarty 9/12 Tr.) at 92:12-98:6. As shown below, every aspect of all of Plaintiff's alleged trade secrets is public.

### 1.    Plaintiff's "Overall Waste Metering System" Is Public

Plaintiff's renewed motion to seal portions of its ITS (Dkt. 114-3) does not attempt to redact anything in its "Overall Waste Metering System" trade secret. Plaintiff concedes that it is—and has been—***entirely*** public. Plaintiff must admit this given the numerous, public disclosures it has made detailing each and every aspect of its products. *See, e.g.*, Section II.B, *supra.* For this reason alone, Plaintiff's trade secret causes of action with respect to its "Overall Waste Metering" trade secret should be dismissed.

### 2.    Plaintiff's "Smart Camera" Trade Secret Is Public

Plaintiff's renewed motion to seal (Dkt. 114-3) concedes that the vast majority of its "smart camera" trade secret is public. Of the approximately twenty components it says are included in its "smart camera" trade secret, Plaintiff now only alleges that one element is confidential. *Compare* Dkt. 114-3 at 7:6-14 *with* Ex. 3 (Hoarty Opening Rpt.) at ¶ 46. The single element that Plaintiff alleges is confidential in its "Smart Camera" trade secret is "████████." As explained in previous filings, Mr. Chehebar has already disclosed to the public that the surface of Plaintiff's products is designed to have "Reliability" against "UV Exposure." Dkt. 121 at 6:19-26. Accordingly, the last element of its "Smart Camera" trade secret that Plaintiff seeks to redact is already public. Because Plaintiff's "Smart Camera" trade secret is public, Plaintiff's trade secret causes of action with respect to its "Smart Camera" trade secret should be dismissed.

### 3.    Plaintiff's "Optical Assembly" Trade Secret Is Public

Plaintiff's renewed motion to seal its trade secret disclosures (Dkt. 114-3) concedes that the vast majority of its "Optical Assembly" trade secret is public. As explained in previous filings, the

1   remaining portions that Plaintiff attempts to redact are also public. Dkt. 121 at 7:1-10:15. But there

2   is a more important takeaway here: Plaintiff's cannot keep their story straight as to (1) what, in their

3   ITS, is confidential and entitled to redaction and (2) what actually defines their trade secret. The

4   thematic issue is encapsulated by its attempt to redact the specific Field of View ("FOV") its R12 and

5   R13 products implement. Dkt. 114-3 at 8:8. This seems to suggest the specific FOVs form the basis

6   of its "Optical Assembly" trade secret. But its expert has already said the specific FOV does not

7   matter and is ***not*** part of the trade secret. *See* Ex. 4 (Hoarty 9/12 Tr.) at 117:20-118:14 (stating that

8   there is no specific FOV defining Plaintiff's trade secret, and, instead, the camera just needs to "be

9   able to monitor contents of the bin, of the dumpster"); 161:12-17 (confirming that the trade secret

10  associated with Plaintiff's R12 device does not have a specific FOV).

11      The reason Plaintiff took this approach is that it knows Defendants' product uses a totally

12  different FOV. This illustrates the dilemma Plaintiff constantly finds itself in: on the one hand, if it

13  says that a specific FOV defines its "Optical Assembly" trade secret it will never be able to

14  demonstrate misappropriation. On the other hand, if it says, as Mr. Hoarty did, the FOV just needs to

15  be wide enough for the camera to take a picture of the waste container it is obviously public (and not

16  a trade secret). The public knows that Plaintiff's products include cameras that take pictures of the

17  inside of waste containers. Plaintiff's website shows the images that its products take. And, Plaintiff

18  has told the world it uses a wide-angle camera lens to take these pictures. Dkt. 121 at 7:1-16.

19      Ultimately, this has been Plaintiff's approach throughout the entirety of fact and expert

20  discovery: suggest their trade secrets are comprised of unique, specific technical details worthy of

21  trade secret protection so they survive the pleading stage, but when asked if those unique, specific

22  technical details actually define their "trade secrets" during depositions, say "no." Rinse and repeat.

23  It leaves Defendants and the Court helplessly unable to understand what Plaintiff's trade secrets are.

24  Where, as here, a plaintiff has "pointed to no evidence showing that any of the information in its . . .

25  trade secret identification . . . is 'not . . . generally known to the public,'" the Ninth Circuit has

26  affirmed a summary judgment in favor of the defendant. *Freeman Inv. Mgmt. Co., LLC v. Frank*

27  *Russel Co.*, 729 Fed. App'x 590, 591 (9th Cir. 2018). This is because the Ninth Circuit emphatically

28  "refuse[s] to do this work for [plaintiff]" or "'scour the record' in search of that information" showing

non-publicness. *Id.* at 591. Regardless, as best as Defendants can understand, everything that Plaintiff alleges defines its "Optically Assembly" trade secret has been publicly disclosed. Dkt. 121 at 7:1-10:15; Ex. 11 (Baker Rebuttal Report) at ¶¶ 58-74.

Because Plaintiff's "Optical Assembly" trade secret is public, Plaintiff's trade secret causes of action with respect to its "Optical Assembly" trade secret should be dismissed.

### 4. Plaintiff's "Training Data," "Subpar Image Detection," "Contamination Detection," and "Container Fullness Analysis" Trade Secrets Are Public

Plaintiff's own patents disclose its "Training Data," "Subpar Image Detection," "Contamination Detection," and "Container Fullness Analysis" trade secrets. Defendants' expert, Dr. Greenspun, mapped each of Plaintiff's alleged trade secret to specific portions of Plaintiff's patents in his opposition report. Ex. 10 (Greenspun Rebuttal Rpt.) at ¶¶ 97-100; *id.* at Ex. 1; Dkt. 121 at 13-19 (same). Plaintiff's only "rebuttal" is a conclusory, say-so assertion from Mr. Hoarty. Ex. 13 (Hoarty Reply Rpt.) at ¶ 24. Such *ipse dixit* falls far short of creating any genuine issue of material fact to defeat a summary judgment. *See, e.g.*, *Harper*, 877 F.2d at 731 (holding that "mere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment); *Cafasso*, 637 F.3d at 1061 ("To survive summary judgment, a plaintiff must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations."); *see also Nelson*, 83 F.3d at 1081-82; *Celotex*, 477 U.S. at 324; Fed. R. Civ. P. 56(c)(1)(A). Accordingly, Defendants have provided unrebutted expert testimony demonstrating that Plaintiff's alleged "Training Data," "Subpar Image Detection," "Contamination Detection," and "Container Fullness Analysis" trade secrets are entirely public in view of Plaintiff's own patents.

For this reason alone, Plaintiff's trade secret causes of action with respect to its "Training Data," "Subpar Image Detection," "Contamination Detection," and "Container Fullness Analysis" trade secrets should be dismissed.

### C. Plaintiff's "Training Data" Is Not a Trade Secret Because Defendants Own It

As a threshold issue, Plaintiff must own its alleged "Training Data" trade secret to argue its been misappropriated. "If a plaintiff cannot show possession, a district court need not reach misappropriation and damage." *See* Dkt. 43 at 3; *see also InteliClear*, 978 F.3d at 657 (same); *Eng'g*

*Network Int'l, Inc. v. Lucent Techs., Inc.*, 178 Fed. App'x 721, 722 (9th Cir. 2006) (affirming district court's summary judgment where plaintiff "has failed to demonstrate its ownership over the alleged trade secrets"). Plaintiff does not and cannot demonstrate ownership. Worse still, here, it is Defendants who own the "training data" at issue, *i.e.*, the images and data captured by the Compology sensors installed in Defendants' containers. *See, e.g.*, Section II.C, *supra*; Dkt. 29-1, Weinger Decl. Ex. B at § 5.2 ("Customer owns **all** rights and title to any Device Data and Derivative Data." (emphasis added)). Plaintiff's lack of ownership alone suffices to doom its "Training Data" trade secret claim. The Court need not look further.

What Plaintiff's "Training Data" trade secret claim ultimately amounts to is a nonsensical accusation that Defendants misappropriated their own property. As a matter of settled law and common sense, Defendants cannot misappropriate what they own. Both the DTSA and CUTSA define misappropriation as acquisition, disclose, or use of a trade secret "of another." 18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b)(1). In *Vista Int'l Ins. Brokers v. Bernstein*, the California Court of Appeals has addressed the exact same situation as here, where a contract expressly stipulates that the defendant own the alleged trade secret at issue:

> [The Superior Court] concluded that [plaintiff] was 'not likely to prevail in proving that defendant Bernstein misappropriated any trade secret.' Misappropriation inherently requires that the defendant improperly acquire, disclose, or use a trade secret **that is owned by another person**. Here, the contract indicated that [defendant] was the full owner of some client accounts and partial owner of other accounts. **[Defendant] cannot misappropriate a list of clients that she owns.**

Super. Ct. No. BC404320, 2015 WL 1383099 at *6 (Cal. Ct. App. Mar. 24, 2015) (internal citations omitted and emphasis added); *see also Celebrity Attractions, Inc. v. Okla. City Pub. Prop. Auth.*, 660 Fed. App'x 600, 606-607 (10th Cir. 2016) (finding that defendant could not have misappropriated certain customer information that plaintiff alleged were trade secrets because, per the controlling agreement between the parties, defendant owned the customer information at issue, and "[a]s an owner, **[defendant] can't be liable for utilizing information it owns**." (emphasis added)).

For this reason alone, Plaintiff's trade secret causes of action with respect to its "Training Data" trade secret should be dismissed.

### D. Plaintiff Has Failed to Show that Its Alleged Trade Secrets Derive Independent Economic Value

To prevail, a trade secret plaintiff must show that each of its alleged trade secrets derive independent economic value, actual or potential, from not being generally known in the public or to other persons who can obtain economic value from its disclosure or use. *See* 18 U.S.C. § 1839(3); Cal. Civ. Code § 3426.1(d). This element requires that "the information alleged to be a trade secret 'is valuable because it is unknown to others.'" *Altavion, Inc. v. Konica Minolta Sys. Lab'y, Inc.*, 226 Cal. App. 4th 26, 62 (Cal. Ct. App. 2014). Where a plaintiff fails to provide evidence that each alleged trade secret has such value, summary judgment is warranted. *See, e.g.*, *Direct Techs., LLC v. Elec. Arts, Inc.*, 836 F.3d 1059, 1071 (9th Cir. 2016) (affirming summary judgment where plaintiff failed to present "any evidence that there was value in the secrecy of its design.").

Neither Plaintiff nor Mr. Hoarty (nor anyone else for that matter) attempted to address the ***independent*** economic value of ***each***, ***separate*** trade secret. Mr. Hoarty testified that he did ***not***, in fact, attempt to identify the independent economic value of any, singular trade secret because that is the territory of Plaintiff's damages expert—Mr. Vickery. Ex. 4 (Hoarty 9/12 Tr.) at 59:10-60:2 (Mr. Hoarty explaining he did not attempt to identify the economic value of any trade secret because that is the territory of a damages expert, and confirming he did not speak to Plaintiff's damages expert); 186:18-187:20 (same); 188:18-190:3 (same). But, Mr. Vickery did not provide this analysis. *See generally* Ex. 14 (Vickery Opening Rpt.); Ex. 15 (Vickery Tr.) at 91:8-92:23, 93:13-17. Mr. Hoarty also confirmed that he cannot identify the independent economic value of any portion of any trade secret. Ex. 4 (Hoarty 9/12 Tr.) at 115:1-16. Finally, Mr. Armstrong cannot provide the value of any of the Plaintiff's machine learning model trade secrets either. Ex. 12 (Armstrong Tr.) at 121:2-20, 129:5-25, 141:19-142:6.

Plaintiff thus has provided no analysis of the independent economic value of any of its trade secrets. For this reason alone, all of Plaintiff's trade secret causes of action should be dismissed.

### IV. CONCLUSION

Fact and expert discovery revealed the following: (1) Plaintiff, its employees, and paid experts cannot agree on the identification of a single trade secret, (2) all of the technical features alluded to

1    as trade secrets are public, and (3) Plaintiff, its employees, and paid experts did not even attempt to

2    identify an independent economic value for any alleged trade secret or portion of an alleged trade

3    secret. For the foregoing reasons, Defendants respectfully request that the Court grant this Motion

4    and enter summary judgment against Plaintiff with regard to both of its trade secrets misappropriation

5    causes of actions.

6

7    Dated: October 10, 2024                      Respectfully Submitted,

8                                       /s/ *Matthew S. Galica*

9                                       Arameh Zargham O'Boyle (SBN: 239495)
                                          AZOboyle@mintz.com

10                                      MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND
                                          POPEO, P.C.

11                                      2049 Century Park East, Suite 300
                                     Los Angeles, CA 90067

12                                      Telephone:     (310) 586-3200
                                     Facsimile:      (310) 586-3202

13

14                                      James M. Wodarski (Admitted *Pro Hac Vice*)
                                     JWodarski@mintz.com

15                                      Michael C. Newman (Admitted *Pro Hac Vice*)
                                     MCNewman@mintz.com

16                                      Matthew S. Galica (Admitted *Pro Hac Vice*)
                                     MSGalica@mintz.com

17                                      James J. Thomson (Admitted *Pro Hac Vice*)
                                     JJThomson@mintz.com

18                                      Sean M. Casey (Admitted *Pro Hac Vice*)
                                     SMCasey@mintz.com

19                                      Tianyi Tan (Admitted *Pro Hac Vice*)
                                     TTan@mintz.com

20                                      Stephen Chen (Admitted *Pro Hac Vice*)
                                     SChen@mintz.com

21                                      Amy LoBue (Admitted *Pro Hac Vice*)
                                     ALoBue@mintz.com

22                                      MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, AND
                                          POPEO, P.C.

23                                      One Financial Center
                                     Boston, MA 02111

24                                      Telephone:     (617) 542-6000
                                     Facsimile:      (617) 542-2241

25                                      Attorneys for Defendants
                                     RECYCLE TRACK SYSTEMS, INC., and

26                                      RECYCLESMART SOLUTIONS INC.

27

28