# EXHIBIT AD-R

Case 3:23-cv-04804-WHA   Document 230-21   Filed 12/18/24   Page 2 of 14

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually 1 (1 to 4)
Conducted on August 15, 2024

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3             -----------------
 4
 5   ROADRUNNER RECYCLING, INC.,   )
                                   )
 6           Plaintiff,            )
     vs.                           ) Case No.
 7                                 ) 3:23-cv-04804-WHA
     RECYCLE TRACK SYSTEMS, INC.,  )
 8   and RECYCLESMART SOLUTIONS    )
     INC.,                         )
 9                                 )
             Defendants.           )
10   ---------------------------)
11
12           ATTORNEYS' EYES ONLY
13
     VIDEOTAPED DEPOSITION OF ROADRUNNER RECYCLING, INC.,
14      By and through its Designated Representative,
                  TIMOTHY JAY LONGSON,
15            and in his Individual Capacity
                  Thursday, August 15, 2024
16              San Francisco, California
17
18              9:32 a.m. PDT
19                  to
20              6:01 p.m. PDT
21
22
23   Stenographically Reported by:
     Burgundy B. Ryan, RPR,
24   CSR No. 11373
     Job No. 549087
25   Pages 1-232
```

**Page 2**

```
 1                A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4         JEFFER MANGELS BUTLER & MITCHELL LLP
           By:  JOSEPH J. MELLEMA, Esquire
 5         3 Park Plaza
           Suite 1100
 6         Irvine, California 92614
           949.623.7200
 7         jmellema@jmbm.com
 8   ON BEHALF OF THE DEFENDANT:
 9         MINTZ, LEVIN, COHN, FERRIS, GLOVSKY, and
           POPEO, P.C.
10         By:  MATHEW S. GALICA, Esquire
           One Financial Center
11         Boston, Massachusetts 02111
           617.542.6000
12         msgalica@mintz.com
13   ALSO PRESENT:
14         KEN LAUGUICO, Videographer
           Planet Depos
15
```

**Page 3**

```
 1                DEPOSITION SUPPORT INDEX
 2
 3   QUESTIONS INSTRUCTED NOT TO ANSWER:
 4   PAGE    LINE
 5   (None)
 6
 7
 8   REQUEST FOR PRODUCTION OF DOCUMENTS
 9   PAGE    LINE
10   (None)
11
12
13   STIPULATIONS
14   PAGE    LINE
15   (None)
16
17
18   QUESTIONS MARKED
19   PAGE    LINE
20   (None)
21
22
23            REPORTER'S NOTE:
24   QUOTATION MARKS ARE USED FOR CLARITY AND DO NOT
25   NECESSARILY REFLECT A DIRECT QUOTE.
```

**Page 4**

```
 1                   I N D E X
 2                                              PAGE
 3   EXAMINATION BY MR. GALICA................. 8
 4
 5               --o0o--
 6
 7             E X H I B I T S
 8   EXHIBIT      DESCRIPTION              PAGE
 9    323     30(b)(1) Deposition Notice    13
10    324     30(b)(6) Deposition Notice    14
11    325        Early Block Diagram        47
12    326     Identification of Trade Secret 79
13    327     Identification of Trade Secret 156
14    328        Unidentified Document      187
15    329        Security Measurements      188
16    330    Compology System Architecture  196
                     and Security
17
      331         Diagram of SC01           198
18               Bluetooth Communication
19    332         Compliance Document       202
20    333            FCC Submission         205
21    334            CeteCom Report         206
22    335    Compology Camera Installation  209
                         Guide
23
      336            FCC Submission         212
24
25
```

## Page 5

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| 337 | FCC Submission | 214 |
| 338 | FCC Submission | 215 |
| 339 | FCC Submission | 215 |
| 340 | FCC Submission | 216 |
| 341 | FCC Submission | 216 |
| 342 | FCC Submission | 219 |
| 343 | Block Diagram and Schematics | 220 |
| 344 | Schematic | 228 |

--o0o--

## Page 6

BE IT REMEMBERED that, pursuant to Notice of Taking Deposition, and on Thursday, August 15, 2024, commencing at 9:32 a.m. PDT thereof, at Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, 44 Montgomery Street, San Francisco, California, before me, Burgundy B. Ryan, a Certified Shorthand Reporter in and for the State of California, personally appeared

TIMOTHY JAY LONGSON,

a witness called on behalf of DEFENDANT, pursuant to all applicable sections of the Federal Rules of Civil Procedure, and who, having been first duly sworn by me to testify to the truth, was examined and testified as follows:

THE VIDEOGRAPHER: Here begins Media No. 1 in the videotaped deposition of Timothy Longson in the matter of RoadRunner Recycling Inc. vs. Recycle Track Systems Inc., et al, in the United States District Court, Northern District of California, Case No. 3:23-cv-04804-WHA.

Today's date is August 15th, 2024.

The time on the video monitor is 9:32.

The videographer today is Ken Lauguico, representing Planet Depos.

This video deposition is taking place at 44

## Page 7

Montgomery Street, 36th Floor, in San Francisco, California.

Would counsel please voice-identify themselves and state whom they represent?

MR. GALICA: Matthew Galica from Mintz Levin on behalf of the Defendant.

MR. MELLEMA: Joseph Mellema, Jeffer Mangels, on behalf of plaintiff RoadRunner Recycling Inc.

THE VIDEOGRAPHER: The court reporter today is Brooke Ryan, representing Planet Depos.

The witness will now be sworn.

(Whereupon, the witness was sworn.)

COURT REPORTER: Thank you very much.

Would you please state your name for the record?

THE WITNESS: My name is Timothy Jay Longson.

COURT REPORTER: Would you please spell it?

THE WITNESS: T-i-m-o-t-h-y J-a-y L-o-n-g-s-o-n.

COURT REPORTER: Thank you very much.

Counsel, you may proceed.

/////
/////

## Page 8

TIMOTHY JAY GALICA,

having been first duly sworn to tell the truth, testified as follows:

EXAMINATION

By MR. GALICA:

Q. Good morning.

A. Good morning.

Q. How are you?

A. Good.

Q. Do you go by Tim?

A. I go by Jay.

Q. Jay. All right, Jay. Where do you currently reside?

A. Okay. I currently reside in Sebastopol, California.

Q. Okay. Have you been deposed before?

A. No.

Q. Okay. So I'll just walk through some ground rules just so we're on the same page, if that's all right.

A. Yes.

Q. So as you know, today your testimony is being taken under oath as if it were going to be presented before a judge or jury.

Do you understand that?

Case 3:23-cv-04804-WHA   Document 230-21   Filed 12/18/24   Page 4 of 14
ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually    23 (89 to 92)
Conducted on August 15, 2024

**89**

1  software of any Compology or RoadRunner device?
2      MR. MELLEMA: Objection. Form.
3      THE WITNESS: By front-end software, are
4  you talking about the web app?
5  By MR. GALICA:
6      Q. Yes.
7      **A. I have not been involved in the development**
8  **of the web app.**
9      Q. Do you understand front-end software to
10 include anything beyond the web app?
11     **A. My understanding is front-end specifically**
12 **relates to the web app.**
13     Q. Okay. And you have not been involved in
14 the development related to that?
15     **A. Correct.**
16     Q. Okay. All right. I'll have you read
17 lines 23 -- starting on page 4, starting on line 23,
18 going over to line 5 on page 5. And let me know
19 when you're done.
20     **A. Where did you want to stop?**
21     Q. Line 5 on page 5.
22     **A. Okay. I'm done.**
23     Q. All right. So line 23, page 4 alludes to
24 overall know-how and design and then it lists a
25 number of aspects of Compology and RoadRunner

**90**

1  products.
2      Do you see that?
3      **A. Yes.**
4      Q. Okay. Can you describe the overall
5  know-how of Compology's waste metering system?
6      **A. My interpretation is this line is all of**
7  **the elements that go into make our product valuable**
8  **to our customers.**
9      Q. And what are all of those elements that
10 make the product valuable to your customers?
11     MR. MELLEMA: Objection. Form.
12     THE WITNESS: Well, this is not
13 comprehensive. I don't think I can comprehensively
14 list all of them, but it may include the physical
15 hardware components, such as the smart camera
16 apparatus, optical assembly and design, firmware,
17 such as image preprocessing techniques implemented
18 in the camera apparatus, training data, machine
19 learning models, an AI system implementing the
20 machine learning models, and algorithms and purposes
21 to generate data analysis and recommendations to
22 customers, including fullness, emptiness,
23 contamination schedules, data ingestion,
24 efficiencies, location analysis of waste
25 containers.

**91**

1  By MR. GALICA:
2      Q. So you're saying that's the trade secret?
3      MR. MELLEMA: Objection. Form.
4      THE WITNESS: I didn't say that.
5  By MR. GALICA:
6      Q. What is that then?
7      **A. I said -- well, I don't know. Maybe**
8  **somebody can read off what I said.**
9      Q. Are you done?
10     **A. I'm done.**
11     Q. Okay. So line 23, page 4, first phrase
12 says, "RoadRunner's trade secrets include the
13 overall know-how and design" and then it lists a
14 number of components; correct?
15     MR. MELLEMA: Objection. Form.
16     THE WITNESS: Are you asking me what's
17 written here?
18 By MR. GALICA:
19     Q. Do you understand what this document is
20 supposed to do?
21     MR. MELLEMA: Objection. Form.
22     THE WITNESS: Maybe you can tell me and
23 I'll tell you if that's congruent with my
24 understanding.
25 By MR. GALICA:

**92**

1      Q. Well, I'm asking the questions. Do you
2  understand what this document is supposed to do?
3      MR. MELLEMA: Same objection.
4      THE WITNESS: I believe so.
5  By MR. GALICA:
6      Q. What do you understand it to be?
7      **A. The plaintiff's identification of trade**
8  **secrets.**
9      Q. Okay. And then on line 23, page 4, you see
10 how it says, "RoadRunner's trade secrets include the
11 overall know-how and design of its waste metering
12 system"?
13     **A. Yes.**
14     Q. Okay. So what is -- can you explain what
15 the overall know-how and design is of the waste
16 metering system?
17     MR. MELLEMA: Objection. Form.
18     THE WITNESS: I don't understand what
19 you're trying to ask me.
20 By MR. GALICA:
21     Q. I'm trying to understand what your trade
22 secrets are, and in line 23 on page 4, it says they
23 include the overall know-how and design. Do you see
24 that?
25     So I'm trying to figure out what that

Case 3:23-cv-04804-WHA   Document 230-21   Filed 12/18/24   Page 5 of 14
ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually 24 (93 to 96)
Conducted on August 15, 2024

**Page 93**

1  overall know-how and design is.
2  **A. I think it relates to those things listed**
3  **underneath that line.**
4  Q. So that's what -- the overall know-how and
5  design is verbatim lines 23 on page 4 to lines 5 on
6  page 5?
7      MR. MELLEMA: Objection. Form.
8      THE WITNESS: I didn't write this, but I
9  believe that those are some of the included trade
10 secrets.
11 By MR. GALICA:
12 Q. What are other trade secrets?
13 **A. As I said, I don't have a comprehensive**
14 **list of all of the trade secrets, so I can't answer**
15 **that question.**
16 Q. This document is supposed to be that
17 list?
18 **A. I think this document --**
19     MR. MELLEMA: Hold on. Objection form.
20 By MR. GALICA:
21 Q. You can answer.
22 **A. My understanding is that this document**
23 **outlines trade secrets that relate to this case.**
24 Q. Right. And I'm asking you questions about
25 them.

**Page 94**

1      Do you understand that?
2  **A. Yes. I understand that.**
3  Q. Okay. So do you not know one way or
4  another what overall know-how and design, as used in
5  line 23 on page 4, means?
6      MR. MELLEMA: Objection. Form.
7      THE WITNESS: I understand my
8  interpretation of overall know-how and design.
9  By MR. GALICA:
10 Q. What's your interpretation of overall
11 know-how and design?
12     MR. MELLEMA: Objection. Form.
13     THE WITNESS: I believe it to mean all of
14 the information needed to create the system.
15 By MR. GALICA:
16 Q. And what is all of the information needed
17 to create the system?
18     MR. MELLEMA: Objection. Form.
19     THE WITNESS: I can't answer that. That's
20 literally a decade's worth of work that me and my
21 colleagues undertook.
22 By MR. GALICA:
23 Q. Can you name one thing?
24 **A. Yep. So in order to get very good GPS**
25 **reception,** [redacted]

**Page 95**

1  [redacted]
2  [redacted]
3  [redacted]
4  [redacted]
5  [redacted]
6  [redacted] **That's just one example.**
7  Q. Okay. Can you think of any others?
8  **A. I can think of probably hundreds.**
9  Q. Can you name another?
10 **A. Yeah. So, I mean, a big part of what**
11 **provides value to the system is that it's able to**
12 **withstand the harsh environments of a trash**
13 **container and live out in the field for multiple**
14 **years. So much of the work that we do is aimed at**
15 **making sure that the devices are rugged and that**
16 **they can withstand this environment, and we've spent**
17 **thousands of hours performing highly-accelerated**
18 **life cycle testing to ensure that our cameras can**
19 **withstand this harsh environment.**
20 Q. Okay. So are you saying that the trade
21 secret is the cameras can withstand harsh
22 environments or the design choices that you made
23 that allows them to withstand harsh environments?
24 **A. It's the design choices are the -- the**
25 **trade secret.**

**Page 96**

1  Q. Okay. So what are the design choices that
2  you made so that your products could withstand harsh
3  environments?
4  **A. There's many, as I said, but one example**
5  **could be the choice of materials used in the**
6  **housing.**
7  Q. Any others?
8  **A. The geometry of the housing.**
9  Q. And with respect to the materials chosen,
10 do all of the Compology and RoadRunner devices use
11 the same materials?
12     MR. MELLEMA: Objection. Form.
13     THE WITNESS: I don't remember all of the
14 materials we've used throughout all of the revisions
15 or versions of the camera.
16 By MR. GALICA:
17 Q. What about as between the R11 and R12?
18 **A. I believe both of the front housings for**
19 **those parts were polycarbonate.**
20 Q. Okay. Do they have the same shape?
21 **A. No.**
22 Q. So are those different trade secrets, one
23 for the R11 and one for the R12?
24 **A. There are certainly different trade secrets**
25 **within each version of the camera.**

**Page 97**

1  Q. Okay. So focusing on the one that
2  encompasses the design choices you made that enable
3  your products to withstand harsh environments, is
4  that a different trade secret for the R11 and the
5  R12?
6  A. I believe there are overlaps between the
7  two, but there may be specific design choices that
8  are different within those two that could be
9  considered trade secrets.
10  Q. So what are -- what's the overlap?
11  A. They have many features that overlap. One
12  example is that they both use polycarbonate as the
13  front housing.
14  Q. And what are the different trade secrets?
15  A. I would have to go and review the -- the
16  designs in order to try to come up with some list.
17  Q. So where -- yeah. Where is the information
18  defining these trade secrets located?
19  MR. MELLEMA: Objection. Form.
20  THE WITNESS: Can you give me a specific
21  trade secret that you're asking about?
22  By MR. GALICA:
23  Q. Yeah. The two we've just been talking
24  about, so the material and the shape.
25  MR. MELLEMA: Objection. Form.

**Page 98**

1  THE WITNESS: The materials and the shape
2  are defined in the technical drawings.
3  By MR. GALICA:
4  Q. Okay. Anywhere else?
5  A. That is the document of truth for the
6  material and shape.
7  Q. Okay. And so it's your position that
8  you've never disclosed the shape of your products to
9  the public?
10  A. I never said that.
11  Q. Well, you said it was a trade secret;
12  right?
13  A. I said that the shape helps with making
14  sure that it can survive harsh environments.
15  Q. And is that a trade secret?
16  A. I don't believe that the shape is a trade
17  secret. I'm sure there's elements within the
18  enclosure that are trade secret.
19  Q. And you've never shown the inside of your
20  enclosures to the public?
21  MR. MELLEMA: Objection. Form.
22  THE WITNESS: There are FCC filings that
23  include pictures of the inside of the devices.
24  By MR. GALICA:
25  Q. So you've shown them to the public then;

**Page 99**

1  correct?
2  MR. MELLEMA: Objection. Form.
3  THE WITNESS: As I said, there are some
4  images that show some portion of the inside of
5  the -- inside of the device that are public.
6  By MR. GALICA:
7  Q. So what -- what is the portion that isn't
8  shown to the public that's a trade secret?
9  A. I would have to review all of those
10  documents to be able to comment further.
11  Q. You don't know as you sit here right now?
12  A. No. I don't remember what specifically was
13  shown in the FCC filing.
14  Q. All right. If you could turn to page 5 and
15  read lines 7 through 11 and let me know when you're
16  done.
17  A. Okay. I'm done.
18  Q. Okay. So can you explain the unique
19  configuration of the parts in the smart camera
20  assembly, what that means?
21  A. I'm struggling to explain it any more
22  clearly than it's already stated here.
23  So unique, as in it doesn't exist
24  elsewhere. Configuration, like how they're
25  arranged.

**Page 100**

1  Is there something else you're looking for?
2  Q. Well, let me ask it a different way. So
3  for the -- strike that.
4  What's the overall waste metering system?
5  MR. MELLEMA: Objection. Form.
6  THE WITNESS: Yeah. That's too broad of a
7  question. I don't -- I can't -- I can't summarize
8  it in the time that we have here.
9  By MR. GALICA:
10  Q. What -- what are the high level components
11  of it?
12  A. I think at a high level, we're providing
13  insights to our customers from how their containers
14  fill up and what are the contents of those
15  containers.
16  Q. So using the phrase "overall waste metering
17  system", is that too broad of a phrase?
18  MR. MELLEMA: Objection. Form.
19  THE WITNESS: Too broad of a phrase for
20  what?
21  By MR. GALICA:
22  Q. For you to understand what the trade secret
23  is associated to that?
24  A. As I said before, I think there are many
25  trade secrets that are encompassed within that broad

Case 3:23-cv-04804-WHA   Document 230-21   Filed 12/18/24   Page 7 of 14

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually   26 (101 to 104)
Conducted on August 15, 2024

101

1  statement.
2  Q. So the overall waste metering system, that
3  itself is not a trade secret?
4  A. I think we have it listed as a trade secret
5  right there on line 22 of page 4.
6  Q. Okay. That's what I'm trying to
7  understand.
8     What is the overall waste metering system?
9     MR. MELLEMA: Objection. Form.
10    THE WITNESS: I think the overall waste
11 metering system encompasses many parts. This
12 includes the hardware, the software, the algorithms,
13 the labeled and trained data. There is many
14 elements.
15 By MR. GALICA:
16 Q. But it's that unique configuration of those
17 specific elements and how they're connected that
18 constitutes the trade secret; is that correct?
19    MR. MELLEMA: Objection. Form.
20    THE WITNESS: Can you rephrase the
21 question?
22 By MR. GALICA:
23 Q. What was unclear about it?
24 A. To be honest, I'm going around in circles.
25 I don't know what you're asking me.

102

1  Q. We share the same frustration.
2     Can you define, as you sit here right now,
3  what the trade secret is for your overall waste
4  metering system?
5  A. As I said, I think it encompasses multiple
6  trade secrets. I don't think it's one single trade
7  secret.
8  Q. So there is not one single trade secret for
9  your overall waste metering system; correct?
10 A. As far as I understand it, correct.
11 Q. Okay. If you could turn to page 7 and read
12 through lines 6 through 14. Let me know when you've
13 had a chance to review that.
14 A. I've read that paragraph.
15 Q. Okay. So do you understand that to mean
16 that there is a single trade secret for the smart
17 camera apparatus?
18 A. I believe this to be a -- a trade secret
19 that describes the overall apparatus but that does
20 not exclude the possibility that there are
21 additional trade secrets that are basically sub
22 elements of that.
23 Q. Okay. And just for the record, you're
24 reading line 6, "Compology's smart camera apparatus
25 trade secret includes", you -- you see the phrase

103

1  "trade secret" is in the singular form there?
2  A. Yes. But we also talk about the optical
3  assembly and design as a separate trade secret, but
4  that is part of the smart camera apparatus. That's
5  why I was saying there may be, basically, like, sub
6  trade secrets included within that overarching trade
7  secret.
8  Q. Well, just focusing on line 6 through 14 on
9  page 7, you would agree that that -- what's
10 described there is intended to be a single trade
11 secret; correct?
12 A. Yeah. By the use of singular versus
13 plural, that's what I'm lead to believe.
14 Q. Okay. And that trade secret includes
15 everything that's listed in lines 6 through 14;
16 correct?
17 A. Correct.
18 Q. What's the difference between the optical
19 assembly and the smart camera?
20 A. So as we've defined it, the optical
21 assembly includes a lens, an image sensor, a lens
22 mount, and a flash flex.
23 Q. I'm sorry. What was the last --
24 A. And a -- and a -- an FCP, a flexible
25 printed circuit board.

104

1  Q. Okay. And -- and going back to lines 6
2  through 14 on page 7, is the smart camera apparatus
3  the same in the R11 and R12 device?
4  A. No.
5  Q. Is it the same -- let me ask it a different
6  way.
7     Is the smart camera apparatus different for
8  the R11, R12 and R13?
9  A. Yes. I would call each of those a separate
10 smart camera.
11 Q. So would you also call each of those a
12 separate trade secret?
13 A. I believe so.
14 Q. And is the trade secret in line 6 through
15 14 just the fact that it includes these components,
16 or is it the specific components in the smart camera
17 of each device?
18    MR. MELLEMA: Objection. Form.
19    THE WITNESS: I believe this paragraph just
20 is -- is just listing some of the components but
21 that those do not constitute the trade secret.
22 By MR. GALICA:
23 Q. So this isn't the trade secret?
24    MR. MELLEMA: Objection. Form.
25    THE WITNESS: I think this describes at a

Case 3:23-cv-04804-WHA   Document 230-21   Filed 12/18/24   Page 8 of 14

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually
Conducted on August 15, 2024
27 (105 to 108)

---

**Page 105**

high level the trade secret, but I would not call this the trade secret.

By MR. GALICA:

Q. What would you call the trade secret?

A. **All of those design files that we've provided in discovery.**

Q. All of what design files?

A. **All of the design and know-how needed to build these smart camera apparatuses.**

Q. So you would need to have all of the design files for every single component listed here in each specific component, including all data sheets, to know what the trade secret is?

MR. MELLEMA: Objection. Form.

THE WITNESS: No.

By MR. GALICA:

Q. How is that incorrect?

A. **There are -- we have -- we're describing the camera apparatus as a trade secret, and that includes many design choices within that camera apparatus that are all -- that are all trade secrets, as in they're not public knowledge. So if someone were to reverse engineer our product and pick out any of those design choices that were not public knowledge, then they would be infringing upon**

**Page 106**

our trade secret.

Q. You said it would be all of the information in the design files that you provided; correct?

MR. MELLEMA: Objection. Form.

THE WITNESS: No, I did not say that.

By MR. GALICA:

Q. So then what -- what's the boundary? What's the scope of the trade secret?

A. **I think any of the privately-held design choices that we used in these cameras are within the overarching trade secret.**

Q. But we already established those 6 -- lines 6 through 14, that's one trade secret; right?

MR. MELLEMA: Objection. Form.

By MR. GALICA:

Q. So -- and you can't -- beyond what you've testified to today, you can't define the scope or boundary of the trade secret identified in lines 6 through 14?

MR. MELLEMA: Objection. Form.

THE WITNESS: I'm not sure if I can answer that question.

By MR. GALICA:

Q. Why can't you answer that question?

A. **Because I feel like this is an issue of**

**Page 107**

semantics, and I'm not trained as a lawyer to be able to differentiate the semantic differences between what you're trying to get at.

Q. You understand that RoadRunner's alleging that RecycleSmart has misappropriated trade secrets; right?

A. I do.

Q. Okay. That's not a matter of semantics; correct? That's what is going on; correct?

A. **Right.**

Q. Okay. And you, in line 6 through 14, on page 7 of your trade secret identification, you say that your trade secret includes, and then you list eight lines of technical description.

Do you see that?

A. **Yeah.**

Q. I'm trying to figure out what is the scope of that technical description defining your trade secret.

Do you understand that?

A. **How do you define scope in this context?**

Q. What does this mean? What is the scope and boundary of the trade secret information, line 6 through 14?

A. **So the physical camera, the smart camera**

**Page 108**

**apparatus that we designed and built, any aspect of that that's not public knowledge, that is the trade secret.**

Q. Is the battery pack public knowledge?

A. **No.**

Q. So you've never disclosed to the public what type of batteries you use?

A. **That's not what I said.**

Q. Have you disclosed to the public what type of batteries you used?

A. **I believe marketing has, yes.**

Q. Okay. So that's not a trade secret, then.

A. **The battery chemistry isn't, but the battery pack is.**

Q. Okay. And what is secret about the battery pack?

A. **There's a number of elements that we've included in that battery pack that make it into a pack, as opposed to just a single battery.**

Q. And what are those elements that you've included?

A. **We've included a [redacted]
[redacted]
[redacted]**

Q. And you've never disclosed a picture of

Case 3:23-cv-04804-WHA   Document 230-21   Filed 12/18/24   Page 9 of 14

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually   31 (121 to 124)
Conducted on August 15, 2024

121

1  20 on page 7 of Exhibit 326. Just let me know when
2  you get there.
3      A. Line 20, page 6?
4      Q. Page 7.
5      A. Yep. I'm here.
6      Q. Okay. So you see it says "optical assembly
7  and design"?
8      A. Uh-huh.
9      Q. Okay. Is there one trade secret for the
10 optical assembly and design?
11     A. I guess I don't know exactly what the legal
12 definition of the trade secret here is, but I think
13 this identifies pieces of it. Let me just read it.
14     Q. Sure.
15     A. Yeah. I guess from a legal perspective, I
16 don't -- I don't know whether there is one trade
17 secret or multiple trade secrets encompassed in
18 this, but...
19     Q. Did you have any conversations with your
20 counsel about the subject of your testimony during
21 lunch?
22     A. Yeah.
23     Q. You discussed the subject of your testimony
24 during lunch?
25     A. Oh, sorry. We just discussed generally

122

1  the -- the testimony and, you know, how things are
2  going.
3      Q. Okay. Nothing specific?
4      A. No.
5      Q. He didn't suggest how to answer questions
6  when you return from break?
7      A. No.
8      Q. Okay. I will turn your attention to lines
9  3 through 10 on page 8. Can you just give that a
10 read and let me know when you've had a chance to do
11 that?
12     A. Okay.
13     Q. Do you see line 4 -- end of line 3,
14 beginning of line 4, where it says, "over the course
15 of many years to optimize the captured images"?
16     A. Yes.
17     Q. How did you optimize the captured images
18 for the R11?
19     A. Well, a big piece was, you know, designing
20 the whole lens assembly, so making sure that we had
21 an adequate IR filter, adequate field of view, that
22 the image sensor had low light sensitivity. I'm
23 trying to think what else was important in those
24 design decisions.
25        R11 actually had two cameras, so two image

123

1  sensors, two lenses, et cetera, so we were working
2  at the time on doing stereo photography to assist
3  with the fullness evaluation.
4      Q. Okay. So -- excuse me. There were two
5  cameras with the R11, you said; correct?
6      A. Uh-huh.
7      Q. Did those have different fields of view?
8      A. No. In fact, when you're doing stereo
9  photography, you typically want those two cameras to
10 be similar; otherwise, you have to account for those
11 dissimilarities.
12     Q. Okay. So ideally you want them to be
13 identical; correct?
14     A. It really depends on what you're trying to
15 achieve. I can imagine a scenario in which if
16 you're only interested in stereo content within some
17 small range, that you might want one large field of
18 view camera to capture the entire contents and then
19 a smaller one to capture just the stereo information
20 in that small range. But for our purposes at the
21 time, we were interested in having two similar
22 cameras.
23     Q. And just to be clear, similar or identical?
24     A. These two cameras were identical short of
25 manufacturing tolerances.

124

1      Q. So within manufacturing tolerances, they
2  were designed to be identical?
3      A. There may have been slight differences in
4  the way they were mounted and/or the connectors that
5  they used, but I believe they were nearly identical.
6      Q. Okay. And you referred to stereo
7  functionality. Do you recall that?
8      A. Yes.
9      Q. What is a stereo camera?
10     A. A stereo camera is one that uses two image
11 sensors and lenses to generate a single composite
12 image with depth information included, like your
13 eyes. Your eyes are stereo.
14     Q. I didn't mean to cut you off.
15     A. Assuming you have two eyes.
16     Q. And are the image sensors used in a stereo
17 camera configuration specifically define -- designed
18 for that purpose?
19     A. Yes. I would recommend that. If you're
20 designing a stereo camera, then you should probably
21 consider how you're designing it.
22     Q. So there are image sensors that are
23 dedicated for use in stereo camera systems; is that
24 correct?
25     A. There are image sensors that allow you to

Case 3:23-cv-04804-WHA   Document 230-21   Filed 12/18/24   Page 10 of 14

ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually    32 (125 to 128)
Conducted on August 15, 2024

**Page 125**

1  synchronize the image capture so that both image
2  sensors capture an image simultaneously, at the
3  exact same time. However, we did not use such
4  synchronized image sensors for this product.
5      Q. So you didn't use ones that were specific
6  for stereo camera systems; correct?
7      A. That's correct. If -- if your contents
8  isn't changing very rapidly and you don't care about
9  that synchronization, then you can get away with
10 just a standard image sensor.
11     Q. Okay. Does the R12 incorporate a stereo
12 camera?
13     A. No. R12 had just one single lens and image
14 sensor.
15     Q. And is that true for the R13 and its
16 variants as well?
17     A. Yes.
18     Q. Okay. You previously said that you
19 designed it to have adequate IR. Do you recall
20 that?
21     A. I think I said ▮
22     Q. What is an ▮
23     A. It's a ▮
24 ▮
25     Q. And what is the amount adequate that ▮

**Page 126**

1  ▮
2      A. So if you don't -- ▮
3  ▮
4  ▮
5  ▮
6  ▮
7      Q. So you incorporated an ▮ to prevent
8  that from occurring?
9      A. That's correct.
10     Q. And did you design the ▮?
11     A. No.
12     Q. Who did?
13     A. I don't know the company for this specific
14 one. I would have to go and look at our
15 documentation.
16     Q. So you just purchased the part; correct?
17     A. Yeah, effectively. I'm -- I'm sure it was
18 not a relatively off-the-shelf part.
19     Q. In lines 5 to 6 on page 8, you state that
20 "the camera lens is a fixed focus lens."
21        Do you see that?
22     A. Yes.
23     Q. What does that mean?
24     A. That means it cannot dynamically change
25 focus. If it's a fixed focus, it has a single focus

**Page 127**

1  that's set at time of manufacturing.
2      Q. And did you set the focus?
3      A. I did. I set the focus in the design
4  specifications and then our manufacturer assembled
5  the parts to our specifications.
6      Q. And who assembled the parts?
7      A. We've used a few different camera module
8  vendors over the years. The one we're using
9  currently is called ▮
10     Q. And how do you set the focus on a camera
11 lens?
12     A. For these particular lenses, they have a
13 screw thread, which threads into a lens mount, and
14 the amount that you screw it down influences the
15 focus.
16     Q. And did you set the same focus for the
17 cameras in the R11, R12, and R13?
18     A. It's similar, but we've used different
19 lenses for different products, so there's some
20 variation between them.
21     Q. Okay. And is setting the focus, for
22 example, a trade secret?
23     A. I wouldn't characterize it as that, but I
24 suppose maybe somebody could.
25     Q. Why wouldn't you characterize it as that?

**Page 128**

1      A. It's not something that -- well, I think
2  because there's probably a variety of focuses that
3  would be acceptable, and so there's not a whole lot
4  of, kind of, ingenuity that went into that decision.
5      Q. And then reading, again, lines 5 and 6, it
6  says, "The camera lens is a fixed focus lens with an
7  optimal field of view and focal length."
8        Do you see that?
9      A. Uh-huh.
10     Q. What is the focal length for the R11?
11     A. I don't remember the specific focal length,
12 but it's around ▮
13     Q. And what is a focal length?
14     A. Focal length basically dictates where --
15 where the light convergences, like, how far away
16 from the lens the light is converging.
17     Q. Okay. And when you said that the focal
18 length for the R11 is around ▮, in what form of
19 measurement is that?
20     A. To be honest, I've forgotten the -- the
21 metric, but I think it's ▮          It's a --
22 yeah. I think it's in the ▮
23     Q. Okay. And is it different for the R12?
24     A. I'm sure it's subtlety different, but it's
25 probably pretty similar.

**129**

1  Q.  Okay.  Would you say the focal length is a
2  trade secret?
3  A.  I think -- as far as I know, the focal
4  length has never been shared with anyone else
5  publicly, so -- and it does derive value to us, so
6  you could characterize it that way.
7  Q.  What is the value that it derives to you?
8  A.  It allows us to capture images that are
9  appropriate for the -- both the environment that
10 we're in and the machine learning algorithms that
11 are analyzing those images.
12  Q.  Okay.  So you set the focal length, so --
13 based on the environment that you're in and the
14 machine learning algorithms that you are using;
15 correct?
16  A.  The focal length allows you -- I mean, the
17 focal length and field of view are similar and, kind
18 of, go hand-in-hand, but they -- they basically
19 dictate what you're able to capture, what -- what
20 the images look like.
21  Q.  And the focal length and field of view are
22 specific, though, to the R11, for example; correct?
23  A.  Each camera has a specific focal length and
24 field of view, that's correct.
25  Q.  Okay.  So a camera with a different field

**130**

1  of view and focal length would not be the trade
2  secret; correct?
3  A.  Yeah.  Again, I don't know exactly how the
4  law defines the trade secret in this case, but --
5  Q.  So you don't know one way or the other?
6  A.  No.
7  Q.  So -- okay.  Strike that.
8     Do you see further down lines 18 through 20
9  on page 8?  If you would just review that and let me
10 know when you've had a chance to.
11  A.  Yes.  I see that.
12  Q.  Okay.  Do you recall the different types of
13 lens assemblies that you experimented with for the
14 R11?
15  A.  Very generally.  I mean, I don't remember
16 specifics, but, yeah, we -- we worked with a number
17 of lens vendors to select an appropriate lens for
18 our application.
19  Q.  But -- but specifically the material;
20 correct?
21  A.  Yes.  So there was a -- I don't know when
22 we ▇▇▇▇▇▇▇▇▇▇.  I don't remember what
23 product that was, but we did find that ▇▇▇
24 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
25 ▇▇▇▇▇▇ which was problematic for both our human

**131**

1  and machine learning classification.
2  Q.  Why did you use ▇▇▇▇▇▇ in the
3  first place?
4  A.  Typically, lens vendors will include
5  ▇▇▇▇▇▇▇▇ to make the lenses cheaper.
6  Q.  So you didn't actually choose to use ▇
7  ▇▇▇▇▇▇  That was just a byproduct of the
8  component you purchased from a third party?
9  A.  We chose the component to meet other design
10 criteria, and it happened to be ▇▇▇▇▇▇▇▇ a
11 ▇▇▇▇▇, and we found that that was problematic and
12 we at some point shifted to ▇▇▇▇▇▇▇▇
13  Q.  Okay.  Is it uncommon for cameras to have
14 an ▇▇▇▇▇▇?
15  A.  For relatively inexpensive cameras, that is
16 uncommon.  For more expensive, like, you know,
17 DSLRs, for example, they're ▇▇▇▇▇.  You will
18 never see ▇▇▇▇▇▇▇ in a DSLR.
19  Q.  So if you just purchase a more expensive
20 component, you would get ▇; correct?
21     MR. MELLEMA:  Objection.  Form.
22     THE WITNESS:  I'm sure there's expensive
23 ▇▇▇▇▇, too.
24 By MR. GALICA:
25  Q.  Are you aware of any?

**132**

1  A.  No.  This is all speculation.
2  Q.  Okay.
3     MR. MELLEMA:  I keep thinking we're going
4  to get spied on over here.  It keeps turning on, and
5  the cameras look at us.
6     MR. GALICA:  Is that an ▇▇▇▇▇▇?  It
7  might be.
8     MR. MELLEMA:  It looks expensive.
9  By MR. GALICA:
10  Q.  I'm going to direct your attention to lines
11 7 through 19 on page 9.  If you could just read
12 through that and let me know when you've had a
13 chance to review it.
14  A.  I've read it.
15  Q.  So lines 16 and 17 reference a
16 nano-coating.  Do you see that?
17  A.  Yes.
18  Q.  And what is the purpose of the
19 ▇▇▇▇▇▇▇?
20  A.  To facilitate debris shutting.
21  Q.  Okay.  And do you believe that the
22 ▇▇▇▇▇▇ is a trade secret?
23  A.  I do.
24  Q.  What's the value of it?
25  A.  It prolongs the life of our cameras.

**133**

1  Q. Can you quantify that in a dollar amount?
2  A. I might be able to with some research, but
3  I can't off the top of my head.
4  Q. Does it provide any other benefits?
5  A. It may [redacted], but
6  I'm not 100 percent sure on that.
7  Q. Any other ones?
8  A. It may provide some [redacted], but,
9  again, I'm not sure about that.
10 Q. Okay. How would you quantify the value in
11 a dollar amount?
12 A. I would look at our fleet of cameras,
13 identify ones with and without the nano-coating, and
14 look at the failure rates over time due to optical
15 occlusions.
16 Q. And how would that provide a dollar amount?
17 A. So based on that distribution of time to
18 failure due to optical occlusions, you can assign a
19 dollar amount based on either the cost of a
20 technician to go out and clean that window or the
21 cost of replacing that camera.
22 Q. In the context of your overall product, how
23 valuable is the nano-coating?
24     MR. MELLEMA: Objection. Form.
25     THE WITNESS: Again, I don't know the exact

**134**

1  value. We would have to do a study to understand
2  that.
3  By MR. GALICA:
4  Q. Do you see lines 17 through 19 on page 9?
5  A. Yes.
6  Q. It says that, "The window geometry of the
7  camera assembly housing was recessed."
8     Do you see that?
9  A. Yes.
10 Q. What does that mean?
11 A. I think what we're getting at here is that
12 the -- the way in which the geometry is formed
13 minimizes trash from the container coming into
14 contact with the window.
15 Q. And what is the window?
16 A. The window is the area where we let light
17 in to the image sensor and lens.
18 Q. Okay. So is that visible from the outside
19 of your product?
20 A. Part of it is, yes.
21 Q. What part is?
22 A. The outside.
23 Q. And what part isn't?
24 A. The inside.
25 Q. And what is valuable about the inside of

**135**

1  the window geometry?
2  A. We often employ [redacted]
3  [redacted]
4  [redacted], so that's not visible and the
5  mounting of the camera inside is not visible.
6  Q. So -- and none of those relate to waste and
7  debris sliding off the camera; correct?
8  A. Somewhat. You can have increased light
9  pollution because there is debris on the lens -- or
10 on the window, so I wouldn't say that just as an
11 overarching blanket statement.
12 Q. Well, how does the internal geometry make
13 sure that waste and debris slide off?
14 A. Well, the internal geometry obviously
15 supports the outside geometry as well. You can't
16 just have one without the other.
17 Q. So what's unique about the internal
18 geometry so that it allows the external geometry to
19 have waste and debris slide off?
20 A. I would have to review the design drawings,
21 but I'm sure there's elements that are required in
22 order to provide the geometry that we have on the
23 outside.
24 Q. Can you think of any right now?
25 A. For example, these are injection molded

**136**

1  parts, and there's a number of design constraints
2  that you have to use in order to successfully
3  produce parts via injection molding.
4     So the specific geometry needs to allow
5  this giant metal tool that acts as your mold to be
6  able to separate and release those parts without
7  them, basically, sticking or staying adhered to that
8  tool.
9  Q. But you just need to do that in order to
10 make a product, though; correct?
11 A. Yeah. I mean, that is generally needed for
12 any injection molded part.
13 Q. Okay. So that isn't specific, though, to
14 the geometry that ensures that waste and debris
15 slide off; correct?
16 A. Well, I'm sure that there were specific
17 design choices made on the internal geometry to
18 accommodate the external geometry.
19 Q. Okay. Do you see line 26 on page 9?
20 A. Yes.
21 Q. Actually, I'm sorry. Let me -- let me back
22 up.
23    You said that the R11 includes a
24 nano-coating; correct?
25 A. I didn't say that, no.

---

137

1   Q. Does the R11 include a nano-coating?
2   A. No.
3   Q. Does the R12 include a nano-coating?
4   A. Actually, let me take a step back. R11 and
5  R12 both include ███████ which one could
6  potentially characterize as a nano-coating, but the
7  way in which we're describing nano-coating here is a
8  little bit different. So it's a separate coating
9  than the ███████ Neither R11 nor 12 had the
10 nanocoat.
11  Q. Okay. Does the R13 include a nano-coating?
12  A. Yes.
13  Q. All of its variants?
14  A. Yes.
15  Q. Okay. Does the R13 include the ███████?
16  A. Yes.
17  Q. All of the variants?
18  A. Yes.
19  Q. The window geometry is different for the
20 R11 and R12; correct?
21  A. Yes.
22  Q. And for the R13 and its variants?
23  A. Yes.
24  Q. Okay. All right. Going to line 26 on page
25 9.

138

1       "The low powerless -- power wireless
2  communication module and location sensors", do you
3  see that?
4   A. Yes.
5   Q. Is that a single trade secret?
6   A. Again, I don't know how these trade secrets
7  are being defined in the legal context. There were
8  many design choices that we made to optimize both of
9  those systems. I -- from my understanding of what
10 trade secret means, I think many of those design
11 choices could be considered a trade secret.
12  Q. Let's start with LTE Cat-M1. What is
13 that?
14  A. This is a variant of the LTE network that's
15 specifically targeting low power, low bandwidth
16 machine to machine or IoT devices.
17  Q. And was that used in the R11?
18  A. No.
19  Q. Was it used in the R12?
20  A. Yes.
21  Q. Okay. And, in fact, you've publicly
22 disclosed that that's been used; correct?
23  A. Yes. It's disclosed in the FCC filing.
24  Q. Okay. So just the fact that the R12 uses
25 LTE Cat-M1, you're not saying that's a trade secret;

139

1  right?
2   A. I don't believe that that would be
3  considered a trade secret based on the fact that
4  it's public knowledge.
5   Q. Okay. And what about GPS or GNSS? Let's
6  start with what are those?
7   A. GPS stands for global positioning system.
8  I have forgotten what GNSS stands for, but it's
9  basically the same thing. GPS is the United States
10 version of GNSS.
11      So other countries have deployed
12 satellites -- oh, it says right there, global
13 navigation satellite system.
14      So, for example, Europe has their own
15 variant of GPS and China has their own variant and
16 Russia has their own variant.
17  Q. And when you said "there it is right
18 there", are you referring to lines 19 and 20 on page
19 10?
20  A. Yeah. 19 defines GNSS, global navigation
21 satellite system.
22  Q. Okay. Did the R11 include GNSS and GPS
23 support?
24  A. Yes.
25  Q. Okay. And you're not alleging that the

140

1  fact that it includes GNSS and GPS capabilities,
2  that's a trade secret; right?
3   A. I don't believe so. I think those are both
4  public knowledge.
5   Q. If I could go back to lines 3 through 6 on
6  page 10. If you would just read that and let me
7  know when you have.
8   A. I've read that.
9   Q. So it says that "the RF performance must be
10 optimized."
11      Do you see that?
12  A. Yep.
13  Q. How did you optimize the RF performance in
14 the R11?
15  A. The methods used in the R11 are consistent
16 with the other devices. ███████████████████
17 ███████████████████████████████████████████
18 ███████████████████████████████████████████
19 ███████████████████████████████████████████
20 ███████████████████████████████████████████
21 ███████████████████████████████████████████
22 ███████████████████████████████████████████
23 ███████████████████████████████████████████
24 ███████████████████████████████████████████
25 ███████████████████████████████████████████

Case 3:23-cv-04804-WHA   Document 230-21   Filed 12/18/24   Page 14 of 14
ATTORNEYS' EYES ONLY
Transcript of Timothy Jay Longson, Corporate Designee & Individually 58 (229 to 232)
Conducted on August 15, 2024

**Page 229**

1  Q. Okay. Can you identify any trade secret in
2  this schematic?
3  A. No.
4  Q. Okay.
5  A. I believe this is part of the design for
6  R12, which, if not, should publicly could constitute
7  a trade secret.
8  Q. Then I'm going to direct your attention to
9  page RoadRunner 000000153.
10    Do you recognize that?
11  A. This looks like part of the schematic for
12  R13.
13  Q. Can you point to any trade secret in that
14  schematic?
15  A. Again, I can't point out specific trade
16  secrets, but this is part of the R13 camera, which,
17  if kept secret, could be considered a trade secret.
18  Q. Can you go to the previous page, so the
19  number ending 152?
20    Do you recognize this?
21  A. This is the system block diagram for R13.
22  Q. Can you point to a trade secret here?
23  A. Again, this is part of R13, overall camera
24  system. If kept confidential, it could be
25  considered a trade secret.

**Page 230**

1  Q. What aspects of it could be considered a
2  trade secret?
3  A. The overall design of the electronic
4  system.
5  Q. Anything beyond that?
6  A. I can't think of anything at this time.
7    MR. GALICA: Just note a few things. We
8  received a document production late last night, so
9  to the extent that anything in that document
10  production warrants further questioning, we're going
11  to reserve the right on that. I think there were a
12  few topics where the deponent witness was not
13  prepared to testify, and then we'd also request the
14  document that he said he prepared related to the
15  comparison of FCC or the Pello system and Compology
16  system.
17    With that said, I don't have further
18  questions right now.
19    MR. MELLEMA: What specific topics do you
20  contend he wasn't prepared for?
21    MR. GALICA: Sure. I think at a minimum,
22  in a non-exhaustive way, the time spent developing
23  each product.
24    MR. MELLEMA: Did you ask him about that?
25    MR. GALICA: Yeah, I did. He said he

**Page 231**

1  didn't know. The value ascribed to each trade
2  secret, the algorithms, and those are the ones that
3  immediately come to mind.
4    MR. MELLEMA: Okay. No questions for me.
5    MR. GALICA: All right.
6    THE VIDEOGRAPHER: Okay. This marks the
7  end of the deposition -- the deposition of Timothy
8  Longson. We are going off the record at 18:01.
9    (Proceedings concluded.)
10    ---o0o---

**Page 232**

1  CERTIFICATE OF STENOGRAPHIC REPORTER
2
3
4    I, BURGUNDY B. RYAN, a Certified Shorthand
5  Reporter, hereby certify that the witness in the
6  foregoing deposition,
7    TIMOTHY JAY LONGSON,
8  was by me duly sworn to tell the truth, the whole
9  truth, and nothing but the truth, in the
10  within-entitled cause; that said deposition was
11  taken at the time and place therein named; that the
12  testimony of said witness was stenographically
13  reported by me, a disinterested person, and was
14  thereafter transcribed into typewriting.
15    I further certify that I am not of counsel
16  or attorney for either or any of the parties to said
17  deposition, nor in any way interested in the outcome
18  of the cause named in said caption.
19
20    DATED: Wednesday, August 21, 2024.
21
22
23    Burgundy B. Ryan, CSR No. 11373, RPR