# EXHIBIT AF-R

ATTORNEYS' EYES ONLY

Transcript of Justin Armstrong, Corporate Designee & Individually    1 (1 to 4)

Conducted on August 22, 2024

**Page 1**

```
 1          UNITED STATES DISTRICT COURT
 2          NORTHERN DISTRICT OF CALIFORNIA
 3   - - - - - - - - - - - - - -x
 4   ROADRUNNER RECYCLING, INC.,   :
 5                Plaintiff,    :  No 3:23-cv-04804-WHA
 6   vs.                          :
 7                                :
 8   RECYCLE TRACK SYSTEMS, INC., :
 9   AND RECYCLESMART SOLUTIONS,
10   INC.,
11                Defendants.
12   - - - - - - - - - - - - - -x
13
14          ATTORNEYS' EYES ONLY
15   VIDEOTAPED DEPOSITION OF ROADRUNNER RECYCLING, INC.,
16     By and through its Designated Representative,
                  JUSTIN ARMSTRONG,
17          and in his Individual Capacity
                  Pittsburgh, PA
18          Thursday, August 22, 2024
                  9:34 a.m.
19
20
21   Job No.: 548736
22   Pages: 1 - 214
23   Reported By: Brooklyn E. Schweitzer
24          RPR, CRR, CA CSR
25
```

**Page 2**

```
 1          Videotaped Deposition of JUSTIN ARMSTRONG,
 2   conducted at the offices of:
 3
 4
 5          Hilton Garden Inn
 6          Pittsburgh University Place
 7          3454 Forbes Avenue
 8          Pittsburgh, PA 15213
 9
10
11          Pursuant to Notice, before Brooklyn E.
12   Schweitzer, Registered Professional Reporter,
13   Certified Realtime Reporter, Notary Public in and
14   for the Commonwealth of Pennsylvania, and California
15   CSR No. 14612.
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1          A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4       JOSEPH J. MELLEMA, ESQUIRE
 5       JEFFER MANGELS BUTLER & MITCHELL LLP
 6       3 Park Plaza, Suite 1100
 7       Irvine, California 92614
 8       Phone: (949)623-7200
 9       E-mail: Jmellema@jmbm.com
10
11
12   ON BEHALF OF THE DEFENDANTS:
13       MATTHEW S. GALICA, ESQUIRE
14       MINTZ, LEVIN, COHN, FERRIS, GLOVSKY
15       AND POPEO, P.C.
16       One Financial Center
17       Boston, Massachusetts 02111
18       Phone: (617)542-6000
19       E-mail: MSGalica@mintz.com
20
21
22
23
24
25
```

**Page 4**

```
 1          C O N T E N T S
 2   EXAMINATION                      PAGE
 3     By Mr. Galica                    8
 4
 5
 6          E X H I B I T S
 7   EXHIBIT                          PAGE
 8   Exhibit 345   Defendants' Amended 30(b)(1)
 9                 Notice of Deposition of Justin
10                 Armstrong                    42
11   Exhibit 346   Defendants' 30(b)(6) Notice
12                 of Deposition of Justin
13                 Armstrong                    42
14   Exhibit 347   6/11/18 Emails
15                 ROADRUNNER000016625 -
16                 ROADRUNNER000016631          43
17   Exhibit 348   Context Viewpoint - RTN Use of
18                 Compology Saas
19                 ROADRUNNER000064439
20   Exhibit 349   Architecture Diagram Key
21                 ROADRUNNER000072550          64
22   Exhibit 350   Plaintiff's Identification of
23                 Trade Secrets
24                 ROADRUNNER000000097 -
25                 ROADRUNNER000000118          65
```

Case 3:23-cv-04804-WHA   Document 230-23   Filed 12/18/24   Page 3 of 13

ATTORNEYS' EYES ONLY
Transcript of Justin Armstrong, Corporate Designee & Individually   2 (5 to 8)
Conducted on August 22, 2024

**Page 5**

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 351 | Locking a Container to as Service Location | |
| | RTS_00335593 - RTS_00335596 | 85 |
| Exhibit 352 | In-App Data Download | |
| | RTS_00335565 - RTS_00335568 | |
| Exhibit 353 | Fullness Notifications | 157 |
| | RTS_00335524 - RTS_00335528 | |
| Exhibit 354 | Contamination Notifications | |
| | RTS_00335704 - RTS_00335708 | 163 |
| Exhibit 355 | Rightsizing | |
| | RTS_00335903 - RTS_00335909 | 165 |
| Exhibit 356 | Web Data Collection Report Page Title: Rightsizing | |
| | RTS_00335894 - RTS_00335902 | 166 |
| Exhibit 357 | Web Data Collection Report Page Title: Contamination Notifications | |
| | RTS_00335697 - RTS_00335703 | 171 |
| Exhibit 358 | Web Data Collection Report Page Title: Fullness Notifications | |
| | RTS_00335517 - RTS_00335523 | 171 |

**Page 6**

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 359 | Web Data Collection Report Page Title: In-App Data Download | |
| | RTS_00335559 - RTS_00355564 | 171 |
| Exhibit 360 | Web Data Collection Report Page Title: Locking a Container to a Service Location | |
| | RTS_00335587 - RTS_00335592 | 172 |
| Exhibit 361 | Second Amended Complaint for (1) Trade Secret Misappropriation Under California Uniform Trade Secrets Act; (2) Trade Secret Misappropriation Under Defend Trade Secrets Act; and (3) Breach of Contract | 176 |
| Exhibit 362 | Compology API api.compology.com | |
| | ROADRUNNER000024629 - ROADRUNNER000024633 | |
| Exhibit 363 | Compology API | |
| | ROADRUNNER000024769 - ROADRUNNER000024775 | 191 |

**Page 7**

E X H I B I T S

| EXHIBIT | | PAGE |
|---|---|---|
| Exhibit 364 | U.S. Patent Application No. US 2020/0193620 A1 | |
| | RTS_00333112 - RTS_00333135 | 192 |
| Exhibit 365 | U.S. Patent Application No. US 10,943,356 B2 | |
| | RTS_00332217 - RTS_00332241 | 195 |
| Exhibit 366 | U.S. Patent Application No. US 2021/0158308 A1 | |
| | RTS_00333188 - RTS_00333209 | 199 |
| Exhibit 367 | Compology Waste Metering for Contamination Reduction | 204 |
| Exhibit 368 | Web Data Collection Report Page Title: Waste Metering Overview Presentation | |
| | RTS_00337209 - RTS_00337222 | 211 |

**Page 8**

P R O C E E D I N G S

VIDEOGRAPHER:  Here begins Media No. 1 in the videotaped deposition of Justin Armstrong in the matter of RoadRunner Recycle, Incorporated, versus Recycle Track Solutions, Incorporated, et al., in the United States District Court, Northern District of California, Case No. 3:23-CV-04804-WHA.

Today's date is August 22nd of 2024, and the time on the video monitor is 9:34 a.m.  The videographer today is Jacob Balistreri representing Planet Depos.  This video deposition is taking place at 3454 Forbes Avenue, Pittsburgh, PA 15213.

Would counsel please voice identify themselves and state whom they represent.

MR. GALICA:  Matthew Galica from Mintz Levin on behalf of Defendants.

MR. MELLEMA:  Joseph Mellema from Jeffer Mangels Butler and Mitchell on behalf of Plaintiff.

VIDEOGRAPHER:  The court reporter today is Brooklyn Schweitzer representing Planet Depos.  The witness will now be sworn.

JUSTIN ARMSTRONG, was called, and having been duly sworn, testified as follows:
EXAMINATION

ATTORNEYS' EYES ONLY

Transcript of Justin Armstrong, Corporate Designee & Individually    3 (9 to 12)
Conducted on August 22, 2024

---

**9**

1  BY MR. GALICA:
2     Q.  Good morning, Mr. Armstrong.  How are you?
3     **A.  I'm great.  How are you?**
4     Q.  Good, thank you.
5        Could you please state your full name for
6  the record and spell your last name?
7     **A.  Sure.  Justin Christopher Armstrong,**
8  **A-R-M-S-T-R-O-N-G.**
9     Q.  And where do you currently reside?
10    **A.  In Fort Lauderdale, Florida.**
11    Q.  Okay.  Could you provide an address,
12 please?
13    **A.  Sure.  It's 1826 North Dixie Highway,**
14 **Apartment 204, in Fort Lauderdale, Florida.  Postal**
15 **code, too?  Yes?**
16    Q.  Yes.
17    **A.  33305.**
18    Q.  Sorry.  I didn't know if it started with a
19 2.
20       Have you been deposed before?
21    **A.  I have not.**
22    Q.  So I'd like to run through some ground
23 rules to just make sure today goes as smoothly as
24 possible.  Is that okay?
25    **A.  Mm-hmm.**

---

**10**

1     Q.  Okay.  So, as you know, your testimony
2  today is under oath as if it was being taken before
3  a judge or jury.
4        Do you understand that?
5     **A.  Yes.**
6     Q.  Okay.  And ultimately your testimony may
7  be presented to a judge or jury as part of this
8  proceeding.
9        Do you understand that?
10    **A.  Yes.**
11    Q.  And because of that, it's important that
12 you testify truthfully and to the best of your
13 ability.
14       Do you understand that?
15    **A.  Yes.**
16    Q.  So throughout today, I'm going to be
17 asking you questions.  If you don't understand the
18 question, can you ask me to clarify it?
19    **A.  Yes.**
20    Q.  Okay.  If you do answer the question, I'll
21 assume that you understood my question.  Is that
22 fair?
23    **A.  Okay.**
24    Q.  If you need to take a break throughout the
25 day, just let me know.  All I'd ask is that if I

---

**11**

1  have a question pending, you answer that before we
2  go on break.
3        Is that okay?
4     **A.  Maybe.**
5     Q.  Okay.  Well, as part of the rules, I ask
6  that you answer a question if I have it pending.  Is
7  that fair?
8     **A.  If I can answer it.**
9     Q.  Okay.  You're doing a good job with it for
10 the most part, but because everything is being
11 recorded, it's important that you give verbal
12 answers as opposed to head nods or gestures.
13       Is that okay?
14    **A.  Yep.**
15    Q.  And then all I'd ask is that before -- you
16 let me finish my question before you start
17 answering.  Is that fair?
18    **A.  Sure.**
19    Q.  And then I'll let you answer the question
20 before I ask another one.  Is that okay?
21    **A.  Sure.**
22    Q.  Throughout your day -- throughout the day,
23 your attorney may object from time to time, but you
24 understand that you're still obligated to answer the
25 question unless specifically instructed not to by

---

**12**

1  your counsel.  Do you understand that?
2     **A.  Yes.**
3     Q.  Is there any reason you can't testify
4  fully and truthfully today?
5     **A.  Not that I know of.**
6     Q.  Okay.  Did you do anything to prepare for
7  today's deposition?
8     **A.  Yeah.  I met with Joe here several times.**
9     Q.  Okay.  When did those meetings take place?
10    **A.  One was yesterday, one was on the 12th of**
11 **August, I think, and one was a couple weeks before**
12 **that.  I don't remember the exact date.**
13    Q.  And was anybody else present at the
14 meeting yesterday?
15    **A.  No.**
16    Q.  Was anybody else present at the meeting on
17 the 12th?
18    **A.  Nope.  Hang on a second.  I'm trying to**
19 **remember -- no.  There was -- no.  No one else was.**
20    Q.  Was there anybody else present in the
21 meeting that took place prior to the 12th?
22    **A.  I don't remember, but I don't think so.  I**
23 **don't think.  Occasionally the other attorney, Stan,**
24 **is in the meetings, but I don't think he was there**
25 **for any of those.**

---

Case 3:23-cv-04804-WHA    Document 230-23    Filed 12/18/24    Page 5 of 13

ATTORNEYS' EYES ONLY
Transcript of Justin Armstrong, Corporate Designee & Individually    28 (109 to 112)
Conducted on August 22, 2024

109

1  so working hours of Compology employees were spent
2  developing this.
3       MR. MELLEMA: Objection to form.
4       A.  With this particular model, it was long
5  enough ago that I don't really remember how long I
6  spent on it, but it was typically several months of
7  work to get these up and running.
8       Q.  And was that full-time work?
9       A.  Yeah.
10      Q.  So you weren't working on any other models
11  during that time?
12      A.  During the time that I was working on this
13  model for several months, yeah, I wasn't working on
14  other models.
15      Q.  Okay.
16      MR. MELLEMA: Is now a good time for a
17  break? It's been about an hour. Maybe for lunch?
18      THE WITNESS: Sounds good to me.
19      MR. GALICA: Yeah, we can do that, then.
20      VIDEOGRAPHER: Okay. We are going off of
21  the record at 12:44 p.m.
22      (A recess was taken.)
23      VIDEOGRAPHER: We are going back on the
24  record at 1:34 p.m.
25  BY MR. GALICA:

110

1       Q.  You recall before lunch we were talking
2  about the subpar image detection model?
3       A.  Yeah.
4       Q.  It's on Page 15 of the document.
5       A.  Mm-hmm.
6       Q.  Can you identify the specific software
7  files that comprise this feature?
8       A.  Can you be more specific?
9       Q.  What is the model? Can you point to a
10  file that defines the model for this?
11      A.  Yeah. The model is stored in H5 file.
12      Q.  That's the type of file?
13      A.  Yeah.
14      Q.  Do you know the name of the file?
15      A.  It probably has a name like Breaking Dawn
16  or Superman 4 or something like that.
17      Q.  Okay. And where does the training data
18  used to train this model exist?
19      A.  In Compology, it exists in the Postgres
20  database, and the image values -- key value store,
21  S3.
22      Q.  Okay. And Lines 21 through 28 describe
23  the method used to perform subpar image detection?
24      MR. MELLEMA: Objection; form.
25      A.  Let me take a moment to --

111

1       Q.  Sure.
2       A.  You said 21 through 28?
3       Q.  Yep.
4       A.  I would say that that passage defines the
5  function of the SPID. But your question was
6  different, I think.
7       Q.  Well, are you saying that the function of
8  SPID is the trade secret or something else is?
9       A.  I think we're saying that the function --
10  the existence and the function of SPID are trade
11  secret.
12      Q.  Okay. So you don't believe that a feature
13  detecting usable or unusable images has ever been
14  disclosed to the public by you?
15      MR. MELLEMA: Objection to form.
16      A.  Excuse me.
17      I don't know if it has.
18      Q.  You don't know one way or another?
19      A.  I -- I don't know if that -- the existence
20  of that as a feature of Compology has been
21  disclosed. I also think that the way that you used
22  so or therefore or whatever it was in the phrasing
23  of your question connected it to the thing that you
24  said before, which is that the entire function of
25  the SPID, exactly what it does and exactly how it

112

1  works, is more than just the fact that something
2  exists that does that. I think one piece of
3  information is a subset of the other.
4       Q.  So what is the trade secret, then?
5       A.  I'm so sorry.
6       Q.  Take your time.
7       A.  Go ahead.
8       Q.  Yeah. So what is the trade secret, then?
9       MR. MELLEMA: Objection to form.
10      A.  So I understand that the trade secret is
11  everything that's described in this section.
12      Q.  Okay. And you would describe this -- how
13  would you describe the section?
14      MR. MELLEMA: Objection to form.
15      A.  I mean, do you want me to read it, or --
16      Q.  Is it just the text, that's the trade
17  secret, nothing beyond that?
18      A.  I don't really know. I mean, these are
19  kind of questions that seem like a lawyer should
20  answer. I could explain my understanding of how
21  trade secrets work again, but...
22      Q.  So you don't know one way or another?
23      A.  I -- you're asking do I know if the text
24  is the entirety of the trade secret?
25      Q.  Yeah.

ATTORNEYS' EYES ONLY

Transcript of Justin Armstrong, Corporate Designee & Individually    29 (113 to 116)

Conducted on August 22, 2024

113

1    A.  I don't know if that's true or not.
2    Q.  Okay.  You don't know one way or another?
3    A.  I think the text describes the trade
4  secret.  I think that's how you can say it.
5    Q.  And just what the text says here,
6  nothing -- nothing beyond that?
7         MR. MELLEMA:  Objection to form.
8    A.  I'm sorry.  I really don't understand what
9  you're asking.
10    Q.  Well --
11    A.  It seems like kind of an existential
12  question about what a trade secret is.
13    Q.  And you don't know what the trade secret
14  is, then --
15         MR. MELLEMA:  Objection --
16    Q.  -- is that correct?
17         MR. MELLEMA:  -- to form.
18    A.  I said that I don't know conceptually what
19  a trade secret is.  I know what this trade secret
20  is.
21    Q.  Okay.  What is this trade secret?
22    A.  This trade secret is the fact that we have
23  a system that detects subpar images and treats them
24  a specific way in terms of classifying why they're
25  not acceptable for use in fullness, and the fact

114

1  that that is deployed the way it is within the
2  system, I think -- I think that's the trade secret.
3    Q.  Okay.  So if there was another feature
4  that did something different than that, that
5  wouldn't be your trade secret, correct?
6         MR. MELLEMA:  Objection; form.
7    A.  So there are other trade secrets that are
8  at issue in the lawsuit, I think.
9    Q.  I'm just focusing on Lines 21 through 28.
10    A.  Okay.
11         MR. MELLEMA:  Same objection.
12    Q.  So you said the trade secret is the fact
13  that we have a system that detects subpar images and
14  treats them a specific way in terms of classifying
15  why they are not acceptable for use in fullness, and
16  the fact that that is deployed the way it is within
17  the system, that's the trade secret.
18         Do you recall saying that?
19    A.  Yeah.
20    Q.  Okay.  What's the specific way that the
21  images are classified in that previous answer you
22  gave?
23    A.  So there's four or five different modes of
24  failure that are really common in the waste industry
25  that we identified.  And so it determines which of

115

1  those modes the image belongs to.
2         So that's what I meant when I said
3  specific way.
4    Q.  Okay.  And if there were a feature that
5  didn't have those specific modes of classifying,
6  that wouldn't be your trade secret, right?
7         MR. MELLEMA:  Objection to form.
8    A.  If there were a feature?
9    Q.  Yeah.
10    A.  Like if there were a feature where --
11    Q.  I'm trying to understand if you're saying
12  that subpar image detection as a feature or concept
13  is the trade secret or the specific way in which you
14  perform subpar image detection is the trade secret?
15         MR. MELLEMA:  Objection to form.
16    A.  Yeah.  The way that you worded that is a
17  little confusing to me.
18         The way in which we do it could mean the
19  method of implementation, or it could also mean,
20  like, what I was saying about exactly what --
21  what is the classification that's being performed
22  there.
23    Q.  Okay.  Are you saying the method of
24  implementation is the trade secret?
25    A.  No, I don't think so.

116

1    Q.  Okay.  Are you saying that the specific
2  way in which classification is performed is the
3  trade secret?
4    A.  What do you mean by that?
5    Q.  I'm just going off of your previous
6  answer.
7         MR. MELLEMA:  Objection; form.
8    Q.  So you testified that there's a specific
9  way that classification is performed.
10         Do you recall saying that?
11    A.  Right.  I was referring to the different
12  buckets of images, the different modes of failure
13  that the images fall under.
14    Q.  Okay.  And is that the trade secret?
15    A.  It's part of the trade secret.
16    Q.  What else is part of the trade secret?
17    A.  The way --
18         MR. MELLEMA:  Objection; form.
19    A.  I -- so among the other things that are
20  parts of the trade secret are how -- the existence
21  or the idea of -- as I understand it, the idea of
22  having a system like that, the idea of having it
23  deployed at the head of the image classification
24  pipeline, and the way that it's integrated into the
25  rest of the pipeline, I would say are also elements

ATTORNEYS' EYES ONLY

Transcript of Justin Armstrong, Corporate Designee & Individually    30 (117 to 120)

Conducted on August 22, 2024

117

1  of the trade secret as I understand it.
2     Q.  Okay.  And would you agree that if it
3  isn't deployed at the head of the image
4  classification pipeline and is integrated into the
5  rest of the pipeline differently than the way you do
6  it, that would be a different trade secret --
7        MR. MELLEMA:  Objection.
8     Q.  -- right?
9     A.  No, I wouldn't agree.
10    Q.  Why not?
11    A.  I think it could still be basically the
12 same thing, but it could be the second step in the
13 classification pipeline, if there was a
14 classification pipeline.
15    Q.  And that's the same trade secret or a
16 different one?
17       MR. MELLEMA:  Objection; form.
18    A.  What is?
19    Q.  You just said it could still basically be
20 the same thing.  So it's the same trade secret if
21 it's implemented differently?
22    A.  I guess -- are we talking about your
23 client's system here?
24    Q.  I have only been talking about Lines 21
25 through 28 or Page 15.

118

1     A.  Yeah, but you're -- you're saying in a
2  hypothetical, right?  You're saying if something
3  else existed.  So can you be more concrete?  What
4  are we talking about there?  Are we talking about
5  somebody else built the same thing but it's a little
6  bit different?  Is that what you're asking?
7     Q.  I'm asking for -- if there's something
8  that is different than what's described in 21
9  through 28, is that a different trade secret?
10    A.  I'm just -- I'm really having trouble with
11 the way that you're phrasing this question.  As I
12 understand it, you can have a trade secret.
13 Somebody could make their own thing that they are
14 privy to your secret, it influenced their thing.
15 And their thing isn't in and of itself a trade
16 secret, but it was derived from your thing that was
17 a trade secret.  Right?
18       And so is your question this other thing,
19 is that a trade secret?  I don't think it is.  I
20 think it's something that was derived from a trade
21 secret.
22       I think that's what you're trying to ask,
23 but, again, I'm a little confused.
24    Q.  Okay.  Let me ask it a different way,
25 then.

119

1        Well, let me ask this:  The software that
2  defines the method described in Lines 21 through 28,
3  where does that reside?
4     A.  So the software that trains the model or
5  the software that -- can you be more specific?
6     Q.  Well, are you saying that the trade secret
7  is something different than the SPID model?
8     A.  I think that the concept of the SPID model
9  is part of the trade secret.  I think that the
10 specific function that the SPID serves is part of
11 the trade secret.
12    Q.  All right.  Let's do it line by line.
13       21 through 22, in operation, the SPID
14 receives a subject image and a reference image of
15 the same waste container.
16       What is the SPID in that sentence?
17       MR. MELLEMA:  Objection to form.
18    A.  SPID stands for subpar image detector.
19    Q.  Is that the model?
20    A.  It could be referring to the model or of
21 the system that uses the model.  I think in this
22 case we would say that it's referring to the entire
23 system that uses the SPID model.
24    Q.  And that's every component of the entire
25 Compology system?

120

1        MR. MELLEMA:  Objection; form.
2     A.  No, that's not what I meant.
3     Q.  Then what -- what components is it?
4     A.  The fact that it's integrated into the
5  Platform at a specific point in the image pipeline,
6  the micro service that's built around the model,
7  the -- yeah.  I'd say that's what's referred to as
8  the SPID in that sentence.
9     Q.  Okay.  And you see Lines 22 through 25?
10    A.  Okay.
11    Q.  Read through it, and let me know when
12 you're done.
13    A.  Yeah.
14    Q.  What makes the determination of a decision
15 on image quality?
16    A.  You're asking how the SPID makes a
17 determination?
18    Q.  Yeah.
19    A.  It uses a machine learning model.
20    Q.  Okay.  And how does it make a binary --
21 core determination of a binary confidence level?
22    A.  You know, I -- I don't remember off the
23 top of my head how the confidence level is
24 calculated.
25    Q.  What component performs that calculation?

Case 3:23-cv-04804-WHA    Document 230-23    Filed 12/18/24    Page 8 of 13

ATTORNEYS' EYES ONLY
Transcript of Justin Armstrong, Corporate Designee & Individually    31 (121 to 124)
Conducted on August 22, 2024

121

1    A.  The micro service around the model.
2    Q.  Okay.  What's the value of your subpar
3  image detection feature?
4          MR. MELLEMA:  Objection; form.
5    A.  I don't know.  I'm just an engineer.
6    Q.  Do you know the value of any of your
7  machine learning algorithms or processes?
8          MR. MELLEMA:  Objection to form.
9    A.  I don't think I -- I know how to assign --
10  you're talking about monetary value?
11    Q.  Do you assign any other type of value to
12  them?
13    A.  Well, I mean, yeah.  I think my work is
14  valuable.  I think qualitative value.  There's
15  also -- in the case of the SPID, there's specific --
16  like, specific ways that we avoid giving bad data to
17  customers, and I think there's value in that.  But
18  that's not necessarily monetary value.
19    Q.  Can you quantify it in a different way?
20    A.  I don't think I can quantify it.
21    Q.  Okay.  Turning to Page 16 and 17 of the
22  same document, you'll see there's a Subheading 2,
23  container fullness analysis.
24    A.  Mm-hmm.
25    Q.  And you see starting on Line 17 of Page 16

122

1  and then carrying over to Lines 18 of Page 17?
2    A.  Mm-hmm.
3    Q.  It talks about the operation of the
4  container fullness analysis?
5    A.  Mm-hmm.
6    Q.  Do you see that?
7       Is that an accurate description of how
8  container fullness analysis is performed?
9    A.  Yeah.  An inference mode.
10    Q.  What do you mean by an inference mode?
11    A.  Also, as we've discussed a couple of other
12  times, there's a -- there's multiple steps in
13  deploying a machine learning model.  So there's the
14  training portion, the evaluation, and then once the
15  model's finished training, then it's used for what
16  we call inference.
17       And so to me this passage that you pointed
18  me to here is describing the inference function.
19    Q.  Okay.  Did Compology have a container
20  fullness machine learning model prior to you
21  starting work at Compology?
22    A.  It did.
23    Q.  Okay.  Do you know who designed it?
24    A.  They were a consultant.  Yeah.  I mean,
25  designed and trained it.

123

1    Q.  Who was the consultant that designed and
2  trained it?
3    A.  I don't know.
4    Q.  Was it a single person or a company?
5    A.  I'm not sure.
6    Q.  Who would know?
7    A.  Probably Ben Chehebar.
8    Q.  Okay.  Do you know what model they used?
9    A.  They trained a custom model, I believe.
10    Q.  That they designed themselves?
11    A.  Yeah.
12    Q.  Do you still use that model?
13    A.  We don't.
14    Q.  Do you know how -- how many images it took
15  for the consultant to train that custom model?
16    A.  I don't.
17    Q.  Why don't you use that custom model
18  anymore?
19    A.  It wasn't very accurate.  And it was
20  actually two models:  one for front-load Dumpsters
21  and one for roll-off Dumpsters.  And it only
22  automated about 45 percent of the images, had a very
23  low throughput.  So the new one that we made to
24  replace it was better.
25    Q.  Okay.  What one did you use to replace it?

124

1    A.  I think we called it Drummer.
2    Q.  And was it two separate models:  one
3  for -- excuse me -- front-load and one for roll-off?
4    A.  No.  It was one that did both.
5    Q.  And is that how it's currently deployed
6  right now, just one model for both?
7    A.  One model, yeah.
8    Q.  Okay.
9    A.  We had a different model for trailers, but
10  that's separate from Dumpsters.
11    Q.  Okay.  And is that in connection with your
12  work with SkyBitz?
13    A.  SkyBitz is the big trailer customer of
14  Compology, yeah.
15    Q.  Okay.  But that doesn't have anything to
16  do with waste management, correct?
17    A.  Yeah.  I guess not really.
18    Q.  Okay.  Do you have any other models to
19  assess fullness levels in waste containers?
20    A.  No --
21    Q.  Beyond Drummer, sorry.
22    A.  So Drummer was the one that I replaced --
23  the model that pre-dated me, I replaced with
24  Drummer, but there have been several subsequent
25  models.  The current one is called Foongus, like the

ATTORNEYS' EYES ONLY
Transcript of Justin Armstrong, Corporate Designee & Individually    32 (125 to 128)
Conducted on August 22, 2024

---

125

1  Pokemon.
2      Q.  And are all the subsequent models based on
3  Drummer?
4      A.  No, I don't -- I don't think you would say
5  that they're based on it.  They're based on the
6  training data.
7      Q.  Are they different model architectures?
8      A.  Yes.
9      Q.  Okay.  Can you walk through all of them
10 and identify the model architecture you used?
11         MR. MELLEMA:  Objection; form.
12     A.  I can't really off the top of my head
13 remember exactly what the details of each model's
14 architecture were.  I could look through source code
15 repositories and find out.
16         But they -- they use the same basic
17 constituent components in different combinations and
18 sizes.
19     Q.  And were those open source components?
20     A.  The framework is open source, but I think
21 it's more accurate to say that it's implemented in
22 an open source library.
23     Q.  Okay.  And what open source library did
24 you implement it in?
25     A.  TensorFlow.

---

126

1      Q.  Do you implement all of your machine
2  learning models in TensorFlow?
3      A.  All of the deep learning machine models,
4  yes.
5      Q.  Okay.  What is different about the
6  constituent components across the different sets of
7  models that you use to determine fullness analysis
8  -- fullness levels?
9          MR. MELLEMA:  Objection; form.
10     A.  They have slightly varying architectures.
11     Q.  In what -- sorry.
12     A.  Each model -- I would say generally each
13 version of the model got a little bit bigger in
14 terms of having more trainable parameters, more
15 weights and biases.  Sometimes additional layers as
16 well.
17     Q.  Why do you use the TensorFlow library as a
18 framework for your machine learning models?
19         MR. MELLEMA:  Objection; form.
20     A.  You can use any library and still get a
21 good model if you have good enough training data.
22 They basically do the same thing.  The two that are
23 most popularly used are PyTorch and TensorFlow, and
24 we chose to use TensorFlow.  That's just -- at the
25 time, PyTorch was kind of immature, I believe, and

---

127

1  we just stuck with TensorFlow because it makes it
2  easier if everything's just in the same system, same
3  style.
4      Q.  So you didn't try to find a model that
5  would work with fewer and lower quality images?
6          MR. MELLEMA:  Objection; form.
7      A.  Are you referring to trying to get a,
8  like, pre-trained model as opposed to training our
9  own?
10     Q.  Yeah.
11     A.  There have been a few times that we've
12 tried -- not with fullness -- to use pre-trained,
13 publicly available models to see if they were
14 helpful, but they weren't.
15     Q.  Which ones did you try?
16     A.  I tried the Google BoundingBox service,
17 which I assume is based on a model.  They don't
18 really tell you.  I tried to do that for
19 contamination at one point.
20     Q.  Did you try to do it for any other models?
21     A.  Let me think about that.  I don't think
22 so.  I think really the only attempt at pre-trained
23 models was an attempt for contamination.
24     Q.  Okay.  And for every other model you
25 started with an untrained model?

---

128

1          MR. MELLEMA:  Objection; form.
2      A.  For all the other machine learning
3  models -- sorry, deep learning models, I've trained
4  them from scratch or from -- sometimes you go
5  through various phases of training.  So sometimes I
6  would use a model that was pre-trained to do a
7  specific task, and then used some of the weights
8  from that model in conjunction with new, random
9  weights.  We call that transfer learning.
10     Q.  For what models did you do that?
11     A.  Definitely for the content ID model.
12 That's necessary.  I think that that was used in the
13 SPID at one point, but I don't -- I don't
14 specifically remember the process that I went
15 through for every model.  You know, it's basically
16 you try things until you find something that works.
17     Q.  So you can't think of any other models
18 where you used transfer learning?
19     A.  I can't.
20     Q.  And everything else would have been using
21 an untrained model in the first instance, correct?
22     A.  Using an untrained model meaning starting
23 with uninitialized random weights --
24     Q.  Yeah.
25     A.  -- and then training from there?  Yeah.

---

Case 3:23-cv-04804-WHA   Document 230-23   Filed 12/18/24   Page 10 of 13
ATTORNEYS' EYES ONLY
Transcript of Justin Armstrong, Corporate Designee & Individually   33 (129 to 132)
Conducted on August 22, 2024

**129**

1    Q.  Okay.  Do you believe it's public
2  knowledge that Compology offers a container fullness
3  analysis feature?
4    **A.  I do.**
5    Q.  Okay.  Do you know the value of your
6  container fullness feature?
7        MR. MELLEMA:  Objection; form.
8    **A.  I don't really know what its value is.**
9    Q.  Maybe we can just zero this out:  Do you
10  know the value of any of the machine learning
11  models?
12        MR. MELLEMA:  Objection; form.
13    **A.  Monetary value is what you're asking?**
14    Q.  Let's start with monetary value.
15    **A.  I don't know what the monetary value is of**
16  **that, no.**
17    Q.  Do you know of any other value assigned to
18  any machine learning model?
19        MR. MELLEMA:  Objection; form.
20    **A.  I mean, all of the machine learning models**
21  **serve a purpose in the end to make the customers**
22  **happy.  So...**
23    Q.  Can you quantify that for any machine
24  learning model?
25    **A.  I can't.**

**130**

1    Q.  Okay.  And then just going back to Lines
2  17 on Page 16 to 16 on Page 17 --
3        MR. MELLEMA:  16, 17; 17, 16?
4        MR. GALICA:  Other way around, 17, 16; 16,
5  17.
6        THE WITNESS:  Okay.
7  BY MR. GALICA:
8    Q.  Does that describe the container fullness
9  analysis that's performed in inference mode?
10    **A.  Yes.**
11    Q.  Okay.  And that involves the model
12  receiving a subject and reference image to start,
13  correct?
14    **A.  Right.  Those are the inputs into the**
15  **model.**
16    Q.  Okay.  And then the model determines the
17  estimated fullness with a binary confidence level?
18    **A.  Yes.  For the -- it's determined from the**
19  **output of the model.**
20    Q.  Okay.  Do you believe that that process is
21  confidential?
22    **A.  I believe that the entire process here has**
23  **confidential elements to it.**
24    Q.  What are the confidential elements?
25    **A.  The fact that we use the confidence level**

**131**

1  **specifically and that that's a decision point for**
2  **whether or not to involve human -- human review of**
3  **the image, as far as I know, is confidential.**
4        **The fact that -- yeah.  I guess I would**
5  **say that that's confidential, yeah.**
6    Q.  Okay.  So turning to Subheading 3 on Page
7  17 titled "contamination detection/content
8  identification core classifier."
9        Do you see that?
10    **A.  Mm-hmm.**
11    Q.  Okay.  And this is describing the
12  contamination machine learning model?
13    **A.  Mm-hmm.**
14    Q.  Is that fair to say?  Okay.
15        And it says that -- well, strike that.
16        Did a model for contamination detection
17  exist prior to you being employed by Compology?
18        MR. MELLEMA:  Objection; form.
19    **A.  No.**
20    Q.  When did you develop the model to perform
21  contamination detection?
22    **A.  I believe it was in 2020.**
23        MR. GALICA:  Gets me every time.
24        MR. MELLEMA:  I know, I keep looking back
25  at it.

**132**

1        MR. GALICA:  It jiggles.
2        MR. MELLEMA:  It's like who's coming in
3  the door?  That's what I keep thinking.
4  BY MR. GALICA:
5    Q.  Sorry.  How long did it take to develop
6  that?
7    **A.  The model or the process of collecting the**
8  **data and deploying the model and everything?**
9    Q.  Let's start with the model.
10    **A.  The actual training of the model I think**
11  **probably took me about a month once I had the data.**
12    Q.  Okay.  And what did you use as a model?
13  TensorFlow?
14    **A.  Mm-hmm.**
15        MR. MELLEMA:  Objection; form.
16    Q.  How many images did you use to first train
17  it?
18    **A.  I -- I don't remember at all.**
19    Q.  Do you have an approximation?
20    **A.  You know, I -- I think it -- I think it**
21  **was probably just shy of a million.**
22        **Actually, I should -- I should revise what**
23  **I said.  I'm thinking -- when I say 2020, I'm**
24  **thinking of the classifier model that does bounding**
25  **boxes, but there was actually a model before that**

Case 3:23-cv-04804-WHA    Document 230-23    Filed 12/18/24    Page 11 of 13

ATTORNEYS' EYES ONLY
Transcript of Justin Armstrong, Corporate Designee & Individually    35 (137 to 140)
Conducted on August 22, 2024

137

1 that Compology can detect is confidential?
2    **A.  I believe that this set as a complete set**
3 **is confidential.**
4    Q.  Okay.
5    **A.  I'm sure at some point we've mentioned --**
6 **I mean, I remember in that conference that I**
7 **mentioned, for example, that plastic bags are**
8 **something that we look for.**
9    Q.  Okay.  So plastic bags, at least, you
10 would agree is public?
11    **A.  Yeah, I would say agree that --**
12    Q.  Okay.
13    **A.  -- the fact that that model looks for**
14 **plastic bags is public.**
15    Q.  What else in that list of seven items is
16 public?
17    **A.  I'm not sure.**
18    Q.  You see Lines 27 on Page 17 to Line 1 on
19 Page 18?
20    **A.  Yeah.**
21    Q.  Where it says that the seven kinds -- the
22 selection of these seven kinds of potential
23 contamination --
24    **A.  Mm-hmm.**
25    Q.  -- and the frequency in which they appear

138

1 is trade secret?
2    **A.  Mm-hmm.**
3    Q.  You'd at least agree that the
4 identification of plastic bags is not a trade
5 secret, right?
6    **A.  Yeah.  I agree that the fact that plastic**
7 **bags is an item of interest to us is publicized.**
8    Q.  Okay.  Page 18, Lines 2 through 7.  Does
9 that describe the method performed for content --
10 sorry, contamination detection?
11    **A.  Part of it.**
12    Q.  What's it missing?
13    **A.  I guess the other -- this is describing**
14 **the part where we get a bounding box and we use it.**
15 **I would say that the bounding boxes feed into other**
16 **parts of the system where they get bundled up into**
17 **fill cycles, and that's also an important part of**
18 **the content ID -- system, excuse me.  That's not**
19 **mentioned here.**
20    Q.  Why is that not mentioned here?
21    **A.  I'm guessing because it's not one of the**
22 **trade secrets at issue in the lawsuit.**
23    Q.  Okay.
24       Going to Section 4 on Page 18
25 titled "empty event detection." Do you see that?

139

1    **A.  Mm-hmm.**
2    Q.  See Lines 15 through 17 where it says, the
3 empty event detection processes, therefore, employs
4 sensor fusion to combine fullness changes,
5 accelerometers signatures, and Dumpster metadata;
6 e.g., deployment, front-load, or roll-off, to make
7 this determination.
8    **A.  Yep.**
9    Q.  What is sensor fusion?
10    **A.  Sensor fusion is describing a process of**
11 **taking measurements from more than one sensor and**
12 **combining them together.  In this case, the**
13 **accelerometer sensor with the camera sensor.**
14    Q.  And is empty event detection performed
15 using a deep learning model?
16    **A.  No.  It's a random forest.**
17    Q.  Is it public that Compology offers a
18 feature to perform empty event detection?
19    **A.  I think so, yeah.**
20    Q.  Okay.  Do you see on Page 19, Lines 7
21 through 12?
22    **A.  Yep.**
23    Q.  Is that an accurate description of how the
24 empty event detection feature is performed?
25       MR. MELLEMA:  Objection; vague -- I'm

140

1 sorry, form.
2    **A.  It's an accurate depiction of how the --**
3 **the -- so this is basically the list of features**
4 **that the model takes as input.**
5    Q.  Okay.  What does it do with those inputs?
6    **A.  It produces a prediction about whether or**
7 **not an empty event has occurred between two camera**
8 **posts.**
9    Q.  And how does it do that in software?
10    **A.  It uses a random forest.  So a random**
11 **forest is a combination of decision trees in an**
12 **ensemble, and essentially they vote on which -- on**
13 **what their answer is.**
14    **So in this case, each decision tree in the**
15 **random forest will say whether or not it thinks that**
16 **an empty event occurred, and then we take the sort**
17 **of quorum of what they said.**
18    Q.  And is it significant that you implement
19 this method using a random forest decision tree?
20    **A.  Yeah.  I'd say it's significant.  Not**
21 **necessary, but I think it was a good choice for**
22 **which algorithm to use.**
23    Q.  Had you considered other ones?
24    **A.  Yeah.  At various points, we've considered**
25 **using a deep learning approach to this where it**

Transcript of Justin Armstrong, Corporate Designee & Individually    36 (141 to 144)
Conducted on August 22, 2024

141

1  actually looks at the images. I briefly considered
2  using logistic regression but decided against it.
3      Q.  And you would consider this -- the way you
4  implement empty event detection to be machine
5  learning algorithm; is that fair to say?
6      A.  Yes.
7      Q.  Not deep learning, but still a machine
8  learning algorithm?
9      A.  Yes.
10     Q.  And is that different than just a
11 run-of-the-mill software algorithm?
12     A.  Well, I don't know what run-of-the-mill
13 would be, but --
14     Q.  What in your mind makes this a machine
15 learning algorithm?
16     A.  The fact that you use training data to
17 have the model make up its own rules, essentially,
18 rather than explicitly programming in rules.
19     Q.  Did a model for performing empty event
20 detection exist prior to you being employed by
21 Compology?
22     A.  It didn't.
23     Q.  When did you first develop this model?
24     A.  I think it was in the summer of 2017.
25     Q.  And how long did it take?

142

1      A.  Several months, I think, if I remember
2  correctly.
3      Q.  And you don't know a value that you could
4  assign to it?
5          MR. MELLEMA:  Objection to form.
6      A.  I don't know a value.
7      Q.  You see about midway down Page 19
8  Subheading 5, recommendation generation?
9      A.  Mm-hmm.
10     Q.  And is this feature implementing deep
11 machine learning?
12     A.  It's not.
13     Q.  How is it implemented?
14     A.  It's implemented using what I'd call
15 classical statistics.
16     Q.  And what does that mean?
17     A.  So the -- once we know the average
18 fullness increase per day, the part of the algorithm
19 that's decision-making, you could say, is
20 essentially trying to estimate the probability that
21 an overflow might occur on a bin given a
22 hypothetical-schedule type of schedule.
23     Q.  And what's the recommendation that you're
24 seeking to provide by performing the right sizing
25 algorithm for a customer?

143

1      A.  We're trying to provide the cheapest
2  pickup schedule that still has an acceptable
3  overflow risk. So a low enough overflow risk below
4  a threshold.
5      Q.  And you agree the right sizing feature
6  that you offer is publicly known, correct?
7      A.  That it exists?
8      Q.  Yeah.
9      A.  Yeah.
10     Q.  Okay. But you have a specific way of
11 implementing it, correct?
12     A.  Correct. And the -- that feature in
13 particular is laid out in quite a bit of detail in
14 the UI. We found that in order to get people to
15 trust it -- trust the recommendations, we really had
16 to show our work on that one. So it's -- it's
17 really spelled out in the U -- the application UI.
18     Q.  In the web portal?
19     A.  Yes.
20     Q.  Okay. So if somebody looked at that, they
21 would understand what your trade secret is?
22         MR. MELLEMA:  Objection to form.
23     A.  I don't know if anybody would, but if
24 somebody who was in this industry who was, you know,
25 well trained, I think, would.

144

1      Q.  Why do you say that?
2      A.  Why do I say that the person would have to
3  be well trained? I mean, if I were to show the web
4  portal to my 13-year-old daughter, I don't think it
5  would mean much to her, but if I show it to somebody
6  who lives and breathes the waste industry, I think
7  they understand the problems that -- that it's
8  trying to solve.
9      Q.  And what does the web portal show?
10     A.  It shows for a given bin what the fullness
11 increase per day is for each day of the week. It
12 shows sort of the bounds of how -- how much
13 variability we've observed in the fullness increase
14 per day. And then it shows what our recommendation
15 for the new pickup schedule is, how many -- how much
16 money we expect that to save. I don't think we show
17 the overflow probability.
18     Q.  And is the overflow probability an
19 important aspect of your specific implementation?
20     A.  You have to have some kind of threshold in
21 order for it to work, because otherwise the
22 algorithm would just say how about picking it up
23 every day? That's very safe. Right? And the idea
24 is to minimize the cost of the pickup schedule.
25     Q.  Okay. But you don't show that overflow

213

1       ACKNOWLEDGMENT OF DEPONENT
2
3       I, JUSTIN ARMSTRONG, do hereby acknowledge
4   that I have read and examined the foregoing
5   testimony, and the same is a true, correct and
6   complete transcription of the testimony given by me
7   and any corrections appear on the attached errata
8   sheet signed by me.
9
10
11
12  _____  _____
13  (DATE)          (SIGNATURE)
14
15
16
17
18
19
20
21
22
23
24
25

214

1       REPORTER'S CERTIFICATE
2
3       I, BROOKLYN E. SCHWEITZER, CSR NO. 14612,
4   RPR, CRR, in and for the State of California, do
5   hereby certify:
6       That prior to being examined, the witness
7   named in the foregoing deposition was by me duly
8   sworn to testify the truth, the whole truth and
9   nothing but the truth and that the witness reserved
10  the right of signature;
11      That said deposition was taken down by me
12  in shorthand at the time and place therein named,
13  and thereafter reduced to typewriting under my
14  direction, and the same is a true, correct and
15  complete transcript of said proceedings.
16      I further certify that I am not interested
17  in the event of the action.
18      Witness my hand this 29th day of August,
19  2024.
20
21
22  _____
23  Certified Shorthand
24  Reporter for the
25  State of California